**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**

| | | |
|---|---|---|
| RESOLUTE FOREST PRODUCTS, INC., RESOLUTE FP US, INC., RESOLUTE FP AUGUSTA, LLC, FIBREK GENERAL PARTNERSHIP, FIBREK U.S., INC., FIBREK INTERNATIONAL INC., and RESOLUTE FP CANADA, INC. | : : : : : : | |
| | : | CIVIL ACTION FILE NO. _____ |
| Plaintiffs, | : : | |
| - against - | : : : | **COMPLAINT** |
| GREENPEACE INTERNATIONAL (aka "GREENPEACE STICHTING COUNCIL"), GREENPEACE, INC., GREENPEACE FUND, INC., FORESTETHICS, DANIEL BRINDIS, AMY MOAS, , MATTHEW DAGGETT, ROLF SKAR, TODD PAGLIA, and JOHN AND JANE DOES 1-20, | : : : : : : : | **JURY TRIAL DEMANDED** |
| Defendants. | : : | |

Plaintiffs Resolute Forest Products, Inc., Resolute FP US, Inc., Resolute FP Augusta, LLC, Fibrek General Partnership, Fibrek U.S., Inc., Fibrek International, Inc., and Resolute FP Canada, Inc., (collectively, "Resolute" or "Plaintiffs"), as and for their complaint against Greenpeace International (aka "Greenpeace Stichting Council"), Greenpeace, Inc. ("GP-Inc."), Greenpeace Fund, Inc. ("GP-Fund"), Daniel Brindis, Amy Moas, Matthew Daggett, Rolf Skar (collectively, "Greenpeace Defendants"), ForestEthics, Todd Paglia (together, "ForestEthics") and John and Jane Does 1-20, allege as follows:

**PRELIMINARY STATEMENT**

1.      "Greenpeace" is a global fraud.  For years, this international network of environmental groups collectively calling themselves "Greenpeace" has fraudulently induced people throughout the United States and the world to donate millions of dollars based on materially false and misleading claims about its purported environmental purpose and its

"campaigns" against targeted companies.  Maximizing donations, not saving the environment, is Greenpeace's true objective.  Consequently, its campaigns are consistently based on sensational misinformation untethered to facts or science, but crafted instead to induce strong emotions and, thereby, donations.  Moreover, virtually all of Greenpeace's fraudulently induced donations are used to perpetuate the corrupted entity itself and the salaries of its leaders and employees.

2.       Because soliciting money, not saving the environment, is Greenpeace's primary objective, it has demonstrated time and time again that it will do anything to drive donations, including fabricating evidence.  For example, Greenpeace has staged phony photo-ops of seal and other animal slaughters, and fraudulently pawned off common trees felled by natural causes as several hundred year old ancient trees illegally forested by those it falsely vilifies.  Indeed, Greenpeace's most senior leaders have been forced to admit that their goal is not to present accurate facts, but to "emotionalize" issues and thereby "pressure" (i.e. manipulate) their audiences.

3.       Greenpeace's most important audience is its prospective donors.  To "emotionalize" and manipulate this group, Greenpeace uses what it calls internally "ALARMIST ARMAGEDDONIST FACTOIDS" to induce donations and other support it would not otherwise receive.  Indeed, virtually every Greenpeace "ALARMIST AND ARMAGEDDONIST" statement, report, web, and blog post is accompanied with a heavy-handed plea in various forms for the reader to "DONATE NOW."  The truth is not necessary to Greenpeace; the money is.

4.       Beyond direct donations, Greenpeace's lies generate support for boycotts and other adverse actions against its targets and those who dare do business with them.  Greenpeace uses these boycotts and other attacks, and the threat of them, to extort public concessions,

endorsements, and other benefits from its targets, which it then promotes to potential donors as successes or other reasons to provide even further financial support.

5.     For decades, Greenpeace has executed its fraudulent campaigns against numerous companies with virtual impunity, and its tactics have become increasingly more aggressive as a result.  Since no later than 2012, Resolute has been the target of a self-described "radical" Greenpeace campaign falsely designating Resolute as the Canadian Boreal "Forest Destroyer." The Canadian Boreal forest Greenpeace claims Resolute is "destroying" is a vast evergreen forest and ecological system covering thirty-one percent of Canada (and continuing through Eurasia).

6.     In its own words, Greenpeace's "Resolute: Forest Destroyer" campaign targets "one particular company, Resolute Forest Products . . . [that is] leading the charge" in "destroying endangered forests," "operating and sourcing wood" "in violation of law," and causing the "destruction of endangered species" and "critical caribou habitat" that Greenpeace predicts will lead to a "Caribou Herd Death Spiral," "extirpation" and "extinction."  The "Resolute: Forest Destroyer" campaign also accuses Resolute of  "abandoning," "impoverishing," and exploiting the Boreal's indigenous communities, including "ignoring the rights of First Nations Communities," and "logging on Indigenous People's land without consent."  And this campaign shamelessly exploits the most followed environmental issue of the day, climate change, by also misrepresenting Resolute's harvesting as a major climate change risk:

> The Boreal Forest . . . representing the largest carbon storehouse on the planet, [] plays an essential role in curbing climate change . . . But the mighty Boreal Forest is under serious threat:  logging company Resolute Forest Products is destroying vast swathes of this immense ancient forest, logging without the consent of impacted Indigenous Communities, and putting threatened woodland caribou at increased risk.

7.       Greenpeace's "Resolute: Forest Destroyer" campaign is malicious, false, misleading, and without any reasonable factual basis in numerous respects.  First, Resolute is not a "destroyer" of the Boreal forest in any possible sense of the word, and cannot in any way be accurately characterized as such.  Canada retains about ninety percent of its original forest cover, with agriculture and urbanization, not forestry and certainly not Resolute, responsible for the ten percent lost over several hundred years.  Indeed, less than .5% (.005) of the vast Canadian Boreal forest is harvested annually, only a minority of which is harvested by Resolute, while at least five times more is lost annually due to natural causes like fires, insects, disease and blowdowns.  Moreover, where Resolute does harvest, every harvested area is promptly regenerated either naturally or by seeding or planting.  On average, from 2010-2012, Resolute planted over 60 million trees per year.  By 2012, Resolute **planted its billionth tree** in Ontario alone and has since continued to plant many millions more.

8.       Because of these efforts and those of the other Canadian forestry companies, there is virtually no permanent loss of Boreal forest acreage annually, and the nominal .02% (.002) that is lost is lost not to forestry, but to industrial and urban development, transportation, recreation, and hydroelectricity.  As a result of its record, Resolute has received numerous awards and recognitions for its responsible and sustainable forestry.  The claim by Greenpeace -- which has never planted a single tree in the Boreal forest -- that Resolute -- which has planted over a billion trees in the Boreal forest and contributed to **no** permanent loss of forest acreage -- is a "Forest Destroyer" is patently false and unfounded.  It is a malicious lie.

9.       Second, it is equally false and unfounded to accuse a company that has not caused any loss of Boreal forest acreage of materially impairing the Boreal forest's ability to mitigate climate change.  Even worse, this accusation ignores the very science Greenpeace purports to

4

rely on, which unequivocally reports that (a) the amount of carbon stored in North American forests has increased by millions of metric tons per year; (b) Canadian forestry caused less than .06% of global greenhouse gas emissions; and, most important, (c) harvesting in the Boreal and other large forests provides the most significant means of **mitigating climate change**, as young forest growth absorbs dramatically more greenhouse gases than older growth, which ultimately emits instead of absorbs such gases.  As the United Nations Intergovernmental Panel on Climate Change -- often cited by Greenpeace elsewhere -- has explained:

> In the long term, a sustainable forest management strategy aimed at maintaining or increasing forest carbon stocks, **while producing an annual sustainable yield of timber, fibre, or energy from the forest will generate the largest sustained mitigation benefit**. (emphasis added)

Greenpeace's climate change attack on Resolute is another blatant and malicious lie.

10.     Third, Greenpeace's repeated claim that Resolute's harvesting is putting threatened woodland caribou herds at risk is also false and misleading because, while associating Resolute with what it calls "dramatic" habitat and population declines, Greenpeace fails to mention that Resolute is actually not the actor responsible for either.  As with donors thinking they were fighting forest loss or climate change, donors to this campaign who thought they were saving caribou have been duped.

11.     Indeed, Greenpeace's campaign repeatedly fails to disclose that (a) in 2010 Resolute and other forestry companies agreed with Greenpeace to, in Greenpeace's own words, a "moratorium . . . **protecting virtually all of the habitat of the threatened woodland caribou**," (emphasis added) and Resolute's operations since that time have remained outside "virtually all of th[at] habitat"; (b) the specific caribou populations whose Quebec habitats Greenpeace claims Resolute impacts constitute a very small percentage of the overall caribou population in Quebec, more than 98% of which remains stable and self-sustaining; (c) even for these few caribou

populations Greenpeace singles out, Resolute only operates in very limited portions of their alleged habitats; (d) there is no evidence any Resolute operations have had an actual adverse impact on these caribou; (e) the scientific research Greenpeace purports to rely on against Resolute actually makes clear that, by several orders of magnitude, the real loss of, and risk to, caribou habitats and populations is in western Canada, especially Alberta, far away from Resolute's operations; and (e) Resolute's harvesting is conducted pursuant to forest management plans and certification standards that require caribou habitat protection.

12.    Fourth, an equally insidious lie about the purported "Resolute: Forest Destroyer" is that it has "abandoned," exploited, and "impoverished" the Boreal's indigenous peoples and operated without regard to their rights.  Again, Greenpeace, which does not generate large scale employment or economic opportunities for these indigenous peoples, exploits them with these false attacks in their name against a company that has, in fact, created and sustained numerous jobs, worked to protect the environment, and shared economic opportunities with those indigenous peoples despite difficult economic times and material Greenpeace interference. Sadly, where Resolute has been forced to close certain businesses, Greenpeace's "Resolute: Forest Destroyer" campaign has often been a material direct or indirect contributor to those closures.  Indeed, Greenpeace's obvious commitment to using the "Resolute: Forest Destroyer" campaign to generate donations is a major risk and impediment to capital investment in the region and a direct harm to the indigenous peoples who would benefit from such investment and whom Greenpeace dishonestly claims to be protecting.

13.    Nevertheless, despite this risk and impediment, Resolute still has not, as Greenpeace misrepresents, "abandoned" the local communities, but instead continued to operate, honor its pension and other financial obligations (as opposed to many other forest products

companies that have failed to do so) and, where closures were unavoidable, provided support and assistance to those impacted.  This is just one of the reasons Resolute (unlike Greenpeace) enjoys broad support from the local communities in the Boreal regions in which it operates and has received numerous awards and recognitions attesting to this truth.

14.     As with its other campaigns, Greenpeace has repeatedly manufactured facts and evidence to support the "Resolute: Forest Destroyer" campaign's lies.  For example, it has published staged photos and video falsely purporting to show Resolute logging in prohibited areas and others purporting to show forest areas impacted by Resolute harvesting when the areas depicted were actually impacted by fire or other natural causes.

15.     And, as with other campaigns, Greenpeace and others working with it have aggressively targeted Resolute's customers with extortive threats and other illegal conduct.  To identify those customers, Greenpeace employees and agents have impersonated Resolute employees, its customers, and others to illegally misappropriate proprietary customer and supply chain information.  Once identified, Greenpeace and its co-conspirators have issued extortive demands to these customers to sever their ties with Resolute and publicly endorse the "Resolute: Forest Destroyer" campaign or face crippling boycotts and other threatening behavior accusing them of also being "Forest Destroyers."

16.     For example, in 2014, the "Resolute: Forest Destroyer" campaign targeted Resolute customer Best Buy on the eve of its busiest online shopping season.  When Best Buy ignored Greenpeace's demands, on November 26, 2014, the day before Thanksgiving, Greenpeace launched a very public and well-orchestrated boycott of Best Buy.  A Twitter handle Reaper Tango Down -- associated with the cyber-hacktivist group Anonymous -- immediately retweeted Greenpeace's boycott announcements, called Resolute a "Massive Tree Killer," and

announced it had attacked and taken down Resolute's website, and later the next day the Forest

Products Association of Canada ("FPAC") website with "Denial of Service" cyber-attacks.  Best

Buy's website began experiencing problems at the same time and would completely crash on

November 28th, the "Black Friday" morning after Thanksgiving which is its busiest online

shopping day of the year.  Remarkably coincidental, or remarkably telling, one of Greenpeace's

leaders of the Best Buy attack presciently announced the Best Buy web crash via Twitter

virtually the moment it happened and before anyone else.  A few days later, Greenpeace induced

supporters and co-conspirators to again attack Best Buy's website, which led to over 50,000

emails and false product reviews flooding the site.  The aggressive attack was effective.  Just

days later, on December 8, 2014, Best Buy announced it would be shifting its sourcing away

from Resolute and towards suppliers who acquiesced to Greenpeace's threatening dictates.

17.     Greenpeace's "Resolute: Forest Destroyer" campaign has targeted dozens of other

Resolute customers around the world in a similar fashion, including several in Georgia, leading

to lost revenues in an amount Greenpeace itself has publicly calculated to be not less than C$100

million to date and counting.  In addition to these lost revenues, the "Resolute: Forest Destroyer"

campaign has severely damaged Resolute's reputation in the marketplace and business

community, with local and government officials, and with the peoples occupying the Boreal

forest.  It has also caused Resolute to devote substantial fees and expenses to respond to, address,

and mitigate the impacts of the "Resolute: Forest Destroyer" disinformation campaign.  In total,

these damages are far in excess of the C$100 million Greenpeace estimates.

18.     The "Resolute: Forest Destroyer" campaign has fraudulently induced many

millions of dollars in donations from regular working class people, who have been duped about

Greenpeace and Resolute, and, most important, duped into believing their donations were

preventing forest loss, mitigating climate change, saving caribou, and helping indigenous peoples.  The "Resolute: Forest Destroyer" campaign has also defrauded the United States Treasury by improperly shielding Greenpeace from paying tax on these "donations" even though Greenpeace's demonstrably untrue business model and false campaigns, including this campaign, are misrepresented in their tax filings and do not qualify for tax exempt treatment because they are designed to secure money to perpetuate the organization and not to undertake legitimate steps to mitigate real environmental issues or serve the public interest.  Indeed, it was for this very reason that Greenpeace had its tax exempt status stripped in Canada over 20 years ago and recently has been accused by government officials in India of violating tax laws, engaging in fraudulent accounting, and laundering money.

19.      Although Greenpeace's "Resolute: Forest Destroyer" campaign portrays Resolute as an "outlier" engaged in rogue activities, it is Greenpeace that is, by far, the outlier and rogue environmental group engaged in illegal and unethical behavior to make money for itself and its leaders.

## JURISDICTION AND VENUE

20.      This action arises under The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961-1968, and state statutes and common law.

21.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over the pendent state-law claims under 28 U.S.C. § 1367.

22.      This Court has personal jurisdiction over Defendants pursuant to, *inter alia*, 18 U.S.C. § 1965 because each Defendant resides in the United States, transacts business on a systematic and continuous basis here, and/or has engaged in tortious misconduct here in violation of U.S. law, and under the Georgia long-arm statute, O.C.G.A. 9-10-91 (2010), because each

Defendant, directly and through agents, transacts business within the state; committed tortious acts and omissions within the state; committed tortious injury in the state caused by an act or omission outside the state; regularly does business, engages in persistent course of conduct, and derives substantial revenue from services rendered in the state; owns, uses and possesses real property within the state; or is registered to do business in and has consented to personal jurisdiction in this state.

23.     Venue for this action is proper in pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this forum and Defendants are subject to personal jurisdiction in this judicial district.  Numerous Defendants regularly conduct business in the State of Georgia and, with respect to Resolute, utilized numerous Georgia contacts, including specifically targeting critical Resolute customers located in Georgia, and traveling to the State to perform significant campaign furthering acts.  In addition, as set forth herein, Defendants' wrongful conduct and related activities caused substantial effects in this jurisdiction and in this district based on their tortious conduct in and outside the State.

## **THE PARTIES**

24.     Plaintiff Resolute Forest Products, Inc. ("Resolute Forest Products") is a corporation incorporated pursuant to the laws of Delaware and headquartered in Montréal, Quebec, Canada.  Resolute is the parent company of the other Plaintiff entities herein.  Together with the subsidiaries described herein, Resolute is engaged in the forest products industry, planting and harvesting trees, milling wood and wood fiber to create a diverse range of products, including market pulp, wood products, newsprint, tissue, and specialty papers as well as power generation in Canada and the United States.  The company owns or operates over forty pulp,

paper, tissue and wood products facilities in the United States, Canada and South Korea, and operates mills in both Canada and the United States, including in West Virginia, Georgia, Tennessee, Alabama, Mississippi, Florida, Washington State, South Carolina, and Michigan. Resolute employs approximately 8,000 people worldwide, and, in recent years, has annual sales in the range of $3 billion.  Resolute is the largest producer of newsprint in the world and in North America, the biggest volume producer of wood products east of the Rockies, the third largest market pulp producer in North America, and the largest in North America producing uncoated mechanical papers.

25.     Plaintiff Resolute FP US, Inc., is a corporation incorporated pursuant to the laws of Delaware, and is a wholly owned subsidiary of Resolute Forest Products.

26.     Plaintiff Resolute FP Augusta, LLC is a limited liability company organized under the laws of Delaware with its headquarters and principal place of business in Augusta, Georgia.

27.     Plaintiff Fibrek General Partnership, acting through its managing partner Fibrek Holding Inc., is a general partnership formed pursuant to the laws of the Province of Quebec and is a wholly owned subsidiary of Resolute Forest Products.

28.     Plaintiff Fibrek U.S., Inc. is a corporation incorporated pursuant to Delaware law and is a wholly owned subsidiary of Resolute Forest Products.

29.     Plaintiff Fibrek International Inc. is a corporation incorporated pursuant to the laws of Canada and is a wholly owned subsidiary of Resolute Forest Products.

30.     Plaintiff Resolute FP Canada, Inc. is a corporation incorporated pursuant to the laws of Canada and is a wholly owned subsidiary of Resolute Forest Products.

31.     Defendant Greenpeace International ("Greenpeace International" or "GPI"), aka Stichting Greenpeace Council, is a putative Dutch not-for-profit foundation based in Amsterdam, the Netherlands.

32.     Defendant Greenpeace, Inc. ("GP-Inc.") is a putative nonprofit corporation organized pursuant to the laws of California and headquartered in Washington D.C., and is licensed to do business and raises funds in the form of donations in many states throughout the United States, including Georgia.  It is registered for tax-exempt status as a Section 501(c)(4) "social welfare" organization with the Internal Revenue Service, and describes its social welfare mission as "promot[ing] the protection and preservation of the environment."

33.     Defendant Greenpeace Fund, Inc. ("GP-Fund") is also incorporated under the laws of California and maintains its headquarters in Washington, D.C.  GP-Fund is a registered tax-exempt 501(c)(3) "charitable organization," and is licensed to do business and raises funds in the form of donations in many states throughout the United States, including Georgina.  GP-Fund donates a significant amount of funds each year to GP-Inc., some of which is ear-marked for GP-Inc.'s forest campaign, as is intimately involved in the planning of that campaign.

34.     ForestEthics is a 501(c)(3) corporation organized under the laws of California with headquarters in Bellingham, Washington State.  ForestEthics has recently rebranded itself as "STAND."

35.      Defendant Todd Paglia is the Executive Director of ForestEthics residing in Washington State.

36.     Defendant Daniel Brindis is a Senior Forests Campaigner employed at all relevant times by GP-Inc. and resides in San Francisco, California.

37.     Defendant Amy Moas is a Senior Forests Campaigner employed at all relevant times by GP-Inc. and resides in Las Vegas, Nevada.

38.     Defendant Matthew Daggett is a Global Campaign Leader employed at all relevant times by Greenpeace International and resides in Saint Petersburg, Florida.

39.     Defendant Rolf Skar is a Forest Campaign Director employed at all relevant times by GP-Inc. and resides in San Francisco, California.

40.     John and Jane Does 1 through 20, whose identities are presently unknown to Plaintiffs, include other participants in Greenpeace's fraudulent campaigns, including its "Resolute: Forest Destroyer" campaign as well as co-conspirators, and/or aiders and abettors of the named Defendants in the scheme, enterprise, and misconduct alleged in this complaint, including, among others, cyber-hacktivists, environmental activists, and certain foundations directing funds to the Defendants.

## STATEMENT OF FACTS

### A.  **The Criminal Enterprise**

41.     The campaign against Resolute alleged herein was conducted by an illegal enterprise (the "Greenpeace Enterprise") consisting of various legally distinct but associated-in-fact environmental groups, individuals, and others who associated together for the purpose of carrying out the pattern of racketeering activity alleged herein, including, but not limited to, using the mails and wires to defraud donors and steal proprietary information, defrauding the United States Treasury, making bribes and extortive threats, transporting and transmitting misappropriated funds and property through interstate commerce, and conspiracies to do the same. The enterprise associated for the purpose of carrying out these racketeering acts was comprised of, among others, the following members:

(a)     **Greenpeace International** - Defendant Greenpeace International is a putative

Dutch charitable foundation ("Stiching") formed under the laws of the Netherlands.  As a Dutch

putative charitable foundation, Greenpeace International has no members or equity capital and is

run entirely by its appointed board.  Greenpeace International serves as the international

coordinating body for a network of over twenty-six legally distinct national and regional

associations under the common Greenpeace name, including the Defendants GP- Inc. and GP-

Fund in the United States, but which have no formal corporate structure under which anyone is a

parent, subsidiary or affiliate of the other.  Rather these are distinct corporate or other legal

entities from around the globe associated-in-fact by way of their common use of the Greenpeace

name and their long-term and regular long-standing interrelationships and associations, shared

objectives, and concerted action.  Greenpeace International, among other things, holds the

Greenpeace trademark and each of these organizations pays Greenpeace International for the

right to use that trademark.  These organizations also provide grants, loans, and other financial

remuneration to Greenpeace International from time to time and for specific purposes, and

Greenpeace International also provides grants and disbursements back to select organizations

from time to time to support its international campaigns.  As such, Greenpeace International is

directly involved in the creation, management, control, and implementation of the associations'

coordinated campaigns and associated fundraising.

(b)     **Greenpeace Fund, Inc.** – Defendant GP-Fund is a 501(c)(3) not-for profit

foundation which falsely purports to be exclusively operated for a charitable purpose.  It has no

voting members and is run exclusively by its board of directors.  GP-Fund collects 501(3)(c) tax

exempt donations throughout the United States, including in Georgia, and distributes those

monies to Greenpeace International in the Netherlands and GP-Inc. in the United States.  In

2014, GP-Fund collected approximately $14.8 million and distributed approximately $6 million of that to Greenpeace International and $5 million to GP-Inc. in the United States.  The rest of the revenue was consumed by salaries and fundraising expenses.   Although GP-Fund and GP-Inc. are identified by the Greenpeace association as Greenpeace USA, they are separate and distinct legal entities with no corporate relationship to each other in the form of parent, subsidiary or affiliate.  Indeed, their separate tax-status so requires.  Like Greenpeace International does throughout the Greenpeace associations, GP-Fund is intimately involved in planning, approval, direction, and monitoring of the GP-Inc. campaigns and activities that it funds and from which it fundraises.

(c)      **Greenpeace, Inc. -** Defendant GP-Inc. is a nonprofit corporation organized pursuant to the laws of California and headquartered in Washington D.C., and is licensed to do business and raises donations in many states throughout the United States, including Georgia.  It is registered for tax-exempt status as a Section 501(c)(4) "social welfare" organization with the Internal Revenue Service, and falsely purports to be operated "exclusively to promote social welfare" and describes its social welfare mission as "promot[ing] the protection and preservation of the environment."  Funded by direct donations as well as grants and loans from GP-Fund, GP-Inc. receives substantial direction, control, and monitoring from Greenpeace International and GP-Fund.  It also coordinates closely with other entities in the Greenpeace association, including particularly Greenpeace Canada in executing the campaign directed at Resolute set forth below.

(d)      **Greenpeace Canada** – Greenpeace Canada is a federally incorporated company with its head offices in Toronto, Ontario and is the Canadian presence of the Greenpeace associations.  It works closely with Greenpeace International and GP-Inc. in executing the campaign directed at Resolute set forth below.

(e)    **Matthew Daggett** – Defendant Matthew Daggett is the Greenpeace International Global Campaign Leader for Forests with responsibility for Greenpeace International's coordination and support for the campaign alleged herein.  Defendant Daggett coordinates closely the activities of the various organizations and individuals engaged on the campaign directed at Resolute as alleged herein.

(f)    **Daniel Brindis** – Defendant Daniel Brindis is a Senior Forest Campaigner for GP-Inc. with responsibility for GP-Inc.'s participation in the campaign directed at Resolute alleged herein.

(g)    **Amy Moas** – Defendant Amy Moas is a Senior Forest Campaigner for GP-Inc. with responsibility for GP-Inc.'s participation in the campaign directed at Resolute alleged herein.

(h)    **Rolf Skar** – Defendant Rolf Skar is a Forest Campaigner for GP-Inc. with responsibility for GP-Inc.'s participation in the campaign against Resolute alleged herein.

(i)    **Richard Brooks** – Richard Brooks is a Forest Campaign Coordinator for Greenpeace Canada with responsibility for operating and managing Greenpeace Canada's coordinated role and participation in the Greenpeace Enterprise campaign directed at Resolute alleged herein.

(j)    **Shane Moffatt** – Shane Moffatt is a Forest Campaigner for Greenpeace Canada with responsibility for operating and managing Greenpeace Canada's coordinated role and participation in the Greenpeace Enterprise campaign directed at Resolute alleged herein.

(k)    **Nicolas Mainville** – Nicolas Mainville is a Forest Campaigner for Greenpeace Canada with responsibility for operating and managing Greenpeace Canada's coordinated role and participation in the Greenpeace Enterprise's campaign directed at Resolute alleged herein.

(l)  **Annie Leonard** – Annie Leonard is the Executive Director of GP-Fund and GP-Inc. with responsibility for operating and managing the coordinated role and participation of these two Defendants in the Greenpeace Enterprise's campaign directed at Resolute alleged herein.

(m)  **ForestEthics** – Defendant ForestEthics is a 501(c)(3) corporation headquartered in Washington State, which is now called STAND.  A coalition of three partner organizations, US-based ForestEthics, Canadian-based ForestEthics Advocacy, and ForestEthics Solutions (collectively, "ForestEthics"), ForestEthics has strong ties to Greenpeace, upon which its organization is modeled.  Indeed, ForestEthics founder, Tzeporah Berman, was the former co-director of Greenpeace International's Global Climate and Energy Program, and Karen Mahon, the director of ForestEthics Advocacy, was formerly the director of Greenpeace Canada.  The two organizations have been described as "close all[ies]" and have a long history of collaborating on campaigns together, including the one directed at Resolute described herein.  Like Greenpeace, ForestEthics is known for its coercive and manipulative "campaigns" which have targeted, among others, Victoria's Secret, 3M and Staples.  Following Greenpeace's blueprint, ForestEthics has aggressively disseminated sensational lies untethered to facts, to threaten, malign, and isolate large corporate targets and extort public concessions, endorsements, and other benefits, which it then touts to potential donors as successes to extort additional financial support.  As set forth herein, beginning in 2012, Greenpeace and ForestEthics identified Resolute as a target, and embarked on a years-long "Resolute: Forest Destroyer" campaign.  Throughout this campaign, ForestEthics participated directly and indirectly in the criminal enterprise, by among other things, echoing the falsehoods that Greenpeace was disseminating in reports, direct

communications, and on Twitter; threatening Resolute's executives, its customers, and stakeholders; and engaging in other wrongful conduct.

(n)     **Todd Paglia** - Defendant Todd Paglia is the Executive Director of ForestEthics residing in Washington State and had responsibility for operating and managing ForestEthics' coordinated role and participation in the Greenpeace Enterprise's campaign directed at Resolute alleged herein.

(o)     **Amanda Carr** – Amanda Carr is a Campaign Director for the Environmental non-government organization ("ENGO"), Canopy.  Ms. Carr has operational and managerial control over Canopy's coordinated role and participation in the Greenpeace Enterprise's campaign directed at Resolute alleged herein, works in concert with the Defendants and other enterprise members to, among other things, undermine Resolute's participation in the Canadian Boreal Forest Agreement ("CBFA") and interfere with Resolute's relationships with other signatories to and participants in the CBFA.

(p)     **John and Jane Does** - On a frequent and long-term basis, the Defendants and enterprise members work with third-parties currently unknown to Plaintiffs to illegally misappropriate proprietary and other confidential information from Resolute and its customers as well as targets of other campaigns by impersonating other people and customers and otherwise misrepresenting themselves.  The Defendants and enterprise members have also associated with persons unknown to Plaintiffs at this time to engage in illegal cyber-attacks and intrusions on Plaintiffs and their customers.  This is part of a broader enterprise practice of engaging in various illegal activities to misappropriate trade and other secrets from, or interfere with, targets of the Greenpeace Enterprise's campaigns and the customers of those targets.

42.     Although these persons and entities are distinct and independent of each other, and free and incentivized to act in and advance their own interests independently, they have associated in fact with a common purpose, identifiable relationships, and sufficient longevity to pursue their common purpose.  Specifically, beginning from no later than 2012 through to the present they have been engaged in a mutually understood, agreed upon, and coordinated campaign of racketeering activity directed at Resolute.

43.     The common purpose of the Greenpeace Enterprise was to target Resolute with a disinformation campaign that could be used to fraudulently induce millions of dollars in donations from individual donors and foundations that could be used to fund the salaries of the enterprise members and its leaders, perpetuate more fraudulent fundraising, and expand the campaign to direct attacks on Resolute customers that would provide even more powerful fundraising opportunities.

44.     The relationship in and among the enterprise members included Greenpeace International providing the right to use the Greenpeace name to enterprise members GP-Inc., GP-Fund, and Greenpeace Canada, funding these entities and underwriting this disinformation campaign, and providing an internet platform and website to support, facilitate, and promote the campaign.  In addition, Greenpeace International actively participated in the campaign by publishing and republishing the campaign's disinformation on its own webpages, in direct communications in the market place, and by being directly involved in the operation, control and planning of that campaign through its Defendant and enterprise member Matthew Daggett and his coordination with enterprise members Skar, Moas, Brooks, Brindis, Moffatt, Mainville, and Leonard, all of whom were involved in the operation and control of the campaign,.  In exchange for this participation, Greenpeace International used the disinformation campaign to directly and

fraudulently induce donations and to secure portions of the monies that GP-Fund, GP-Inc., and Greenpeace Canada fraudulently induced from others.

45.     GP-Fund likewise provided funding to GP-Inc. to underwrite the disinformation campaign, published and republished the disinformation on its own webpages and, along with Greenpeace International, was actively involved in the operation, control and planning of the campaign with GP-Inc., Greenpeace Canada, and other enterprise members.  GP-Fund exercised its operation and control through enterprise member Annie Leonard, who is its executive director, and who directed and controlled the activities of GP-Inc. and enterprise members Daniel Brindis, Amy Moas, and Rolf Skar, who operated and controlled GP-Inc.'s enterprise related activities.  GP-Fund benefited from this participation by fraudulently inducing donations to itself directly that it used to sustain its continued operations, pay the salary of Annie Leonard and others, and fund even more fundraising by itself and GP-Inc.

46.     GP-Inc.'s relationship with the Greenpeace Enterprise included receiving funding and substantial support from both Greenpeace International and GP-Fund, including the use of the Greenpeace name and the funding necessary to pay its substantial operating expenses and salaries and fund its execution of the disinformation campaign.  GP-Inc. and enterprise members Brindis, Moas, and Skar aggressively prosecuted the disinformation campaign to fraudulently induce donations that then were used to fund GP-Inc.'s operations and enrich GP-Fund and Greenpeace International.  These enterprise members also coordinated closely, and mutually operated and controlled the disinformation campaign and broader attacks with Greenpeace Canada and enterprise members Richard Brooks, Shane Moffat, and Nicolas Mainville, including assuming substantial responsibility for the attacks on Resolute customers funded by the disinformation campaign.  GPI-Inc. undertook these activities in consultation and coordination

with Greenpeace International and GP-Fund as well as enterprise members Greenpeace Canada, ForestEthics, and Canopy.  GP-Inc. also worked closely with third-party enterprise members responsible for the theft of proprietary customer and supply trade secrets from Resolute and its customers.

47.    Greenpeace Canada received funding from Greenpeace International and GP-Fund and worked closely with GP-Inc. in executing the disinformation campaign.  Enterprise members Brooks, Moffatt, and Mainville conducted the operation and control of these consultations and the implementation of the disinformation campaign.  Greenpeace Canada used the disinformation campaign to fraudulently induce donations and procure more financial support from Greenpeace International and GP-Fund.

48.    ForestEthics and Canopy worked closely with GP-Inc. and Greenpeace Canada in both the dissemination of disinformation and the subsequent aggressive attacks on Resolute's customers and did so to participate in the opportunity to induce donations based on the fraudulent disinformation that would perpetuate these organizations and pay the salaries of its owners and leaders, including ForestEthics leader Todd Paglia and Canopy leader Amanda Carr.

49.    For approximately four years this group and the others comprising the Greenpeace Enterprise have been pursuing the Greenpeace Enterprise's purposes and they continue to do so today.

50.    The Greenpeace Enterprise's campaign against Resolute has entailed significant contacts with and effects in the State of Georgia where Resolute operates a newsprint mill and where numerous Resolute customers are located.  As set forth in detail below (see infra § C), in furtherance of the criminal scheme against Resolute, the Greenpeace Enterprise disseminated false and misleading statements about Resolute to key Resolute customers located in Georgia via

email and telephone communications.  The Greenpeace Enterprise has also employed on-the-ground tactics in Georgia aimed at harming Resolute's relationships with key constituents, including traveling to Augusta, Georgia in May 2015 to disseminate the Greenpeace Enterprise's lies to shareholders, customers, journalists, and others at the Resolute annual meeting via direct communications and broadcasts outside the event.  These wrongful acts have caused Resolute to suffer substantial damages in Georgia, including lost customers, lost revenues, cutbacks and layoffs at Resolute's Augusta facility.

### B.  Greenpeace's Fraudulent Scheme

#### 1.  Greenpeace's Pattern And Practice Of Fraud, Extortion, And Other Illegality

51.     For more than 20 years, the association of distinct regional entities using the Greenpeace name ("Greenpeace") have strayed further and further away from legitimate environmental work to schemes for generating monies necessary to perpetuate the salaries of their officers and employees and to continue fundraising.  If Greenpeace were genuinely focused on the environment, it would be focused on facts, science, and real environmental issues.  But Greenpeace has consistently focused instead on sensational headlines that are divorced from real issues and the truth, and crafted instead at maximizing donations.  Its approach misleads people about, and misdirects their monies and assistance from legitimate environmental groups and efforts to address real environmental issues.

52.     Greenpeace's preoccupation with the sensational rather than the accurate has been demonstrated time and time again.  For example, in 2006, Greenpeace mistakenly released an unfinished draft email about nuclear power awaiting only the insertion of what the drafter described as an "ALARMIST AND ARMAGEDDONIST FACTOID:"  "In the twenty years

since the Chernobyl tragedy, the world's worst nuclear accident, there have been nearly [FILL IN ALARMIST AND ARMAGEDDONIST FACTOID HERE]."

53.     Likewise, in 2009, when a BBC interviewer called its recent claims about arctic summer ice disappearing by 2030 scientifically "preposterous" and "scare mongering," the leader of Greenpeace International at the time, Gerd Leipold, did not clarify or defend the accuracy of those claims, but defended instead Greenpeace's right and intent to "emotionalize" people and cause "pressure" on its target audiences: "We as a pressure group have to emotionalize issues.  We are not ashamed of emotionalizing issues."  Even though Greenpeace International would subsequently admit that "[a]s a climate scientist himself [Leipold] rightly knows that no scenario currently predicts the collapse of the entire land-based ice sheet as early as 2030," when asked in that interview to admit this very fact he well knew to be true, Leipold first claimed "I don't know" and then "I don't think it will" in an abject refusal to unequivocally acknowledge what even his own organization later admitted was an unequivocal scientific fact lest he diminish the "emotionalizing" he believed his group was trying to manufacture. Emotions, not facts, are the bread and butter of Greenpeace.

54.     Greenpeace needs to "emotionalize" issues rather than report facts to generate sufficient donations that its bloated and ineffective operations would not otherwise generate.  For example, well over 60% of GP-Inc.'s annual revenues go to the six-figure salaries of its executives and the salaries and benefits of its other employees.  A whopping 94% of revenue is consumed by salaries and administrative and fundraising expenses, including office expenses, IT, travel, lodging, conferences, and telemarketing expenses.  That is to say, far from an organization that actually does things to improve the environment, Greenpeace is fundamentally a fundraising organization that raises funds to pay its leaders and continue raising more funds.

23

55.     But this is not how it portrays itself to donors.  Thus, at the heart of this fraudulent scheme are fundamental lies as to what Greenpeace is and does, the manner in which donation dollars are used, and the specific misrepresentations it makes about its campaigns and targets.  These lies are perpetuated on donors, tax authorities, targets and their customers, and the public at-large.

56.     In perpetuating this fraudulent scheme, Greenpeace has developed a playbook that is readily recognizable.  It identifies or manufactures a hot-button environmental issue; disseminates sensational, alarmist, and false claims about impending calamity related to that issue; targets a high-profile company to vilify for the impending calamity, including by staging fake videos, photographs, and other evidence (such as staging animal slaughters by Greenpeace members impersonating others, and misrepresenting ordinary trees that have fallen as "ancient trees" harvested by its targets or photos and videos of one location or event passed off as another); bombards supporters with urgent requests to "DONATE NOW"; and directs extortive demands, tortious interference, and other illegal conduct at its targets and their customers.  When Greenpeace's extortion succeeds, it insists that its target publicly endorse its campaign and lies, which it then uses to drive more donations and attacks.

57.     A prime example of Greenpeace's *modus operandi* is its long running campaign against commercial fishing.  In the 2000's, Greenpeace began manufacturing sensational claims about over-fishing and the purportedly impending extinction of dozens of fish species.  Not surprisingly, these species corresponded with 50% of all currently available seafood sold in U.S. grocery stores, which Greenpeace then targeted along with the fishing industry in an "ALARMIST AND ARMAGEDDONIST" fundraising campaign that included sensational and untrue publications like, "Carting Away the Oceans: Grocery Stores are Emptying the Seas."

58.     This campaign included sensational claims, among other things, that 90% of all large predatory fish had already been lost, and that absent urgent and drastic action by its audiences (i.e., donors making donations), oceanic fish stocks would collapse within decades. These "ALARMIST AND ARMAGEDDONIST" claims had no basis in fact or science.  They were just another Greenpeace lie.

59.     Indeed, at the time, the National Oceanic and Atmospheric Administration ("NOAA") and other international agencies monitoring ocean fisheries were reporting that many of the species Greenpeace said were expiring were actually thriving, and those still facing challenges were recovering under rigorous management plans.  For example, while Greenpeace identified Alaskan Pollack, Yellow Fin Tuna, Bigeye Tuna, Monk Fish, and various other species as near extinction, NOAA identified none of these species as "overfished" and many for which instead it reported that "population levels are high."  Likewise, Greenpeace also warned that supermarket sales were depleting the ocean shrimp stocks even though virtually all supermarket shrimp was sourced from farms.  Because Greenpeace knew these to be the actual facts, its sensational claims otherwise were intentionally false and misleading.

60.     Greenpeace's campaign particularly zeroed in on the tuna industry, with the usual "ALARMIST AND ARMAGEDDONIST FACTOIDS" about impending extinction.  However, international agencies actually monitoring the tuna stocks, in collaboration with responsible environmental organizations who actually care about the science, facts, and real environmental protection, were correctly reporting that the commercially fished tuna stocks had not declined in 60 years:

> Tuna and billfish . . . are fished at levels that will provide maximum sustainable yield and are at the abundance that will produce maximum sustainable yield. The U.S. Fisheries are doing extremely well.

61.     Undeterred, Greenpeace also issued sensational alerts about the massive amounts of "by-catch" of non-tuna in tuna nets.  Again, however, this "emotionalizing" issue ignored the science and facts, which showed that by-catch had been reduced to less than 5% in the industry. Nevertheless, Greenpeace has adopted the preposterous claim that the world's tuna demand should be caught only with rod and reel to avoid any by-catch at all.  This is nothing more than an assertion that people should no longer eat tuna.  More important, even if such methods could satisfy the world's tuna demand, doing so would be entirely inconsistent with Greenpeace's claims and fundraising on climate change because doing so would exponentially increase the carbon footprint of the tuna fishing fleet, which would need to be far bigger and operate far longer if forced to apply such inefficient means.  It would also require the massive catch of bait fish vastly in excess of the amounts of non-tuna by-catch Greenpeace was purporting to protect in the first place.  A less coherent position could not be conceived.  But coherence, science, and truth are not important to Greenpeace leadership; inducing donations by whatever means necessary is.

62.     Indeed, were Greenpeace interested in science, facts, and real results, it would not have refused for over five years to participate in the International Seafood Sustainability Foundation's ("ISSF") highly successful work improving sustainable commercial tuna fishing. Reflecting a legitimate environmental campaign, this organization is comprised of the tuna industry, leading marine biologists and scientists, and a Who's Who of responsible environmental groups, including the World Wildlife Fund ("WWF"), FishWise, New England Aquarium, Conservation International, SeaFoodWatch, Bird Life International, NOAA, Union of Concerned Scientists, Shark Advocates International, Hawaii Pacific University, and Sustainable Fisheries.  These environmental groups, serious about sustaining the tuna stocks, along with the

scientific community and the industry members, who also want to preserve the species upon which their livelihood depends, have worked diligently to dramatically improve the sustainability of the species and reduce the fishing fleet's environmental impact.

63.     Were Greenpeace serious about sustainable tuna fishing it would participate in these efforts.  It does not because doing so offers minimal fundraising potential.  Instead, it motors around the ocean in a 240-foot former-Soviet naval vessel, powered by two 3,000 hp gas-powered engines, pumping out sensational but environmentally irrelevant or detrimental fundraising photos and videos, including, ironically, of it using speedboats, helicopters, drones, and submarines to destroy greenhouse gas reducing Fish Aggregating Platforms that ISSF members have developed and deployed to minimize the fishing fleet's carbon footprint.

64.     Likewise, in December 2014, a major international climate change conference was held in Peru.  Rather than focus its efforts on participating in that conference, Greenpeace again elected instead to pursue an environmentally devastating publicity stunt at a Peruvian UNESCO Heritage Site miles way.  That site, called the Nazca Lines, is a precious moon-like landscape that, because of the environment, has preserved large, extremely fragile geoglyphic figures ancient peoples formed over 2,500 years ago by removing rocks forming a thin patina cover over white sands.  Walking in the Nazca Lines is illegal because doing so necessarily and permanently alters the landscape and, thus, the geoglyphics.  Unconcerned, a gaggle of blundering Greenpeace activists trolloped to, on, and around the site to unfurl a large banner. When they left, they had permanently defaced this several thousand-year-old UNESCO Heritage Site.  Although Greenpeace purported to apologize for this damage, it refused to identify the members responsible for the illegal destruction and to this day is harboring and protecting those eco-terrorists from justice.

65.     A year later, Greenpeace's dishonesty and malice would again be revealed when, in December 2015, it targeted distinguished Physicist William Happer the day before he was to testify to Congress on $CO_2$.  Attempting to intimidate and discredit Dr. Happer, Greenpeace engaged in a pre-textual email contact in which it impersonated a representative of a Middle Eastern fossil fuel company and offered to hire Dr. Happer to write a paper to support their $CO_2$ position.  Dr. Happer first sent them prior papers he had already published to make clear what his position was, and then also warned them that he did believe fossil fuels caused environmental problems even though he believed certain exaggerated concerns about $CO_2$ were not scientific. Dr. Happer asked for no remuneration, and when Greenpeace kept pressing to provide some, he made clear that (unlike Greenpeace) he was not motivated by money but would write what he believed as "a labor of love" for science and a subject he cared deeply about:  "My activities to push back against climate extremism are a labor of love, to defend the cherished ideals of science . . . ."  Instead, "if" the company wanted to reimburse him, he explained he would rather they donate "whatever" amount to a charitable scientific organization that educated on this issue but paid him nothing:  "If your client was considering reimbursing me for writing something, I would ask for whatever fee would come to me would go directly to $CO_2$ coalition  . . . [which] occasionally covers travel expenses but pays me no fees or salary."

66.     Ignoring this impeccable exchange, the evening before he was to testify, Greenpeace attempted to intimidate Dr. Happer by threatening to publish a story about him and "how fossil fuel companies are able to pay academics to produce research which is of benefit to them."  Of course, his exchange showed no such thing and, in fact, reflected the opposite.  When he testified anyway, Greenpeace carried out its threat by publishing a report about him called "Academic-For-Hire" falsely claiming that he had agreed to be "secretly pa[id]" to "write

research sowing doubts about climate change and promote the company's commercial interests." The story was pure libelous smear as Dr. Happer (a) made clear he did not want to get paid but would write out of "a labor of love;" (b) was not going to get paid anything; (c) made clear he would only write about research and conclusions he had already published; and (d) merely deflected Greenpeace's repeated efforts to get him to accept payment by stating that "if" Greenpeace wanted to "consider[ ] reimbursing" him it could instead donate "whatever" amount to a charity from which he received no remuneration.  Greenpeace then publicly confronted Dr. Happer in Congress as he sat for testimony by loudly repeating these slanderous charges before being forcibly removed from the chamber.

67.     This pattern of fraud, deceit, extortive threats, and other illegal activities by Greenpeace has been going on for decades.  As a Greenpeace founder, Dr. Patrick Moore, has explained, once Greenpeace attained a significant public profile, others in the organization saw it as a means not to pursue legitimate environmental work, but instead corrupted the organization into a means of enriching themselves through perpetual fraudulent fundraising.  As a result, among other things, Canadian authorities long ago revoked Greenpeace's charitable status because its sensational claims "served no public purpose," and authorities in India are also attempting to revoke its charitable status and business registration and investigating it for fraudulent accounting and tax evasion.  Just months ago, founder Moore labelled Greenpeace a "monster" engaged in "extremism," "RICO," "wire-fraud," "witness tampering" and "obstruction of justice."  Resolute is only the latest target of this fraudulent and illegal operation.

### 2.  The Illegal Campaign Against Resolute

Since no later than 2012, the several organizations operating under the Greenpeace banner and other organizations and persons constituting the Greenpeace Enterprise alleged herein have prosecuted an unrelenting and increasingly hostile campaign against the Plaintiffs,

the specifics of which are as follows.

### a. The Greenpeace Enterprise Destroys the "Historic" CBFA to Launch a Funding Campaign.

68.     In 2008, Resolute's predecessor agreed to the Greenpeace Enterprise's demands that it significantly increase the amount of its products that were environmentally certified by the Forest Stewardship Council ("FSC").  Even though all operations of Resolute's predecessor at the time were certified by other internationally recognized organizations, the Greenpeace Enterprise considered FSC the "green" standard for certifications due, in large part, to its role and that of ENGOs in FSC itself.  True to its word, Resolute would soon become the global leader in FSC certifications.

69.     In 2010, Resolute and other forest companies operating in the Boreal also entered into the Canadian Boreal Forest Agreement ("CBFA") with leading ENGOs, including Defendants Greenpeace and ForestEthics.  At the time, the CBFA was hailed as a historic and unprecedented agreement forming the largest partnership of its kind anywhere in the world. Under the CBFA, the industry signatories voluntarily committed to expand protected areas within the Boreal forest where they already held harvesting rights, develop recovery plans for species at risk, take action on climate change, and improve the prosperity of local populations. As one of the ENGO representatives explained at the time, it was the "largest forest conservation agreement of its kind in history" under which:

> companies involved are proposing to voluntarily relinquish their rights to [harvest] areas equivalent to about 70 million acres – an area as large as Montana . . . We have never, in our experience, seen the forest industry willing to make these kinds of adjustments to their logging plans . . . if the agreement ultimately becomes permanent it will completely change the face of logging in the Boreal forest.

70.     On May 6, 2011, on the one-year anniversary of the CBFA, the Greenpeace Enterprise praised the "historic agreement's" impact and "significant" progress, especially the

fact that it had already provided what the Greenpeace Enterprise described as a "moratorium . . . protect[ing] "virtually all of the habitat of the threatened woodland caribou":

> A year after the signing and announcement of the Canadian Boreal Forest Agreement (CBFA), there has been significant progress on implementation. Greenpeace negotiated and signed the CBFA because of tremendous potential for conservation that it presents. The forest industry has finally accepted there is an urgent need to create large protected areas in the commercial Boreal forest in order to preserve biodiversity and habitat-of-species at risk, such as the woodland caribou . . ..To maintain the 'solutions-minded' space to allow this to occur, the logging companies have agreed to a moratorium on logging in nearly 29 million hectares of the 72 million hectares of Canadian Boreal Forest covered by the CBFA. <u>The moratorium area protected virtually all of the habitat of the threatened woodland caribou.</u> (emphasis added).

71.     Throughout the period the Greenpeace Defendants called a "moratorium," Resolute operated outside of "virtually all of the habitat of the threatened woodland caribou" as the Greenpeace Enterprise itself described.  In addition, Resolute committed thousands of hours to analyzing and proposing additional protected lands to protect woodland caribou, including proposals to increase such areas by 1.7 million hectares in Quebec and 2 million hectares in Ontario; matched funds raised by ENGOs to conduct research on species management; proposed bringing indigenous communities and governments into the CBFA process so that its goals could be more quickly implemented; and prepared detailed management plans in collaboration with ENGOs, indigenous communities, and governments.

72.     By 2012, however, the Greenpeace Enterprise, consistent with its playbook, had decided to blow-up the "historic" CBFA because it had exhausted its publicity and fundraising potential to the Greenpeace Enterprise.  Accordingly, per its playbook, the Greenpeace Enterprise concocted a scheme to falsely accuse Resolute of breaching the CBFA as a pretext for the Greenpeace Enterprise's withdrawing and using that withdrawal to launch a more lucrative high-profile fundraising campaign.

73.     The Greenpeace Enterprise launched this scheme with a highly sensational, publicized, and false report released in December 2012 and titled "Exposed: Resolute Forest Products Breaks Historic Environmental Agreement."  The report falsely accused Resolute of logging in various regions of the Boreal forest in violation of the CBFA, and purported to corroborate those claims with photographs of the roads Resolute had purportedly built with devices depicted in the photos purporting to show corroborating GPS coordinates.  The photos, however, were faked, and the report was a sham.  Resolute had not committed any of the acts it was accused of, or otherwise broken the CBFA.

74.     Nevertheless, the Greenpeace Enterprise used these trumped up claims and phony evidence as a pretext to withdraw from the CBFA and plea for donations to fight Resolute for logging where it promised not to:

> When the biggest logging company in the Boreal forest goes back on its word to stay out of critical habitat, it signals the Agreement has broken down . . . Greenpeace needs your help.  Help stop Resolute from logging in Canada's endangered forest.  Share this video and tell your friends about the Resolute scandal in the Boreal.

The accompanying video also falsely purported to depict Resolute operating "in off-limit caribou habitat," a clear violation of the CBFA that it had not committed.

75.     The Greenpeace Enterprise also issued a December 6, 2012 "Backgrounder" titled "Resolute Forest Products violates Canadian Boreal Forest Agreement with logging activity in off-limit areas" which repeated the false account and photographic depictions of Resolute breaching the "off-limit" areas in violation of the CBFA.

76.     On December 11, 2012, the Greenpeace Enterprise issued another statement "It's Over Resolute Forest Products," announcing that the Greenpeace Enterprise was leaving the CBFA because the "agreement's foundation was broken by logging activity in bad faith" and

thus, the Greenpeace Enterprise claimed, "[it] can't trust [Resolute] to meet their end of the bargain . . ."

77.     Having blown-up the CBFA and launched a new fundraising campaign asking for help to stop logging activity that was not actually occurring, the Greenpeace Enterprise executed a classic "bait and switch," substituting in its literature the previously agreed upon off-limit areas -- which the Greenpeace Enterprise had previously trumpeted as "protecting virtually all of the habitat of the threatened woodland caribou" -- with an entirely new set of areas the Greenpeace Enterprise unilaterally designated "Endangered Forests" that exceeded not only the previously agreed upon off-limits areas but included areas in which the Greenpeace Enterprise and the other ENGOs had previously and explicitly agreed Resolute could harvest.

78.     Once it had executed its "bait and switch," in March 2013, the Greenpeace Enterprise admitted its prior claims were false and purported to retract them, but then substituted those false claims for other false claims that Resolute was harvesting in "Endangered Forests." In making its retraction, the Greenpeace Enterprise admitted that it "incorrectly stated that Resolute had breached the Canadian Boreal Forest Agreement by . . . secretly engag[ing] in logging contrary to the terms of the [CBFA]," but misrepresented that its false accusations were due to "inaccurate maps," and that "it did not intend to hurt the company but intended to promote a vision of the Boreal that includes Resolute."  It did not explain the phony GPS coordinates.

79.     Immediately thereafter, in May 2013, the Greenpeace Enterprise launched its "Resolute: Forest Destroyer" campaign based on the new false claims that Resolute was "one of the destructive logging companies in Canada . . . responsible for destroying critical caribou habitat in endangered forest areas" and violating a previously agreed upon moratorium with the Cree Nation in the Broadback Forest.  At the time, Resolute commenced a defamation and

tortious interference action in Canada against enterprise members Greenpeace Canada, Brooks, and Moffatt (none of whom are named defendants in this action).  Thereafter, Defendant GP-Inc. joined the campaign and dramatically intensified its tempo and aggressiveness.

80.     For the next three years, GP- Inc., Greenpeace Canada and the other enterprise members would aggressively pursue the "Resolute: Forest Destroyer" campaign with ever expanding and increasingly malicious lies disseminated to every important Resolute business constituency.  Most aggressively targeted were (a) Resolute's customers, including those in Georgia, to whom the Greenpeace Enterprise made extortive threats to also publicly label them as "forest destroyers" if they continued to do business with Resolute; and (b) the FSC and its auditors whom the Greenpeace Enterprise contaminated with its disinformation in order to make it impossible for Resolute to maintain its status as the industry's leader in FSC certifications.

### b.  The "Forest Destroyer" Campaign

81.     Having blown-up the CBFA, the Greenpeace Enterprise's new campaign issued broad, sensational, and ubiquitous claims that Resolute was a "Forest Destroyer" operating without regard for law, morals, or any concern for the Boreal or its people.  Among other things, the Greenpeace Enterprise would again fabricate phony photographic evidence and redraw or rename maps to misrepresent, among other things, that Resolute was harvesting in areas in which it had previously agreed not to harvest, even though these were all areas in which the Greenpeace Enterprise had previously agreed Resolute could harvest.

82.     The Greenpeace Enterprise would also manufacture a false sense of urgency, importance, and grand purpose by grossly misrepresenting and exaggerating the conditions in the Boreal forest, and Resolute's impact there, tying these wild claims to hot-button issues such as global warming, endangered species, and the treatment of indigenous peoples, as well as made-up concepts having no application to the Boreal like "ancient," "old" and "endangered" forests.

34

The Greenpeace Enterprise misrepresented that these sensational claims were based on the "best science" when, in fact, these claims were either contradicted or unsupported by the very science they cited.

83.     Ultimately, however, the biggest lies were that the Greenpeace Enterprise was acting objectively, scientifically, and based only on a genuine interest in protecting the Boreal from a rogue corporation that would otherwise destroy it when, in fact, Resolute was a leader in sustainable Boreal forestry and the Greenpeace Enterprise's sole objective was to falsely demonize it to raise money for itself and the salaries of its leaders and those running its campaigns.

> **i.     The Greenpeace Enterprise Misrepresents that Resolute Is "Destroying" an "Endangered," "Ancient," "Intact," "Old Growth" Forest and Its Communities.**

84.     The "Resolute: Forest Destroyer" campaign refocused the Greenpeace Enterprise's efforts on the United States, with GP-Inc. assuming a larger role and American customers being targeted.  Its central narrative was that Resolute is a dangerous industry "outlier" posing an existential threat to Canadian forests due to its purportedly "unsustainable" practices: "logging is the primary driver of forest loss across Canada and one company [Resolute] is leading the charge . . . with forest destruction in Endangered Forests in Quebec and Ontario."  Thus, the Greenpeace Enterprise's campaign ubiquitously and falsely declares that, among other things, Resolute is (a) a "Forest Destroyer" responsible for "destroying endangered forests" falsely described as "ancient," "intact," and "old growth"; (b) "operating and sourcing wood from [these] Endangered Forests";  (c) "responsible for the destruction of vast acres of Canada's magnificent Boreal forest," the "destruction of endangered species" and "critical caribou habitat," and a "Caribou Herd Death Spiral," "extirpation" and "extinction"; and (d) "manag[ing] . . . without scientific based conservation methods" and "despite scientific

recommendations" otherwise because it is "unwilling[] to do even the minimum required by science in terms of conservation."

85.     In addition to accusing Resolute of "destroying" the Boreal Forest and its species, the Greenpeace Enterprise falsely accuses Resolute of  "abandoning," "impoverishing," and exploiting the Boreal peoples and communities, including "ignor[ing] the rights of First Nations Communities" and "log[ging] on Indigenous People's land without consent."

86.     And the Greenpeace Enterprise's "Resolute: Forest Destroyer" campaign shamelessly exploits the most followed environmental issue of the day, climate change, by also misrepresenting Resolute's harvesting as a major climate change risk.

87.     The Greenpeace Defendants have admitted that these claims are "radical" and that they intend them to be so.  The Greenpeace Enterprise's "Radical Resolute" is a rogue company that operates outside the bounds of the law, the rights of others, and all social responsibility, and which, therefore, the enterprise -- with "DONOR HELP" -- must stop before it causes irreversible destruction to the Boreal and its people as well as the global climate.   This narrative is not only "radical," it is malicious, false, fraudulent, and defamatory.  Its component "facts" and broader claims misrepresent and omit the truth in order to fraudulently induce donations to a scheme designed solely to enrich the Greenpeace Enterprise and not protect against any real environmental risk posed by the fictional environmental bogey-man the enterprise has created.

### 1.     Resolute Does Not "Destroy" the Boreal Forest In Any Possible Sense.

88.     Merriam-Webster defines "destroy" as "to cause (something) to end or no longer exist: to cause the destruction of (something): to damage (something) so badly that it cannot be repaired."  And this is exactly the "radical" meaning of "Resolute: Forest Destroyer" the Greenpeace Enterprise admits it intends to convey to those it is inducing to

contribute money or otherwise support its campaign.  The Greenpeace Enterprise knows that the best way to maximize its monetary haul is a sensationalized cause in which Resolute is a corporate villain posing an immediate and existential threat to the Boreal, its species, and its people.  The Greenpeace Enterprise's allegations are demonstrably false with no remotely reasonable factual or scientific basis.[1]

89.     In total, less than .5% (.005) of Canada's vast Boreal forest is harvested annually, and Resolute is responsible for only a minority of that miniscule percentage.  In contrast, five times more trees in the Boreal are impacted annually by natural causes such as fires, insects, disease, and wind blowdowns.  Where Resolute does harvest (and where any other companies harvest), each area is promptly and successfully regenerated either naturally (75% of the time) or by Resolute or the government seeding and planting.  Between 2010-2012, Resolute planted an

---

[1] The "Resolute: Forest Destroyer" campaign ubiquitously publishes and republishes its various iterations of the false claim that Resolute is "destroying" the Boreal forest through website postings, Twitter and other social media, and direct communications with customers, the industry, the media, the government, and indigenous communities, including, by way of example, the following:

- #StandForForests Webpage: "Resolute Forest Products is destroying vast swathes of [the Canadian Boreal Forest]."

- July 21, 2015 blog post, "US Pharmacy Giant Rite Aid Is Destroying Canada's Boreal Forest" which described Resolute as "a controversial logging giant . . . with a history of environmental destruction," and falsely accused Resolute of "logging in the last intact forests in Canada."

- July 27, 2015 blog post, "Why Forests Are Critical For Public Health," which falsely alleged that Resolute "is threatening the future of the Boreal forest and the wildlife that rely on it to thrive."

- July 28, 2015 blog post, "US Pharmacy Giant Making Wrong Choice For The Boreal Forest," which falsely represented: "A major player in [ ] forest destruction is Resolute Forest Products – a pulp, paper and lumber company that's turning the endangered Boreal Forest into products like throwaway flyers."

- October 12, 2015 blog post, "Maker of Post-It Notes Lives Up To Promise, Begins to Eliminate Destructive Logger from Supply Chain," which falsely accused Resolute of "unsustainable forestry operations," and "degrading endangered forests."

- February 22, 2016 blog post, "A Good Reputation Takes Work Not Forest Destruction," which describes Resolute as "the company at the heart of forest destruction in the Endangered Forest areas in Ontario and Quebec."

Additional examples of false publications concerning Resolute's forestry operations and sustainability practices published on Greenpeace's website are set forth in Appendix A.

average of over 60 million trees per year, and by 2012 it had **planted its billionth tree in**

**Ontario alone** and has continued to plant trees there since.  That is **a billion** more trees than the

Greenpeace Enterprise has ever planted in the Boreal and, of course, the direct opposite of

"destruction."   Indeed, there is virtually no permanent loss of Boreal forest acreage annually,

and the nominal .02% (.0002) that is lost, is in large part attributable not to forestry but to

industrial and urban development, transportation, recreation, and hydroelectricity.

90. It is, therefore, demonstrably false and utterly unfounded for the Greenpeace

Enterprise to claim that "logging is the primary driver of forest loss across Canada and that one

company [Resolute] is leading the charge . . . with forest destruction in Endangered Forests in

Quebec and Ontario."  There is nothing about the facts remotely supporting these claims or

qualifying Resolute or even the entire Canadian Boreal forest products industry as "Forest

Destroyers."  The Greenpeace Enterprise's campaign saying otherwise is a lie based on

misrepresenting and manufacturing bogus "facts" and vast omissions of the most relevant and

accurate information.

91. Among the facts omitted from the "Resolute: Forest Destroyer" campaign facts is

that in the areas where Resolute is permitted to harvest, it does so exclusively under the strict

guidelines and regulations of the Quebec and Ontario provincial governments, which hold title to

these public lands for their people and strictly regulate, monitor, and enforce the manner in

which they are harvested.  Indeed, Canadian forests, particularly the Boreal, are some of the most

strictly regulated forests in the world as evidenced by, among other things, a comprehensive Yale

University study ranking Canada's forestry laws and management as among the world's most

rigorous.  Not only does the Greenpeace Enterprise's disinformation campaign omit these facts,

it misrepresents that the Boreal "has no defenders" and, therefore, donors should give to the

Greenpeace Defendants to speak for the forest --"The forest can't defend itself – it needs your help – donate now" -- when, in fact, the Boreal has numerous defenders, all, unlike Greenpeace, with actual self-interest in its health and survival.  By contrast, the Greenpeace Enterprise only has the self-interested and conflicted interest in using the Boreal forest to raise funds.

92.     Also omitted is that the woodlands Resolute manages and harvests are all independently certified to at least one of two internationally-recognized forest management standards used in Canada – Sustainable Forestry Initiative ("SFI") and FSC.

93.     Nor does the Greenpeace Enterprise disclose that Resolute is regularly recognized as an industry leader in sustainable forestry, environmental protection, and safety.  In the past two years alone, Resolute has received over twenty regional, North American, and global awards and distinctions for its sustainability, environmental, and safety practices adding to a long list of similar awards, including, for example:

- In 2014, *The New Economy*'s Clean Tech global award for Best Forestry and Paper Solutions was awarded to Resolute for its innovation, research, long-term vision, and leadership in sustainable forestry;

- In 2014, Resolute's President and CEO was named to Canada's prestigious Clean50, which recognizes leaders in sustainability in 16 different business categories;

- In 2015, the Northern Ontario Business "Judges' Choice" Award was presented to Resolute for the innovative work in lowering greenhouse gas emissions by turning sawdust into pellet fuel at Resolute's Thunder Bay sawmill;

- In 2015, Resolute was the silver Best in Biz awardee for being North America's most socially and environmentally responsible company of the year, and a bronze awardee in the international division based on, among other things, its commitment to 100% woodland certifications, transparent sustainability reporting, innovative partnerships with First Nations, and substantial efforts to minimize resource consumption, waste generation, air emissions, water discharge, and environmental incidents;

- In 2015, Resolute received The International Business Awards (IBAs) gold award in its environment, health, and safety category for both Canada and the United States;

- In 2015, Resolute received the AF&PA Leadership in Sustainability Award for Safety;

- In 2016, a team of four Resolute employees were also recognized by Clean50 for their leadership in reducing greenhouse gases and environmental incidents, among other achievements; and

- In 2016, The New Economy's Clean Tech global award for Best Forestry and Paper Solutions was again presented to Resolute.  The award recognizes companies whose ideas, achievements, projects and solutions reflect innovation, long-term vision and leadership. The New Economy highlighted Resolute's achievements in a number of areas, including: a 70% reduction in greenhouse gas emissions since 2000; investing in cleaner energy with 72% of total energy needs now from renewable sources and 78% of fuel energy from biomass; 100% responsible and sustainable forest management certification and 100% chain of custody certification; Resolute's partnerships with Canada's First Nations and Aboriginal communities; the company's world-class safety performance; and the successful launch and growth of Resolute's Align brand of eco-efficient, budget-friendly papers, which use up to 50% less wood fiber than traditional freesheet papers, and have a carbon footprint 35% to 85% smaller than traditional offset papers.

94.     It is difficult to think of something more factually unfounded and malicious than an organization that has not planted a single tree in the Boreal forest labelling as a "Forest Destroyer" a company that has planted more than a billion trees in the Boreal, not caused any material permanent Boreal forest loss, harvested in accordance with internationally-recognized certifications, and been repeatedly recognized as a leader in its overall sustainability practices.

## 2.   <u>The Canadian Boreal is Not "Endangered."</u>

95.     In addition to a fictional villain and risk, the Greenpeace Enterprise's campaign ubiquitously mischaracterizes the Boreal as an "endangered" forest to create a false sense of importance, urgency, and grand purpose.  Like "Destroyer," the selection of this term is no mistake.  "Endangered" is defined as being "at risk of extinction," and is universally recognized as such throughout North America because of the Endangered Species Act in the United States that protects species facing extinction.

96.     And like its accusation that Resolute was "destroying" the Boreal, labelling the Boreal itself as "endangered" could not be further from the truth or less reasonably based in fact or science.  Indeed, in making this false claim, the Greenpeace Enterprise misrepresents science

that actually finds that the Boreal is "still vast and relatively undisturbed in northernmost Canada and Alaska . . . [and] among the least threatened in the world" (emphasis added).  Moreover, according to the Frontier Forest Index, which measures the state of worldwide frontiers, Canada has a score of 8/99 (where 99 is the worst possible score), receiving the fourth lowest (best) mark globally, demonstrating that, as detailed above, the country's frontier has experienced little to no loss and is by no reasonable standard "endangered."  Additionally, according to the United Nations Food & Agricultural Organization's Global Forest Resources Assessment, the Canadian Boreal is not in any way an "endangered forest."

97.     Similarly, the Greenpeace Enterprise often misrepresents the Canadian Boreal as an "ancient" forest to manufacture a false sense that unique trees many hundreds to thousands of years old are being destroyed.  The Greenpeace Enterprise is aware, however, that this term has no ecological or scientific basis as it relates to the Boreal forest, which is not comprised of long-lived tree species and experiences frequent natural disturbance.  In the Canadian Boreal forest, growth is considered "old" after only a 100 years, which is not "ancient" or even unique or remarkable in North America or the world.

98.     Instead, having raised alarms with loud headlines about the Boreal being an "endangered" "ancient" forest that Resolute is "destroying" and "deforesting,"  the Greenpeace Enterprise's messaging typically then executes another subtle "bait and switch" by speaking instead about "degradation" (not destruction) of (not a forest) but "intact forest landscapes."  The Greenpeace Enterprise defines "degradation" as virtually any impact on an area that appears previously untouched by major natural disturbances or any human intrusion even if only an access road.  Thus, the bait and switch garners attention and alarm about the "destruction" of an "endangered" and "ancient" forest, and then talks instead about far more modest, and often

nominal, "disruption" of limited portions of the forest instead.  Moreover, far from "destroyed,"
even these "disruptions" are temporary and regenerated within the forest harvesting cycle.  Even
they are not "endangered."

99.      The Greenpeace Enterprise's rhetorical sleights of hand are particularly
misleading because in Quebec and Ontario, approximately 85% of so-called intact forest
landscapes are above the Northern Boundary (where the law prohibits industrial forestry), and
90% of intact forest landscapes in Quebec are either beyond the Northern Boundary or in
otherwise protected areas.  Moreover, those areas in which Resolute does harvest are
predominately not intact forest landscapes, and the vast majority of so-called "degradation" of
such lands in Canada occurs due to natural and other non-forestry causes in western Canada far
from Resolute's operations.

**ii.     The Greenpeace Enterprise
Misrepresents Resolute
<u>As a Climate Change Risk.</u>**

100.      The "Resolute: Forest Destroyer" campaign also exploits the mass interest and
concern about climate change with a completely fallacious charge that Resolute's harvesting is a
material climate change risk because it impairs the Boreal's ability to absorb and store carbon.
This is a whopping lie.[2]

---

[2]      Resolute's depiction as a climate change risk is ubiquitously published and republished by the Greenpeace
Enterprise, including by way of example in the following reports and blog posts:

- December 22, 2014 blog post, "Who's Been Naughty And Who's Been Nice To The Planet This Year,"
  which described Resolute as "[on] [t]op of the naughty list," and falsely alleged that "[w]ithout action to
  curb unsustainable practices like Resolute's, Canada is on the road to worsening climate change and
  betraying the amazing biodiversity we hold in trust for this world."

- July 21, 2015 blog post, "US Pharmacy Giant Rite Aid Is Destroying Canada's Boreal Forest" which
  falsely accuses Resolute of "jeopardizing one of the Earth's largest carbon sinks and putting our global
  climate at risk"

- July 21, 2015 blog post, "Rite Aid: Still Making the Wrong Choice for Forests" which falsely alleges that
  Resolute is "bad news for the climate"

101.    Contrary to the Greenpeace Enterprise's representations, the UN's Intergovernmental Panel on Climate Change -- whose reports and conclusions the Greenpeace Defendants feature and cite prominently on its website and in its other campaigns -- has declared that sustainable forest harvesting and management is one of the most important mechanisms for removing and sequestering greenhouse gases from the atmosphere:

> In the long term, a sustainable forest management strategy aimed at maintaining or increasing forest carbon stocks, while producing an annual sustained yield of timber, fiber, or energy from the forest will generate the largest sustained mitigation benefit.

102.    The reason for this is simple and well known to the Greenpeace Enterprise.  As numerous studies have shown, greenhouse gas absorption and sequestration is maximized by harvesting old trees that have ceased absorbing greenhouse gases and are, or will soon begin, emitting greenhouse gases, and regenerating with new trees that absorb the most greenhouse gases during their growth and maintenance phases.  Furthermore, using harvested wood that absorbs and stores greenhouse gases to replace other raw materials that do not -- like metal, plastics, and concrete -- also further mitigates climate change.  Numerous studies and commentators have noted the importance of Canada's substantial forest and forest industry to these objectives.  The Greenpeace Enterprise's shameful attempt to exploit people's real concerns about mitigating climate change to dupe them into supporting a campaign that does the opposite lays bare that it is motivated by money, not its proclaimed environmental concern.

- July 27, 2015 blog post, "Why Forests Are Critical For Public Health" which misrepresents that "the health of forests around the world - and with them the health of billions of people - is in jeopardy.  The Canadian Boreal forest, for example, is one of the largest reservoirs of carbon in the world . . . [b]ut it is under threat from unsustainable logging [by] [o]ne company in particular, Resolute Forest Products."

- January 28, 2015 blog post, "US Pharmacy Giant Making Wrong Choice for the Boreal Forest" which falsely states that "the Boreal is the world's largest carbon absorbing ecosystem, purifying the air you breath and keeping the climate stable . . . [b]ut in Canada, one force is cutting out the heart of the forest: destructive logging . . . [and a] major player in this forest destruction is Resolute Forest Products."

Additional examples of false publications concerning the impact of Resolute's operations on climate change are set forth in Appendix B.

103.    The Greenpeace Enterprise takes this exploitation even further by falsely associating Resolute and Boreal forestry with significant land use changes worldwide that dramatically diminish the ability of the global forests to mitigate climate change.  But these changes have nothing to do with Resolute or the Boreal forest.  These changes relate to the conversion of forest lands to agricultural and population centers and other natural and human non-forestry related conversions, which are occurring overwhelmingly in Africa, Asia, and South America, and notably NOT IN THE BOREAL.  To the contrary, the United Nations' most recent reporting declares that the amount of greenhouse gases stored in North American forests has increased by millions of metric tons per year, and deforestation caused less than 2% of the total greenhouse gas emissions in Canada in 2012, representing a miniscule portion of global greenhouse gas emissions, about 0.06%.

104.    And, as with its lies about Resolute's sustainable forestry, the Greenpeace Enterprise's false depiction of Resolute as a climate change risk nowhere discloses that Resolute is globally recognized as a leader in climate change mitigation and for reducing its own carbon footprint by 70% over a year 2000 baseline.  Nor does it disclose that Resolute has won numerous international awards and distinctions for its climate change initiatives.

### iii.    Greenpeace Misrepresents That Resolute Is Impairing The Sustainability of Threatened Caribou.

105.    The Greenpeace Enterprise's fraudulent campaign also exploits the condition of Canada's woodland caribou herds by misrepresenting that Resolute's activities are responsible for, or are adversely affecting, the risks to threatened populations.  The Greenpeace Enterprise creates this false and misleading message by misrepresenting, distorting, and omitting the relevant science and facts.

106. In particular, the Greenpeace Enterprise misrepresents the relevant science and study findings in associating Resolute's activities with the "dramatic decline" of woodland caribou in Canada "due to industrial pressure" that Greenpeace claims has caused the loss of "50% of caribou habitat in the last 100 years," and asserting that the "caribou herds whose range overlaps with Resolute's Montagne Blanches operations are unlikely to survive beyond 50 years due to continuing habitat destruction."[3]

107. The Greenpeace Enterprise's association of Resolute with the "dramatic decline" in Canadian woodland caribou and habitat overall, and its claims as to specific limited populations near Resoute's operations are materially false and misleading because it misrepresents or fails to disclose the following material facts that demonstrate such claims to be entirely unfounded.

---

[3] Greenpeace disseminates these claims ubiquitously in website, blog, Twitter, and other internet publications as well as in direct email and other communications, including, by way of example, in the following Greenpeace reports and blog posts:

- May 21, 2013 report, "Resolute's False Promises: The [Un]Sustainability Report," which falsely asserted that "Resolute talks up the 'vital role' protecting habitat plays in its operations while in fact the company is actively logging the remaining habitat of caribou herds that have been deemed to be not self-sustaining . . . ."

- June 1, 2015 blog post, "What Did 10,000 Tweets Say To Resolute Forest Products," which falsely attributed the threat of woodland caribou extinction to Resolute's operations.

- July 28, 2015 blog post, "US Pharmacy Giant Making Wrong Choice For The Boreal Forest," which falsely represented: "For years, Resolute has been needlessly destroying critical habitat of the endangered woodland caribou . . .."

- August 14, 2015 blog post, "Collaboration Is The Key To Sustainability In Canada's Boreal Forest," which falsely alleged that the "woodland caribou herd overlapping Resolute-managed Caribou Forest is experiencing excessive disturbance of its habitat," and further represented without any basis, that this purported "shortcoming" contributed to FSC's decision to terminate Resolute's forestry certificates.

- October 12, 2015 blog post, "Maker of Post-It Notes Lives Up To Promise, Begins to Eliminate Destructive Logger from Supply Chain," which falsely accused Resolute of "degrading" the "habitat of endangered wildlife, like the Woodland caribou."

Additional examples of Greenpeace's false publications concerning Resolute's putative impact on the woodland caribou are set forth in Appendix C.

108.    First, in 2010 and 2011, in talking about the CBFA that it negotiated, Greenpeace heralded that the agreement provided, in Greenpeace's own words, a "moratorium area that protected virtually all of the habitat of the threatened woodland caribou."  Yet, to this day, Resolute's harvesting remains absent from "virtually all of [that] habitat," and, therefore, the woodland caribou could not possibly have gone from "protected" to "endangered" due to Resolute's activities.

109.    Second, to the extent that Resolute has since the end of that suspended period under the CBFA harvested in some nominal portion of the area that Greenpeace previously admitted "protected virtually all of the habitat of the threatened woodland caribou," such incursions were at miniscule levels of approximately .41% (.0041) of "virtually all of th[at] habitat" and some of that was to salvage wood from areas leveled by fire or other natural disturbances.  Put most simply, it cannot possibly be credibly stated that the reduction of .0041 from a 29 million hectare "area that protects virtually all of the caribou habitat" caused woodland caribou to go from "protected" to "endangered" by Resolute's harvesting.  Indeed, Greenpeace's flip-flop from triumphantly declaring the caribou protected to alarmingly declaring the caribou endangered by Resolute, based on virtually identical circumstances, demonstrates its bad faith.  And this bad faith is further evidence by the fact that these miniscule incursions were always contemplated by the CBFA, and, in most cases, explicitly agreed to by Greenpeace under the CBFA.

110.    Third, the Greenpeace Enterprise falsely associates Resolute's operations with a "dramatic decline" of woodland caribou "due to industrial pressure" and the loss of "50% of caribou habitat."  There is not only no evidence associating Resolute with these developments, but the actual evidence, including the studies the Greenpeace Enterprise is misrepresenting,

shows the opposite.   That science unequivocally demonstrates that the risk to the Canadian

woodland caribou the Greenpeace Enterprise is describing emanates not from Ontario or Quebec

where Resolute operates, but from western Canada, especially Alberta and British Columbia, far

from Resolute's operations.   Thus, the 2014 report on Canadian woodland caribou by Global

Forest Watch, which the Greenpeace Enterprise cites frequently in this and other contexts, (a)

concluded that "[o]ur analysis clearly indicates that the threat to boreal caribou is highest in

Alberta" (where Resolute does not operate); (b) identified all fifteen of the designated caribou

habitats in Alberta and British Columbia (where Resolute does not operate) as having the highest

habitat disturbance levels and at highest population risks; and (c) did not, in contrast, identify

any of the designated habitats the Greenpeace Enterprise associates with Resolute's Quebec

operations as being similarly at risk.

111.     Likewise, the Canadian government's Environment Canada study that the

Greenpeace Enterprise cites for its false claims against Resolute points squarely to these same far

off regions and other actors as the source of risk to caribou and their habitats.   The study

designates all twelve of the identified herds in Alberta as being non-self-sustaining with habitat

disturbance levels well over 60%, and all five herds in British Columbia as being non-self-

sustaining with habitat disturbance levels between 57-80%.   In contrast, the same report indicates

that the vast Quebec herd of over 9,000 caribou as self-sustaining and not at risk.

112.     Third, although the Greenpeace Enterprise claims that this study shows that three

much smaller Quebec caribou populations near Resolute's operations "are unlikely to survive

beyond 50 years," the actual findings identify only one of those populations as such.   Thus, even

if one accepts the Greenpeace Enterprise's undisclosed assumptions, in contrast to the dire

conditions in western Canada, according to the very study the Greenpeace Enterprise relies upon,

at most, only 1.3% of the entire Quebec caribou population alone is arguably adversely impacted by Resolute's harvesting.

113.    Fourth, even this alleged risk is grossly overstated because the Greenpeace Enterprise fails to disclose that (a) Resolute harvests in only small portions of the habitats the Greenpeace Enterprise identifies with these populations, with others never mentioned by the Greenpeace Enterprise responsible for the rest; (b) there is no evidence that Resolute's operations have actually adversely impacted any critical habitat of woodland caribou; and (c) Resolute's harvesting is conducted according to management plans issued by the provincial governments, which have responsibility for caribou management, that include, among other things, long-term plans to restore and maintain caribou habitats, establish protected areas, and implement effective management practices.

114.    Finally, the Greenpeace Enterprise never explains that the habitat disturbance levels upon which these studies are based rely on research of "captive" local herds in western Canada that are geographically restricted from migrating and thus more vulnerable to local disturbances, not the much larger, migrating herds found where Resolute operates.  There is no evidence these disturbance levels are probative of the populations where Resolute operates and, in fact, migrating caribou populations whose ranges include some of the most heavily forested areas of Ontario and Quebec, such as Lac Saint Jean region, have materially increased.

####    iv.    The Greenpeace Enterprise Misrepresents Resolute's Relationship with First Nations Communities.

115.    Perhaps the most insidious lie the Greenpeace Enterprise peddles to defraud donors is that they will be protecting indigenous communities, called in Canada "First Nations,"

who live in the Boreal forest and who the Greenpeace Enterprise misrepresents Resolute has exploited, "abandoned," and "impoverished."[4]

116.     The fact, however, is just the opposite.  While Resolute obviously has issues with its First Nations partners from time to time like any commercial enterprise, it unquestionably provides substantial economic benefits to the people and communities in the Boreal through employment, vendor contracts, the purchase of wood harvested by these communities, and through various forms of joint ventures and partnerships through which they share in the economics of Boreal forestry.  It is this shared interest in the sustainable use of the Boreal that accounts for the overwhelming support Resolute enjoys among the people and communities in the Boreal, completely contrary to the Greenpeace Enterprise's claims.

117.     Resolute has numerous successful partnerships with various First Nations, including the Fort Williams First Nation, Couchiching First Nation, Mitaanjigamiing First Nation, Nigigoonsiminikaaning First Nation, Seine River First Nation, Lac La Croix First

---

[4] The Greenpeace Enterprise has ubiquitously published and republished these claims on its website, blogs, internet forums, Twitter and in direct communications via email and personal communications including, by way of example, the following:

- June 1, 2015 blog post, "What did 10,000 Tweets Say to Resolute Forest Products" which falsely declares that Resolute has widespread conflicts with First Nations communities by stating that "[w]e came to lend our voice to Indigenous First Nations community leaders who are demanding that Resolute respect their rights and desires for protection for their traditional territories."

- July 21, 2015 blog post, "Rite Aid: Still Making the Wrong Choice for Forests" which falsely accuses Resolute of "ignor[ing] the rights of First Nations communities that have inhabited the Boreal for countless generations and who are decision-makers in their territories."  This allegation was also repeated in another July 21, 2015 blog post, "US Pharmacy Giant Is Destroying Canada's Boreal Forest" and a July 28, 2015 blog post, "US pharmacy giant making wrong choice for the Boreal Forest."

- February 2016 publication, "Endangered Forests in the Balance: The impact of logging reaches new heights in the Montagnes Blanches Endangered Forest" which falsely declares that Resolute is responsible for disputes with First Nations communities by stating that "[t]o eliminate controversy and regain the trust of the marketplace, customers should expect [Resolute] to . . . Ensure Free, Prior and Informed Consent of Indigenous Peoples and respect of Indigenous Rights and Title for any activities on First Nations territories overlapping the Montagnes Blanches Endangered Forest."

Additional examples of false publications concerning Resolute's putative disputes with First Nations published on Greenpeace's website are set forth in Appendix D.

Nation, Lac des Mille Lacs First Nation, Wabigoon Lake Ojibway Nation, Atikamekw Council

of Obedjiwan, Kitigan Zibi Anishinabeg and the Gull Bay First Nation, among others.  Among

these are the following examples:

- Fort William First Nation: On May 14, 2013, Resolute celebrated the 10th anniversary of its Thunder Bay sawmill partnership between Resolute and the Fort William First Nation, which only the year before had become the first facility in Canada to operate under regulations created by the First Nations Commercial and Industrial Development Act facilitating industrial development with First Nations on their land. The project's ongoing success is the result of Resolute's even broader collaboration with the Fort William First Nation, many members of which are employed at and provide contracting and supplies to the mill.

- Wabigoon Lake Ojibway Nation: Resolute assisted the Wabigoon Lake Ojibway Nation in establishing a tree nursery in their community in the late 1990s and has purchased between 1-1.5 million trees annually from the nursery to support regeneration activities. Resolute also employs members of the Nation at its Ignace sawmill.

- Atikamekw Council of Obedjiwan: The Opitciwan Sawmill is a unique joint venture operation that has operated successfully since 1988. The Atikamekw Council of Obedjiwan owns 55%, while Resolute owns 45%. The sawmill is located on reserve land and employs numerous community members. As part of the joint venture, Resolute has contributed to the maintenance of road access to the community, supported infrastructure, assisted in the implementation of the sawmill forestry service and entered into wood purchase agreements with the community. In September 2013, the sawmill was awarded the prestigious Aboriginal Business Leadership Award by the Forest Products Association of Canada and the Canadian Council for Aboriginal Business, in recognition of its exemplary history in the community, its commitment to sustainability, the high quality of its production, and a number of other criteria.

- Kiashke Zaaging Anishinaabek, or KZA: The KZA First Nation harvests wood from the Black Spruce sustainable forest license area and delivers round wood, wood chips and biomass fuel to Resolute's Thunder Bay operations.

- Lac des Mille Lacs First Nation:  Resolute has entered into a partnership agreement with the Lac des Mille Lacs First Nation to identify and pursue new economic opportunities related to the harvesting and management of the Black Spruce and Dog River-Matawin forests for its facilities in Northwestern Ontario.

- Conseil des Innus de Pessamit: Resolute has a collaboration agreement with the Conseil des Innus de Pessamit, providing for the recruitment, training, and hiring of Innu labor in Quebec's Côte-Nord region and investment in Innu businesses in the forest, biofuel and wildlife industries.

- Pekuakamiulnuatsh Takuhikan (Mashteuiatsh): In 2015, Resolute raised significant funds for organizations in the Innu community of Pekuakamiulnuatsh Takuhikan (Mashteuiatsh) in the region of Saguenay–Lac-Saint-Jean (Quebec) and Resolute's President and Chief Executive Officer, Richard Garneau, served as honorary chairman of the Mashteuiatsh summer festival promoting and preserving the community's rich history.

- Nigigoonsiminikaaning First Nation, Lac des Milles Lacs First Nation, Seine River First Nation, Couchiching First Nation, Mitaanjigamiing First Nation, and Lac La Croix First Nation:  Resolute signed a Memorandum of Agreement ("MOA") that sets out the framework for several contracts that have resulted in C$100 million in new business for six First Nations MOA partners over the next five years.

118.    Resolute also works with local and provincial governments to support continued economic development. Some recent examples include (all values in C$):

- The Quebec Economic Investment, administered by the provincial government, to which Resolute has contributed $2 million per year over five years for a total of $10 million to be spent on industry diversification and economic development.

- Similar funds have been created in the MRC Domaine-du-Roy and the MRC Maria Chapdelaine in Quebec, to each of which Resolute has contributed $200,000 per year over five years for a total of $1 million in each of the two funds to be spent on community and economic development.

- A separate fund exists in Ontario, administered by the Minister of the Environment, to which Resolute has contributed $1 million per year over five years for a total of $5 million to be spent on environmental projects and activities in the Province.

- During the mill closure process, Resolute engages with local stakeholders to support the continued prosperity of their communities through the maintenance, repurposing and sale of idled assets to other investors.  This includes heating facilities through the winter, creating partnerships to safely demolish old facilities and most often selling the mills for the symbolic sum of $1 to local governments while retaining all environmental remediation responsibility.

119.    In depicting itself as the protector of these Boreal people and communities, the Greenpeace Enterprise not only lies to those it is attempting to defraud, but lies about the people and communities it falsely claims to protect.  Far from protecting these people and communities, the Greenpeace Enterprise's disinformation campaign, extortion, and other illegal conduct has inflicted enormous economic hardship on the Boreal people and communities -- contributing to

the closing of their businesses and joint ventures, putting them out of work, and depriving them of buyers for their products.

120.   Likewise, the Greenpeace Enterprise's mantra that it is protecting the interests of the First Nations grossly misrepresents the truth that but for a very small number of First Nation communities, the vast majority of First Nations have constructive and economically beneficial relationships with Resolute that the Greenpeace Enterprise's efforts would only serve to destroy.

121.   The fact is that the sustainable utilization of the Boreal is in the shared interests of all interested parties, including Resolute, the Boreal people and communities, and the Canadian federal and provincial governments, who ultimately decide how best to address all the competing considerations.  The harvesting that occurs is the product of a robust and rigorous political and economic process in which all relevant considerations are carefully weighed.

122.   The only party who is genuinely not interested in these considerations is the Greenpeace Enterprise, which is a stranger to the Boreal with no skin in the game other than using the Boreal to raise money, none of which is spent on any real conservation efforts in the Boreal.  Highly misleading and hypocritical is the Greenpeace Enterprise's request for donations to address Resolute's purported "abandoning" of the local communities by closing facilities and "laying off thousands of workers" that fails to explain that these closures and layoffs are a result of economic and market realities, and in some cases, at least partly because of the "Resolute: Forest Destroyer" campaign.  Even then, far from abandoning these communities, where Resolute has been forced to discontinue operations, it has provided substantial notice of such actions and worked diligently with affected employees, all levels of government, and other local authorities on programs to lessen the impact of permanent closures.

123.    Ignoring Resolute's real relationship with the Boreal community, the Greenpeace Enterprise grossly distorts and overemphasizes singular issues and events to smear Resolute.  For example, grasping at ways to smear Resolute, the Greenpeace Enterprise misrepresents that Resolute did not intend to honor its pension obligations, but instead would tell its workers "give us decades of work and we'll pay you back with decreased pension benefits."  In fact, Resolute has always committed to honor 100% of the pension benefits under registered plans for its over 20,000 Canadian and American pensioners even when it had the opportunity to reduce those obligations, while many other companies in this industry had, in fact, cut pension benefits by as much as 40%.

124.    Likewise, the Greenpeace Enterprise accuses Resolute of attempting to "impoverish" the residents of Thunder Bay through tax breaks.  What the Greenpeace Enterprise misrepresents as a "tax break" was a routine property tax assessment appeal Resolute filed because declining property values had resulted in it being overtaxed under the existing tax regime.  It was not seeking a "break" from that existing regime; it was seeking the proper application of that regime.  Similar cases filed by other forestry companies have found taxes were overvalued by 60% and 73%.  Even if its appeal succeeds, Resolute will remain one of the largest industrial employers in Thunder Bay and one of the largest taxpayers.

> **v.    The Greenpeace Enterprise Misrepresents
> Resolute's FSC Certification Status.**

125.    The Greenpeace Enterprise repeatedly misrepresents that Resolute had FSC certificates revoked because FSC auditors determined Resolute was engaged in the same serious misconduct the Greenpeace's Enterprise "Resolute: Forest Destroyer" campaign alleged, including its misrepresentations that Resolute was engaged in "unsustainable forest operations," "reckless clear cutting," "logging in Endangered Forests without consent of First Nations,"

"destroying critical habitat for the endangered woodland caribou" and, thereby, causing a "high risk of extirpation of caribou herds and many other species," and being "unwilling to take steps needed to create real solutions to protect these forests that scientists say must be protected" or "work collaboratively with stakeholders and achieve consent . . . from First Nations Communities."[5]

126.    Once again, however, the Greenpeace Enterprise's sensational claims are factually without basis.  The audits that led to these temporary suspensions were not based on any such wide-ranging or substantial findings.  Instead, the suspensions were based on narrow

---

[5] Greenpeace has ubiquitously published and republished these claims on its website, blogs, internet forums, Twitter and in direct communications via email and personal communications including, by way of example, the following:

- December 16, 2013 blog post, "'Its [sic] Not Our Fault That We Lost Our Green Label' says logging giant Resolute," which misrepresented that "Rainforest Alliance, Resolute's auditor stepped up and suspended the certificates after investigating the company's operations and finding them lacking . . . The company's operations are destroying woodland caribou habitat, old-growth areas are being degraded and the company hasn't obtained consent from at least one First Nation community, the Cree, for their logging. Those are very clear violations of the FSC standard."

- March 18, 2014 blog post, "Mount Royal Cross Transformed Into Scales Of Justice: Greenpeace Protests The Reckless Destruction Of Canada's Boreal Forest," which falsely stated that, Resolute "lost" three of its FSC certificates due to "destructive practices."

- August 14, 2015 blog post, "Collaboration Is The Key To Sustainability In Canada's Boreal Forest," which falsely alleged that "Over the past year, [Resolute] has seen the Forest Stewardship Council (FSC) terminate or suspend its responsible forestry certificates," due to "[s]hortcomings in the company's environmental performance" including "impact on woodland caribou, habitat and old growth forest, failure to protect high conservation values and lack of support from stakeholders for its operations."

- January 2016 report, "Resolute Forest Products: Key Risks And Concerns For Investors," which made the false representation that "Resolute had an unprecedented four of its FSC certificates covering more than 8.7 million hectares of Canada's Boreal Forest either suspended or terminated in 2014 and most of 2015 for major noncompliance with FSC criteria," including "overharvesting, inadequate protection for woodland caribou habitat and old-growth and high conservation value forests, and failure to uphold Principle 3: Indigenous People's Rights."

- February 2016 report, "Montagnes Blanches Endangered Forest," which misrepresented the cause of the suspension for Resolute's FSC certificate for Lac St. Jean as resulting from the "failure to conserve the threatened woodland caribou, protect old growth forests, conserve intact forest landscapes and maintain Indigenous rights."

Additional examples of the Greenpeace Enterprise's false publications concerning Resolute's FSC certificates are set forth in Appendix E.

and idiosyncratic issues, most of which were out of Resolute's control, and an unprecedented treatment of those issues by those handling audits.

127.    First, one audit cited a specific, complex territorial dispute between the Quebec Government and two First Nations concerning a portion of the audited area that was unresolved at the time of the audit, even though Resolute was not a direct party to the dispute and lacked any ability to control or resolve it.

128.    Second, both audits challenged the adequacy of the provincial government's caribou conservation plans, which was also not an issue Resolute controlled.  Moreover, other FSC holders relying on the same caribou habitat conservation plan did not have their FSC certification suspended.

129.    Third, contrary to the Greenpeace Enterprise's claims otherwise, these temporary suspensions had nothing to do with Resolute's on-the-ground practices or compliance with any laws or regulations.

130.    Fourth, most important, the Greenpeace Enterprise's claims about Resolute's FSC compliance do not disclose the Greenpeace Enterprise's direct and indirect role in the suspensions Resolute suffered, or that Resolute was treated dramatically differently than other FSC certificate holders operating in the same areas.  Greenpeace's "Resolute: Forest Destroyer" campaign targeted Resolute's relationship with FSC and its FSC auditors from the very start, with a parallel campaign attacking FSC for not being stringent enough.

131.    That campaign soon evolved into direct claims by the Greenpeace Enterprise that FSC and its auditors were not tough enough on Resolute the "Forest Destroyer."  Thus, as it would do with Resolute customers, the Greenpeace Enterprise threatened to tarnish the FSC brand by accusing it of certifying Resolute despite the Greenpeace Enterprise's highly publicized

claims that Resolute was destroying the Boreal forest, its woodland caribou, and its indigenous people.  Once the threat was set, the Greenpeace Enterprise began filing formal complaints with the FSC and Resolute's auditors, and engaging in a campaign of informal communications, to pressure and precipitate the suspension of Resolute's certification, which the Greenpeace Enterprise would then use to further attack Resolute and raise funds.  Demonstrating how deeply the Greenpeace Enterprise had infiltrated Resolute's Canadian FSC certification and dispute resolution process, a preliminary and non-public report on a Cree complaint filed against Resolute appeared on the Greenpeace Defendant's website even though it was not a party to that complaint or investigation.

132.   The Greenpeace Enterprise's success in contaminating Resolute's Boreal FSC certifications is  evidenced by, among other things, the dramatically disparate treatment to which Resolute's FSC certifications were subjected, including, among other things, the following:

(a)   **First Nations** – In Quebec, FSC auditors issued major non-compliances to Resolute for disputes with First Nations, which ultimately contributed to its two suspensions, even though other certificate holders had similar or larger disputes with no non-compliances even declared let alone suspensions issued, and harvested in the very same First Nation's territory using the very same means, which was mandated by the government's forestry officials. Moreover, Resolute was suspended for implementing a government mandated harvesting approach because the Cree purportedly preferred an alternative method -- mosaic cutting -- that is detrimental to caribou and prohibited by the government, but no other certificate holders who likewise followed the law in the same territory over the same Cree objections suffered similar consequences.

(b)     **Caribou Plans** – FSC auditors deemed compliance with the government's regional caribou plan to be insufficient for Resolute while it was deemed sufficient for two certificate holders on adjoining management units and a third certificate holder on another adjacent management who was not even complying with the regional plan and who also was harvesting in prohibited mosaic cut-blocks that are highly-detrimental to woodland caribou. Similarly, FSC auditors deemed insufficient Resolute's compliance with the government's established 35% habitat disturbance rate, the disturbance level was barely even examined in audit reports for other certificate holders, even those operating in the same caribou habitats as Resolute and with greater disturbance levels than Resolute.  Indeed, while overall compliance with the Federal Recovery Strategy was a key requirement imposed by Resolute's auditors, it was and continues to be ignored in most other certificate audits even when audited by the same person. Indeed, Resolute was required to conduct long-term modelling and monitoring of disturbance levels, best available habitats, road network densities, and old forest impacts to demonstrate compliance with federal law even though certificate holders in adjacent areas were not even required to explain their efforts to comply with that law.  Ultimately, Resolute was issued one major non-compliance for planning operations in unfragmented, intact forests, but adjacent certificate holders were not, despite exceeding maximum disturbance thresholds in the same forests.

(c)     **Allowable Cut Calculation** – In Quebec, the allowable cut calculation is the responsibility of the government's chief forester.  For other certificate holders, this chief forester's calculation was sufficient to sustain certification, but Resolute was required to prepare a separate calculation that incorporated various FSC standards that were not even mentioned in

the audit reports of other certificate holders.  Resolute was issued a major non-compliance finding for failing to do this to the auditor's subjective satisfaction.

(d)      **Old Forests** – Resolute was the only certificate holder for whom the governments' approach for old forests was deemed inadequate.  It alone was subjected to a subjective auditor determination of what should be required.

(e)      **Gap Analysis** – FSC requires that "gap analyses" be conducted to ascertain the need for additional protected areas in forest tenures.  Resolute used the widely utilized MNR GapTool to conduct this analysis, as did most other certificate holders, because, among other reasons, Ontario legally mandates its use.  The auditors informed Resolute that it was not permitted to use MNR GapTool for FSC purposes, nor could it use other commonly accepted methods used by other certificate holders.

(f)      **Maximum Contributions** – Where the gap analysis so indicates, "maximum contributions" of acreage must be made to add to protected areas.  Although Resolute tenures in Ontario currently have the highest level of regulated parks and protected areas in Ontario by substantial margins, it submitted 199,000 hectares of additional candidate sites, which would have resulted in 1 million hectares of parks and protected areas associated with Resolute's tenures.  Ontario's Ministry of Natural Resources concluded, "the areas identified for protection would maximize contributions needed to enhance representation through filling remaining gaps within the extent of your tenure."  Nevertheless, Resolute's FSC auditors declared it insufficient, despite approving another certificate holder's proposed contribution of merely 5,000 hectares.

133.      The Greenpeace Enterprise not only mischaracterizes the reasons for Resolute's suspensions, it also misrepresents and omits the true facts about Resolute's overall record of FSC and other certification compliance.  Resolute is one of the largest holders of FSC sustainable

forest management certificates in all of North America and in January 2015 successfully renewed its FSC certificates in the Mauricie, Abitibi (jointly with Tembec) and North Shore regions of Quebec.  The North Shore certificate was renewed based on the caribou habitat conservation plan prepared and implemented by the government of Quebec.

134.    Moreover, the Greenpeace Enterprise has misrepresented that Resolute no longer supports FSC certification and is actively seeking to undermine the FSC brand.  In fact, Resolute has always remained a supporter of FSC certification standards, both in terms of sustainable forest management certification and chain of custody certification, and is one of the largest holders of FSC certificates in North America.  Although the company has received notice of temporary suspensions under the FSC National Boreal Standard in a process contaminated by Greenpeace, all of the areas in question nevertheless remain certified under the SFI standard. Indeed, in 2012 World Wildlife Fund (WWF) announced Resolute as the largest manager of FSC certified forests in the world, and at one time Resolute achieved FSC certification of 76% of the company's managed forests.  Moreover, 100% of the woodlands Resolute manages are audited and certified by independent third parties, and Resolute has publicly committed to maintaining 100% certification in its operations.

**vi.    The Greenpeace Enterprise Falsely Accuses Resolute of Harvesting in the Protected Areas of the Broadback Valley, Trout Lake, and Montagnes Blanches.**

135.    Although the Greenpeace Enterprise purported to retract its 2012 claims that Resolute was harvesting in the areas prohibited under the CBFA, it quickly revived this fraud in a different form.  Rather than use doctored photos and explicit claims, it now redrew maps and rewrote long-standing geographical delineations to again make the materially false and misleading accusation that Resolute was improperly harvesting in protected areas that it should

not and in which it had agreed not to operate, including particularly what Greenpeace's newly minted delineations called the Broadback Valley, Trout Lake, and Montagnes Blanches.[6]

### 1.  **Broadback Valley**

136.    The Greenpeace Enterprise's "Resolute: Forest Destroyer" campaign falsely accuses Resolute of building roads and infrastructure in the Broadback Valley, which it characterizes as one of the last remaining intact forests in Northwest Quebec, in violation of a moratorium it entered with Greenpeace, Canopy and CPAWS in March 2010 in the context of the CBFA.  This is false.  The area of this moratorium was exactly the area identified in the press release of April 30, 2009 issued jointly by the SNAP and Cree Nation.  Despite the fact that its commitment was for the "short term," to this date, i.e. six years later, Resolute has honored the moratorium it entered into with these three ENGOs.  The areas in this region where Resolute has harvested were not covered by the moratorium, and, in fact, Greenpeace explicitly agreed Resolute could harvest there in connection with the CBFA agreement.

137.    Moreover, the "proposed protected area" which were temporarily subspended from harvesting through this moratorium, were approximately 9,000 square kilometers, and it was expressly understood that harvesting would need to continue outside those area, including in caribou habitats.  Nevertheless, as part of the "Resolute: Forest Destroyer" campaign, the Greenpeace Enterprise attacked Resolute for improperly harvesting in the "Broadback" by simply expanding the area so delineated by 300%, to include areas it previously agreed Resolute and others would be harvesting.

---

[6] Specific examples of false publications concerning Resolute's putative logging in restricted areas are set forth in Appendix F.

138.    Finally, the Greenpeace Enterprise has once again produced falsified video and photographic footage purporting to evidence Resolute's allegedly improper harvesting in the "Broadback" that is actually footage of insect devastation on the North Shore of Quebec several hundred kilometers away.

### 2.   Trout Lake Forest

139.    The Greenpeace Enterprise's misinformation campaign misrepresents that Resolute regularly builds roads and harvests in the Trout Lake Forest caribou habitat.  This allegation is featured prominently on the homepage for the Greenpeace Enterprise's "Resolute: Forest Destroyer" campaign which alleges that "[i]n Northwestern Ontario, Resolute manages vast lands in the Trout Lake-Caribou Endangered Forest."

140.    Resolute does not harvest in protected areas; does not hold harvest rights in the Trout Lake Forest; and does not harvest in the Trout Lake Forest.  In fact, a different logging company, Domtar, has responsibility for the Forest Management Unit ("FMU") in which the Trout Lake Forest is located, and this FMU is over 100 kilometers away from the nearest Resolute forest tenure.  To nevertheless allege that Resolute harvested in this area and thus impacts certain of its caribou populations, Greenpeace conflates this FMU with an adjoining but separate management unit in which Resolute operates called the Caribou Forest.  This is the equivalent of accusing a Georgia timber company of harvesting in Florida by just combining those two distinct states solely for the purpose of making that claim.

### 3.   Montagnes Blanches

141.    The Greenpeace Enterprise falsely accuses Resolute of building roads and harvesting in the Montagnes Blanches, all of which are located above the Northern Limit and out of bounds for all forestry.  Once again, to accuse Resolute of illegal activity, the Greenpeace Enterprise simply redraws the existing maps beyond any colorable relationship to the historical

and long understood delineations of the Montagnes Blanches.  To accuse Resolute of harvesting in this prohibited area, the Greenpeace Enterprise, as it did with the Broadback, simply unilaterally expands the clearly delineated Montagnes Blanches to include those areas outside that delineated area where Resolute was operating.  Remarkably, Greenpeace's revisions do not include the actual Montagnes Blanches mountains and are totally located within the areas that were until now universally understood to be outside the Montagnes Blanches (and remain so to everyone but the Greenpeace Enterprise and those they are misleading).

142.    Like the allegations concerning Resolute's putative logging in Trout Lake, the Greenpeace Enterprise's false assertion that Resolute is logging in the Montagnes Blanches is featured prominently on the homepage for the Greenpeace Enterprise's "Resolute: Forest Destroyer" campaign.  The same allegation is also featured in other Greenpeace publications, including, among others: (i) "Mount Royal Cross Transformed Into Scales Of Justice: Greenpeace Protests The Reckless Destruction Of Canada's Boreal Forest" which falsely alleged that "[i]n the Montagnes Blanches Endangered Forest in Quebec, Resolute is operating in First Nations traditional territory without consent"; and (ii) Greenpeace's February 2016 publication, "Endangered Forests in the Balance: The Impact Of Logging Reaches New Heights In The Montagnes Blanches Endangered Forest" which falsely asserts that "Resolute Forest Products' logging operations are central to the fate of the Montagnes Blanches Endangered Forest.  Five of the company's sawmills and four of its pulp and paper mills operate using wood from Forest Management Units (FMUs) overlapping or neighboring the Montagnes Blanches Endangered Forest."

### c. The Greenpeace Enterprise's Dissemination of Disinformation, Extortion and Other Tortious and Illegal Conduct.

143.    Greenpeace and the other enterprise members disseminated the Greenpeace Enterprise's disinformation ubiquitously, via websites, blogs, Twitter posting, emails, public displays, brochures, letters, and innumerable direct in-person and telephonic conversations, to Resolute's most important constituencies, including customers, industry partners and participants, third-party auditors, and government regulators.

### i. The Greenpeace Enterprise Scuttles the CBFA.

144.    Central to the launching and success of the "Resolute: Forest Destroyer" campaign was the need to scuttle the "historic" CBFA executed on May 10, 2010.  Beginning no later than September 2012, the Greenpeace Enterprise began misrepresenting to other CBFA signatories and participants, including the FPAC industry signatories and their customers participating in the CBFA's Boreal Business Forum ("BBF"), that Resolute was violating the CBFA by harvesting and logging in the protected areas agreed upon in the CBFA.  These communications were intended to undermine Resolute's participation in the CBFA, justify Greenpeace Canada's departure from the CBFA, and harm Resolute's business relationships with the CBFA signatories and participants, customers, Boreal communities, and national, regional, and local governments.

145.    For example, on September 17, 2012, Stephanie Goodwin (Greenpeace Canada), Todd Paglia (ForestEthics), and Amanda Carr (Canopy), wrote to member companies of the FPAC falsely accusing Resolute of engaging in "active logging and road building . . . in areas originally designated off limits within the CBFA, including . . . in the Quebec region under priority [thereby] fast-tracking the erosion of the legitimacy of [CBFA]."  The Greenpeace

Enterprise made the same accusations against Resolute to virtually all of the CBFA members in direct oral and written communications sent in the second half of 2012.

146.     After Greenpeace Canada announced in December 2012 its very public CBFA withdrawal based on these same phony pretexts and their accompanying fake photos and videos, on December 14, 2012, Stephanie Goodwin wrote to the FPAC and ENGO CBFA signatories outlining "the escalation that led to Greenpeace's departure from the CBFA."  Among other things, Ms. Goodwin repeated the false accusations that Resolute had engaged in "road building in original CBFA Areas of Suspended Harvest despite active efforts by Greenpeace and other environmental organizations," which was categorically false.  She also falsely misrepresented that Resolute had "caused a fundamental breakdown in the Agreement and created a 'talk and log' process."  This too was categorically false because it was Greenpeace Canada that essentially broke off and obstructed CBFA participation mid-way through 2012 as it focused instead on manufacturing evidence that it could use as a pretext for withdrawal from and the scuttling of the CBFA.

147.     The Greenpeace Enterprise knew that these accusations were false when made, as were its claim that it was abandoning the CBFA based on these knowingly false claims.  Indeed, after the Greenpeace Enterprise was later forced to retract those claims, it nevertheless refused to resume CBFA participation.  Instead, it continued its newly launched "Resolute: Forest Destroyer" campaign because that was what it intended to do all along.  The Greenpeace Enterprise understood that constructive collaboration and real progress is not sufficiently sensational to generate donation flow.  Instead, false claims of breached agreements, forests being destroyed, caribou being extirpated, indigenous peoples being abused, and climate change being made worse are all far more lucrative fundraising propositions.

148.    To make sure, however, that the CBFA remained no threat to these efforts, the

Greenpeace Enterprise continued to pepper CBFA signatories and participants with lies,

including, for example, disseminating "Resolute's False Promises: The [un]sustainability report

of 2013" (the "Unsustainability Report").  Likewise, in a May 2013 interview with the Globe and

Mail concerning the CBFA negotiations, ForestEthics stated: "Getting environmentalists and

logging companies to come to an agreement is not easy. We feel like Resolute is the bad apple,

and that the rest of the bushel is in very good shape."  Other misrepresentations the Greenpeace

Enterprise disseminated to CBFA signatories and participants are set forth more fully in

Appendices A-E.

### ii.    The Greenpeace Enterprise Threatens and Contaminates Customer and Industry Relationships.

149.    The Greenpeace Enterprise aggressively targeted Resolute's customers and

industry relationships with disinformation, extortive threats, and illegal misconduct.  In order to

secure proprietary information about the customers of Resolute and suppliers of its customers,

the Greenpeace Enterprise directly and through agents engaged in fraudulent impersonations

through which they misappropriated such proprietary information and exploited it for their own

illegal purposes.

150.    One key business relationship that the Greenpeace Enterprise targeted early was

Resolute's customer Kimberly-Clark, which maintains offices in Roswell, Georgia, and to which

the Greenpeace Enterprise regularly directed disinformation and threats in Georgia, including to

the Vice President of Global Sustainability and Manager of Sustainable Forest Management.  For

example, on July 27, 2012, Richard Brooks wrote to a Kimberly-Clark sustainability officer

located in Georgia, misrepresenting four areas of Resolute's alleged non-compliance with FSC

standards including "a) failure to properly identify and protect High Conservation Values, b) not

adhering to Precautionary Principle in relation to woodland caribou management, c) inadequate protected areas plans and d) lack of appropriate consultation with interested parties."  Kimberly-Clark forwarded the communication to Resolute and demanded that Resolute rebut the allegations, which Resolute did.  The Greenpeace Enterprise continued to bombard Kimberly-Clark with false claims about Resolute's forestry practices, including the impact of its logging on the woodland caribou, including during meetings in December 2012 and May 2013, and countless other emails, letters, and telephonic discussions throughout 2013, 2014 and 2015. Ultimately, the noise generated by the Greenpeace Enterprise had its intended effect.  On September 16, 2015, Kimberly-Clark informed Resolute that "[d]ue to Resolute's continued dispute with Greenpeace and the recent upsets in the CBFA we are not going to be able to pursue a contractual relationship."

151.    Likewise, by email dated December 7, 2012, Rolf Skar wrote to the Vice President and General Manager of the Paper Purchasing Unit of Hearst, falsely accusing Resolute of violating the CBFA.  Mr. Skar attached fake "evidence" purportedly detailing "Resolute Forest Product's violation of the Agreement," and requested a meeting with Hearst to discuss "the implications of Resolute's logging activity and the Agreement's failure to produce comprehensive conservation plans."  In the weeks that followed, the Greenpeace Enterprise forwarded Hearst "additional information on Resolute's claims," including the "Boreal Alarm" report which, among other things, reiterated the Greenpeace Enterprises' fabricated allegations that Resolute violated the CBFA and was not in compliance with FSC standards.

152.    From mid-2012 through the first quarter of 2013, the Greenpeace Enterprise disseminated its false claims that Resolute was violating the CBFA, including, the "Boreal

Alarm" report and other written materials to, among others, the following Resolute customers: Harlequin Enterprises, Ltd., Unisource Worldwide, TC Transcontinental Printing, and Lowe's.

153.    Moreover, the Greenpeace Enterprise explicitly and implicitly issued extortive threats to these targets that if they continued to source materials from Resolute they would face a "reputational risk" of being exposed by the Greenpeace Enterprise for their association with Resolute and its purported but falsely asserted bad acts, but, if they terminated their relationships with Resolute and, in some instances, endorsed the Greenpeace Enterprise's stance, they would be protected from such exposure.

154.    When the Greenpeace Enterprise was finally forced to retract these claims in March 2013, it just repackaged them as part of the "Resolute: Forest Destroyer" campaign.  Just days after its March 19, 2013 retraction, it began falsely accusing Resolute of material non-compliance in its FSC certificates.  For example, on March 28, 2013, the Greenpeace Enterprise separately wrote to TC Transcontinental Printing and Verso Corporation falsely stating, among other things, that Resolute was operating in endangered forests, was engaging in "destructive logging," threatening woodland caribou herds, and that the Greenpeace Enterprise had "uncovered serious non-compliance issues related to Resolute's Forest Stewardship Council (FSC) certificates covering the[] [Endangered Forests]."  It reiterated its request that TC Transcontinental Printing and Verso Corporation examine their supply chains to determine whether TC Transcontinental Printing or Verso were sourcing materials from Resolute, and, if so, terminate that relationship lest they too be targeted.

155.    The Greenpeace Enterprise disseminated similar falsehoods to UPM, a leading supplier of paper to European printers, and to UPM's customers.  Beginning in early 2013, UPM frequently communicated to Resolute its concerns about the impact that the Resolute: Forest

Destroyer campaign would have on its business should it continue to source pulp from Resolute, and repeatedly requested that Resolute rebut false allegations of purported destructive logging practices and suspended FSC certificates.  Moreover, to safeguard itself against customer concerns with Resolute sourced-pulp, the European supplier demanded that Resolute provide only FSC certified pulp.  Resolute acquiesced to UPM's demands, and throughout 2013, Resolute expended significant time and resources responding to the enterprise allegations during calls, in-person meetings, and in written correspondence.  Notwithstanding Resolute's demonstration of the falsity of the enterprise allegations, on April 2, 2014, UPM informed Resolute of its decision to suspend purchases of Resolute's NBSK in their Blandin and Madison mills because of the Greenpeace Enterprise's "black mailing."  During direct communications between UPM's Vice President of Raw Material Sourcing and executives at Resolute, UPM assured Resolute that it continued to believe in Resolute's sustainability approach, but it was acting under tremendous pressure from Greenpeace Defendants who threatened that if UPM continued to source pulp from Resolute, they would target its German printers, including Axel Springer, directly, thereby harming UPM's business and reputation among its key constituents.  Yet, UPM's interest in Resolute continues.  In September 2015 -- one and a half years after it communicated its decision to suspend purchases of NBSK from Resolute -- UPM reached out to Resolute for an update on the "Greenpeace" conflict.  Upon learning that the campaign to target Resolute was ongoing, UPM reiterated that its management was taking "a conservative and safe approach as far as the Greenpeace situation," and would not likely resume business with Resolute while the Greenpeace Enterprise's campaign was ongoing.

156.    At the same time that the Greenpeace Enterprise was threatening Resolute's business relationships with suppliers in Europe, it was simultaneously disseminating the

"Resolute: Forest Destroyer" lies directly to Axel Springer, one of Resolute's largest German customers.  From 2013 through 2015, Axel Springer was a frequent target of the Greenpeace Enterprise's campaign.  As a result, in August 2015, Axel Springer informed Resolute that it had decided to cancel its most recent orders due to the Greenpeace Enterprise's campaign.  The Greenpeace Enterprise immediately leaked the news of Axel Springer's decision to multiple media outlets, and celebrated the news on Twitter, noting that the controversy generated by the "Resolute: Forest Destroyer" campaign alone was enough to interfere with Resolute's customer relationships:  "Publisher @axelspringer_EN ditches unsustainable @resolute paper. Wants Canadian paper but less enviro controversy."

157.    The campaign had a similar impact on Resolute's business relationship with Proctor & Gamble ("P&G"), one of the world's largest manufacturers of tissue products which operates a large manufacturing plant in Albany, Georgia.  Historically, P&G procured pulp supplies from Resolute's mills in Thunder Bay, Catawba, and St. Felicien.  Accordingly, in or around December 2012, the Greenpeace Enterprise began targeting P&G, sending them false and misleading information concerning Resolute's purported violation of the CBFA and raising questions about Resolute's FSC certificates.  For example, on May 15, 2013, enterprise sent P&G its "Unsustainability Report," which accused Resolute of "[u]nsustainable forestry, regulatory infractions, failure to protect endangered species, 'green' products that don't live up to the name, certification that comes up short, disregard for Indigenous rights and communities struggling for their fair share," and P&G immediately forwarded the report to Resolute and demanded explanations.   And Richard Brooksand other enterprise members continued to disseminate the false "Resolute: Forest Destroyer" lies to P&G throughout 2013.  Enterprise member ForestEthics did the same.  As a direct result, during the negotiations for the renewal of

P&G's contracts for 2014, P&G demanded that Resolute include exit clauses which would allow P&G to suspend the contracts in the event that: (a) Greenpeace threatened to campaign against P&G publicly because of its relationship with Resolute; (b) Resolute lost its FSC certifications; or (c) Resolute's mill production was impacted by the campaign launched against them.  To secure the contract renewal for this critical account, Resolute agreed to P&G's demands.  The Greenpeace Enterprise responded by escalating its efforts to interfere with the P&G relationship, and in March of 2014, P&G informed Resolute that it was increasingly concerned Greenpeace's campaign would have a detrimental impact on its customers and its brand, and, ultimately, these concerns would lead P&G to source pulp from other suppliers.

158.    The Greenpeace Enterprise continued to disseminate the "Resolute:  Forest Destroyer" lies to Resolute's customers and trade associations throughout 2013, including, but not limited, to the following:

- Enterprise members disseminated copies of the Unsustainability Report and communicated the campaign's lies to, among others, Wausau Paper, Lowe's, Pro Build, and the European Newspaper Publishers Association ("ENPA").

- During a May 28, 2013 conference call with the major North American directory publishers, including Resolute customers Local Search Association ("LSA"), YP, and Dex Media, enterprise members repeated the campaigns false claims that, among other things, Resolute was (a) destroying endangered forest areas in Quebec; (b) endangering threatened caribou herds; and (c) logging without the consent of the Cree First Nation.

- In August 27, 2013 letters to The F.P. Horak Company and Perfection Press, Inc., the Greenpeace Enterprise misrepresented that "Resolute has a long track record of unsustainable logging activities in Canada's Boreal Forest[,] [i]t is involved in disputes with Indigenous communities where logging is occurring without their consent" and "its operating practices threaten iconic wildlife species."  The letter warned The F.P. Horak Company and Perfection Press that they were purchasing Resolute products that were sourced "from the Montagnes Blanches and other Endangered Forest Areas" and "threatened the forests' ecological integrity, iconic species and community well-being," and demanded that the companies "cease purchasing from Resolute Forest Products . . ."

- In an October 10, 2013 communication to Ushodaya Enterprises, the Greenpeace Enterprise repeated its false allegation that Resolute produces "controversial newsprint" and has a "long track record of unsustainable and irresponsible logging activities in

Canada's Boreal Forest" which "threaten wildlife species at risk such as woodland caribou," is logging without the consent of indigenous First Nations, logs in endangered forests, and has problems with its FSC certificates.  The letter warned that "until these issues are resolved, we believe that sourcing from Resolute poses significant reputational risks.

- During October 2013, the enterprise targeted Union Bank -- the fourth largest bank in California -- who was featured on Resolute's AlignPaper.com site as a testimonial in connection with its use of Resolute's Ecopaque Laser Paper disseminating its lies that Resolute was destroying the Boreal forest and endangered species and harming indigenous communities.  As a result, Union Bank demanded to be removed from Resolute's website and informed its supplier, Clifford Paper, that it wished to discontinue the use of Resolute's product.

- In a series of emails dated December 12, 2013, the Greenpeace Enterprise disseminated the defamatory press release, "Canada's Largest Logging Company Loses Three Sustainability Certificates Proving Forests Mismanaged" to, among others, Harlequin Enterprises Ltd., Lowe's and Unisource Worldwide.  This announcement misrepresented that "Lack of suitable protection for high conservation value forest areas, threatened woodland caribou herds, and missing consent from aboriginal communities are at the heart of these suspensions." The press release further alleged that Resolute needs to "rethink their approach and avoid risking the economic viability of communities and the health of the forest."

159.    This pattern continued throughout 2014, 2015 and to present.  During this period, the Greenpeace Enterprise ubiquitously disseminated the "Resolute: Forest Destroyer" lies to, among others, the following Resolute customers: Seaman Paper, Penguin Random House, Flambeau River Paper, Twin Rivers Paper Company, Wausau Papers, Wegner Media, Kruger Products, McGraw Hill, Newsmedia UK, Workman Publishing, and Midland Paper.  In addition, these lies were accompanied by demands that these customers stop doing business with Resolute and explicit and implicit threats to target them with such lies if they did not do so.   By way of example, on January 27, 2014, Stephanie Goodwin of Greenpeace Canada wrote to Flambeau River Paper, accusing Flambeau of having links to "destructive logging operations in Canada via Resolute Forest Products."  The letter further criticized Resolute's logging practices as "threaten[ing] wildlife at risk such as the woodland caribou," and operating in "Endangered

Forests of extraordinary high ecological value," which Goodwin stated resulted in the recent suspension of three FSC certificates.

160.    The Greenpeace Enterprise sent similar correspondence to Northern & Shell and Trinity Mirror Plc, by separate letters dated February 2, 2015, each misrepresenting that "Resolute is involved in forest destruction and degradation in some of the most ecologically and culturally important areas of Canadian Boreal Forest," and has recently had FSC certificates terminated or suspended "due to serious shortcomings related to Indigenous People's rights, old growth forest protection, endangered species (caribou) conservation and a lack of stakeholder support for operations."  Accordingly, the Greenpeace Enterprise warned that Resolute was "a controversial, high risk source of forest products, including newsprint," and made explicit that this "high risk" could be avoided if they instead did business with "alternative, environmentally and socially responsible suppliers."  The letters did not disclose that Resolute was as "environmentally and socially responsible supplier" as any other in the Boreal or elsewhere, and, in fact, by any objective measure was one of the most environmentally and socially responsible, or that the enterprise was saying otherwise only because Resolute was the face of a phony campaign driven entirely by financial, not environmental motives.

161.    The Greenpeace Enterprise did the same to McGraw Hill in a March 23, 2016 letter again referencing the campaign's false claims that Resolute was "logging unsustainably" and also added the false and misleading claims that between 2000 and 2013 "7% of the intact forests in the areas [managed by Resolute in Ontario] have been lost."  Based on these lies, the Greenpeace Enterprise implored McGraw Hill "to identify alternative suppliers, including in the Canadian Boreal, who can meet your expectations and safeguard the future of the forests" again

without revealing that Resolute was at a minimum equal to any alternative suppliers in the Boreal.

162.     In April 2016, the Greenpeace Enterprise disseminated its false and misleading report entitled "Montagnes Blanches Endangered Forest," to several of Resolute's critical accounts, including Workman Publishing, Penguin Random House, and News Corp, among others.  The report repeated the false and misleading designation of areas where Resolute operates as part of a "Montagne Blanche Endangered Forest" and that it had a certificate suspended because of "failure to conserve the threatened woodland caribou, old growth forests, conserve intact forest landscapes, and maintain indigenous rights" thus purportedly corroborating he Greenpeace Enterprise's false "Resolute: Forest Destroyer" narrative previously and continually broadcasted to the market.

163.     As intended, customers immediately expressed concerns about sourcing products from Resolute mills in the region misrepresented as "Montagnes Blanche Endangered Forest." Specifically, on April 21, 2016, News Corp emailed Resolute, "How much of the paper that we purchase from you [  ] comes from the areas that Greenpeace is complaining about?" and inquired "Can we eliminate [Resolute's] [  ] [mill] all together from our supply mix?"  In response, a Resolute executive assured News Corp: "I don't believe eliminating the mill is the answer, we would just be playing into their hands and giving into their tactics."  Nevertheless, News Corp replied, "I appreciate that [  ], but I'm more concerned with them leaving [Harper] alone.  If that means eliminating [the mill], I think I want to go down that route."  News Corp's fears would soon become a reality.  In early May 2016, the Greenpeace Enterprise informed News Corp that it would be contacting the authors for Harper Collins directly to pressure them to cut all ties with Resolute.

### iii.   The Greenpeace Enterprise Publicly Attacks Resolute's Customers and Industry Relationships.

164.    At the same time that the "Resolute: Forest Destroyer" campaign privately

targeted certain Resolute customers, it was simultaneously targeting other large Resolute

customers through high profile, highly inflammatory reports, blog posts, and other internet

publications.  The objective of this campaign was to exploit the false public narrative of the

"Resolute: Forest Destroyer" campaign and leverage it to publicly intimidate, pressure, and

shame these significant customers into terminating their business relationships with Resolute.

Targets of this campaign included 3M, Best Buy, and Rite Aid.

### 1.   3M

165.    The Greenpeace Enterprise's first public target was 3M.  Enterprise member

ForestEthics initiated the attack in 2009 by issuing a series of reports which falsely accused 3M

of sourcing materials from endangered forests, including Canada's Boreal forest.  Beginning in

the spring of 2014, Greenpeace joined ForestEthics with an April 29, 2014 sensational and false

report written by Defendant Amy Moas titled "Exposed: 3M Sourcing From Forest Destruction"

that solicited donations by stating that Greenpeace was "proud to stand with . . . our ally,

ForestEthics" and joined their "demand that 3M immediately stops sourcing [products] from

forest destroyers" like Resolute and instead source only from "responsible sources."  Associating

Resolute and the Canadian Boreal forestry with allegedly highly destructive rainforest and other

forestry and industrial development in South America, Asia, and Russia, the report falsely asserts

that "logging is the single greatest threat to caribou survival" and "is pushing the woodland

caribou to the brink of extinction."

166.    The attack and continuing extortive threat on 3M succeeded when, on March 6,

2015, 3M announced a new paper sourcing policy, which the Greenpeace Enterprise immediately

announced in a report, singling out Resolute, "3M has notified controversial logging giant Resolute Forest Products that it will need to comply with its new sourcing standards or lose business," and days later, on March 18, 2015, 3M informed Resolute after "work[ing] with ForestEthics and Greenpeace . . . we are not pursuing new business with Resolute."  By the fall, the Greenpeace Enterprise successfully pressured 3M to terminate all previously existing business with Resolute which Resolute learned on October 12, 2015 when 3M informed Resolute it was  eliminating it from its supply chain due to the "continued controversy" with Greenpeace.

## 2.  **Best Buy**

167.    During the same period, the Greenpeace Enterprise targeted Resolute's business relationship with Best Buy.  On November 26, 2014, it published "Better Buying In The Boreal Forest" and "Best Buy is Wasting Ancient Forests, One Flyer At A Time."  Both reports specifically targeted Resolute, and supply relationship with BestBuy based on the "Resolute: Forest Destroyer" campaign's central lies.

168.    In "Better Buying in the Boreal Forest", the enterprise misrepresented that Resolute was a "controversial logging company" that "is an outlier in the Canadian forest sector" because of its "significant degradation of the boreal, destruction of endangered species habitat, and disputes with indigenous communities."  It further misrepresented that Resolute "will not do the minimum that science says is necessary to protect our forests" and was "not meeting commitments to ensure caribou survive" and had instead "imperiled woodland caribou" and sued one of its FSC auditors "to silence critics."  None of these claims were true, and the enterprise members knew they were not true.

169.    Nevertheless, the enterprise explicitly threatened Best Buy with likewise being saddled with the false claim that "[b]y buying from Resolute, . . . BestBuy risks using priceless

caribou habitat or fibre sourced without First Nation consent." To avoid such "risks," the Greenpeace Enterprise made explicit that Best Buy must stop using Resolute and instead use Boreal "forest product companies in Canada successfully pursuing sustainable, equitable, and economically viable forestry." Greenpeace, of course, identified none, because the entire predicate of this point was false. Resolute was not an "outlier" in Boreal forestry, except in so far as it was a leader in sustainable Boreal forestry, or at a bare minimum, practiced forestry that was as "sustainable" as any other company, as protective (and, in fact, demonstrably more protective) to the woodland caribou, and as respectful and collaborative with the indigenous populations. Resolute's operations in the Boreal, met or exceeded those that were legally required, those required for all available certifications, including FSC certification, and those utilized by other companies operating in the Boreal.

170.    Similarly, in her "Best Buy is Wasting Ancient forest, One Flyer at a Time" blog post, Defendant Amy Moas endorsed and promoted the "Better Buying" report and further falsely claimed Resolute was not "a sustainable source" of Boreal products because it was "responsible for destruction of vast swathes of Canadian Boreal Forest, degrading critical caribou herds, and logging without consent of impacted First Nations." She further confirmed the "risk" predicted in the Greenpeace report by accusing BestBuy of "fueling destruction in the Canadian Boreal forest" by sourcing from Resolute.

171.    The same day the Greenpeace Enterprise launched its BestBuy attack, a Twitter feed associated with the cyber-hacktivist group Anonymous -- which had enterprise member Richard Brooks as one of the few Twitter feeds it "follows" -- retweeted a Brooks tweet announcing the BestBuy attack at or about the same time it announced it had attacked and taken down the website of Resolute, describing it as a "MASSIVE TREE KILLER." The next day,

Thanksgiving, it continued to report that it had taken down Resolute's website, and also reported having attacked and taken done the website for CBFA signatory FPAC while simultaneously retweeting tweets by Brooks about Greenpeace's Best Buy attack.

172.     On the day before Thanksgiving, the same day that Greenpeace launched its BestBuy attack and Anonymous attacked the Resolute website, Best Buy's website began experiencing difficulties that prevented customers from accessing the website.  These difficulties continued on Thanksgiving Day as the Resolute website remained disabled from attack, and the FPAC site was also disabled.  The next day, Black Friday, Best Buy's biggest shopping day of the year, the Best Buy site crashed repeatedly and was taken down.  It remained disabled or degraded for much of the day and into the weekend.

173.     The initial crash on Black Friday was between approximately 10-10:30 a.m., and it was not reported in the media for several hours later.  With incredibly coincidental or incredibly revealing timing, however, at 9:54 a.m., enterprise member Brooks, who was being retweeted by the anonymous group who took down the Resolute and FPAC website, announced on Twitter that the Best Buy website had "crashed" ("Might be the weight of 100 million pounds of wasteful flyers from forests that crashed the site") and again at 10:33 am that it was "down" ("BestBuy down, servers couldn't handle the volume? Or the weight of 100 million lbs of flyers from forest?").  He did not indicate how he happened to be monitoring the website at virtually the very moment it began to experience difficulties that morning, or how he quickly concluded it had "crashed."

174.     Within days of the denial of service attacks, the Greenpeace Enterprise escalated its campaign against Best Buy.  On December 1, 2014, GP Inc. Program Coordinator, Aspa

Tzaras, encouraged activists and volunteers to submit false product reviews on Best Buy's website.  Tzaras wrote:

> **Write a false product review** on Best Buy's website, be creative and make sure to weave in the campaign issues!  By sourcing vast amounts of paper from the Boreal and Resolute, Best Buy risks trashing ancient forests for throw-away flyers.  This is bad news for our climate, bad news for creatures that live in the Boreal like the woodland caribou, and bad news for the health and diversity of Canada's ancient forests.

(emphasis added).  In the days that followed, Best Buy received over 52,000 emails and negative product reviews from Greenpeace supporters.

175.     The enterprise 2014 blitzkrieg attack on Best Buy produced immediate victory. On December 8, 2014, Best Buy publicly announced that it would shift business away from Resolute toward companies that support "sustainable forestry practices," which were the Greenpeace Enterprise words plainly placed in its mouth as a condition of peace.  Enterprise member ForestEthics promised that other companies would soon follow suit, stating "Best Buy is just the beginning."  ForestEthics echoed this doomsday predication in a Twitter post, dated January 13, 2015: "In 2015 is some of the biggest brands in the world are going to get as far away frm #Resolute as they can." [sic.]

### 3.  Rite Aid

176.     As promised, Greenpeace Defendants, ForestEthics and other enterprise members continued to press their attack using the Best Buy attack as a model.  Beginning in April 2015, Greenpeace Defendants published a series of false and defamatory publications accusing Rite Aid of sourcing "millions of pounds of paper a month to create [ ] throwaway flyers and junk mail" for "buy one get one free flyers" from "controversial logging giant Resolute Forest Products – a company with a history of environmental destruction."  On April 15, 2015, Defendant Daniel Brindis published "Rite Aid: Still Making The Wrong Choice For Forests" which republished the Greenpeace Enterprise's lies that "Resolute is logging in the last

undisturbed ancient forests in Quebec and Ontario, some of which is threatened Woodland Caribou habitat," and criticized Resolute for "ongoing conflicts with Indigenous First Nations."

177.     More significantly, the April 15, 2015 post attached mock ups of Rite Aid circulars which falsely imply that Resolute was committing the following destructive practices: (i) "Caribou Herd Death Spiral – Destroy One Destroy Another One Free!"; (ii) Logging on Indigenous Peoples Land Without Consent"; (iii) "Destroying Endangered Forests – Destroy One Destroy Another One Free!"; and (iv) "Buzzcutting Bird Breeding Grounds."  Defendant Brindis reiterated these same falsehoods in another post, "How Rite Aid and Other Customers of Boreal Forest Products Can Support Real Solutions," published two days later, which implored Rite Aid to make "better buying decisions," because "[d]espite the appealing Buy one get one free offer, throwing away endangered forests is always a bad deal."

178.     But the attack on Rite Aid did not end there.  Between July 21, 2015 and July 28, 2015, Defendant Amy Moas published three separate blog posts which accused Rite Aid of "Still Making The Wrong Choice For Forests," and "Destroying Canada's Boreal Forest."  The posts criticized Rite Aid for "ignor[ing] what science tells us: the Canadian Boreal forest is at risk and Rite Aid's supplier, Resolute, is making a bad situation worse," by "cutting out the heart of the forest," "needlessly destroying critical habitat of the endangered woodland caribou and at times logging in the Indigenous Peoples' territories without their consent."  On the basis of these false lies, Defendant Moas implored Rite Aid to "make the Rite Choice," and stop "turning a blind eye to the forest destruction behind its throwaway flyers."  The Greenpeace Enterprise reiterated these same falsehoods on Facebook and Twitter using the hashtag #RiteAidWrongChoice.

179.     The Greenpeace Enterprise threatened to employ similar public shaming tactics against one of Resolute's largest and most important customers, The Home Depot, Inc. ("Home

Depot").  In or around August 2014, enterprise member Richard Brooks approached Home

Depot and threatened to resort to market campaigns and in-store demonstrations just as it had

done to Best Buy if Home Depot continued to source paper from Resolute.  In response, Home

Depot publicly agreed to engage in discussions with Greenpeace to "ensur[e] their paper and

solid wood suppliers are practicing responsible and sustainable forestry."

180.    Greenpeace and the other enterprise members have also communicated the same

materially false, misleading, and defamatory claims to numerous other actual and potential

customers not yet known specifically by Resolute because of the surreptitious nature of the

communications.

### iv.    The Greenpeace Enterprise Targeted Resolute's FSC Certifications

181.    The Greenpeace Enterprise targeted Resolute's FSC certifications by appealing to

FSC directly and by seeking to improperly influence FSC's purportedly independent third-party

auditors.

182.    The FSC is an international non-profit association, whose membership includes

environmental organizations, indigenous peoples and several forest products producers and

retailers.  The FSC promulgates standards for responsible forest management, and maintains a

global forest certification system for forests and forest products.  As a result of lobbying and

promotion by ENGOs, FSC certification has become an accepted mechanism for companies that

rely on forest products to manufacture consumer goods to signal to their supply chain and end

purchasers that they are committed to recognized sustainability practices.

183.    In or about 2008, Resolute committed publicly to obtain 100% certification of its

managed forest from predominant North American certification standards, including FSC, that

certify forest management practices.  By September of 2008, Resolute obtained its first FSC

certification for three of its forest units.  Less than four years later, Resolute had become the

world's largest holder of FSC certificates.  On June 20, 2012, Resolute announced that an

additional 7.9 million acres of forest lands in the Lac-Saint-Jean region of Quebec met the FSC

Boreal Standard, raising the total area of Resolute-managed FSC-certified forests in North

America to 25.6 million acres, an area twice the size of Nova Scotia and larger than Portugal,

Hungary or South Korea.

184.    Resolute's commitment and successful implementation of the FSC pledge it made

to Greenpeace entities and the other ENGOs was a surprise and, to these Greenpeace entities, a

problem because it impaired the ability to threaten Resolute customers with being tarred by false

accusations about Resolute when many of Resolute's Boreal products were certified by the

specific certification standard the Greenpeace Enterprise and the other ENGOs promoted as the

gold standard (FSC Forest Management standard and FSC Controlled Wood Standard).  It was

essential for the Greenpeace Enterprise to manufacture a crack in Resolute's FSC armor.  To do

this, it schemed to procure the loss or suspension of at least some of Resolute's FSC

certifications.  And it crafted many elements of the "Resolute: Forest Destroyer" campaign to

accomplish this goal.

185.    This campaign began in July 2012, within weeks of the announcement that

Resolute was the largest holder of FSC certifications in the world.   In response to that news, the

Greenpeace Enterprise immediately filed a false and misleading complaint with the FSC,

alleging, among other things, that Resolute was not in compliance with the FSC standards as

they relate to the Caribou Forest tenure in Ontario.  Specifically, the FSC complaint, echoing

what would become the mantras of the "Resolute: Forest Destroyer" campaign, falsely alleged

that Resolute had not:  (a) properly identified and protected High Conservation Values; (b)

adhered to the Precautionary Principles in relation to the woodland caribou management; (c) adequately protected area plans; or (d) appropriately consulted with interested parties.

186.    Rainforest Alliance was retained to conduct an independent audit of the disputed areas.  However, the Greenpeace Enterprise contaminated the independence of the audit through, among other means, the "emotionalizing pressure" its "Forest Destroyer" campaign was designed to generate and through other forms of direct and indirect communication and influence.  The result was a disparate and unprecedented audit and result.

187.    The Greenpeace Enterprise's campaign had its intended effect.  On December 17, 2013, the Rainforest Alliance announced that it would be suspending two Resolute FSC certificates.  ForestEthics immediately spread the news of the Greenpeace Enterprise's success via Twitter, "Canada's largest forest company, Resolute Forest Products, loses several ecocertifications [sic] #FSC," and subsequently tweeted "Grand Council of the Crees wins suspension of Resolute Forest Products' #FSC Certification."  Greenpeace Defendants, including Defendant Amy Moas, also spread the news through false tweets that misrepresented that the suspensions were due to "the violation of strict #sustainability standards" and commended the FSC for "stop[ping] the destruction."

188.    As set forth more fully above, the Greenpeace Enterprise would continue to pressure and influence the FSC and its auditors and cause highly disparate and more demanding standards to be applied to Resolute than any other holders of FSC certificates.

### v.    The Greenpeace Enterprise Targeted Government Regulators.

189.    The Greenpeace Enterprise sought to exert similar pressure on government regulators to implement additional regulatory requirements governing forestry practices. Accordingly, on June 27, 2009, the Greenpeace Enterprise staged a protest at the Ministry of

Natural Resources in Quebec City.  While the demonstration targeted the government of Quebec, the Greenpeace Enterprise specifically and intentionally sought to draw the regulators' attention to Resolute's logging and forestry practices by utilizing Resolute wood products taken from the company's Chateau-Richer sawmill during their protest activities.

190.    Moreover, on June 10, 2015, the Greenpeace Enterprise emailed Peter Politis, Mayor of the Town of Cochrane, reiterating its concerns "about the sustainability of [Resolute's] forestry operations and their impact on the ecological health of our public forests."  Significantly, the Greenpeace Enterprise falsely represented to Politis that its "concerns have been validated by the Forest Stewardship Council and their independent auditors" suspension and/or termination of four FSC certifications.  Yet, as set forth above, the suspension and termination of Resolute's FSC certifications was a direct result of the Greenpeace Enterprise's disinformation campaign.  Accordingly, the Greenpeace Enterprise's attempt to cite the FSC's actions -- which they themselves had influenced -- as independent verification of the lies they had been, and continued to disseminate, was intentionally false and misleading and designed to harm Resolute.

191.    The June 10, 2015 email to Politis further stated, without any basis, that Resolute "seem[s] unwilling to do anything about [sic] other than rile up communities and threaten organizations with lawsuits."  The email concluded by falsely alleging that Resolute "has troubling relationships with some (not all) First Nation communities" and wrongly accused Resolute of laying off thousands of workers, while other companies, like Domtar and Canfor, are increasing their workforce."

### vi.    The Greenpeace Enterprise's Other "Bad Acts"

192.    The Greenpeace Enterprise engaged in additional overt acts in furtherance of its efforts to broadly disseminate falsehoods about Resolute, cause harm to Resolute's business and reputation, and generally promote its agenda with respect to forest management.

193.    For example, in May 2013, ForestEthics attempted to coerce Resolute to "collaborate" with ForestEthics and others on setting aside large tracts of forest to create large new protected areas as part of the negotiations related to the implementation of the CBFA. During a meeting held at Resolute's Montreal offices, Todd Paglia of ForestEthics threatened a Resolute official that if Resolute failed to cede to ForestEthics' demands, ForestEthics would destroy Resolute's image among its critical market constituents.  On the other hand, if Resolute agreed to collaborate with ForestEthics in a public campaign, ForestEthics would ensure that Resolute was viewed in a positive light.  Following the meeting, Mr. Paglia circulated to Resolute samples of ForestEthics' previous "collaborations" with Staples and Victoria's Secret. Notwithstanding ForestEthics' threats, Resolute declined ForestEthics' demands.

194.    In the months that followed, the Greenpeace Enterprise made good on its threat to destroy Resolute's reputation in the industry.  For example, on March 18, 2014, ten Greenpeace activists and a group of volunteers embarked on a publicity stunt to shun "Resolute's destructive logging practices."  The enterprise members transformed the iconic Mount Royal Cross overlooking Montreal into an "immense scales of justice."  Two giant scales were suspended from the arms of the cross.  The heavy side was depicted with the Resolute logo.  By contrast, the lighter side of the scale represented the forest and the communities and wildlife that depended on it.  Running vertically along the cross was a twelve meter banner which posed the question: "Justice?"

195.    Similarly, around this time, the Greenpeace Enterprise launched a public campaign "The Stand For Forests" pledge.  The campaign -- which amounted to nothing more than another publicity stunt to disseminate the Greenpeace Enterprise's false lies about Resolute -- falsely accused Resolute of "put[ting] the health of the Boreal Forest at risk with its destructive

logging practices" and purported to "call for people to come together . . . even if it means facing a $7 million lawsuit" and sign a pledge "as a symbol of shared resolve to protect Canada's Boreal Forest from Resolute's clear-cutting."  The product of the Stand for Forests Campaign was a "guardian tree," which was ultimately presented to Resolute at its corporate headquarters in Montreal on May 22, 2014.  As evidence of the widespread impact of the Greenpeace Enterprise's campaign, the guardian tree was signed by 61,000 activists and supporters.

196.    Most recently, in August 2015, ForestEthics again tried to undermine Resolute's participation in the CBFA and its relationship with its critical stakeholders which were its partners in that agreement.  In an open warning letter addressed to Resolute's CEO, Richard Garneau, ForestEthics publicly accused Resolute of "refusing to co-operate" in the CBFA and purported to unilaterally dismiss Resolute from the CBFA.  In response, Garneau rebutted ForestEthics' allegations of noncompliance, and exposed the underlying purpose of ForestEthic's correspondence, stating "this is just your business model: find the largest company in the industry and threaten, malign, isolate and attack them until they back down.  Then use that success to drive others in the industry to do the same."

**C.  The Greenpeace Enterprise's Georgia Activities**

197.    The Greenpeace Enterprise's campaign against Resolute has entailed significant contacts with and effects in the State of Georgia, where Resolute operates a newsprint mill and where numerous Resolute customers are located.  Both GP-Inc. and GP-Fund are registered charities under the Georgia Charitable Solicitation Act of 1988 (O.C.G.A. § 43-17-1, et seq.), and GP-Inc. is registered in Georgia as a Foreign Nonprofit Corporation under O.C.G.A. § 14-3-1501, et seq.

198.    The Greenpeace Enterprise has made false and misleading statements about Resolute to key Resolute customers located in Georgia via email and telephone communications. These customers include YP, The Home Depot, Kimberly-Clark, P&G, and Georgia Pacific.

199.    The Greenpeace Enterprise's wrongful acts have also caused Resolute to suffer substantial damage in Georgia, including lost customers, lost revenue and cutbacks and layoffs at Resolute's Augusta facility.

200.    For example, in mid-2013, the Greenpeace Enterprise contacted the major directory publishers in the United States – among them were Resolute customers YP, LSA and Dex Media – attempting to effectuate both the termination of the publishers' existing business relationships with Resolute and the prevention of prospective business dealings.  Enterprise member Richard Brooks held a conference call with multiple publishers on May 28, 2013 and, with the aid of a PowerPoint presentation he provided to the publishers, made false and misleading statements about Resolute's operations in the Boreal Forest.  Brooks' presentation stated that Resolute operates in "Endangered Forest areas in Quebec," specifically the "Montagnes Blanches Endangered Forest,"  and misrepresented Resolute's operations with respect to woodland caribou, conflicts with indigenous First Nations, and Resolute's FSC certificates.  Brooks also warned the publishers of the risk of reputational damage arising from being associated with Resolute.  YP, one of Resolute's major customers, participated on the conference call from their headquarters in Tucker, Georgia.

201.    The Greenpeace Enterprise also attempted to interfere with Resolute's business relationship with The Home Depot, representing one of Resolute's largest and most important customers.  The Home Depot maintains its headquarters in Atlanta, Georgia.  In August 2014, Resolute was informed that Richard Brooks had threatened The Home Depot with market

campaigns and in-store demonstrations if The Home Depot continued to buy from Resolute.  The Greenpeace Enterprise's efforts to interfere with this key relationship were publicized in a January 12, 2015 Bloomberg article:

> Greenpeace said it's in talks with Home Depot Inc. and Office Depot Inc. to get them to stop using Resolute products.  Greenpeace is talking to Resolute customers "about ensuring their paper and solid wood suppliers are practicing responsible and sustainable forestry," Richard Brooks, coordinator of the organization's Canada forest campaign, said last week.

202.    Resolute's important relationship with Kimberly-Clark – which maintains corporate offices in Roswell, Georgia – was also targeted by the Greenpeace Enterprise. Kimberly-Clark had itself been the victim of a years-long campaign by Greenpeace related to sourcing from Canada's forests – a campaign which also involved substantial contacts with Georgia.  For example, on August 13, 2008, Greenpeace activists launched a boat in a pond at Kimberly-Clark's Roswell offices from which protesters hung banners and vocally protested the company's practices.  Six activists were arrested in Roswell for this stunt.

203.    In furtherance of the Greenpeace Enterprise's campaign against Resolute, Greenpeace regularly communicated with Kimberly-Clark executives in Georgia, including their Vice President of Global Sustainability and Manager of Sustainable Forest Management. Specifically, on July 27, 2012, Richard Brooks sent an email to a Kimberly Clark executive located in the Georgia office regarding Resolute's alleged "FSC Non-compliance issues," including "a) failure to properly identify and protect High Conservation Values, b) not adhering to the Precautionary Principle in relation to woodland caribou management c) inadequate protected area plans, and d) lack of appropriate consultation with interested parties."

204.    On August 21, 2012, a Kimberly-Clark employee in Georgia informed Resolute that he had been contacted by the Greenpeace Enterprise about Resolute's FSC certificates and

requested Resolute's response to the misleading allegations.  The Greenpeace Enterprise continued to bombard Kimberly-Clark with false claims about Resolute's forestry practices, including the impact of its logging on the woodland caribou, including during meetings in December 2012 and May 2013, and countless other emails, letters, and telephonic discussions throughout 2013, 2014 and 2015.

205.    The Greenpeace Enterprise's persistent efforts were ultimately successful.  On September 16, 2015, Kimberly-Clark informed Resolute that "[d]ue to Resolute's continued dispute with Greenpeace and the recent upsets in the CBFA, we are not going to be able to pursue a contractual relationship."

206.    The Greenpeace Enterprise likewise targeted Resolute's business with P&G – one of the world's largest manufacturers of tissue paper products which operates a manufacturing plant in Albany, Georgia.  Two of Resolute's paper mills supplied P&G's Albany plant.  Due to the significance of this account for Resolute, throughout 2013 and 2014, enterprise member Richard Brooks regularly communicated to P&G's sustainability officers the Greenpeace Enterprise's disinformation concerning the status of Resolute's FSC certificates.  In response, P&G expressed significant concern that they might become a Greenpeace target for maintaining a business relationship with Resolute.  These concerns played an important role in the companies' 2014 contract renewal negotiations for P&G's Georgia plant.  As a result of these concerns, in 2014, P&G informed Resolute of its decision to source its Georgia facility from another supplier.

207.    In addition to sabotaging Resolute's existing customer relationships in Georgia, the Greenpeace Enterprise has also successfully scared away at least one significant prospective customer in Georgia.  In late 2014, the Greenpeace Enterprise prevented Resolute from securing

a large contract with one of the world's leading manufacturers of tissue paper, Georgia Pacific, which is headquartered in Atlanta, Georgia.  Fearing that dealings with Resolute might put them in the Greenpeace Enterprise's sights, Georgia Pacific abandoned negotiations for a large contract with Resolute.

208.    The Greenpeace Enterprise has also employed on-the-ground tactics aimed at harming Resolute's relationships with key constituents.  On May 29, 2015, Greenpeace activists, including enterprise member Richard Brooks and Defendants Matt Daggett and Rolf Skar, travelled to Augusta, Georgia to communicate falsehoods about Resolute to Resolute's Board of Directors, shareholders, customers, members of the media and financial sectors, and the public alike.  Greenpeace advertised their plans in advance in order to recruit Greenpeace supporters to participate in Greenpeace's "Thunderclap" campaign, thereby facilitating the transmission and display of thousands of messages to Resolute's "most important event of the year" in Augusta Georgia.  On May 22, 2015, Defendant Daniel Brindis wrote:

> On the 29th of May, the company is holding its Annual General Meeting in Augusta, Georgia – the most important event of the year where company leaders and shareholders will meet to review their annual plans.  This is also our opportunity to ask Resolute to make protecting the Boreal Forest a key priority for the upcoming year. . . We need you to take part in our global Thunderclap Twitter action to shout as loud as we can . . . Sign up using your Facebook or your Twitter Account adding your voice to our global tweet and on the day of the AGM, your message and your name will automatically go live to the event.

Greenpeace later touted the success of their demonstration in Georgia:

> Five Greenpeace activists trekked to Augusta, Georgia, USA from several corners of North America to deliver some simple messages to the senior management and board of Resolute Forest Products . . . We were accompanied, digitally, by people across five continents and from countries as diverse as Brazil, India, New Zealand, Spain, Thailand, Turkey, the United States, and Canada.  Their messages were projected on site to the company's shareholders and directors. . . . We delivered our messages loud and clear.  Resolute senior managers and board heard us.

209.     Further, in addition to the many aspects of Greenpeace's campaign that have been directed towards or occurred within the State of Georgia, as well as the resulting loss of customers, Resolute has also suffered significant harm, including having to decrease its overall production of newsprint, and in particular decreased production at its newsprint mill in Augusta Georgia where wood and old newspaper and magazines are processed to make newsprint.  In mid-2013, Resolute invested $30 million in its Augusta facility.  At the time, the facility provided jobs for approximately 290 workers.  However, due in part to significantly lower demand for Resolute's products stemming, in part, from the Greenpeace Enterprise's ongoing campaign of disinformation, Resolute has been forced to shut down one of the plant's two paper machines, requiring Resolute to lay-off approximately 95 employees and reducing capacity by more than half.  This closure will cost the company C$20 million.

210.     Combined, it is clear that various members of the Greenpeace Enterprise and their ongoing campaign have significant connections to the State of Georgia: email and telephone communications have repeatedly been directed to the State; members of the Greenpeace Enterprise have travelled to the State to perform significant campaign-furthering acts; and the Greenpeace Enterprise has caused Resolute to suffer substantial damages in Georgia.

**D.  <u>Damages</u>**

211.     The Greenpeace Enterprise's campaign has and continues to inflict substantial harm on Resolute in various respects.

212.     Indeed, in January 2016, Greenpeace published a putative briefing for investors admitting, indeed trumpeting, that the issues it had manufactured during the "Resolute: Forest Destroyer" campaign "are contributing to a loss of market share, loss of social license to operate in the Boreal Forest, reputational damage, and increased costs" to Resolute.  Greenpeace's admission is accurate.

213. First, the unrelenting campaign of disinformation has materially harmed Resolute's brand, reputation, and goodwill in the marketplace, as well as the business, community, and government relationships on which its business depends.

214. Second, the campaign has directly targeted and either impaired or terminated multiple contractual and other customer relationships including, but not limited to, those set forth herein such as 3M, Axel Springer, Best Buy, Georgia Pacific, Kimberly Clark, P&G, Union Bank, Burrows Paper Corporation, and UPM.  Greenpeace's January 2016 release admitted that the loss of Kimberly Clark, 3M, and Axel Springer alone was at least C$100 million:

> "Exact financial impact of these reductions and cancellations is not in the public domain but given the estimate contracts of identified customers' cancellations, we would estimate it about C$100 million."

215. Third, beyond specific contracts and customer relationships that have been lost or impaired, the amount of market share Greenpeace acknowledges Resolute is losing constitutes even greater harm, and it is not harm that is limited merely to products related directly to the Boreal forest.  Ascertaining the full scope of these losses will require discovery.

216. Fourth, as Greenpeace notes, Resolute has incurred costs and expenses attempting to address the issues and difficulties the campaign against it has caused, as well as internal resources.  These include time and expenses incurred responding to and rebutting the campaign's disinformation directly with customers, auditors, regulators, and other stakeholders, publicly responding to and rebutting Greenpeace's public disinformation, and pursuing legal remedies for Greenpeace's illegal behavior.

217. The total amount of these damages can only be calculated once the full scope and activities of the Greenpeace Enterprise are revealed.

# CAUSES OF ACTION

## COUNT I

### RACKETEERING IN VIOLATION OF RICO, 18 U.S.C. §§ 1962(c)
### (AGAINST ALL DEFENDANTS)

218.   Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

219.   Defendants are persons within the meaning of 18 U.S.C. § 1961(3).

220.   Beginning in at least 2012 and continuing through the present (the "Scheme Period"), Defendants and enterprise members were associated in fact and comprised an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) willfully and with actual knowledge of the illegality of their actions and those of the enterprise.  The Greenpeace Enterprise is engaged in, and its activities affect, interstate and foreign commerce.

221.   The Greenpeace Enterprise has an existence beyond that which is merely necessary to commit predicate acts and, among other things, oversaw and coordinated the commission of numerous predicate acts on an on-going basis in furtherance of the scheme, each of which caused direct harm to Plaintiffs.

222.   During the Scheme Period, each of the Defendants agreed to and did conduct and participate in the affairs of the Greenpeace Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962(c).  It was the purpose of the Greenpeace Enterprise to create and disseminate false and misleading reports and information concerning Resolute, under the guise of protecting the environment, but in truth, for the unlawful purpose of soliciting fraudulent donations from the public at-large.  This widespread dissemination scheme was intended to, and did in fact, result in substantial profits for the members of the Greenpeace Enterprise, and caused harm to Resolute.

223.    The Greenpeace Enterprise's conduct and acts in furtherance of the fraudulent scheme included, but were not limited to the predicate RICO acts of: (i) mail fraud in violation of 18 U.S.C. § 1341; (ii) wire fraud in violation of 18 U.S.C. § 1343, as set forth in 18 U.S.C. §§ 1961(1)(B); (iii) extortion and other crimes in violation of 18 U.S.C. § 875-77, 880 and 18 U.S.C. § 1512; (iv) illegal interference with commerce in violation of 18 U.S.C. § 1951; (v) illegal monetary transactions in violation of 18 U.S.C. § 1957; (vi) and corresponding Georgia statutes criminalizing the same conduct, and which constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

224.    Specifically, among other things, throughout the Scheme Period, in furtherance of and for the purpose of executing and attempting to execute the described schemes and artifices to defraud, each of the Defendants, on numerous occasions, used and caused to be used wire communications in interstate and foreign commerce and U.S. mails, by both making and causing to be made wire communications and mailings.  These wire communications and mailings were made, inter alia, for the purpose of: (i) preparing false and misleading reports concerning Resolute and its customers; (ii) broadly disseminating the false and defamatory reports and other statements through Greenpeace's website and other internet platforms, such as Twitter and Facebook; (iii) communicating and coordinating with one another to effectuate the dissemination of false and misleading information necessary to perpetrate the scheme to harm Resolute; (iv) disseminating the false and misleading allegations directly to Resolute's stakeholders, customers, trade associations, government regulators, and other critical market constituents through email, U.S. mail, and phone; (v) misappropriating proprietary customer, sourcing, and other trade secret information from Resolute and its customers; (vi) harassing Resolute's customers with extortionate threats; (vii) soliciting fraudulent charitable donations from the public by means of

false pretenses, representations, or promises; (viii) wiring fraudulently obtained funds to sustain the Greenpeace Enterprise's "campaign" against Resolute; and (ix) submitting materially false and misleading tax submissions and financial information.  Defendants committed and participated in these acts willfully and with knowledge of their illegality.  These predicate acts were intended to and did mislead donors, customers, and others about the Plaintiffs so as to induce donations and compliance with the Defendants' demands and to extract and intimidate others, all of which objectives were obtained.

225.    Each such use of a wire communication and/or mailing in connection with the described scheme constitutes a separate and distinct violation of the RICO statute, by virtue of violating the incorporated federal predicate acts proscribed by 18 U.S.C. §§ 1341 and/or 1343, and each causing direct injury to Resolute's business and reputation.  While Resolute does not have the full knowledge of the extent of the use of the wires and mails by the Greenpeace Enterprise in furtherance of the scheme, the following charts show some, but not all, of those violations.

226.    Greenpeace authored and published numerous reports and other Resolute-related updates and blog posts as set forth in Table A, on its website.  Each publication constitutes a separate fraudulent wire communication:

**TABLE A**

| GREENPEACE PUBLICATIONS | |
|---|---|
| **TITLE** | **DATE** |
| Consuming The Boreal Forest: The Chain Of Destruction From Logging Companies To Consumers | 8/1/2007 |
| Crisis In Our Forests: A Case Study Of AbitibiBowater's Irresponsible Forestry In The English River Forest | Nov-09 |
| Resolute Forest Products Violate Canadian Boreal Forest Agreement With Logging Activity In Off-Limit Areas | 12/6/2012 |
| Boreal Alarm: A Wakeup Call For Action In Canada's Endangered Forests | 1/2013 |

| | |
|---|---|
| Greenpeace Calls For A Halt On Logging In Five Key Areas In The Boreal Forest | 1/22/2013 |
| Ridiculous Tax Break Sought By Resolute In The Boreal Forest | 4/10/2013 |
| Protecting Our Land – The Mishigamish In The Broadback Valley In Quebec | 4/29/2013 |
| Algonquin Community Defends Their Lands Against Resolute Forest Products | 5/14/2013 |
| Resolute's False Promises: The [Un]sustainability Report 2013 | 5/15/2013 |
| Buyer Beware, Resolute Forest Products' Sustainability Falls Flat, Report Reveals | 5/15/2013 |
| Resolute's Green Marketing Won't Cut It | 5/16/2013 |
| Resolute Forest Products' Deceit Leads To Collapse Of Boreal Agreement | 5/21/2013 |
| Resolute's Flawed 'Controlled Wood' Threatens FSC's Credibility | 8/29/2013 |
| FSC AT RISK: Canada's Resolute Forest Products: Opening FSC To Controversial 'Controlled Wood' Sources | 8/29/2013 |
| Woodland Caribou Aren't The Only Ones In Trouble | 10/3/2013 |
| ForestEthics Defends An Endangered Forest In Ontario | 10/10/2013 |
| Sustainability Requires Action, Not Words | 10/10/2013 |
| FSC Suspends Three Certificates Operated By Logging Giant Resolute | 12/12/2013 |
| Canada's Largest Logging Company Resolute Loses Three Sustainability Certificates, Proving Forest Mismanaged | 12/12/2013 |
| Its Not Our Fault That We Lost Our Green Label' Says Logging Giant Resolute | 12/16/2013 |
| Resolute's FSC Suspensions In Ontario and Quebec, and Assessment Failure In Ontario | 1/14/2016 |
| The Guardian Tree: Where art and the forest come together | 2/12/2014 |
| Forest Solutions: An Insider's Look At Greenpeace Collaborations In Forest Regions Around The World | 3/1/2014 |
| Message To Resolute: You Can Collaborate With Us.  Others Have | 3/17/2014 |
| Mount Royal Cross Transformed Into Scales Of Justice: Greenpeace Protests The Reckless Destruction Of Canada's Boreal Forest | 3/18/2014 |
| Montreal Cross Scales Of Justice | 3/18/2014 |
| What Environmentalists Do | 4/3/2014 |
| FSC AT RISK: Resolute Forest Management: FSC Must Do More To Protect Intact Forests, Species At Risk And Indigenous Rights In Canada | 5/2014 |
| Mr. Garneau, Will You Be Part Of The Solution?  60,000 Citizens Stand For Forests | 5/22/2014 |
| Shoot: Signature Delivery At Resolute Headquarters in Montreal | 5/22/2014 |
| Ignoring Boreal Forests Could Speed Up Global Warming | 5/5/2014 |
| Greenpeace At Resolute's AGM: Will Richard Garneau Be Part Of The Solution | 5/23/2014 |
| Resolute's Transparency Crisis Over Its Operations In Canada's Forests | 6/12/2014 |
| Ontario Nature Shines A Spotlight On Caribou Forest | 9/15/2014 |

| | |
|---|---|
| Field Visit To Atikamekw: The Devastation Of The Logging Industry Has Lasted Too Long | 9/26/2014 |
| Better Buying In The Boreal Forest | 11/2014 |
| Best Buy Is Wasting Ancient Forests, One Flyer At A Time | 11/26/2014 |
| Electronics Giant Best Buy Wasting Boreal Forest One Flyer At A Time: Greenpeace Report | 11/26/2014 |
| Help Best Buy Get Out Of Ancient Forests | 11/26/2014 |
| Best Buy Does Better For Canada's Forests, Commits To Sustainable Paper | 12/9/2014 |
| For Workers And For Our Public Forests, Resolute Must Work To Regain Its FSC Certificates | 12/18/2014 |
| Who's Been Naughty And Who's Been Nice To The Planet This Year | 12/22/2014 |
| Will You Stand For The Boreal Forest? | 2/17/2015 |
| Posted: Good News for Forests! | 3/5/2015 |
| FSC International Calls Out Resolute Forest Products' Leadership, Asks For An Immediate Change In Approach | 3/16/2015 |
| Rite Aid Making The Wrong Choice For Ancient Forests | 4/15/2015 |
| How Rite Aid And Other Customers Of Boreal Forest Products Can Support Real Solutions | 4/17/2015 |
| Join Our Thunderclap: Say It Loud For Real Solutions In The Boreal Forest | 5/22/2015 |
| Chief Forester Of Quebec Issues Alarming Report On Future Of Caribou | 5/29/2015 |
| What Did 10,000 Tweets Say To Resolute Forest Products? | 6/1/2015 |
| Ban On Logging: Cree First Nation More Committed Than Ever To Protect Their Last Intact Forests | 7/14/2015 |
| Rite Aid: Still Making The Wrong Choice For Forests | 7/21/2015 |
| US Pharmacy Giant Rite Aid Is Destroying Canada's Boreal Forest | 7/21/2015 |
| Why Forests Are Critical For Public Health | 7/25/2015 |
| US pharmacy Giant Making Wrong Choice For The Boreal Forest | 7/28/2015 |
| Collaboration Is The Key To Sustainability In Canada's Boreal Forest | 8/14/2015 |
| Maker of Post-It Notes Lives Up To Promise, Begins To Eliminate Destructive Logger from Supply Chain | 10/12/2015 |
| Protecting Intact Forests & FSC's Motion 65: Getting The Facts Straight | 12/15/2015 |
| Resolute Forest Products: Key Risks And Concerns For Investors | 1/1/2016 |
| Axing The Broadback? Strong Opposition To The Logging Industry At The COMEX Public Hearings | 1/21/2016 |
| Certification Update February 2016 - Montagnes Blanches Endangered Forest | 2/2016 |
| Endangered Forests in the Balance - The impact of logging reaches new heights in the Montagnes Blanches Endangered Forest - Updated February 2016: | 2/2016 |
| A Good Reputation Takes Work Not Forest Destruction | 2/22/2016 |
| Boreal Forest: The Facts | 3/27/2016 |
| Resolute: Forest Destroyer | Undated |
| Boreal Forests | Undated |
| #STAND FOR FORESTS | Undated |

227.    The Greenpeace Enterprise also disseminated falsehoods about Resolute by phone, through electronic mail, U.S. mail, and posts on social media platforms, such as Twitter and Facebook, which resulted in direct injury to Plaintiffs.  The total number of phone calls, e-mails, and mailings, and the identities of all enterprise members is not yet known, but members of the Greenpeace Enterprise engaged in the following phone calls, e-mails, and U.S. mailings as set forth in Table B, each constituting a separate mail or wire communication in furtherance of the fraudulent scheme:

**TABLE B**

| ADDITIONAL MAIL AND WIRE COMMUNICATIONS | | | | |
|---|---|---|---|---|
| **SENDER/CALLER** | **RECIPIENT** | **DATE** | **SUBJECT** | **METHOD** |
| Greenpeace | Kimberly-Clark | 8/21/2012 | Challenging Resolute's compliance with FSC standards | E-mail |
| Greenpeace | P&G | 9/2012 | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest | U.S. Mail or E-Mail |
| Greenpeace | P&G | 11/2012 | Challenging Resolute's compliance with FSC standards | U.S Mail or Email |
| Greenpeace | Lowes Companies, Inc. | 1/2013 | Accusing Resolute of logging in restricted areas | Phone |
| Joanna Kerr | Seaman Paper | 1/9/2013 | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest | U.S. Mail or E-Mail |
| Andisheh Beiki | Harlequin Enterprise | 1/17/2013 | Transmitting the "Boreal Alarm" Report | E-mail |
| Andisheh Beiki | Lowes Companies, Inc. | 1/22/2013 | Transmitting the "Boreal Alarm" Report | E-mail |
| Catharine Grant; Daniel Brindis | Jean Denault | 3/28/2013 | Accusing Resolute of threatening the survival of woodland caribou herds | U.S. Mail or E-mail |
| Catharine Grant | Wausau Paper | 5/15/2013 | Transmitting  "Resolute False Promises - the [Un]sustainability Report" | E-mail |
| Rolf Skar | N/A | 5/15/2013 | "New report shows Canadian logging giant Resolute Forest Products cutting into endangered forests @GreenpeaceCA" | Twitter |

| Stand | N/A | 5/21/2013 | "Our Commitment 2 #Boreal #Forest Protection: Stronger than @ResoluteFP via @ForestEthics #TheRootWord" | Twitter |
|---|---|---|---|---|
| Stand | N/A | 5/21/2013 | "@ResoluteFP won't do anything close to what science warrants to protect our it-forests and threatened #caribou" | Twitter |
| Todd Paglia | N/A | 5/21/2013 | "My blog: Our Commitment to Boreal Forest Protection: Stronger than Resolute" | Twitter |
| Greenpeace | Unisource Worldwide | 5/31/2013 | Transmitting "Resolute False Promises - the [Un]sustainability Report" | U.S. Mail or E-mail |
| Greenpeace | Local Search Association | 6/2013 | Accusing Resolute of forest destruction and degradation in Canada's Boreal Forest | Phone |
| Richard Brooks | Hearst | 6/14/2013 | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest | E-mail |
| Daniel Brindis | Perfection Press, Inc. | 8/27/2013 | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest | U.S. Mail or E-mail |
| Greenpeace | Pearson | 9/3/2013 | Accusing Resolute of Violating the CBFA | U.S. Mail or E-mail |
| Greenpeace | Pearson | 9/26/2013 | Accusing Resolute of Violating the CBFA | Phone |
| Oliver Salge | Francine Cunningham | 11/21/2013 | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest | E-mail |
| Richard Brooks | Lowes Companies, Inc. | 12/12/2013 | False allegations re FSC suspensions | E-mail |
| Amy Moas | N/A | 12/13/2013 | "Good new Canadian logging giant Resolute Forest's #FSC certificates suspended. Stop the destruction! #Greenpeace" | Twitter |
| Stand | N/A | 12/17/2013 | "Grand Council of the Crees wins suspension of Resolute Forest Products' #FSC Certification" | Twitter |
| Greenpeace USA | N/A | 12/17/2013 | "The @FSC_IC stands up to logging giant, #Resolute, for the violation of strict #sustainability standards" | Twitter |
| Stand | N/A | 12/17/2013 | "Canada's largest forest company, Resolute Forest | Twitter |

| | | | Products, loses several eco-certifications from #FSC" | |
|---|---|---|---|---|
| Greenpeace USA | N/A | 12/18/2013 | "Logging giant, #Resolute, points fingers as to why they recently lost @FSC_IC #sustainability certifications" | Twitter |
| Greenpeace | Resolute Customer | 1/2014 | Accusing Resolute of unsustainable operations in the Canadian Boreal forest. | U.S. Mail or Email |
| Greenpeace | Pro Build | 3/2014 | Transmitting the "Boreal Alarm" report | U.S. Mail or Email |
| Greenpeace | N/A | 3/18/2014 | "@GreenpeaceCA turn Montreal Mt Royal into scales of justice - resolute Logging co. vs Boreal Forest #StandForForests" | Twitter |
| Nicolas Mainville | N/A | 3/19/2014 | "Sending a resolute message to a forest destroyer #standforforests" | Twitter |
| Hilde Stroot; Oliver Salge | Wegener Media | 4/3/2014 | False allegations re FSC suspensions | U.S. Mail or E-mail |
| Stephanie Goodwin | Mr. Truemper | 4/4/2014 | Transmitting  "Forest Solutions" report | U.S. Mail or Mail |
| Richard Brooks | Krueger | 4/14/2014 | Transmitting link to "Forest Solutions - Collaborations with Greenpeace from around the world" | E-mail |
| Amy Moas | N/A | 5/21/2014 | "Shameful! @Resolutefp sues @RnfrstAlliance to cover up forest destruction. Awful Corporate behavior! @GreenpeaceCA" | Twitter |
| John Sauven | Guardian | 7/15/2014 | Accusing Resolute of threatening the survival of woodland caribou herds | E-mail |
| Nicolas Mainville | N/A | 10/12/2014 | "Why is @resolutefp so upset about @BestBuy using sustainable paper? Because they failed #FSC exams." | Twitter |
| Nicolas Mainville | N/A | 12/21/2014 | "@resolutefp abandons #FSC standard despite corporate commitments, risking contracts and sustainability bit.ly/1wAT9hX @RBGreenpeace" | Twitter |

| Nicolas Mainville | N/A | 1/25/2015 | "Thanks @gcccra @billnama. Resolute's violation of free prior consent under #FSC has been recognized by #ASI, what would now be the solution?" | Twitter |
|---|---|---|---|---|
| Greenpeace | Express Newspapers | February 2015 | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest | U.S. Mail or E-mail |
| Greenpeace | News International | February 2015 | Accusing Resolute of unsustainable  operations in the Canadian Boreal Forest | U.S. Mail or E-mail |
| Pat Venditti | Northern & Shell | 2/2/2015 | Accusing Resolute of forest destruction and degradation in Canada's Boreal forest | U.S. Mail or E-mail |
| Pat Venditti | Trinity Mirror Plc | 2/2/2015 | Accusing Resolute of forest destruction and degradation in Canada's Boreal forest | U.S. Mail or E-mail |
| Rolf Skar | N/A | 3/16/2015 | "@FSC_IC asks that Resolute Forest Products "immediately stops their discriminatory activities and communications" | Twitter |
| Todd Paglia | N/A | 3/16/2015 | "Once again @resolutefp is part of an agreement but doesn't want to follow the rules they agreed to: FSC replies" | Twitter |
| Richard George | European Newspaper Publishers Association | 5/13/2015 | Accusing Resolute of waging public attack on the FSC | U.S. Mail or E-mail |
| Christiane Mazette | Folha | 8/2015 | Accusing Resolute of forest destruction and degradation in Canada's Boreal forest | E-mail |
| Amy Moas | N/A | 8/31/2015 | "Publisher @axelspringerEN ditches unsustainable @resolutefp paper. Wants Canadian paper but less enviro controversy" | Twitter |
| Todd Paglia | N/A | 12/18/2015 | "#Forest Products shows collaboration is foreign concept, rejects calls for mediation, go it alone or die?" | Twitter |
| Amy Moas | Midland Paper | Undated | Accusing Resolute of logging in Montagnes Blance | E-mail |

| Amy Moas | Penguin Random House | Undated | Accusing Resolute of logging in Montagnes Blance | E-mail |
|---|---|---|---|---|
| Greenpeace | Newscorp | Undated | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest | U.S. Mail or E-mail |
| Stephanie Goodwin | Pro Build | Undated | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest | Phone |
| Stephanie Goodwin | Pro Build | undated | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest | U.S. Mail or E-mail |

228.     In addition, Greenpeace International, GP-Fund, GP-Inc., and Greenpeace Canada have processed millions of dollars in fraudulenty induced donations over the wires in thousands of individual transactions.  Each such transaction constitutes a predicate act.

229.     As alleged, the Greenpeace Enterprise also took direct action against Resolute's customers whereby the Greenpeace Enterprise issued extortive threats demanding that such customers terminate their relationships with Resolute and endorse the Greenpeace Enterprise's position and efforts, which provided a substantial benefit to the Greenpeace Enterprise in the form of enhanced fundraising potential.

230.     As alleged, the Greenpeace Enterprise also used the mails and wires to misappropriate proprietary customer, sourcing and other trade secret information under false pretenses from Resolute and its customers for purposes of furthering the Enterprise'

231.     Each of the predicate acts referred to in the preceding paragraphs was for the purpose of executing the Greenpeace Enterprise's fraudulent scheme, and Defendants and enterprise members engaged in such acts with the specific intent of furthering that scheme, willfully and with knowledge of its falsity.  Each of the Defendants performed or participated in the performance of at least two of the predicate acts.

232.     The conduct and actions set forth herein were related to each other by virtue of: (a) common participants; (b) a common victim; and (c) the common purpose and common result of a concerted attack on Plaintiffs' business practices to fraudulently solicit and maximize donations and cause harm to Resolute's business and reputation.

233.     The Defendants' activities were interrelated, not isolated, and involved a calculated series of repeated violations of the law in order to conceal and promote fraudulent activity.  The Greenpeace Enterprise has existed with the current members and others as yet unknown since at least 2012, and the conduct and activities have continued as of the date of this Complaint.

234.     The Defendants' direct and indirect participation in the Greenpeace Enterprise's affairs through the pattern of racketeering and activity described herein constitutes a violation of 18 U.S.C. § 1962(c).

235.     As a direct and proximate cause of the Defendants' violations of 18 U.S.C. §1962(c), Plaintiffs have sustained damage to their business, property, and reputation, including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above that was not only foreseeable but intended and an objective of the predicate activity. Plaintiffs' damages include, but are not limited to: (i) lost revenue, profits and enterprise value, including lost business opportunities, lost customers, lost market share and decreased production; (ii) increased fees and expenses, as well as the expenditure of significant human resources, incurred and devoted to uncovering the nature and scope of, and attempting to remedy, Defendants' illegal enterprise and the harm directly resulting therefrom; (iii) misappropriated proprietary information; and (iii) damaged reputation in the global marketplace, business and environmental communities.

236.     As a result of the violations of 18 U.S.C. § 1962(c), Plaintiffs have suffered damages in an amount to be proven at trial, but which Greenpeace itself estimates to be not less than C$100 million.  Plaintiffs are entitled to recover from the Defendants the amount in which they have been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest, costs, and attorneys' fees incurred by reason of the Greenpeace Enterprise's violations of 18 U.S.C. § 1962(c), and disgorgement of Defendants' illicit proceeds.

## COUNT II

### RACKETEERING IN VIOLATION OF RICO, 18 U.S.C. §§ 1962(a)
### (AGAINST ALL DEFENDANTS)

237.     Plaintiffs restate paragraphs 1 through 227 above as if fully set forth herein.

238.     The Greenpeace Enterprise is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a), which was engaged in, or the activities of which affected, interstate and/or foreign commerce.

239.     In furtherance of the Greenpeace Enterprise, Defendants committed the predicate racketeering acts as pleaded herein.  It was the purpose of the Greenpeace Enterprise to create and disseminate false and misleading reports and information concerning Resolute, under the guise of protecting the environment, but in truth, for the unlawful purpose of soliciting fraudulent donations from the public at-large.  This widespread dissemination scheme was intended to, and did, result in substantial profits for the members of the Greenpeace Enterprise, and caused enormous harm to Resolute in so far as it funded the enterprise racketeering activity against Plaintiffs which intentionally damaged its business and property.

240.     The Greenpeace Enterprise's conduct and acts in furtherance of the fraudulent scheme included, but were not limited to the predicate RICO acts of: (i) mail fraud in violation of 18 U.S.C. § 1341; (ii) wire fraud in violation of 18 U.S.C. § 1343, as set forth in 18 U.S.C. §§

1961(1)(B); (iii) extortion and other crimes in violation of 18 U.S.C. § 875-77, 880 and 18 U.S.C. § 1512; (iv) illegal interference with commerce in violation of 18 U.S.C. § 1951; (v) illegal monetary transactions in violation of 18 U.S.C. § 1957; (vi) and corresponding Georgia statutes criminalizing the same conduct, and which constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

241.    In conducting the affairs of the Greenpeace Enterprise, Defendants used and invested income that was derived from the pattern of racketeering activity, directly or indirectly, in the operations of the Greenpeace Defendants and the Greenpeace Enterprise, which are entities and an enterprise engaged in, and the activities of which affect, interstate and foreign commerce, in violation of 18 U.S.C. § 1962(a).  Specifically, the Defendants used funds they fraudulently procured through the alleged pattern of predicate acts to: (a) fund the Greenpeace Enterprise; (b) fund the dissemination of materially false and fraudulent information used to induce donors to make contributions to the Greenpeace Enterprise and individual Enterprise Members; and (c) fund the expanded attack on Resolute and its relationships with customers, partners and other critical business constituents as alleged in this complaint, including but not limited to the use of illicit funds from fraudulently induced donations to fund the direct actions against Resolute customers that caused the loss of those customers and market share in an amount the Greenpeace Enterprise has estimated to be not less than C$100 million, to fund direct and indirect actions directed at Resolute's relationship with FSC and the auditors responsible for evaluating compliance with FSC certification standards, and to fund the fraudulent misappropriation of proprietary customer, sourcing and other trade secret information from Resolute and its customers, which it then used to target these customers.

242.     Accordingly, the racketeering activity consisted of multiple, related acts perpetrated during the Scheme Period that are indictable under 18 U.S.C. § 1343 (relating to wire fraud) and 18 U.S.C. § 1341 (relating to mail fraud) as well as the other predicatepat acts alleged herein that are within the scope of 18 U.S.C. § 1961(1)(B) and (5).

243.     As a direct and proximate cause of the Defendants' violations of 18 U.S.C. §1962(a), Plaintiffs have sustained damage to their business, property and reputation, including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above, as well as, the use and investment of the illicit funds derived through those predicate acts to target and harm Resolute's business, property and reputation.  Plaintiffs' damages include, but are not limited to: (i) lost revenue, profits and enterprise value, including lost business opportunities, lost customers, lost market share and decreased production; (ii) misappropriated proprietary information; (iii) increased fees and expenses, as well as the expenditure of significant human resources, incurred and devoted to uncovering the nature and scope of, and attempting to remedy, Defendants' illegal enterprise and the harm directly resulting therefrom; and (iv) damaged reputation in the global marketplace, business and environmental communities.

244.     As a result of the violations of 18 U.S.C. § 1962(a), Plaintiffs have suffered substantial damages in an amount to be proven at trial, but which the Greenpeace Enterprise has estimated as not less than C$100 million.  Plaintiffs are entitled to recover from the Defendants the amount in which they have been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest, costs, and attorneys' fees incurred by reason of the Greenpeace Enterprise's violations of 18 U.S.C. § 1962(a), and disgorgement of Defendants' illicit proceeds.

## COUNT III

### CONSPIRACY IN VIOLATION OF RICO, 18 U.S.C. § 1962(d)
### (AGAINST ALL DEFENDANTS)

245.    Plaintiffs restate paragraphs 1 through 227 above as if fully set forth herein.

246.    During the Scheme Period, each of the Defendants willfully, knowingly and unlawfully conspired to, and did further the efforts of the Greenpeace Enterprise to perpetrate the scheme against Plaintiffs through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(c) and 1962(a).

247.    In furtherance of the conspiracy and to effectuate its objectives, each of the Defendants agreed that the following predicate acts, among others, would be committed by one or more members of the conspiracy:  (i) mail fraud in violation of 18 U.S.C. § 1341; (ii) wire fraud in violation of 18 U.S.C. § 1343, as set forth in 18 U.S.C. §§ 1961(1)(B); (iii) extortion and other crimes in violation of 18 U.S.C. § 875-77, 880 and 18 U.S.C. § 1512; (iv) illegal interference with commerce in violation of 18 U.S.C. § 1951; (v) illegal monetary transactions in violation of 18 U.S.C. § 1957; (vi) and corresponding Georgia statutes criminalizing the same conduct as set forth in O.C.G.A. 16-14-3(9)(A) and (B), and which constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

248.    Specifically, the following predicate acts were performed at the direction of, and/or were foreseeable to, the Defendants, for the purpose of executing the scheme to solicit fraudulent donations and harm Resolute's business: (i) the preparation of false and misleading reports concerning Resolute and its customers; (ii) the broad dissemination of false and defamatory reports and other statements through Greenpeace's website and other internet platforms, such as Twitter and Facebook; (iii) communication and coordination with one another to effectuate the dissemination of false and misleading information necessary to perpetrate the

scheme to harm Resolute; (iv) the dissemination of false and misleading allegations directly to Resolute's stakeholders, customers, trade associations, government regulators, and other critical market constituents through email and phone; (v) the misappropriation of proprietary customer, sourcing and other trade secret information from Resolute and its customer; (vi) the harassment of Resolute's customers with extortionate threats; (vii) the solicitation of fraudulent charitable donations from the public by means of false pretenses, representations, or promises; (viii) the wiring of fraudulently obtained funds to sustain the Greenpeace Enterprise's "campaign" against Resolute; and (ix) submitting materially false and misleading tax submissions and financial information.

249.   It was specifically intended and foreseen by Defendants that the Greenpeace Enterprise would engage in, and conduct activities which affected interstate commerce.  Each Defendant was aware of the various racketeering schemes, assented to the efforts of the Greenpeace Enterprise to carry out these acts, and acted in furtherance of the conspiracy.

250.   The pattern of racketeering consisted of multiple acts of racketeering by each of the Defendants.  The activities of these Defendants were interrelated, not isolated, and were perpetrated for the same or similar purposes by the same persons.  These activities extended for several years, and continued up to the commencement of this action.  The Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(c) and 1962(a), in violation of 18 U.S.C. § 1962(d).

251.   Plaintiffs have been injured in their business and property as a direct and proximate cause of the Defendants' conspiracy to violate 18 U.S.C. §§ 1962(c) and 1962(a), and the overt acts taken in furtherance of that conspiracy.

252.     Plaintiffs have been injured in their business and property as a direct and proximate cause of the Defendants' violations of 18 U.S.C. §1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above.  Plaintiffs' damages include, but are not limited to: (i) lost revenue, profits and enterprise value, including lost business opportunities, lost customers, lost market share and decreased production; (ii) misappropriated proprietary information; (iii) increased fees and expenses, as well as the expenditure of significant human resources, incurred and devoted to uncovering the nature and scope of, and attempting to remedy, Defendants' illegal enterprise and the harm directly resulting therefrom; and (iv) damaged reputation in the global marketplace, business and environmental communities.

253.     As a result of the violations of 18 U.S.C. § 1962(d), Plaintiffs have suffered substantial damages in an amount to be proven at trial, but which the Greenpeace Enterprise has estimated as not less than C$100 million.  Plaintiffs are entitled to recover from the Defendants the amount in which they have been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest, costs, and attorneys' fees incurred by reason of the Greenpeace Enterprise's violations of 18 U.S.C. § 1962(d), and disgorgement of Defendants' illicit proceeds.

## COUNT IV

### RACKETEERING IN VIOLATION OF O.C.G.A § 16-14-4(b)
### (AGAINST ALL DEFENDANTS)

254.     Plaintiffs restate paragraphs 1 through 227 above as if fully set forth herein.

255.     Throughout the Scheme Period, Defendants and enterprise members were associated in fact and comprised an "enterprise" within the meaning of O.C.G.A.§§ 16-14-3(6) and 16-14-4(b), which was engaged in, or the activities of which affected, interstate or foreign commerce.

256.     During the Scheme Period, each of the Defendants willfully, knowingly, and unlawfully conspired to, and did further the efforts of the Greenpeace Enterprise to perpetrate the scheme against Plaintiffs through a pattern of racketeering activity in violation of O.C.G.A. §§ 16-14-3(8)(A) and (9)(A), and 16-14-4(b).

257.     In furtherance of the conspiracy and to effectuate its objectives, each of the Defendants agreed that the following predicate acts, among others, would be committed by one or more members of the conspiracy: (i) mail fraud in violation of 18 U.S.C. § 1341; (ii) wire fraud in violation of 18 U.S.C. § 1343, as set forth in O.C.G.A. §§ 16-14-3(9)(A)(xxix), (iii) extortion and other crimes in violation of 18 U.S.C. §§ 875-77, 880 and 18 U.S.C. § 1512; (iv) illegal interference with commerce in violation of 18 U.S.C. § 1951; and (v) illegal monetary transactions in violation of 18 U.S.C. § 1957, as set forth in O.C.G.A. §§ 16-14-3()(A) and (B) and which constitute a pattern of racketeering activity pursuant to O.C.G.A. §§ 16-14-3(8)(A).

258.     Specifically, among other things, throughout the Scheme Period, in furtherance of and for the purpose of executing and attempting to execute the described schemes and artifices to defraud, each of the Defendants, on numerous occasions, used and caused to be used wire communications in interstate and foreign commerce and U.S. mails, by both making and causing to be made wire communications and mailings.  These wire communications and mailings were made, inter alia, for the purpose of: (i) preparing false and misleading reports concerning Resolute and its customers; (ii) broadly disseminating the false and defamatory reports and other statements through Greenpeace's website and other internet platforms, such as Twitter and Facebook; (iii) communicating and coordinating with one another to effectuate the dissemination of false and misleading information necessary to perpetrate the scheme to harm Resolute; (iv) disseminating the false and misleading allegations directly to Resolute's stakeholders, customers,

trade associations, government regulators, and other critical market constituents through email, U.S. mail, and phone; (v) misappropriating proprietary customer, sourcing, and other trade secret information from Resolute and its customers; (vi) harassing Resolute's customers with extortionate threats; (vii) soliciting fraudulent charitable donations from the public by means of false pretenses, representations, or promises; (viii) wiring fraudulently obtained funds to sustain the Greenpeace Enterprise's "campaign" against Resolute; and (ix) submitting materially false and misleading tax submissions and financial information.  Defendants committed and participated in these acts willfully and with knowledge of their illegality.  These predicate acts were intended to and did mislead donors, customers, and others about the Plaintiffs so as to induce donations and compliance with the Defendants' demands and to extract and intimate others, all of which objectives were obtained.

259.    Each such use of a wire communication and/or mailing in connection with the described scheme constitutes a separate and distinct violation of the Georgia RICO statute, by virtue of violating 18 U.S.C. §§ 1341 (relating to mail fraud) and 1343 (relating to wire fraud), which are defined as racketeering activity under 18 U.S.C. § 1961(1)(B), as well as the other federal predicate acts alleged herein, and which constitute racketeering activity under the Georgia RICO statute pursuant to O.C.G.A. § 16-14-3(9)(A)(xxix), and each causing direct injury to Resolute's business, property and reputation.

260.    Greenpeace authored and published numerous reports and other Resolute-related updates and blog posts as set forth in Table A (supra), on its website.  Each publication constitutes a separate fraudulent wire communication:

261.    The Greenpeace Enterprise also disseminated falsehoods about Resolute by phone, through electronic mail, U.S. mail, and posts on social media platforms, such as Twitter

and Facebook, which resulted in direct injury to Plaintiffs.  The total number of phone calls, e-mails, and mailings, and the identities of all enterprise members is not yet known, but members of the Greenpeace Enterprise engaged in the following phone calls, e-mails, and U.S. mailings as set forth in Table B (supra), each constituting a separate mail or wire communication in furtherance of the fraudulent scheme.

262.    In addition, Greenpeace International, GP-Fund, GP-Inc., and Greenpeace Canada have processed millions of dollars in fraudulent induced donations over the wires in thousands of individual transactions.  Each such transaction constitutes a predicate act.

263.    As alleged, the Greenpeace Enterprise also took direct action against Resolute's customers whereby the Greenpeace Enterprise issued extortive threats demanding that such customers terminate their relationships with Resolute and endorse the Greenpeace Enterprise's position and efforts, which provided a substantial benefit to the Greenpeace Enterprise in the form of enhanced fundraising potential.

264.    As alleged, the Greenpeace Enterprise also used the mails and wires to misappropriate proprietary customer , sourcing and other trade secret information under false pretenses from Resolute and its customers for purposes of furthering the Enterprise.

265.    It was specifically intended and foreseen by Defendants that the Greenpeace Enterprise would engage in, and conduct the foregoing activities, which affected interstate commerce.  Each Defendant was aware of the various racketeering schemes, assented to the efforts of the Greenpeace Enterprise to carry out these acts, and acted in furtherance of the conspiracy.

266.    The pattern of racketeering consisted of multiple acts of racketeering by each of the Defendants.  The activities of these Defendants were interrelated, not isolated, and were perpetuated for the same or similar purposes by the same persons.

267.    These activities extended for several years, and continued up until the commencement of this action.

268.    As a direct and proximate cause of Defendants' violations of O.C.G.A. § 16-14-4(b), Plaintiffs have sustained damages to their business, property and reputation, including injury by reason of both the attempted and actual commission of the predicate acts constituting the pattern of racketeering activity pursuant to O.C.G.A. §§ 16-14-3(8)(A) and (9)(A)) set forth above.

269.    Plaintiffs' damages include, but are not limited to: (i) lost revenue, profits and enterprise value, including lost business opportunities, lost customers, lost market share and decreased production; (ii) misappropriated proprietary information; (iii) increased fees and expenses, as well as the expenditure of significant human resources, incurred and devoted to uncovering the nature and scope of, and attempting to remedy, Defendants' illegal enterprise and the harm directly resulting therefrom; and (iv) a severely damaged reputation in the global marketplace, business and environmental communities.

270.    As a result of the violations of O.C.G.A. § 16-14-4(b), Plaintiffs have suffered substantial damages in an amount to be proven at trial, but which Greenpeace itself estimates to be not less than C$100 million.  Pursuant to O.C.G.A. § 16-14-6(c), Plaintiffs are entitled to recover treble their general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of the RICO Associates' violations of O.C.G.A. § 16-14-4(b).

## COUNT V

### CONSPIRACY IN VIOLATION OF RICO, O.C.G.A §16-14-4(c)
### (AGAINST ALL DEFENDANTS)

271.   Plaintiffs restate paragraphs 1 through 227 above as if fully set forth herein.

272.   During the Scheme Period, each of the Defendants willfully, knowingly and unlawfully conspired and agreed, attempted to, and did further the efforts of the Greenpeace Enterprise to perpetrate the scheme against Plaintiffs recounted herein through a pattern of racketeering in violation of O.C.G.A § 16-14-4(b).

273.   In furtherance of the conspiracy and to effectuate its objectives, each of the Defendants agreed that the following predicate acts, among others, would be committed by one or more members of the conspiracy: (i) mail fraud in violation of 18 U.S.C. § 1341; (ii) wire fraud in violation of 18 U.S.C. § 1343; (iii) extortion and other crimes in violation of 18 U.S.C. §§ 875-77, 880 and 18 U.S.C. § 1512; (iv) illegal interference with commerce in violation of 18 U.S.C. § 1951; and (v) illegal monetary transactions in violation of 18 U.S.C. § 1957, as set forth in O.C.G.A. §§ 16-14-3(9)(A) and 9(B), and which constitute a pattern of racketeering activity pursuant to O.C.G.A. §§ 16-14-3(8)(A).

274.   Specifically, among other things, throughout the Scheme Period, in furtherance of and for the purpose of executing and attempting to execute the described schemes and artifices to defraud, each of the Defendants, on numerous occasions, used and caused to be used wire communications in interstate and foreign commerce and U.S. mails, by both making and causing to be made wire communications and mailings.  These wire communications and mailings were made, inter alia, for the purpose of: (i) preparing false and misleading reports concerning Resolute and its customers; (ii) broadly disseminating the false and defamatory reports and other statements through Greenpeace's website and other internet platforms, such as Twitter and

Facebook; (iii) communicating and coordinating with one another to effectuate the dissemination of false and misleading information necessary to perpetrate the scheme to harm Resolute; (iv) disseminating the false and misleading allegations directly to Resolute's stakeholders, customers, trade associations, government regulators, and other critical market constituents through email, U.S. mail, and phone; (v) misappropriating proprietary customer, sourcing, and other trade secret information from Resolute and its customers; (vi) harassing Resolute's customers with extortionate threats; (vii) soliciting fraudulent charitable donations from the public by means of false pretenses, representations, or promises; (viii) wiring fraudulently obtained funds to sustain the Greenpeace Enterprise's "campaign" against Resolute; and (ix) submitting materially false and misleading tax submissions and financial information.  Defendants committed and participated in these acts willfully and with knowledge of their illegality.  These predicate acts were intended to and did mislead donors, customers, and others about the Plaintiffs so as to induce donations and compliance with the Defendants' demands and to extract and intimate others, all of which objectives were obtained.

275.    Each Defendant was aware of these various racketeering schemes, assented to the efforts of the Greenpeace Enterprise to carry out these acts, and acted in furtherance of the conspiracy to conduct and participate in the conduct of the affairs of the Greenpeace Enterprise through a pattern of racketeering activity.  The Defendants' conduct constitutes a conspiracy to violate O.C.G.A § 16-14-4(b), in violation of O.C.G.A § 16-14-4(c).

276.    Plaintiffs have been injured in their business and property as a direct and proximate cause of the Defendants' conspiracy to violate O.C.G.A § 16-14-4(b), and the overt acts taken in furtherance of that conspiracy.

277.    Plaintiffs' damages include, but are not limited to: (i) lost revenue, profits and enterprise value, including lost business opportunities, lost customers, lost market share and decreased production; (ii) misappropriated proprietary information; (iii) increased fees and expenses, as well as the expenditure of significant human resources, incurred and devoted to uncovering the nature and scope of, and attempting to remedy, Defendants' illegal enterprise and the harm directly resulting therefrom; and (iv) a damaged reputation in the global marketplace, business and environmental communities.

278.    As a result of the Defendants' violations of O.C.G.A § 16-14-4(c), Plaintiffs have suffered substantial damages in an amount to be proven at trial, but which Greenpeace itself estimates to be not less than C$100 million.  Pursuant to O.C.G.A. § 16-14-6(c), Plaintiffs are entitled to recover treble their general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of the Greenpeace Enterprise's violations of O.C.G.A. § 16-14-4(b).

## COUNT VI

### DEFAMATION
### (AGAINST ALL DEFENDANTS)

279.    Plaintiffs restate paragraphs 1 through 227 above as if fully set forth herein.

280.    As set forth herein, Defendants knowingly and intentionally published false and injurious statements about Resolute, including, among other things, that:

   (a) Resolute is engaged in destructive and unsustainable logging activities in Canada's Boreal Forest;

   (b) Resolute is engaged in logging activities in the First Nations Communities' territories without their consent;

   (c) Resolute is responsible for the destruction of vast areas of Canada's Boreal Forest and destroyed critical woodland caribou habitat;

(d) Resolute's logging practices violate Canadian forestry regulations and FSC certification standards;

(e) Resolute's Forest Stewardship Council certificates have been suspended as a result of serious deficiencies in Plaintiffs' logging operations;

(f) Resolute violated the CBFA by logging in off-limits areas.

281.   Defendants published these false and misleading statements in numerous publications on the internet, on social media platforms such as Twitter and Facebook, and in direct emails, letters, and telephone communications with Plaintiffs' stakeholders, customers, trade associations, government regulators, and other critical market constituents.

282.   The false and defamatory statements set forth herein concerning Plaintiffs were made and published with actual malice, as such statements were made by Defendants with knowledge of their falsity or reckless disregard for their truth.

283.   Defendants published these falsehoods to third-parties and understood and intended that these false statements would have the effect of injuring Plaintiffs' reputation, preventing others from doing business with Plaintiffs, and interfering with Plaintiffs' existing business relationships.  Those third-parties include, among others, Plaintiffs' stakeholders, customers, trade associations, shareholders, third-party auditors, government regulators, other critical market constituents, and the general public.

284.   Defendants' false statements directly harmed Plaintiffs' business, property, and reputation in numerous specific ways, including, but not limited to: lost customers; lost profits; increased expenses; legal fees; and costs expended to mitigate the impact of Defendants' malicious campaign.

285.   Defendants' publication of the false and defamatory statements cited herein have proximately caused Plaintiffs to suffer monetary damages in an amount to be determined at trial.

286.    The Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to consequences.

287.    Because Defendants have engaged in conduct of a fraudulent and malicious nature, Plaintiffs are entitled to reputational and punitive damages.

## COUNT VII

### TORTIOUS INTERFERENCE WITH
### PROSPECTIVE BUSINESS RELATIONS

288.    Plaintiffs restate paragraphs 1 through 227 above as if fully set forth herein.

289.    Plaintiffs had prospective business relationships with many third-parties, including, but not limited to: (i) potential customers; (ii) potential investors; (iii) potential distributors; (vii) potential employees; (viii) community leaders; and (iv) government regulators.

290.    Each of the Defendants knew of Plaintiffs' potential business relationships with these third parties.

291.    Defendants intentionally and maliciously interfered with Plaintiffs' prospective business relationships with these third-parties by employing wrongful means, including, but not limited to, the dissemination of false, misleading and defamatory statements concerning Plaintiffs' business.  This interference was committed intentionally and without justification or excuse and was carried out by, among other things:

    (a) The publication of false and misleading statements in numerous publications on the internet;

    (b) The publication of false and misleading statements on social media platforms;

    (c) The dissemination of false, misleading, and defamatory allegations to Plaintiffs' stakeholders, customers, trade associations, community leaders, government regulators, and other critical market constituents; and

    (d) Other overt acts to harm Plaintiffs' business and reputation.

292.     Plaintiffs had a reasonable expectation that each of the aforementioned business relationships would result in Plaintiffs obtaining the benefits of these business opportunities. However, Defendants' wrongful actions directly caused Plaintiffs to lose the business relationships described herein, thereby causing Plaintiffs to suffer significant economic damages. Each of the Defendants was aware of, and intended to cause, this detrimental impact on Plaintiffs' prospective business relationships.

293.     As a direct and proximate result of Defendants' intentional interference with Plaintiffs' prospective business relationships with third-parties, Plaintiffs' business relationships were damaged, including but not limited to: (i) prospective relationships with new customers; and (ii) potential new business with existing customers.

294.     The Defendants' wrongful interference with Plaintiffs' prospective business relationships caused Plaintiffs to suffer monetary damages, stemming from, among other things, lost revenue, decreased production, increased costs, injury to reputation and attorney's fees in an amount to be determined at trial.

295.     The Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to consequences.

296.     Because Defendants have engaged in conduct of an oppressive, fraudulent, and malicious nature, Plaintiffs are entitled to punitive damages.

## COUNT VIII

### TORTIOUS INTERFERENCE WITH
### CONTRACTUAL RELATIONS

297.     Plaintiffs restate paragraphs 1 through 227 above as if fully set forth herein.

298.     Plaintiffs had contractual relationships and agreements with third-parties, including, among others, customers, trade associations, distributors, and shareholders.

299.     Each of the Defendants knew of Plaintiffs' contractual relationships with these third-parties.

300.     Defendants intentionally and maliciously interfered with Plaintiffs' contractual relationships with these third-parties.  This interference was committed intentionally and without justification and was carried out by, among other things:

> (a) The dissemination of false, misleading and defamatory allegations to and about customers in an effort to coerce those customers to cease conducting business with Plaintiffs;

> (b) The publication of false and misleading statements in numerous publications on the internet, on social media platforms, and via email, mail, telephone in-person communications to Plaintiffs' stakeholders, customers, trade associations, shareholders, third-party auditors, government regulators, community leaders and other critical market constituents.

> (c) Threatening to harm Plaintiffs' customers unless they terminated their business relationships with Plaintiffs; and

> (d) Effecting the unjustified suspension of Plaintiffs' FSC certificates in order to damage the marketability of Plaintiffs' products.

301.     Defendants were not parties to these contracts and interfered with the contractual relationships without privilege.

302.     As a direct and proximate result of Defendants' intentional interference with Plaintiffs' contractual relationships with third-parties, Plaintiffs have suffered actual damages in an amount to be determined at trial.

303.     The Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to consequences.

304.     Because Defendants have engaged in conduct of an oppressive, fraudulent, and malicious nature, Plaintiffs are entitled to punitive damages.

### COUNT IX

### COMMON LAW CIVIL CONSPIRACY
### (AGAINST ALL DEFENDANTS)

305.     Plaintiffs restate paragraphs 1 through 227 above as if fully set forth herein.

306.     As set forth herein, each of the Defendants, together with others, conspired with respect to Counts VI through VIII, and acted in concert to commit unlawful acts.  Each of the Defendants shared the same conspiratorial objective, which was to create and disseminate false, misleading and defamatory statements, regarding:

(a) Plaintiffs' logging practices and the alleged effect these practices had on the First Nations Communities, the Canadian Boreal Forest, woodland caribou habitat, and the world climate;

(b) Plaintiffs' logging practices allegedly violating the Canadian Forestry laws and regulations and FSC certification standards;

(c) Plaintiffs' Forest Stewardship Council certifications being suspended as the result of serious deficiencies in Plaintiffs' logging operations; and

(d) Plaintiffs' alleged violation of the CBFA by logging in off-limits areas.

307.     Defendants' conspiratorial scheme was carried out by the commission of the wrongful and overt acts set forth above, including, but not limited to:

(a) The publication of false and misleading statements in numerous publications on the internet;

(b) The publication of false and misleading statements on social media platforms;

(c) The dissemination of false, misleading, and defamatory allegations to Plaintiffs' stakeholders, customers, trade associations, third-party auditors, government regulators, and other critical market constituents.

308.     At all relevant times, Defendants' conduct was willful and done with legal malice and knowledge that it was wrongful.

309.    As a direct, proximate result of the operation and execution of the conspiracy, Plaintiffs have been injured and suffered damages in an amount to be proven at trial.

## COUNT X

### TRADEMARK DILUTION IN VIOLATION OF O.C.G.A. § 10-1-451(b)
### (AGAINST ALL DEFENDANTS)

310.    Plaintiffs restate paragraphs 1 through 227 above as if fully set forth herein.

311.    Defendants' use of the "Resolute: Forest Destroyer" slogan for its unlawful and malicious attack on Plaintiffs' business constitutes an unauthorized and unlawful use of Plaintiff's "Resolute Forest Products" trademark.

312.    As described herein, Defendants' primary motivation behind their years-long attack on Resolute has been to fraudulently induce people throughout the United States and the world to donate millions of dollars based on materially false and misleading claims about its purported environmental purpose and "campaigns."

313.    In furtherance of this goal of maximizing donations, the Defendants have labeled Resolute Forest Products the "Resolute: Forest Destroyer" – a horrible villain of a company that is threatening Canada's Boreal forest, the wildlife and communities that live there.  The Defendants have baselessly caused the public to view Resolute Forest Products – a global leader in sustainable forestry practices with an outstanding reputation in the business community – as a "Resolute: Forest Destroyer" that is "responsible for the destruction of vast areas of Canada's magnificent Boreal forest, damaging critical woodland caribou habitat and logging without the consent of impacted First Nations."

314.    This baseless association is exactly what the Defendants intended.  Defendants' actions demonstrate intentional, willful and malicious intent to harm Plaintiffs' goodwill and business reputation by using the "Resolute Forest Destroyer" mark to create an undesirable,

unwholesome, and unsavory mental association with Plaintiffs' "Resolute: Forest Products" trademark.

315.    Defendants' use of "Resolute: Forest Destroyer" to describe Plaintiffs' business has tarnished and disparaged Plaintiffs' image as a responsible corporate citizen that embraces and prioritizes sustainable forestry practices, the image which Plaintiffs have strived to portray through their distinctive trademark, "Resolute Forest Products."

316.    As a direct and proximate result of Defendants' unauthorized and improper use of Plaintiffs' trademarks, Defendants have caused and continue to cause irreparable injury to Plaintiffs' goodwill and business reputation, as well as the dilution of the value of Plaintiffs' trademarks, in violation of the Georgia anti-dilution act, O.C.G.A. § 10-1-451(b), for which Plaintiffs are entitled to injunctive relief, disgorgement, and such other relief as is just and proper.

## COUNT XI

## AWARD OF ATTORNEYS' FEES UNDER O.C.G.A. §13-6-11
### (AGAINST ALL DEFENDANTS)

317.    Plaintiffs restate paragraphs 1 through 227 above as if fully set forth herein.

318.    The Defendants have acted in bad faith, have been stubbornly litigious or have caused Plaintiffs unnecessary trouble and expense, and Plaintiffs are entitled to recover from Defendants all expenses of litigation, including their reasonable attorneys' fees.

## DEMAND FOR JURY TRIAL

Demand is hereby made for a trial by jury for all issues so triable.

WHEREFORE, Plaintiffs demand judgment:

(a)    Awarding Plaintiffs compensatory damages in amounts to be determined at trial, together with interest, attorneys' fees, costs and disbursements;

122

(b)      Awarding Plaintiffs punitive and exemplary damages in amounts to be determined at trial;

(c)      Awarding Plaintiffs treble damages, costs of suit, attorney's fees and costs of litigation under 18 U.S.C. § 1964(c) and O.C.G.A § 16-14-6(c), in amounts to be determined at trial;

(d)      Awarding Plaintiffs injunctive relief preventing Defendants from engaging in continued wrongful activity and disgorgement, as set forth herein, in the form that the Court may determine is just and proper, and requires them to disgorge all monies they have improperly secured;

(e)      Prejudgment and post-judgment interest; and

(f)      Such other and further relief as is just and proper.


Dated: Augusta, Georgia
       May 31, 2016

                              HULL BARRET, PC


                              By:      /s/ James B. Ellington
                                   **James B. Ellington**
                                   Ga. Bar No. 243858
                                   (JEllington@hullbarrett.com)

                              P.O. Box 1564
                              Augusta, Georgia 30903
                              Tel: (706) 722-4481

                              Of Counsel (Pro Hac Applications To Be Submitted)

                              KASOWITZ, BENSON, TORRES
                                 & FRIEDMAN LLP

                              1633 Broadway
                              New York, New York 10019
                              Tel: (212) 506-1700

**Michael J. Bowe**
(mbowe@kasowitz.com)

**Lauren Tabaksblat**
(ltabaksblat@kasowitz.com)

*Attorneys for Plaintiffs*