# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA

| | | | |
|---|---|---|---|
| RESOLUTE FOREST PRODUCTS, INC., *et al.* | ) | | |
| | ) | | |
| Plaintiffs, | ) | CIVIL ACTION FILE | |
| | ) | NO. 1:16-cv-00071-JRH-BKE | |
| v. | ) | | |
| | ) | | |
| GREENPEACE INTERNATIONAL (aka | ) | | |
| "GREENPEACE STICHTING COUNCIL") *et al.* | ) | | |
| | ) | | |
| Defendants. | ) | | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTIONS TO STRIKE, DISMISS, AND TRANSFER FORUM

Plaintiffs Resolute Forest Products, Inc., Resolute FP US, Inc., Resolute FP Augusta, LLC, Fibrek General Partnership, Fibrek US, Inc., Fibrek International Inc., and Resolute FP Canada, Inc. (collectively referred to herein as "Resolute" or "plaintiffs") respectfully submit this response in opposition to defendants' motions to dismiss, strike and transfer venue.[1]

---

[1]     This memorandum of law is submitted in opposition to the: (1) Greenpeace Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) and Memorandum in Support (Doc. 62); (2) Brief of Defendant Greenpeace Fund, Inc. In Support of Motion to Dismiss (Doc. 61-1); (3) Memorandum of Law In Support of Motion to Dismiss of Defendants Stand and Paglia for Failure to State a Claim (Doc. 55-1); (4) Motion to Dismiss or to Transfer For Lack Of Venue of Defendants Stand and Paglia with Consolidated Memorandum of Law (Doc. 57); (5) Greenpeace Defendants' Motion to Strike Pursuant to O.C.G.A. § 9-11-11.1 and Memorandum In Support (Doc. 60); and (6) Memorandum of Law of Defendants Paglia and Stand In Support of Their Motion to Strike Pursuant to O.C.G.A. § 9-11-9.1 (Doc. 56-1).

Also submitted herewith are the: (1) Declaration of Professor Peter Reich ("Reich Decl."); and (2) Declaration of Frederick Cubbage ("Cubbage Decl.").

All emphasis added and citations omitted unless otherwise noted.  All references to "¶ __" are to paragraphs of the Complaint (Doc. 1) (the "Complaint").

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 3

STATEMENT OF FACTS .................................................................................................... 5

    A.    The Claims Alleged ................................................................................................. 5

    B.    The Parties and Enterprise ..................................................................................... 6

    C.    Greenpeace's Pattern and Practice of Fraud, Extortion and Other Illegality ................. 8

    D.    The Illegal Campaign Against Resolute ................................................................... 9

    E.    The Enterprise's Georgia Activities ...................................................................... 27

    F.    Damages ............................................................................................................ 28

ARGUMENT ................................................................................................................... 28

I.      THE ANTI-SLAPP MOTIONS SHOULD BE DENIED IN THEIR ENTIRETY ... 28

    A.    Georgia's Anti-SLAPP Statute Does Not Apply To Plaintiffs' Federal Claims. ......... 28

    B.    Georgia's Anti-SLAPP Statute Does Not Apply To Plaintiffs' State Law Claims. ...... 31

    C.    Plaintiffs Have More Than Met Their Burden To Prevail On A Motion To Strike At
           The Pleading Stage ............................................................................................. 39

II.     THE FIRST AMENDMENT IS NOT IMPLICATED BY DEFENDANTS'
       RACKETEERING ENTERPRISE AND OTHER UNLAWFUL CONDUCT ........ 41

III.    THE ALLEGATIONS OF THE COMPLAINT FULLY SATISFY THE
       PLEADING REQUIREMENTS .................................................................... 45

IV.    THE FEDERAL RICO CLAIMS ARE PROPERLY PLED .................................... 46

    A.    Each Defendant's Role In The RICO Enterprise Is Adequately Alleged ...................... 48

    B.    The "By Reason Of" Requirement Is Adequately Alleged ......................................... 51

    C.    Racketeering Activity Is Adequately Alleged ......................................................... 56

    D.    The Complaint Alleges A Distinct RICO Enterprise And Each Defendant's
           Participation In The Enterprise ............................................................................. 61

    E.    The RICO Claims Have A Territorial Nexus To The United States ............................. 67

V.     THE GEORGIA STATE LAW CLAIMS ARE PROPERLY PLED ........................ 69

    A.    The Defamation Claim Is Properly Pled ................................................................. 69

    B.    The Tortious Interference Claim Is Properly Pled .................................................... 78

    C.    The Trademark Dilution Claim Is Properly Pled ..................................................... 80

    D.    The Common Law Conspiracy Claim Is Properly Pled .............................................. 82

VI.    VENUE IS PROPER IN THE SOUTHERN DISTRICT OF GEORGIA ................. 83

    A.    This Court Should Defer To Plaintiffs' Choice Of Forum ......................................... 83

    B.    A Substantial Part of The Events In Furtherance Of The
           Conspiracy Occurred In, Or Targeted, The Southern District Of Georgia .................... 83

    C.    Defendants Have Not Met Their Burden To  Demonstrate
           That A Transfer of Venue Is Appropriate ............................................................... 85

VII.   THIS COURT HAS PERSONAL JURISDICTION OVER EACH DEFENDANT  86

CONCLUSION ................................................................................................................ 89

## PRELIMINARY STATEMENT

The Complaint in this action alleges in substantial detail an illegal scheme through which a network of environmental activist groups and those working in concert with them disseminated materially false and misleading accusations about Resolute, and engaged in other illegal conduct to fraudulently induce millions of dollars in donations and otherwise devastate Resolute's business. Among other things, the scheme's misconduct included ubiquitous misrepresentations about the impact of Resolute's business operations on the boreal forest, its indigenous peoples and caribou populations, and climate change, as well as fabricated evidence, extortive threats, cyber-attacks, crippling tortious boycotts, and other illegal conduct.  As a direct result of this misconduct, the defendants themselves have taken credit for inflicting not less than C$100M in damages on Resolute.  Based on these extensive and detailed allegations of fraudulent and otherwise illegal conduct, the Complaint asserts racketeering claims under federal and Georgia law, as well as state law claims for defamation, tortious interference, trademark dilution, and civil conspiracy.

Defendants' motions to dismiss euphemistically recast the Complaint's detailed allegations of intentional misrepresentations, fraud, tortious interference, and other illegal conduct as mere "advocacy" that is protected by the First Amendment and Georgia's anti-SLAPP statute.  However, it is long-settled, black-letter law that the First Amendment provides no protection for the knowing and intentional misrepresentations, fraud, extortion, and other tortious and illegal conduct alleged here.  The same is equally true for Georgia's anti-SLAPP statute.

It is also settled law that under the Supremacy Clause, Georgia's anti-SLAPP statute has no application to plaintiffs' federal RICO claims, or plaintiffs' state law claims asserted in federal court.  Even if Georgia's anti-SLAPP statute applied to certain state law claims, it provides no basis for dismissal at the pleading stage where, as here, the Complaint's allegations state all the required elements of the asserted causes of action.   Finally, even if a *prima facie* factual showing

of falsity beyond the detailed facts alleged in the Complaint were required, Resolute submits with this opposition declarations from renowned scientists attesting to the materially false and misleading nature of the defendants' claims alleged in the Complaint.  For example,  Peter Reich, Ph.D., a preeminent environmental scientist and the recipient of the Nobel Prize equivalent for forest ecology unequivocally attests that the defendants' alleged false and misleading allegations about Resolute reflect a "fundamental disregard for scientific reality," and rely on "distorted results" from studies that are "largely irrelevant to the issue at hand."  Neither the First Amendment nor anti-SLAPP statutes provide any protection for such willful and reckless distortions and misrepresentations.

On the underlying merits, defendants' challenges to the sufficiency of the RICO claims are likewise inapposite, incorrect, or incomplete.  *First*, defendants argue that the Complaint fails to allege each defendant's individual wrongdoing.  However, not only does the Complaint detail each defendant's direct role in the illegal enterprise, no such showing is required here, where the Complaint pleads that defendants acted in concert with one another in furtherance of a conspiracy to harm Resolute, and are each consequently liable for all the enterprise's acts reasonably linked to the RICO enterprise.  *Second*, defendants' challenges to proximate causation and standing fail because the Complaint alleges that Resolute was a foreseeable, and in fact, intended victim of the racketeering scheme and activity.  *Third*, the Complaint adequately alleges hundreds of predicate acts, including mail and wire fraud, extortion, and violations of other criminal statutes.  *Fourth*, the Complaint alleges the existence of an "enterprise" and direct and circumstantial evidence that gives rise to an inference of each defendant's participation therein.  *Fifth*, the Complaint's allegations concerning defendants' U.S.-based conduct, which targeted U.S.-based customers, and resulted in harm to Resolute's U.S.-based operations, including the loss of U.S. based contracts, and closures at U.S. based mills, constitutes domestic injury and harm.

Defendants' venue and personal jurisdiction challenges fare no better.  Under well-settled principles there is a strong presumption in favor of plaintiffs' choice of forum.  This is especially true where, as here, the alternative venue would merely shift the inconvenience from the defendants to the plaintiffs.  Finally, Greenpeace International's assertion that it is not subject to RICO's nationwide jurisdiction is immaterial because the Complaint alleges that GPI is subject to personal jurisdiction in this Court under Georgia's long-arm statute by virtue of its contacts and the contacts of its co-conspirators with this State in furtherance of the conspiracy.

Accordingly, defendants' motions should be denied in their entirety.

# I.    STATEMENT OF FACTS[2]

## A.    The Claims Alleged

As set forth in detail below, the Complaint alleges that the network of environment activist groups collectively calling themselves "Greenpeace," operating with other putative environmental groups and other third parties, are engaged in a fraudulent and illegal scheme whereby they fraudulently procure millions of dollars in donations annually, and use those donations not for their stated purpose, but to perpetuate their scheme and enrich their executives.

For decades, Greenpeace has perpetrated this illegal scheme against numerous companies with virtual impunity.  Since at least 2012, Greenpeace has relentlessly targeted Resolute in what Greenpeace itself calls a "radical" campaign based on the demonstrably false claim that Resolute is "destroying" Canada's boreal forest. Consistent with its playbook, Greenpeace has manufactured facts and evidence to support the "Resolute: Forest Destroyer" campaign, including staged photographs and video footage falsely portraying Resolute's harvesting in prohibited areas and areas Resolute purportedly disrupted when, in fact, fires and other natural causes were the

---

[2]     The Statement of Facts cites to, and relies on, allegations of the Complaint, supplemented by declarations of two experts which, as set forth below, are submitted in response to defendants' motions to strike.

cause of the depicted impact.  More generally, the "Resolute: Forest Destroyer" campaign is comprised entirely of materially false assertions about Resolute's activities and their corresponding impact on the boreal forest.  These factual charges are demonstrably false and unsupported by reasonable application of actual facts.

Greenpeace itself has publicly touted inflicting no less than C$100 million in financial damage to Resolute through this campaign.  To recoup these admitted financial damages, which are ongoing, Resolute has asserted claims under federal and state racketeering statutes, Georgia's trademark statute, and claims for defamation, tortious interference, and civil conspiracy.

### B.    The Parties and Enterprise

#### 1.    Plaintiffs

Resolute is engaged in the forest products industry, planting and harvesting trees, milling wood and fiber, and creating products such as newsprint, tissue and specialty papers, as well as power generation.  (¶¶ 24, 30.)  Resolute owns or operates over forty pulp and paper facilities in Canada, South Korea, and the United States, including operations in Augusta, Georgia, and employs over 8,000 people worldwide, including hundreds in Georgia. (¶ 209.)  Resolute is the largest producer of newsprint in the world, and its Georgia operation produces 215,000 metric tons of newsprint annually.  (¶ 24.)

#### 2.    Defendants and Enterprise Members

##### a.    The Greenpeace Defendants

At the center of the "Forest Destroyer" campaign are the Greenpeace Defendants, an international network of legally-distinct international, national and regional associations and individuals operating under the Greenpeace banner, including Greenpeace International ("GPI"), Greenpeace, Inc. ("GP-Inc."), Greenpeace Fund, Inc. ("GP-Fund"), Matthew Daggett, Daniel Brindis, Amy Moas, and Rolf Skar.  (¶¶ 31-33, 36-39.)  These defendants, along with Greenpeace

6

personnel Richard Brooks, Shane Moffatt, Nicolas Mainville, and Annie Leonard, were directly involved in creating, planning, funding, managing, operating and controlling the coordinated campaign against Resolute, including by, among other things, underwriting the campaign, providing an internet platform to support, facilitate and promote the campaign, actively publishing and republishing false and defamatory lies about Resolute to illicitly raise money, making extortive threats against Resolute's customers, industry partners and constituents, and taking other illegal actions to support this scheme, including stealing proprietary information from Resolute and its customers such as the identity of customers and suppliers for targeting purposes, and orchestrating cyber-attacks to take down Resolute's website and the website of those who continued to associate with Resolute, including the Forest Products Association of Canada ("FPAC"), and Resolute's key customer, Best Buy.  (¶¶ 41, 44-47, 171-173.)

### b.      The ForestEthics Defendants

ForestEthics, recently rebranded "Stand," has strong ties to Greenpeace, upon which its organization is modeled.  (¶¶ 34, 41(m).)  The two organizations have described themselves as "close all[ies]" with a long history of collaborating on campaigns.  (¶ 41(p).)  Under the direction of its executive director, defendant Todd Paglia, ForestEthics worked closely with the Greenpeace Defendants in the dissemination of disinformation and aggressive attacks on Resolute's customers, executives, stakeholders and other critical market constituents.  (¶¶ 41-48.)

### c.      Other Enterprise Members

The Complaint alleges other enterprise members who worked with Greenpeace and ForestEthics to illegally misappropriate proprietary and other confidential information from Resolute and its customers by impersonating other people and customers and otherwise misrepresenting themselves, and other third-parties involved in illegal cyber-attacks, directed at plaintiffs and their their customers.   (¶ 41(o).)

7

### C.       Greenpeace's Pattern and Practice of Fraud, Extortion and Other Illegality

For more than 20 years, Greenpeace has strayed further and further away from legitimate environmental work to schemes for generating monies necessary to perpetuate its corrupt practices and the salaries of its officers and employees.  (¶ 51.)  As set forth in detail in the Complaint, well over 60% of GP-Inc.'s annual revenue goes to its executives' six-figure salaries and other wages, and 94% of GP-Inc.'s revenue is consumed by administrative and fundraising expenses.  (¶ 54.)  Thus, Greenpeace is fundamentally a fundraising organization that raises funds to pay its leaders and continue raising more funds.  (*Id.*)  But, publicly, Greenpeace falsely depicts itself as an organization engaged in direct actions designed to improve the environment, when in fact virtually all of its activities are directed at raising money by disseminating lies about, and interfering with the business of, its targets, including Resolute, without any material impact on the environment at all.  (¶ 55.)  Thus, at the heart of this fraudulent scheme are fundamental lies as to what Greenpeace is and does, the manner in which donation dollars are used, and the specific misrepresentations it makes about its campaigns and targets.  These lies are perpetuated to donors, tax authorities, targets and their customers, and the public at-large.  (¶¶ 51-55.)

In perpetrating this fraudulent scheme, Greenpeace has developed a familiar playbook: (1) it identifies or manufactures a hot-button environmental issue to exploit for its own financial gain; (2) disseminates sensational, alarmist, and false claims about impending calamity related to that high profile issue, including by manufacturing putative evidence; (3) bombards supporters with urgent requests to "DONATE NOW" in order to help Greenpeace stop the purported calamity; and (4) directs extortive demands, tortious interference, and other illegal conduct at its targets, their customers, and critical business constituencies to further stoke up interest and support. When Greenpeace's extortion succeeds, it insists that its target publicly endorse its campaign and lies, which it then uses to stoke up more donations and support.  (¶ 56.)

Greenpeace's own internal documents demonstrate that its *modus operandi* is to sensationalize and misstate issues and facts to drive donations.  For example, a draft email about nuclear power awaited only the insertion of what Greenpeace internally described as an "ALARMIST AND ARMAGEDDONIST FACTOID":  "In the twenty years since the Chernobyl tragedy, the world's worst nuclear accident, there have been nearly [FILL IN ALARMIST AND ARMAGEDDONIST FACTOID HERE]."  (¶ 52.)  As set forth in detail in the Complaint, Greenpeace has deployed similar tactics against dozens of others targets, including the commercial fishing industry and distinguished physicist Dr. William Happer.  (¶¶ 52, 57-66.)

Because of this pattern of fraud, deceit, and other illegal activities, Canada revoked Greenpeace's charitable status, stating its sensational claims "served no public purpose"; similarly, authorities in India are attempting to suspend its charitable status and business registration, and are investigating Greenpeace for fraudulent accounting and tax evasion.  As Greenpeace founder, Dr. Patrick Moore, has explained, once Greenpeace attained a significant public profile, others in the organization saw it as a means not to pursue legitimate environmental work, but instead as a vehicle to enrich themselves through perpetual fraudulent fundraising.  Just months ago, Dr. Moore labeled Greenpeace a "monster" engaged in "extremism," "RICO," "wire-fraud," "witness tampering" and "obstruction of justice."   (¶ 67.)

D.      **The Illegal Campaign Against Resolute**

Beginning in or around 2012, defendants and other co-conspirators formed an association-in-fact (the "Greenpeace Enterprise") to target Resolute with a criminal scheme -- the "Resolute: Forest Destroyer" campaign -- carried out through a pattern of racketeering activity, including, but not limited to, using the mails and wires to defraud donors and steal proprietary information, defraud the United States Treasury, make bribes and extortive threats, transport and transmit misappropriated funds and property through interstate commerce, and conspiracies to do

the same.  (¶ 41.)  The common purpose of the Greenpeace Enterprise was to inflict enormous harm upon Resolute so the Enterprise could fraudulently induce millions of dollars in donations that could then be used to fund the salaries of its leaders, and perpetuate more fraudulent fundraising opportunities.  (¶¶ 41, 43, 67.)

           1.    <u>The Criminal Enterprise</u>

The Greenpeace Enterprise was comprised of, among others, GPI, GP-Fund, GP-Inc., Greenpeace Canada, ForestEthics, Canopy, and individuals working in concert with them.  (¶ 41.)

GP-Inc. and Greenpeace Canada -- through defendants and enterprise members Brindis, Moas, Skar, Brooks, Moffatt and Mainville -- aggressively prosecuted the disinformation campaign against Resolute through the publication of false and defamatory reports, blog posts, and internet publications; direct communications to critical market constituents, extortive threats, boycotts, fabrication of evidence, and other illegal conduct.  *Id.*  GPI and GP-Fund strategized on, approved, underwrote, and provided other substantial support to the campaign.  (¶¶ 44, 45, 46.)  Among other things, GPI permitted the use of the Greenpeace brand and trademark in the "Resolute: Forest Destroyer" campaign, and GPI and GP-Fund funded GP-Inc.'s and Greenpeace Canada's substantial salaries and operating expenses, including those dedicated to the campaign against Resolute.  (¶ 46.)  GP-Fund also exercised substantial control over the formation, planning, management and operation of the campaign through enterprise member Annie Leonard, GP-Fund's executive director.  Leonard directed and controlled the activities of GP-Inc. and enterprise members Brindis, Moas, and Skar, who executed GP-Inc.'s Enterprise-related activities directed at Resolute.  (¶ 45.)  GPI, ForestEthics, and Canopy likewise exercised control over the operation of the Greenpeace Enterprise through defendants and enterprise members, Daggett, Paglia and Carr, respectively, who worked in concert with enterprise members, Skar, Moas, Brooks, Brindis, Moffatt, Mainville, and Leonard to disseminate false lies about Resolute and aggressively target

Resolute's customers and stakeholders through direct attacks and other illegal conduct.  (¶ 46.)

        2.     The Enterprise Scuttles The CBFA
                <u>To Launch A Fundraising Campaign</u>

Central to the launch and success of the "Resolute: Forest Destroyer" campaign was the need to scuttle the Canadian Boreal Forest Agreement ("CBFA"), a historic accord, pursuant to which industry participants -- including Resolute, Greenpeace and ForestEthics -- voluntarily committed to collaboratively expand protected areas within the boreal forest, develop recovery plans for species at risk, and take action on climate change.  (¶¶ 69, 144.)  In touting the significance of the CBFA, which it took credit for creating, Greenpeace declared that its execution protected "virtually all of the habitat of the threatened woodland caribou" from forestry activities. Since the execution of the CBFA in May 2010 this has remained true, and Resolute has otherwise invested thousands of hours and countless resources to analyzing and proposing initiatives to implement the goals of the CBFA.  (¶ 72.)

By 2012, however, the Enterprise had decided cooperative compliance with the "historic" CBFA had exhausted its publicity and fundraising potential.  (¶ 72.)  Accordingly, per its playbook, on September 17, 2012, the Greenpeace Enterprise, including ForestEthics' Paglia, misrepresented to signatories of the CBFA, including the FPAC, that Resolute was engaged in "active logging and road building . . . in areas officially designated off limits within the CBFA."  (¶ 145.)  This was categorically untrue, untethered to any reasonable or responsible factual basis, and Greenpeace and ForestEthics knew this to be the case.  (¶¶ 72, 144-45.)

In December 2012, the Greenpeace Enterprise released a highly sensational, publicized, and defamatory report titled "Exposed: Resolute Forest Products Breaks Historic Environmental Agreement," which falsely accused Resolute of harvesting in various regions of the boreal forest in violation of the CBFA, and purported to corroborate those claims with photographs of the roads

(with purported GPS coordinates displayed) Resolute had purportedly built to do so.  (¶¶ 73-76.)
The photos, however, were fakes, and the report was a sham.  Resolute had not committed any of
the acts of which it was accused, nor did it otherwise violate the CBFA.  (*Id.*)  Nevertheless, on
December 11, 2012, Greenpeace used these completely false claims and manufactured evidence
as a pretext to withdraw from the CBFA and initiate a new aggressive fundraising campaign
predicated on the phony claim that Resolute was "secretly engag[ing] in logging contrary to the
terms of the [CBFA]."  (¶¶ 78-79, 147.)

In March 2013, the Greenpeace Enterprise was forced to retract their prior claims,
admitting that they "incorrectly stated that Resolute had breached the [CBFA]."  (*Id.*)  Nevertheless
Greenpeace refused to resume CBFA participation.  (¶ 147.)  To the contrary, the Greenpeace
Enterprise intensified its fundraising campaign against Resolute, launching its "Resolute: Forest
Destroyer" campaign in May 2013 to do so.

### 3.    The Disinformation Campaign

In May 2013, the Greenpeace Enterprise launched its "Resolute: Forest Destroyer"
campaign based on the broad, sensational, and ubiquitous claims that Resolute was a "Forest
Destroyer" operating without regard for law, morals, or any concern for the Boreal or its people.
(¶ 81.)  For example, it issued a materially false and misleading report titled "Resolute's False
Promises: The [un]sustainability report of 2013" in May 2013 that, among other things, falsely
accused Resolute of "[u]nsustainable forestry, regulatory infractions, failure to protect endangered
species, 'green' products that don't live up to the name, certification that comes up short, disregard
for Indigenous rights and communities struggling for their fair share."  (¶¶ 148, 157.)  Likewise,
in a May 2013 interview with the Globe and Mail (commonly referred to as "Canada's National
Newspaper") concerning the CBFA negotiations, ForestEthics reiterated the false narrative that
Resolute had violated the CBFA and stood alone in refusing to abide by its terms: "Getting

environmentalists and logging companies to come to an agreement is not easy.  We feel like Resolute is the bad apple, and that the rest of the bushel is in very good shape."  (¶¶ 144-48.)

This launch once again utilized fabricated evidence -- including redrawn maps which expanded long-standing geographical delineations and falsified video and photographic footage purporting to depict harvesting in the "Broadback," but which in fact depicted insect devastation in other areas of Quebec several hundreds of miles away -- to misrepresent that Resolute was harvesting in areas in which it had previously agreed not to harvest.   (¶¶ 135, 138.)

Moreover, the Greenpeace Enterprise manufactured a false sense of urgency and importance by grossly misrepresenting and exaggerating the conditions in the boreal forest, and Resolute's impact there, tying these outrageous claims to hot-button issues such as global warming, endangered species, and the treatment of indigenous peoples, as well as made-up concepts having no application to the Boreal, such as "ancient," "old" and "endangered" forests, and misrepresenting that these sensational claims were based on the "best science" when, in fact, these claims were either contradicted or unsupported by the very cherry-picked and limited science they identified as support for their claims.[3]  (¶ 82.)

> a.   The Enterprise Misrepresents that Resolute
>      Is "Destroying" an "Endangered," "Ancient" Forest

At the heart of the "Resolute: Forest Destroyer" campaign is the allegation that Resolute is a "Forest Destroyer" responsible for "destroying endangered forests" falsely described as "ancient," "intact," and "old growth."  (¶¶ 84-87; *see also* Appendix A.)  These allegations are malicious, false and misleading.

First, Resolute is not a "destroyer" of the boreal forest in any possible sense of the word.

---

[3]     Specific examples of false, defamatory and misleading allegations disseminated by the Greenpeace Enterprise are set forth in Appendices A-F to the Complaint.  (*See* Doc. 1-1.)

Canada retains about 90% of its original forest cover, with agriculture and urbanization, not forestry and certainly not Resolute, responsible for the 10% loss over several hundred years. Indeed, less than .5% (.005) of the Canadian boreal forest -- a vast landscape covering several hundred million hectares -- is harvested annually, only a minority of which is harvested by Resolute.  (¶ 89; *see also* Reich Decl. ¶¶ 5, 48.)  Moreover, in those areas where Resolute is permitted to harvest, it does so exclusively under the strict guidelines and regulations of the Quebec and Ontario provincial governments, which hold title to these public lands and strictly regulate, monitor, and enforce the manner in which they are harvested.  (¶ 91; Reich Decl. ¶ 8; Cubbage Decl. ¶¶ 6, 10-13, 23, 47.)   Were these lands not harvested by Resolute, these provincial governments would see that they were harvested by others, because responsibly utilizing this national resource for the benefit of the Canadian people is part of Canada's public policy. Furthermore, all the woodlands Resolute manages and harvests are independently certified by at least one of two internationally-recognized forest management standards used in Canada -- Sustainable Forestry Initiative ("SFI") and Forest Stewardship Council ("FSC").  (¶ 92; Cubbage Decl. ¶¶ 4, 5, 18, 37, 46.)

Notably, even those areas harvested by Resolute are not "destroyed," because each is promptly regenerated either naturally or by seeding or planting.  On average, from 2010-2012, Resolute planted over 60 million trees per year, and by 2012 Resolute *planted its billionth tree* in Ontario alone and has since planted many millions more. (¶ 89.)  Moreover, Professor Reich concludes that "the nominal 0.02% of the boreal forest 'destroyed' annually is due to urban and industrial development: not Resolute's -- or any other forest product company's -- harvesting operations."  (Reich Decl. ¶ 12.)  To the contrary, as a result of its sustainable practices, Resolute has been recognized as an industry leader in sustainability and has received numerous regional, North American and global awards for its responsible forestry.  (¶ 93.)

Second, the boreal forest is not "endangered."  In making this false claim, the Greenpeace Enterprise misrepresents science that shows that the Boreal is "still vast and relatively undisturbed in northernmost Canada and Alaska . . . [and] *among the least threatened in the world*."   (¶ 96.) Moreover, according to the Frontier Forest Index, which measures the state of worldwide frontiers, Canada has a score of 8/99 (where 99 is the worst possible score), receiving the fourth lowest (best) mark globally, demonstrating that, as detailed above, the country's frontier has experienced little to no loss and is by no reasonable standard "endangered."  (*Id*.)

Finally, the Greenpeace Enterprise's allegations that Resolute is destroying "ancient" forests is equally false, misleading, and without ecological or scientific basis as it relates to the boreal forest, which is not "ancient," is not comprised of long-lived tree species, and is regularly subject to substantial natural disturbances.  (¶ 97.)  Thus, in the Canadian boreal forest, growth is considered "old" after only 100 years, which is not "ancient" or even unique or remarkable in North America or the world.  (¶ 97; Reich Decl. ¶¶ 15-17, 37-38.)

> b.   The Enterprise Misrepresents Resolute As a Climate Change Risk

The Greenpeace Enterprise also exploits the mass interest and concern about climate change with the completely fallacious lie that Resolute's operations are a material climate change risk because they impair the Boreal's ability to absorb and store carbon.  (¶ 100; *see also* Doc. 1-1 (Appendix B).)  However, Professor Reich concludes that defendants' claim that Resolute aggravates climate change "shows a fundamental disregard for scientific reality."  (Reich Decl. ¶ 23.)  In fact, the United Nations' Intergovernmental Panel on Climate Change -- often cited by Greenpeace elsewhere -- has declared that sustainable forest harvesting is one of the most important mechanisms for removing greenhouse gases from the atmosphere.  (¶ 101.)  Indeed, as numerous studies have shown, greenhouse gas absorption and sequestration are maximized by harvesting old trees that have ceased absorbing greenhouse gases and are, or will soon begin,

emitting greenhouse gases, and regenerating with new trees that absorb the most greenhouse gases during their growth and maintenance phases.  (¶ 102; Reich Decl. ¶¶ 37-38.)

Likewise, the Greenpeace Enterprise's efforts to falsely link Resolute and boreal forestry with significant land use changes worldwide that dramatically diminish the ability of the global forests to mitigate climate change is equally untethered to facts or science.  (¶ 100 n.2.)   In fact, deforestation is occurring overwhelmingly in Africa, Asia, and South America, and notably, not in the Boreal, where deforestation caused less than 2% of Canada's total greenhouse gas emissions in 2012, amounting to 0.06% of global emissions.  (¶ 103; Reich Decl. ¶¶ 6, 24-25, 33, 39, 48.)

Indeed, the Greenpeace Enterprise's false depiction of Resolute as a climate change risk omits that Resolute is globally recognized as a leader in climate change mitigation, has received numerous international awards and distinctions for climate change initiatives, and has reduced its own carbon footprint by 71% over a year-2000 baseline.  (¶ 104.)

c.    The Enterprise Misrepresents That Resolute Is
Impairing The Sustainability of the Woodland Caribou

The Enterprise's fraudulent campaign also exploits the condition of Canada's woodland caribou herds by misrepresenting that Resolute's activities are responsible for a "dramatic decline" of woodland caribou in Canada "due to industrial pressure" that the Greenpeace Enterprise claims has caused the loss of "50% of caribou habitat in the last 100 years."  (¶ 106.)  But associating Resolute's activities with these claimed impacts on Caribou is a classic bait and switch, as the two have no material factual connection at all.  (*See* Reich Decl. ¶ 7 ("Scientific literature demonstrates that caribou are most affected in western Canada . . . an area far from Resolute's operations"); Reich Decl. ¶¶ 41-47; *see also* ¶¶ 108-14).)  The fact is that the dramatic impacts to which Greenpeace refers are attributed to other industrial activities, in other parts of the Canadian boreal forests and associating them with Resolute is a complete non-sequitur.  (¶¶ 105-07, Appendix C.)

16

Indeed, Greenpeace's own public statements at the time the CBFA was implemented prove this point.  At that time, Greenpeace announced that the agreed upon "moratorium . . . *protect[ed] virtually all of the habitat of the threatened woodland caribou*" in the Quebec and Ontario regions in which Resolute and other forestry companies operate.  Since then, Resolute's operations have remained outside "virtually all of th[at] habitat" and thus, obviously cannot now be accused of, or even associated with, the claimed loss of 50% of the caribou habitat in the Boreal where it does not even operate.   Moreover, the specific Quebec caribou populations Greenpeace does specifically associate with Resolute's activities constitute a nominal percentage of the overall caribou population in Quebec, more than 98% of which remains stable and self-sustaining. Furthermore,  even for these few caribou populations Greenpeace singles out, Resolute only operates in very limited portions of their alleged habitats and even then only  pursuant to forest management plans and certification standards providing for their protection, and  there is no evidence any of Resolute's operations have had an actual adverse impact on these caribou.  Finally, the scientific research the Greenpeace Enterprise purports to rely on against Resolute, and the losses it attributed to Resolute, actually relate to caribou habitats and populations in western Canada, particularly Alberta, far away from Resolute's operations.  (¶¶ 108-14; Reich Decl. ¶ 7.)

       d.     The Enterprise Misrepresents Resolute's
                Relationship with First Nations Communities

The Greenpeace Enterprise also peddled to donors the lie that its "Resolute: Forest Destroyer" campaign protects indigenous communities, known in Canada as "First Nations" who live in the boreal forest and who the Greenpeace Enterprise misrepresents that Resolute has exploited, "abandoned," and "impoverished." (¶ 115.)   There is no factual support for these false claims.  In fact, Resolute provides substantial economic benefits to the people and communities in the Boreal through employment, vendor contracts, the purchase of wood harvested by these

communities, and through various forms of joint ventures and partnerships through which they share in the economics of boreal forestry, and as a result, has numerous successful partnerships with various First Nations. (¶¶ 116-17.)  While there are occasional conflicts in and among some of these relationships that would be expected among any commercial endeavor involving multiple interested constituencies, these provide no support for the extreme claims of exploitation and impoverishment upon which Greenpeace's campaign relies.

> e.     The Enterprise Falsely Accuses
> Resolute of Harvesting in Protected Areas

Although the Enterprise purported to retract its 2012 claims that Resolute was harvesting in areas protected under the CBFA, by May 2013 it had resorted to once again accusing Resolute of harvesting in protected regions, featuring these lies prominently on Greenpeace's website.  Over the course of the next three years, relying on falsified video and photographic footage and redrawn maps, the Greenpeace Enterprise deceitfully accused Resolute of improperly harvesting in the Broadback Valley, Trout Lake and Montagnes Blanches.  (¶¶ 135-42; Appendix F.)

First, the Greenpeace Enterprise falsely accused Resolute of improperly harvesting in the "Broadback Valley" by simply expanding the area delineated as the "Broadback Valley," pursuant to an agreement between Resolute and certain ENGOs, by 300%.  (¶ 137.)  This is like accusing your neighbor of trespassing by simply redrawing your property to encompass your neighbors'.  This false claim is particularly malicious because these areas are not only outside the delineated "Broadback," they also were otherwise excluded from the CBFA moratorium.   Moreover, Greenpeace explicitly agreed Resolute could harvest in these areas. (¶¶ 136-37.)   Further demonstrating the malice of these claims, the Greenpeace Enterprise used falsified video and photographs purporting to demonstrate the dramatic impact of Resolute's allegedly improper harvesting, but which depict completely unrelated insect devastation in a completely unrelated

area of Quebec several hundred kilometers away.  (¶ 138.)

Likewise, the Greenpeace Enterprise falsely accused Resolute of building roads and harvesting in the Montagnes Blanches, a region located above the Northern Limit and out of bounds for all forestry.  Once again, to do so, the Greenpeace Enterprise simply redrew the existing maps beyond any colorable relationship to historical and long understood delineations of the region to include areas outside that delineated area where Resolute was operating.  (¶¶ 141-42.)

Finally, the Greenpeace Enterprise's misinformation campaign misrepresented that Resolute regularly builds roads and harvests in the Trout Lake Forest caribou habitat.  In fact, a different logging company, Domtar, has responsibility for the Forest Management Unit ("FMU") in which the Trout Lake Forest is located, and this FMU is over 100 kilometers away from the nearest Resolute forest tenure.  (¶¶ 139-40.)

        f.     <u>The Enterprise Misrepresents Resolute's Certification Status</u>

In its motions to dismiss, the Enterprise purports to corroborate all its false claims by misrepresenting that Resolute had FSC certificates revoked because FSC auditors determined Resolute was engaged in the same serious misconduct the Enterprise alleged.  However, once again these sensational claims are entirely divorced from the facts, and even if true -- which they are not -- provide absolutely no support for the vastly broader false claims described above.  (¶¶ 125-26.)

With respect to this specific issue, however, the fact is that Resolute is one of the largest holders of FSC sustainable forest management certificates in all of North America.  (¶ 133.)  While Resolute did have three discrete certificates for specific areas -- those for Lac St-Jean, Mistassini-Peribonka, and Black Spruce & Dog River -- suspended in December 2013, the audits that led to these temporary suspensions by their own terms were not based on any wide-ranging findings of serious misconduct in connection with Resolute's on-the ground practices or compliance with regulations or law, but were based on narrow idiosyncratic issues, most of which were outside of

Resolute's control.  (Cubbage Decl. ¶¶ 22-25, 36.)

First, one audit cited a specific, complex territorial dispute between the Quebec Government and two First Nations concerning a portion of the audited area that was unresolved at the time of the audit, even though Resolute was not a direct party to the dispute and lacked any ability to control or resolve it.  (*Id.* ¶¶ 22-25, 36.)  Second, both the Lac St-Jean and Mistassini-Peribonka audits challenged the adequacy of Resolute's habitat conservation plan, a plan which fully complied with the provincial government's caribou conservation requirements.  (*Id.* ¶¶ 22-23, 27-28.)  Indeed, other FSC holders relying on the same caribou habitat conservation plan did not have their FSC certification suspended, which was the result of the Greenpeace Enterprise's direct efforts to contaminate Resolute's relationship with FSC.  (*Id.* ¶¶ 39, 49.)  With respect to the certification of Black Spruce & Dog River forest, in November 2015, the FSC overturned the suspension after a new independent audit, and reinstated Resolute's FSC certificate shortly after the initial suspension.  (¶¶ 30-32.)

Whatever the truth and significance of these particular certification issues, they do not address, let alone provide remote support for the dramatic and false claims that Resolute is "destroying" the boreal forest, responsible for dramatic losses in Caribou habitat and populations, a material risk to climate change, and an "impoverisher" of First Nations.

> ### 4.   The Enterprise Interferes With Customer And Industry Relationships

The Greenpeace Enterprise disseminated these false lies ubiquitously via websites, blogs, Twitter, emails, letters, and innumerable direct in-person and telephonic conversations, to Resolute's most important constituents, including, most significantly to: (a) Resolute's customers, including those in Georgia, to whom the Greenpeace Enterprise made extortive threats to also publicly label them as "forest destroyers" and target them with crippling boycotts if they continued

to do business with Resolute; and (b) the FSC and its auditors whom the Greenpeace Enterprise contaminated with its disinformation in order to make it impossible for Resolute to maintain its status as the industry's leader in FSC certificates. (¶¶ 130-32, 149, 164, 181.)

a.      The Greenpeace Enterprise Issues Extortive Threats To Customers

Beginning in 2013, the Greenpeace Enterprise targeted key Resolute customers, UPM and Axel Springer. The Greenpeace Enterprise threatened these critical Resolute customers that if they continued to source pulp from Resolute, the Enterprise would target them directly, harming their business and reputation among its key constituents. (¶¶ 155-56.) Thus, on April 2, 2014, UPM informed Resolute of its decision to suspend purchases because of the Greenpeace Enterprise's "black mailing." Axel Springer followed suit in August 2015. Upon learning of Axel Springer's decision, the Greenpeace Enterprise immediately leaked the news to multiple media outlets, and celebrated the news on Twitter, noting that the controversy generated by the "Resolute: Forest Destroyer" campaign alone was enough to interfere with Resolute's customer relationships: "Publisher @axelspringer_EN ditches unsustainable @resolute paper. Wants Canadian paper but less enviro controversy." (*Id.*)

Similar threats, including market campaigns and in-store demonstrations, were lodged against Georgia-based, Home Depot, Inc. (¶ 179; *see also* Doc. 55-2.) As the Greenpeace Enterprise intended, in response to these threats, Home Depot publicly endorsed the Enterprise's campaign and agreed to engage in discussions with Greenpeace to "ensur[e] their paper and solid wood suppliers are practicing responsible and sustainable forestry." (¶ 179.)

The Enterprise likewise targeted Resolute customer Kimberly-Clark, which maintains offices in Roswell, Georgia, with disinformation about Resolute's purported FSC noncompliance. Defendants demanded that Kimberly Clark cease doing business with Resolute, including during meetings in December 2012 and May 2013, and scores of emails, letters, and telephonic

discussions throughout 2013, 2014 and 2015.  (¶ 204.)  Ultimately, on September 16, 2015, Kimberly-Clark informed Resolute that "[d]ue to Resolute's continued dispute with Greenpeace and the recent upsets in the CBFA we are not going to be able to pursue a contractual relationship." (¶ 150.)  The Enterprise employed similar tactics with respect to Georgia-based, Procter & Gamble ("P&G"), one of the world's largest manufacturers of tissue products, which operates a large manufacturing plant in Albany, Georgia.  (¶ 157.)  In response, during contract negotiations in 2013, P&G demanded "exit-clauses" in their contracts with Resolute, and, ultimately exercised certain of these exit clauses in March 2014, because it became increasingly concerned that Greenpeace's campaign would have a negative impact on its customers and brands.  (*Id.*)

As set forth in the Complaint, the Greenpeace Enterprise disseminated these same lies about Resolute and issued extortive threats to dozens of Resolute customers and trade associations. (¶¶ 149-63, 198, 200-07.)

> b.      The Greenpeace Enterprise Publicly Attacked
>           <u>Resolute's Customers and Industry Relationships</u>

At the same time that the "Resolute: Forest Destroyer" campaign privately targeted certain Resolute customers, it was simultaneously publicly targeting other large Resolute customers through high profile, highly inflammatory reports, blog posts, and other internet publications.  The objective of this campaign was to leverage the false public narrative of the "Resolute: Forest Destroyer" to publicly intimidate, pressure, and shame these significant customers into terminating their business relationships with Resolute, which it then touted to potential donors as success to extort additional financial support to perpetuate their illegal scheme.  (¶ 164.)

The Greenpeace Enterprise first publicly targeted 3M.  ForestEthics initiated the attack against 3M in 2009 through a series of widely disseminated reports, which falsely accused 3M of sourcing materials from endangered forests, including Canada's boreal forest.  (¶ 165.)  The

Greenpeace Enterprise escalated these efforts with an April 29, 2014 sensational and false report authored by defendant Amy Moas titled "Exposed: 3M Sourcing From Forest Destruction" that solicited donations by stating that Greenpeace was "proud to stand with . . . our ally, ForestEthics" and join their "demand that 3M immediately stops sourcing [products] from forest destroyers" like Resolute and instead source only from "responsible sources." (*Id.*) The joint attack and continuing extortive threat on 3M succeeded. On March 6, 2015, 3M announced a new paper sourcing policy, which the Greenpeace Enterprise immediately announced in a report, singling out Resolute: "3M has notified controversial logging giant Resolute Forest Products that it will need to comply with its new sourcing standards or lose business," and days later, on March 18, 2015, 3M informed Resolute after "work[ing] with ForestEthics and Greenpeace . . . we are not pursuing new business with Resolute." By fall 2015, 3M informed Resolute it was eliminating it from its supply chain due to the "continued controversy" with Greenpeace. (¶ 166.)

The "Resolute: Forest Destroyer" campaign likewise targeted Resolute customer Best Buy. On November 26, 2014, the eve of its busiest online shopping season, i.e. "Black Friday," the Greenpeace Enterprise released a sensational report, "Best Buy Is Wasting Ancient Forests, One Flyer At A Time," which falsely accuses that "[b]y buying from Resolute, . . . BestBuy risks using priceless caribou habitat or fibre sourced without First Nation consent." The Enterprise further threatened that to avoid such "risks," Best Buy must stop using Resolute and instead use Boreal "forest product companies in Canada successfully pursuing sustainable, equitable, and economically viable forestry." (¶ 169.) When Best Buy ignored Greenpeace's demands, on the day before Thanksgiving, Greenpeace launched a very public and well-orchestrated boycott of Best Buy. (¶¶ 167, 172.) A Twitter user "Reaper Tango Down" -- associated with the cyber-hacktivist group Anonymous -- immediately retweeted the Enterprise's boycott announcements, called Resolute a "Massive Tree Killer," and announced that it had used cyber-attacks to take down

Resolute's website, and, later the next day, the FPAC website.  Best Buy's website began experiencing problems at the same time and crashed on November 28, the "Black Friday" morning after Thanksgiving, its busiest online shopping day of the year.  One of the Enterprise's leaders of the Best Buy attack presciently announced the Best Buy web crash via Twitter virtually the moment it happened and before it was publicly reported.  A few days later, Greenpeace induced supporters and co-conspirators to again attack Best Buy's website, which led to over 50,000 emails and false product reviews flooding the site.  The aggressive attack was effective.  Just days later, on December 8, 2014, Best Buy announced it would be shifting its sourcing away from Resolute and towards suppliers who acquiesced to Greenpeace's threatening dictates.  (¶¶ 167-75.)

The Enterprise sought to replicate their Best Buy attack on other targets.  Beginning in April 2015, enterprise members, including defendant Brindis, published a series of false and defamatory publications accusing Rite Aid of sourcing "millions of pounds of paper a month to create [ ] throwaway flyers and junk mail" for "buy one get one free flyers" from "controversial logging giant Resolute Forest Products -- a company with a history of environmental destruction." The reports attached mock ups of Rite Aid circulars which falsely state that Resolute was committing the following destructive practices: (i) "Caribou Herd Death Spiral -- Destroy One Destroy Another One Free!"; (ii) "Logging on Indigenous Peoples Land Without Consent"; (iii) "Destroying Endangered Forests -- Destroy One Destroy Another One Free!"; and (iv) "Buzzcutting Bird Breeding Grounds."  The Enterprise's attack on Rite Aid continued throughout the summer of 2015, with the publication of three false and defamatory reports by defendant Amy Moas, which purported to criticize Rite Aid for "ignor[ing] what science tells us: the Canadian boreal forest is at risk and Rite Aid's supplier, Resolute, is making a bad situation worse," by "cutting out the heart of the forest," "needlessly destroying critical habitat of the endangered woodland caribou and at times logging in the Indigenous Peoples' territories without their

consent."  (¶ 178.)  On the basis of these false lies, defendant Moas implored Rite Aid to "make the Rite Choice," and stop "turning a blind eye to the forest destruction behind its throwaway flyers."  The Greenpeace Enterprise reiterated these same falsehoods on Facebook and Twitter using the hashtag #RiteAidWrongChoice.  (¶¶ 176-80.)

c.    <u>The Enterprise Targeted Resolute's FSC Certificates</u>

The FSC is an international non-profit association, whose membership includes environmental organizations, indigenous peoples and several forest products producers and retailers, whose certifications the Greenpeace Enterprise had touted as the "gold standard" in the industry.  (¶ 182.)  Immediately following Resolute's July 2012 announcement that it had become the largest holder of FSC certificates in the world, the Greenpeace Enterprise embarked on a campaign to procure the suspension and termination of Resolute's FSC certificates, which undermined the Enterprise's false allegations that Resolute was destroying the forest and negatively impacting woodland caribou and climate change.  (¶¶ 182-87.)

In furtherance of these efforts, the Greenpeace Enterprise filed a false and misleading complaint with the FSC, alleging, among other things, that Resolute was not in compliance with the FSC standards as they relate to the Caribou Forest tenure in Ontario. (¶ 185.)  Rainforest Alliance was retained to conduct an independent audit of the disputed areas.  However, the Greenpeace Enterprise contaminated the independence of the audit by, among other means, the "emotionalizing pressure" its "Forest Destroyer" campaign was designed to generate and through other forms of direct and indirect communication and influence.  (¶ 186.)  The result was a disparate and unprecedented audit.  (*See* Cubbage Decl. ¶¶ 22-29.)  On December 17, 2013, the Rainforest Alliance announced the suspension of two of Resolute's FSC certificates.  The Enterprise, including ForestEthics, immediately spread the news of the success via Twitter, "Canada's largest forest company, Resolute Forest Products, loses several ecocertifications [sic]

25

#FSC," misrepresenting that the suspensions were due to "the violation of strict #sustainability standards," and commended the FSC for "stop[ping] the destruction." (¶ 187.)

The Enterprise continually pressured and influenced the FSC and its auditors and caused highly disparate and exceedingly demanding standards to be applied to Resolute, far in excess of those applied to other holders of FSC certificates. (¶¶ 181-88; *see* Cubbage Decl. ¶¶ 22-29, 49.)

        d.      <u>The Enterprise Demanded That Resolute Endorse Its Campaign</u>

Finally, consistent with its playbook, the Greenpeace Enterprise attempted to coerce Resolute to publicly endorse its campaign. During a meeting held at Resolute's offices in May 2013, Todd Paglia of ForestEthics threatened a Resolute executive that if Resolute failed to cede to the Enterprise's demands, the Enterprise would destroy Resolute's image among its critical market constituents. Following the meeting, Mr. Paglia circulated to Resolute samples of the Enterprise's "collaborations" with previous campaign targets, Staples and Victoria's Secret. Notwithstanding these threats, Resolute declined ForestEthics' demands. (¶ 193.)

In the months that followed, the Enterprise made good on its threat to injure Resolute. On March 18, 2014, Enterprise members transformed Montreal's iconic Mount Royal Cross into an "immense scales of justice," featuring the Resolute logo outweighing the forest and its communities and wildlife. Running vertically along the cross was a twelve meter banner which asked: "Justice?" (¶ 194.)

Similarly, around this time, the Greenpeace Enterprise launched another publicity stunt, "The Stand For Forests" pledge, which falsely accused Resolute of "put[ting] the health of the boreal Forest at risk with its destructive logging practices" and purported to "call for people to come together . . . even if it means facing a $7 million lawsuit" and sign a pledge "as a symbol of shared resolve to protect Canada's Boreal Forest from Resolute's clear-cutting." (¶ 195.) The product of the Stand for Forests Campaign was a "guardian tree," which was presented to Resolute

on May 22, 2014.  As evidence of the widespread impact of the Enterprise's campaign, the guardian tree was signed by 61,000 activists and supporters.  (¶ 195.)

>    **E.    The Enterprise's Georgia Activities**

The Enterprise's campaign against Resolute included participants, activities, and effects that were based, conducted, and experienced in Georgia where Resolute operates a newsprint mill and where numerous Resolute customers and prospective customers are located.  (¶¶ 197-210.) Both GP-Inc. and GP-Fund are registered charities under the Georgia Charitable Solicitation Act of 1988 (O.C.G.A. § 43-17-1, *et seq*.), and GP-Inc. is registered in Georgia as a Foreign Nonprofit Corporation under O.C.G.A. § 14-3-1501, *et seq*.  (¶ 197.)  GP-Inc., GP-Fund, and Greenpeace Canada, working in concert with other Enterprise members, disseminated false and misleading lies about Resolute to key Resolute customers and prospective customers in Georgia via email and telephone, including YP, The Home Depot, Kimberly-Clark, P&G, and Georgia Pacific, and threatened these customers and prospective customers with reputational harm, market campaigns and in-store demonstrations if they continued to do business with Resolute.  (¶¶ 201-07.)

Moreover, the Enterprise employed on-the-ground tactics in Georgia including traveling to Augusta, Georgia in May 2015 to disrupt what the Enterprise described as Resolute's "most important event of the year" and communicate falsehoods to Resolute's Board of Directors, shareholders, customers, the media, and the general public at that "most important" annual event. Greenpeace advertised their plans in advance to recruit Greenpeace supporters to participate in Greenpeace's "Thunderclap" campaign, facilitating the transmission and display of thousands of messages on projectors outside the general meeting, and later touted their successes on Twitter: "The[ ] messages were projected on site to the company's shareholders and directors . . . We delivered our message loud and clear.  Resolute senior management and board heard us."  (¶ 208.).

As a result of these wrongful acts, Resolute has suffered damages in Georgia, including

lost customers, lost revenues, closures, cutbacks, and layoffs at Resolute's Augusta facility.

**F.     Damages**

As set forth herein, the Greenpeace Enterprise's "Resolute: Forest Destroyer" campaign has targeted dozens of Resolute customers, leading to lost revenues in an amount Greenpeace itself has publicly calculated to be not less than C$100 million to date and counting.  In addition to these lost revenues, the "Resolute: Forest Destroyer" campaign has severely damaged Resolute's reputation in the marketplace and business community, with local and government officials, and with the peoples occupying the boreal forest.  It has also caused Resolute to devote substantial fees and expenses to respond to, address, and mitigate the impacts of the "Resolute: Forest Destroyer" disinformation campaign.  In total, as a result of the "Resolute: Forest Destroyer" campaign, Resolute has suffered damages in an amount Greenpeace itself estimates to be not less than C$100 million.  (¶¶ 211-17.)

## ARGUMENT

## I.     THE ANTI-SLAPP MOTIONS SHOULD BE DENIED IN THEIR ENTIRETY

Defendants argue that all of plaintiffs' claims should be stricken pursuant to Georgia's state anti-SLAPP statute.  However, as set forth below, Georgia's anti-SLAPP statute -- or any other state's anti-SLAPP statute -- has no application to the claims and conduct asserted in this action. In any event, even if the Court determines that Georgia's anti-SLAPP statute applies to certain claims, plaintiffs state all the required elements of the asserted causes of action, and more than satisfy their burden to prevail on an anti-SLAPP motion at the pleading stage.

**A.     Georgia's Anti-SLAPP Statute Does Not Apply To Plaintiffs' Federal Claims**

It is axiomatic that application of a state anti-SLAPP statute to federal statutory claims would violate the Supremacy Clause of the United States.  *See Bulletin Displays, LLC v. Regency Outdoor Adver., Inc.*, 448 F. Supp. 2d 1172, 1181(C.D. Cal. 2006) ("[A]pplying [state anti-SLAPP

statute] to federal claims . . . [is a] violation of the Supremacy Clause of the Constitution.");
*Martinez v. State of Cal.*, 444 U.S. 277, 284 n.8 (1980) (applying state immunity statute to federal statute would violate supremacy clause).  Courts have reiterated time and time again: "There is no reason why a federal claim, brought in a federal court for an alleged violation of the plaintiffs' federal statutory or constitutional rights, should be subjected to different standards of pleading or proof than are called for under the Federal Rules." *Yeshiva Chofetz Chaim Radin, Inc. v. Vill. of New Hempstead by its Bd. of Trs.*, 98 F. Supp. 2d 347, 360 (S.D.N.Y. 2000); *see also Ginx, Inc. v. Soho Alliance*, 720 F. Supp. 2d 342, 366 (S.D.N.Y. 2010) ("In every other case this Court has located, federal courts have declined to apply anti-SLAPP statutes to federal claims."); *Hilton v. Hallmark Cards*, 599 F.3d 894, 901 (9th Cir. 2009) ("[A] federal court can only entertain anti-SLAPP special motions to strike in connection with state law claims").

Notwithstanding this black-letter law, defendants rely on case-law where federal courts *exercising diversity or pendent claim jurisdiction* applied anti-SLAPP statutes to *state law claims* to argue that Georgia's anti-SLAPP statute provides a complete defense to *all* of plaintiffs' claims in this action, *including plaintiffs' federal RICO claims*.[4]  However, defendants fail to cite a *single case* where state anti-SLAPP law was applied to a federal statutory claim.  To the contrary, the cases they do cite expressly declined to apply anti-SLAPP defenses to federal claims.  *See, e.g.,*

---

[4]     All the cases cited by defendants involve application of anti-SLAPP statutes to state law claims.  *See In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268 (9th Cir. 2013) (state law right-of-publicity); *Liberty Synergistics, Inc. v. Microflo Ltd.*, 718 F.3d 138 (2d Cir. 2013) (malicious prosecution); *Godin*, 629 F.3d 79 (defamation); *Henry v. Lake Charles Am. Press, LLC*, 566 F.3d 164 (5th Cir. 2009) (defamation); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) (state law consumer legal remedies act and unfair business practices laws); *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) (defamation); *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963 (9th Cir. 1999) (breach of fiduciary duties and implied covenant of good faith); *Brownsville Golden Age Nursing Home v. Wells*, 839 F.2d 155 (3d Cir. 1988) (civil conspiracy and tortious interference); *Tobinick*, 108 F.Supp.3d 1299 (unfair competition and libel); *Adventure Outdoors, Inc. v. Bloomberg*, 519 F.Supp.2d 1258 (N.D. Ga. 2007) (defamation and negligence); *Am. Dental Ass'n v. Khorrami*, 2004 WL 3486525 (C.D. Cal. Jan. 26, 2004) (defamation); *Buckley v. DIRECTV, Inc.*, 276 F.Supp.2d 1271 (N.D. Ga. 2003) (unfair business practices act and state RICO); *AirTran Airlines, Inc. v. Plain Dealer Publ'g. Co.*, 66 F.Supp.2d 1355 (N.D. Ga. 1999) (libel); *Sierra Club v. Butz*, 349 F.Supp. 934 (N.D. Cal. 1972) (tortious interference).

*Tobinick v. Novella*, 108 F.Supp.3d 1299, 1302, n.1 (S.D. Fla. 2015) ("Lanham Act [claim] is a federal claim to which the California [anti-SLAPP] statute does not apply."); *Godin v. Schencks*, 629 F.3d 79, 91 (1st Cir. 2010) (declining to apply anti-SLAPP statute to federal law claims).

Moreover, courts applying California's anti-SLAPP statute -- which defendants argue, without any basis, applies in this action[5] -- have universally declined to apply the statute to federal claims.  *See, e.g.*, *Winters v. Jordan*, 2010 WL 3636221 (E.D. Cal. Sept. 14, 2010) ("[A] party may not use an anti-SLAPP special motion to strike to seek the dismissal of claims based on federal law."); *In re Houng*, 2011 WL 6989900, at *9 (B.A.P. 9th Cir. Oct. 24, 2011) ("[None] of the three state-law provisions . . . [including the California anti-SLAPP statute] . . . may be applied to claims involving federal law. . ."); *In re Bah*, 321 B.R. 41, 46 (B.A.P. 9th Cir. 2005) (same).[6]  Thus, in *Bulletin*, the court declined to apply California's anti-SLAPP statute to federal RICO claims, like those asserted here, reasoning that: "California has no interest in dictating rules of procedure or substance applicable to federal claims brought in federal court."  448 F. Supp. 2d at 1182.

Applying these principles, application of Georgia's anti-SLAPP law to plaintiffs' federal RICO claims would permit Georgia state law to affect and alter the substance of federal claims in violation of the Supremacy Clause of the Constitution.  Accordingly, defendants' motions to strike

---

[5]     As set forth below, under the applicable choice-of-law analysis, Georgia law governs the substantive claims in this action.  *See infra* n.44.  However, even if this Court determines that California law governs the substantive claims, the California anti-SLAPP statute would have no application here, because federal courts routinely apply their own state's procedural rules, including anti-SLAPP statutes, even when applying another state's substantive law.  *See Liberty Synergistics*, 718 F.3d at 153-55; *see also Donaldson v. Old Republic Ins. Co.*, 2015 WL 2184322, at *1 (M.D. Ga. May 11, 2015).  Moreover, as set forth below, there is no basis to transfer this case to California.  *See infra* § VI.  Nevertheless, even if there was a change of venue, Georgia's anti-SLAPP statute would still apply, because "the governing law 'does not change following a transfer of venue under [28 U.S.C.] § 1404(a),' regardless of which party initiates the transfer," such that the transferee court "must pretend, for the purpose of determining the applicable state rules of decision, that it is sitting" in the state of the transferor court.  *Liberty Synergistics*, 718 F.3d at 153-54 (quoting *Ferens v. John Deere Co.*, 494 U.S. 516, 530 (1990)).

[6]     *Summit Media LLC v. City of L.A., CA*, 530 F. Supp. 2d 1084, 1094 (C.D. Cal. 2008) ("Anti-SLAPP statute does not apply to federal question claims in federal court because such application would frustrate substantive federal rights."); *Sonoma Foods, Inc. v. Sonoma Cheese Factory, LLC*, 634 F.Supp.2d 1009, 1016 (N.D. Cal. 2007) (same).

plaintiffs' federal RICO claims should be denied.

**B.     Georgia's Anti-SLAPP Statute Does Not Apply To Plaintiffs' State Law Claims**

Defendants' contention that Georgia's anti-SLAPP statute applies to plaintiffs' state law claims is likewise without merit.  Defendants concede that the operative Georgia anti-SLAPP statute at the time this action was commenced (the "Operative Statute") applies only to statements made in connection with an official proceeding, and thus has no application to the statements about Resolute which were not made in this context.  (Doc. No. 56-1 at 4 n.1; Doc. 60 at 3-4.)  Defendants likewise concede that under the Eleventh Circuit decision in *Royalty Network, Inc. v. Harris*, 756 F.3d 1351 (11th Cir. 2014), the Operative Statute does not apply to *any* claims asserted in federal court.  (Doc. No. 56-1 at 10; Doc. 60 at 4-5.)  Thus, defendants resort to arguing that amendments to the Georgia anti-SLAPP statute (the "Amended Statute") -- which became effective only *after* this action was filed -- should be applied retroactively, and should be applied to claims asserted in federal court.  (*See* Doc. 56-1 at 13-15; Doc. 60 at 7-10.)  As set forth below, there is no basis to apply the Amended Statute to actions commenced prior to the statute's effective date.  But, even if this Court determines the Amended Statute applies retroactively, application in federal court would conflict with the Federal Rules of Civil Procedure ("FRCP").  In any event, regardless of whether the Operative or Amended Statute applies, Georgia's anti-SLAPP law does not provide a defense to claims, like those asserted here, which are predicated on an illegal, coordinated scheme involving racketeering, fraud, extortion and conspiracy.

Finally, even if the Court applies Georgia's anti-SLAPP statute to plaintiffs' state law claims, the allegations in the Complaint more than make out a *prima facie* showing required to prevail on a motion to strike.

31

1.    The Georgia Anti-SLAPP Statute Is Not A Defense To
Defendants' False And Defamatory Statements About Resolute

The Operative Statute does not provide a defense to defendants' false and defamatory statements concerning Resolute, because such statements were not made in connection with, or in relation to, an official proceeding, and thus do not fall within the narrow class of speech protected under Georgia's anti-SLAPP law.  The Operative Statute provides:

> For any claim [ ] arising from an act . . . that could reasonably be construed as an act in furtherance of the right of free speech or the right to petition government for a redress of grievances under the Constitution of the Unites States or the Constitution of the State of Georgia in connection with an issue of public interest or concern, both the party asserting the claim and the party's attorney of record, if any, shall be required to file . . . a written verification under oath.

O.C.G.A. § 9-11-11.1(b) (1996).  The statute defines an "act in furtherance of the right of free speech or the right to petition government" as:

> [A]ny written or oral statement, writing or petition made before or to a legislative, executive or judicial proceeding or any other official proceeding authorized by law, or any written or oral statement, writing, or petition made in connection with an issue under consideration or review by a legislative, executive or judicial body or any other official proceeding authorized by law.

*Id.* at § 9-11-11.1(c).

As defendants concede, Georgia courts have declined to expand the scope of the Operative Statute beyond its terms so as to encompass a wide range of speech and conduct connected with any issue of public interest or concern.  *See* Doc. 60 at 3 ("The 1996 statute was limited to the right to petition the government for the redress of grievances on matters of public concern."); *see also* Doc. 56-1 at 4 n.1; *Berryhill v. Ga. Cmty. Support and Solutions, Inc.*, 281 Ga. 439, 442 (2006) (holding anti-SLAPP statute did not apply where statements were not made in connection with an official proceeding); *Emory Univ. v. Metro Atlanta Task Force for the Homeless, Inc.*, 320 Ga. App. 442, 445 (2013) (same).

Here, none of defendants' false and defamatory statements concerning Resolute were made

in connection with an official proceeding.  Accordingly, defendants cannot satisfy the threshold requirement for applicability of Georgia's anti-SLAPP law.

> 2.   Georgia's Anti-SLAPP Statute Does Not Apply
> To State Law Claims Asserted In Federal Court

Defendants likewise concede that the Operative Statute has no application to state law claims asserted in federal court.  *See* Doc. 56-1 at 10 ("The Eleventh Circuit has previously held that the prior version of Georgia's anti-SLAPP statute did not apply in federal court."); Doc. 60 at 4.   In *Royalty Network*, the Eleventh Circuit held that application of Georgia's anti-SLAPP statute to state law claims would conflict with the FRCP, reasoning that the verification requirement imposed by Georgia's anti-SLAPP statute "addresses th[e] same subject" as FRCP Rule 11, and concluding that the two rules "directly conflict" and thus "may not peacefully co-exist or operate in the same case." *Id.* at 1359-60.  Accordingly, the Eleventh Circuit concluded that Georgia's anti-SLAPP statute was not applicable in federal court. *Id.* at 1362.  The holding in *Royalty* applies with equal force here.  For the foregoing reasons, the Operative Statute does not apply to plaintiffs' state law claims.

> 3.   Georgia's Amended Statute Has No Application In This Case

In light of the clear authority which holds that the Operative Statute has no application in this case, defendants argue that Georgia's Amended Statute, which only became effective on July 1, 2016 -- one month after plaintiffs commenced this action on May 31, 2016 -- should be applied retroactively.  *See* Doc. 56-1 at 13-15; Doc. 60 at 7-10.  This argument fails.

> a.   Georgia's Amended Statute Does Not Apply Retroactively

Effective July 1, 2016, the Operative Statute was amended to increase the scope of protected activity to include "free speech in connection with an issue of public interest or concern." O.C.G.A. § 9-11-11.1(b).  Moreover, the Amended Statute eliminates the verification requirement,

and provides that all claims that fall within the statute's scope "shall be subject to a motion to strike unless the court determines that the nonmoving party has established that there is a probability [it] will prevail on the claims." *Id.* at § 9-11-11.1(b)(1).  Finally, the Amended Statute further modifies the governing statute by imposing a mandatory award of attorney's fees and costs in the event that defendant prevails on a motion to strike.  *Id.*

Under Georgia law, statutes affecting the rights, duties, and obligations of the parties do not apply retroactively to actions commenced prior to the statute's effective date absent clear legislative intent.  *See* O.C.G.A. § 1-3-5 ("Laws prescribe only for the future; they cannot impair the obligation of contracts nor, ordinarily, have a retrospective operation"); *Leathers v. Turner*, 75 Ga. App. 62, 65-66 (1947) ("The settled rule for the construction of statutes is not to give them a retrospective operation, unless the language so imperatively requires.").[7]  Here, the Amended Statute is silent as to whether the statute applies retroactively.   Under these circumstances, Georgia courts have held that the statute lacks the clear legislative directive to mandate retroactive application.  *See Hargis v. Dep't of Human Res.*, 272 Ga. 617, 617 (2000).

Defendants argue that "for purposes of retroactivity," the anti-SLAPP law is procedural, and thus can be applied to cases filed prior to the Amended Statutes' effective date.  (*See* Doc. 56-1 at 13-15; Doc. 60 at 7-10.)  However, courts have long-held that changes to the scope of anti-SLAPP laws affect substantive rights and should not be applied retroactively.  *See Doe v. Brown*, 2015 WL 3489404, at *1 n.4 (Sup. Ct. Nev., May 29, 2015) (amendments to Nevada's anti-SLAPP statute which expanded the scope of protected activity to any speech concerning matters of public

---

[7]       Defendants' assertion that the anti-SLAPP statute is "remedial" and thus applies retroactively is likewise without merit.  (Doc. 60 at 8.)  With respect to remedial statutes, Georgia courts have held that in addition to the requirement that the legislature demand retroactive application, it is also required that "a time be fixed subsequent to the passage of the statute which allows citizens affected by it a reasonable time to protect their rights." *Allrid v. Emory Univ.*, 249 Ga. 35, 37 (1982); *Jaro, Inc. v. Shields*, 123 Ga. App. 391, 392 (1971).

interest did not apply retroactively); *see also Sherrod v. Breitbart*, 843 F. Supp. 2d 83, 85 n. 4 (D.D.C. 2012) (declining to apply Washington D.C.'s anti-SLAPP statute to action commenced prior to statute's effective date "[b]ecause the statute is substantive -- or at the very least, has substantive consequences -- and there is no clear legislative intent of retroactivity"), *aff'd*, 720 F.3d 932 (D.C. Cir. 2013); *Anderson Dev. Co. v. Tobias*, 116 P.3d 323, 336 (Sup. Ct. Utah, 2005) (declining to apply Utah's anti-SLAPP statute retroactively because it affects substantive rights). Moreover, burden shifting provisions -- such as those set forth in the Amended Statute -- are substantive as a matter of law.  *See Sherrod*, 843 F. Supp. 2d at 85 n.1; *Godin,* 629 F.3d at 89 ("[I]t is long settled that the allocation of burden of proof [under anti-SLAPP law] is substantive in nature.");  *Lindh v. Murphy,* 521 U.S. 320, 327 (1997) (statutory amendment altering "standards of proof and persuasion in a way favorable" to one party "affect[ed] substantive entitlement to relief" and thus did not apply to pending case).

Finally, under well-settled Georgia law, cost-shifting provisions, such as the Amended Statute's mandatory award of attorney's fees, are substantive and may not be applied retroactively. *See Fowler Properties, Inc. v. Dowland*, 282 Ga. 76, 78 (2007) (statute mandating award of attorney's fees "*affects the rights of parties by imposing an additional duty and obligation* . . . and [thus] operates as *substantive law*, which is unconstitutional given its retroactive effect to pending cases . . ."); *Minter v. Tyson Foods, Inc.*, 271 Ga. App. 185, 188 (2004) (statute creating mandatory attorney fee is substantive, not procedural, and could not be applied to pending actions); *see also Sherrod*, 843 F.Supp.2d at 85 n.4 ("[W]here a statute provides provisions for attorneys' fees and costs for the prevailing party [ ] other courts have held that such statutory provisions are substantive in nature").  Thus, the Amended Statute has no application to plaintiffs' claims in this action which was filed prior to the statute's effective date.

      b.     Application Of The Amended Statute In Federal Court
          <u>Conflicts With The Federal Rules Of Civil Procedure</u>

Even if the Amended Statute was procedural, such that it could be applied retroactively, it would still have no application to plaintiffs' state law claims pending in federal court.[8]

Defendants argue that because the Amended Statute eliminates the verification requirement, application of anti-SLAPP law no longer conflicts with FRCP, and thus the Amended Statute may be applied to state law claims asserted in federal court.  (*See* Doc. 56-1 at 10; Doc. 60 at 4-5.)  However, just this past year, the D.C. Circuit -- the most recent appellate court to address the applicability of anti-SLAPP statutes to state law claims asserted in federal court -- held that the anti-SLAPP statute's requirement that plaintiff demonstrate a likelihood of success on the merits cannot be reconciled with the FRCP.  *See Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1334 (2015).  In *Abbas*, the D.C. Circuit reasoned that because the D.C. anti-SLAPP statute -- which is virtually identical to the Amended Statute -- imposes "an additional hurdle" beyond the requirements of FRCP 12 and 56, the special motion to strike provision could not be applied in federal court.  *Id.*  In so holding, the D.C. Circuit expressly declined to follow earlier precedent, which had applied anti-SLAPP statutes to state law claims asserted in federal court.  Rather, citing to the dissent of Judge Kozinski, the Chief Judge of the Ninth Circuit, in *Makaeff v. Trump University*, the D.C. Circuit concluded: "Federal courts have no business applying exotic state court procedural rules which, of necessity, disrupt the comprehensive scheme embodied in the Federal Rules."  *Id.* at 1336; *see also Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 35 (1988); *Cohen v. Office Depot, Inc.*, 184 F.3d 1292, 1296 (11th Cir. 1999) ("[T]he court must ask whether

---

[8]     Defendants' reliance on a series of cases to argue that anti-SLAPP statutes are procedural (Doc. 56-1 at 13-14; Doc. 60 at 9-10) creates what the *Sherrod* court has described as a "Catch-22" for themselves: "*either* the statute is partially substantive (or has substantive consequences) and is therefore not retroactive [ ], *or* it is purely procedural and inapplicable in federal court under *Erie*." 843 F.Supp.2d at 85 (emphasis in original).

the state law provision conflicts with a federal procedural rule.  If it does, the federal procedural rule applies and the state provision does not.").[9]

Moreover, even the Ninth Circuit has recognized that a motion to strike pursuant to a state anti-SLAPP statute to test the sufficiency of plaintiffs' evidence would result in a "direct collision" with the FRCP.  *See Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) ("If this expedited procedure were used in federal court to test the plaintiff's evidence before the plaintiff has completed discovery, it would collide with [FRCP 56].");  *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 250 n.5 (1986).  Thus, the Ninth Circuit has held that the anti-SLAPP statute's "expedited procedure" to strike plaintiffs' claims based on lack of evidence prior to completion of discovery is not applicable to claims brought in federal court.  *Metabolife,* 264 F.3d at 845;  *see also Rogers v. Home Shopping Network, Inc.*, 57 F. Supp. 2d at 982 (C.D. Cal. 1999) (defendant cannot bring a motion to strike in federal court based on lack of evidence until discovery has been developed); *Aeroplate Corp. v. Arch Ins. Co.,* 2006 WL 3257487, at *7 (E.D. Cal. Nov. 9, 2006) (motions to strike pursuant to anti-SLAPP statutes are "restricted in federal court to only those situations where the issues presented by the anti-SLAPP motion can be resolved purely as a matter of law. . .").  For all these reasons, defendants' motions to strike plaintiffs' state law claims asserted in federal court are improper.

### 4.    The Anti-SLAPP Statute Does Not Shield Defendants' Illegal And Tortious Conduct Simply Because The Conduct Involves Speech

Regardless of whether this Court applies the Operative or Amended Statute, illegal and tortious activity are not protected activities.  *See Browns Mill Dev. Co., Inc. v. Denton,* 247 Ga.

---

[9]      *See also Unity Healthcare, Inc. v. County of Hennepin*, 308 F.R.D. 537, 541-42 (D. Minn. 2015) ("Rule 56 collides head-on with Minnesota's anti-SLAPP law" in two respects.  First, "[t]he restrictive standard for discovery under the anti-SLAPP law is oil to the water of Rule 56's more permissive standard."  Second, "Minnesota's anti-SLAPP law turns judges into pre-trial factfinders who must decide factual disputes . . . and they must do so without drawing inferences in favor of the nonmoving party.  This standard is anathema to the standard under Rule 56.").

App. 232, 234 (2000) (Georgia's anti-SLAPP statute "does not safeguard extrajudicial action, which constitutes tortious misconduct to gather information for use in free speech or petition."); *Blissitt v. Doctors For Medical Liability Reform,* 2004 WL 5219364, at *2 (Ga. Sup. Ct. Dec. 16, 2004) (Georgia anti-SLAPP statute did not apply to claims of tortious misconduct in the form of invasion of privacy). To the contrary, "statements in furtherance of a conspiracy are not the sort of speech the [anti-SLAPP statute] was designed to protect." *Novartis Vaccines & Diagnostics, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.*, 143 Cal. App. 4th 1284, 1297 (2006).

Here, the Complaint details defendants' participation in a racketeering enterprise and conspiracy to harm Resolute through the commission of numerous predicate acts, including:

- harassing Resolute's customers with extortionate threats (¶¶ 153-55, 159-61, 165-66, 169, 175, 200-01);
- crippling boycotts (¶¶ 171-79);
- wiring fraudulently obtained funds to sustain a racketeering campaign (¶¶ 43, 51, 55-56, 67);
- fabricating evidence (¶¶ 56, 73, 78, 81);
- soliciting fraudulent charitable donations from the public by means of false pretenses, representations or promises (¶¶ 43, 51, 55-56); and
- submitting materially false and misleading tax submissions and financial information (¶¶ 67, 208).

The law uniformly holds that this intentional and concerted conduct is beyond the protection of the anti-SLAPP law. Incredibly, defendants ignore these detailed allegations and attempt to recast all of plaintiffs' claims as arising from euphemistically described "protected speech" concerning "environmental issues." (*See* Doc. 56-1 at 2; Doc. 60 at 11.) However, defendants cannot defeat the claims here by simply rephrasing in putatively inoffensive ways the specific materially false and misleading accusations upon which the "Resolute: Forest Destroyer" campaign relied. Moreover, the mere fact that defendants used some speech to carry-out their criminal scheme to harm Resolute is not a defense to plaintiffs' claims. The anti-SLAPP laws

were not intended to, and do not, immunize otherwise illegal or actionable conduct simply because that conduct was carried out through, or accompanied by, some form of speech or communication. *See Novartis,* 143 Cal. App. 4th at 1296–97; *Bulletin,* 448 F. Supp. 2d at 1187 (anti-SLAPP statute did not apply where "principal thrust of [plaintiff's] claim is an alleged corrupt conspiracy").

Rather, where, as here, "the gravamen of the causes of action, *i.e.*, the allegedly wrongful and injury-producing conduct that provides the foundation for the claims" does not constitute protected activity under the anti-SLAPP law, the presence of speech does not provide a defense to plaintiffs' claims.  *Renewable Resources*, 218 Cal. App. 4th at 396; *see also Novartis,* 143 Cal. App. 4th at 1296–97 (holding anti-SLAPP statute does not apply where the gravamen of complaint was conspiracy to commit harassment and other tortious conduct); *Bulletin,* 448 F. Supp. 2d at 1187 (denying motion to strike pursuant to California anti-SLAPP statute where the "principal thrust" of the complaint was an alleged corrupt conspiracy).

**C.    Plaintiffs Have More Than Met Their Burden To Prevail On A Motion To Strike At the Pleading Stage**

Finally, even if this Court determines that the anti-SLAPP statute applies to plaintiffs' state law claims, this Court should resolve defendants' motions to strike under the standards set forth in FRCP 8 and 12.  *See Rogers,* 57 F. Supp. 2d at 982-83; *Metabolife*, 264 F.3d at 846; *Bah*, 321 B.R. at 45 n.6, 47 n.9.  Under this standard, a plaintiff satisfies the burden to demonstrate a probability of prevailing on the merits at the pleading stage, where "the complaint is legally sufficient and supported by a *prima facie* showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited."  *Bulletin Displays*, 448 F. Supp. 2d at 1179 (quoting *Metabolife*, 264 F.3d at 840).  As with Rule 12(b)(6) motions, "the complaint [must] be read liberally, [ ] all well-pleaded allegations [must] be taken as true, and [ ] dismissal generally be with leave to amend."  *Rogers,* 57 F. Supp. 2d at 982-83.

Moreover, on a motion to strike, the Court must refrain from considering defendants' challenges to the sufficiency of plaintiffs' evidence until after discovery. *See Metabolife*, 264 F.3d at 846; *see also Liberty Lobby*, 477 U.S. at 250 n.5. This is especially true where, as here, the complaint alleges in detail that defendants acted with malice and intent to harm Resolute. *See* O.C.G.A. § 9-11-11.1(b)(2) (2016) ("[T]he nonmoving party shall be entitled to discovery on the sole issue of actual malice whenever actual malice is relevant to the court's determination under [the anti-SLAPP statute]."); *see also Rogers*, 57 F. Supp. 2d at 981 (recognizing that where information to defend a motion to strike is in defendants' control, "as is generally the case when a plaintiff must prove malice," leave to conduct discovery should be freely granted before considering the merits of the claims). As set forth below, the allegations in the Complaint state all the required elements of the asserted causes of action. Nothing more is required at this stage.

But, even if the Court does consider defendants' challenges to the sufficiency of plaintiffs' allegations at this juncture -- which it should not -- the accompanying expert declarations of Peter Reich, Ph.D. and Frederick Cubbage, Ph.D. unequivocally demonstrate the falsity of the Greenpeace Enterprise's claims. First, Professor Reich, a recipient of the Nobel Prize equivalent in forest ecology (the BBVA Foundation Frontiers of Knowledge Award in Ecology and Conservation Biology) and a renowned scientist who has published over 500 peer-reviewed articles for international scientific publications, and has conducted research in boreal, tropical and temperate ecosystems, opines that the Greenpeace Enterprise's allegations concerning Resolute's impact on the boreal forest are predicated on "distort[ed] results" from studies that are "weakly related and largely irrelevant to the issue at hand" and demonstrate "a fundamental disregard for scientific reality." (Reich Decl. ¶¶ 23, 38.) Likewise, Professor Cubbage, a leading authority on forest certifications and forest resource policy, concluded that Resolute's 2013 FSC certification suspensions "resulted from unachievable targets wholly outside of Resolute's control," "indicate

40

possible bias," and "do not equate to unsustainable practices."  Professor Cubbage reiterates that "[t]here is no scientific basis whatsoever to generalize about global impacts from the loss of three forest certifications," one of which was subsequently reinstated.  (Cubbage Decl. ¶¶ 45-49).

Accordingly, the detailed allegations of the Complaint -- which standing alone are sufficient to defeat defendants' motions -- along with the declarations of Professors Reich and Cubbage, more than satisfy plaintiffs' burden to demonstrate a probability of success as to each of their claims at the pleading stage.  Accordingly, for all these reasons, defendants' motions to strike should be denied in their entirety.

## II.    THE FIRST AMENDMENT IS NOT IMPLICATED BY DEFENDANTS' RACKETEERING ENTERPRISE AND OTHER UNLAWFUL CONDUCT

Defendants further argue that dismissal is warranted because all of the conduct alleged in the Complaint is protected under the First Amendment.  (Doc. 62 at 13-14; Doc. 61-1 at 13; Doc. 55-1 at 27-28.)  However, defendants' attempt to recast all of plaintiffs' claims as protected free speech suffers from the same infirmities as their anti-SLAPP arguments.  By their very definitions and elements, a racketeering enterprise and conspiracy, as well as claims of fraud and other illegal conduct, are not protected by the First amendment.  If a plaintiff adequately alleges and proves the elements of these claims, they are by definition outside the scope of the First Amendment.

Calculated falsehoods are afforded no protection under the First Amendment.  *See Illinois, ex rel. Madigan v. Telemarketing Assocs.,* 538 U.S. 600, 612 (2003) ("Like other forms of public deception, fraudulent charitable solicitation is unprotected speech."); *Time Inc. v. Hill,* 385 U.S. 374, 390 (1967) ("Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published should enjoy a like immunity."); *U.S. v. Konstantakakos,* 121 F. App'x 902, 905 (2d Cir. 2005)

("[D]eliberate falsehoods enjoy no First Amendment protection"); *Thibadeau v. Crane,* 131 Ga. App. 591, 591 (1974) ("[A] knowingly false statement and [a] false statement made with reckless disregard of the truth, do not enjoy constitutional protection."); *Texas Air Corp. v. Air Line Pilots Ass'n, Intern.,* 1989 WL 146414, *5 (S.D. Fla. Jul. 14, 1989) (same).

The Supreme Court decision in *Madigan* is a case in point.  There, the Illinois Attorney General brought fraud charges against a telemarketing fundraiser for specific false misrepresentations made to donors for the "private pecuniary benefit of [the Telemarketers]."  538 U.S. at 609.  The Supreme Court held that the pleading "described misrepresentations our precedent does not place under the First Amendment's cover."  *Id.* at 618.  Since the Amended Complaint pleaded affirmative misrepresentations, deception, and false statements, no First Amendment analysis was necessary at all: to the contrary, the state's antifraud laws were to be vigorously enforce[ed]."  *Id.* at 619-624;[10] *Konstantakakos,* 121 F. Appx. at 905 (Because the First Amendment does not "shield knowingly false statements made as part of a scheme to defraud," there is no need to conduct any First Amendment analysis.)

Defendants fail to cite a *single* case where a court has applied the First Amendment analysis to evaluate the viability of a civil action alleging fraud, misrepresentation or any other systematic and calculated falsehood, including racketeering.  (Doc. 62 at 13-17, 20-24; Doc. 61-1 at 13; Doc. 55-1 at 26-28.)  They cannot, because the Supreme Court has explicitly declined to extend the First Amendment to such cases.  *See Madigan,* 538 U.S. 600; *Time,* 385 U.S. 389-390.  The societal interest in free speech is simply not at play in cases, like this one, involving illegal conduct

---

[10]       Defendants cite to *Vill. of Schaumberg v. Citizens for a Better Env't*, 444 U.S. 620 (1980), which invalidated a village ordinance prohibiting charities from soliciting contributions unless they used at least 75% of their receipts for their charitable purposes (although not requiring any fraud showing) as violative of the First Amendment, to claim that charitable solicitations, including monies used for administrative expenses, are *per se* protected.  (Doc. 62 at 14, n.11).  However, the subsequent Supreme Court decision in *Madigan*, expressly rejected this argument, holding, "The Court's opinions in Schaumburg [ ] took care to leave a corridor open for fraud actions to guard the public against false or misleading solicitations," which are not protected under the First Amendment.  538 U.S. at 617.

designed to inflict injury for pecuniary gain.  *See Madigan,* 538 U.S. 600; *see also U.S. v. Clum,* 607 F. App'x 922, 928–29 (11th Cir. 2015) ("The evidence in this case shows the defendants' words and acts were not abstract discussions removed from the conspiracy to defraud . . . thus [defendants]' claim of First Amendment protection is frivolous.").

 If the interpretation of the First Amendment advanced by defendants was correct, it would entirely deprive aggrieved parties, like plaintiffs, of the ability to achieve redress for clear and intentional misconduct if the concerted activity involved speech in any part.  The Supreme Court has directly rejected such a reading of the First Amendment:

> [I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed. Such an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against . . . agreements and conspiracies deemed injurious to society.

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949).

 This principle applies specifically to activity that violates valid conduct-regulating statutes, such as RICO.  *See Smithfield Foods, Inc. v. United Food & Commer. Workes Int'l Union* ("*Smithfield II*"), 585 F. Supp. 2d 789, 804-806 (E.D. Va. 2008) (affirming the validity of the federal RICO statute under First Amendment analysis); *U.S. v. Larson,* 807 F. Supp. 2d 142, 165 (W.D.N.Y. 2011) ("[T]he RICO conspiracy provision punishes conduct rather than mere association or speech -- namely, the intentional conduct of agreeing to further the criminal enterprise by committing predicate crimes" and, as a result, such claims do not implicate the First Amendment); *Jund v. Hempstead,* 941 F.2d 1271, 1283 (2d Cir. 1991) ("[T]he defendant Committees are not being punished for their advocacy or their political positions; they are being punished for a long standing coercive solicitation scheme."); *Titan Int'l Inc. v. Becker,* 189 F. Supp. 2d 817, 827-830 (C.D. Ill. 2001) (racketeering scheme that involved "disseminat[ing] false

information about plaintiffs to third parties" not subject to First Amendment review).[11]

In *Northeast Women's Ctr., Inc. v. McMonagle,* the Third Circuit addressed the interplay of the First Amendment and the federal RICO statute, stating that "[i]t is not for the judiciary to eliminate the private action in situations where Congress has provided it."  868 F.2d 1342, 1348 (1989).  In so doing, the court declared that it was "not free to read additional limits into RICO once a plaintiff has made out all of the elements required for a finding of liability under the statute's explicit provisions."  *Id.*

The bedrock principle that the First Amendment does not apply to unlawful conduct, even where speech is involved, has been applied with equal force to conspiracy claims.  *See Giboney,* 336 U.S. at 502; *U.S. v. Stromberg*, 22 F.R.D 513, 521 (S.D.N.Y. 1957) ("The First Amendment does not protect a conspiracy from punishment because speech is used to effect the crime."); *Novartis*, 143 Cal. App. 4th at 1296-97 ("The First Amendment offers no protection for [statements in furtherance of a conspiracy].").

Speech, even if truthful, is not protected by the First Amendment if it is used to further a conspiracy and to violate the law.  *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515 (1972) ("If the end result is unlawful, it matters not that the means used in violation may be lawful."); *Smithfield II*, 585 F. Supp. 2d at 805 ("[E]xtortionate speech has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money, which [has] no protection at all."); *U.S. v. Philip Morris Inc.*, 304 F. Supp. 2d 60, 69-72 (D.D.C. 2004) (even truthful statements made in furtherance of a scheme to defraud are beyond the purview of the First Amendment).

---

[11]     Likewise, threats of extortion are not protected by the First Amendment "simply because they are verbalized or written."  *U.S. v. Bly*, 510 F.3d 453, 458 (4th Cir. 2007); *U.S. v. Boyd*, 231 F. App'x 314, 316 (5th Cir. 2007) ("The First Amendment does not protect extortion."); *U.S. v. Quinn*, 514 F.2d 1250, 1268 (5th Cir. 1975) ("Threats and bribes are not protected simply because they are written or spoken").

Thus, the mere presence of speech is not enough to render plaintiffs' claims predicated on a coordinated racketeering scheme impermissible under the First Amendment at the pleading stage. *See Larson,* 807 F. Supp. 2d at 165-166 ("[I]t is premature at this time to dismiss the indictment [ ] on First Amendment grounds because there has been no evidence introduced to establish precisely what conduct -- protected or unprotected -- is at issue here.  The mere inclusion of speech-related allegations . . . is not enough to deem the entire basis for defendants' [ ] prosecution for extortion and conspiracy facially impermissible under the first amendment.").  Because the claims alleged, by definition, require elements that place them outside the First Amendment, the only relevant issue at this stage of the proceeding is whether plaintiffs have properly alleged each element for all of their claims.  As set forth below, plaintiffs have more than met this burden with respect to each of the causes of action alleged in the Complaint.

## III.   THE ALLEGATIONS OF THE COMPLAINT FULLY SATISFY THE PLEADING REQUIREMENTS

On a motion to dismiss pursuant to FRCP 12, a complaint should be dismissed only where it appears that the facts alleged fail to state a plausible claim for relief.  *Ashcroft v. Iqbal,* 556 U.S. 662 (2009).  Courts must accept all factual allegations as true and construe them "in the light most favorable to the plaintiff."  *Doe v. Miami-Dade Cty.*, 2016 WL 5334979, at *2 (11th Cir. Sept. 23, 2016); *see also Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1243 (11th Cir. 2016); *Plunkett v. Poyner*, 2010 WL 3123087, at *2 (S.D. Fla. Aug. 9, 2010) ("[A]rguments regarding the relative merits of Plaintiff's version of the facts compared with Defendants' version are not germane to consideration of a motion to dismiss.").  A complaint may survive a motion to dismiss   "even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Moreover, as FRCP 9(b) states, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Thus, under FRCP 9(b), it is sufficient to plead "the

who, what, when, where, and how." *U.S. ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012).  The particularity requirement of FRCP 9(b) should be read in conjunction with FRCP 8(a)'s 'short and plain statement' pleading requirement," and "a plaintiff is not required to plead facts as to which they lack prior to discovery." *In re Brooks,* 2012 WL 3781134, at *3 (Bank. S.D. Fla. Aug. 31, 2012); *see also NCI Grp., Inc. v. Cannon Servs., Inc.*, 2009 WL 2411145, at * 10, n.7 (N.D. Ga. Aug. 4, 2009).

Plaintiffs' 124-page Complaint sets forth, in extensive detail, the illegal racketeering scheme targeting Resolute.  These allegations more than amply satisfy the liberal pleading requirements at the motion to dismiss stage.  Accordingly, for the reasons set forth below, defendants' motions to dismiss should be denied in their entirety.

## IV.    THE FEDERAL RICO CLAIMS ARE PROPERLY PLED[12]

Pursuant to the federal RICO statute, it is unlawful for "any person employed by or associated with an enterprise engaged in or affecting interstate commerce to conduct or participate directly or indirectly in the conduct of such an enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962 (c).  The statute also proscribes "any person who has received any income derived, directly or indirectly, from a pattern of racketeering" to "use or invest, directly or indirectly, any part of such income" in an "enterprise which is engaged in, or the activities of which affect interstate or foreign commerce."  *Id.* § 1962(a).  Finally, the statute makes it unlawful for any person to conspire to violate sections § 1962(a) or (c).  *Id.* § 1962(d).

The federal RICO statute provides a private right of action for "[a]ny person injured in his business or property by reason of RICO's substantive provisions."  To plead a RICO violation, a

---

[12]        The Georgia RICO statute was modeled after the federal RICO statute and contains similar language for a similar purpose.  *Functional Prods. Trading, S.A. v. JITC, LLC*, 2014 WL 3749213, at *3 (N.D. Ga. July 29, 2014). As explained herein, since Resolute has sufficiently plead its federal RICO claims, it has likewise plead its Georgia counterpart under O.C.G.A. § 16-14-4(b).

plaintiff must allege defendant: (1) conducted, (2) an enterprise, (3) through a pattern, (4) of racketeering activity, (5) resulting in damages to business or property.  *Jones v. Childers,* 18 F.3d 899, 910 (11th Cir. 1994) (setting forth the elements for a § 1962(c) claim).[13]  This Circuit has held that the statute should be "liberally construed."  *Williams,* 465 F.3d 1277, 1286 (11th Cir. 2006) (citing *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497-498 (1985)); *see also NCI Grp.*, 2009 WL 2411145 at *8 ("RICO is to be read broadly . . .  [and] liberally construed to effectuate its remedial purposes.").

The Complaint sets forth detailed allegations of defendants' participation in a wide-ranging scheme to fraudulently induce millions of dollars in donations through a campaign of disinformation, fraud, misappropriation, extortion, illegal money transfers, other illegal conduct, and conspiracies to do the same, which was intended to -- and did -- cause clear and direct harm to plaintiffs.  (¶ 241.)  These allegations more than amply satisfy the elements of a RICO claim.

Defendants' primary challenges to the RICO claims turn on the specificity of the pleadings and the sufficiency of causation ("by reason of") and the "racketeering activity" elements.  (Doc. 62 at 30, 35-37; Doc. 55-1 at 15-18.)  Moreover, ForestEthics and GP-Fund challenge the pleading of a distinct enterprise and their individual participation in it.  (Doc. 55-1 at 19-23; Doc. 61-1 at 6-9.)  Finally, defendants argue that the Complaint fails to allege domestic conduct and injury, and thus, application of the RICO statute would constitute an impermissible extraterritorial application.

---

[13]     In addition, to plead a violation of 18 U.S.C. § 1962(a), a plaintiff must plead that defendants: (1) receiv[ed] income from a pattern of racketeering activity, and (2) invested that income in an enterprise.  *See In re Sahlen & Assocs., Inc. Sec. Litig.*, 773 F. Supp. 342, 366-67 (S.D. Fla. 1991).  Defendants contend the reinvestment of proceeds from a racketeering activity back into the enterprise to continue its racketeering activity is insufficient to allege proximate causation. (Doc. 62 at 35 n.48.)  However, *Sahlen* sustained a claim under 1962(a) based on defendants' reinvestment of racketeering income "back into the enterprise."  *See id*. at 367.

A plaintiff can establish a § 1962(d) claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts.  *U.S. v. Church*, 955 F.2d 688, 694–95 (11th Cir. 1992).  Direct evidence of a RICO agreement is not required; rather, the existence of a conspiracy "may be inferred from the conduct of the participants."  *Magnifico v. Villanueva*, 783 F. Supp. 2d 1217, 1230 (S.D. Fla. 2011).

(Doc. 55-1 at 9; Doc. 62 at 37-38.)  As set forth below, these challenges have no merit.

### A.     Each Defendant's Role In The RICO Enterprise Is Adequately Alleged

#### 1.     The Complaint Identifies Each Defendant's Direct Role In The Enterprise

Defendants contend that the Complaints' allegations concerning the conduct of the "Greenpeace Enterprise" fails to provide notice of their individual wrongdoing.  (Doc. 62 at 29; Doc. 55-1 at 3.)[14]  As set forth below, these arguments misstate the law, and ignore the Complaint's well-pleaded allegations.

Courts have consistently held that "group pleading" satisfies Rule 9(b)'s particularity requirements at the pleading stage.  *See Renasant Bank. Inc. v. Smithgall,* 2016 WL 4502374, at * 4 (N.D. Ga. Jun 13, 2016) (Rule 9(b) does not require that a plaintiff "plead the precise role of each defendant when a group of defendants have acted in concert to cause the complained of injury"); *see also Peters v. Amoco Oil Co.,* 57 F. Supp. 2d 1268, 1277 (M.D. Al. 1999) ("[T]here are circumstances under which a plaintiff may not be able to plead the precise role of each defendant when a group of defendants have acted in concert with each other to cause the complained of injury."); *In re TFT-LCD Anti-Trust Litig.,* 59 F. Supp. 2d 1179, 1184-1185 (N.D. Cal. 2009) (rejecting argument that the complaint fails to satisfy 9(b) where the complaint "lumps together" the 26 named defendants).  This is particularly true where, as here, the "factual information about the fraud is peculiarly within defendant's knowledge or control."  *Hill v. Morehouse Med. Assocs., Inc.,* 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003).  Thus, where a complaint alleges that multiple defendants acted in concert with one another, "it is appropriate

---

[14]     ForestEthics goes to great lengths to argue that dismissal is warranted because the Complaint is a shot-gun pleading.  (Doc. 55-1 at 4-6.)  As an initial matter, as set forth herein, the Complaint adequately links the specific allegations to the specific causes of action.  However, even if this Court determines that the Complaint is a shot-gun pleading, the Eleventh Circuit mandates that an order requiring plaintiff to re-plead is the proper remedy, not dismissal. *See Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1280 (11th Cir. 2006); *see also Magluta v. Samples*, 256 F.3d 1282, 1285 (11th Cir. 2001) (overturning dismissal and ordering a repleading).

to plead the actions of the group and leave development of individual liability questions until some discovery has been undertaken."  *Peters*, 57 F. Supp. 2d at 1277.

The Complaint easily satisfies these standards with respect to each defendant.   For example, GP-Fund argues that the Complaint fails to adequately provide notice as to its role in the "Resolute-Forest Destroyer" scheme and the individuals involved.  (Doc. 61-1 at 7.)  The answers are readily available: "GP-Fund exercised its operation and control through enterprise member Annie Leonard, who is the executive director of both GP-Fund and GP-Inc., who directed and controlled the activities of GP-Inc. and enterprise members [ ] Brindis, [ ] Moas, and [ ] Skar." (¶ 45.)  Specifically, under Leonard's direction, GP-Fund was intimately involved in planning, approving, directing, and funding the activities in furtherance of the "Resolute: Forest Destroyer" campaign, including distributing approximately $5 million of the $14.8 million of the monies it collected in 2014 to GP-Inc. to fund the illegal scheme.  (¶ 41(b).)  Moreover, together with GP-Inc., GP-Fund published and disseminated more than 50 false and misleading reports about Resolute under the collective name "Greenpeace USA," all of which sought to fraudulently induce donors to "DONATE NOW."  (¶ 41(b); *see also* Compl. Table A.)  GP-Fund's motion to dismiss concedes its direct relationship to the Enterprise, acknowledging that it "raises money, shares a name, and donates money to Greenpeace Inc."  (Doc. 61-1 at 7.)

Similarly, ForestEthics contends that the Complaint precludes them from "discerning precisely what each of them is accused of doing wrong."  (Doc. 55-1 at 3.)  To the contrary, the Complaint alleges that "ForestEthics has aggressively disseminated sensational lies untethered to facts, to threaten, malign, and isolate large corporate targets and extort public concessions, endorsements, and other benefits, which it then touts to potential donors as success to extort additional financial support."  For example, the Complaint underscores ForestEthics' initiation and prosecution of the public campaign to harass and intimidate 3M to stop doing business with

Resolute.  (¶¶ 165-66.)  Moreover, the Complaint highlights Mr. Paglia's false accusation that Resolute engages in "active logging and road building . . . in areas originally designated off limits within the CBFA" to critical CBFA stakeholders. (¶ 145).  In addition, the Complaint alleges that, in May 2013, Paglia threatened a Resolute executive that ForestEthics "would destroy Resolute's image among its critical market constituents" "if Resolute failed to cede to ForestEthics' demands" and publicly endorse the "Resolute: Forest Destroyer" campaign.  (¶ 193.)

These allegations more than satisfy plaintiffs' obligation to provide defendants with notice of their specific involvement in the scheme to defraud.  *See JAC Holdings Enters., Inc. v. Atrium Capital Partners, LLC*, 997 F. Supp. 2d 710, 728 (E.D. Mich. 2014) (allegations that used the general term "conspirators" was sufficient because the complaint provided adequate notice of the specific role of identified individuals); *Garrett v. Cassity*, 2010 WL 5392767, at *17 (E.D. Mo. Dec. 21, 2010) ("Although Plaintiffs' [ ] Complaint does contain a substantial number of allegations directed at defined groups such as the RICO Defendants . . . it also contains numerous allegations specifically highlighting [individuals'] involvement in the scheme to defraud.").[15]

### 2.    Each Defendant Is Liable For The Full Conduct Of The RICO Enterprise

Moreover, defendants' attempt to parse themselves out of the detailed RICO scheme alleged in the Complaint ignores the fundamental legal premise that as a member of the Greenpeace Enterprise, each defendant is responsible for ***all*** of the acts of the enterprise reasonably linked to the RICO conspiracy.  *See U.S. v. Browne*, 505 F.3d 1229, 1263 (11th Cir. 2007).  Thus, each defendant is liable "even if he did not commit the substantive acts that could constitute violations of §§ 1962(a), (b), or (c)."  *Id*. at 1264.  Indeed, under § 1962(d), the extent of

---

[15]    Defendants' contention that the Complaint fails to plead the "who, what, where, when and how" for the predicate acts entirely ignores the detailed tables and appendices which set forth the author, date, and recipient for hundreds of predicate acts of mail and wire fraud.  (*See* Doc. 1, Tables A and B; *see also* Appendices A-E.)

participation in the conspiracy or extent of knowledge of details in the conspiracy does not matter if the proof shows the defendant knew the essential objective of the conspiracy. *Smith v. Berg*, 247 F.3d 532, 537 (3d Cir. 2001); *see also Clum*, 607 F. App'x at 927. As the Supreme Court instructs "one who opts into or participates in a conspiracy is liable for the acts of his co-conspirators . . . even if the defendant did not personally agree to do, or to conspire with respect to, any particular [RICO] element." *Salinas v. U.S.*, 522 U.S. 52, 53 (1997) (acknowledging that § 1962(d) "is even more comprehensive" than common law conspiracy).

As set forth in detail in the Complaint, each of the defendants agreed to engage in a scheme targeting plaintiffs and their businesses through the commission of numerous overt acts.[16] Thus, each defendant is legally responsible for the acts of its co-conspirators that are reasonably foreseeable within the scope of the conspiracy. *See, e.g., U.S. v. Schlei*, 122 F.3d 944, 968 (11th Cir. 1997) ("Each party to a continuing conspiracy may be vicariously liable for substantive criminal offenses committed by a co-conspirator during the course and in furtherance of the conspiracy, notwithstanding the party's non-participation in the offenses or lack of knowledge thereof."); *see also Clum*, 607 F. App'x at 927. Thus, the failure to parse the specific misconduct of each defendant is immaterial, because each defendant is liable for all of the conduct undertaken by the Greenpeace Enterprise. *See Renasant*, 2016 WL 4502374, at *4 (N.D. Ga. Jun. 13, 2016).

## B.     The "By Reason Of" Requirement Is Adequately Alleged

RICO's "by reason of" requirement, set forth in 18 U.S.C. § 1964 (c), implicates the concepts of standing and proximate causation. *See Williams*, 465 F.3d at 1288. Standing is satisfied where plaintiff alleges he was the intended target of the RICO scheme. *Id.* at 1291. Proximate causation is satisfied when the injury sustained was a foreseeable consequence of the

---

[16]     As set forth below, each defendant's role in the Greenpeace Enterprise is adequately alleged. (*See infra* §IV(D).)

RICO violation.  *Id*. at 1288.  The Eleventh Circuit has recognized the "significant overlap" between these two concepts, and has held that both elements are satisfied where there is "some direct relation" between the claimed injury and the RICO violation.  *Id*.

The Supreme Court has stated that proximate causation is a "flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case,'" but is instead used to assign "responsibility for the consequences of that person's own acts."  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008) (quoting *Holmes v. Secs. Investor Protection Corp.*, 503 U.S. 258, 268 (1992).  The standard is "generous enough to include the unintended, though foreseeable, consequences of RICO predicate acts."  *Diaz v. Gates*, 420 F.3d 897, 901 (9th Cir. 2005); *see also Baisch v. Gallina*, 346 F.3d 366, 374 (2d Cir. 2003) (the reasonably foreseeable victims of a RICO violation are the targets, competitors and intended victims of the racketeering enterprise, and injury need only be the foreseeable result, not necessarily the intended result).

Here, the Complaint alleges that defendants engaged in a massive scheme to inflict harm on Resolute through racketeering conduct, including mail and wire fraud, extortion, money laundering, and other fraudulent practices.  (¶ 41.)  This conduct targeted Resolute and resulted in the foreseeable consequence of harming Resolute's business and its relationships with customers, certification agencies, and other constituents.  The Complaint identifies numerous examples of such damages, including dozens of examples of lost customers, lost revenues, closures, cutbacks, and layoffs at Resolute's Augusta facility; as well as lost business opportunities stemming from harm to Resolute's reputation.  (*See, e.g.,* ¶¶ 12, 17, 50, 122, 199, 209.)[17]  These damages constitute

---

[17]      Defendants argue that Resolute's public statements that "structural challenges in the newsprint market" motivated its reduction of operations at its Augusta newsprint mill preclude a finding that the misinformation campaign proximately caused that reduction.  (Doc. 62 at 36.)  However, defendants' conduct need only be "a substantial factor in the sequence of causation" of the plaintiff's injury.  *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994) ("[A] proximate cause is not . . . the same thing as a sole cause").  In *Cox*, union members were seeking redress for bribes made to union negotiators that led them to accept a less favorable collective bargaining agreement.  *Id*.  Like Greenpeace, defendants in *Cox* argued that market conditions were the cause of the less favorable

cognizable RICO injuries.  *See, e.g., Corcel Corp. v. Ferguson Enters., Inc.*, 551 F. App'x 571,

579 (11th Cir. 2014) (lost business opportunity redressable under RICO); *Cement-Lock v. Gas*

*Tech. Inst.*, 2006 WL 3147700 (N.D. Ill. Nov. 1, 2006) (sustaining RICO claim alleging

deprivation of lost business opportunities resulting from harm to reputation).[18]

Defendants ignore these well-pleaded allegations concerning the direct harm Resolute

suffered as the intended and foreseeable victim of the Greenpeace Enterprise -- which defendants

themselves concede resulted in losses of "no less than C$100M" -- and attempt to recast all of

Resolute's claims as seeking to recover injuries sustained by donors and customers arising from

the "Resolute: Forest Destroyer" campaign.  (Doc. 62 at 32-33; Doc. 55-1 at 17-18.)  This

"strawman" argument ignores the actual damages Resolute is seeking to recover in this action and

is predicated on the flawed presumption that only direct recipients of misrepresentations can

recover for injuries a RICO enterprise intended to, and did, inflict.  This is not the law.

Consistent with the "flexible" pleading standards mandated by the Supreme Court, courts

regularly sustain RICO claims that are based on misrepresentations to third parties causing

foreseeable harm to the plaintiff.  *See Corcel*, 551 F. App'x at 577 (proximate causation and

standing were adequately alleged where plaintiff asserted that defendants' misrepresentations of

their qualifications to county to secure construction bids had the foreseeable impact of causing

plaintiff to lose certain contracts); *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 560

(S.D.N.Y. 2005) (city's allegation that defendants made misrepresentations to state government

---

agreement. *Id.* at 1420.  The Eleventh Circuit held proximate cause was adequately alleged for the RICO claim, stating
"[i]t is beside the point whether the depressed condition of the steel industry also contributed to the concessions." *Id.*

[18]       Citing *Doxie v. Ford Motor Credit Co.*, 603 F. Supp. 624, 628 (S.D. Ga. 1984),  GP-Fund argues that Resolute
can only recover for racketeering injuries and not those injuries caused by the predicate acts themselves.  (Doc. 61-1
at 3.)  However, the Supreme Court subsequently rejected the holding in *Doxie*, reasoning that a plaintiff need only
plead an injury to its business or property that was caused by the predicate acts, so long as those acts are sufficiently
related to constitute a pattern.  *See Sedima*, 473 U.S. at 495-97.

and internet cigarette purchasers to deprive city of sales taxes alleged proximate causation for RICO purposes because city's injury was "reasonably foreseeable" and "fact that [ ] a third party was deceived has no bearing on the question of proximate cause").

Indeed, the contemporaneous, natural, and intended elements of proximate causation and standing are particularly strong where, as here, misrepresentations to third parties are about the plaintiff and made for the purpose of injuring the plaintiffs' business and relationship with the third party.  For example, in *Procter & Gamble Co. v. Amway Corp.,* 242 F.3d 539 (5th Cir. 2001), proximate cause existed where the defendants disseminated disinformation about plaintiff to its customers, thereby causing a boycott of plaintiff's products.  While plaintiff was not the recipient of, nor believed or relied on, the disinformation, the injury to its reputation and business relationships was the intended and contemporaneous result of the dissemination of that disinformation to third parties and the public.  *Id.* at 564-65; *see also Pine Ridge Recycling, Inc. v Butts Cnty., Ga.*, 855 F. Supp. 1264, 1274 (M.D. Ga. 1994) (sustaining plaintiff's mail fraud RICO claims against county official on the basis of letter to third party state agency containing false statement with intention of defrauding agency and obstructing plaintiff's permit process).[19]

Moreover, courts have regularly sustained RICO claims based on racketeering acts other than fraud directed at third parties with the intended and natural consequence of injuring plaintiff, such as where the defendant used extortion of a third party to deprive the plaintiff of some tangible or intangible property right.  *See, e.g., Honda Motor Co.*, 941 F. Supp. at 547 (proximate cause existed where plaintiff alleged competing car dealer had bribed manufacturer to secure greater car allocations because "plaintiffs have alleged that the purpose of the bribery scheme was to deprive

---

[19]       *See also Mid Atl. Telecom, Inc. v. Long Distance Servs., Inc.*, 18 F.3d 260, 263-64 (4th Cir. 1994) (sustaining RICO claims alleging that defendants' false advertising had caused plaintiff to lose customers); *Prudential Ins. Co. v. U.S. Gypsum Co.*, 828 F. Supp. 287, 296 (D.N.J. 1993) (RICO claim adequately pled by real estate investors whose contractors were misled by the defendants about the safety of defendants' asbestos products, noting that "the victim need not be the primary victim, only an intended victim").

plaintiff dealers of fair allocation of cars in order to enrich bribe-paying dealers"); *Dooley v. Crab Boat Owners Ass'n*, 271 F. Supp. 2d 1207, 1214 (N.D. Cal. 2003) (sustaining RICO claims predicated on defendants threats to plaintiff's customers).

Citing *Kimberlin v. Nat'l Bloggers Club*, 2015 WL 1242763 (D. Md. Mar. 17, 2015), defendants argue that plaintiffs cannot satisfy the "by reason of" requirement because Greenpeace's donors, not plaintiffs, were the intended and foreseeable victims of the campaign. (Doc. 55-1 at 18; Doc. 61-1 at 9; Doc. 62 at 35, 37.)  However, *Kimberlin* is inapposite, because the court there held that the alleged harm to plaintiff's **reputation** was not a cognizable RICO injury, and thus, the only redressable injury arising from defendants' disinformation campaign was the harm to donors, which plaintiff did not have standing to pursue.  *Id.* at *11-14.

By contrast, in *Feld Entm't Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 318 (D. D.C. 2012) ("*ASPCA*"), the court held that Ringling Brothers had properly alleged standing and proximate causation to assert their RICO claims against animal rights organizations arising from the organizations' dissemination of fraudulent fundraising materials, which misrepresented Ringling Brothers' animal handling practices in order to induce donations. In rejecting defendants' argument that the donors, not plaintiff, were the intended and foreseeable victim of defendants' wrongful conduct, the court held:

> The Supreme Court has held that [a] scheme that injures D by making false statements through the mail to E is mail fraud, and actionable by D through RICO, if the injury is not derivative of someone else's.  Here, [plaintiff] claims that it was directly and contemporaneously injured as a result of the alleged fraud committed against the donors: the money defendants obtained via the alleged mail fraud was directly used to pay [plaintiff's elephant handler] for his participation in the [litigation against the circus]. Moreover, [plaintiff's] injury is not derivative of the alleged losses suffered by the donors.  Instead, it claims an independent injury: lost revenue due to the necessity of defending the [litigation against the circus].

*Id.* at 321-22.  It is precisely this "independent injury" inflicted on Resolute -- which was the intended and foreseeable result of the Enterprise's campaign -- that the Complaint seeks to redress.

Accordingly, defendants' argument that plaintiffs lack standing to pursue damages suffered by customers, donors, and other third parties is a non-sequitur.  (Doc. 62 at 32; Doc. 55-1 at 17-18.)

## C.     Racketeering Activity Is Adequately Alleged

The federal RICO statute defines "racketeering activity" as the commission of two predicate acts set forth in 18 U.S.C. § 1961(a).  As set forth below, the Complaint adequately alleges hundreds of predicate acts, including mail fraud in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343; illegal interference with commerce in violation of the Hobbs Act, 18 U.S.C. § 1951; illegal monetary transactions in violation of 18 U.S.C. § 1957, and violations of corresponding Georgia statutes criminalizing the same conduct.

### 1.     Predicate Acts Of Mail And Wire Fraud Are Properly Pled

The mail and wire fraud statutes make it unlawful to use the mails or interstate wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. §§ 1341, 1343.  To plead mail or wire fraud, a plaintiff must allege: "(1) intentional participation in a scheme to defraud; and (2) use of the interstate wires in furtherance of the scheme."[20]  *U.S. v. Sprague*, 185 F. App'x 794, 796 (11th Cir. 2006).  The gravamen of the claim is the dissemination of material misrepresentations or omissions that are reasonably calculated to deceive persons of ordinary prudence or comprehension.  *Bridge*, 553 U.S. at 647.

The Complaint details defendants' use of U.S. mails and wires in furtherance of a disinformation campaign to mislead donors, customers, and others about Resolute's sustainability practices, environmental impacts, relationship with First Nations and certification status by, among other things:

---

[20]     "Aside from the means by which a fraud is effectuated, the elements of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, are identical."  *U.S. v. Ward*, 486 F.3d 1212, 1221 (11th Cir. 2007).

- preparing false and misleading reports concerning Resolute and its customers;

- broadly disseminating the false and defamatory reports and other statements through Greenpeace's website and other internet platforms, such as Twitter and Facebook;

- communicating and coordinating with one another to effectuate the dissemination of false and misleading information necessary to perpetrate the scheme to harm Resolute;

- disseminating the false and misleading allegations directly to Resolute's stakeholders, customers, trade associations, government regulators, and other critical market constituents through email, U.S. mail, and phone;

- harassing Resolute's customers with extortionate threats;

- soliciting fraudulent charitable donations from the public by means of false pretenses, representations, or promises; and

- wiring fraudulently obtained funds to sustain the Greenpeace Enterprise's "campaign" against Resolute.

(¶¶ 43-49, 73-78, 84, 88, 95, 100, 106, 115, 125, 135, 144-80, 198, 200-08; *see also* App. A-E.)

Such conduct plainly constitutes a scheme to defraud in violation of the mail and wire fraud statutes.[21]   *See, e.g., ASPCA*, 873 F. Supp. 2d at 318 (sustaining mail fraud allegations where animal rights group disseminated misleading fundraising materials misrepresenting plaintiff circus's elephant handling procedures in order to solicit donations); *Texas Air*, 1989 WL 146414 at *5 (holding union's "scheme [to] publicly disseminat[e] false information about [the airline's] safety and its treatment of employees" constituted predicate acts of mail and wire fraud).[22]

---

[21]      Citing *Kimberlin*, 2015 WL 1242763 at *9, defendants attempt to recast all the allegations in the Complaint as "garden-variety" defamation which, defendants allege do not constitute predicate acts under RICO statute. Obviously, false claims made to support a scheme to defraud might equally support a defamation claim, but the claims are not mutually exclusive.   Moreover, neither *Kimberlin*, nor any of the cases cited by defendants, alleged a disinformation campaign -- like the one here -- which was intended to cause harm to business or property through deceptive means.   *See id.* (allegations that defendants disseminated calculated falsehoods for the purpose of causing reputational harm); *Kimm v. Lee*, 2005 WL 89386, at *4 (S.D.N.Y. Jan. 13, 2005) ("Though [plaintiff] may well have suffered reputational injury as a result of the defendants' alleged acts, no one was 'induced to part with anything of value as a result.'"); *Marks v. City of Seattle*, 2003 WL 23024522, at *6 (W.D. Wash. Oct. 16, 2003) (plaintiff did not attempt to plead fraud or extortion as predicate acts); *Mansman v. Smith*, 1997 WL 145009, at *5-6 (E.D. Pa. Mar. 21, 1997) (finding complaint failed to plead any intent to defraud); *Manax v. McNamara*, 660 F. Supp. 657, 661 (W.D. Tex. 1987) (plaintiff failed to identify any scheme to defraud); *Hourani v. Mirtchev*, 796 F.3d 1, 10 n.3 (D.C. Cir. 2015) (plaintiff alleged defamation as a predicate act); *Contes v. City of New York*, 1999 WL 500140, at *8 (S.D.N.Y. July 14, 1999 (same).

[22]      *See also Procter & Gamble*, 242 F.3d 539 (sustaining RICO claim alleging mail and wire fraud arising from defendants' dissemination of false information to lure away plaintiffs' customers and cause boycotts); *Cement-Lock*,

Defendants argue that RICO claims predicated on mail and wire fraud should be dismissed because the Complaint fails to allege plaintiffs' direct reliance on defendants' misrepresentations, or that defendants' "obtain[ed] by deceptive means, something to which defendant is not entitled." (Doc. 62 at 31-33.)   However, contrary to defendants' contention, neither direct reliance nor personal gain are elements of mail or wire fraud.

In *Bridge*, the Supreme Court held that "[u]sing the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering under RICO, even if no one relied on any misrepresentation."   553 U.S. at 648.   The Supreme Court recognized that while reliance may help a plaintiff prove causation, "the fact that proof of reliance is often used to prove an element of the plaintiff's cause of action . . . does not transform reliance itself into an element of the cause of action."   *Id.* at 659.   Thus, the Supreme Court held that the direct victim of a scheme to defraud may recover through RICO whether or not it is the direct recipient of the false statements.   *See id.* at 650; *see also Montoya v. PNC Bank, N.A.*, 94 F. Supp. 3d 1293, 1309 (S.D. Fla. 2015) (holding reliance is not an element of mail and wire fraud).[23]

Likewise, the Eleventh Circuit has long-held that intent to gain is not required to fulfill the fraudulent intent element of a mail or wire fraud claim.   *U.S. v. Levy*, 513 F. App'x 858, 860-61 (11th Cir. 2013) (defining fraudulent intent element of another fraud statute as "the specific intent to deceive or cheat,   *for the purpose of* _either_ *causing some financial loss to another, or bringing* about some financial gain to one's self," and noting "the intent to defraud does not require a

---

2006 WL 3147700 (defendants' use of mails and wires to disseminate false statements to government agencies and financing sources constituted mail and wire fraud).

[23]      In any event, the entire premise of the Complaint is that every constituency critical to plaintiffs' business, their stakeholders, customers, government regulators, and the public at-large, relied on defendants' disinformation, resulting in enormous damage to plaintiffs.   *See, e.g., Bridge*, 553 U.S. at 656 (notion that only those relying on misrepresentation may recover under RICO is "contradicted by the long line of cases in which courts have permitted a plaintiff directly injured by a fraudulent misrepresentation to recover even though it was a third party, and not the plaintiff, who relied on the defendant's misrepresentation"); *Procter & Gamble*, 242 F.3d at 565; *Cyco.Net*, 383 F. Supp. 2d at 560.

personal benefit"); *U.S. v. Gonzalez*, 404 F. App'x 403, 404 (11th Cir. 2010) (same); *Triplett v. U.S.*, 2012 WL 4362774, at *12 (N.D. Ga. Aug. 29, 2012) *aff'd,* 551 F. App'x 472 (11th Cir. 2013). Rather, the gravamen of the scheme to defraud is the intent to cause harm.  *See Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 589 (S.D.N.Y. 2014) ("Intentional fraud is established . . . [where] defendants contemplated or intended some harm to the property rights of the victim.").

The recent Eleventh Circuit decision in *U.S. v. Takhalov* -- relied on by defendants -- is in accord.  827 F.3d 1307 (11th Cir. 2016).  In *Takhalov*, the Eleventh Circuit overturned a jury conviction for wire fraud, finding that allegations that defendants, club owners, lured men into clubs under false pretenses did not constitute a scheme to defraud.  *Id.* at 1316.  In distinguishing between schemes to deceive and schemes to defraud, the Eleventh Circuit stated, "to *defraud*, one must intend to use deception to cause some injury; but one can *deceive* without intending to harm at all."  *Id.* at 1312 (emphasis in original).  Thus, the Eleventh Circuit reasoned that even if the lie induced the men to enter the club, no claim for wire fraud lies if the alleged victims did not suffer any harm once inside the club.  *Id.* at 1315.

Consistent with these standards, in *ASPCA*, the court held that Ringling Brothers Circus had stated a RICO claim predicated on, among other violations, mail and wire fraud, against various animal rights organizations, arising from the groups' use of the mails and wires to disseminate fraudulent fundraising materials.  873 F. Supp. 2d at 318.  The fundraising materials misrepresented Ringling Brothers' elephant handling procedures and falsely stated the donations would be used to target those procedures, when, in fact, the funds were used to bribe Ringling Brothers' elephant handler to participate in a sham lawsuit against Ringling Brothers, which resulted in direct harm to Ringling Brothers, including millions of dollars in legal fees to defend against the sham lawsuit.  *Id.*

Here, the Complaint alleges that defendants, working in concert with others, prosecuted a

widespread disinformation campaign against Resolute to fraudulently induce millions of dollars in donations.  (¶¶ 41-50, 81-83, 143, 147, 164.)  Under *ASPCA*, this conduct plainly amounts to mail and wire fraud.

2.    Predicate Acts Of Extortion Are Properly Pled[24]

The Hobbs Act criminalizes extortion and illegal interference with commerce, which consists of "obtaining of property from another, with his consent, induced by wrongful use of actual   or   threatened   force,   violence,   or   fear,   or   under   color   of   official   right." 18 U.S.C. § 1951(b)(2); *see U.S. v. Haimowitz*, 725 F.2d 1561, 1571 (11th Cir. 1984).   The principal elements of a Hobbs Act violation are "wrongful means and wrongful objective." *Chevron*, 974 F. Supp. 2d at 577.  As defendants concede, "wrongful means" is not limited to fear of physical injury, but rather includes fear of economic harm.  (Doc. 62 at 34.)

As set forth in the Complaint, the Greenpeace Enterprise issued extortive threats to dozens of Resolute's customers demanding that such customers terminate their relationships with Resolute and publicly endorse the Enterprise's campaign, which provided a substantial benefit to the Greenpeace Enterprise in the form of enhanced fundraising potential.  (¶¶ 149-80.)  Moreover, the Greenpeace Enterprise, through defendant Paglia, approached Resolute directly and threatened that if the Company failed to publicly endorse the "Resolute: Forest Destroyer campaign," the Greenpeace Enterprise would "destroy Resolute's image among its critical market constituents." (¶ 193.)  When Resolute refused, the Greenpeace Enterprise followed through on its threats with a  wide-spread  campaign  targeting  Resolute,  its  customers,  and  critical  market  constituents,

---

[24]      Defendants argue that the Complaint has not sufficiently pled the predicate acts of money laundering in violation of 18 U.S.C. § 1957.  (Doc. 55-1 at 8, 14.)  The elements of money laundering are (1) defendant knowingly engaged in a monetary transaction, (2) where defendant knew the property involved derived from specified unlawful activity, and (3) the property was of a value greater than $10,000.  *See NCI Grp.*, 2009 WL 2411145 at *10.  Here, the Complaint alleges that defendants violated § 1957 by processing millions of dollars in fraudulently induced donations to perpetuate its illegal scheme.  (*See*, *e.g.*, ¶¶ 43, 48.)  Under *NCI*, these allegations suffice to allege money laundering at the pleading stage.

60

including public demonstrations and secondary boycotts, which resulted in the loss of dozens of customers and business relationships.  (¶¶ 149-80, 198, 200-08, 212-15.)  Such conduct plainly constitutes extortion in violation of the Hobbs Act.  *See Smithfield Foods v. United Food and Commercial Workers Intern. Union ("Smithfield I")*, 633 F. Supp. 2d 214, 219–21, 225 (E.D. Va. 2008).

In *Smithfield*, the plaintiff alleged that the union violated the Hobbs Act by engaging in wrongful tactics to coerce union recognition, including, *inter alia*,  (i) preparing and releasing false reports accusing Smithfield of violating safety regulations, (ii) interfering with Smithfield's relationship with several customers and a celebrity promoter, (iii) orchestrating protests at Smithfield's shareholders' meeting and the places of business of several of Smithfield's customers, and (iv) contacting retailers that carried Smithfield's products and threatening demonstration activity if they did not discontinue all sales of those products.  *Smithfield I,* 633 F. Supp. 2d at 219–21.  The *Smithfield* court rejected the argument, advanced by defendants here, that none of these acts constitute extortion because there was no property interest at stake and, even if there was, the union was not seeking to obtain that property for themselves, reasoning that the right to pursue a lawful business including the solicitation of customers necessary to conduct such business has long been recognized as a property right.  *Smithfield II*, 585 F. Supp. 2d at 810; *see also Dooley*, 271 F. Supp. 2d at 1213-14.

### D.     The Complaint Alleges A Distinct RICO Enterprise And Each Defendant's Participation In The Enterprise

The RICO statute defines an enterprise as "any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. §1961(4).  The Supreme Court has interpreted the term "enterprise" broadly, stating that "[t]he term 'any' ensures that the definition has a wide reach, [ ] and the very concept of an association in fact is expansive.'"  *Boyle v. U.S.*, 556 U.S. 938, 944

(2009).  An association-in-fact enterprise must have: (1) "a purpose"; (2) "relationships among those associated with the enterprise"; and (3) "longevity sufficient to permit these associations to pursue the enterprise's purpose."  *Id.* at 946 (association "requires both interpersonal relationships and a common interest"); *Williams*, 465 F.3d at 1284 (to allege a RICO enterprise, a complaint must plead a "loose or informal association of distinct entities" that function with a "common purpose").  ForestEthics and GP-Fund argue that the Complaint fails to plead their participation in the Enterprise.  Moreover, ForestEthics argues that the alleged RICO enterprise is not distinct from its own affairs.   For the reasons set forth below, these arguments lack merit.

       1.    <u>The Complaint Alleges Each Defendant's Participation In The Enterprise</u>

GP-Fund and ForestEthics go to great lengths to argue that the detailed allegations of the Complaint amount to mere "parallel conduct," which is insufficient to impose RICO liability.  (Doc. 55-1 at 19-22; Doc. 61-1 at 6-9.)  The crux of the argument is that the failure to plead an overt agreement by ForestEthics or GP-Fund to join the Enterprise warrants dismissal of the RICO claims asserted against these defendants.  This argument misstates the law on enterprise and the well-pleaded allegations of the Complaint.

It is well-settled that an agreement to "participate" in a RICO enterprise may be "inferred from the conduct of the alleged participants or from circumstantial evidence of the scheme."  *Church*, 955 F.2d at 695; *see also Rajput v. City Trading, LLC*, 476 F. App'x 177, 180 (11th Cir. 2012) ("[T]he existence of conspiracy may be inferred from the conduct of the participants.").[25]  Circumstantial evidence of participation may include, but is not limited to, inferences from the members' commission of similar racketeering acts in furtherance of a shared objective, financial

---

[25]    *See also U.S. v. Elliott*, 571 F.2d 880, 898 (5th Cir. 1978) (enterprise's "affairs are likely to be conducted in secrecy and to involve a minimal amount of necessary contact between participants. Thus, direct evidence of association may be difficult to obtain; a jury should be permitted to draw the natural inference arising from circumstantial evidence of association.").

ties, coordination of activities, community of interests and objectives, interlocking nature of the schemes, and overlapping nature of the wrongful conduct. *See, e.g.*, *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 263-64 (2d Cir. 1995) (jury could infer that two corporations engaged in manufacturing electromagnetic locks were members of an association-in-fact enterprise from their pattern of disseminating false and deceptive statements about a competitor's electromagnetic locks to obtain business); *U.S. v. Doherty*, 867 F.2d 47, 68 (1st Cir. 1989) ("The number of acts, their relationship, their having taken place over several years, and the consistent participation of the central figures in the scheme show a 'group of persons associated together for a common purpose of engaging in a criminal course of conduct.'").  Moreover, this Circuit has recognized that "proof of an association's devotion to making money from repeated criminal activity demonstrates an enterprise's common purpose of engaging in a course of conduct, regardless of whether the criminal activity is diverse."  *Church*, 955 F.2d at 698.

The Complaint is replete with direct and circumstantial evidence that ForestEthics and GP-Fund participated in the enterprise to harm Resolute.[26]  For example, the Complaint alleges that ForestEthics and Greenpeace have described themselves as "close-allies" and have a long history of collaborating together on coercive and manipulative "campaigns," which have targeted, among others, Victoria's Secret, 3M and Staples by aggressively disseminating sensational lies to threaten, malign, and isolate large corporate targets and extort public concessions, endorsements, and other benefits, which it then touts to potential donors as successes to extort additional financial support.  (*See, e.g.*, ¶¶ 41(m), 165.)  Consistent with this practice, these entities worked together

---

[26]      Defendants reliance on *Almanza v. United Airlines, Inc.*, 162 F. Supp. 3d 1341, 1353 (S.D. Ga. 2016) and *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1292–93 (11th Cir. 2010) for the proposition that to prove a RICO enterprise a plaintiff must allege an overt agreement is misplaced.  Neither *Almanza* nor *Am. Dental* impose such a stringent burden at the pleading stage; rather, both decisions held that plaintiffs had failed to plead a RICO enterprise because the claims were devoid of even circumstantial evidence that a RICO enterprise existed. *See Almanza*, 162 F. Supp. 3d at 1353-54; *Am. Dental*, 605 F.3d at 1294-95.

to, *inter alia,* target Resolute's key customer, 3M including, by harassing and issuing extortive threats to 3M to terminate its relationship with Resolute or become a public target of the campaign. (¶ 165.)   When 3M failed to immediately acquiesce to ForestEthics' demands, Greenpeace escalated the attack by disseminating a highly sensational report designed to publicly pressure, intimidate and shame 3M.  As direct evidence of defendants' collaboration with respect to 3M, defendant Moas announced that Greenpeace was "proud to stand with . . . our ally, ForestEthics." (*Id*.)  Likewise, when 3M subsequently terminated all business with Resolute, 3M announced that it had done so after "work[ing] with ForestEthics and Greenpeace."  (¶ 166.)

GP-Fund's assertion that the Complaint fails to plead its participation in the Greenpeace Enterprise similarly lacks merit.  The Complaint details that GP-Fund and GP-Inc. share the same Executive Director, Annie Leonard, and together published and disseminated dozens of false reports about Resolute under the collective name "Greenpeace USA."  (¶ 41(b, l); *see also* Compl. Table A.)   Leonard's dual management of GP-Fund and GP-Inc. involves fundraising on behalf of the former, in order to transfer to the latter.  Further, GP-Fund readily admits that it "raises money, shares a name, and donates money to Greenpeace Inc."  (Doc. 61-1 at 7.)  These allegations are more than sufficient to plead participation in an enterprise at the motion to dismiss stage.  *See Williams*, 465 F.3d at 1286 ("Whether the plaintiffs ultimately establish sufficient evidence to meet the boundaries of the operation-or-management test is a question *best answered at the summary-judgment stage or at trial*."). [27]

---

[27]     In light of these detailed allegations concerning GP-Fund's role in disseminating the misinformation in conjunction with GP-Inc. under the name "Greenpeace U.S.A." and their involvement in identifying potential targets and developing and implementing the campaigns, GP-Fund's reliance on *In re MasterCard Int'l. Inc., Internet Gambling Lit*., 132 F. Supp. 2d 468 (E.D. La. 2001) for the proposition that transferring money is insufficient to confer RICO liability is entirely misplaced.  (Doc. 61-1 at 8.)  To the contrary, the court in *Mastercard* recognized that where, as here, the complaint alleges that defendants approved and edited the misinformation and exercised some control over the parameters of the scheme, such allegations gives rise to RICO liability.  *Id*. at 490 (citing *Sikes v. Am. Tel. & Tel.* 179 F.R.D. 342 (S.D. Ga. 1998)).

Contrary to GP-Fund's and ForestEthics' assertions, RICO liability is not limited to those with primary responsibility for the enterprise's affairs.  *See id.* at 1285.  Rather, to plead participation, a plaintiff need only allege that each defendant played "some part in directing the enterprise's affairs."  *City of New York v. LaserShip, Inc.*, 33 F. Supp. 3d 303, 310 (S.D.N.Y. 2014).  Clear legal precedent mandates that this is a "relatively low hurdle for plaintiffs to clear, especially at the pleading stage."  *Id.*; *see also U.S. v. Posada-Rios*, 158 F.3d 832, 856-57 (5th Cir. 1998) (holding that the "operation or management" element does not require that the defendant have decision-making power, only that defendant "take part in" the operation of the enterprise); *U.S. v. To*, 144 F.3d 737, 747 (11th Cir. 1998) (requirement satisfied by evidence that defendant planned and carried out one robbery with other members of a crime gang that committed a series of similar robberies); *U.S. v. Castro,* 89 F.3d 1443, 1452 (11th Cir. 1996) (RICO statute applies broadly to attach liability to both direct and indirect participants).

2.        The Greenpeace Enterprise Is Distinct From Its Affairs

ForestEthics' assertion that plaintiffs failed to allege that the RICO enterprise is distinct from the pattern of acts purportedly committed is equally unavailing.  (Doc. 55-1 at 22-23.)  The Eleventh Circuit has recognized that there may be an overlap between the affairs of the enterprise and the perpetrators' own affairs, but this does not mean that the enterprise is not sufficiently distinct.  *U.S. v. Cagnina*, 697 F.2d 915, 920–22 (11th Cir. 1983) (rejecting argument that enterprise must be an identifiable group with an existence separable from the pattern of racketeering activity, noting that evidence of an enterprise and a pattern "may in particular cases coalesce"); s*ee also U.S. v. Console*, 13 F.3d 641, 652 (3d Cir. 1993) ("The function of overseeing and coordinating the commission of several different predicate offenses and other activities on an on-going basis is adequate to satisfy the separate existence requirement.").

Here, the Complaint alleges that various environmental groups banded together to form an

association-in-fact for purposes of providing legitimacy to, funding for, and otherwise successfully executing their "Resolute: Forest Destroyer" campaign and casting a wider net with respect to their attacks on customers, certification agencies and other critical market constituents.   (¶ 41.) Moreover, the Complaint alleges that the impact of defendants' collaborative efforts against Resolute (with multiple defendants targeting the same customers and repeating the same fraudulent statements) was far more effective than one single environmental group acting alone against Resolute could have been.   (*See, e.g.*, ¶ 166 (3M: after "work[ing] with ForestEthics *and* Greenpeace . . . we are not pursuing new business with Resolute.")).

Under these circumstances, the Complaint alleges a distinct RICO enterprise.  *See U.S. v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1116 (D.C. Cir. 2009) (tobacco companies engaged in the same business as their legitimate activities -- selling cigarettes -- "constituted an entity distinct from each defendant," because the defendants jointly committed fraud, by "participat[ing] in the conduct of not just their own affairs, but the enterprise's as well," while also "conspir[ing] to do so.); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 378 (3d Cir. 2010) ("It will often be the case that the interests of the enterprise are congruent with those of its members; such congruence presumably provides the incentive for members to participate in the enterprise. We think, therefore, that if defendants band together to commit [violations] they cannot accomplish alone . . . then they cumulatively are conducting the association-in-fact enterprise's affairs, and not [simply] their own affairs."); *ASPCA*, 873 F. Supp. 2d at 314-15 (rejecting argument that defendants were conducting their own affairs as opposed to the enterprise's).[28]

---

[28]     ForestEthics's reliance on *Reves v. Ernst & Young*, 507 U.S. 170 (1993) and *Super Vision Int'l, Inc. v. Mega Int'l Commercial Bank Co.*, 534 F. Supp. 2d 1326 (S.D. Fla. 2008) is misplaced.  Both cases stand for the proposition that a company's providing supplementary services to a RICO enterprise in that company's regular course of business will not suffice as the requisite participation under RICO.  Here, unlike in in *Reves* and *Super Vision*, the Complaint alleges that ForestEthics took an active role in the racketeering conduct, and thus clearly participated in the Enterprise.

### E.     The RICO Claims Have A Territorial Nexus To The United States

Finally, citing *RJR Nabisco, Inc. v. European Cmty.,* 136 S. Ct. 2090 (2016), defendants argue that the federal RICO claims should be dismissed because RICO lacks extraterritorial reach. (Doc. 55-1 at 9; Doc. 62 at 37-38.)  This argument misstates the law and ignores the detailed factual allegations pled in the Complaint.

As an initial matter, the predicate acts of money laundering under 18 U.S.C. § 1957 and extortion in violation of the Hobbs Act apply extraterritorially to conduct that occurs outside the United States but has an impact in the United States.  *See id.* at 2105 (money laundering applies extraterritorially); *U.S. v. Ivanov*, 175 F. Supp. 2d 367, 373–74 (D. Conn. 2001) (Hobbs Act encompassed extraterritorial conduct).  Thus, the Greenpeace Enterprise's foreign conduct in furtherance of money laundering or extortion constitute predicate acts under RICO.

In any event, the Complaint plainly pleads both domestic conduct and injury.  The Complaint details the U.S.-based enterprise members' conduct in furtherance of the conspiracy, including the preparation and dissemination of false and misleading lies concerning Resolute in the U.S. via reports, blog posts, tweets and direct communications with Resolute customers, stakeholders, certification agencies and other critical market constituents.  (*See, e.g.*, ¶¶ 143, 164-65, 170, 178, 187, Table B (reports by Moas); ¶¶ 176-77, Table B (reports by Brindis); ¶¶ 151, Table B (communications and tweets by Skar).)  Moreover, each of the Greenpeace Enterprise's false reports and blog posts were featured prominently on Greenpeace U.S.A's website.  (*See, e.g.*, Compl., Table A.)

Likewise, enterprise members traveled to Augusta, Georgia to publicly disseminate their lies concerning Resolute at its annual meeting attended by shareholders, customers, and its employees (*see, e.g.*, ¶¶ 50, 208); fraudulently induced donations from U.S.-based donors to perpetuate their illegal scheme against Resolute (*see, e.g.*, ¶¶ 56, 57); and filed fraudulent tax

returns with the U.S. government (*see, e.g.*, ¶ 55).  And, among other things, GPI reaped the benefits of these substantial domestic predicate acts in the form of illicit revenues and gains procured domestically and sent to GPI.

Finally, even those enterprise members located outside the U.S. engaged in domestic conduct in the U.S., including disseminating the Enterprise's lies about Resolute and issuing extortive threats to U.S.-based customers and critical market constituents and organizing boycotts, denial of services, cyber-attacks, and other illegal conduct that targeted U.S.-based companies. *See, e.g., U.S. v. Goldberg*, 830 F.2d 459, 462 (3d Cir. 1987) (in a wire fraud case involving transfer of funds from Canada to Bahamas caused by telephone calls originated from the United States, the court held that the "jurisdiction of the federal courts . . . include[s] offenses, wholly committed outside of this country, if the acts committed are intended to have an effect in the United States").[29]

Likewise, the Complaint alleges domestic injury to Resolute -- a corporation incorporated pursuant to the laws of Delaware, which operates mills in West Virginia, Georgia, Tennessee, Alabama, Mississippi, Florida, Washington State, South Carolina, and Michigan -- including closures, cutbacks, and layoffs at U.S.-based mills, lost revenues, and other lost business opportunities. (*See, e.g.*, ¶¶ 24-29; 211-17.)  These same injuries were sustained by Resolute's U.S.-based subsidiaries whose financials are consolidated on Resolute's balance-sheet. (¶¶ 50, 199, 209.)  These allegations more than satisfy *RJR*'s domestic injury requirement.  *See Tatung Co., Ltd. v. Shu Tze Hsu*, 2016 WL 6683201, at *5-8 (C.D. Cal. Nov. 14, 2016) (foreign

---

[29]     *See also U.S. v. Hayes*, 99 F. Supp. 3d 409, 421 (S.D.N.Y. 2015) (presumption against extraterritoriality did not require dismissal of wire fraud charges against Swiss resident where complaint alleged that defendant used U.S. wires to manipulate LIBOR rates and memorialize trades affected by those rate); *U.S. v. Hijazi*, 845 F. Supp. 2d 874, 886-87 (C.D. Ill. 2011) (defendant, a Lebanese citizen and resident of Kuwait, could be prosecuted in U.S. for wire fraud where co-conspirator e-mailed American corporation regarding fraudulent subcontract, attempted to deposit kick-back in U.S. banks, and used his U.S. e-mail to communicate with defendant).

corporation doing business in the U.S. suffers a "domestic injury" when it incurs "financial injuries [ ] while doing business in this country as the result of an American RICO operation.").[30]

Contrary to defendants' contention, the fact that the Complaint pleads damages in Canadian dollars does not undermine the allegations that Resolute suffered domestic injury.  (Doc. 62 at 38.) Rather, as set forth in the Complaint, the allegation that Resolute has suffered no less than C$100M in damages used Canadian dollars only because that is the denomination that defendants used when they made that claim.  (¶¶ 17, 214.)

## V.       THE GEORGIA STATE LAW CLAIMS ARE PROPERLY PLED

### A.       The Defamation Claim Is Properly Pled

To plead defamation under Georgia law, a plaintiff must allege: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm."  *Infinite Energy, Inc. v. Pardue*, 310 Ga. App. 355, 356 (2011) (reversing trial court's dismissal on pleadings).[31]  Defendants' motions challenge the sufficiency of the pleadings with respect to the first and third elements.  As set forth below, the Complaint alleges facts sufficient to support each of these elements.

#### 1.       The Complaint Adequately Pleads the Falsity of Each Statement

To prevail on a motion to dismiss a defamation claim, a complaint need only plead

---

[30]     *RJR*, 136 S. Ct. 2090, is inapposite to the determination of whether the allegations here allege domestic harm and injury because in *RJR*, plaintiffs conceded that none of its injuries were domestic.

[31]     Defendants assert that plaintiffs are public figures or, at a minimum, limited purpose public figures, based on the public controversy regarding its forestry practices, and thus must allege actual malice as an element of its defamation claim.  (Doc. 55-1 at 29-30; Doc. 62 at 26-27.)  However, the Georgia Court of Appeals has declined to impose public figure (or limited public figure status) on a plaintiff on the basis of a controversy generated by defendants' defamatory and fraudulent statements.  *See Infinite Energy*, 310 Ga. App. at 360.  Because defendants have failed to demonstrate that plaintiffs are public figures, they should not be treated as public figures for purposes of this motion.  *Id.* at 360-61 (determination as to whether "energy giant" natural gas company was either a general or limited purpose public figure should not be made at pleadings stage).  However, even if the Court determines that plaintiffs are public figures, as set forth herein, defendants' actual malice is pled in spades.

statements that can reasonably be interpreted as implying defamatory facts, *i.e.* statements that are "capable of being proved false." *No Witness, LLC v. Cumulus Media Partners, LLC*, 2007 WL 4139399, *5 (N.D. Ga. Nov. 13, 2007).  Because "in most cases truthfulness is a question of fact for the jury," non-defamatory interpretations of the statements or other defenses concerning the publication of the statements proffered by defendants are not appropriately resolved at the pleading stage.  *See Sweeney v. Athens Reg'l Med. Ctr.*, 709 F. Supp. 1563, 1580 (M.D. Ga. 1989); *see also Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 707 (11th Cir. 2016) (holding "actual truth or falsity of a statement [is] quintessentially a question of fact"); *No Witness*, 2007 WL 4139399 at *7 (on a motion to dismiss the court will accept the complaint's allegations that the statements are false as true).[32]  Here, the Complaint and the accompanying six appendices set forth dozens of false and defamatory statements disseminated by defendants since June 1, 2015.

2.    Defendants Made Their Statements with "Actual Malice"

As discussed in the context of the First Amendment defenses, because the claims alleged against the defendants include as their elements knowing and calculated falsehoods, they, by definition, satisfy the actual malice standard.  *See New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964) (defining actual malice as the publication of a statement "with knowledge that it was false or with reckless disregard of whether it was false or not.")  A complaint pleads actual malice where it alleges that defendant "made the false publication with a 'high degree of awareness of probable falsity, or [ ] entertained serious doubts as to the truth of his publication.'" *Harte-Hanks*

---

[32]    As is common throughout defendants' motions, defendants improperly apply the standard of review for summary judgment, and not a motion to dismiss, relying on *Anderson*, 477 U.S. at 257 for the proposition that plaintiffs need to "demonstrate a probability of prevailing on their burden of coming forward with 'affirmative evidence' to allow a reasonable reader to find on clear and convincing evidence, that they knew what they published was false or had, in fact, serious doubts of the truth."  (Doc. 60 at 14.)

*Comms., Inc. v. Connaughton*, 491 U.S. 657, 688 (1989).[33]

In conducting a constitutional malice inquiry, a court must examine each piece of relevant circumstantial evidence within the context of the total evidence to determine whether the evidence as a whole supports an inference of actual malice. *See Melton v. Bow,* 145 Ga. App. 272, 272-73 (1978) (notwithstanding the publisher's assertions that he acted in good faith, the court should look at the "totality of the circumstances" to determine whether malice is alleged); *see also Valdez v. Maya Publ'g Grp. LLC*, 2011 WL 2413510, *6 (S.D. Cal. June 15, 2011) ("Factors such as failure to investigate, financial motive, anger and hostility, and reliance on sources known to be unreliable or biased, may constitute circumstantial evidence of malice"); *Prozeralik v. Capital Cities Commc'ns*, 82 N.Y.2d 466, 475 (1993) (constitutional malice inquiry "does not preclude consideration of all of the factual record in full, including 'circumstantial evidence' and evidence of the defendant's motive [which] necessarily encompasses all of these usual factors").

Here, considering the "totality" of the allegations, there is no question that the Complaint adequately alleges actual malice. The Complaint pleads that defendants were central participants in an illegal racketeering enterprise to harm Resolute through the dissemination of materially false information about Resolute's purported impact on environment, which were made with the express purpose to "emotionalize" donors and induce fraudulent donations. (¶¶ 51, 54-56, 81-83, 143, 149, 164, 212.) The Complaint also alleges in specific and extensive detail the alleged misrepresentations and the specific reasons why they were knowingly false, unfounded, and unreasonable. This misconduct, together with the profit-driven motive, is probative evidence of actual malice. *See Harte-Hanks*, 491 U.S. at 688 (motive is relevant for actual malice analysis).

---

[33]  FRCP 9(b) expressly exempts a party alleging actual malice from pleading with particularity: "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

Pointing to a handful of cherry-picked statements from certain cherry-picked reports which defendants conveniently and euphemistically rewrite in the most inoffensive manner possible, defendants argue that all of the statements made about Resolute were "substantially true" and do not support a finding of actual malice.  (Doc. 60 at 13-14.)  However, the Complaint and the declarations of Professors Reich and Cubbage demonstrate that defendants' specific statements were demonstrably false and predicated on distorted evidence and flawed and outdated science.

For example, notwithstanding the fact that the Enterprise conceded that its 2012 claim that Resolute was harvesting in areas prohibited by the CBFA was based on falsified GPS coordinates, following its public retraction, the Enterprise once again resorted to doctored photos and redrawn maps to falsely accuse Resolute of harvesting in protected areas including in Greenpeace's February 2016 publication "Endangered Forests in the Balance: The Impact Of Logging Reaches New Heights In The Montagnes Blanches Endangered Forest" and direct communications to Resolute customers.  (¶¶ 135-42.)  Moreover, the Enterprise ubiquitously disseminated the false allegation that Resolute's harvesting was impairing the boreal forest's ability to mitigate climate change, including in reports published by defendant Moas in July 2015, despite the fact that the United Nations Intergovernmental Panel on Climate Change -- whose reports and conclusions Greenpeace features and cites prominently -- has declared that sustainable forest harvesting and management is one of the most important mechanisms for removing and sequestering greenhouse gases from the atmosphere.  (¶ 101.)  As a result, Professor Reich concluded that defendants' allegations concerning Resolute's impact on climate change "cherry-pick[ed]" and "distort[ed]" results" from a "weakly related and largely irrelevant" study, "rather than examining the state-of-the-art science of today."  (Reich Decl. ¶ 38.)

Moreover, defendants' contention that certain discrete facts find some support in scientific literature does not preclude a finding of actual malice where, as here, defendants' gross allegations

72

of wrongdoing do not logically follow, or are not sufficiently supported by, the underlying factual predicates. Thus, for example, irrespective of the truth or falsity of defendant Moas's assertion that "the Boreal is the world's largest carbon absorbing ecosystem, purifying the air you breathe and keeping the climate stable" (Doc. 60 at 19), there is no reasonable basis to conclude that Resolute's harvesting in the boreal forest had a materially negative impact on climate change generally so as to support defendants' sensational apocalyptic accusations. (*See* Reich Decl. ¶ 40 ("Moas's overall conclusion that Resolute 'put[s] our global climate at risk' has no basis in fact.").)

Moreover, scientific publications, including those cited extensively by defendants in other areas directly contradict defendants' lies about Resolute. (¶ 101.) Indeed, Professor Reich concludes that defendants' claim that "Resolute aggravates climate change . . . shows a fundamental disregard for scientific reality." (Reich Decl. ¶ 23.) The law is settled that "[a] publisher cannot feign ignorance or profess good faith when there are clear indications present which bring into question the truth or falsity of defamatory statements." *Hunt v. Liberty Lobby*, 720 F.2d 631, 644 (11th Cir. 1983); *see also St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).

### 3. "Opinion" Defense Is Not Applicable

Defendants contend the defamatory statements alleged in the Complaint are protected by the First Amendment as non-actionable opinion, non-literal assertions of fact or rhetorical hyperbole. (*See* Doc. 55-1 at 26-28; Doc. 56-1 at 7-8; Doc. 60 at 19-20, 22; Doc. 61-1 at 13; Doc. 62 at 20-24.) Defendants are wrong.

It has been long-held that there is no blanket protection for "opinions," and even utterances couched as "opinion" or "fair comment" will support a defamation claim if the utterance (a) constituted an express statement of verifiably false facts; (b) implied statements of verifiably false facts; or (c) was based on incorrect or incomplete facts. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13-20 (1990); *see also Gettner v. Fitzgerald*, 297 Ga. App. 258, 261 (2009) ("There is

. . . no wholesale defamation exception for anything that might be labeled 'opinion.'"); *Eidson v. Barry*, 202 Ga. App. 587, 587-88 (1992) (reversing trial court's ruling that defendant was not subject to liability for defamation based on the simple characterization of defendant's comments as an opinion).[34]   Here, a perfunctory review of the Complaint, and the six accompanying appendices, demonstrates that the false and misleading allegations disseminated by defendants constitute statements actionable in defamation.

When determining whether a statement constitutes a fact or opinion, "a court constructs a statement's meaning through the eyes of an average reader."  *Harris v. Pierce Cty., Ga.*, 2014 WL 3974668, at *15 (S.D. Ga. Aug. 14, 2014); *see also Hayes v. Irwin*, 541 F. Supp. 397, 432 (N.D. Ga. 1982) ("The language of an alleged libel must be construed, not by what the writer intended to mean, but by the construction which would be placed upon it by the average and reasonable reader.") *aff'd,* 729 F.2d 1466 (11th Cir. 1984); *Michel*, 816 F.3d at 695 (what constitutes a fact or opinion is "based on what the average person hearing or reading the communication would take it to mean").  Indeed, "the publication must be construed as a whole in its plain, natural, and ordinary meaning, as other people would understand it, according to the sense in which it appears to have been published and the idea it was meant to convey."  *Hayes*, 541 F. Supp. at 432.  Accordingly,

---

[34]     Most of the "opinion" cases cited by defendants were not decided on the pleadings, but rather, on summary judgment or after trial.  *See Wolf v. Ramsey*, 253 F. Supp. 2d 1323 (N.D. Ga. 2003) (summary judgment); *Bird v. Weis Broad. Corp.*, 193 Ga. App. 657 (1989) (post-trial judgment); *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) (summary judgment); *Stange v. Cox Enters., Inc.*, 211 Ga. App. 731 (1994) (summary judgment); *Anderson*, 477 U.S. 242 (summary judgment); *Kirsch v. Jones*, 219 Ga. App. 50 (1995) (summary judgment); *Wertz v. Allen*, 313 Ga. App. 202 (2011) (summary judgment); *Milkovich*, 497 U.S. 1 (1990) (summary judgment); *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711 (11th Cir. 1985) (summary judgment); *Bennett v. Hendrix*, 325 F. App'x 727 (11th Cir. 2009) (post-trial judgment); *Lucas v. Cranshaw*, 289 Ga. App. 510 (2008) (summary judgment); *McCall v. Couture*, 293 Ga. App. 305 (2008) (summary judgment); *Cox Enters., Inc. v. Nix*, 274 Ga. 801 (2002) (summary judgment); *Jaillett v. Ga. Television Co.*, 238 Ga. App. 885 (1999) (summary judgment); *Atlanta Humane Soc. v. Mills*, 274 Ga. App. 159 (2005) (summary judgment); *800 Mktg. Solutions, Inc. v. GMAC Ins. Mgmt. Corp.*, 2008 WL 2777140 (M.D. Ga. July 14, 2008) (summary judgment); *Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264 (1974) (post-trial judgment); *Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6 (1970) (post-trial judgment); *U.S. Steel, LLC, v. Tieco, Inc.*, 261 F.3d 1275 (11th Cir. 2001) (post-trial judgment); *Blomberg v. Cox Enters., Inc.*, 228 Ga. App. 178 (1997) (summary judgment).

in conducting this analysis, the court must consider, among other things, the context and circumstances surrounding the publication, including the medium by which it was disseminated and the audience to which it was published.  *See id.* at 433.

Here, defendants held themselves out as legitimate environmental organizations engaged in environmental advocacy, which had "developed an ***expertise*** in matters related to the protection and conservation of Canada's boreal forests . . ."  *Resolute v. 2471256 Canada Inc. dba Greenpeace Canada, et al.*, CV-164-13, ¶ 34 (Sup. Ct. J. Ontario Aug. 20, 2014).  Indeed, every page on Greenpeace USA's website, *greenpeace.org*, reiterates this: "Want to learn more about tax-deductible giving, donating stock and estate planning?  Visit Greenpeace Fund, a nonprofit, 501(c)(3) charitable entity created to increase public awareness and understanding of environmental issues through ***research***, the media and ***educational programs***."

Moreover, defendants touted that their statements were based only on the "best science."  The representations naturally lead "a reasonable listener or reader [to] infer that the speaker or writer knows certain facts, unknown to the audience, which support the opinion and are detrimental to the person toward whom the communication is directed."  *Gross v. New York Times*, 82 N.Y.2d 146, 153-54 (1993); *see also Bennett*, 325 F. App'x at 740-41 (emphasizing that the context in which a flier was published by a county sheriff stating that a person was a convicted criminal could lead a reasonable reader to conclude that it was a factual assertion); *see also Slaughter v. Friedman*, 32 Cal.3d 149, 154 (1982) (an accusation that, if made by a layperson, might constitute opinion may "carry a ring of authenticity and reasonably might be understood as being based on fact" if made by someone with specialized knowledge).  Thus, even statements dressed up as "opinion-based publications" may be understood as an assertion of "science-based facts."[35]

---

[35]    Although the court in *Murphy v. Farmer* found some of the defendant's statements to be hyperbole, and therefore non-actionable opinion, it still denied defendant's motion to dismiss the defamation claims: "at this stage

Likewise, opinions couched as factually verifiable statements are actionable.[36] *See Straw v. Chase Revel, Inc.*, 813 F.2d 356, 359 (11th Cir. 1987) (finding editorial was subject to factual verification because it read like a recitation of fact rather than a pure opinion); *Davita Inc. v. Nephrology Assocs., P.C.*, 253 F. Supp. 2d 1370, 1377 (S.D. Ga. 2003) (holding opinion statements based on objective facts are actionable because they "may imply an assertion of objective fact"); *Cassells v. Hill*, 2010 WL 4616573, at *6 (N.D. Ga. Nov. 8, 2010) ("[A] statement of opinion can be actionable as defamatory if it can reasonably be interpreted as stating or implying defamatory facts about the plaintiff and, if so, if the defamatory assertions are capable of being proved false."); *Michel*, 816 F.3d at 700 (finding that statements about celebrity news connoted fact-based reporting and thus did not constitute protected opinion).

Here, Greenpeace disseminated false lies that Resolute harvested in prohibited areas and violated the CBFA, materially contributed to climate change, destroyed the woodland caribou habitat and posed a material risk to those populations, and took advantage of First Nations. These statements purported to be based on fact-based research, which -- on their own terms -- were meant to be taken as serious, professional, and reliable assertions and compilations of objective fact by those issuing them, and thus are not protected opinions.[37] This is all the more so when joined with the allegations that Greenpeace failed to disclose that its real motivation in its efforts was generating donations and not effectuating responsible environmental activism.

---

the Court is not convinced that all of the statements necessarily constitute hyperbole or unactionable statements of opinion." 176 F.Supp.3d 1325, 1357 (N.D. Ga. 2016).

[36]     Defendants reliance on *Collins v. Cox Enters., Inc.*, 215 Ga. App. 679 (1994), for the proposition that an editorial opinion cannot be the basis for a defamation claim is misplaced. In Collins, the court determined that the statements were "merely speculation" and did not give rise to an "objective fact that might be proved false." 215 Ga. App. at 679.

[37]     None of defendants' publications are "styled as a cartoon, parody, or editorial, and their tone is not satirical or exaggerated." *Bennett*, 325 F. App'x at 742. There are no overt indications here that defendants were merely presenting opinions to their audience. There is no disclaimer clearly labeling what followed was a statement of opinion, or no "softening language to signal readers that they are not reading a factual account." *Michel*, 816 F.3d at 700.

Moreover, the Greenpeace Enterprise's false representations that Resolute "is bad news for the climate" (¶ 100 n.2) and that it is "put[ting] the health of the Boreal Forest at risk with its destructive logging practices" (¶ 195) -- which imply that Resolute's harvesting are materially contributing to climate change and negatively harming the boreal Forests -- are likewise actionable.   Under well-settled principles, implied statements of verifiably false facts by selectively including false facts and omitting certain facts are actionable in defamation.   *See Eidson*, 202 Ga. App. at 588 (finding implied defamation from defendant's comments about plaintiff's alleged illegal conduct because it could be an assertion that plaintiff was guilty of a crime punishable by law); *Milkovich*, 497 U.S. at 18-19 (statement may "imply a false assertion of fact," as, for example: "If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts, which lead to the conclusion that Jones told an untruth.").[38]

Finally, defendants' contention that because *some* of their allegedly defamatory publications provide the reader with hyperlinks and footnotes to sources, and facts purportedly relied upon, *all* of their publications are therefore protected because they merely imply defendants' subjective interpretation of the facts, is likewise unavailing.  (*See* Doc. 62 at 22-23.)  The law is clear that simply citing sources purporting to support false statements does not permit an author to manufacture First Amendment protection for its defamatory statements.  *See Milkovich*, 497 U.S. at 18-19 ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact."); *see also Davita*, 253 F.Supp.2d at 1377 n.4 ("Presumably any

---

[38]     *Davita*, 253 F. Supp. 2d at 1377 (statements that plaintiffs have "exercised undue influence over patients and that they have no ethics or morals" were actionable and sufficient to state a claim for defamation because they implied plaintiffs had committed undisclosed acts supporting the statements; the court found other statements not actionable but on grounds not raised here); *Harcrow v. Struhar*, 236 Ga. App. 403, 404 (1999) (finding implied defamation from defendant's statements that plaintiffs either shot defendant's cat and were guilty of a crime or were at least prime suspects in the shooting of defendant's cat).

facts disclosed with an opinion would have to be truthful for the opinion not be actionable as defamation.  Otherwise, an individual could simply fabricate a set of facts and then subjectively interpret them negatively without fear of liability."); *Michel*, 816 F.3d at 701 ("[W]e reject the defendants' suggestion that because the article presents its sources and allows readers to decide the veracity of the article for themselves, the assertion of fact is transformed into an opinion.").

In short, defendants ask this Court to simply accept at face value that the disclosed "factual basis" for their "opinions" is complete and accurate.  Not only is defendants' position flatly contradicted by the expert affidavits of Professors Reich and Cubbage, but accepting defendants' assertions would completely negate the presumption afforded plaintiffs on a motion to dismiss, and therefore, must be rejected.

## B. The Tortious Interference Claim Is Properly Pled

Defendants challenge plaintiffs' tortious interference claim on the ground that it was not pled with specificity.  The elements of tortious interference are: (1) improper action or wrongful conduct by the defendant without privilege; (2) with malice and the intent to injure; (3) causing third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) proximately causing damage.  *Lee v. Christian*, 98 F. Supp. 3d 1265, 1276 (S.D. Ga. 2015).  Plaintiffs have alleged each element.[39]

This Court has defined "improper action or wrongful conduct" as activity that generally involve[s] predatory tactics -- such as those alleged here -- including fraud or misrepresentation, defamation, and extortion.  *U.S. Capital Funding VI, Ltd v. Patterson Bankshares, Inc.*, 137 F.

---

[39]     *See Covad Commc'ns Co. v. BellSouth Corp.*, 299 F.3d 1272, 1292 (11th Cir. 2002), *rev'd on other grounds* ("At the Rule 12 stage, the only proper inquiry is whether [Plaintiff] has alleged such direct interference [to] . . . existing and prospective business relations with customers."); *see also Walker v. Gowen Stores LLC*, 322 Ga. App. 376, 378 (2013) ("[A]llegations sufficiently gave the defendants fair notice of the claim and a general indication of the type of litigation involved so as to survive a[ ] motion to dismiss").

Supp. 3d 1340, 1371 (S.D. Ga. 2015); *see also Cobb Theatres III, LLC v. AMC Entm't Holdings, Inc.*, 101 F. Supp. 3d 1319, 1344 (N.D. Ga. 2015).[40]   Applying these principles, the *Cobb* court held that defendants' extortive threats to plaintiffs' distributors and landlord to terminate their contractual relationships with plaintiff stated a claim for tortious interference.  *Id.*

Defendants' contention that Resolute has failed to allege the "malice" element of tortious interference strains credulity.  (*See*, *e.g.*, Doc. 55-1 at 32.)   Malice "is to be given a liberal meaning" and does not require any "[p]ersonal ill will or animosity . . .; rather, any unauthorized interference, or any interference without legal justification or excuse will suffice."  *U.S. Capital Funding*, 137 F. Supp. 3d at 1373 ("Persuading a person to break a contract for the indirect purpose of injuring the plaintiff is a malicious and actionable act if injury arises from it"); *Arford v. Blalock*, 405 S.E.2d 698, 704 (1991) (the crux of malice is "when the thing done is with the knowledge of plaintiff's rights, and with the intent to interfere therewith").[41]   Here, because defendants' campaign was explicitly designed to intentionally interfere with Resolute's business, there can be no legitimate dispute about "malice."  *See also Alta Anesthesia Assocs. of Ga., P.C. v. Gibbons*, 537 S.E.2d 388, 393 (2000) (holding malice element satisfied where defendant "procured business from surgeons . . . by threatening those surgeons that they would not provide coverage for them . . . unless they referred all of their surgeries to [defendant]").

---

[40]      Defendants suggest that plaintiffs have merely recast their defamation claim as tortious interference.  (Doc. 62 at 40.)  As an initial matter, defamation satisfies the required "improper action or wrongful conduct" element.  *U.S. Capital Funding*, 137 F. Supp. 3d at 1371 (defamation constitutes "improper action or wrongful conduct").  Moreover, ForestEthics' claim that their "critical personal opinions" do not give rise to a tortious interference claim lacks merit.  As set forth *supra* § V(A)(3), "an opinion can constitute actionable defamation if the opinion can reasonably be interpreted . . . to state or imply defamatory facts about the plaintiff that are capable of being proved false."  Most importantly, plaintiffs have alleged that defendants engaged in conduct which went far beyond the mere dissemination of false information, including organizing boycotts, cyber-hacking, and other illegal activities, all of which constitute "improper action" for purposes of tortious interference.

[41]      GP-Fund erroneously equates the "malice" element of tortious interference with "actual malice" in a defamation context.  (Doc. 61-1 at 14.)  Tortious interference's malice is "broadly construed" relative to defamation, and encompasses a greater range of culpable conduct.  *See*, *e.g.*, *Walker*, 322 Ga. App. at 378.

Finally, the Complaint details how defendants' long-term disinformation campaign and extortive threats damaged plaintiffs' relationships with existing and prospective customers and other critical market relationships. For example, as a result of the Enterprise's campaign, Georgia Pacific abandoned contractual negotiations with Resolute. (¶¶ 153, 207.) Moreover, numerous Resolute customers terminated contracts because of the Enterprise's extortive threats, including, among others, 3M, Axel Springer, Best Buy, Georgia Pacific, Kimberly-Clark, Procter & Gamble, Union Bank, Burrows Paper and UPM. (¶¶ 150, 155-56, 158-59, 166, 175, 205-07, 214.) In fact, Kimberly-Clark notified Resolute that "we are not going to be able to pursue a contractual relationship" "*[d]ue to Resolute's continued dispute with Greenpeace.*" (¶ 205.) Defendants heralded the campaign's results in terminating the Kimberly-Clark, 3M, and Axel Springer contracts, boasting that the three contracts were worth at least C$100 million. (¶ 214.)[42]

## C.    The Trademark Dilution Claim Is Properly Pled

To prevail on a trademark dilution claim under O.C.G.A. § 10-1-451(b), a plaintiff need only show that "the contested use is likely to injure its commercial reputation or dilute the distinctive quality of its marks." *Pillsbury Co. v. Milky Way Prods., Inc.*, 1981 WL 1402, at *14 (N.D. Ga. Dec. 24, 1981). Greenpeace and GP-Fund challenge the trademark dilution claim on the grounds that the trademark is not "distinctive." (Doc. 61-1 at 16; Doc. 62 at 38-39.) To plead "distinctiveness," under Georgia law "the mark must be at least descriptive with a secondary meaning." *Healthier Choice Flooring, LLC v. CCA Global Partners, Inc.*, 2014 WL 12529091, at *16 (N.D. Ga. Mar. 31, 2014). "Georgia dilution law neither requires a trademark to be famous nor demands the parties be in competition." *Id.* "Secondary meaning is the connection in the

---

[42]    The ForestEthics Defendants also contend that the four-year statute of limitations has elapsed. (Doc. 55 at 32.) *See* O.C.G.A. § 9-3-31. However, ForestEthics interfered with Resolute's contracts with P&G in 2013, 3M and Best Buy in 2014, and Rite Aid in 2015. (¶¶ 157, 165, 175-76.) These interferences all occurred within four years of Resolute's Complaint in 2016.

consumer's mind between the mark and the product's producer, whether that producer is known or unknown." *U.S. Pharm. Corp. v. Breckenridge Pharm., Inc.*, 2010 WL 3731112, at *5 (N.D. Ga. Sept. 16, 2010). "Whether secondary meaning exists is a question of fact." *Id.*

Here, plaintiffs allege that, since 2011, they have been inextricably connected to the "Resolute" name: the company is the largest producer of newsprint in the world, owning or operating over 40 products facilities globally, including in Georgia, is a recognized public leader in sustainability, and has received dozens of local, regional, national, and international awards related to sustainability. (¶ 93.) In fact, Resolute's trademark is distinctive enough that defendants transformed Montreal's iconic Mount Royal Cross into an "immense scales of justice," featuring Resolute's recognizable logo. (¶ 194.)[43]

Trademark dilution occurs when the "uniqueness of the plaintiff's marks as the designation for its products is diminished by the defendant's unauthorized use of the marks." *Original Appalachian Artworks v. Topps Chewing Gum*, 642 F. Supp. 1031, 1039 (N.D. Ga. 1986). The Complaint pleads that defendants' use of plaintiffs' "distinctive" mark has tarnished Resolute's image as a "responsible corporate citizen that embraces and prioritizes sustainable forestry practices" throughout its operations. (¶ 315.) These factual allegations more than amply satisfy plaintiffs' burden at the pleading stage. *WEC Holdings, LLC v. Juarez*, 2008 WL 345792, at *5 (D. Nev. Feb 5, 2008) (a plaintiff need not "provide evidence, at [the motion to dismiss] stage, that its mark is famous"). [44]

---

[43]     Contrary to defendants' claim (Doc. 55-1 at 34), a trademark dilution claim under O.C.G.A. § 10-1-451(b) does not require registration. *See U.S. Pharm. Corp.*, 2010 WL 3731112, at *8 ("§ 451(b) does not expressly require registration."). In any event, Resolute's trademark is registered with the U.S. Patent and Trademark Office.

[44]     *See also Vulcan Golf, LLC v. Google Inc.*, 552 F.Supp. 2d 752, 773 (N.D. Ill. 2008) (declining to determine fame at the motion to dismiss stage "[g]iven the factual inquiry necessary to determine whether a trademark is 'famous' for purposes of [the Lanham] Act").

Defendants' contention that their conduct is protected by the First Amendment is meritless. The Constitution does not guarantee the right to use another party's trademarks for "commercial" criticism and commentary. *Original Appalachian*, 642 F. Supp. at 1034. Here, the Complaint details the widespread "Resolute: Forest Destroyer" campaign to fraudulently induce millions of dollars in donations. Accepting these allegation as true, the "Resolute: Forest Destroyer" campaign constitutes commercial speech which "is not [ ] entitled to the constitutional protection afforded noncommercial speech." *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 68 (1983).

### D.      The Common Law Conspiracy Claim Is Properly Pled

A civil conspiracy is "a combination between two or more persons either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort." *Metro Atlanta Task Force for the Homeless, Inc. v. Ichthus Cmty. Trust*, 298 Ga. 221, 225 (2015). The Supreme Court of Georgia has recognized the intrinsic difficulty in proving a conspiracy and has thus held that conspiracy may be pleaded in general terms. *Cook v. Robinson,* 216 Ga. 328, 329-30 (1960).

Defendants summarily contend that the civil conspiracy claim fails because plaintiffs have failed to allege a common design between the defendants. (Doc. 62 at 40 n.54.) However, the Georgia Supreme Court has recognized that to prove common design, a complaint need not allege an overt agreement. *Cook*, 216 Ga. at 330 (at the pleading stage, "it need not appear that the parties met together either formally or informally, or entered into any explicit or formal agreement; nor is it essential that it should appear that either by words or by writings they formulated their unlawful objects"). Rather, a civil conspiracy may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances. *Id.*

The Complaint pleads copious allegations that defendants had the same conspiratorial objective when they committed defamation, tortious interference and trademark dilution, including that each defendant shared the same conspiratorial objective to disseminate false and misleading

statements and reports about Resolute and interfere with Resolute's business relationships in furtherance of a campaign to fraudulently induce donations.  (¶ 306.)  The Complaint also details the long-history of collaboration between the various Greenpeace entities, ForestEthics and the individuals working with them, as well as their joint attack against critical CBFA stakeholders and customers, including 3M, from which a common design can readily be inferred.  (¶¶ 41(m), 145, 165-166.)  Under these circumstances, the common law conspiracy claim is properly pled.

## VI.     VENUE IS PROPER IN THE SOUTHERN DISTRICT OF GEORGIA

### A.     This Court Should Defer To Plaintiffs' Choice Of Forum

It is well-settled that plaintiffs' choice of forum is entitled to considerable deference.  *See Perlman v. Delisort-Theodule*, 451 F. App'x 846, 848 (11th Cir. 2012); *see also Robinson v. Giarmaco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir. 1996) ("The plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations.").  Notwithstanding this clear legal precedent, defendants argue that venue should be transferred to the Northern District of California.  (Doc. 57; Doc. 62 at 10-12.)  As set forth below, defendants have failed to meet their burden to demonstrate that a change of venue is appropriate.[45]

### B.     A Substantial Part of The Events In Furtherance Of The Conspiracy Occurred In, Or Targeted, The Southern District Of Georgia

Pursuant to 28 U.S.C. §1391(b)(2), venue is proper in *any* district where "a substantial part of the events or omissions giving rise to the claim[s] occurred."  *Premium Nutraceuticals, LLC v. Leading Edge Mktg., Inc.*, 2016 WL 3841826, at *5 (S.D. Ga. July 12, 2016) (under 28 U.S.C.

---

[45]     Likewise, defendants have not proffered any basis for their claim that California law governs the substantive claims here.  (Doc. 62 at 11-12.)  As an initial matter, defendants have not identified any conflict between California law and Georgia law, and thus no choice-of-law analysis is required.  *See Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1171 (11th Cir. 2009) (where defendant failed to identify a conflict, "the court should avoid the conflicts question and simply decide the issue under the law of each of the interested states").  However, even assuming *arguendo*, that a conflict does exist, defendants' conclusory allegations that California has the "most significant relationship" to the claims in this action are flatly contradicted by the allegations of the complaint, which detail the scheme's participants, activities, and effects that were based, conducted and experienced in Georgia.  (¶¶ 197-210.)

§1391(b)(2), a plaintiff is "not required to select the venue with the most substantial nexus to the dispute").  Courts have recognized that a "substantial part of the events" giving rise to an action may have occurred in several districts.  *See Hartford Cas. Ins. Co. v. Sany Am., Inc.*, 991 F. Supp. 2d 1303, 1307 (N.D. Ga. 2014) (finding venue was properly laid in Georgia despite accident that gave rise to insurance claim occurring in Texas); *Boehner v. Heise*, 410 F. Supp. 2d 228, 240–41 (S.D.N.Y. 2006) (finding venue for defamation suit was proper in New York despite publication having been written in Wisconsin because publication concerned New York company).

In light of this standard, defendants resort to arguing that "no significant campaign further[ing] acts" occurred in this district.  These arguments cannot be reconciled with the well-pleaded allegations of the complaint.  As set forth in the Complaint, Greenpeace Enterprise employed on-the-ground tactics in Georgia, including traveling to Augusta, Georgia in May 2015 to disseminate the Greenpeace Enterprise's lies to shareholders, customers, journalists, stakeholders, and employees at Resolute's annual meeting.  (¶ 208.)  Under clear legal precedent, "attendance at a single conspiratorial meeting in the district is enough to establish venue."  *Delong Equip. Co. v. Wash. Mills Abrasive Co.*, 840 F.2d 843, 856 (11th Cir. 1988); *see also Home Ins. Co. v. Thomas Indus., Inc.*, 896 F.2d 1352, 1357 (11th Cir. 1990) (appropriate venue established even where plaintiff "presented no evidence that a fraudulent scheme was hatched" at certain meetings of defendants because "at this stage of the litigation, the plaintiff is not required to prove that the meetings facilitated fraudulent conduct by the defendants").  Moreover, the "Resolute: Forest Destroyer" campaign entailed significant contacts with and effects in the state of Georgia where Resolute operates a newsprint mill, including targeting numerous resident customers, resulting in substantial damage in Georgia, including lost customers, lost revenue and cutbacks and layoffs at Resolute's Augusta facility in this District where material parts of the RICO injury occurred.  (¶¶ 197-210.)

### C.   Defendants Have Not Met Their Burden To Demonstrate That A Transfer of Venue Is Appropriate

"[A] transfer that would only shift inconvenience from the defendant to the plaintiff does not outweigh the plaintiff's choice for Section 1404(a) purposes."   *S.E.C. v. Lauer*, 478 F. App'x 550, 554 (11th Cir. 2012); *see also U.S. v. $633,021.67 in U.S. Currency*, 842 F. Supp. 528, 535 (N.D. Ga. 1993) ("[I]f the balance of factors is only *slightly* in favor of the movant, a court should deny the motion to transfer.").   Rather, the burden is on the moving party to demonstrate a venue transfer is appropriate.   *See Greely v. Lazer Spot, Inc.*, 2012 WL 170154, *3 (S.D. Ga. Jan. 19, 2012).[46]

The key factor in determining whether transfer of venue is appropriate is the convenience of witnesses.   *See Weintraub v. Advanced Correctional Healthcare, Inc.*, 161 F. Supp. 3d 1272, 1280 (N.D. Ga. 2015); *Greely*, 2012 WL 170154 at *3.   Courts afford more weight to non-party witnesses, especially key witnesses who have information regarding defendants' liability, and place less emphasis on the inconvenience to party witnesses and their employees.   *Weintraub*, 161 F. Supp. 3d at 1280.   Here, the sole basis for defendants' motion to transfer venue is inconvenience to party witnesses and employees.   (Doc. 57; Doc. 62 at 10-12) (listing only defendants and their employees as potentially inconvenienced witnesses).   Significantly, defendants fail to identify a single non-party witness that would be inconvenienced if this case were tried in this District.[47]

However, the Complaint makes clear that several critical non-party witnesses reside in

---

[46]      Defendants cite to *Greely* to support their request to transfer venue.   (Doc. 62 at 10.)   However, while the court did grant a transfer in that case, it did so *at the bequest of plaintiffs*.   2012 WL 170154, at *2. Thus, *Greely* supports the general practice of deferring to plaintiff's choice in venue absent "unusually extreme circumstances." *SME Racks, Inc. v Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1101–02 (11th Cir. 2004).

[47]      To meet their burden of demonstrating that transfer is appropriate, "the party seeking transfer must specifically list the evidence and witnesses on which the party intends to rely in the transferee district, along with a general statement of the topics of each witness' testimony." *See Pilates, Inc. v. Pilates Inst., Inc.*, 891 F. Supp. 175, 183 (S.D.N.Y. 1995).   Here, ForestEthics' conclusory statement that "[a]ll of Stand's employees, witnesses, and documents that may be relevant to this case are located in San Francisco or its nearby offices in the Pacific Northwest" does not come close to meeting their burden.   (Doc. 57 at 2.)

Georgia, including Mr. Jarvis from Home Depot and Georgia-based customers targeted by the Enterprise.[48]  Under these circumstances, defendants cannot satisfy their burden to demonstrate that an alternative venue would make it "substantially more convenient" to third party witnesses. *Elec. Transaction Network v. Katz*, 734 F.Supp. 492, 501 (N.D. Ga. 1989).

Moreover, a transfer of venue would be particularly inappropriate here -- where GP-Fund and GP-Inc. are registered to do business in Georgia and avail themselves of various charitable and nonprofit laws.  (¶ 197.)  By contrast, none of the plaintiffs have any offices or employees in California.   Thus, transferring venue to California, would do nothing more than "shift inconvenience from the defendant to the plaintiff" in contravention of Section 1404(a).  *Lauer*, 478 F. App'x at 554.[49]

## VII.   THIS COURT HAS PERSONAL JURISDICTION OVER EACH DEFENDANT

GPI argues for dismissal of all the claims asserted against them on the basis that this Court lacks personal jurisdiction over them.[50]  The crux of this claim is that because GPI is a foreign entity, which was served abroad pursuant to the Hague Convention, GPI is not subject to

---

[48]     Defendants contend that the location of certain witnesses in Georgia, does not support a finding that venue is proper in this district, because some of these witnesses are located in the Northern and Middle Districts of Georgia. (Doc. 62 at 10 n.7.) However, § 1404(a) analysis is focused on the convenience of witnesses, not their specific home districts. *See Moss & Assoc., LLC v. E Light Elec. Servs., Inc.*, 2016 WL 4578144, at *5–6 (N.D. Ga. Sept. 2, 2016) (transferring action from Northern District to Middle District for convenience of nonparty witness from Florida as analysis focuses on convenience for witnesses, not their specific home districts); *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 317 (5th Cir. 2008) ("[T]he factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled"). Thus, in weighing the inconvenience to third party witnesses, requiring these witnesses to travel to Georgia would be less inconvenient than traveling to California.

[49]     In the event that this Court determines that venue is improper in this District, the appropriate remedy would be to transfer this action to an appropriate venue. *See* 28 U.S.C. § 1406(a); *see also LaFerney v. Citizens Bank of East Tenn.*, 2011 WL 4625956 at *1 (S.D. Ga. Sept. 30, 2011). "When venue would be proper in another district under 28 U.S.C. §1391, transfer is preferred over dismissal unless there is evidence that a case was brought in an improper venue in bad faith or in an effort to harass a defendant." *Id*. at *2. There is no such showing of bad faith here.

[50]     All of the domestic defendants concede personal jurisdiction in Georgia pursuant to 18 U.S.C. § 1965's nationwide service of process provision.  However, the ForestEthics Defendants and the individual defendants argue that if the RICO claims are dismissed, there is no basis to exercise jurisdiction over them.  (Doc. 55-1 at 10-13; Doc. 62 at 9.)  For the reasons set forth herein, these defendants would be subject to jurisdiction on the basis of the contacts of their co-conspirators.

nationwide jurisdiction under 18 U.S.C. 1965.  (Doc. 62 at 8-9.)  As set forth below, dismissal is not warranted here, because GPI is subject to personal jurisdiction under the Georgia Long Arm Statute, O.C.G.A. § 9-10-91, or, alternatively, Federal Rule of Civil Procedure 4(k)(2).

### A.     This Court May Exercise Jurisdiction Over GPI Under Georgia's Long Arm Statute

Under the Georgia Long Arm Statute this Court may "exercise personal jurisdiction over any nonresident . . . if in person or through an agent, he . . . [c]ommits a tortious act or omission within this state . . ." O.G.C.A. § 9-10-91(2).   Here, the Complaint alleges that GPI's global campaign leader, along with several other members of the Greenpeace Enterprise, traveled to Georgia to disseminate false and misleading statements directly to Resolute's Board of Directors, senior management, and shareholders at Resolute's annual meeting.  (¶ 208.)  These tortious acts committed in this State in furtherance of the RICO enterprise, are sufficient to confer jurisdiction over GPI and Daggett.  *See Delong*, 840 F.2d at 848-54 (out-of-state corporate representative's attendance at one conspiratorial meeting in Georgia was sufficient to establish long-arm jurisdiction over representative and out-of-state corporation).

Moreover, Georgia's long-arm statute confers personal jurisdiction over a non-resident on the basis of its co-conspirators contacts with this State.  *See Dixie Homecrafters, Inc. v. Homecrafters of Am., LLC*, 2009 WL 596009, at *7 (N.D. Ga. Mar. 5, 2009); *see also Hyperdynamics Corp. v. Southridge Capital Mgmt., LLC*, 305 Ga. App. 283, 294 (2010); *Rudo v. Stubbs*, 221 Ga. App. 702 (1996). Applying these principles, GPI is subject to conspiracy jurisdiction by virtue of the other Greenpeace Enterprise members' contacts with the state in furtherance of the conspiracy.  Indeed, neither GP-Inc. nor GP-Fund dispute that they are subject to jurisdiction in Georgia where they are registered to do business, and have solicited donations, which were used to further the illegal racketeering scheme against Resolute.  (¶ 197.)  Moreover,

these defendants, and the individuals working on their behalf, are subject to long arm jurisdiction pursuant to O.G.C.A. § 9-10-91(2), by virtue of their tortious conduct directed at the state of Georgia and its residents, including the employment of on-the-ground tactics in Augusta, Georgia during Resolute's annual meeting, and the issuance of extortive threats to key Resolute customers located in Georgia. *See*, *e.g.*, *Marvin L. Walker & Assoc., Inc. v. A. L. Buschman, Inc.*, 147 Ga. App. 851 (1978) (fraudulent phone call into Georgia was sufficient to establish court's personal jurisdiction over nonresident caller); *Natl. Egg Co. v. Bank Leumi le-Israel B. M.*, 504 F. Supp. 305, 311 (N.D. Ga. 1980) ("[A] single misrepresentation sent into the forum state from outside the forum state and causing injury therein is a sufficient basis for the assertion of long-arm jurisdiction"); *accord Delong*, 840 F.2d at 851 n.10.

As set forth above, GPI explicitly understood that the Enterprise was targeting Georgia and its residents as demonstrated by, *inter alia*, the on-the-ground tactics GPI carried out in this state. Under these circumstances, this Court may exercise conspiracy jurisdiction over GPI.  *See Natl. Egg*, 504 F. Supp. at 313 ("There is little or no doubt that, under some sets of circumstances, nonresident co-conspirator (A) who has had no direct contacts of his own with the forum may be held subject to the jurisdiction of the forum's courts, provided that another co-conspirator (B) is subject to the forum court's jurisdiction.").

### B.        Jurisdiction Over GPI Is Proper Pursuant To Fed. R. Civ. P. 4(k)(2)

However, even if this Court were to conclude that GPI is not subject to long-arm jurisdiction in this state, this Court may nevertheless exercise jurisdiction over GPI pursuant to FRCP 4(k)(2).  A Court has jurisdiction under Rule 4(k)(2) when a foreign defendant lacks substantial contacts with any single state, but has sufficient contacts with the U.S. as a whole to satisfy due process standards.  *Merial Ltd. v. Cipla Ltd.*, 681 F. 3d 1283, 1293-94 (Fed. Cir. 2012). Rule 4(k)(2) provides for jurisdiction where plaintiff's claim arises under federal law, defendant

is not subject to jurisdiction in any state, and due process requirements are satisfied.  *Id*. at 1294.

Courts have "adopted a burden-shifting mechanism so that 'if the defendant contends that he

cannot be sued in the forum state and refuses to identify any other where suit is possible, then the

federal court is entitled to use Rule 4(k)(2).'"  *Id*.; *see also S.E.C. v. Carrillo*, 115 F.3d 1540, 1543-

44 (11th Cir. 1997); *Exter Shipping Ltd. v. Kilakos*, 310 F. Supp. 2d 1301, 1313 n.4 (N.D. Ga.

2004); *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220 (11th Cir. 2009).

Here, plaintiff's federal RICO claims arise under federal law.  Moreover, the Complaint

pleads in detail GPI's contacts with the U.S. in furtherance of the "Resolute Forest Destroyer"

campaign, including the dissemination of falsehoods to U.S. customers and the U.S. public at-large

via GPI's website, phone, email, and on-the-ground tactics in Augusta, Georgia during Resolute's

annual meeting.  (¶¶ 198-208.)  Thus, GPI has "purposely availed itself of the privileges and

benefits of conducting its activities in the forum" such that GPI should reasonably anticipate being

haled into court in the U.S.  *Carrillo*, 115 F.3d at 1545-46 (targeting U.S. citizens through the

phone, mail, internet, and in person, constitutes minimum contacts for purposes of exercising

jurisdiction under Rule 4(k)(2)); *see also Mwani v. Bin Laden*, 417 F.3d 1, 13 (D.C. Cir. 2005).

For the foregoing reasons, this court has jurisdiction over defendant GPI.[51]

## CONCLUSION

For the reasons stated above, defendants' Motions to Strike, Dismiss, and Transfer Forum

should be denied in their entirety.  To the extent the Court is inclined to grant any of defendants'

motions in whole or in part, any dismissal should be without prejudice and with leave to amend.[52]

---

[51]     If this Court finds that Resolute has failed to establish personal jurisdiction over GPI, this Court should grant limited jurisdictional discovery.  *See Majd-Pour v. Georgiana Cmty. Hosp., Inc.*, 724 F.2d 901, 903 (11th Cir. 1984) ("[T]he plaintiff should be given the opportunity to discover facts that would support his allegation of jurisdiction"); *see also Henriquez v. El Pais Q'Hubocali.com*, 500 F. App'x 824, 830 (11th Cir. 2012).

[52]     The Federal Rules of Civil Procedure instruct that "[t]he court should freely give leave [to amend a pleading] when justice so requires."  Fed. R. Civ. P. 15(a).  Accordingly, the well-established rule in the Eleventh Circuit and the Southern District of Georgia is that "[w]here a more carefully drafted complaint might state a claim, a plaintiff

This 22nd day of November, 2016.

Respectfully submitted,

/s/ James B. Ellington                        /s/ Lauren Tabaksblat
James B. Ellington                            Michael J. Bowe (*admitted pro hac vice*)
Georgia Bar No. 243858                        Lauren Tabaksblat (*admitted pro hac vice*)
Hull Barrett, PC; P.O. Box 1564               Kasowitz, Benson, Torres & Friedman, LLP
Augusta, Georgia 30903                        1633 Broadway
(706) 722-4481 (telephone)                    New York, NY 10019
(706) 722-9779 (facsimile)                    (212) 506-1700 (telephone)
jellington@hullbarrett.com                    mbowe@kasowitz.com
                                              ltabaksblat@kasowitz.com
                                              Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

This is to certify that I have this day electronically filed the foregoing Response to Defendants' Motion to Strike, Dismiss, And Transfer Forum with the Clerk of Court using the CM/ECF system and served upon counsel of record by electronic filing, as follows:

James S. Murray                               Thomas W. Tucker
Warlick, Stebbins, Murray, Chew LLP           Tucker Long
P.O. Box 1495                                 P. O. Box 2426
Augusta, GA 30903                             Augusta, GA 30903

Lisa Zycherman                                Thomas M. Barton
Davis Wright Tremaine, LLP                    Shaun M. Daughtery
1919 Pennsylvania Avenue, NW                  Coles Barton, LLP
Washington, DC 20006-2401                     150 South Perry Street, Suite 100
                                              Lawrenceville, GA 30046

This 22nd day of November, 2016.

/s/ Lauren Tabaksblat
Lauren Tabaksblat

---

must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001); *Hamilton v. Carecore Nat'l., LLC*, 2010 WL 768179, at *2 (S.D. Ga. Mar. 4, 2010).