# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA

RESOLUTE FOREST PRODUCTS, INC., *et al.*,  )
        )
        Plaintiffs,        )        CIVIL ACTION FILE
        )        NO. CV116-071
        v.        )
        )
GREENPEACE INTERNATIONAL, *et al.*,  )
        )
        Defendants.        )
        )

## GREENPEACE DEFENDANTS' REPLY MEMORANDUM
## IN SUPPORT OF RULE 12(B)(6) MOTION TO DISMISS
## AND MOTION TO STRIKE PURSUANT TO O.C.G.A. § 9-11-11.1

Defendants Greenpeace International ("GPI"), Greenpeace, Inc. ("GP Inc."), Daniel Brindis, Amy Moas, Matthew Daggett, and Rolf Skar (collectively, the "Greenpeace Defendants," "Greenpeace," or "GP") respectfully submit this consolidated reply in support of their motion to dismiss pursuant to Rule 12(b)(6), and their motion to strike pursuant to the Georgia anti-SLAPP statute, the Complaint of Resolute Forest Products, Inc., Resolute FP US, Inc., Resolute FP Augusta, LLC, Fibrek General Partnership, Fibrek U.S., Inc., Fibrek International Inc., and Resolute FP Canada, Inc. (collectively, "RFP").

In opposition to the Greenpeace Defendants' motions, RFP asks the Court to ignore both the real-world and constitutional dimensions of this lawsuit, in favor of bare, vague and legally flawed allegations, arguing that the Greenpeace Defendants have "euphemistically recast" their activities as "mere 'advocacy.'" Pls.' Resp. Opp. Defs.' Mot. Strike, Dismiss & Transfer Forum 3, ECF No. 75 (hereinafter "Opp."). Rather than view this case through a First Amendment lens in the broader context of the public debate over environmental policies and practices, RFP would have the Court leap immediately to the extraordinary conclusion that all of Defendants' advocacy relating to RFP is "illegal," and indeed criminal.

First, this turns the constitutional analysis on its head: Supreme Court precedent instructs that courts must determine ***as a threshold matter*** whether claims are subject to First Amendment

scrutiny, and if so analyze the claims in that light. This includes determining whether RFP's purported claims under RICO, and its state claims for conspiracy, trademark infringement and tortious interference, are merely disguised defamation claims, as the Greenpeace Defendants demonstrated in their opening briefs. GP Defs. Mot. Dismiss 29-40, ECF No. 62 (hereinafter "Mot. Dismiss"); GP Defs. Mot. Strike 24, ECF No. 60 (hereinafter "Mot. Strike").   An examination of the actual statements in suit makes clear that each of RFP's claims is based on First Amendment-protected speech. By contrast, in its opposition RFP itself conveniently avoids supporting its legal arguments by reference to any of the actual alleged statements by the Greenpeace Defendants,[1] as its claims fall apart once the content and context of those statements are examined. At bottom, because RFP's defamation claim fails, all its remaining claims, including RICO, must fail too.

The proper forum for a debate such as this one is the public marketplace of ideas. That is where Greenpeace has criticized RFP's practices, and that is where RFP should respond (and indeed has, with vigorous self-promotion and counter-attacks). This is especially true where the issues under discussion involve complex scientific issues better suited for scientists, scholars and concerned citizens. Courts are particularly ill-suited as a forum for adjudicating scientific "truth," as RFP is asking this Court to do here. Courts must thus use special care in examining whether a claimed defamatory statement is "provably false" in the scientific context.

Indeed, to meet its burden under the Georgia anti-SLAPP statute of demonstrating a probability that it will prevail on its claims, RFP submits two affidavits from experts that RFP says "demonstrably" prove the falsity of Defendants' advocacy. Far from doing so, these experts in fact serve only to highlight that the challenged statements are no more than opinion based on disclosed facts.  Further, even if those statements could be proven false, which they cannot, the Greenpeace Defendants could not have acted with actual malice when they published those statements as they had no basis for believing them false when they made them. The Greenpeace

---

[1] Instead, RFP includes a "Statement of Facts," independent from its legal arguments, which just repeats the poorly-pled factual allegations in the Complaint.  *See infra* Section A.

Defendants herewith submit declarations from three respected experts, not to prove RFP's experts wrong since that is not defendants' burden, but to further demonstrate that the statements made by the Greenpeace Defendants were based on sound science (and in fact are the far better interpretation of that science) and to underscore that this is all a matter of scientific debate, precluding a finding of falsity and actual malice, as a matter of law.

RFP is advocating an extraordinary expansion of RICO law, in a case where the facts simply do not fit either the spirit or the letter of that law, and where applying RICO, with its treble damages threat, to this type of activity would chill speech across a wide range of public advocacy. Allowing this threatens to open the floodgates for any plaintiff who disagrees with positions that any advocacy groups might take. Already, since RFP filed its Complaint, two copycat cases have been filed by *pro se* plaintiffs, one against environmental groups including Greenpeace, and one against media companies, targeting advocacy about climate change and news stories about the election, much as both the environmental and media amici feared.[2] *See Goldstein v. Climate Action Network, et al.*, 16-cv-00211 (N.D. Tex. 2016); *Hollander v. CBS News Inc., et al.*, 16-cv-06624 (S.D.N.Y. 2016). Should these types of cases take root, and especially if they are allowed to survive early dispositive motions, the collective burden on advocacy groups and the courts, and the injury to open, public debate, could be extreme. Stopping these types of cases in their tracks before this occurs is precisely the point of the anti-SLAPP laws and the burden, even at the pleading stage, imposed by the First Amendment.

---

[2] An Amici group comprised of nine non-profit organizations that advocate for environmental awareness and protection has expressed deep concern with RFP's suit, which if successful would "permit[] the RICO statute to be used as club to silence legitimate speech and expression," in a manner that "is contrary to long-established protections afforded public-interest advocacy." Amici Br. 4, ECF No. 64 ("Amici depend on the freedom to debate controversial topics, often against powerful business interests, in the public sphere." *Id.* at 6.). *See United States v. Alvarez*, 132 S. Ct. 2537, 2547-48 (2012) (plurality); *id.* at 2552, 2556 (Breyer, J., concurring); *id.* at 2564 (Alito, J., dissenting). Similarly, an Amici group comprised of 12 media organizations have urged: "[p]rotecting Greenpeace's freedom of expression – by rejecting the application of a federal racketeering statute to speech on matters of public concern, by applying the protection of an anti-SLAPP statute, and by protecting statements of opinion - will ensure that speakers, including members of the news media, can exercise their constitutional rights without fear of unjustified reprisals." Reporters Committee For Freedom of the Press Amici Br. 2, ECF No. 63-1

## A.    RFP'S CLAIMS ARE BASED ON SPEECH SUBJECT TO FIRST AMENDMENT SCRUTINY, AND DO NOT STATE A CLAIM FOR DEFAMATION

As the Greenpeace Defendants demonstrated in their opening briefs, RFP's claims all sound in defamation. To avoid the one-year statute of limitations for defamation under Georgia law and avoid the reach of the First Amendment, RFP asks the Court to place form over substance and look only at the incendiary labels RFP gives its claims:  illegal extortion, fraud, tortious interference, conspiracy, racketeering, even money laundering. To do so would impermissibly evade the constitutional analysis necessary to determine whether the challenged speech is protected under the First Amendment in the first instance, which it indisputably is.

As a threshold matter, RFP never expressly concedes that its defamation claim is extraordinarily more limited than claimed in its Complaint, although its silence speaks volumes. The applicable one-year statute of limitations requires dismissal of 218 of the 267 statements at issue, leaving only 49 statements that are not time-barred. Mot. Dismiss 17-18 (citing O.C.G.A. § 9-3-33). Given the astonishing number of statements cited by RFP that were made by non-parties, there are only 26 non-time-barred statements made by named parties. *Id*. at 18-20 (citing GP Defs.' Tables C and D). By not responding to this analysis, RFP concedes Greenpeace's assertion that these are the only statements in suit on RFP's defamation claims, as only one who takes a responsible part in a publication of defamatory material may be held liable for the publication.  *Id*. (*citing Universal Commc'n Sys., Inc. v. Turner Broad. Sys., Inc.*, 168 F. App'x 893 (11th Cir. 2006) (*per curiam*)). Nor has RFP ***anywhere*** addressed these 26 statements in suit to make the necessary showing that the statements are actionable and that RFP is likely to succeed on the merits of its defamation claim. *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016). Instead, RFP reverts to the same summary allegations in the Complaint, which grossly mischaracterize the statements, relying on the quantity, rather than quality, of the allegations. *See*, *e.g.*, Opp. 71 (couching analysis on "totality" of allegations).[3]

---

[3] If the Greenpeace Defendants are correct that RFP's other claims are just reformulated defamation claims based on the same speech, those claims too are barred by the statute of limitations. *See* Mot. Dismiss 16-18. Even if the Court was to evaluate the content of those statements, RFP has not come close to showing that those statements were false

1.        **Courts Must Police Complaints That Can Chill Speech At the Pleading Stage**

Courts must serve as gatekeepers to ensure that protected speech on matters of public controversy – like Greenpeace's here – is not subject to the burdens of litigation and potential liability. While RFP would have the court accept conclusory allegations that the speech at issue here is really fraud and extortion, Opp. 41, the Court's gatekeeper role is not so easily dismissed. "[F]ederal courts have historically given close scrutiny to pleadings in libel actions." *Arthur v. Offitt*, 2010 WL 883745, at *3 (E.D. Va. Mar. 10, 2010), which is essential because "[t]he threat of being put to the defense of a lawsuit … may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, especially to advocates of unpopular causes." [4] *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966). *See also Connick v. Myers*, 461 U.S. 138, 145 (1983); *see also, e.g., Hustler Magazine v. Falwell*, 485 U.S. 46, 50 (1988) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."). In drawing "the line between speech unconditionally guaranteed and speech [that] may legitimately be regulated," courts "examine for [them]selves the statements in issue and the circumstances under which they were made." *Bose Corp. v. Consumers Union of U.S., Inc*. 466 U.S. 485, 508 (1984) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964)). While RFP would prefer that the Court sidestep this important contextual analysis, the Constitution requires a closer look.  If there were any doubt, the anti-SLAPP Act ***requires*** this Court to resolve the issue now, to avoid imposing the burdens of litigation on Greenpeace for exercising its First Amendment rights.

RFP contends that assessing the constitutional protections for Greenpeace's challenged statements "would entirely deprive aggrieved parties, like plaintiffs, of the ability to achieve redress for clear and intentional misconduct," Opp. 43, but this misstates Greenpeace's position,

---

statements of fact, as opposed to non-actionable opinion based on disclosed fact, nor adequately pled, much less shown, that Greenpeace published with knowledge of falsity or serious doubt as to the their truth.

[4] RFP's reliance on commercial fraud cases, like *Illinois, ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 612 (2003), which involved for-profit fundraising corporations, and *U.S. v. Konstantakakos*, 121 F. App'x 902, 905 (2d Cir. 2005), which involved criminal visa fraud, are inapposite.  *See* Opp. 41-42.  Here, there is no credible allegation – nor could there be – that Greenpeace, a non-profit association, is engaged in commercial activity, nor has Greenpeace been criminally charged.

and the law. Greenpeace does not advocate overturning well-established exceptions to First Amendment protection – but it does strongly object to RFP's contention that this Court need not concern itself with whether Greenpeace's statements are protected at all. RFP has a mechanism for redress – a defamation claim that, unlike here, met all the constitutionally imposed requirements.  The fact that Greenpeace's advocacy is sent in a letter to an RFP customer or a donor does not convert protected speech to extortion or tortious interference or fraud.

RFP argues that deliberate falsehoods are not protected under the First Amendment. The Greenpeace Defendants agree. But not every falsehood, even if allegedly deliberate, is fraud. *See Illinois, ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 617 (2003) ("Simply labeling an action one for 'fraud,' of course, will not carry the day."). RFP concedes as much when it acknowledges that "[i]f a plaintiff adequately alleges and proves the elements of these claims, they are by definition outside the scope of the First Amendment."  Opp. 41. The Greenpeace Defendants simply argue on their motions that when properly scrutinized under applicable First Amendment standards, RFP's pleading does not "adequately allege" deliberate false statements of fact or fraud pursuant to the required Constitutional inquiry.[5]

RFP myopically focuses on whether the challenged statements are true, but "[t]ruth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). "That is because 'speech concerning public affairs is more than self-expression; it is the essence of self-government." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Garrison*, 379 U.S. at 74-75). "At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and

---

[5] Again, RFP's reliance on *Madigan* is surprising, as that case underscores why RFP's arguments in its opposition are unavailing. The Supreme Court affirmed that the First Amendment protects the right to engage in charitable solicitation, 538 U.S. at 611, but that where for-profit fundraising telemarketers falsely ***and fraudulently*** misrepresented to donors that a significant amount of each dollar donated would be paid to a non-profit charity, such falsehoods violated applicable state antifraud laws. The speech at issue in *Madigan* is distinguishable because it did not touch on advocacy on an issue of public importance – as is the case here.  And, the Supreme Court found the applicable state statute did not violate First Amendment protections because the complainant must meet a heightened pleading burden, by "clear and convincing evidence" – in line with the "[e]xacting proof requirements of this order, in other contexts," such as those found here, which "have been held to provide sufficient breathing room for protected speech." *Id*. at 620-21.

opinions on matters of public interest and concern." *Hustler Magazine*, 485 U.S. at 50. Greenpeace's political advocacy criticizing RFP's forestry practices lies within the core of First Amendment protection and, to succeed, RFP must demonstrate more than substantial falsity; it must show knowing falsity or high degree of awareness of falsity. *Garrison*, 379 U.S. at 73-74.

### 2.       Statements in Suit Are Protected Scientific and Political Opinions

There is no question that the Greenpeace Defendants and RFP are on different ends of the political and environmental spectrum, and have very different opinions on key public issues. *Compare* Declaration of Lisa Zycherman ("Zycherman Decl."), Ex. A (GP's goal "is to ensure the ability of the earth to nurture life in all its diversity.") *with* Compl. ¶ 24 (describing RFP's timber operations). But if RFP bristles at GP's criticism of its practices, Supreme Court precedent teaches that RFP's remedy lies through counterspeech in the crucible of public debate.[6] "The remedy for speech that is false is speech that is true. This is the ordinary course in a free society. The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth." *United States v. Alvarez*, 132 S. Ct. 2537, 2550 (2012) (plurality opinion). Put simply, "[t]he theory of our Constitution is 'that the best test of truth is the power of the thought to get itself accepted in the competition of the market.'" *Id.* (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)). Accordingly, companies like RFP – who stake out positions on controversial scientific and public policy issues such as sustainable forestry – must and do rebut criticism and compete for public acceptance of their ideas. *See Dilworth v. Dudley*, 75 F.3d 307, 310 (7th Cir. 1996) ("[J]udges are not well equipped to resolve academic controversies … and scholars have their own remedies for unfair criticisms of their work – the publication of a rebuttal."); *accord Lott v. Levitt*, 556 F.3d 564, 570 (7th Cir. 2009).

---

[6] As Amici non-profit organizations that advocate for environmental awareness and protection suggested: "If [RFP] wishes to challenge Greenpeace's statements about [RFP's] (or Greenpeace's) environmental record, it is free to do so. It can publicize its record on planting trees (Compl. ¶ 7), the "numerous awards and recognitions" it says it has received for "responsible and sustainable forestry" (¶ 8), its position on climate-change science (¶ 9), or its support for local communities in the Boreal Forest (¶¶ 12-13), and subject those claims to scrutiny in the court of public opinion, where they belong." Amici Br. 6, ECF No. 64.

### a.    RFP Deliberately Ignores the Advocacy Context

In assessing whether commentary on a matter of public concern is protected, context is crucial because "it is in part the settings of the [words] in question that make their hyperbolic nature apparent, and which helps determine the way in which the intended audience will receive them." *Moldea v. New York Times Co.*, 22 F.3d 310, 314 (D.C. Cir. 1994). Here the context is critical in two respects: ***First***, Greenpeace's publications are well-known for advancing the organization's advocacy mission and opinions, not hard news. ***Second***, the challenged publications were part of a heated public debate, here over RFP's logging practices, where criticism and heated rhetoric are the coin of the realm.[7] As the New York Court of Appeals admonished: "It must not be forgotten that in articulating the boundaries separating fact from opinion courts concern themselves not with a narrow semantic inquiry but with one having a profound constitutional dimension; we determine no less than what may and, to a degree, what may not be freely said." *Immuno A.G. v. Moor-Jankowski*, 145 A.D.2d 114, 123, 537 N.Y.S.2d 129, 134-35, *aff'd sub nom. Immuno AG. v. Moor-Jankowski*, 74 N.Y.2d 548, 549 N.E.2d 129 (1989), *cert. granted, judgment vacated sub nom. Immuno A.G. v. Moor-Jankowski*, 497 U.S. 1021 (1990) (letter to editor from "known animal rights activist" arguing that pharmaceutical company's tests on chimpanzees could spread hepatitis to humans, was protected opinion).

RFP continues to (deliberately) misunderstand the advocacy context and tries to convert all of Greenpeace's statements into supposed absolute statements of scientific fact, Opp. 75, but readers would clearly understand Greenpeace to be an advocacy organization not only from its reputation but also from context – that GP was offering its interpretation and conclusions from sound scientific reports it cites. For example, one publication in suit, "Rite Aid: Still Making the Wrong Choice for Forests," GP Defs.' Mot. Dismiss Suppl. App., ECF 62-52, ("GP Defs.'

---

[7] RFP itself has helped set the tone of the debate, accusing Greenpeace of, *e.g.*, "A Record of Failures and Falsehoods," a "win at all costs approach to attacking companies and opponents around the world [that] has left a trail of fictions, dangerous stunts, stunning mistakes and disillusioned employees," and "attacks founded on ulterior motives, hidden deals" (*see* http://www.Resolutevgreenpeace.com/blog/), and even "thuggery" (*see* http://blog.resolutefp.com/2016/02/we_are_resolute/#more-5907). *See also* Mot. Dismiss 2-3, 7 n.4; Mot. Strike 16 n.15.  Allowing RFP to sue critics for using such rhetoric would "license one side of [the] debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." *R.A.V. v. St. Paul*, 505 U.S. 377, 392 (1992).

Suppl. App.") Tab 1, is self-evidently an advocacy piece with rhetorical slogan stating: "HURTING *NOT HELPING* FORESTS," and "RITE AID WRONG CHOICE: Destroying forests, one flyer at a time." The publication opines that Rite Aid's weekly advertising flyers should not be sourced from paper generated by RFP because the logging company engages in several unsustainable forestry practices. The challenged statements in the publication, *e.g.*, that "RFP Forest Products, currently one of [Rite Aid's] suppliers, is destroying endangered forests," is supported by the disclosed facts that RFP's decision to log in "some of the last ancient forests in Canada still undisturbed by industrial development," has resulted in "threaten[ing] wildlife like the woodland caribou and puts one of Earth's largest carbon sinks at risk." *Id*. Greenpeace contrasts these practices with those of other large companies such as Kimberly-Clark, Procter & Gamble, and Hewlett-Packard, and hyperlinks to sources supporting the assertion that "the best science" recognizes the validity of Greenpeace's position. *Id*. The piece, although based on credible science, also resounds as advocacy on environmental public policy, concluding with a call to action to "Tell Rite Aid's CEO to do the 'rite' thing for forests," with a hyperlink for the reader to engage in their own speech on the issue. *See also* GP Defs.' Suppl. App. Tab 2 ("US Pharmacy Giant Rite Aid Is Destroying Canada's Boreal Forest"). What is the "best," like what is the "worst," are classic opinion. *See Seaton v. TripAdvisor LLC*, 728 F.3d 592, 598-601 (6th Cir. 2013) (term "dirtiest hotel" was opinion).

In addition to statements made to the general public, RFP also complains of statements made by the Greenpeace Defendants to RFP's customers, but the context and content of these statements made clear that these communications were also advocacy. As an example, RFP challenges an email Defendant Moas wrote to educational publisher McGraw Hill raising the company's use of paper sourced from RFP in light of McGraw Hill's stated commitment to sustainability. GP Defs.' Suppl. App. Tab 8. After describing the importance of the Canadian boreal forest, Moas asks McGraw Hill to review an attached briefing on the "Montagnes Blanches Endangered Forest," and summarizes in her email some portions of that report. Moas also notes RFP's loss of two FSC certificates in the area as well as its unwillingness to be

involved in a mediation process proposed by FSC and the resultant potential expulsion of RFP from FSC membership (and citing a third-party news article on point). *Id.* Moas concludes her email by asking McGraw Hill to "investigate your supply chains for links to Resolute Forest Products and then determine and communicate your sustainability expectations," and if McGraw Hill did not want to be associated with RFP, to identify alternative suppliers. *Id.* The attached *Endangered Forest in the Balance* report itself is extensively documented with references to sources, but it too discloses Greenpeace's perceived role as an advocate, with calls to action such as sections entitled "Solutions are within reach for Resolute" (with accompanying bullet points showing suggested steps RFP could take) and "Customer action vital for forest solutions and business certainty" (with a similar list of suggested steps for customers.) *Id.* These statements leave no doubt that Greenpeace was not presenting itself as the only word on any scientific issue, but rather was pressing its well-known mission of environmental advocacy based on science – the kind of speech at the core of First Amendment protection.

> **b.** **The First Amendment Protects the Greenpeace Defendants' Opinions**

RFP contends that Greenpeace cannot avail itself of the opinion defense because it does not disclose the facts upon which it bases its opinion, Opp. 75, but that is patently inaccurate. For example, with respect to the publication "RFP Forest Products: Key risks and concerns for investors," GP Defs.' Suppl. App. Tab 7, RFP challenges Greenpeace's commentary that RFP "had an unprecedented four of its FSC certificates … suspended or terminated … for major noncompliance with FSC criteria." Compl. 54 n.5. The statement details what noncompliance was at issue: "overharvesting, inadequate protection for woodland caribou habitat and old-growth and high conservation value forests, and failure to uphold [FSC] Principle 3: Indigenous People's Rights." *Id.* And the publication is extensively annotated with footnotes to source documents, including scientific publications and hyperlinks to FSC documents detailing the status of RFP's certificates. *Id.* Although RFP's declarant Frederick Cubbage "examine[s] the reasons for the suspension" of RFP's certificates, he does not deny that suspensions occurred, he

only disputes the conclusions that can be drawn from them.  Opp. ¶ 7. As discussed below, that is *his* opinion; Greenpeace's opinion (and its experts') based on these facts differed.

Because environmental science, like so many scientific pursuits, is "at best an inexact science in which numerous and widely varied approaches and philosophies exist" and about which "there can be much debate and disagreement," *Spelson v. CBS, Inc.*, 581 F. Supp. 1195 1202-03 (N.D. Ill. 1984), *aff'd*, 757 F.2d 1291 (7th Cir. 1985), speech espousing opinions on matters of environmental science, "[r]egardless of the merit of [those] opinion[s]," is protected.

For example, a federal court in Virginia dismissed a defamation action concerning the highly-charged scientific debate regarding mandatory vaccinations for children. An infectious disease specialist and vaccine proponent was quoted in an article in *Wired* magazine challenging the theories of the plaintiff, a prominent vaccine skeptic, saying they make him "'just want to scream'" because "'[s]he lies.'" *Arthur v. Offit*, 2010 WL 883745, at *3 (E.D. Va. Mar. 10, 2010) (granting motion to dismiss). The plaintiff sued the scientist and the magazine for defamation, but the court found that the challenged statement – plaintiff "lies" – could not be reasonably understood in that context to suggest that the plaintiff is "'a person lacking honesty and integrity.'" *Id*. at *5. Instead, the court found that the statement was part of "an emotional and highly charged debate about an important public issue over which" the parties had "diametrically opposed views" and that the word choice was "precisely the kind of 'loose, figurative' language that tends to 'negate any impression that the speaker is asserting actual facts.'" *Id*. (citations omitted). The comments of the scientist – notwithstanding his recognized expertise – were self-evidently ground in his personal viewpoint and were "the very sort that, in the context of a heated and very public scientific debate, would 'fall on [listeners'] ears like repetitive drumbeats.'" *Id*. In sum, the court concluded that the statement that the plaintiff "lies" about vaccine science was "illustrative of the rough-and-tumble nature" of the scientific controversy at issue and "simply not actionable" in the context of "the intense nature of the debate" over that question.  *Id*.

The experts proffered on the instant motions further demonstrate that Greenpeace's statements are on issues of public importance, and on matters on which both experts and the public can have different opinions. A statement is not actionable when it is "not the character but the ideas" of the plaintiff that are at stake. *Dilworth*, 75 F.3d at 310. Accordingly, courts have uniformly recognized that statements calling into question the scientific judgment or conclusions of another are protected, nonactionable opinion – a threshold decision typically made on a motion to dismiss. *See Underwager v. Channel 9 Australia*, 69 F.3d 361, 367 (9th Cir. 1995) (statement that expert on unreliability of children's testimony about sexual abuse was "[l]ying" was non-verifiable opinion "[b]ecause how one proves child abuse is a highly controversial subject" and "the audience … would be likely to recognize that the statements did not represent provable assertions").[8]

Specifically, RFP's two opposition expert declarations[9] demonstrate that Greenpeace's statements constitute nonactionable opinions about the underlying studies, reports, and facts.[10] For example, declarant Cubbage undertakes a review of the FSC's suspensions of RFP's certifications and concludes: "Resolute's 2013 FSC audits indicate possible bias. Audits of

---

[8] *See also, e.g., Dilworth*, 75 F.3d at 310 (affirming Rule 12(b)(6) dismissal and calling widely published professor "a crank [was] basically just a colorful and insulting way of expressing disagreement with his master idea," and resolving such "academic controversies" was not the role of defamation law); *Sinclair v. TubeSock TedD*, 596 F. Supp. 2d 128, 133 (D.D.C. 2009) (granting motion to quash discovery subpoenas and dismissing suit on finding not actionable to claim a plaintiff was "spreading lies," because the claim was "less an attack on [plaintiff's] general character and instead a dispute with the accuracy of a specific statement made by him."); *Klein v. Victor*, 903 F. Supp. 1327, 1335 (E.D. Mo. 1995) (granting motion to dismiss where statements about child abuse therapist, claiming she supplied "pseudo-scientific propaganda materials" and was motivated by desire to seek economic profit, were rhetorical expressions of author's viewpoint and unverifiable); *Yiamouyiannis v. Thompson*, 764 S.W.2d 338, 340 (Tex. App. 1988) (statements in context of debate over fluoridation of drinking water that biochemist was a "quack," "hoke artist," and "imported fearmonger" protected as "vintage hyperbole" and "shorthand way of opining that [the opponent] was not worthy of belief, his views are confused nonsense, and he is not qualified to instruct the public about fluoridation").

[9] These expert statements do not address every statement that RFP alleges to be false. Neither affidavit squarely addresses challenged statements concerning whether Resolute is engaged in logging activities in the First Nations Communities' territories without their consent. *See* Compl. ¶¶ 115-124, 280(b), n.4, App. D.

[10] RFP claims that Greenpeace only disclosed "selective" facts, Opp. 77, but never explains which statements it means and which facts were not disclosed, or how their omission render the statements substantially false. Selection of what to include or exclude is a classic editorial judgment over which courts refrain from substituting their own judgment for that of the author's. *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1243 (11th Cir. 1999) ("The decision to air the interview of one person but not another is at heart an editorial decision."); *Rinaldi v. Holt, Rinehart & Winston*, 42 N.Y.2d 369, 383-85 (1977).

similar forests in similar situations should have similar outcomes. That did not appear to be the case for Resolute. An applicant in full compliance with relevant laws should be certified under any standard." Cubbage Decl. ¶ 49, ECF No. 76.  In contrast, in a declaration submitted by the Greenpeace Defendants, after reviewing in detail the FSC certification process, Keith Moore explains that it is "incorrect to state . . . that a company that meets regulatory regimes therefore should be certified," because:

> The FSC certification system establishes a higher standard and a broader suite of requirements and FSC certification is indicative of better stewardship that is more socially and environmentally responsible, more consultative, more respectful of Indigenous Peoples rights, and more protective of endangered wildlife and high conservation values than is compliance with provincial legislation.

Declaration of Keith Moore ("Moore Decl")¶ 43.[11]

As another example, RFP's declarant Reich states, based on data from an underlying study, that while logging in a portion of Quebec "has resulted in fewer forests older than 100 years and an increase in young forests," this does not alter the age structure of the forest because "the range of stand ages remains the same," and thus that it is incorrect to say the forest has been "destroyed." Reich Decl. ¶ 17.  Expert Jay Malcolm, however, states that

> destruction can mean many different things.  If the fundamental nature of the forest is degraded during the course of management – for example by the loss of wildlife species or ecological processes – then we can also reasonably say that it has been destroyed.  After all, a forest consists of more than its trees.

Declaration of Jay Malcolm ("Malcolm Decl.") ¶ 6.  He then examines the same data cited by Reich and concludes that "from a wildlife perspective, the range of forest ages is not the problem.  Plant and animal species need areas of habitat to inhabit in order to maintain viable populations: it is the amount of a particular type of habitat, rather than its mere presence, that is critical here. . . . The net effect will be progressive endangerment of oldgrowth-loving species." Malcolm Decl. ¶ 9.

---

[11] Also, Cubbage acknowledges that the concept of "sustainability" is "problematic" and subject to differing opinions – even on the question of whether FSC certification can equate with sustainability or whether certification can only indicate "that an applicant meets that organization's specific standards and metrics measuring compliance." Cubbage Decl. ¶ 43.

The expert declarations' opinions thus underscore why the challenged statements that, *e.g.*, "logging in some of the last ancient forests in Canada ...threatens wildlife like the woodland caribou," Appendix C 4, "logging is ... jeopardizing one of Earth's largest carbon sinks," Compl. 42 n.2, and that RFP engages in "unsustainable forestry operations" based the FSC violations, are broad expressions of ideas and interpretations, based on disclosed science, that cannot be subject to defamation liability, much less proof of deliberate falsehoods. *See Michel*, 816 F.3d at 695 ("The immunity granted to opinions reflects, in part, the First Amendment principle that there can be no false ideas," distinguishing as factual whether plaintiff "bailed" on a concert sponsored by "his" Foundation); *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 718 (11th Cir. 1985).

### c.     The First Amendment Protects Vigorous Criticism and Advocacy

As is readily apparent from the face of the statements at issue and the context in which they were published, defendants were expressing constitutionally protected opinions about RFP's forestry practices and its impact on native populations, endangered wildlife habitat and climate change. *See* GP Defs.' Suppl. App. The opinions expressed were no doubt harsh, and one may not agree with them, but they remain protected speech. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (First Amendment protects expression and challenges to prevailing orthodoxy of the day even in language that is "vehement, caustic and ... unpleasantly sharp."); *see also, e.g., Snyder v. Phelps*, 562 U.S. 443 (2011).

### (1)     Courts Are Ill-Suited To Officiate Scientific Debate

First Amendment protection is particularly warranted where the discussion involves complex scientific issues that are properly left to scientists and concerned citizens to test, debate, and resolve, rather than a court in the context of a defamation action. *Competitive Enter. Inst. v. Mann*, 2016 WL 7404870 (D.C. Dec. 22, 2016) ("The proper place for the discussion is the scientific community and the public sphere of policy prescriptions."). Scientific and environmental policy issues must be resolved through free and open debate, not litigation. Courts

thus use special care to discern whether a statement is "provably false" in the scientific context. *Immuno AG. v. Moor-Jankowski*, 567 N.E.2d at 1276, 1280.

Scientific claims "are, in principle, 'capable of verification or refutation by means of objective proof,'" as "it is the very premise of the scientific enterprise that it engages with empirically verifiable facts about the universe." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 496 (2d Cir. 2013) (quoting *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 728 n.7 (1st Cir. 1992)). But "propositions of empirical 'fact'" themselves "may be highly controversial and subject to rigorous debate," and "courts are ill-equipped to undertake to referee such controversies." *Id.* at 497. As the Seventh Circuit explained, even though "scientific truth" is theoretically verifiable, it is nevertheless "elusive." *Underwager v. Salter*, 22 F.3d 730, 735-36 (7th Cir. 1994). "[S]cientific controversies must be settled by the methods of science rather than by the methods of litigation." *Id.* at 736. "More papers, more discussion, better data, and more satisfactory models – not larger awards of damages – mark the path toward superior understanding of the world around us."[12] *Id.*

A legion of courts have refused to call winners or losers in the midst of ongoing scientific or environmental policy debate, preferring instead to allow competition in the marketplace of ideas rather than risk stifling progress.[13] In *Reuber v. Food Chemical News, Inc.*, for example, the Fourth Circuit highlighted this risk when rejecting a claim against an industry publication over its reporting about a scientist's qualifications and research. 925 F.2d 703 (4th Cir. 1991)

---

[12] Having a court or a jury sit as the arbiter of scientific truth is not only contrary to settled First Amendment law, but also stunts the ongoing evolution of scientific exploration. *See, e.g., Ezrailson v. Rohrich*, 65 S.W.3d 373, 382 (Tex. App. 2001) ("Scientists continuously call into question and test hypotheses and theories; this questioning advances knowledge" and scientific conclusions are "'subject to perpetual revision…. The scientific project is advanced by broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance.'") (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).

[13] *E.g., Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 326 (S.D.N.Y. 2006) (granting motion for dismissal on the pleadings) ("Courts cannot inquire into the validity of scientific works, for any unnecessary intervention by the courts in the complex debate and interplay among the scientists that comprises modern science can only distort and confuse.") (citation omitted). In short, "putting to the pre-existing prejudices of a jury the determination of what is 'true' [in the realm of scientific debate] may effectively institute a system of censorship. Any nation which counts the Scopes trial as part of its heritage cannot so readily expose ideas to sanctions on a jury finding of falsity." *Time, Inc. v. Hill*, 385 U.S. 374, 406 (1967) (Harlan, J., concurring in part and dissenting in part).

(dispute between scientist and industry publication regarding the carcinogenic properties of pesticides). Recognizing that "[i]n the hurly burly of political and scientific debate, some false (or arguably false) allegations fly," *id.* at 717, the *Reuber* court stressed deference to scientific processes and academic debate: "We reject the attempt to silence one's adversaries in a public controversy by suing organizations attempting to inform the public about questions raised as to the research of every putative defamation plaintiff." *Id.* at 718. *See also Arthur v. Offit*, 2010 WL 883745, at *6 (granting motion to dismiss and explaining because of the "prospect of litigation over unresolved – and perhaps unresolvable – scientific arguments…. Courts have a justifiable reticence about venturing into the thicket of scientific debate, especially in the defamation context."); *United States ex rel. Haight v. Catholic Healthcare W.*, 2007 WL 2330790, *3 (D. Ariz. 2007) ("[E]xpressions of scientific opinion or judgment about which reasonable minds may differ cannot be false."); *Oxycal Labs., Inc. v. Jeffers*, 909 F. Supp. 719, 724 (S.D. Cal. 1995) (denying motion for preliminary injunction and holding that "[t]he Court cannot [inquire] into the validity of … scientific theories, nor should it.") (dispute over scientist's claim that vitamin contained cancer-causing agent).

The recent case of *Competitive Enterprise Institute v. Mann*, in the District of Columbia Court of Appeals, highlights the difference between non-actionable statements in the scientific context that express "a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts," 2016 WL 7404870, at *17, and statements actionable as libelous. Consistent with the legal precedent set forth above, the court framed the broader political context for allegedly defamatory articles about a professor at Penn State who was a key figure in the debate over global warming. *Id.* at *18. Of the three articles that the plaintiff challenged, the court found that one of those, an editorial in *National Review*, was not defamatory but rather constituted protected opinion, despite the fact that the article mocked and "belittl[ed]" the plaintiff. *Id.* at *24.

The court found, however, that claims based on two other articles could survive the anti-SLAPP motion because the plaintiff proffered sufficient evidence for a reasonable jury to find,

by clear and convincing evidence, that defendants acted with actual malice in publishing highly personal attacks accusing him of engaging in specific acts of scientific misconduct. These attacks included comparing "Dr. Mann's 'molest[ing] and tortur[ing] data in the service of politicized science' to [Jerry] Sandusky's 'molesting children'" at Penn State. *Id.* at *34. The court rejected the notion that these articles, as opposed to the editorial, were directed to the science of the larger global warming debate including Dr. Mann's "hockey stick graph," as they did not address the plaintiff's scientific methodology, but rather were "pointed accusations of personal wrongdoing," based on mysteriously obtained emails referring to the "trick" in reporting data. *Id.* at *19. Moreover, defendants' alleged honest belief in truth of their statements was not dispositive on actual malice, as multiple investigations, conducted by separate investigatory bodies, all found no evidence of misconduct or wrongdoing on part of professor.  *Id.* at *21.

As discussed in more detail below, the statements in suit, while critical of RFP's practices, are not the types of personal attacks described by the court in *Mann*.  They were made by an environmental advocate whom all recipients of the publications would understand to be expressing criticism about a global timber products company. They were made in the service of a larger political debate. They were based on scientific studies, typically disclosed to the reader. To take just the first three statements listed in Appendix A to the Complaint and attributed to a named defendant (Amy Moas) within the limitations period:

- "Resolute Forest Products, a logging company at the heart of the controversy related to forest destruction in the Endangered Forests of Quebec and Ontario." (Email)

- "Resolute's controversial logging [ ] threatens endangered species and old growth forests. . . ." (Email)

- "Publisher @axelspringer_EN ditches unsustainable @resolutefp paper. Wants Canadian paper but less enviro controversy." (Tweet)

These statements, on their face, while calling out RFP specifically, all cite to public controversy over destruction of forest tracts and sustainability. These are precisely the types of speech that the *Mann* court and every court before it would deem protected under the First Amendment.

17

### (2)  GP's Language Confirms Their Statements Are Protected Commentary On Matters of Public Controversy

Speakers who engage in protected expression on matters of public controversy – like Greenpeace here – often use forceful language to make their point.  They do not hew to strict literalisms or scientific precision, but regularly use words "in a loose, figurative sense" to express "strong disagreement," *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin*, 418 U.S. 264, 284 (1974), and attack their intellectual opponents through "rhetorical hyperbole" or "vigorous epithet[s]." *Id*. at 285.[14]

The Supreme Court has made clear that the First Amendment provides broad leeway for such speech on matters of public controversy. In *Greenbelt Co-Op Publishing v. Bresler*, for example, a real estate developer brought a defamation suit based on his critics' statement that he had resorted to "blackmail" in his business negotiations. 398 U.S. 6, 7 (1970). On that theory, the lower court had allowed the case to go to trial because the statement "could be found by the jury (as it was) to charge [the plaintiff] with the commission of a crime." 253 Md. 324, 351-52 (1969). The Supreme Court reversed, emphasizing the need to provide broad protection for speech in a public debate on "a subject of substantial concern to all who lived in the community."  398 U.S. at 13. As the Court noted, the statement had been made in a public debate that was "heated, as debates about controversial issues usually are," and the term "blackmail" had been used as a colorful way of "characterize[ing] the position [plaintiff] had taken in his negotiations." *Id*.  For that reason, "the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [plaintiff's] negotiating position extremely unreasonable." *Id*. at 14. "To permit the infliction of financial liability" for such a statement "would subvert the most fundamental meaning of a free press, protected by the First and Fourteenth Amendments." *Id*.; *Horsely v. Feldt*, 304 F.3d 1125, 1131-32 (11th Cir. 2002); *see* Mot. Dismiss 23-24.

---

[14] *See also New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 278 (1964) (without strong protection for "vehement, caustic, and sometimes unpleasantly sharp" criticism in public debate, threat of litigation would cast "pall of fear and timidity … upon those who would give voice to public criticism."); *Underwager v. Channel 9 Australia*, 69 F.3d at 367 ("audience to a discussion" on "highly controversial subject" "expect emphatic language on both sides."); *Partington v. Bugliosi*, 56 F.3d 1147, 1154 (9th Cir. 1995).

RFP and its expert Reich argue that the use of the words such as "destroyer" and "destruction" by Greenpeace must be read literally to mean the elimination of all of the trees in the entire Canadian Boreal forest.  Opp. 13-14; Reich Decl. ¶¶ 5, 10-12.  Reich goes so far as to note that the "only places in which vast swathes of forest have been *destroyed* are places where the landscape has literally been turned into cities (*e.g.*, Atlanta,) or converted to row-crop agriculture or pastures (*e.g.*, Ohio corn fields)."  Reich Decl. ¶ 12. This argument only proves the point that no reasonable reader would *ever* interpret a statement such as "forest destroyer" to mean literally the permanent removal of all trees from a forest landscape.  In the context of Greenpeace's environmental advocacy on a controversial issue, use of a "vigorous epithet" such as this one is not only permitted, but protected.  Finally, experts Kneeshaw and Malcolm both point out that the boreal forest is indeed being harmed in numerous serious ways, demonstrating that use of the words "destroyer" and "destruction" are more than fair game as rhetorical devices to advance Greenpeace's environmental advocacy. Kneeshaw Decl. ¶¶ 36, 56; Malcolm Decl. ¶ 4.

### 3.   RFP Fails to Plead Sufficient Facts To Overcome The Actual Malice Standard

#### a.   RFP is a Public Figure

On actual malice, RFP does not seriously argue that it is not a public figure or that defendants' statements are not on matters of public concern.  Opp. 69 n.31.  Instead, RFP oddly argues in a footnote that it is not a public figure based on controversy – but that is not Greenpeace's primary argument and RFP does not address Greenpeace's assertion that a ***public company*** like RFP "may recover for injury to reputation only on clear and convincing proof of 'actual malice.'" *New York Times Co. v. Sullivan*, 376 U.S. at 279-80.  In any event, RFP clearly has often weighed in on a matter of utmost controversy – environmental protection, including climate change.  *See supra* n.8 (citing RFP website)**.**

### b.      RFP Cannot Meet Its High Burden on Actual Malice

Even more notably, RFP never adequately addresses the high burden it must meet on actual malice. In the wake of *Iqbal* and *Twombly*, a plaintiff cannot state a claim simply by making conclusory assertions of the elements of actual malice, which is all RFP does. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007). For this reason, federal courts routinely dismiss defamation cases for failure to state a claim where a plaintiff fails to plead specific facts to make an inference of actual malice plausible. *Michel*, 816 F.3d at 702 (rejecting defamation plaintiff's claim that suits involving public figures should not be dismissed without discovery because "after *Iqbal* and *Twombly*, every circuit that has considered the matter has applied the *Iqbal/Twombly* standard and held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice") (collecting cases).

A plaintiff has the burden of pleading and ultimately proving by clear and convincing evidence specific facts demonstrating that the defendant made each statement with a "high degree of awareness of their probable falsity." *Garrison v. Louisiana*, 379 U.S. at 74. Rather than addressing each of the alleged defamatory statements in suit, RFP erroneously asks the Court to conclude that the "totality" of its allegations are sufficient to plead actual malice, hiding behind the volume of general allegations that the defendants engaged in an "illegal racketeering enterprise" and that in furtherance of that activity they "disseminated materially false information," blithely calling them "lies" without even discussion of the language in suit. Opp. 67, 71. In other words, RFP attempts to avoid the high burden of pleading actual malice by subsuming their defamation claim in their RICO claim.

### c.      GP's Reliance on Reputable Publications Precludes RFP from Plausibly Pleading Actual Malice

And, critically, RFP ignores the fact that in publishing the challenged statements Greenpeace relied on published articles, statements in official court records, scientific reports, and government reports. Mot. Dismiss 28. Greenpeace's reliance on previously published

material from reputable publications precludes RFP from plausibly pleading actual malice, as a matter of law.  *See, e.g., Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988); *Klayman v. City Pages*, 2015 WL 1546173, at *16-17 (M.D. Fla. Apr. 3, 2015) (plaintiff could not prove actual malice when newspapers and authors relied on judicial opinions and public filings in Florida Bar disciplinary proceedings), *aff'd*, 2016 WL 3033141, at *5 (11th Cir. May 27, 2016) ("Evidence that an article contains information that readers can use to verify its content tends to undermine claims of actual malice."), *Tobinick v. Novella*, 108 F. Supp. 3d 1299, 1310 (S.D. Fla. 2015), *appeal pending*, Case No. 15-14889 (11th Cir.) (reliance on prior publication no actual malice). Here, the challenged publications expressly cite the criticisms lodged in government reports, comprehensive audits conducted on RFP's logging practices, critiques by First Nation Communities, and scientific analyses published in reputable sources, which all contain the facts RFP now challenges.  *See* Mot. Dismiss 22 & n.29.

### d.    RFP's Expert Declarations Confirm the Statements In Suit Were Not Made With Actual Malice

The differing opinions expressed by RFP's experts and Greenpeace's experts also demonstrate that the complained-of statements could not have been made with actual malice. Reich's declaration illustrates this point. After reviewing Greenpeace's statements regarding woodland caribou habitat disturbance, Reich concedes that Greenpeace's reliance on "disturbance levels" are "a rough but useful guide to potential management impacts," and that "a consensus among Canadian scientists is that the greater the landscape coverage of recent landscape disturbance, the poorer the success of caribou recruitment." Reich Decl. ¶ 43. Reich underscores that prevailing scientific research on the needs of caribou herds lacks certitude: "The most current assumption (yet still uncertain) suggests that caribou herds are self-sustaining when the percent of land disturbed is 35% or less…." *Id.* ¶ 44.  And Reich observes that "[d]ifferences in delineation of 'populations' and of risk levels for a given level of disturbance among researchers exist because data in general are sparse, so definitive knowledge is lacking." *Id.* Likewise, Cubbage concedes that "[a]s a preliminary observation, measuring and achieving

sustainability [in forestry] is far from an exact science," noting that the notion of "[s]ustainability invokes competing values, uncertain ecological and social science, and crucial differences in the scale and measurement of sustainability."  Cubbage Decl. ¶ 14.

RFP's expert declarations thus only confirm that the subject matter of the challenged statements, and the sources on which they are based, are open to differing interpretations and opinion. This precludes a finding that the Greenpeace Defendants made the challenged statements with knowledge of falsity or serious doubts as to truth.  *Meisler v. Gannett Co.*, 12 F.3d 1026, 1030 (11th Cir. 1994).  Where even the experts retained by RFP concede lack of certainty, RFP cannot, and has not, plausibly pled that Greenpeace made the challenged statements with the requisite "high degree of awareness of their probable falsity." 379 U.S. at 74. Thus, RFP cannot, as a matter of law, "plausibly plead actual malice in accordance with the requirements set forth in *Iqbal* and *Twombly*."  *Michel*, 816 F.3d at 702.

**B.   RFP'S CLAIMS MUST BE STRICKEN UNDER THE ANTI-SLAPP STATUTE**

**1.     RFP Has Not Met Its Burden to Show a Probability of Prevailing**

The Greenpeace Defendants have brought two motions to address the deeply flawed underpinnings of RFP's claims. The first, a traditional motion to dismiss, tests the legal sufficiency of those claims on their face.  The second, a motion to strike under the Georgia anti-SLAPP statute, requires the Greenpeace Defendants to make a *prima facie* showing that RFP's claims arise from an act in furtherance of the Greenpeace Defendants' rights of petition or free speech. After that showing is made, the burden shifts back to RFP to demonstrate a probability that it will prevail on its claims. *See* Mot. Strike 10; *Competitive Enter. Inst. v. Mann*, 2016 WL 7404870, at *15 ("The Anti-SLAPP Act gives the defendant the option to up the ante early in the litigation, by filing a special motion to dismiss that will require the plaintiff to put his evidentiary

22

cards on the table and makes the plaintiff liable for the defendant's costs and fees if the motion succeeds.")[15]

The Greenpeace Defendants have readily shown that all of RFP's claims are directed towards protected speech. Thus, RFP must meet its burden of showing a probability of success through supporting affidavits. Here, rather than putting its cards on the table – for instance, providing more details concerning the various vaguely-pled alleged acts by the Greenpeace Defendants that RFP claims caused it harm – RFP presents two expert declarations that purport to show the "falsity" of the content of defendants' advocacy.

As noted in the previous section, these expert opinions instead highlight that statements by the Greenpeace Defendants about RFP's environmental record cannot be proven false, and represent instead a difference in opinion and interpretation of many of the same facts. In connection with their motion to strike pursuant to the anti-SLAPP statute only, the Greenpeace Defendants also submit three declarations from experts Jay Malcolm, Daniel Kneeshaw, and Keith Moore addressing some of the key issues in Greenpeace's advocacy about RFP, including RFP's degradation of forests, and the relationship between that degradation and other environmental impacts including climate change and declines in caribou populations, and the significance of the termination of its certifications. These declarations highlight the significant differences of opinion that even experts may have over the same or similar underlying factual materials, thus showing that RFP cannot sustain its burden of making a prima facie case of either substantial falsity or actual malice. *See Tobinick*, 108 F. Supp. 3d at 1306-07 (granting motion to strike under California anti-SLAPP Act defamation claim notwithstanding allegation that that, for his statements characterizing plaintiff's medical practice as "health fraud," defendant had relied on "weak" scientific evidence for statements that were "leaps and bounds ahead of the evidence").

---

[15] In *Mann*, the court held that the standard on an anti-SLAPP motion under the D.C. statute, which is similar to the Georgia statute, is "substantively the same as the standard on a Federal Rule 56 motion for summary judgment: whether the evidence suffices to permit a jury to find for the plaintiff."  *Id*. at n.32.

Just by example, RFP's expert Reich – who does not purport to be an expert on woodland caribou – first **concedes** that "[f]actors leading to high risk for caribou populations have occurred in certain parts of Canada" and include "timber harvest operations," but attempts to distinguish the areas where RFP operates from the areas where caribou are at risk, concluding that Greenpeace's public statements about threats to caribou from RFP's logging operations are "gross exaggerations." Reich Decl. ¶¶ 41-47. However, to expert Daniel Kneeshaw, who carefully surveys the available literature in his declaration and sets forth at length the various disturbances caused by logging and their impact on woodland caribou, such a conclusion "is either disingenuous, uninformed or intentionally manipulative":

> Without the habitat in the commercial forest, the woodland caribou in Quebec would be reduced by more than half. Given that this species is already at risk, focusing only on forest land north of the commercial limit, as suggested by Reich, is not a viable option to maintaining woodland caribou. In a reduced zone with less than half of current numbers, both demographic variability and environmental variability (hard winters, etc.) could lead to extirpation of the species.

Declaration of Daniel Kneeshaw ("Kneeshaw Decl.") ¶ 48.  These very different conclusions from respected experts on a key issue in the public debate over RFP's forestry practices, based on many of same underlying facts,[16] highlight RFP's failure to demonstrate that it can prevail on its claims in the face of the Greenpeace Defendants' motion to strike.

### 2.    The Anti-SLAPP Statute Applies to RFP's Claims

RFP devotes much attention in its Opposition to creating a straw man argument that the Georgia anti-SLAPP statute does not apply to federal claims.   Opp. 28. The Greenpeace Defendants do not, however, contend that the statute applies to federal claims, but rather that that statute (a) applies in federal court to state claims; and (b) applies to purported federal claims that are in reality just disguised state defamation claims.  Mot. Strike 7-10.  Clear case precedent in the anti-SLAPP context holds that a plaintiff cannot simply affix a conclusory label such as

---

[16] Of note is that RFP's declarant Reich in fact failed to consider crucial information in one of the reports he relies upon: That three times the land area north of the commercial logging limit is required to support less than half of the caribou population.  Kneeshaw Decl. ¶ 47. Indeed, Reich's opinions are, to a large extent, "[b]ased on information provided by Resolute," but then fails to provide such information.  Reich Decl. ¶¶ 5, 6, 12, 18, and 42.

RICO on defamation claims and shield its claims from the required scrutiny – at this early stage in the proceedings, the Court here must carefully determine whether or not the RICO label applies or whether the challenged conduct is protected speech.

> The anti-SLAPP procedures are designed to shield a defendant's constitutionally protected *conduct* from the undue burden of frivolous litigation.  It follows, then, that courts may rule on plaintiffs' specific claims of protected activity, rather than reward artful pleading by ignoring such claims if they are mixed with assertions of unprotected activity.

*Baral v. Schnitt*, 205 Cal. Rptr. 3d 475, 488 (2016).

RFP cites *Bulletin Displays, LLC v. Regency Outdoor Advertising, Inc.*, 448 F. Supp. 2d 1172, 1181 (C.D. Cal. 2006), in the RICO context, as well as other cases addressing other federal claims, for the proposition that "application of a state anti-SLAPP statute to federal statutory claims would violate the Supremacy Clause . . . ." Opp. 28. However, in *Bulletin* the court in fact followed California's two-step process for examining potential anti-SLAPP claims:  first determining whether the movant has made a prima facie showing that the plaintiff's claims arise from speech or petition, and second considering "the pleadings, and supporting and opposing affidavits stating the facts [on] which the liability or defense is based." 448 F. Supp. 2d at 1179. In addressing the first step as to the RICO and Clayton Act claims, the court held that while the anti-SLAPP statute applies to state law claims in federal court, it would not apply the statute to plaintiff's federal claims.  However, in that case, unlike here, it had no cause to consider whether the federal claims were merely disguised state law claims, as defendant made no such allegation; indeed, plaintiff did not even make a defamation claim in that case. The court further refused to apply the statute to the plaintiff's state law claims as well, because the statements at issue concerned business dealings, not an issue of public interest or under review by a public body, and the alleged "campaign contributions" were actually corrupt payments in exchange for city contracts.  *Id.* at 1183-87. *Bulletin* is fully consistent with the need for courts to carefully review alleged federal claims as a threshold to determine whether they are "artful pleading" as the Baral

Court says – simply vehicles for avoiding dismissal under the anti-SLAPP statute and for avoiding application of the one-year defamation statute of limitations.

### 3.      The Anti-SLAPP Statute Applies Retroactively, in Federal Court

RFP then spends several additional pages setting up another straw man argument and tearing it down: That the previous version of the anti-SLAPP statute does not apply to its claims. The Greenpeace Defendants do not seek application of that prior version of the statute to RFP's claim, as their opening memorandum in support of their motion to strike made clear.  Mot. Strike 5-10.   Rather, the Greenpeace Defendants assert that the ***current*** version of the statute, as amended on July 1, 2016, applies in connection with their motion to strike because (a) the instant motion was filed after the effective date of that amendment; and (b) the statute does not impose new liabilities based on past conduct or alter substantive rights of the parties.  Mot. Strike 7-10.

In response, RFP argues that "[u]nder Georgia law, statutes affecting the rights, duties, and obligations of the parties do not apply retroactively to actions commenced prior to the statute's effective date absent clear legislative intent."  Opp. 34 (citations omitted).  RFP then goes on to suggest that because "the Amended Statute is silent as to whether the statute applies retroactively" the court should find "that the statute lacks the clear legislative directive to mandate retroactive application."  *Id.*

Unfortunately for RFP, it is just not true that the legislature had no view on retroactive application of the anti-SLAPP statute. RFP should be well aware of this, as its own counsel in the present case has argued recently in another case:

> The legislative history of the 2016 amendments to Georgia's anti-SLAPP law indicates that the General Assembly expected the law to apply retroactively. An initial draft of the amendment included language limiting application of the amended statute "to all claims made on or after July 1, 2015," LC 41 0455 at § 3: 106-07. However, the legislature chose not to include that language in the final law, *see* 2016 Ga. Laws Act 420 (H.B. 513) at§ 4. Removing language precluding retroactivity suggests that the legislature preferred retroactive application of the amended statute.

Zycherman Decl., Ex. B, at 27 (Brief of *Amici Curiae* Georgia Press Association, Georgia First Amendment Foundation, The Atlanta Journal-Constitution, WAGA Fox 5 and The Motion Picture Association Of America, Inc. in Support of the Constitutionality Of O.C.G.A. § 9-11-11.1, its Applicability In Federal Court and Retroactivity, submitted on November 1, 2016 by Hull Barrett, PC in *Carbone v. Cable News Network, Inc.*, 16-CV-01720-ODE (N.D. Ga.)).

Ignoring this legislative history elsewhere championed by its counsel, RFP then argues that a D.C. Circuit case, *Abbas v. Foreign Policy Group*, 783 F.3d 1328 (D.C. Cir. 2015), controls here because it is the "most recent" case to address the issue of whether an anti-SLAPP statute applies in federal court, although RFP does acknowledge that the *Abbas* court is an outlier breaking with precedent in other courts to so hold.  Opp. 36.[17]  But as RFP's counsel argues forcefully in the above-mentioned amicus brief in *Carbone*, after the Eleventh Circuit in *Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1362 (11th Cir. 2014) declined to apply the anti-SLAPP statute in federal court based on the verification procedure, the Georgia legislature "[t]aking the hint, . . . eliminated the verification requirement and replaced it with a probability-of-success standard, thus clearing the way for use of the anti-SLAPP law in federal court."  Zycherman Decl., Ex. B at 12.  In light of the fact that the Eleventh Circuit expressly relied on the presence of the verification provision in the prior version of the Georgia anti-SLAPP statute as the critical element distinguishing the Georgia statute from those in Maine, California and Alabama that have been held to apply in federal court, under *Royalty Network*, the removal of that provision clearly would bring Georgia in line with those states.

## C.  RFP'S OPPOSITION DEMONSTRATES THAT ITS RICO CLAIMS ARE BASELESS

A RICO plaintiff must plausibly allege that the defendant operated or managed a criminal enterprise through a pattern of racketeering activity including at least two "predicate"

---

[17] The D.C. Court of Appeals' controlling interpretation in *Mann* of the D.C. anti-SLAPP Law to track the requirements of Rule 56, renders the grounds in *Abbas* for not applying the D.C. law now moot.  The Georgia anti-SLAPP law similarly conforms with the Rule 56 standard.  *See* fn 17.  In any event, to the extent there is a conflict of law, the California anti-SLAPP Act is applicable here and has been routinely applied by federal courts around the country. *E.g.*, *Tobinick v. Novella*, 108 F.3d at 1305; *see also* Mot. Strike n.2 & 7-10.

racketeering acts, and must also show "(1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016) (citations omitted). RFP fails to sufficiently plead the requisite predicate acts, and fails to show direct injury to its business or property proximately caused by the alleged activity – the Greenpeace Defendants' environmental advocacy – or that such advocacy is actionable under RICO where otherwise protected by the First Amendment.

Before turning to the specific predicate acts alleged here, it is worth noting that none of the cases that RFP cites in support of its RICO claims address a fact situation remotely analogous to the context here, involving a long-standing advocacy group engaging in precisely the types of activities in which it has engaged for decades, in connection with issues on which it has taken very public positions.  The RICO cases cited by RFP – even those in which some aspect of the case touches on something approaching advocacy – without exception involve significant additional egregious conduct, or actions by direct competitors taken to directly harm the target of the predicate act in order to benefit the competing business. RFP's approach here is to cobble together these cases with inapposite facts and assemble a patchwork of purportedly criminal acts, but with this approach any plaintiff could paint any global advocacy group as a RICO conspiracy, so long as it labels any statements made as fraudulent, any discussions with constituent groups as extortion, and any solicitation of donations as money laundering, tax fraud, wire fraud and misappropriation.[18]  RFP cannot point to a single case where a court has found that allegedly false statements in a broad advocacy campaign state a RICO claim.

### 1. It is Now Clear that RFP Asserted Multiple Purported Predicate Acts With No Factual Basis Whatsoever

In its Complaint, RFP alleges a laundry list of supposed "predicate acts" under RICO in addition to its claims for extortion and wire/mail fraud (discussed separately below). *See* Mot.

---

[18] Under RFP's theory, any libel claim involving publication by multiple parties could state a RICO claim, because any alleged false fact could stand for fraud, pleading actual malice would stand for specific intent, pleading harm to reputation (often shown through lost customers) would stand for direct injury ***and the publisher would be subject to treble damages***.  However, allowing such pleadings to proceed under a RICO theory would deprive defendants of the First Amendment protections that have been adopted in defamation cases to prevent chilling of speech.

Dismiss 30-31; Opp. 38. However, RFP's Opposition unmistakably discloses that – as outlined in the Greenpeace Defendants' opening brief– RFP never had legitimate grounds for these incendiary allegations, as it has not asserted even the most basic facts regarding the "who, what, where, when and how"[19] of each claim, as required by *Twombly* or Local Rule 9.1:

- Fabricating evidence. In its Opposition, RFP cites to "fabrication of evidence" as one of the alleged predicate acts for its RICO claim. Opp. 3, 38. First, the "evidence" it claims was fabricated was not material submitted in an official proceeding or investigation, and RFP does not identify – because it cannot – how material produced outside of such settings could violate any of the criminal statutes that provide predicate act under the RICO statute.[20] Second, although it makes the claim broadly, the only specific facts it asserts relate to a 2012 report by non-defendant Greenpeace Canada with mistaken map citations that Greenpeace Canada long ago retracted, and as to which RFP released any claims and which, in any event, is well beyond the one-year statute of limitation for defamation. Mot. Dismiss 6. RFP also cites no facts related to purported "fabrication" rather than that (admitted) error.

- Bribery. RFP accuses defendants of "making bribes" in the Complaint (Compl. ¶ 41), and restates this accusation in its Opposition. Opp. 9, but never bothers to provide any further details beyond those two words.

- Witness tampering. Although RFP cited to 18 U.S.C. § 1512, the witness tampering statute, in its Complaint, it provided zero support for this allegation whatsoever, and does not mention this allegation in its Opposition.

- Misappropriation of proprietary information. In its Opposition, RFP restates the same bare allegations made in its Complaint, broadly and vaguely accusing all defendants of "stealing proprietary information from Resolute and its customers such as the identity of customers and suppliers for targeting purposes." Opp. 7, 9. This type of allegation does not provide even the bare minimum information necessary to give the Greenpeace Defendants "fair notice of what the . . . claim is and the grounds upon which it rests" under Rule 8. *See Conley v. Gibson*, 355 U.S. 41, 47 (1957). RFP does not identify who allegedly stole proprietary information, how it was stolen, when it was stolen, where the theft occurred, or specifically what proprietary information it possessed that was misappropriated or whether it was confidential, rather than public.

---

[19] In a footnote, RFP states that "Defendants' contention that the Complaint fails to plead the 'who, what, where, when and how' for the predicate acts entirely ignores the detailed tables and appendices which set forth the author, date, and recipient for hundreds of predicate acts of mail and wire fraud." Opp. 50 n.15. Even if these tables and appendices could save the deficient allegations relating to mail and wire fraud – and they cannot, as explained below – they do not supply the missing ingredients for bribery, witness tampering, impersonation, misappropriation, money laundering, and the like.

[20] Under Eleventh Circuit law, even fabrication of evidence in connection with litigation may not serve as a predicate act. *United States v. Pendergraft*, 297 F.3d 1198, 1207 (11th Cir. 2002).

- <u>Impersonation/false pretenses.</u> RFP makes little effort in its Opposition to defend its assertion of this frivolous claim. In the Complaint, RFP's most detailed allegation on this subject was: "the Greenpeace Enterprise directly and through agents engaged in fraudulent impersonations through which they misappropriated such proprietary information and exploited it for their own illegal purposes." Compl. ¶ 149. In its Opposition, RFP makes clear that this allegation is made only against "other" enterprise members, Opp. 7, rather than the named defendants, but again does not identify who allegedly impersonated whom, when these activities occurred, where they occurred, or how they were accomplished. In any event, criminal impersonation is not one of the predicate acts identified under the RICO statute.[21]

- <u>Tax fraud.</u>  RFP's Opposition mentions fraud on tax authorities in passing, citing portions of its Complaint unrelated to tax issues. Opp. 38. The one paragraph in the Complaint that does address alleged tax fraud states only that the Greenpeace Defendants have "defrauded the United States Treasury by improperly shielding Greenpeace from paying tax on these 'donations' even though Greenpeace's demonstrably untrue business model and false campaigns, including this campaign, are misrepresented in their tax filings and do not qualify for tax exempt treatment because they are designed to secure money to perpetuate the organization and not to undertake legitimate steps to mitigate real environmental issues or serve the public interest." Compl. ¶ 55. This is sheer speculation, as RFP's Complaint makes no effort to demonstrate that the Greenpeace Defendants' "business model" is "untrue," that their funding campaigns generally are "false," that there are misrepresentations in the Greenpeace Defendants' tax filings, that the Greenpeace Defendants do not qualify for tax exempt treatment or that the IRS has made any determination to that effect. *Twombly* and *Iqbal* make clear that such conclusory allegations cannot stand.[22]

- <u>Fraudulent "inducement" of donors.</u>  As the *Madigan* case cited by RFP makes clear, the type of statements to donors that may be actionable as fraud typically are statements relating to how donated funds will be used. *Illinois ex rel. Madigan v. Telemarketing Assocs.,* 538 U.S. 600, 618-19 (2003) ("Telemarketers affirmatively represented that a significant amount of each dollar donated would be paid over to VietNow to be used for specific charitable purposes while in fact Telemarketers knew that 15 cents or less of each dollar would be  'available to VietNow for its purposes."). Here, RFP alleges only that defendants have made false statements in their advocacy campaigns relating to RFP, and that donations raised by defendants while these campaigns were underway are therefore fraudulent. Opp. 38 (citing Compl. ¶¶ 43, 51, 55-56).  Although it alleges that "at the heart of this fraudulent scheme are fundamental lies as to what Greenpeace is and does, the manner in which donation dollars are used, and the specific misrepresentations it makes about its campaigns and targets," Opp. 8, RFP has never identified ***any*** such "lies" made by

---

[21] The only state criminal statutes treated as predicate acts under RICO are those addressing "murder, kidnapping, gambling, arson, robbery, extortion, bribery, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in the Controlled Substances Act)."  18 U.S.C. § 1961.

[22] As noted previously, RFP also has no standing to assert claims for tax fraud or fraudulent inducement of donors because none of its alleged injuries would have stemmed directly from that conduct. Mot. Dismiss 35.

and Greenpeace entity about "what it is and does" or how donated funds are used.  It also has made no effort to tie any specific, allegedly false RFP campaign statements to particular fundraising efforts.

- Money Laundering.  Although RFP cites to predicate acts of money laundering under 18 U.S.C. § 1957, Opp. 67, it provides zero support for this allegation.  Instead, it identifies the elements of a money laundering claim – (1) defendant knowingly engaged in a monetary transaction (2) where it knew the property involved derived from specified unlawful activity and (3) the property was valued at over $10,000 – and then states that RFP has sufficiently pled such a claim because "the Complaint alleges that defendants violated § 1957 by processing millions of dollars in fraudulently induced donations to perpetuate its illegal scheme." Opp. 60 n.24. Yet it offers no specific factual allegations concerning this alleged activity, including scienter, and proffers no basis for the monetary threshold other than Greenpeace's general fundraising receipts, which it makes no effort to tie to any campaign regarding RFP. Nor does it explain how any alleged "money laundering" could proximately cause harm to RFP.

- Wiring fraudulently obtained funds. In its Complaint, RFP makes no specific allegations regarding the wiring of donated funds, other than its general allegations regarding the "inducement" of donors, as described above.  *See* Opp. 38.

### 2.    RFP's Mail/Wire Fraud and Extortion Allegations are Fatally Flawed

RFP's deliberate effort to blur lines between named parties, between parties and non-parties, and between the elements of its claims dominate its arguments in support of its RICO claims. In particular, RFP attempts to divorce the causation and injury requirements of its claim from the specific predicate acts it asserts, by flipping the order of argument and addressing standing first, in a vacuum. However, when RFP's allegations regarding proximate cause and injury are examined in connection with the actual, underlying claims from which they must flow, rather than independently, the insufficiency of the RICO claims becomes even more readily apparent. In particular, we examine proximate cause and injury in the context of the alleged predicate acts of mail and wire fraud below, before turning to RFP's baseless "extortion" claims.

### a.    Mail and Wire Fraud

Mail and wire fraud claims require proof that a defendant intentionally participated in a scheme to defraud someone of money or property, and used the mails or wires to further that scheme. *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010); *see also*

*City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 552 (S.D.N.Y. 2005) (plaintiff must prove "(1) scheme to defraud, including proof of intent; (2) money or property as object of scheme; (3) use of mails or wires to further the scheme.").   As noted previously, RICO allegations merit "particular scrutiny" (Mot. Dismiss 12), and this is especially true where "the use of mail or wires to communicate is not in and of itself illegal." *Rothstein v. GMAC Mortgage, LLC*, 2013 WL 5437648, at *12 (S.D.N.Y. Sept. 30, 2013). "[I]n the Eleventh Circuit '[a] scheme to defraud requires proof of material misrepresentations, or the omission or concealment of material facts reasonably calculated to deceive persons of ordinary prudence.'" *Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1372 (M.D. Fla. 2005) (*quoting United States v. Hasson*, 333 F.3d 1264, 1270-71 (11th Cir. 2003)). Plaintiffs must establish that the defendant "had a conscious, knowing intent to defraud and that a reasonably prudent person would have been deceived by [its] misrepresentations." *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1306 (11th Cir. 2003) (*citing Pelletier v. Zweifel*, 921 F.2d 1465, 1503 (11th Cir. 1991) (concluding that sophisticated plaintiff's claim of reliance failed in light of undisputed facts showing that he "did not trust [the defendant's] representations and did not act as though he trusted [the defendant]"); *Beck v. Prupis*, 162 F.3d 1090, 1095 (11th Cir. 1998) (plaintiff must "prove that a reasonable person would have relied on the misrepresentations").

### (1)     RFP Has At Most Pled Falsity, Not Intentional Fraud

Obviously, if statements are not false or defamatory, they are hardly likely to play a part in any fraudulent scheme. However, the reverse is not true: Just because statements are alleged to be erroneous or false does not mean they are fraudulent. In other words, while it is possible that a particular alleged false statement might play a role in a particular scheme to defraud, RFP cannot simply point to alleged false statements and, without more, convert them to a fraudulent scheme simply by rebranding them as such, as RFP tries to do here. *See Ray*, 836 F.3d at 1350 ( ("The mere fact of having been misled does not ineluctably give rise to a RICO cause of action unless

the act of misleading the plaintiffs actually caused them injury in their business or to their property that they would not otherwise have suffered.").

On page 57 of its Opposition, RFP lists the ways in which defendants purportedly defrauded third parties (not RFP) using the mails and wires, including "preparing false and misleading reports," "disseminating the false and defamatory reports," "coordinating with one another to effectuate the dissemination of false and misleading information," "disseminating the false and misleading allegations directly to . . . critical market constituents," "soliciting fraudulent charitable donations . . . by means of false pretenses," and "wiring fraudulently obtained funds." Effectively, conceding, as RFP must, that defamation cannot be a predicate act (*see* Mot. Dismiss 30-31) RFP tries to create the illusion of other fraudulent activity with its list but all of these activities[23] relate only to the creation or dissemination of advocacy statements (and indeed depend on the ***content*** of those statements) and only the allegation regarding solicitation of donations even arguably has "money or property as object of [the alleged] scheme," a required element of its claim and even that still turns on the allegations of false advocacy. RFP says that these listed activities, lumped together, "plainly constitute[] a scheme to defraud." Opp. 57. They do not.

The Complaint does not plausibly plead a specific intent to defraud, as RFP concedes it must. Opp. 58. Although RFP makes bare allegations about the Greenpeace Defendants' supposed "knowing" false statements, for the same reasons that it cannot demonstrate actual malice, it cannot show intentionally fraudulent statements. Indeed, its submission of expert declarations that attempt to explain why the underlying science favors RFP's interpretations, not those of Greenpeace, undermine any showing of an intent to deceive.

The recent *U.S. v. Takhalov* case in the Eleventh Circuit, which RFP largely ignores, addresses the importance of this distinction between falsity and fraud. Under *Takhalov*, as the Greenpeace Defendants previously have explained, to establish intent to defraud, a plaintiff must

---

[23] RFP also lists "harassing Resolute's customers with extortionate threats," discussed in Section C.2.a.(3)(i), *infra*.

show that a defendant sought to deprive someone "of something of value" to which the defendant is not entitled "by trick, deceit, chicane, or overreaching." 827 F.3d 1307, 1313 (11th Cir. 2016). *Takhalov* also instructs that "a schemer who tricks someone to enter into a transaction has not 'schemed to defraud' so long as he does not intend to harm the person he intends to trick. And this is so even if the transaction would not have occurred but for the trick. For if there is no intent to harm, there can only be a scheme *to deceive*, but not one *to defraud*." *Id.*

RFP ignores these portions of *Takhalov*, suggesting vaguely that the case is "in accord" with other cases holding that fraud requires a showing of intent to harm a property right of the victim.  Opp. 59. RFP then quickly shifts focus to a district court case in another circuit, *Feld Entertainment Inc. v. American Society for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288 (D.D.C. 2012), involving fraudulent fundraising materials where the materials specifically stated that funds raised would be used to target animal handling behaviors of a circus, when instead they were used to bribe circus employees to bring a sham lawsuit. *Id.* In conclusion, RFP then asserts that its own allegations fit this fact pattern, and therefore constitutes wire fraud:

> Here, the Complaint alleges that defendants, working in concert with others, prosecuted a widespread disinformation campaign against Resolute to fraudulently induce millions of dollars in donations. … Under *ASPCA*, this conduct plainly amounts to mail and wire fraud.

Opp. 59-60. RFP does ***not*** argue in its Opposition, because it cannot, that any of the other alleged acts cited on page 57, discussed above, assert the necessary "specific intent to deceive or cheat, for the purpose of either causing some financial loss to another, or bringing about some financial gain to one's self" that even RFP concedes the law requires, much less the "deprivation of someone of something of value" by trick or deceit as required by *Takhalov*. Opp. 58-59.

This is a classic bait-and-switch argument. RFP first points generally to a supposed laundry list of acts that purportedly constitute a "fraudulent" scheme without any explanation of how that "conduct" consists of anything other than publication of alleged false statements that RFP claims caused harm to reputation, *i.e.*, a defamation claim. However, when it must directly address the case law requiring proof of fraud, RFP points only to the charitable donation context,

because for all of the reasons set forth in the Greenpeace Defendants' opening brief, *see* Mot. Dismiss 31-33, RFP has no basis for any claim that "dissemination" of alleged false statements, without more, can constitute fraud.

RFP's mail and wire fraud claims fail even to the extent they are allegedly based on fraudulent fundraising. The Complaint does not identify any purportedly fraudulent statements – or any other conduct – made in the context of fundraising solicitations that differ from the statements defendants have made in support of their advocacy generally. There are no allegations regarding specific misrepresentations to donors regarding the use of donated funds in connection with RFP,[24] as was present in *Feld Entertainment* and as is required by *Takhalov*'s admonition that "a schemer who tricks someone to enter into a transaction has not 'schemed to defraud' so long as he does not intend to harm the person he intends to trick." 827 F.3d 1313. If RFP were right, every paid subscriber to a publication which had an allegedly false story would have a claim for mail or wire fraud. That cannot be the law. *See Lacoff v. Buena Vista Pub., Inc.*, 183 Misc. 2d 600 (N.Y. Sup. 2000) (publication of erroneous annual rate of return in book not actual malice, and on fraud claim "plaintiffs provide[d] no factual basis whatsoever for their conclusory allegations that defendants knew and intended to mislead book buyers as to the Beardstown Ladies' annual rate of return. The Beardstown Ladies publicized this precise rate of return before the Book was published, in their videotape, … and on news programs and in investment and retirement newsletters."). *Id.* at 611-12.

### (2)     RFP Has Not Pled a Causal Link Between the Alleged Predicate Acts of Mail/Wire Fraud and a Direct Injury

RFP has not adequately pled a sufficient causal link between the alleged predicated acts of mail and wire fraud and any concrete damages borne by RFP. The "by reason of" language in

---

[24] In *Feld Entertainment*, the Court held that the plaintiff met the Rule 9(b) particularity requirement because it set forth an alleged scheme to defraud, alleged that defendants provided a circus employee with grants and donations by mail and "arranged a cover for their payments to induce him to fraudulently participate in the … lawsuit, and set forth "how those of the defendants who are alleged to have committed wire fraud did so, with references to specific communications, dates, senders and recipients." 873 F. Supp. 2d at 318. Here, RFP's claims fail to meet the particularity requirement of Rule 9(b) because RFP does not set specify in any way facts relating to the alleged fraud, but again merely sets forth details regarding the underlying, allegedly false, advocacy statements.

the RICO statute requires that plaintiffs "plead facts sufficient to give rise to a reasonable inference that the claimed racketeering activity . . . was the but-for and proximate cause of the plaintiffs' injuries," and that "[t]he connection between the racketeering activity and the injury can be neither remote, purely contingent, nor indirect." *Ray,* 836 F.3d at 1349.

RFP argues that a plaintiff satisfies the standing requirement where it "alleges [it] was the intended target of the RICO scheme," and satisfies the proximate cause requirement where it alleges that "the injury sustained was a foreseeable consequence of the RICO violation." Opp. 51-52. To the extent RFP means that bare allegations of these elements are sufficient to withstand a motion to dismiss, this is plainly wrong. *See Williams v. Mohawk Indus.*, 465 F.3d 1277, 1287 (11th Cir. 2006) ("courts should scrutinize proximate causation at the pleading stage and carefully evaluate whether the injury pled was proximately caused by the claimed RICO violations."). Greenpeace does not deny that RFP was the "target" of its advocacy, but RFP cannot convert bare allegations about the publication of misleading statements concerning RFP into a fraudulent RICO scheme, without more. Nowhere does RFP explain how allegedly false statements leading donors to donate money to the Greenpeace Defendants could lead directly to the types of losses RFP claims that it suffered, including "lost customers, lost revenues, closures, cutbacks, and layoffs." Opp. 52. As the Eleventh Circuit has stated:

> [T]he fact that an injury is reasonably foreseeable is not sufficient to establish proximate cause in a RICO action—the injury must be direct. Thus, we have previously held that plaintiffs did not adequately plead a RICO claim where their complaint asserted only the bald conclusion that the plaintiffs relied on a misrepresentation without showing how that reliance was manifested. Moreover, we have held that plaintiffs lack standing to bring a RICO claim unless their injuries were proximately caused by the RICO violation.

*Ray,* 836 F.3d at 1349 (citations omitted).

Here, RFP has failed to plead with particularity "how the alleged misrepresentations and omissions were material to the Defendants' alleged scheme to defraud," and how the Greenpeace Defendants' statements "were reasonably calculated to deceive" donors. *See Wilson v. Everbank*, N.A., 77 F. Supp. 3d 1202, 1225-27 (S.D. Fla. 2015). For instance, RFP makes no effort to

explain how donations to the Greenpeace Defendants are attributable to statements made about RFP, given the multiple campaigns by the Greenpeace Defendants on multiple environmental issues involving many different parties, and given the many reasons why a donor might donate to an environmental cause. Further, even if it could make such a showing, where there is a more direct victim, less direct victims do not have standing to bring a claim (Mot. Dismiss 35), and on the face of RFP's argument, clearly it would be the donors themselves who would have suffered any direct injury from the alleged fraud, and thus remedies for any such harm must be pursued, if at all, by the donors themselves, under applicable case law.  *See Id.; Kimberlin v. National Bloggers Club*, 2015 WL 1242763, at \*13 (D. Md. Mar. 17, 2015)**.**

Further, even if RFP could somehow make out a claim that the Greenpeace Defendants' protected campaign statements to the general public somehow were fraudulent, there is still no causal link to the alleged harm. For instance, RFP attempts to explain away in a footnote the fact that, as set forth in the Greenpeace Defendants' opening brief, RFP publicly announced that "structural challenges in the newsprint market" motivated its reduction of operations at its Augusta mill, by arguing that in other cases courts have found that the alleged predicate acts do not have to be the ***only*** cause of the injury. This misses the point. Here, RFP has not plausibly pled any causal connection at all between statements made by the Greenpeace Defendants and the shut-down of a paper machine at that mill.

The cases cited by RFP demonstrate the stark difference between a plausible causation chain, and those that are speculative and remote. For example, in *Corcel Corp. v. Ferguson Enters., Inc.*, 551 F. App'x 571 (11th Cir. 2014), the defendants "solicited and prepared false and misleading documents and repeatedly submitted those documents to the County for the express purposes of (1) obtaining defendant LT's SBE certification and (2) winning supply contracts from the County.…" *Id.* at 577. The Court found that "the defendants' alleged fraud directly caused plaintiff Corcel to lose multiple County contracts." *Id.* In other words, the defendants

intentionally schemed to defraud the County of something of value: a business opportunity the plaintiff, its immediate competitor, alleged it would otherwise have received but for the fraud.[25]

Similarly, in *Feld Entertainment*, there was a much more direct causal link between the alleged predicate acts and the potentially cognizable damages to the plaintiff.  Notably, the district court first held that the plaintiff could ***not*** claim damages for defendants' "legislative and administrative advocacy efforts to ban elephants in circuses," even if those advocacy efforts allegedly defrauded legislative or administrative bodies, and even if plaintiff was a direct target of those efforts, and even if the advocacy was false and defamatory, because such fraud could not have directly caused the injury complained of by plaintiff (costs incurred to defend a litigation). 873 F. Supp. 2d at 320. By contrast, the court held that fraudulent fundraising efforts plausibly could lead directly to the alleged injury, because the money allegedly fraudulently raised from donors was then used by defendants to fund the ***sham*** lawsuit that defendants had bribed circus employees to bring and that the plaintiff was now forced to defend. Addressing an argument that the injury to the plaintiff was derivative of the injury to the donors, the court found that the plaintiff's lost revenue due to defending the lawsuit constituted an "independent injury." *Id*. at 321. RFP argues that it too suffered an independent injury like that in *Feld Entertainment*, but remarkably, fails to identify what that injury is or how it flows causally from the alleged fraud. Opp. 55.  It is Greenpeace, not RFP, that is incurring costs to defend this lawsuit and it is Greenpeace Canada that is incurring costs to defend RFP's parallel lawsuit in Canada.[26]

---

[25] The other cases cited by RFP are similar. In *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d at 558, 560 . the Court held that the failure to file certain required reports with the state government could constitute the predicate act of mail fraud, and that the city's reliance on this omission might be able to supply the necessary causation, but warned that the chain of causation was "inherently speculative."  In *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539 (5th Cir. 2001), a direct competitor spread a false rumor to Procter & Gamble's customers that the company was involved in Satanism, in order to lure the customers to the competitor.  The court identified a "narrow exception" to the general rule that "fraud addresses liability between persons with direct relationships," *id.* at 564, confined to situations where "a competitor lured the plaintiff's customers away by a fraud directed at the plaintiff's customers."  *Id.* at 565 (*citing Summit Properties, Inc. v. Hoechst Celanese Corp.*, 214 F.3d 556, 561 (5th Cir. 2000), *cert. denied*, 531 U.S. 1132 (2001)). Here, where the GP Defendants are not competitors and did not have money or property as the object of their published statements, the narrow exception does not apply.

[26] RFP also claims that the Greenpeace Defendants made fraudulent statements to RFP's own customers, but as noted previously, this claim fails because RFP has not asserted the necessary intent to "depriv[e] someone of something of value" by trick or deceit as set forth in *Takhalov* nor are they competitors who won the deals that RFP

### (3)   The "Motivating Principles" of the "Directness" Requirement Suggest There is No Proximate Cause Here

The Eleventh Circuit has noted that in evaluating whether proximate causation exists, "courts should consider the 'motivating principle[s]' behind the directness component of the proximate-cause standard in RICO cases." *Williams v. Mohawk Indus.*, 465 F.3d 1277, 1288 (11th Cir. 2006) (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458, 126 S. Ct. 1991, 1997 (2006)) (alterations adopted). Such motivating principles include (1) "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action"; (2) "the speculative nature of the proceedings that would follow if [the plaintiff] were permitted to maintain its claim"; (3) whether the alleged harm "could have resulted from factors other than [the plaintiff's] alleged acts of fraud"; (4) "any appreciable risk of duplicative recoveries"; and (5) whether "the immediate victims of [the] alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." *Corcel Corp.* , 551 F. App'x at 576  (*citing Anza*, 547 U.S. at 458-60). Here, RFP has barely even attempted to tie together any supposed fraudulent behavior and its alleged damages, which are at best speculative and may have been caused by numerous factors, and the only persons even allegedly directly injured – Greenpeace's donors – can vindicate any such injury themselves.

Without the requirements that limit the scope of mail and wire fraud, and that circumscribe RICO standing, plaintiffs would be encouraged to allege ever more complex and wide-ranging schemes, the better to pluck more and more attenuated "damages" through implausible causation chains. That is exactly what RFP attempts to construct here.  In short, RFP has not plausibly pled any predicate use of the mails or wires that defrauded RFP itself or any other party leading directly to harm to RFP, because it has not alleged an intentional scheme to defraud such parties of money or property to the benefit of Greenpeace.  Nor has it pled any specific instances of falsity in connection with fundraising.  But even if it could, it cannot claim

---

claims they lost. Also, these allegations appear to be duplicative of RFP's claim that the Greenpeace Defendants "extorted" customers, discussed in the next section.

injury flowing derivatively from donors' losses, nor is there any causal connection between the alleged defrauding of donors and the other losses it claims.

### i.  Extortion

RFP makes only a half-hearted attempt to defend its groundless claim that the Greenpeace Defendants have engaged in extortion by advocating their positions regarding RFP's environmental record to RFP's customers. Opp. 60-61.  Extortion under the Hobbs Act occurs when a party obtains property from another as a result of the "wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Here, there is no claim that the Greenpeace Defendants used force or violence, or acted under official imprimatur to gain property for Greenpeace. RFP argues that "fear" may include fear of economic harm.  However, even if the notion of public disclosure of a relationship with a timber company that Greenpeace already openly criticizes for poor environmental practices constitutes economic fear, "there is nothing inherently wrongful about the use of economic fear to obtain property."[27] *United States v. Sturm*, 870 F.2d 769, 773 (1st Cir. 1989). Rather, courts must distinguish between the wrongful use of fear and legitimate "hard bargaining," *George Lussier Enters., Inc. v. Subaru of New England, Inc.*, 393 F.3d 36, 50 (1st Cir. 2004).  RFP does not explain how the statements by Greenpeace Defendants were "wrongful" – it simply conclusorily labels them as "extortive threats" or says they "plainly constitute[] extortion."  Opp. 60-61.

Permissible "hard bargaining," which is common in competitive markets, has an analog in legal boycotts, which also bring to bear free market economic pressure but are not deemed extortive under the Hobbs Act. Speech that may coerce or embarrass others into boycotting particular businesses has long been protected by the First Amendment. *Thornhill v. Alabama*, 310 U.S. 88 (1940); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 910 (1982). To the extent that such statements to customers even could be said to rise to the level of a suggested

---

[27] Of course, as discussed further below, the Greenpeace Defendants also were not attempting to "obtain property."

"boycott," RFP again makes no effort to explain why the Greenpeace Defendants' activities here differ from legal boycotts.  *See* Mot. Dismiss 34.

RFP's pleading of extortion under the Hobbs Act must also be dismissed because it ignores Supreme Court precedent that requires a demand for transferrable property from the extorted party to the party doing the extorting. In *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393 (2003), addressing a claim that attempts to shut down abortion clinics were acts of extortion, the Court observed:

> even when their acts of interference and disruption achieved their ultimate goal of "shutting down" a clinic that performed abortions, such acts did not constitute extortion because petitioners did not "obtain" respondents' property. Petitioners may have deprived or sought to deprive respondents of their alleged property right of exclusive control of their business assets, but they did not acquire any such property. Petitioners neither pursued nor received "something of value from" respondents that they could exercise, transfer, or sell.

537 U.S. at 404-05 (citation omitted). To divert the Court's attention from this omission, RFP cites a single district court case from another Circuit in the context of a labor dispute. Opp. 61 (*citing Smithfield Foods v. United Food and Commercial Workers Int'l Union*, 633 F. Supp. 2d 214, 219–21, 225 (E.D. Va. 2008)). However, in *Smithfield Foods*, the defendant union specifically schemed to extort an agreement from the plaintiff to recognize the union as exclusive bargaining agent of the employees of one of the plaintiff's plants. 633 F.Supp. 2d at 219. Addressing extortion, the court held that Smithfield possessed an intangible property interest in the right to recognize, or not recognize, a union as a bargaining representative, ***and that the union used threats in order to acquire that right***.

Greenpeace has not extorted anything from RFP's customers. Rather, in this case, independent environmental groups have published (non-defamatory) opinions, based on disclosed science, about RFP's activities in the Canadian boreal forest, and encouraged RFP's customers to review that same information and consider whether to stop buying products from RFP until it changed its ways. Remarkably, RFP argues that the Greenpeace Defendants extorted RFP's customers in order to obtain a "substantial benefit to the Greenpeace Enterprise in the

form of enhanced fundraising potential." Opp. 60. To quote the *Scheidler* Court again, "[t]o conclude that such actions constituted extortion would effectively discard the statutory requirement that property must be obtained from another, replacing it instead with the notion that merely interfering with or depriving someone of property is sufficient to constitute extortion." 537 U.S. at 405. "Enhanced fundraising potential" was not something RFP's customers possessed that the Greenpeace Defendants could obtain from them – this simply does not constitute the demand for the transfer of anything of value from the customers to Greenpeace as required by the Hobbs Act, and as the court found was alleged in *Smithfield Foods*.[28] 633 F. Supp. 2d 214, 225 (E.D. Va. 2008). Nor has RFP pled any facts supporting any purported enhanced fundraising potential flowing from statements made to customers.

Again, ***the Greenpeace Defendants urge the Court to review the actual statements made in context***, as such review should make clear that any statements to RFP customers were typical of public advocacy generally, and consistent with the non-actionable statements made by Greenpeace Defendants to the general public, discussed in Section A, *supra*. As another example, in its recent reply brief in support of its motion for this Court to reconsider the stay of discovery, RFP trumpets a letter recently sent by Greenpeace to some of RFP's customers as "ongoing" misconduct. Reply 4, ECF No. 85-1.

First, the Greenpeace Defendants should not and cannot be forced to stop their advocacy in the face of baseless legal claims – if they did, RFP would already find itself successful in chilling protected speech.[29] Second, the content of Greenpeace's recent letter readily demonstrates that the speech falls well within the confines of First Amendment protection, and is hardly illegal extortion. After a lengthy summary of Greenpeace's perspective on RFP's environmental record, replete with cites to scientific studies supporting that view, Greenpeace urges the following:

---

[28] Even if some customers subsequently declined to do business with RFP, if Greenpeace's advocacy played a role, RFP could have mitigated that outcome by telling customers its position or altering its sustainability practices.

[29] Indeed, predictably, RFP has now sent a cease and desist letter attempting to restrain this speech, demanding that Greenpeace cease circulation of its letter.

> Given the controversy and serious questions surrounding Resolute Forest Products, paper customers like _____ have a crucial role to play in addressing the challenge facing the future of the Canadian Boreal forest. The first step is to investigate your supply chain for links to Resolute Forest Products and then communicate your sustainability expectations to them directly. If RFP is not able to meet these expectations, we would urge you to explore how alternative suppliers, including those who operate in the Canadian Boreal, can better meet your sustainability commitments going forward.

> As we have seen most recently in the award-winning forestry solutions forged in British Columbia in the Great Bear Rainforest, customer support for First Nations, provincial governments and environmental organizations is a key ingredient to successful solutions for healthy ecosystems, prosperous communities and a sustainable forest product supply.

Reply 5, ECF No. 85-1 (footnotes omitted).

This type of communication is an exemplar of the type of free market exchange of ideas that should be encouraged rather than chilled, here with the goal of improving the climate in which we all live by urging customers to urge RFP to adopt better practices. *See also* Amici Br. 9, ECF No. 64 (Brief of Amici Curiae non-profit environmental organizations) ("It is a time-honored feature of our democracy for nongovernmental organizations (like Defendants and *Amici*) to provide a vehicle for people to advocate for causes, with the full protection of the Constitution. . . . *Amici* believe that deforestation, climate change, conservation and human-rights issues are paradigmatic matters of public concern. These matters of paramount importance to the public should be debated rigorously in public under the highest level of First Amendment protection.").

## D.    RFP'S OPPOSITION PROVIDES NO FURTHER SUPPORT FOR ITS FATALLY FLAWED STATE LAW CLAIMS

### 1.    Tortious Interference

RFP does not seriously dispute that its claim for tortious interference under Georgia law is based on the same factual allegations that support its defamation claim, arguing that "defamation satisfies the required 'improper action or wrongful conduct' element." Opp. 79 n.40. By the same token, RFP's interference claims based on the alleged statements must fail if RFP cannot make out a defamation claim, as set forth above.  *See* Mot. Dismiss 39-40.

RFP argues that it has "alleged that defendants engaged in conduct which went far beyond the mere dissemination of false information, including organizing boycotts, cyber-hacking, and other illegal activities, all of which constitute 'improper action' for purposes of tortious interference." Opp. 79 n.40. Once again, these are mere labels and misdirection – for all of the same reasons set forth previously, RFP has not plausibly pled any such activity that is not based on the very same statements it references on its defamation claim. All such supposedly independent fraudulent "acts" are either pled without any specificity, or plausibility,[30] or are simply reformulated speech activities protected by the First Amendment. They all boil down to and depend on the statements that are not actionable under RFP's defamation claim. The "malice," *i.e.,* ill-will, which RFP cites is no substitute for alleging specific facts that would support actual malice, *i.e.*, knowledge of falsity or serious doubt as to truth. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989).

## 2. Trademark Infringement

RFP's claim for state trademark dilution of its purported common law trademark RESOLUTE FOREST PRODUCTS appears to be more of an afterthought than a considered claim. Conspicuously, RFP does ***not*** make a claim for trademark infringement or dilution under federal law, even though it has a federally registered trademark in the names RESOLUTE and RESOLUTE FOREST PRODUCTS, whereas it has no Georgia state trademark registration. This is because any such federal claim would be frivolous. *See* Mot. Dismiss 38-39. *Tobinick v. Novella,* 142 F. Supp. 3d 1275 (S.D. Fla. 2015) (granting summary judgment under Lanham Act where criticism of product held not to be commercial speech). Moreover, the Georgia Supreme Court has recently confirmed that a trademark dilution claim such as this one cannot be used to attempt an end-run around defamation law. *McHugh Fuller Law Group, PLLC v. PruittHealth, Inc.*, --- Ga. ---, 794 S.E.2d 150 (2016).

---

[30] The cyber-attacking is particularly lacking in plausibility, accusing Greenpeace to be somehow responsible for hacking Best Buy's site by Anonymous, a group well-known for cyber-attacks. Compl. ¶¶ 171-172.

As Georgia law as to trademark infringement parallels federal law, *see Original Appalachian Artworks v. Topps Chewing Gum,* 642 F. Supp. 1031, 1036 (N.D. Ga. 1986), RFP attempts to rely on the previously less well-delineated Georgia state law of trademark dilution to make out a claim. Yet as the Greenpeace Defendants have noted, RFP has failed to the necessary elements of a dilution claim: registration or ownership of a trademark, distinctiveness, use by defendants of term in a trademark sense, and facts showing tarnishment of the mark. Mot. Dismiss 38-39. RFP, bizarrely, attempts to shore up the missing element of distinctiveness by pointing to a paragraph in the Complaint setting forth the purported fact that RFP "is regularly recognized as an industry leader in sustainable forestry, environmental protection, and safety," and that it has won awards relating to sustainability. Opp. 81; Compl. ¶ 93. Nothing in that paragraph mentions RFP's alleged Georgia trademark or how being an industry leader creates distinctiveness tied to the trademark in the mind of the consuming public. Even in the *McHugh Fuller* case, discussed below, the plaintiff presented evidence that it "had made substantial investments in its marks, including engaging a national marketing firm, conducting focus groups, and obtaining feedback regarding their strength, and that the marks are used on billboards, in advertisements, on mouse pads and water bottles, and in a host of other marketing materials used by [plaintiff] in Georgia and surrounding states." 794 S.E.2d at 153.

In *McHugh Fuller*, decided on November 21, 2016, the Georgia Supreme Court addressed for the first time a trademark dilution claim where the defendant, a law firm, was not using the allegedly infringing trademark on its owns goods or services, but to identify the plaintiff, a nursing home company, in an advertisement by the defendant law firm seeking would be plaintiffs. After tracing the history of Georgia's anti-dilution statute within the context of modern trademark law, the Court held – as the Greenpeace Defendants argued in their opening brief (MTS at 38) – that "[t]arnishment can occur "only if the defendant uses the designation as its own trademark for its own goods or services." *Id.* at 153 (*citing* 4 McCarthy on Trademarks § 24:122.  This alone is determinative of RFP's trademark dilution claim. Significantly, however, the Court also stated:

> [C]ases in which a defendant uses the plaintiff's mark to refer to the plaintiff in a context that harms the plaintiff's reputation are not properly treated as tarnishment cases. . . . [E]xtension of the antidilution statutes to protect against damaging nontrademark uses raises substantial free speech issues and duplicates other potential remedies better suited to balance the relevant interests.")

*Id.* at 156 (citing 2 Gilson on Trademarks § 5A.01 [6]. *See* Restatement (Third) of Unfair Competition § 25 cmt. i (1995) (Mar. 2016 update)) (citations and quotations omitted).  In other words, a plaintiff cannot reframe a claim sounding in defamation as dilution and avoid the strictures of the First Amendment.

Finally, RFP argues that the First Amendment "does not guarantee the right to use another party's trademarks for 'commercial' criticism and commentary." Opp. at 82. In fact, consistent with modern trademark law, it does. RFP cites to the 2014 environmental campaigners turning the Mount Royal Cross above Montreal into a makeshift "scales of justice," with the Resolute logo on one side and the forest on the other side of the scale.  Opp. 81; Compl. ¶ 194. This is quintessential visual commentary.  Mot. Dismiss 38-39.[31] RFP argues that the fact that the Greenpeace Defendants raise money through donations, and that they have used the phrase "Resolute: Forest Destroyer" in campaigns generally, means that the use of the phrase is "commercial." This is absurd. The Greenpeace Defendants are non-profit entities engaged in environmental advocacy who have used the phrase in order to criticize RFP, not as a trademark to market their own products or services, and the fact that they also seek donations cannot convert their campaign statements into commercial uses. No consumer would be confused to think RFP had somehow endorsed this campaign – just the opposite.

## E.   RFP HAS NOT SHOWN THAT JURISDICTION OR VENUE ARE PROPER

RFP continues to argue that a single trip made to Georgia by an individual defendant, Daggett, where it is vaguely alleged that he "communicated falsehoods" but where the only identified "falsehoods" were not conveyed in Georgia during that trip, Mot. Dismiss 8-9, suffices to confer personal jurisdiction on GPI.  In support, RFP cites a single case, *Delong Equipment*

---

[31] RFP oddly cites a wholly inapposite discussion of **copyright** fair use in the parody context in *Original Appalachian*, 642 F. Supp. at 1034.

*Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843 (11th Cir. 1988), which it characterizes as finding jurisdiction based on a "corporate representative's attendance at one conspiratorial meeting." Opp. 87. What RFP neglects to mention is that the court indicated that this meeting constituted the "heart of the alleged tort" – this was the meeting where the key parties met to agree to restrain trade. 840 F.2d at 849 (also noting other acts in the state). By contrast, Daggett's trip to Georgia was not itself even alleged to be a conspiratorial act, and again, RFP has not pled any details of any fraud or other tort committed during that trip.

In addition, in its Opposition, RFP tacitly concedes that if its RICO claims fail, its only argument for the Court's exercise of jurisdiction over individual defendants Daggett, Skar, Brindis and Moas rests on its (threadbare) claims of conspiracy. However, in *Dixie Homecrafters, Inc. v. Homecrafters of America, LLC*, the court noted that even the alleged non-resident "co-conspirator" must still have purposefully directed its activities toward the forum state and such that the defendant reasonably anticipate being hauled into court there. 2009 WL 596009, at *7 (N.D. Ga. Mar. 5, 2009) (citing *Rudo v. Stubbs,* 221 Ga. App. 702, 704 (1996)). The court further cautioned that mere conclusory allegations of conspiracy are not sufficient to warrant personal jurisdiction. *Id.; see also Wells Fargo Bank Nat'l Ass'n v. Berkman*, 2011 WL 709483, at *4 (N.D. Ga. Feb. 17, 2011) (finding that the "bare existence" of a conspiracy is not enough to support long-arm jurisdiction) (quoting *Coopers & Lybrand v. Cocklereece,* 157 Ga. App. 240, 276 S.E.2d 845 (1981)). In this instance, as the Greenpeace Defendants have previously noted, RFP cannot demonstrate an underlying tort, or a common design,[32] and thus cannot demonstrate any conspiracy. If the Court thus finds that RFP has not adequately pled allegations of conspiracy, it should decline to exercise jurisdiction, including, to the extent applicable, pendant jurisdiction, over GPI and the individual defendants. *See United Mine*

---

[32] Acknowledging that it cannot demonstrate any overt agreement between the alleged conspirators, RFP asks the Court to "infer[ ]" a "common design" from its "copious" allegations under its RICO claim, including "collaboration[s]" between environmental entities. Opp. 82-83. Yet its continuing refusal to detail these supposed links and explain how they differ from the type of collaboration all political advocacy groups undertake when advocating on common causes, remains fatal to its conspiracy claim.

*Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (justification for pendant jurisdiction "lies in considerations of judicial economy, convenience and fairness to the litigants").[33]

Contrary to RFP's claim, Opp. 83, now that the Greenpeace Defendants have objected to venue, RFP bears the burden of showing that the selected venue is proper pursuant to 28 U.S.C. § 1406(a). *See Premium Nutraceuticals, LLC v. Leading Edge Marketing Inc.*, 2016 WL 3841826, at *5 (S.D. Ga. July 12, 2016). RFP has not met its burden. While RFP concedes that pursuant to 28 U.S.C. § 1391(b)(2) venue is proper in any district where a "substantial part" of the events that give rise to the claim occurred, *see Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1372 (11th Cir. 2003), RFP's arguments regarding proper venue read more like a "minimum contacts" analysis for personal jurisdiction rather than a consideration of which acts have operative significance to its claims. *Id.* RFP's brief simply retreads the lone trip made by some of the named defendants to Augusta as if this trip has central importance. It does not. RFP cites no facts to substantiate that any of GP's alleged complained-of statements or acts targeted the Augusta plant or led to layoffs at the plant.  Indeed, while alleging that messages were delivered, it does even not plead what those messages said or how they were "lies."  Opp. 67.

Rather, RFP clings to two older cases that supposedly show that a "single conspiratorial meeting" in a judicial district is enough to establish venue. Opp. 84. In fact, in those cases, *Delong* (*see supra*) and *Homes Ins. Co. v. Thomas Industries, Inc.*, 896 F.2d 1352 (11th Cir. 1990), the court applied the "weight of the contacts" test, which is no longer the prevailing standard for determining venue. *Bell v. Rosen*, 2015 WL 5595806, at *5 (S.D. Ga. Sept. 22, 2015) (finding that the "weight of the contacts" test applied to an old version of § 1391(b) before

---

[33] Further, while RFP concedes that Rule 4(k)(1) of the Federal Rules of Civil Procedure is not applicable under these circumstances, its argument that the Court exercise jurisdiction over GPI pursuant to Rule 4(k)(2) is no stronger. The very contacts that RFP alleges GPI has with the United States, *see* Opp. 89, can be construed as nothing more than limited promotion. As the Eleventh Circuit has found, exercising personal jurisdiction under these circumstances would offend fair play and substantial justice.  *See Fraser v. Smith*, 594 F.3d 842, 850 (11th Cir. 2010) ("[w]hen a defendant's contacts with the United States are confined to…limited self-promotion, and a few narrow relationships with American businesses, the exercise of nationwide general jurisdiction over that defendant would 'offend traditional notions of fair play and substantial justice.'").

the statute was amended).[34]   More recently, the Eleventh Circuit has made clear that proper venue analysis requires more than the "minimum contacts" analysis that RFP is peddling; it requires the court to consider which of defendant's activities have a close nexus to the alleged wrongs. *Jenkins Brick Co.*, 321 F.3d at 1372.  RFP, based in Canada, with none of the defendants located in Georgia, simply does not and cannot argue that the alleged activities at the heart of this dispute occurred in the Southern District of Georgia.

Most significantly, RFP does not deny that the Northern District of California ("NDCA") is the only forum where a plurality of the parties, witnesses, and documentary evidence resides, at least in this country. RFP, however, tries to defend its choice of venue by noting that "several critical non-party witnesses reside in Georgia." Opp. 85-86. The only person RFP names, though, is a single individual from Home Depot. *Id.* at 86. The remaining "critical non-party witnesses" to which RFP refers are nameless "Georgia-based customers targeted by the Enterprise." *Id.* Courts have rightfully afforded limited weight to such conclusory and vague statements about the convenience of unknown and unnamed witnesses. *Stat Med. Devices, Inc. v. Intrinsyk, LLC*, 2015 WL 10960945, at *5 (S.D. Fla. Dec. 1, 2015); *Del Monte Fresh Produce Co. v. Dole Food Co.*, 136 F. Supp. 2d 1271, 1282 (S.D. Fla. 2001) (noting that "vague statements about the convenience of unknown and unnamed witnesses is insufficient to convince this Court that the convenience of the witnesses and the parties would be best served by transferring venue.")

RFP essentially asks the Court to weigh the interests of one potential witness more heavily than the interests of a multitude of parties and witnesses in this case. This lopsided position undermines the very nature of the transfer venue analysis, which necessitates the Court, in its discretion, to balance many factors, including the totality of the circumstances, to determine whether an alternate venue is more convenient for the parties and witnesses. *See Bell*, 2015 WL 5595806, at *7-14 (S.D. Ga. Sept. 22, 2015). Here, NDCA is a substantially more convenient venue for the plurality of parties and witnesses than this Judicial District.

---

[34] In *Homes Ins. Co.*, just as in *Delong*, the "single conspiratorial meeting" was alleged to be the very meeting where the conspiracy at the heart of the allegations was hatched or where explicit fraudulent conduct occurred.

This 23rd day of January, 2017.

Respectfully submitted,

/s/   Thomas W. Tucker
_____

| | |
|---|---|
| Thomas W. Tucker | Laura Handman (admitted *pro hac vice*) |
| Georgia Bar No. 717975 | Lisa Zycherman (admitted *pro hac vice*) |
| TUCKER LONG, PC | DAVIS WRIGHT TREMAINE, LLP |
| 453 Greene Street | 1919 Pennsylvania Avenue, NW, Suite 800 |
| Augusta, Georgia 30901 | Washington, DC 20006-2401 |
| (706) 722-0771 | (202) 973-4200 |
| ttucker@tuckerlong.com | laurahandman@dwt.com |
| | lisazycherman@dwt.com |
| | |
| | Lacy H. Koonce, III (admitted *pro hac vice*) |
| | DAVIS WRIGHT TREMAINE, LLP |
| | 1251 Avenue of the Americas, 21st Floor |
| | New York, NY 10020-1104 |
| | (212) 603-6467 |
| | lancekoonce@dwt.com |

*Attorneys for Defendants Greenpeace International, Greenpeace, Inc., Daniel Brindis, Amy Moas, Matthew Daggett, and Rolf Skar*

## CERTIFICATE OF SERVICE

This is to certify that on the 23rd day of January, 2017, I have served all parties in this case in accordance with the directives from the Court Notice of Electronic Filing ("NEF") which was generated as a result of electronic filing.

   /s/ Lisa B. Zycherman
LISA B. ZYCHERMAN (Admitted *Pro Hac Vice*)