# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA

RESOLUTE FOREST PRODUCTS, INC., *et al.*,     )
                                              )
                           Plaintiffs,        )          CIVIL ACTION FILE
                                              )          NO. CV116-071
            v.                                )
                                              )
GREENPEACE INTERNATIONAL, *et al.*,           )
                                              )
                           Defendants.        )
_____)

## DECLARATION OF KEITH MOORE
## IN SUPPORT OF GREENPEACE DEFENDANTS'
## MOTION TO STRIKE PURSUANT TO O.C.G.A. § 9-11-11.1

I, **KEITH MOORE**, hereby certify as follows:

I have been retained by Defendants Greenpeace International and Greenpeace, Inc. ("Greenpeace") to render expert opinions regarding the policies and operational practices of the Forest Stewardship Council (FSC); certification audits; the claims that arise from FSC certification; the relationships between FSC certification and compliance with forest management laws and regulations in Canada; and the place of "Free, Prior and Informed Consent within FSC. I submit this Declaration in support of Defendants' Motion to Strike Pursuant to O.C.G.A. § 9-11-11.1, and in response to the declaration submitted by Frederick Cubbage on behalf of Resolute Forest Products, Inc., Resolute FP US, Inc., Resolute FP Augusta, LLC, Fibrek General Partnership, Fibrek U.S., Inc., Fibrek International Inc., and Resolute FP Canada, Inc. (collectively, "Resolute"). I am over the age of 21, and I am competent to provide this Declaration. I make this declaration based on my own personal knowledge, training and experience with forest certification under the FSC, the regulatory regimes in Canada that govern forest management and the practice of auditing in the context of FSC certification.

## INTRODUCTION

1.      I have been asked to provide opinions about specific matters related to the Forest Stewardship Council (FSC) certification of forests managed by Resolute Forest Products (Resolute) in Ontario and Quebec in the Boreal Forest Region of Canada.  In this submission I make the following five points:

    a.   FSC is a well-developed and highly regulated system that includes a rigorous system of auditing and identifying non-conformances that, in unusual and rare circumstances, and after a thorough process, leads to suspension when non-conformance is not remedied.

    b.   There are significant differences between compliance with the regulatory regimes in Ontario and Quebec and voluntary forest certification.

    c.   FSC certification has been achieved on over 50 million hectares (almost 125 million acres) in 70 different forests managed by numerous different companies across Canada.  FSC sets high standards but those standard has been achievable by many companies in Canada who have made commitments to meet them.

    d.   FSC does not directly refer to "sustainability" but FSC certification indicates a higher level of performance to meet a higher and broader range of Indicators of social and environmental responsibility than are required in other certification systems or in legislation.  It therefore could be considered a surrogate for meeting many of the elements that most experts would consider to be part of "sustainability".

e.  The FSC requirements for FPIC (Free, Prior and Informed Consent) is not an outlier but is part of a larger trend that includes many other commodities and organizations and international agencies.

## SUMMARY OF QUALIFICATIONS

2.  I am an independent forestry consultant.  I provide consulting services in forest management planning, forest certification, forest policy and other areas of forestry through my business, Moore Resource Management.  I completed a Master's Degree in Geography (M.A. Resource Management) at the University of British Columbia in Canada in 1976. I completed additional university courses in Forest Management, and completed a supervised program of activities and a forest policy examination. I was accepted as a Registered Professional Forester (RPF) by the Association of British Columbia Forest Professionals in 1985.  I began my full-time professional career in 1976 and I have worked continuously in forest management since 1976, either in government (1976-1988 and 1995-2000) or as a private consultant (1988-1995 and 2000-present).

3.  My forest consulting work (1987-1995 and 2000-2016) has involved work in 5 different provinces in Canada and 12 other countries around the world (USA, Montenegro, Russia, Kenya, Tanzania, Indonesia, Malaysia, Bangladesh, Guatemala, Guyana, Cameroon and Australia).  I have worked for a diversity of clients – forest companies, governments, international multi-lateral organizations, environmental non-government organizations, and First Nations.

4.  Since 2000, much of my consulting work has involved projects related to Forest Stewardship Council (FSC) certification.  As an independent self-employed consultant, I have

served as a team leader or team member on approximately 82 FSC audits[1] involving approximately 30 different forest management units, and approximately 21 different forest companies in 8 countries.  I have done extensive FSC auditing work in 5 provinces in Canada including 12 audits in the boreal forests in Ontario. Virtually all of these audits were multi-day projects, involving teams of professionals.  All of the audits were forest management audits, not chain of custody audits.

5.      Since 2000, I have also been active as a consultant in the development of the policies, procedures and forest management standards in the FSC system that guide certification bodies (CBs) and auditors in conducting audits in the Boreal Region of Canada and other countries. I assisted in the development of, and/or the field testing of, the FSC standards in 3 provinces in Canada, and in Kenya, Montenegro, Russia and Alaska. I have been a member of the Policy and Standards Committee of the FSC International Board since 2013, and I have been chair since 2015.  Previously, I served on three different Advisory Committees established by FSC international or FSC Canada.

6.      From 2000 to 2015, most of my FSC auditing was done on single project contracts with Rainforest Alliance (previously known as SmartWood), a global FSC CB responsible for the largest number of FSC certificates in Canada.  Over that period I was designated as a Rainforest Alliance "Senior Auditor" and I was retained by Rainforest Alliance to lead their most complicated and contentious audits.  I provided advice to other auditors, and I provided consultant services to Rainforest Alliance on their internal audit procedures and on

---

[1] The terms "audit" and "auditor" are used broadly in FSC certification and in other certification systems to describe the evaluations that are carried out by teams of professionals on a defined area of land to evaluate the conformity of forestry activities with the requirements of a specific certification standard.  I use the term "audit" as a general term to refer to a number of different types of evaluations, often with different names, that are undertaken as part of the certification process. I use the terms "auditor" and "audit team" to refer to the people who carry out those different types of evaluations.   Different organizations and different systems use different terms.

training of their consultant auditors.  Over several years, I participated in conference calls with all the auditors working on contract with Rainforest Alliance in Canada to ensure a consistent approach to similar issues across the country.  In May 2015, I ended my affiliation with Rainforest Alliance (RA) and I have done no work for RA since them.  I have had experience working with two other FSC accredited CBs, and I have read many audit reports prepared by other FSC CBs.

7.     As a consultant I have also assisted in the development of certification standards in other resource sectors and unrelated to FSC.  This has led me to review many standards involving agriculture products (palm oil, beef, coffee) pulp and paper products, mining and jewelry products, as well as fair trade and organic certification.

8.     Prior to my work in FSC certification, I served two terms (1995-2000) as the first Chair of the Forest Practices Board (FPB) of British Columbia.    In this capacity, I led the "independent watchdog for sound forest management in B.C." As Chair, I was responsible for carrying out a statutory responsibility to audit forest practices and government's enforcement of forest practices legislation in the province, deal with public complaints, challenge government decisions and report to the public and the provincial Legislature about the state of forest practices in B.C. In this capacity, I led the development of independent forest practices audits in British Columbia. Over the course of my 5-year appointment, I was responsible for supervising a team of staff and consultants and completed 26 audits, approximately 100 complaint investigations and special investigations, five Annual Reports to the Legislature, and numerous legal challenges to government decisions. I made many public statements, press releases and speeches, and held public meetings throughout B.C.  This appointment reflected my previous years of experience

(1976-1988) in government with the administration of legislated forest management requirements and my independence as a respected forestry consultant (1988-1995).

9.      I am a very experienced professional practitioner within the FSC certification system, with experience covering both the policy and procedural aspects of how audits are conducted within the FSC system, and the practical aspects of how teams of professionals working for a CB actually conduct those audits.  I am also familiar with forest legislation and regulatory regimes in Canada and am knowledgeable about the significant differences between the regulatory system and forest certification.

10.     I attach at **Exhibit A** a full current curriculum vitae and a list of my work involving FSC audits, policy and procedure.

## PRIOR KNOWLEDGE OF RESOLUTE'S ACTIVITIES

11.     I am a member of the Forest Stewardship Council and an experienced FSC auditor who has worked on FSC related projects in 5 provinces of Canada since 2000.  I have had interactions with Resolute Forest Products during FSC audits in north-western Ontario and with some of the individuals who were members of the Rainforest Alliance audit teams in the other parts of Ontario and Quebec in 2013.  I also have some familiarity with the circumstances that preceded the legal action launched by Resolute against the Rainforest Alliance and others related to the 2013 audits.  However, I did not work on any of the audits that led to suspensions of any of Resolute's FSC certificates, and I was not in any way involved in the legal action against the Rainforest Alliance.

12.     Specifically, in 2008, 2009 and 2010, I was either the team leader or a team member on the Rainforest Alliance audit teams evaluating the Caribou Forest in northwestern Ontario that was owned and managed at that time by Abitibi-Bowater, now Resolute. In 2013, I

was the team leader on an annual audit of the Caribou Forest that included an audit of a planned expansion of that certificate to include the English River Forest, also in northwestern Ontario and also owned by Resolute.  In the course of that work in early October 2013, I interacted with Rainforest Alliance staff and my audit team members, and with Resolute staff in the Thunder Bay office on FSC requirements related to caribou, protected areas and First Nations on the Caribou and English River Forests.

13.     I had no involvement whatsoever at any time in the audits of the Black Spruce and Dog River-Mattawin Forests in Ontario.  At the time of the October 2013 audit of the Caribou Forest, I was aware that there was also an audit of the Black Spruce and Dog River-Mattawin Forests underway, and that non-conformities with the FSC system in that forest unit involved similar conformance issues that I and my team were confronting on the Caribou and English River Forests.  Thus, to ensure consistent approaches across the audits, I discussed those issues with the auditors involved in the Black Spruce and Dog River-Mattawin audit, with Resolute staff and with Rainforest Alliance staff.  That communication was normal professional practice.  I did not have any further involvement or any discussions whatsoever related to any of those audits or any subsequent activities on those forests after I completed the Caribou annual audit report at the beginning of January 2014.

14.     I have never had any involvement whatsoever in the Lac St-Jean and Mistassini-Perinbonka forests in Quebec.  I am a professional colleague of the team leader of those 2012 audits and I have worked on other FSC projects with him.  I am unaware of any of the circumstances in those forests and I have never had any communication with that individual or any persons related to the issues or findings in those audits in Quebec.

15.     In 2014, as an FSC member, I was aware of the legal proceedings initiated by Resolute against the Rainforest Alliance and two individuals, which proceedings later settled.  I worked closely with those individuals on the Caribou Forest audit and other audits over my years working with Rainforest Alliance.  They are professional colleagues.   As a member of the FSC Policy and Standards Committee, I participated in a discussion of the FSC response to the legal proceeding initiated by Resolute.   As a member of FSC I wrote letters to FSC Canada and members of the FSC International Board to express concerns about Resolute's action and to urge a response from FSC.

I have never had any contractual or work relationships with Greenpeace anywhere. I have no knowledge or any prior involvement whatsoever in any aspect of the Resolute legal proceedings with Greenpeace.

## THE FOREST STEWARDSHIP COUNCIL CERTIFICATION REGIME

16.     I have reviewed the declaration of Dr. Frederick Cubbage submitted by Resolute in this litigation, and found many of the statements about FSC certification to be inaccurate and uninformed, perhaps because Dr. Cubbage apparently has very limited experience with the FSC system.   In order to address those inaccuracies in detail and to provide a more complete description than provided in the declaration of Dr. Cubbage, I provide here an outline of Forest Stewardship Council certification, especially as it pertains to the Boreal Region of Canada, and to the forest units in the Boreal region of Ontario and Quebec managed by Resolute that were certified and then suspended in 2014.

17.     The Forest Stewardship Council (FCS) is an independent and non-governmental organization with members and certified forests in over 80 countries.   FSC is governed by its members.  Every member self-identifies as belonging to a social, economic or environmental

chamber, based on their interests.   All decisions taken within FSC are based on chamber-balanced processes that give equal weight to the views of the members in these three chambers - economic, environmental and social.   A board of directors is elected by the members and an international staff carries out work on behalf of the board and the members to establish policy, procedures and standards that guide the strategic and operational direction of FSC certification globally. This organization is commonly referred to as FSC International. There are also FSC national initiatives (NI) that represent the interests of FSC members is a given region or country – for example, FSC Canada.

18.     FSC has established, through this chamber-balanced system, a standard of good forest stewardship, also referred to as responsible forest management, based on principles of "environmentally appropriate, socially beneficial and economically viable" management of defined areas of forest. FSC typically does not use the word "sustainable" in describing the forests or the forest management regimes that it certifies.

**The Framework of FSC Global Principles & Criteria and National and Regional Standards**

19.     As discussed below, FSC certification is based on conformity with a set of Indicators and Criteria that are found in a national or regional standard, for example, the FSC National Boreal Standard (NBS) in the Boreal Region of Canada. Auditing to assess conformance is conducted against the applicable national or regional standard such as the NBS. Like all other regional standards, the NBS provides guidance related to each Indicator in the form of "Verifiers".  These Verifiers are not conformance requirements, and are not audited in the certification process.

20.     The national or regional standards like the NBS follow a globally applicable framework of 10 Principles and 56 Criteria that are set out in the global FSC Principles and

Criteria.  These Principles and Criteria, commonly referred to as the P&C were originally developed in 1993.  They are the fundamental underpinning of all FSC certification. They provide the framework of globally applicable principles that are used to develop regionally appropriate and more detailed standards, like the NBS.  The P&C are not audited for conformance.  The 1993 P&C were modified in a minor way after 1993 but have been consistent from 2002 until 2015.[2] [3]

**FSC Regional Standards and Indicators**

21.    To make the global P&C applicable and appropriate to the many different forests, different jurisdictions, and different socio-economic and environmental conditions in forests around the world, FSC has established a system for developing regional or national standards based on these global P&C but with detailed requirements applicable to regional forests, for example the Boreal Region of Canada.  Thus, regional or national FSC standards are developed by FSC members within the region for the specific social, environmental and economic circumstances in that region in a "chamber balanced" process that follows requirements established by FSC International.

22.    These regional or national processes develop Indicators that establish the detailed requirements of the standard under each of the Criteria within each Principle.  The regional standard with a complete set of applicable Indicators is then submitted for approval by FSC International. Once approved by FSC, this standard is referred to as a Regional or National

---

[2] There are also FSC standards that establish Chain of Custody (CoC) requirements for use of FSC logos on products once they leave the forest. The CoC standards and other standards that regulate the use of the FSC Trademark, for example, are not addressed in this declaration.
[3] In 2015, a new version of the P&C was approved by the FSC membership.  New national and regional standards, including a single standard for Canada, are now being developed by standard development groups, and the new P&C will be implemented when these new national standards are approved by FSC.

Standard or a National Forest Stewardship Standard (NFSS).  This is the standard that must be met to achieve FSC certification in that specific region or nation.

23.     It is the Indicators developed in the regional process and published in a regional standard, such as the NBS, that set the specific requirements that must be met in any defined forest within that region in order for the forest to be FSC certified.  Auditors assess compliance against the Indicators and each Indicator is an equally important part of the standard as determined by the FSC members in the chamber balanced process.

**FSC's Guidance-Only "Verifiers"**

24.     FSC also requires Verifiers to be developed for each Indicator.  Verifiers provide examples of how an indicator can be met or provide guidance to auditors or companies seeking certification.  But Verifiers are guidance only, not conformance requirements and therefore are never audited. In his declaration, Dr. Cubbage refers to "an immense list of Indicators and Verifiers that cannot be checked specifically in the brief period of an audit".[4]  This is not correct. The content and the number of Verifiers in a standard is essentially irrelevant, except as guidance.  They are not evaluated in any audits. Conformity is assessed and reported against the Indicator.

**The National Boreal Standard in Canada**

25.     In Canada, 4 Regional FSC standards have been developed in this way to reflect different forest conditions across the country.  Three Standards are formally approved by FSC and are in use in Canada.  One of these is the National Boreal Standard (NBS) approved by FSC in 2004.  This standard applies to any and all forest units within the Boreal Region of Canada that seeks FSC certification.  The NBS (2004) was the standard used to audit Resolute in all forests in Ontario and Quebec.

---

[4] See Point 17, page 10, declaration of Frederick Cubbage.

**The FSC Certification Process**

26.     FSC certification applies to a defined area of forest.  In order to be certified as meeting the FSC standard, and eligible to make on-product claims that products from that forest are FSC certified, the forest must be audited by professionals working for, or retained on contract by, an accredited certification body (CB). The CB is selected by the applicant for certification and the CB then carries out all the necessary work to audit and determine conformity with the applicable standard.  If the applicant is found to be in conformity, the CB awards the certificate. The accreditation of CBs and the procedures that both the CB and the auditors working for it must follow in conducting audits and certifying conformance with the applicable FSC standard are also regulated by FSC.

27.     FSC sets the standards but the actual certification of forests (FM certification) is carried out by a CB.  The CB is accredited to carry out independent evaluations (audits) to assess conformity with the FSC standards on a defined forest area, and, if there is conformity, to award an FSC certificate confirming that the forest meets the applicable standard.  This confirms that the forest is a well-managed forest meeting FSC requirements for good forest stewardship. Where there is not conformity with an Indicator, the CB identifies a Non-conformity report (NCR) and, when NCRs are not fully addressed within the time period assigned, the CB must either not award the certificate, or must suspend the certificate.

28.     Rainforest Alliance is one of the largest CBs in the FSC system and was the CB that certified all the Resolute forests in the Boreal Region of Canada.  RA has staff and contract auditors around the world and is by far the biggest CB working in Canada and one of the two largest in the world in terms of FSC certifications.  It has a worldwide reputation in forest certification but also works in agriculture and tourism certification.

29.     Audits that lead to FSC certification are initiated by an applicant (for example, Resolute) that seeks certification for a defined area of forest that they have rights to manage. The first step is a full assessment conducted by auditors working for a CB (for example RA) to assess conformity with all the Principles, Criteria and Indicators in the applicable FSC National standard (for example the NBS).  For large forests, like those found in Boreal Canada the typical assessment team is 3 to 5 auditors who are on-site for 3 to 5 or more days. They assess the 185 Indicators in the NBS and write-up findings for each one. As noted above, they do not assess Verifiers.

30.     The audit includes collection and review of documents prior to the on-site visit, further review of documents and interviews of company staff on site, field visits, and interviews with Indigenous People and a wide array of stakeholders.  In this way conformity with every applicable Indicator in all the Criteria and Principles in the standard is assessed and reported in a full assessment report. Any Non-conformance identified is classified as Minor or Major Non-Conformance, following guidance and criteria established by FSC and the CB manuals.

31.     In an assessment, prior to certification, any Major Non-Conformance prevents certification until the non-conformity or non-conformities are resolved.   Minor Non-Conformances in an assessment do not block certification, but the certificate is issued with Minor Non-Conformity Reports (Minor NCR's) for each non-conformance.  The Minor NCRs must then be addressed and closed in the time frame assigned by the auditors, usually by the next annual audit in one year.  The findings of the audit team are reviewed, and may be challenged by the forest manager and finally by a task manager for the CB who must approve them.  All assessments leading to certification are independently evaluated by at least 2 peer reviewers before the Assessment Report is finalized and a certificate awarded.

32.     Once a certificate is awarded, the CB is required to conduct annual audits (also referred to as surveillance audits) on each certified forest.  These are conducted once in each calendar year with a scope limited to evaluation of a sub-set of Principles and Criteria, to any NCRs from previous audits, and to the substance of any complaints or issues raised by stakeholders.  Thus, annual audits do not assess all the Indicators, and typically are completed by a smaller audit team with fewer days of audit time.  They also involve review of documents, field observations and interviews with stakeholders and other methods of evaluation.  After five years of certification there must be a re-assessment which is another assessment of every Indicator to assess conformance.

33.     A Public Summary report detailing the assessment work and listing each NCR is posted on the FSC website. There is a system to address complaints or challenges to the audits from stakeholders and there is a defined dispute resolution process for companies who wish to challenge the audit findings.

**Major and Minor Non-Conformances**

34.     Any non-conformances identified in an annual audit following certification are classified as Major or Minor, and Non-conformance reports (NCRs) with timelines to rectify are written. Minor NCRs are then evaluated again at the next annual audit, and in the case of a Major NCR, the non-conformance is evaluated within 6 months in a Major NCR Verification Audit. Failure to close a Major NCR within the time allotted results in suspension of the certificate. Failure to close a Minor NCR results in it being elevated to a Major NCR again with a timeline, and if not closed in a Major NCR Verification audit, the certificate is then suspended.  Once suspended, the certificate can be re-instated when the NCR is closed. This process of full assessment, annual audits, identification of Minor NCRs, elevation to Major NCRs if not closed,

and then to suspension is a prescribed procedure and was followed in all three Resolute forests as specified in the FSC procedures.

35.     Major NCRs are not uncommon in FSC assessments, prior to certification, and must be closed before a certificate can be awarded.  However, they are very uncommon in annual audits following certification, since issues that would lead to major non-conformance issues typically are identified prior to certification.   Following certification, Major NCRs more frequently result from a failure to close a Minor NCR in an annual audit.   These occur occasionally, but are not common in Canada, since most forest managers work very diligently to close the NCRs before they are raised to Major NCRs.   They are not issued frivolously or without serious consideration by the auditors and the CB because they have significant consequences for both the forest manager and the CB. They are also subject to challenge by the certificate holder through the dispute resolution process.

36.     Suspension of a certificate is the required end result of a progressive process that, follows a progression from Minor NCR, to Major NCR to suspension over a period of approximately 18 months.  Suspension is highly unusual, and only follows diligent work and thorough consideration by the auditors and the CB.

37.     The performance of the CB and the auditors is closely monitored by both independent witness auditors retained by the CB, and by auditors retained by the Accreditation Services International (ASI) that audits CB work on behalf of FSC to ensure consistent application of all FSC requirements by the CBs and their auditors. In addition, stakeholders also review the Public Summary Reports and scrutinize auditor performance.

38.     In my opinion, based on my experience with a large number of audits conducted to meet the requirements of governments, certification systems and other needs, the FSC

certification system is a well-organized and controlled structure that included a robust process to develop regionally appropriate standards that reflect the perspectives and expectations of FSC members in that region. Conformance against the NBS in the Boreal Region of Canada is assessed by independent audit teams, within a very structured system, who carry out detailed document reviews, stakeholder interviews and field evaluations.

## DIFFERENCES BETWEEN CERTIFICATION AND COMPLIANCE WITH THE REGULATORY REGIMES IN ONTARIO AND QUEBEC

39.     In Ontario and Quebec, virtually all forestry activities occur on publicly owned land (referred to as Crown land).   Tenures are awarded by government.   The companies managing forests under those tenure arrangements are required to be in compliance with many provisions of provincial legislation and some limited federal legislation. Compliance is mandatory, and enforcement of the legislation is carried out by enforcement staff working for provincial and federal agencies who have powers to lay charges or levy other penalties or sanctions such as stop-work orders.

40.     Participation in a forest certification system, by contrast, is voluntary.  Companies with forestry tenures can choose to participate in a certification system of their choice – in Ontario and Quebec, this could be either FSC, the Sustainable Forestry Initiative (SFI) or the Canadian Standard Association (CSA) – or not to participate in any of the certification systems.[5] By choosing to participate in FSC, a company such as Resolute agrees to demonstrate that their forest management meets the standards of the FSC system, and agrees to subject themselves to audits carried out by accredited CBs and to meet all the requirements.  They choose to participate

---

[5] There is a perception that the government of Ontario requires forest companies to be certified under one of the three systems.  This is not correct.  Certification is encouraged by government but there is no such requirement for certification in legislation or even in policy.  Certification in Ontario is voluntary.

in the FSC, or other certification system, because they perceive that successful certification brings a variety of market and non-market benefits.  They are free to leave the system, without any impact on their tenure or regulatory compliance requirements.  In his declaration, Dr. Cubbage states that "Resolute should not be held captive to FSC's unreasonable demands…".[6] In my opinion, Resolute was not held captive; they had voluntarily chosen to participate in the FSC system.

41.     The legislation that companies must be in compliance with is passed by governments and reflects the will and the standards of the citizens resident there.  Certification requirements, on the other hand, reflect only the wishes and standards of the members who participate in those organizations and develop those standards.  FSC has attracted a specific set of members who, in general, have agreed to seek to implement different standards of management, usually higher standards, and a broader set of perspectives on good management, usually in areas of socio-economic benefits, environmental protection, local economic development and stakeholder consultation.  Companies who choose to meet those higher and broader FSC standards on the forest land areas that they manage do so for a variety of reasons that reflect corporate priorities, often related to market benefits or access, or social license. These motivations are completely different than the requirement to comply with all applicable legislation.

42.     Compliance with laws, regulations, treaties, and international conventions is part of the FSC standards.  It is set out in FSC Principle 1, titled Compliance with Laws and FSC Principles, and includes 6 Criteria and a number of Indicators in each Criteria.  Companies cannot be awarded FSC certificates without being in compliance with Principle 1.  However, in

---

[6] See Point 48, page 17, declaration of Frederick Cubbage.

addition to Principle 1, FSC certification requires conformity with many other elements of forest stewardship that are set out in the Criteria and Indicators in 9 other Principles.

43.    It is incorrect to state or imply, as Dr. Cubbage does in his declaration, that a company that meets regulatory regimes therefore should be certified.[7]  It is also incorrect to state that a company that meets regulatory requirements is equivalent to a company meeting all FSC certification requirements.  Finally, it is incorrect to state that a company that meets regulatory requirements is "sustainable".  The FSC certification system establishes a higher standard and a broader suite of requirements and FSC certification is indicative of better stewardship that is more socially and environmentally responsible, more consultative, more respectful of Indigenous Peoples rights, and more protective of endangered wildlife and high conservation values than is compliance with provincial legislation.  Achieving an FSC certification requires the company to carry out many activities and field practices that are not required by legislation.

44.    FSC by its own design, sets a high standards.  Not every forest company is expected to meet it.  However, it is not "unachievable" as suggested by Dr. Cubbage.[8] Forest companies in the boreal forests of Ontario, Quebec and Alberta and in other types of forests in other provinces have managed to achieve and maintain FSC certification.  Currently in Canada, there are over 50 million hectares (almost 125 million acres) certified in over 70 different forest management units, the great majority of these in the boreal region and certified under the NBS. All of these forests, managed by a number of different companies, have met and continue to meet the FSC requirements and continue to be certified through annual audits and re-assessments.

---

[7] See Point 49, page 17, declaration of Frederick Cubbage.
[8] See Point 45, page 16, declaration of Frederick Cubbage.

That indicates that in those same jurisdictions, the FSC targets have been achieved and have been within the control of other forest companies to meet.

45.     In 2000, upon completing my second term as Chair of the British Columbia Forest Practices Board (FPB), I returned to private practice and re-opened my consulting business with a specific focus on forest certification and the work of the FSC.  This decision was based on my learning at the FPB that enforcement of a comprehensive regime of forestry legislation is an effective way to bring all companies into basic compliance with legal standards.  However, legislation does not cover many of the diverse elements that are now considered good forest stewardship, or best management, or sustainable forestry.  Legislation is ineffective in fostering innovation and often stifles corporate commitment and practice to do a better job of stewarding forests and striving for sustainability than simple compliance with legislation.  My experience was that certification, as a voluntary scheme promising a reward from consumers in the market place, was a much more effective way to improve forest management and realize good forest stewardship than enforcement of a narrow set of regulatory requirements.

**THE RIGOROUS AUDITING THAT LED TO RESOLUTE'S SUSPENSIONS**

46.     I have described the process of assessments and annual audits that are required in the FSC system prior to, and following, the award of a certificate.  These audits involve a detailed analysis of documents, observations in the field, interviews with stakeholders, and often consultation with outside experts.  They are carried out by teams who work together for several days.  The results are reviewed externally and because they are published on the FSC website are subject to public review.  FSC audits are thorough and rigorous, and are supervised by

professionals employed in CBs.  The audits are regularly evaluated by the independent external body, ASI.

47.     Auditors who work for, or on contract with, accredited CBs must meet minimum standards of education, work experience, and training in FSC systems.  They must sign declarations that they have no conflicts of interest or bias.  All of these requirements are established within FSC standards and the auditing manuals of the CBs and are monitored by both the CBs and by the independent external body, ASI.  These have ensured a high standard of auditing in FSC certification in Canada, including Ontario and Quebec.

48.     From 1995 to 2000 I led the development of independent forest audits in British Columbia, and was responsible for the release of 26 Forest Practice Board (FPB) audit reports.  I am also familiar with the Independent Forest Audit (IFA) in Ontario.  Both of these programs are recognized globally as leaders in forest auditing.

49.     In my professional experience, based on my knowledge of the systems in place and the CB involved, I believe that the audits conducted on the Resolute forests in Ontario and Quebec were done by well-qualified individuals who followed a well-defined and rigorous process.  I am confident that these audits fully met the standards expected for credible independent audits.  Based on the checks in place, there is no reasonable probability that the auditors were superficial or biased in their work or took findings of non-conformance lightly. The steps leading to suspension were progressive over a period of approximately 18 months. The non-conformances that ultimately led to suspension were substantial and substantive non-conformities with FSC indicators.  In the circumstances, the auditors involved had no choice but

to recommend suspension, and RA, as the CB, was also required to follow the established process that required suspension in those circumstances.

In his declaration, Dr. Cubbage refers to the SFI certification system at several points and refers to the fact that 100% of Resolute's forests were audited and certified by SFI.  SFI is a legitimate and very successful forest certification system but as Dr. Cubbage points out, SFI is based on conformity with a significantly different set of standards than FSC.[9]  In my opinion, the SFI certifications do not "corroborate" anything in regard to FSC certification.  They simply reflect the fact that different auditors found conformity with a different standard that was developed by different interest groups and that reflects different forest management priorities and values.

## THE MEANING OF FSC CERTIFICATION AND CLAIMS OF SUSTAINABILITY

50.     As described above, "sustainability" is not a word that is used within the FSC system to describe the attestation associated with FSC certification.  FSC certification is an attestation of good forest stewardship, or responsible forest management measured by the requirements and standards established within the FSC Principles, Criteria and Indicators.

51.     Sustainability is also not normally associated with full compliance with applicable legal or regulatory requirements.  That would be described simply as a state of being in full compliance with legislation.

52.     Based on my experience with both provincial legislation and compliance, and with FSC certification, my professional opinion is that FSC certification is indicative of better stewardship that is more socially and environmentally responsible, more consultative, more

---

[9] See Footnote 10, pages 13 and 14, declaration of Frederick Cubbage.

respectful of Indigenous People's rights, and more protective of endangered wildlife and high conservation values than is compliance with provincial legislation. Certification does not measure "sustainability" but FSC certification indicates a higher level of performance to meet a higher and broader range of Indicators of social and environmental responsibility. It therefore could be considered a surrogate for meeting many of the elements that most experts would consider to be part of "sustainability", even though that term is very elusive and vaguely defined. While FSC does not refer to "sustainability", I believe it would be fair to say, in very simple terms, that a forest that is FSC certified is more likely to meet more tests of "sustainability" than one that is not, or one that is certified to another system, or one that meets legal requirements.

## "FREE, PRIOR AND INFORMED CONSENT" IN THE FSC STANDARD

53.     One of the important Principles that have been a fundamental underpinning of FSC certification since 1996 is Principle 3 "Indigenous Peoples Rights". Criterion 3.1 within Principle 3 states:

> *"Indigenous people shall control forest management on their lands and territories unless they designate free and informed consent."*

54.     The requirement to obtain "free and informed consent" for forest management plans and operations from Indigenous Peoples on lands within their territories has always been and remains an integral part of FSC's mission. Principle 3 encourages forest management that can lead to relationships and agreements with Indigenous Peoples as a sign of respect for aboriginal rights to lands and territories. It is an important demonstration of FSC's desire to support and reward socially responsible forest management that respects the rights of Indigenous Peoples.

55.     In Canada, it is well known that FSC Principle 3 imposes a greater burden on companies seeking FSC certification than national or provincial law.  It is also known that this requirement does not appear in other forest certification standard and is one of the key areas that distinguishes FSC from those other forest certifications. It reflects FSC's higher and different standards for good stewardship or responsible management.

56.     The Criteria and Indicators in Principle 3 establish requirements that are among the most difficult to meet and for that reason they are closely scrutinized by auditors. As a result, in Boreal Canada there have been numerous NCRs imposed by auditors either as Major NCRs that had to be closed prior to certification, or as Major or Minor NCRs imposed during annual audits that had to be closed in the next audit.  Some companies have likely chosen not to seek FSC certification because of the requirements of Principle 3.  However, in virtually all cases, those that have applied for FSC certification, and those that manage FSC certified forests have worked diligently to address the issues that led to the NCRs and they have successfully met the requirements and closed the NCRs either prior to the certification or in subsequent audits.

57.     All of the approximately 50 million hectares of certified forests in 70 forest management units managed by different companies across Canada have managed to meet the requirements in Principle 3, and have maintained conformance with FSC requirements, including Principle 3.  I am not aware of another FSC certificate that has been suspended for non-conformance within Principle 3.  It is not correct to state, as Dr. Cubbage does, that only 33% or less of FSC certified operations in British Columbia would be considered to have fully satisfied the FPIC criterion".[10]  In fact, all of the certified forests (100%) in Canada have fully satisfied the requirements of Principle 3 to remain in conformity and to remain FSC certified. In the FSC

---

[10] See Footnote 7, page 10, declaration of Frederick Cubbage.

certified forests that I am familiar with, full conformity with Principle 3 has been determined and documented in the audits. It is a challenge and requires effort by companies, but the requirements have been regularly achieved.  If they were not possible to achieve, there would be no FSC certificates in Boreal Canada.

58.     FSC is not an outlier in its emphasis on implementing FPIC, as stated by Dr. Cubbage.[11]  FPIC emerged as a formal concept in the United Nations Declaration on the Rights of Indigenous Peoples that was passed by the UN General Assembly in 2007.  In Canada, the government first announced support for UNDRIP in 2010, and then in 2015 announced that it fully supported UNDRIP without qualification.[12]  The endorsement of FPIC is also consistent with decisions emerging from the Supreme Court of Canada regarding respect for the rights of Indigenous Peoples.  Thus the FSC emphasis on requiring FPIC in Canada is consistent with the emerging direction more generally in Canada.[13]

59.     FPIC is also being quickly adopted by other commodity certification systems, and by other resource companies internationally and in Canada.  For example, I am aware of the following:

> In 2012, the Boreal Leadership Council (BLC) in Canada, with membership including forest companies (Tembec and Domtar), an energy company (Suncor), a bank (TD Bank group) and others expressed multi-stakeholder support for the concept of Free, Prior, and Informed Consent and in 2015 published a guide to

---

[11] See Point 39, page 14, declaration of Frederick Cubbage.
[12] Support by the government was dropped for a period between 2010 and 2015.
[13] FSC Canada Guidance on Free, Prior and Informed Consent (FPIC).

Understanding Successful Approaches to Free, Prior, and Informed Consent in Canada. [14]

In 2013 Asia Pulp and Paper (APP), the largest forest company in Asia produced a corporate Forest Conservation Policy (FCP) as a commitment to socially and environmentally responsible operations in all of its plantation forestry operations in Indonesia.  This FCP includes a commitment to social and community engagement that includes a commitment to implement FPIC.[15]

In 2013 the Roundtable on Sustainable Palm Oil (RSPO), with over 2500 members around the world produced Principles and Criteria for the Production of Sustainable Palm Oil.  This standard is the basis for certification of palm oil producers and processors around the world.  It has numerous references to FPIC.  This standard builds on a 2008 guidance document on FPIC.[16]

In 2014, the World Bank produced an Environmental and Social Standard for Indigenous Peoples to set out draft requirements for the Bank and its borrower countries related to development projects.  This standard described FPIC at some length and describes circumstances where FPIC applies to Bank projects.[17]

60.     FSC is the only one of the three forest certification systems in Canada to require "consent" and to embrace FPIC for forestry operations and to respect Indigenous Peoples rights in this way.  However, FSC is clearly not "an outlier".  In my experience, FPIC is increasingly a

---

[14] BLC 2012, *Free, Prior, and Informed Consent in Canada: A summary of key issues, lessons, and case studies towards practical guidance for developers and Aboriginal communities; and*
*BLC 2015*. Understanding Successful Approaches to Free, Prior, and Informed Consent in Canada. Part I. September 2015. *Recent Developments and Effective Roles for Government, Industry, and Indigenous Communities*
[15] Asia Pulp and Paper (APP), 2013. Forest Conservation Policy.
[16] Roundtable on Sustainable Palm Oil, 2014. Principles and Criteria for the Production of Sustainable Palm Oil
[17] World Bank, 2014. Environmental and Social Standard 7. Indigenous Peoples. Draft for Consultation.

normal part of demonstrating leadership in good forest stewardship throughout the world and for many other natural resources.  In this way the FSC requirements are part of Canadian and global change to recognize and respect the rights of Indigenous Peoples as envisioned by the UNDRIP.

61.     Based on my familiarity with the requirements of the National Boreal Standard for Canada, with the FSC and CB procedures that guide the conduct of audits and the issuance of Minor and Major NCRs, and with the qualifications, experience and training required of auditors, as I have described above, I do not believe that the suspensions of the Resolute certificates were a result of merely "technical reasons"[18] or "possible bias".[19] The suspensions involved non-conformance with substantive FSC requirements, and occurred after a thorough process that is controlled by procedures established by both FSC and RA, the accredited certification body.

62.     I declare, certify, verify and state under perjury that the foregoing is true and correct.

Keith Moore M.A., R.P.F.

Queen Charlotte, BC, Canada

January 22, 2017

---

[18] See Point 26, page 10, declaration of Frederick Cubbage

[19] See Point 34, page 12, declaration of Frederick Cubbage.

EXHIBIT A

*CURRICULUM VITAE*

# KEITH MOORE M.A., R.P.F. (B.C.)

| | |
|---|---|
| P.O. Box 209 | Tel:    (250) 559-8700 (office) |
| Queen Charlotte, Haida Gwaii, | E-mail: mrm@qcislands.net |
| British Columbia, Canada    VOT 1SO | Skype:  mrmkeith |

## *PERSONAL DATA*

| | |
|---|---|
| Profession: | Forester, R.P.F. |
| Nationality: | Canadian |
| Health: | Excellent |

## *PROFESSIONAL WORK EXPERIENCE*

**March 2015 to present      Environmental Forestry Consultant (self-employed), Moore Resource Management, Queen Charlotte City, Haida Gwaii, B.C., Canada.**

**Projects**
- Team member on 5 person team completing Centralized National Risk Assessment (CNRA) for Canada related to FSC Controlled Wood (2016)
- Evaluated an offer of a 25-30,000 hectare community forest to a group of five communities on Haida Gwaii, Canada and provided advice. (2016)
- Team member on 4 person team undertaking an FSC controlled wood assessment in a natural forest concession in East Kalimantan, Indonesia. (2016)
- Led 3 person team undertaking a re-assessment of an FSC certified plantation operation in Sabah, Malaysia. (2016)
- Developed set of performance-based standards for pulp and paper operations in Indonesia for two large international NGO's and international consumer groups.(2016)
- Led field assessment team in North Kalimantan, Indonesia to review methodology and collect field data to compare carbon emissions from conventional logging and "reduced impact logging (RIL)" in two cutblocks in a forest concession.(2015)
- Forestry Strategy Co-ordinator, Haida Gwaii Management Council - Led community consultation meetings, organized and facilitated a 2 day public forum with over 100 people to discuss the development of a comprehensive forestry strategy for Haida Gwaii with an emphasis on creating a sustainable economy and community wellbeing through management of the forests on Haida Gwaii. Continued development of community-based forestry strategy until end of September, 2015. (2015)
- Led a 4-person team undertaking a re-assessment of a large FSC certified forest in northern Alberta.(2015)
- Organized and facilitated trip for media to Haida Gwaii on behalf of Rainforest Alliance to look at forestry operations of FSC certified Taan Forest Products. (2015)

**January 2014 – February 2015     Team Leader, Independent Evaluation of Progress by Asia Pulp and Paper to meet Commitment Made in their Forest Conservation Policy, February 2013.**

Key tasks
- Developed procedures to undertake an evaluation of one of the most controversial pulp and paper companies in the world.
- Recruited and led a team of 9 other consultants, from Indonesia, Malaysia and Germany in this large year-long evaluation, while resident in Indonesia.
- Led field work in a total of 21 different forest concessions scattered across 5 provinces of Indonesia.
- Undertook extensive consultations with social and environmental NGOs, nationally and internationally, and with many other institutions.
- Drafted report for public release.

**June 2000 – December 2013.  Environmental Forestry Consultant (self-employed), Moore Resource Management, Queen Charlotte City, Haida Gwaii, B.C., Canada.**

**FSC Certification-related Work, 2012 and 2013**
- Assisted international working group to develop first draft of generic indicators for new FSC Principles and Criteria. (2013)
- Team leader on annual audits in south-eastern BC (Canfor),  Alberta (Al-Pac) and northwestern Ontario (Resolute) and verification audit in Nova Scotia, Canada.(2013)
- Confidential consultant evaluation of a large company in eastern Canada for potential FSC certification. (2012)
- Team leader on pre-assessment (Canfor) in Kootenay region, BC, Canada. (2012)
- Team leader on annual audits in BC (Canfor), Alberta (Al-Pac) and Nova Scotia (NSLFFPA) Canada. (2012)
- Team leader on Major NCR verification audit (CFCI) in coastal BC, Canada. (2012)
- Developed revised Rainforest Alliance standard for FSC certification in Australia. (2012)

**Forest Management and Related Work, 2012 and 2013**
- Provided advice about the development of a major project involving evaluation of progress by a large forest company in Indonesia to meet new corporate policies and commitments. (2013)
- Completed a discussion paper "A Comprehensive Forestry Management Strategy for Haida Gwaii" to stimulate public dialogue about future forest strategies on Haida Gwaii for Haida Gwaii Management Council.(2013)
- Independent environmental impact assessment of projects implemented in Guatemala by Rainforest Alliance with US AID funds to meet US environmental regulations.(2012)
- Developed and undertook a project to promote FSC certified wood products from Guatemala in BC.(2012)
- Team member on assessment of performance by Government of Guyana on UN sponsored REDD+ initiative funded by Government of Norway.(2012)

**FSC Certification-related Work, 2006-2011**
**2011**
- Team member on two annual audits (Iisaak) in coastal BC, Canada.

- Team leader on evaluation of suspended FSC Controlled Wood certificate (APRIL), Sumatra, Indonesia.
- Interpretation work on FSC Policy for Association and Rainforest Alliance Policy on High Visibility Operations.
- Preliminary work on development of standards for FSC certification of protected areas in Guatemala and study of FSC protected areas globally for presentation to side meeting at FSC General Assembly.
- Team leader on annual audit (NewPage Port Hawkesbury) Nova Scotia, Canada.
- Team leader on assessment (Gunns), Western Australia and South Australia.
- Team leader on pre-assessment (WAPRES) in Western Australia.
- Team leader on annual audit (CFCI) in coastal BC, Canada.

**2010**
- Team member on annual audit (Tembec), north-eastern BC.
- Team leader on annual audit (CFCI), coastal BC.
- Team leader on reassessment (Al-Pac), northern Alberta.
- Trainer on auditor training program in Nova Scotia.
- Team leader on annual audit (NewPage Port Hawkesbury), Nova Scotia.
- Team member on annual audit (Abitibi Bowater), north-western Ontario.
- Team leader on pre-assessment (Gunns) Tasmania, Australia.
- Developed procedures for addressing overlapping tenures on certified land areas
- Team leader on pre-assessment (Spray Lake Sawmills), southern Alberta.

**2009**
- Team member on re-assessment (Tembec), south-east BC.
- Co-team leader of pre-assessment and assessment team (Abitibi Bowater), Caribou Forest, north-western Ontario.
- Team member of assessment (SFIL-Decolvenaere) in eastern Cameroon, West Africa.
- Trainer for team leader and auditor training programs.
- Team leader on 3 annual audits in Nova Scotia and New Brunswick.

**2007 and 2008**
- Team leader of pre-assessment and assessment (Coast Forest Conservation Initiative) group certification in the mid-coast area of British Columbia.
- Team member and co-team leader of familiarization tour and pre-assessment (Sealaska Corporation), Southeast Alaska.
- Team leader of assessment (Tembec Chetwynd), boreal region of British Columbia.
- Team leader of assessment (NewPage Port Hawkesbury), mainland and Cape Breton Island of Nova Scotia.
- Team leader on pre-assessments/gap analyses of 6 different forest company operations in Canada - four in British Columbia, one in New Brunswick and one in Alberta.
- Team leader on one annual FSC surveillance audits in Australia, 3 in BC, and a major corrective action request audit in Alberta.
- Providing technical assistance to World Bank/World Wildlife Fund Alliance, NGOs and forest companies in Kenya to develop FSC standards for Kenya.
- Led two workshops on FSC certification in British Columbia sponsored by FSC Canada, Tembec and SmartWood, and spoke at major community conference.

**Forest Management and Related Work, 2006-2011**

- Assisted and provided technical advice to Government of BC and Council of the Haida Nation about implementing ecosystem-based forest management (EBM) planning on Haida Gwaii. (2006 to 2011)
- Member of 5 person team developing standards for ecosystem-based management for the Canadian boreal forest; expert advisor to Canadian Boreal Forest Accord. (2010 and 2011)
- Conducted evaluation of timber investment corporation (TIMO) in southern USA for large European institutional investor. (2007)
- Member of a team providing advice to government of Montenegro about development of National Forest Policy. (2007)
- Facilitated joint technical evaluation of the effects of draft Land Use Plan Agreement for Haida Gwaii on economically available timber supply. (2007)
- Assisted Okanagan Indian Band to assess logging plans and develop a land use plan for watersheds within their territory. (2006, 2007)

## March 2000 to December 2006 Work

**Forest Certification**

- Team leader on pre-assessment of a forest company in Nova Scotia for certification (2006).
- Leader of assessment team on two Tembec Industries forest licences (268,000 ha) in East Kootenay area of British Columbia for FSC certification. (2005-2006)
- Leader of assessment team on Alberta Pacific Ltd. forest management area (5.8 million ha) in northern Alberta for FSC certification. (2005-2006)
- Leader of team for assessment of Tembec forest licence (217,000 ha) in south-eastern BC for FSC certification. (2005-2006)
- Part of 3-person team that provided technical assistance to Working Group developing FSC Standards in Montenegro. (2004-2006)
- Providing technical assistance to World Bank/World Wildlife Fund Alliance, NGOs and forest companies in Kenya to develop FSC certification standards for Kenya. (2005-2007)
- Team leader on seven annual FSC surveillance audits in Canada: three in Ontario (Tembec Romeo Malette, Smooth Rock Falls and Gordon Cosens Forests); three in BC (Tembec TFL 14 and Iisaak Forest Resources TFL 57, 2005) and one in Alberta (Al-Pac). (2004-2006)
- Team leader on two annual FSC surveillance audits of Hancock Victoria Plantations in Victoria, Australia. (2005 and 2006)
- Leader of assessment team on Domtar Ltd. Pineland Martel Forest (500,000 ha) in northern Ontario for FSC certification and co-ordinator/advisor for two other assessment teams on Algoma and Northshore Forests (1.5 million ha) in north-eastern Ontario. (2004)
- Leader of assessment team on Tembec Romeo Malette and Smooth Rock Falls Forests (total area of 1.1 million ha) in northern Ontario for FSC certification. (2004)
- Leader of assessment team on Tembec TFL 14 in south-eastern BC (150,000 ha) for FSC certification. (2003)
- Co-ordinated the field-testing of the draft Forest Stewardship Council Standards for British Columbia (2001); Northern Ontario (2002); Komi Republic of Russia (2002) and the Boreal Forest Region of Canada (2003) and provided extensive recommendations for changes and improvements to the standards in all four regions.
- Compared the auditing procedures for certification under the Forest Stewardship Council (FSC) and Sustainable Forestry Initiative (SFI). (2003)
- Member of team auditing a forest area in Komi Republic in Russia (700,000 ha) to determine if it met pre-conditions for FSC certification. (2 trips 2002)

- Member of a 3-person international Commission of Enquiry into the approval of the Forest Stewardship Council's Regional Standards for the Maritime Region of Canada. (2000)

**Independent Forest Audits**
- Member of a team retained by Ontario Ministry of Natural Resources to evaluate the Independent Forest Audit (IFA) program in Ontario. (2006)

**Land use planning**
- Acted as advisor and technical consultant to the Land-use Planning Team for Haida Gwaii led by the Province of BC and the Council of the Haida Nation. (2003-2005)
- Technical reviewer of BC Forest Practices Board proposal to undertake an audit of biodiversity conservation. (2005)
- Member of 5-person team that developed drafts of an Ecosystem-based Management Planning Handbook for coastal BC. (2002)
- Participated in several workshops and assisted in writing a framework for implementing ecosystem-based management in coastal BC. (2002)
- Reviewed watershed management plans and provided advice about forest planning in Clayoquot Sound on Vancouver Island to a joint government/First Nations management board. (2001 and 2002)
- Co-ordinated a multi-disciplinary team developing a riparian decision-making tool for the central coast of B.C. (2001)

**Operational forest management planning**
- Reviewed a proposed amendment to a forest development plan with 41 cutblocks and provided recommendations for Council of the Haida Nation. (2003)
- Conducted a spatial assessment of timber supply in the Haida Gwaii portion of TFL 47 and provided recommendations about appropriate AAC to Council of the Haida Nation and Deputy Chief Forester. (2003)

**Windthrow assessment**
- Assessed windthrow along cutblock boundaries and provided expert reports (as expert witness) for prosecutions by Conservation Officer Service (2001 and 2002) and Department of Fisheries and Oceans. (2003)
- Assessed windthrow potential in proposed cutblock for small forest company. (2002)

**Other projects**
- Advised and assisted the Commission for Environmental Co-operation (NACEC) in their investigation of a complaint about logging in British Columbia. (2002)
- Supervised a project to develop strategies for restoring ecosystems from the impacts of introduced species on Haida Gwaii/the Queen Charlotte Islands. (2001)

## January 1995 - March 2000. Chair, Forest Practices Board of British Columbia, Victoria, B.C., Canada.

I served two appointments with a term of 5 years and 3 months as the first Chair of the Forest Practices Board of B.C. – the "independent watchdog for sound forest management in B.C." This role combined the roles of auditor-general, ombudsman and public interest advocate for sound forestry in the province.

As Chair, I was responsible for carrying out a statutory responsibility to audit forest practices and government's enforcement of forest practices legislation in the province, deal with public complaints, challenge government decisions and report to the public and the provincial Legislature about the state of forest practices in B.C. As the first Chair, I was responsible for leading the development of all policy and procedures in a brand new organization, recruiting senior staff and establishing an administrative structure for this independent tribunal. In this capacity I led the development of independent forest practices audits in British Columbia.

Over the course of my 5-year appointment, I was responsible for completing 26 audits, approximately 100 complaint investigations and special investigations, five Annual Reports to the Legislature, and numerous legal challenges to government decisions. I made many public statements, press releases and speeches, and held public meetings throughout B.C.

I chaired a board of 7 members and built an organization with up to 31 staff and an annual budget of approximately $6 million.  Under my leadership the Board developed a solid reputation as a fair and credible public watchdog for sound forest management. The Board recently completed 20 years as a very respected and valued independent body in British Columbia.

## 1988 - December 1994.  Environmental Forestry Consultant (self-employed), Moore Resource Management, Queen Charlotte City, Haida Gwaii, B.C., Canada.

I operated my own consulting business and completed a wide variety of forest and environment-related projects for more than 20 clients including:

| | |
|---|---|
| B.C. Ministry of Forests | B.C. Ministry of Environment |
| Conservation International | B.C. Parks |
| Husby Forest Products | Skeena Sawmills |
| Steelhead Society | Canadian Parks Service |
| Abfam Enterprises | Coast Forest Management |
| Department of Fisheries and Oceans | Friends of Ecological Reserves |
| Sandwell International | Hay and Company Consultants |
| United Nations Environment Programme | World Wildlife Fund |
| Malaspina College | MacMillan Bloedel |

Domestic projects included:

**Scientific Advisory Panel for Sustainable Forestry Practices in Clayoquot Sound**
Member of the panel that developed comprehensive standards for ecosystem management in the Clayoquot Sound area of British Columbia.

**Forest Sector Strategy Committee**
Represented environmental interests on an influential committee that advised government on developing long-term industrial forestry strategy for British Columbia and led to the establishment of a multi-million dollar Crown corporation, Forest Renewal B.C.

**Policy advice**
Advised the government of British Columbia on development and implementation of Forest Practices Code legislation and prepared a submission to a public enquiry.

**Forest ecosystem assessment and planning**
Undertook five projects to evaluate the environmental values that influence pattern of logging and road construction in previously unlogged or partially logged watersheds. The evaluations included wildlife and fisheries values, consideration of other old-growth forest values and the maintenance of biological diversity. Final reports provided detailed plans and recommendations about rate and pattern of harvest and protection of the values identified.

**Environmental impact assessment**
Undertook assessments of the impacts of planned logging operations for four forest companies and the Ministry of Forests.

**Forest practices audits**
Undertook audits of forest practices in several coastal and interior British Columbia logging operations to assess compliance with established guidelines.

**Coastal temperate rainforest conservation**
Undertook the first assessment of the conservation status of temperate rainforest ecosystems in coastal British Columbia and published a major report.

**Watershed restoration**
Prepared, with four other consultants, a rehabilitation program for roads, landings, landslides and cutblock boundaries on 3000 ha affected by logging and road construction.

**Training**
Presented 11 two-day courses in fisheries-forestry guidelines to groups of foresters, government biologists and technicians, and consultants.

Approximately 20 other domestic projects and 3 international projects.

## 1978-1986 and 1987-1988.  Habitat Management Biologist, B.C. Ministry of Environment, Queen Charlotte City, B.C., Canada.

Duties included:
**Environmental impact assessment**
Undertook environmental impact assessment of all forestry activities on the Queen Charlotte Islands and prescribed measures to avoid or mitigate environmental impacts.  Work included assessment of logging, road construction, silviculture, herbicide use, log storage and forest management planning.

Participated in several major environmental impact assessments including offshore oil exploration, a large gold mine development and an airport.

**Development of guidelines for forest harvesting activities**
Developed, or was a member of committees that developed, management guidelines for:
- logging on streamsides on the Queen Charlotte Islands;
- forestry activities in coastal British Columbia;
- hydrological guidelines for watershed management in coastal British Columbia.

**Soil conservation**
Member of a committee that initiated, planned and managed a $1.5 million, 5-year study of
the extent and impact of soil erosion following logging and road construction.

**Land use planning**
Member of a multi-sectoral public planning team that undertook a five-year study of future
land uses in the South Moresby area of British Columbia. The completed plan ultimately led
to the establishment of a 145,000 ha National Park Reserve.

**Wildlife and fisheries inventory**
Undertook or participated in several wildlife inventory projects including peregrine falcons,
bald eagles, and several species of seabirds and shorebirds. Assisted in inventory of fish
species in numerous streams and lakes.

## 1975-1978. Consultant, B.C. Ministry of Forests, Victoria, B.C., Canada.

Completed projects included:
**Streamside protection**
Developed, tested and published a handbook to guide decision-making about forest
harvesting practices along streamsides in order to protect fish habitat, water quality,
recreational potential and wildlife use, and avoid windthrow.

**Site preparation for regeneration**
Developed and introduced a new procedure for integrating silvicultural objectives and
forest protection objectives into site preparation after logging.

**Blowdown**
Completed a report on factors contributing to blowdown in streamside leave areas.

## 1974. Wildlife Technician, B.C. Ministry of Environment, Nanaimo, B.C., Canada.

Completed projects included:
**Streamside protection**
Undertook and reported on a study of the effectiveness of streamside leave areas for
protecting fish habitat from the impacts of logging.

**Moose habitat**
Undertook and reported on a preliminary study of moose habitat and moose population in a
coastal inlet of British Columbia.

---

## *INTERNATIONAL FOREST MANAGEMENT WORK EXPERIENCE (alphabetical)*

**Australia**       **Senior auditor and team leader, SmartWood/Rainforest Alliance**
Led teams on pre-assessment and assessment of controversial operations (Gunns and
WAPRES) in Western Australia, and South Australia. (2011)

Led pre-assessment of a large, very controversial company seeking FSC certification in
Tasmania, South Australia and Western Australia (Gunns). (2010)

Led three annual surveillance audits of a large and controversial FSC certified forest company in Victoria, Australia (Hancock Victoria Plantations). (March 2005, March 2006, February 2007)

**Bangladesh       Conservation Planner, Sandwell International**
Member of a large international team funded by UNDP and Asian Development Bank which prepared a Forestry Master Plan Team for Bangladesh. Resident in Bangladesh and responsible for protected areas assessment and conservation of representative ecosystems. (January to June 1992)

**Cameroon       Senior auditor, SmartWood/Rainforest Alliance**
Provided audit quality assurance as a member of 5-person assessment team for FSC certification of a large high profile concession in eastern Cameroon (SFIL). (2009)

**Guatemala       Independent consultant, TREES program, Rainforest Alliance**
Undertook 3 week environmental evaluation of projects implemented by TREES Program with funding from USAID in order to comply with US Regulation 216. (2012)

Led 2 person team evaluating potential for certification of Tikal National Park and developed a draft certification standard for protected areas. (2011)

**Guyana       Member of assessment team, Rainforest Alliance**
Participated on a 3 member team in a Government of Norway funded assessment of performance by the Government of Guyana to meet REDD+ Indicators established in an agreement between Government of Guyana and Government of Norway. (2012)

**Indonesia       Senior auditor, Rainforest Alliance, SCSGlobal and NEPCon**
Member of a team of 4 undertaking an FSC Controlled Wood assessment in a natural forest concession in East Kalimantan. (2016)

Led team of 4 in a short field assessment to test a methodology, and collect data to compare carbon emissions in conventional and reduced impact logging (RIL) in a concession in Kalimantan. (2015)

Led team of nine other professions undertaking an evaluation of the environmental and social practices of a large Indonesian company (APP). Resident in Indonesia for this year-long project that involved field work in 21 different concessions over a 3 month period. (2014)

Provided advice to senior Rainforest Alliance staff for development of a project to evaluate progress by a large Indonesian company to meet corporate policies and commitments. (2013)

Led 2-person team evaluating a highly controversial suspended FSC certificate (APRIL) and provided recommendations to parties about how to address issues that led to the suspension. (2011)

**Kenya       Technical advisor, World Bank/WWF Alliance**
Advisor to process to develop national FSC certification standards for Kenya including presentations to workshops, facilitating meetings and working with diverse interests in Kenya. (2005 - 2007)

Resident in Kenya and worked in the Tropical Forestry Program at UNEP headquarters. Work included preparation of background papers on forestry and conservation issues in Jamaica, Lesotho and Mali for the Tropical Forest Action Plan. (January to April 1989)

**Malaysia          Independent consultant and auditor, SCSGlobal**
Led 3 person team in a re-evaluation of an FSC certified plantation operation (AFI). (2016)

Attended General Assembly and Workshop of NEPCon, an international certification body. (2016)

Attended FSC General Assembly in Sabah, Malaysia and led a panel presentation to technical working session on certification of protected areas. (2011)

**Montenegro       Technical advisor, Lux Development Corp. and Cathro Consulting**
Member of a team funded by Lux Development Corporation to provide advice about development of national forest policy for Montenegro. (2007-2008)

Member of 3-person team funded by Lux Development Corporation that assisted national FSC Working Group to develop draft National FSC standards for Montenegro. (August 2004, January 2005, November 2005 and April 2006)

**Russia            Auditor, SmartWood/Rainforest Alliance**
With one other person undertook two pre-condition verification audits of a 700,000 ha forestry operation in the Komi Republic in northwestern Russia to determine if it had met pre-conditions for Forest Stewardship Council (FSC) certification established by a previous assessment team.  Undertook a field test of draft regional FSC standards in the Komi Republic. (March and October 2002)

**Tanzania          Forester, United Nations Environment Programme,**
With one other consultant undertook a field mission in Tanzania to review all aspects of the management and utilization of the African Blackwood tree (*Dalbergia melanoxylon*) and prepare a report for UNEP. (May through August 1987)

**USA               Auditor, SmartWood/Rainforest Alliance and Nepcon**
Co-team leader of a five person team doing a preliminary evaluation and a full pre-assessment of a large forest company in Alaska (Sealaska). (2007 and 2008)

Co-team leader on field testing of draft FSC regional standard for Alaska (2008)

Evaluation of forest management practices, social and environmental responsibility of a timber investment firm in Ohio and Georgia for a Danish consultant retained by a Danish pension fund. (2007)

---

## *INTERNATIONAL TRAVEL EXPERIENCE*

In addition to overseas consulting work experience in the USA, Montenegro, Russia, Kenya, Tanzania, Indonesia, Malaysia, Bangladesh, Guatemala, Guyana, Cameroon and Australia, my overseas travels have covered 75 countries including 28 African, 8 middle-Eastern, 7 Asian, 24

European and 5 Central and South American countries.  Traveling and working, I have spent more than 5 years overseas.

| | |
|---|---|
| 2016 | Attended international conference in Singapore. Visited Italy, Malaysia and Shanghai, China. Lived in Bali and worked in Sabah, Malaysia, and East Kalimantan, Indonesia (2 months) |
| 2015 | Travelled and lived in Indonesia (3 months).  Worked briefly in Indonesia. Travelled in Kenya and South Africa (5 weeks).  Presented paper at conference in South Africa |
| 2014 | Lived and worked in Indonesia for 11 months.  Extensive travel in Sumatra and Kalimantan and numerous trips to Jakarta.  Attended FSC General Assembly in Spain and travelled in Portugal (10 days). Attended meetings in Germany. Visited United Arab Emirates. |
| 2013 | Travel and holiday in South Africa (4 weeks) and Namibia (1 week). Holiday and work in Indonesia. (5 weeks) |
| 2012 | Worked in Guatemala (3 weeks) and Guyana (3 weeks) with extensive field travel. |
| 2011 | Worked and traveled in Indonesia and Singapore (12 days), Malaysia (10 days) Guatemala (2 weeks) and Australia (2 weeks). |
| 2010 | Worked in Australia (10 days). |
| 2009 | Worked in Cameroon (10 days). Holiday in France and Spain (5 weeks). |
| 2008 | Attended FSC General Assembly, South Africa (2 weeks). |
| 2008 | Travel and holiday in Italy and Germany (2 weeks). |
| 2007 | Worked in Australia (2 weeks). Travel and holiday in Cuba (1 week). |
| 2006 | Worked in Australia (2 weeks) and Montenegro (1 week). |
| 2005 | Worked in Montenegro (2 trips), Australia (1 trip) and Kenya (2 trips). |
| 2004 | Travel in Kenya for 3 and ½ weeks. Worked in Montenegro for 2 and ½ weeks |
| 2002 | Worked in Komi Republic, Russia (2 trips, nearly 4 weeks). |
| 2001 | Travel for 2 weeks in Costa Rica. |
| 1992 | Lived and worked in Bangladesh for 4.5 months. Traveled in Thailand. |
| 1989 | Lived and worked in Kenya for 2.5 months. Traveled in Tanzania. |
| 1986-87 | Lived and worked in Kenya and Tanzania for 10 months. Traveled in Tanzania, Zambia, Zimbabwe, Botswana and Europe. |
| 1984 | Travel in Kenya and Tanzania, Italy and Germany. |
| 1978 | Travel in Indonesia, Singapore, Hong Kong, Macau and Taiwan. |
| 1973 | Traveled by my own Land Rover for 8 months from Europe to Tunisia, over the Sahara and Sahel, along the West African coast from Nigeria to Mauritania and back to Europe. |
| 1970-72 | Lived and worked in England for 18 months. |
| 1969-70 | Traveled by my own Land Rover for 10 months from South Africa, through East Africa and Ethiopia, through Saudi Arabia and the Middle East, and across Europe to Great Britain. |
| 1968 | Lived and worked in Denmark for 3 months. Traveled in Europe. |

## PROFESSIONAL AND EDUCATIONAL QUALIFICATIONS

**Registered Professional Forester**

> Association of British Columbia Professional Foresters (since 1985)
> College of Alberta Professional Foresters (temporary membership, 2006, 2007, 2010, 2012)

**Master of Arts** (Resource Geography). University of British Columbia, Vancouver, B.C., Canada. Master's Thesis Topic: A Decision-Making Procedure for Streamside Management on Vancouver Island, B.C. 1976.  Specialization:

- Integrated resource management
- Environmental impact assessment
- Forest land management
- Rural development planning

**Bachelor of Commerce.**  University of British Columbia, Vancouver, B.C., Canada. 1969.

## AWARDS

**1999      Bill Young Award for Excellence in Integrated Resource Management.**
Awarded jointly by Association of B.C. Professional Foresters and B.C. Registered Professional
Biologists for fostering leadership in integrated resource management and promoting cooperation
between forest, fish and wildlife management.

## ADDITIONAL TRAINING

| | |
|---|---|
| 2016 | Scientific Certification Systems, Lead Auditor Training |
| 2014 | Excel course, Northwest Community College |
| 2010 | Completed ISO 9001 Lead Auditor Training |
| 2001 | Rainforest Alliance/SmartWood, Lead Assessor Training |
| 1995 | Management of Administrative Tribunals |
| 1993 | Certified Fisheries Forestry Guidelines Trainer |
| 1992 | Qualified Wildlife/Danger Tree Assessor |
| 1988 | Basic Supervision |
| 1985 | Introductory Oil Spill Containment and Recovery |
| 1978 | Instructional Techniques |
| 1978 | Private Pilots Licence |

## CURRENT AND RECENT ORGANIZATIONAL ACTIVITIES

- Member, Board of Directors, Haida Enterprise Corporation (HAICO). HAICO is a business
entity of the Haida Nation with an obligation to manage, grow and govern the business enterprises of
the Haida Nation with the goal of developing a sustainable economy on Haida Gwaii. HAICO
businesses include a logging company, two fishing lodges, an eco-cultural lodge, a small hotel and
restaurant, and a fish processing business. (December 2016 to present and on-going)

- Chair, Policy and Standards Committee, FSC International Board. This committee provides
recommendations about the approval and development of certification policies and standards to the
FSC International Board.  I facilitate and communicate decisions for the 6 member committee. (2013
to present and on-going)

- Member, Gwaii Haanas Advisory Committee. This committee provides advice to government
authorities about the management of a 300,000 national marine and terrestrial protected area.  (2014
to present and on-going)

- Vice-president and Board member, Haida Gwaii Higher Education Society.  This society
operates semester abroad programs on Haida Gwaii for third and higher year university students.
2008 to present and on-going)

- Member, Board of Directors, Laskeek Bay Conservation Society. This society is involved in long-term biological monitoring, interpretation and education on a 50 hectare island with coastal temperate rainforest and offshore marine ecosystems. (1991 to present and on-going)

- Member, Advisory Planning Commission, Village of Queen Charlotte. (2006 – 2010)

- Member, FSC International Advisory Group on Revision of FSC Principles and Criteria. (2009-2011)

- Member, FSC Canada National Standards Advisory Committee. (2003-2005)

- Member, Steering Committee that organized an international conference in 2002 on the impacts of introduced species on island ecosystems, with specific reference to Haida Gwaii.

- Member, Scientific Advisory Panel For Sustainable Forestry Practices in Clayoquot Sound. This panel developed a set of principles and specific operational guidelines for implementing ecosystem management in an area of approximately 1 million ha in coastal BC. (1990-1995).

- Member of BC Forest Sector Strategy Committee. This CEO-level committee was established by the premier of the province to provide strategic forest policy advice to the provincial cabinet. (1992-1995)

## PRESENTATIONS TO CONFERENCES AND TRAINING WORKSHOPS

- Presentation to NEPCon General Assembly, Kota Kinabalu, Malaysia (April, 2016)
- Presentation to 2nd World Seabird Conference – CapeTown, South Africa (October, 2015).
- Presentation on certification of protected areas to FSC General Assembly, Malaysia (July 2011).
- Presentations to 3rd year forestry and geography students, University of British Columbia and University of Victoria, and Haida Gwaii Semester (2009 and on-going in 2014).
- Lead trainer, SmartWood Auditor Training, Kempt, Nova Scotia, May 2010.
- Lead trainer, SmartWood Team Leader Training, Ottawa, Ontario, September 2009.
- Presenter, SmartWood Auditor Training, Vancouver, BC, April 2009.
- Presentation to Domtar/Acadian Timber, Edmundston, New Brunswick, February 2009.
- Presentation to West Island Woodland Advisory Group, Port Alberni, BC, February 2009.
- Speaker, Conference sponsored by City of Port Alberni, BC, January 2008.
- Speaker and Workshop Leader, Forest Certification Watch Conference, Vancouver, May 2007.
- Member of Awards Jury, Forest Certification Watch, 2007.
- Speaker, Green Building Forum, Nelson, BC, June 2006.
- Speaker, Forest Certification Watch Conference, Vancouver, April 2004.

## PUBLICATIONS and MAJOR REPORTS

Marthinus, D., A. Klassen and K. Moore 2016. Monitoring and measurement of carbon emission reduction outcomes at Inhutani II Unit Malinau, attributable to use of Reduced Impact Logging practices.  Report prepared by The Borneo Initiative, The Nature Conservancy, Tropical Forest Foundation and SCSGlobal.

Donovan, R.Z. and K. Moore. 2014. An Initial Exploration of Forest Stewardship Council (FSC) Certification of Protected Areas.  Report prepared for Greenpeace, WWF US and FSC International.

Moore, K. 2013. Development of a Comprehensive Forestry Strategy for Haida Gwaii – A Background Paper for Discussion. Prepared for Haida Gwaii Management Council.

Donovan, R.Z., K. Moore, and M. Stern. 2012. Verification of Progress Related To Indicators For the Guyana-Norway REDD+ Agreement. 2nd Verification audit covering the period October 1, 2010 – June 30, 2012.  Rainforest Alliance Report prepared for the Government of Norway.

Moore, K. 2011. From Global to Local – Why is FSC Popular around the World but Not in BC.  BC Forest Professional, Nov-Dec, 2011.

Moore, K. and G. Bull, 2004. Regulating the interactions between forestry and fish - Guidelines, codes of practice and legislation.  Chapter 31 (707-728).  In Fishes and Forestry: Worldwide Watershed Interactions and Management. T.G. Northcote and G.F. Hartman, editors, Blackwell Publishing, Abingdon, Oxfordshire, UK.

Moore, K. and G. Bull. 2003.  A global review of forest guidelines, codes and legislation pertaining to fish-forestry interaction. PART 4 (80-122).  In International Expert Meeting on the Development and Implementation of National Codes of Practice for Forest Harvesting – Issues and Options, Kazusa Academia Hall, Kisarazu City, Chiba Prefecture, Japan. Nov. 17-20, 2003. Available at: http://rinya.maff.go.jp.

Moore, K., 1992. Conservation Report, Bangladesh Forestry Master Plan. Sandwell International for Asian Development Bank, Manilla, Phillipines.

Moore, K., 1991. Partial Cutting and Helicopter Yarding on Environmentally Sensitive Floodplains in Old-growth Hemlock/Spruce Forests. FRDA Report 166, Research Branch, B.C. Ministry of Forests.

Moore, K., 1991. Coastal Watersheds - An Inventory of Watersheds in the Coastal Temperate Forests of British Columbia. B.C. Endangered Spaces Project Working Paper, Earthlife Canada Foundation and Ecotrust/Conservation International.

Moore, M.K. and J.E. Hall, 1987. Report of a Mission to Assess the Management and Conservation of *Dalbergia melanoxylon*, Mpingo, in Tanzania. United Nations Environment Program, Environment Management Services.

South Moresby Resource Planning Team, 1982. South Moresby - Land Use Alternatives.  Province of British Columbia, Ministry of Forests. (Member of a team of authors).

Toews, D.A.A. and M.K. Moore, 1982. Effects of Three Streamside Logging Techniques on Large Organic Debris and Stream Channel Morphology in Carnation Creek. Proceedings of a Symposium - Carnation Creek, a Ten-Year Review. Nanaimo, B.C. February 1982.

Toews, D.A.A. and M.K. Moore, 1981. Effects of Streamside Logging on Large Organic Debris in Carnation Creek. Land Management Report #11. Province of British Columbia, Ministry of British Columbia Ministry of Forests, Research Branch.

Moore, M.K., 1978. A Decision-Making Procedure for Streamside Management on Vancouver Island.  Province of British Columbia, Ministry of Forests, Research Branch. First and second editions.

Moore, M.K., 1977. Factors Contributing to Blowdown in Streamside Leave Strips on Vancouver Island. Land Management Report #3. Province of British Columbia, Ministry of Forests, Research Branch.

Moore, M.K., 1976. A Decision-Making Procedure for Streamside Management on Vancouver Island. Master of Arts thesis. University of British Columbia, Department of Geography.

December, 2016