KASOWITZ BENSON TORRES LLP
Lyn R. Agre (State Bar No. 178218)
lagre@kasowitz.com
101 California Street
Suite 2300
San Francisco, CA 94111
(415) 421-6140 (telephone)
(415) 398-5030 (facsimile)

KASOWITZ BENSON TORRES LLP
Michael J. Bowe (admitted *pro hac vice*)
mbowe@kasowitz.com
Lauren Tabaksblat (admitted *pro hac vice*)
ltabaksblat@kasowitz.com
1633 Broadway, New York, NY 10019
(212) 506-1700 (telephone)
(212) 506-1800 (facsimile)

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RESOLUTE FOREST PRODUCTS, INC., *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>GREENPEACE INTERNATIONAL, *et al.*<br><br>Defendants. | CASE NO. 3:17-CV-02824-JST<br><br>Hon. Jon S. Tigar<br>Courtroom 9<br><br>**PLAINTIFFS' AMENDED COMPLAINT** |

Plaintiffs Resolute Forest Products, Inc., Resolute FP US, Inc., Resolute FP Augusta, LLC, Fibrek General Partnership, Fibrek U.S., Inc., Fibrek International, Inc., and Resolute FP Canada, Inc., (collectively, "Resolute" or "Plaintiffs"), as and for their complaint against Greenpeace International (aka "Greenpeace Stichting Council"), Greenpeace, Inc. ("GP-Inc."), Greenpeace Fund, Inc. ("GP-Fund"), Daniel Brindis, Amy Moas, Matthew Daggett, Rolf Skar (collectively, "Greenpeace Defendants"), ForestEthics, Todd Paglia (together, "ForestEthics") and John and Jane Does 1-20 (collectively, "defendants"), allege as follows:

## PRELIMINARY STATEMENT

1.     "Greenpeace" is a global fraud.  For years, this international network of environmental groups collectively calling themselves "Greenpeace" has fraudulently induced people throughout the United States and the world to donate millions of dollars based on materially false and misleading claims about its purported environmental purpose and its "campaigns" against targeted companies.  Maximizing donations, not saving the environment, is Greenpeace's true objective.  Consequently, its campaigns are consistently based on sensational misinformation untethered to facts or science, but crafted instead to induce strong emotions and, thereby, donations.  Moreover, virtually all of Greenpeace's fraudulently induced donations are used to perpetuate the corrupted entity itself and the salaries of its leaders and employees.

2.     Because soliciting money, not saving the environment, is Greenpeace's primary objective, it has demonstrated time and time again that it will do anything to drive donations, including fabricating evidence.  For example, Greenpeace has staged phony photo-ops of seal and other animal slaughters, and fraudulently pawned off common trees felled by natural causes as several hundred year old ancient trees illegally forested by those it falsely vilifies.  Indeed, Greenpeace's most senior leaders have been forced to admit that their goal is not to present accurate facts, but to "emotionalize" issues and thereby "pressure" (i.e. manipulate) their audiences.

3.     Greenpeace's most important audience is its prospective donors.  To "emotionalize" and manipulate this group, Greenpeace uses what it calls internally "ALARMIST ARMAGEDDONIST FACTOIDS" to induce donations and other support it would not otherwise

1   receive.  Indeed, virtually every Greenpeace "ALARMIST AND ARMAGEDDONIST"

2   statement, report, web, and blog post is accompanied with a heavy-handed plea in various forms

3   for the reader to "DONATE NOW."  While Greenpeace holds its campaigns out as "science-

4   based," the Greenpeace worldwide association has admitted that their allegations "do not hew to

5   strict literalism or scientific precision," and are instead only "hyperbole" and "heated rhetoric"

6   that cannot be taken "literally."  Of course, were such disclaimers shared with the public when it

7   is bombarded by the untruths these corrupt organizations use to "emotionalize" donors and

8   induce contributions, few if any would make such contributions. The truth is not necessary to

9   Greenpeace; the money is.

10          4.      Beyond direct donations, Greenpeace's lies generate support for boycotts and

11   other adverse actions against its targets and those who dare do business with them.  Greenpeace

12   uses these boycotts and other attacks, and the threat of them, to extort public concessions,

13   endorsements, and other benefits from its targets, which it then promotes to potential donors as

14   successes or other reasons to provide even further financial support.

15          5.      For decades, Greenpeace has executed its fraudulent campaigns against numerous

16   companies with virtual impunity, and its tactics have become increasingly more aggressive as a

17   result.  Since no later than 2012, Resolute has been the target of a self-described "radical"

18   Greenpeace campaign falsely designating Resolute as the Canadian boreal "Forest Destroyer."

19   The Canadian boreal forest Greenpeace claims Resolute is "destroying" is a vast evergreen forest

20   and ecological system covering thirty-one percent of Canada (and continuing through Eurasia).

21          6.      In its own words, Greenpeace's "Resolute: Forest Destroyer" campaign targets

22   "one particular company, Resolute Forest Products . . . [that is] leading the charge" in

23   "destroying endangered forests," "operating and sourcing wood" "in violation of law," and

24   causing the "destruction of endangered species" and "critical caribou habitat" that Greenpeace

25   predicts will lead to a "Caribou Herd Death Spiral," "extirpation" and "extinction."  The

26   "Resolute: Forest Destroyer" campaign also accuses Resolute of  "abandoning,"

27   "impoverishing," and exploiting the boreal's indigenous communities, including "ignoring the

28   rights of First Nations Communities," and "logging on Indigenous People's land without

1
2
3

consent." And this campaign shamelessly exploits the most followed environmental issue of the day, climate change, by also misrepresenting Resolute's harvesting as a major climate change risk:

4
5
6
7

> The Boreal Forest . . . representing the largest carbon storehouse on the planet, [] plays an essential role in curbing climate change . . . But the mighty Boreal Forest is under serious threat: logging company Resolute Forest Products is destroying vast swathes of this immense ancient forest, logging without the consent of impacted Indigenous Communities, and putting threatened woodland caribou at increased risk.

8
9
10
11
12
13
14
15
16
17
18
19

7.     Greenpeace's "Resolute: Forest Destroyer" campaign is malicious, false, misleading, and without any reasonable factual basis in numerous respects. First, Resolute is not a "destroyer" of the boreal forest in any possible sense of the word, and cannot in any way be accurately characterized as such. Canada retains about ninety percent of its original forest cover, with agriculture and urbanization, not forestry and certainly not Resolute, responsible for the ten percent lost over several hundred years. Indeed, less than .5% (.005) of the vast Canadian boreal forest is harvested annually, only a minority of which is harvested by Resolute, while at least five times more is lost annually due to natural causes like fires, insects, disease and blowdowns. Moreover, where Resolute does harvest, every harvested area is promptly regenerated either naturally or by seeding or planting. On average, from 2010-2012, Resolute planted over 60 million trees per year. By 2012, Resolute **planted its billionth tree** in Ontario alone and has since continued to plant many millions more.

20
21
22
23
24
25
26
27

8.     Because of these efforts and those of the other Canadian forestry companies, there is virtually no permanent loss of boreal forest acreage annually, and the nominal .02% (.002) that is lost is lost not to forestry, but to industrial and urban development, transportation, recreation, and hydroelectricity. As a result of its record, Resolute has received numerous awards and recognitions for its responsible and sustainable forestry. The claim by Greenpeace -- which has never planted a single tree in the boreal forest -- that Resolute -- which has planted over a billion trees in the boreal forest and contributed to **no** permanent loss of forest acreage -- is a "Forest Destroyer" is patently false and unfounded. It is a malicious lie.

28

9.      Second, it is equally false and unfounded to accuse a company that has not caused any loss of Boreal forest acreage of materially impairing the Boreal forest's ability to mitigate climate change.  Even worse, this accusation ignores the very science Greenpeace purports to rely on, which unequivocally reports that (a) the amount of carbon stored in North American forests has increased by millions of metric tons per year; (b) Canadian forestry caused less than .06% of global greenhouse gas emissions; and, most important, (c) harvesting in the Boreal and other large forests provides the most significant means of **mitigating climate change**, as young forest growth absorbs dramatically more greenhouse gases than older growth, which ultimately emits instead of absorbs such gases.  As the United Nations Intergovernmental Panel on Climate Change -- often cited by Greenpeace elsewhere -- has explained:

> In the long term, a sustainable forest management strategy aimed at maintaining or increasing forest carbon stocks, **while producing an annual sustainable yield of timber, fibre, or energy from the forest will generate the largest sustained mitigation benefit.** (emphasis added)

Greenpeace's climate change attack on Resolute is another blatant and malicious lie.

10.     Third, Greenpeace's repeated claim that Resolute's harvesting is putting threatened woodland caribou herds at risk is also false and misleading because, while associating Resolute with what it calls "dramatic" habitat and population declines, Greenpeace fails to mention that Resolute is actually not the actor responsible for either.  As with donors thinking they were fighting forest loss or climate change, donors to this campaign who thought they were saving caribou have been duped.

11.     Indeed, Greenpeace's campaign repeatedly fails to disclose that (a) in 2010 Resolute and other forestry companies agreed with Greenpeace to, in Greenpeace's own words, a "moratorium . . . **protecting virtually all of the habitat of the threatened woodland caribou**," (emphasis added) and Resolute's operations since that time have remained outside "virtually all of th[at] habitat"; (b) the specific caribou populations whose Quebec habitats Greenpeace claims Resolute impacts constitute a very small percentage of the overall caribou population in Quebec, more than 98% of which remains stable and self-sustaining; (c) even for these few caribou populations Greenpeace singles out, Resolute only operates in very limited portions of their

alleged habitats; (d) there is no evidence any Resolute operations have had an actual adverse impact on these caribou; (e) the scientific research Greenpeace purports to rely on against Resolute actually makes clear that, by several orders of magnitude, the real loss of, and risk to, caribou habitats and populations is in western Canada, especially Alberta, far away from Resolute's operations; and (e) Resolute's harvesting is conducted pursuant to forest management plans and certification standards that require caribou habitat protection.

12.     Fourth, an equally insidious lie about the purported "Resolute: Forest Destroyer" is that it has "abandoned," exploited, and "impoverished" the Boreal's indigenous peoples and operated without regard to their rights.  Again, Greenpeace, which does not generate large scale employment or economic opportunities for these indigenous peoples, exploits them with these false attacks in their name against a company that has, in fact, created and sustained numerous jobs, worked to protect the environment, and shared economic opportunities with those indigenous peoples despite difficult economic times and material Greenpeace interference. Sadly, where Resolute has been forced to close certain businesses, Greenpeace's "Resolute: Forest Destroyer" campaign has often been a material direct or indirect contributor to those closures.  Indeed, Greenpeace's obvious commitment to using the "Resolute: Forest Destroyer" campaign to generate donations is a major risk and impediment to capital investment in the region and a direct harm to the indigenous peoples who would benefit from such investment and whom Greenpeace dishonestly claims to be protecting.

13.     Nevertheless, despite this risk and impediment, Resolute still has not, as Greenpeace misrepresents, "abandoned" the local communities, but instead continues to operate, honor its pension and other financial obligations (as opposed to many other forest products companies that have failed to do so) and, where closures are unavoidable, provides support and assistance to those impacted.  This is just one of the reasons Resolute (unlike Greenpeace) enjoys broad support from the local communities in the Boreal regions in which it operates and has received numerous awards and recognitions attesting to this truth.

14.     As with its other campaigns, Greenpeace has repeatedly manufactured facts and evidence to support the "Resolute: Forest Destroyer" campaign's lies.  For example, it has

published staged photos and video falsely purporting to show Resolute logging in prohibited areas and others purporting to show forest areas impacted by Resolute harvesting when the areas depicted were actually impacted by fire or other natural causes.

15.     And, as with other campaigns, Greenpeace and others working with it have aggressively targeted Resolute's customers with extortive threats and other illegal conduct.  To identify those customers, Greenpeace employees and agents have impersonated Resolute employees, its customers, and others to illegally misappropriate proprietary customer and supply chain information.  Once identified, Greenpeace and its co-conspirators have issued extortive demands to these customers to sever their ties with Resolute and publicly endorse the "Resolute: Forest Destroyer" campaign or face crippling boycotts and other threatening behavior accusing them of also being "Forest Destroyers."

16.     For example, in 2014, the "Resolute: Forest Destroyer" campaign targeted Resolute customer Best Buy on the eve of its busiest online shopping season.  When Best Buy ignored Greenpeace's demands, on November 26, 2014, the day before Thanksgiving, Greenpeace launched a very public and well-orchestrated boycott of Best Buy.  A Twitter handle Reaper Tango Down -- associated with the cyber-hacktivist group Anonymous -- immediately retweeted Greenpeace's boycott announcements, called Resolute a "Massive Tree Killer," and announced it had attacked and taken down Resolute's website, and later the next day the Forest Products Association of Canada ("FPAC") website with "Denial of Service" cyber-attacks.  Best Buy's website began experiencing problems at the same time and would completely crash on November 28th, the "Black Friday" morning after Thanksgiving which is its busiest online shopping day of the year.  Remarkably coincidental, or remarkably telling, one of Greenpeace's leaders of the Best Buy attack presciently announced the Best Buy web crash via Twitter virtually the moment it happened and before anyone else.  A few days later, Greenpeace induced supporters and co-conspirators to again attack Best Buy's website, which led to over 50,000 emails and false product reviews flooding the site.  The aggressive attack was effective.  Just days later, on December 8, 2014, Best Buy announced it would be shifting its sourcing away from Resolute and towards suppliers who acquiesced to Greenpeace's threatening dictates.

Case 3:17-cv-02824-JST   Document 185   Filed 11/08/17   Page 8 of 190

17.     Greenpeace's "Resolute: Forest Destroyer" campaign has targeted dozens of other Resolute customers around the world in a similar fashion, leading to lost revenues in an amount Greenpeace itself has publicly calculated to be not less than C$100 million to date and counting. In addition to these lost revenues, the "Resolute: Forest Destroyer" campaign has severely damaged Resolute's reputation in the marketplace and business community, with local and government officials, and with the peoples occupying the Boreal forest.  It has also caused Resolute to devote substantial fees and expenses to respond to, address, and mitigate the impacts of the "Resolute: Forest Destroyer" disinformation campaign.  In total, these damages are far in excess of the C$100 million Greenpeace estimates.

18.     The "Resolute: Forest Destroyer" campaign has fraudulently induced many millions of dollars in donations from regular working class people, who have been duped about Greenpeace and Resolute, and, most important, duped into believing their donations were preventing forest loss, mitigating climate change, saving caribou, and helping indigenous peoples.  The "Resolute: Forest Destroyer" campaign has also defrauded the United States Treasury by improperly shielding Greenpeace from paying tax on these "donations" even though Greenpeace's demonstrably untrue business model and false campaigns, including this campaign, are misrepresented in their tax filings and do not qualify for tax exempt treatment because they are designed to secure money to perpetuate the organization and not to undertake legitimate steps to mitigate real environmental issues or serve the public interest.  Indeed, it was for this very reason that Greenpeace had its tax exempt status stripped in Canada over 20 years ago and recently has been accused by government officials in India of violating tax laws, engaging in fraudulent accounting, and laundering money.

19.     Although Greenpeace's "Resolute: Forest Destroyer" campaign portrays Resolute as an "outlier" engaged in rogue activities, it is Greenpeace that is, by far, the outlier and rogue environmental group engaged in illegal and unethical behavior to make money for itself and its leaders.

**JURISDICTION AND VENUE**

20.     This action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, and state statutes and common law.

- 7 -

PLAINTIFFS' AMENDED COMPLAINT CASE NO. 3:17-CV-02824-JST

21.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over the pendent state-law claims under 28 U.S.C. § 1367.  Moreover, this Court has jurisdiction pursuant to 28 U.S.C. § 1332.

22.     This Court has personal jurisdiction over Defendants pursuant to, *inter alia*, 18 U.S.C. § 1965 because each Defendant resides in the United States, transacts business on a systematic and continuous basis here, and/or has engaged in tortious misconduct here in violation of U.S. law, and under the California long-arm statute, Cal. Civ. Proc. Code § 410.10, because each Defendant, directly and through agents, transacts business within the state; committed tortious acts and omissions within the state; committed tortious injury in the state caused by an act or omission outside the state; regularly does business, engages in persistent course of conduct, and derives substantial revenue from services rendered in the state; owns, uses and possesses real property within the state; or is registered to do business in and has consented to personal jurisdiction in this state.

23.     Venue for this action is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this forum and Defendants are subject to personal jurisdiction in this judicial district.  Moreover, numerous Defendants regularly conduct business in the State of California.

**THE PARTIES**

24.     Plaintiff Resolute Forest Products, Inc. ("Resolute Forest Products") is a corporation incorporated pursuant to the laws of Delaware and headquartered in Montréal, Quebec, Canada.  Resolute is the parent company of the other Plaintiff entities herein.  Together with the subsidiaries described herein, Resolute is engaged in the forest products industry, planting and harvesting trees, milling wood and wood fiber to create a diverse range of products, including market pulp, wood products, newsprint, tissue, and specialty papers as well as power generation in Canada and the United States.  The company owns or operates over forty pulp, paper, tissue and wood products facilities in the United States, and Canada, and operates mills in both Canada and the United States, including in West Virginia, Georgia, Tennessee, Alabama, Mississippi, Florida, Washington State, South Carolina, and Michigan.  Resolute employs

approximately 8,000 people worldwide, and, in recent years, has annual sales in the range of $3.5 billion.  Resolute is the largest producer of newsprint in the world and in North America, the biggest volume producer of wood products east of the Rockies, the third largest market pulp producer in North America, and the largest producer of uncoated mechanical papers in North America.

25.    Plaintiff Resolute FP US, Inc., is a corporation incorporated pursuant to the laws of Delaware, and is a wholly owned subsidiary of Resolute Forest Products.

26.    Plaintiff Resolute FP Augusta, LLC is a limited liability company organized under the laws of Delaware with its headquarters and principal place of business in Augusta, Georgia.

27.    Plaintiff Fibrek General Partnership, acting through its managing partner Fibrek Holding Inc., is a general partnership formed pursuant to the laws of the Province of Quebec and is a wholly owned subsidiary of Resolute Forest Products.

28.    Plaintiff Fibrek U.S., Inc. is a corporation incorporated pursuant to Delaware law and is a wholly owned subsidiary of Resolute Forest Products.

29.    Plaintiff Fibrek International Inc. is a corporation incorporated pursuant to the laws of Canada and is a wholly owned subsidiary of Resolute Forest Products.

30.    Plaintiff Resolute FP Canada, Inc. is a corporation incorporated pursuant to the laws of Canada and is a wholly owned subsidiary of Resolute Forest Products.

31.    Defendant Greenpeace International ("Greenpeace International" or "GPI"), aka Stichting Greenpeace Council, is a putative Dutch not-for-profit foundation based in Amsterdam, the Netherlands.

32.    Defendant Greenpeace, Inc. ("GP-Inc.") is a putative nonprofit corporation organized pursuant to the laws of California and headquartered in Washington D.C., and is licensed to do business and raises funds in the form of donations in many states throughout the United States, including Georgia.  It is registered for tax-exempt status as a Section 501(c)(4) "social welfare" organization with the Internal Revenue Service, and describes its social welfare mission as "promot[ing] the protection and preservation of the environment."

33.     Defendant Greenpeace Fund, Inc. ("GP-Fund") is also incorporated under the laws of California and maintains its headquarters in Washington, D.C.  GP-Fund is a registered tax-exempt 501(c)(3) "charitable organization," and is licensed to do business and raises funds in the form of donations in many states throughout the United States.  GP-Fund donates a significant amount of funds each year to GP-Inc., some of which is ear-marked for GP-Inc.'s forest campaign, as is intimately involved in the planning of that campaign.

34.     ForestEthics is a 501(c)(3) corporation organized under the laws of California with headquarters in Bellingham, Washington State.  ForestEthics has recently rebranded itself as "STAND.earth."

35.     Defendant Todd Paglia is the Executive Director of ForestEthics residing in Washington State.

36.     Defendant Daniel Brindis is a Senior Forests Campaigner employed at all relevant times by GP-Inc. and resides in San Francisco, California.

37.     Defendant Amy Moas is a Senior Forests Campaigner employed at all relevant times by GP-Inc. and resides in Las Vegas, Nevada.

38.     Defendant Matthew Daggett is a Global Campaign Leader employed at all relevant times by Greenpeace International and resides in Saint Petersburg, Florida.

39.     Defendant Rolf Skar is a Forest Campaign Director employed at all relevant times by GP-Inc. and resides in San Francisco, California.

40.     John and Jane Does 1 through 20, whose identities are presently unknown to Plaintiffs, include other participants in Greenpeace's fraudulent campaigns, including its "Resolute: Forest Destroyer" campaign as well as co-conspirators, and/or aiders and abettors of the named Defendants in the scheme, enterprise, and misconduct alleged in this complaint, including, among others, cyber-hacktivists, environmental activists, and certain foundations directing funds to the Defendants.

**STATEMENT OF FACTS**

A.      **The Criminal Enterprise**

41.      The campaign against Resolute alleged herein was conducted by an illegal

enterprise (the "Enterprise") consisting of various legally distinct but associated-in-fact

environmental groups, individuals, and others who associated together for the purpose of

carrying out the pattern of racketeering activity alleged herein, including, but not limited to,

using the mails and wires to disseminate false and misleading information to Resolute's

customers and other critical market constituents, defraud donors and steal proprietary

information, defrauding the United States Treasury, making bribes and extortive threats,

transporting and transmitting misappropriated funds and property through interstate commerce,

and conspiracies to do the same. The enterprise associated for the purpose of carrying out these

racketeering acts was comprised of, among others, the following members:

(a)      **Greenpeace International** – Defendant Greenpeace International is a putative

Dutch charitable foundation ("Stitching") formed under the laws of the Netherlands.  As a Dutch

putative charitable foundation, Greenpeace International has no members or equity capital and is

run entirely by its appointed board.  Greenpeace International serves as the international

coordinating body for a network of over twenty-six legally distinct national and regional

associations under the common Greenpeace name, including the Defendants GP- Inc. and GP-

Fund in the United States, but which have no formal corporate structure under which anyone is a

parent, subsidiary or affiliate of the other.  Rather, these are distinct corporate or other legal

entities from around the globe associated-in-fact by way of their common use of the Greenpeace

name and their long-term and regular long-standing interrelationships and associations, shared

objectives, and concerted action.  Greenpeace International, among other things, holds the

Greenpeace trademark and each of these organizations pays Greenpeace International for the

right to use that trademark.  These organizations also provide grants, loans, and other financial

remuneration to Greenpeace International from time to time and for specific purposes, and

Greenpeace International also provides grants and disbursements back to select organizations

from time to time to support its international campaigns.  As such, Greenpeace International is

1    directly involved in the creation, management, control, and implementation of the associations'
2    coordinated campaigns and associated fundraising.

3          (b)    **Greenpeace Fund, Inc.** – Defendant GP-Fund is a 501(c)(3) not-for profit
4    foundation which falsely purports to be exclusively operated for a charitable purpose.  It has no
5    voting members and is run exclusively by its board of directors.  GP-Fund collects 501(3)(c) tax
6    exempt donations throughout the United States, and distributes those monies to Greenpeace
7    International in the Netherlands and GP-Inc. in the United States.  In 2014, GP-Fund collected
8    approximately $14.8 million and distributed approximately $6 million of that to Greenpeace
9    International and $5 million to GP-Inc. in the United States.  The rest of the revenue was
10   consumed by salaries and fundraising expenses.   Although GP-Fund and GP-Inc. are identified
11   by the Greenpeace association as Greenpeace USA, they are separate and distinct legal entities
12   with no corporate relationship to each other in the form of parent, subsidiary or affiliate.  Indeed,
13   their separate tax-status so requires.  Like Greenpeace International does throughout the
14   Greenpeace associations, GP-Fund is intimately involved in planning, approval, direction, and
15   monitoring of the GP-Inc. campaigns and activities that it funds and from which it fundraises.

16         (c)    **Greenpeace, Inc. -** Defendant GP-Inc. is a nonprofit corporation organized
17   pursuant to the laws of California and headquartered in Washington D.C., and is licensed to do
18   business and raises donations in many states throughout the United States.  It is registered for
19   tax-exempt status as a Section 501(c)(4) "social welfare" organization with the Internal Revenue
20   Service, and falsely purports to be operated "exclusively to promote social welfare" and
21   describes its social welfare mission as "promot[ing] the protection and preservation of the
22   environment."  Funded by direct donations as well as grants and loans from GP-Fund, GP-Inc.
23   receives substantial direction, control, and monitoring from Greenpeace International and GP-
24   Fund.  It also coordinates closely with other entities in the Greenpeace association, including
25   particularly Greenpeace Canada in executing the campaign directed at Resolute set forth below.

26         (d)    **Greenpeace Canada** – Greenpeace Canada is a federally incorporated company
27   with its head offices in Toronto, Ontario and is the Canadian presence of the Greenpeace

28

associations.  It works closely with Greenpeace International and GP-Inc. in executing the campaign directed at Resolute set forth below.

(e)     **Matthew Daggett** – Defendant Matthew Daggett is the Greenpeace International Global Campaign Leader for Forests with responsibility for Greenpeace International's coordination and support for the campaign alleged herein.  Defendant Daggett coordinates closely the activities of the various organizations and individuals engaged on the campaign directed at Resolute as alleged herein.

(f)     **Daniel Brindis** – Defendant Daniel Brindis is a Senior Forest Campaigner for GP-Inc. with responsibility for GP-Inc.'s participation in the campaign directed at Resolute alleged herein.

(g)     **Amy Moas** – Defendant Amy Moas is a Senior Forest Campaigner for GP-Inc. with responsibility for GP-Inc.'s participation in the campaign directed at Resolute alleged herein.

(h)     **Rolf Skar** – Defendant Rolf Skar is a Forest Campaigner for GP-Inc. with responsibility for GP-Inc.'s participation in the campaign against Resolute alleged herein.

(i)     **Richard Brooks** – Richard Brooks was formerly a Forest Campaign Coordinator for Greenpeace Canada during the period relevant to this complaint with responsibility for operating and managing Greenpeace Canada's coordinated role and participation in the Enterprise's campaign directed at Resolute alleged herein.

(j)     **Shane Moffatt** – Shane Moffatt is a Forest Campaigner for Greenpeace Canada with responsibility for operating and managing Greenpeace Canada's coordinated role and participation in the Enterprise's campaign directed at Resolute alleged herein.

(k)     **Nicolas Mainville** – Nicolas Mainville was formerly a Forest Campaigner for Greenpeace Canada during the period relevant to this complaint with responsibility for operating and managing Greenpeace Canada's coordinated role and participation in the Enterprise's campaign directed at Resolute alleged herein.

(l)     **Annie Leonard** – Annie Leonard is the Executive Director of GP-Fund and GP-Inc. with responsibility for operating and managing the coordinated role and participation of these two Defendants in the Enterprise's campaign directed at Resolute alleged herein.

(m)     **ForestEthics** – Defendant ForestEthics is a 501(c)(3) corporation headquartered in Washington State, which is now called STAND.  A coalition of three partner organizations, US-based ForestEthics, Canadian-based ForestEthics Advocacy, and ForestEthics Solutions (collectively, "ForestEthics"), ForestEthics has strong ties to Greenpeace, upon which its organization is modeled.  Indeed, ForestEthics' founder, Tzeporah Berman, was the former co-director of Greenpeace International's Global Climate and Energy Program, and Karen Mahon, the director of ForestEthics Advocacy, was formerly the director of Greenpeace Canada.  The two organizations have been described as "close all[ies]" and have a long history of collaborating on campaigns together, including the one directed at Resolute described herein.  Like Greenpeace, ForestEthics is known for its coercive and manipulative "campaigns" which have targeted, among others, Victoria's Secret, 3M and Staples.  Following Greenpeace's blueprint, ForestEthics has aggressively disseminated sensational lies untethered to facts, to threaten, malign, and isolate large corporate targets and extort public concessions, endorsements, and other benefits, which it then touts to potential donors as successes to extort additional financial support.  As set forth herein, beginning in 2012, Greenpeace and ForestEthics identified Resolute as a target, and embarked on a years-long "Resolute: Forest Destroyer" campaign.  Throughout this campaign, ForestEthics participated directly and indirectly in the criminal enterprise, by among other things, echoing the falsehoods that Greenpeace was disseminating in reports, direct communications, and on Twitter; threatening Resolute's executives, its customers, and stakeholders; and engaging in other wrongful conduct.

(n)     **Todd Paglia** – Defendant Todd Paglia is the Executive Director of ForestEthics residing in Washington State and had responsibility for operating and managing ForestEthics' coordinated role and participation in the Enterprise's campaign directed at Resolute alleged herein.

(o) **Amanda Carr** – Amanda Carr is a Campaign Director for the Environmental non-government organization ("ENGO"), Canopy.  Ms. Carr has operational and managerial control over Canopy's coordinated role and participation in the Enterprise's campaign directed at Resolute alleged herein, works in concert with the Defendants and other enterprise members to, among other things, undermine Resolute's participation in the Canadian Boreal Forest Agreement ("CBFA") and interfere with Resolute's relationships with other signatories to and participants in the CBFA.

(p) **John and Jane Does** - On a frequent and long-term basis, the Defendants and enterprise members work with third-parties currently unknown to Plaintiffs to illegally misappropriate proprietary and other confidential information from Resolute and its customers as well as targets of other campaigns by impersonating other people and customers and otherwise misrepresenting themselves.  The Defendants and enterprise members have also associated with persons unknown to Plaintiffs at this time to engage in illegal cyber-attacks and intrusions on Plaintiffs and their customers.  This is part of a broader enterprise practice of engaging in various illegal activities to misappropriate trade and other secrets from, or interfere with, targets of the Enterprise's campaigns and the customers of those targets.

42.     Although these persons and entities are distinct and independent of each other, and free and incentivized to act in and advance their own interests independently, they have associated in fact with a common purpose, identifiable relationships, and sufficient longevity to pursue their common purpose.  Specifically, beginning from no later than 2012 through to the present they have been engaged in a mutually understood, agreed upon, and coordinated campaign of racketeering activity directed at Resolute.

43.     The common purpose of the Enterprise was to target Resolute with a disinformation campaign that could be used to fraudulently induce millions of dollars in donations from individual donors and foundations that could be used to fund the salaries of the enterprise members and its leaders, perpetuate more fraudulent fundraising, and expand the campaign to direct attacks on Resolute customers that would provide even more powerful fundraising opportunities.

44.     The relationship in and among the enterprise members included Greenpeace International providing the right to use the Greenpeace name to enterprise members GP-Inc., GP-Fund, and Greenpeace Canada, funding these entities and underwriting this disinformation campaign, and providing an internet platform and website to support, facilitate, and promote the campaign.  In addition, Greenpeace International actively participated in the campaign by publishing and republishing the campaign's disinformation on its own webpages, in direct communications in the market place, and by being directly involved in the operation, control and planning of that campaign through its Defendant and enterprise member Matthew Daggett and his coordination with enterprise members Skar, Moas, Brooks, Brindis, Moffatt, Mainville, and Leonard, all of whom were involved in the operation and control of the campaign.  In exchange for this participation, Greenpeace International used the disinformation campaign to directly and fraudulently induce donations and to secure portions of the monies that GP-Fund, GP-Inc., and Greenpeace Canada fraudulently induced from others.

45.     GP-Fund likewise provided funding to GP-Inc. to underwrite the disinformation campaign, published and republished the disinformation on its own webpages and, along with Greenpeace International, was actively involved in the operation, control and planning of the campaign with GP-Inc., Greenpeace Canada, and other enterprise members.  GP-Fund exercised its operation and control through enterprise member Annie Leonard, who is its executive director, and who directed and controlled the activities of GP-Inc. and enterprise members Daniel Brindis, Amy Moas, and Rolf Skar, who operated and controlled GP-Inc.'s enterprise related activities.  GP-Fund benefited from this participation by fraudulently inducing donations to itself directly that it used to sustain its continued operations, pay the salary of Annie Leonard and others, and fund even more fundraising by itself and GP-Inc.

46.     GP-Inc.'s relationship with the Enterprise included receiving funding and substantial support from both Greenpeace International and GP-Fund, including the use of the Greenpeace name and the funding necessary to pay its substantial operating expenses and salaries and fund its execution of the disinformation campaign.  GP-Inc. and enterprise members Brindis, Moas, and Skar aggressively prosecuted the disinformation campaign to fraudulently

PLAINTIFFS' AMENDED COMPLAINT CASE NO. 3:17-CV-02824-JST

induce donations that then were used to fund GP-Inc.'s operations and enrich GP-Fund and Greenpeace International.  These enterprise members also coordinated closely, and mutually operated and controlled the disinformation campaign and broader attacks with Greenpeace Canada and enterprise members Richard Brooks, Shane Moffat, and Nicolas Mainville, including assuming substantial responsibility for the attacks on Resolute customers funded by the disinformation campaign.  GPI-Inc. undertook these activities in consultation and coordination with Greenpeace International and GP-Fund as well as enterprise members Greenpeace Canada, ForestEthics, and Canopy.  GP-Inc. also worked closely with third-party enterprise members responsible for the theft of proprietary customer and supply trade secrets from Resolute and its customers.

47.     Greenpeace Canada received funding from Greenpeace International and GP-Fund and worked closely with GP-Inc. in executing the disinformation campaign.  Enterprise members Brooks, Moffatt, and Mainville conducted the operation and control of these consultations and the implementation of the disinformation campaign.  Greenpeace Canada used the disinformation campaign to fraudulently induce donations and procure more financial support from Greenpeace International and GP-Fund.

48.     ForestEthics and Canopy worked closely with GP-Inc. and Greenpeace Canada in both the dissemination of disinformation and the subsequent aggressive attacks on Resolute's customers and did so to participate in the opportunity to induce donations based on the fraudulent disinformation that would perpetuate these organizations and pay the salaries of its owners and leaders, including ForestEthics leader Todd Paglia and Canopy campaign director Amanda Carr.

49.     For approximately four years this group and the others comprising the Enterprise have been pursuing the Enterprise's purposes and they continue to do so today.

**B.     Greenpeace's Fraudulent Scheme**

**1.     Greenpeace's Pattern And Practice Of Fraud, Extortion, And Other Illegality**

50.     For more than 20 years, the association of distinct regional entities using the Greenpeace name ("Greenpeace") have strayed further and further away from legitimate

environmental work to schemes for generating monies necessary to perpetuate the salaries of their officers and employees and to continue fundraising.  If Greenpeace were genuinely focused on the environment, it would be focused on facts, science, and real environmental issues.  But Greenpeace has consistently focused instead on sensational headlines that are divorced from real issues and the truth, and crafted instead at maximizing donations.  Its approach misleads people about, and misdirects their monies and assistance from legitimate environmental groups and efforts to address real environmental issues.

51.    Greenpeace's preoccupation with the sensational rather than the accurate has been demonstrated time and time again.  For example, in 2006, Greenpeace mistakenly released an unfinished draft email about nuclear power awaiting only the insertion of what the drafter described as an "ALARMIST AND ARMAGEDDONIST FACTOID:"  "In the twenty years since the Chernobyl tragedy, the world's worst nuclear accident, there have been nearly [FILL IN ALARMIST AND ARMAGEDDONIST FACTOID HERE]."

52.    Likewise, in 2009, when a BBC interviewer called its recent claims about arctic summer ice disappearing by 2030 scientifically "preposterous" and "scare mongering," the leader of Greenpeace International at the time, Gerd Leipold, did not clarify or defend the accuracy of those claims, but defended instead Greenpeace's right and intent to "emotionalize" people and cause "pressure" on its target audiences: "We as a pressure group have to emotionalize issues.  We are not ashamed of emotionalizing issues."  Even though Greenpeace International would subsequently admit that "[a]s a climate scientist himself [Leipold] rightly knows that no scenario currently predicts the collapse of the entire land-based ice sheet as early as 2030," when asked in that interview to admit this very fact he well knew to be true, Leipold first claimed "I don't know" and then "I don't think it will" in an abject refusal to unequivocally acknowledge what even his own organization later admitted was an unequivocal scientific fact lest he diminish the "emotionalizing" he believed his group was trying to manufacture.  Emotions, not facts, are the bread and butter of Greenpeace.

53.    Greenpeace needs to "emotionalize" issues rather than report facts to generate sufficient donations that its bloated and ineffective operations would not otherwise generate.  For

example, well over 60% of GP-Inc.'s annual revenues go to the six-figure salaries of its executives and the salaries and benefits of its other employees. A whopping 94% of revenue is consumed by salaries and administrative and fundraising expenses, including office expenses, IT, travel, lodging, conferences, and telemarketing expenses. That is to say, far from an organization that actually does things to improve the environment, Greenpeace is fundamentally a fundraising organization that raises funds to pay its leaders and continue raising more funds.

54.     But this is not how it portrays itself to donors. Thus, at the heart of this fraudulent scheme are fundamental lies as to what Greenpeace is and does, the manner in which donation dollars are used, and the specific misrepresentations it makes about its campaigns and targets. These lies are perpetuated on donors, tax authorities, targets and their customers, and the public at-large.

55.     In perpetuating this fraudulent scheme, Greenpeace has developed a playbook that is readily recognizable. It identifies or manufactures a hot-button environmental issue; disseminates sensational, alarmist, and false claims about impending calamity related to that issue; targets a high-profile company to vilify for the impending calamity, including by staging fake videos, photographs, and other evidence (such as staging animal slaughters by Greenpeace members impersonating others, and misrepresenting ordinary trees that have fallen as "ancient trees" harvested by its targets or photos and videos of one location or event passed off as another); bombards supporters with urgent requests to "DONATE NOW"; and directs extortive demands, tortious interference, and other illegal conduct at its targets and their customers. When Greenpeace's extortion succeeds, it insists that its target publicly endorse its campaign and lies, which it then uses to drive more donations and attacks.

56.     A prime example of Greenpeace's *modus operandi* is its long running campaign against commercial fishing. In the 2000's, Greenpeace began manufacturing sensational claims about over-fishing and the purportedly impending extinction of dozens of fish species. Not surprisingly, these species corresponded with 50% of all currently available seafood sold in U.S. grocery stores, which Greenpeace then targeted along with the fishing industry in an

"ALARMIST AND ARMAGEDDONIST" fundraising campaign that included sensational and untrue publications like, "Carting Away the Oceans: Grocery Stores are Emptying the Seas."

57.     This campaign included sensational claims, among other things, that 90% of all large predatory fish had already been lost, and that absent urgent and drastic action by its audiences (i.e., donors making donations), oceanic fish stocks would collapse within decades. These "ALARMIST AND ARMAGEDDONIST" claims had no basis in fact or science.  They were just another Greenpeace lie.

58.     Indeed, at the time, the National Oceanic and Atmospheric Administration ("NOAA") and other international agencies monitoring ocean fisheries were reporting that many of the species Greenpeace said were expiring were actually thriving, and those still facing challenges were recovering under rigorous management plans.  For example, while Greenpeace identified Alaskan Pollack, Yellow Fin Tuna, Bigeye Tuna, Monk Fish, and various other species as near extinction, NOAA identified none of these species as "overfished" and many for which instead it reported that "population levels are high."  Likewise, Greenpeace also warned that supermarket sales were depleting the ocean shrimp stocks even though virtually all supermarket shrimp was sourced from farms.  Because Greenpeace knew these to be the actual facts, its sensational claims otherwise were intentionally false and misleading.

59.     Greenpeace's campaign particularly zeroed in on the tuna industry, with the usual "ALARMIST AND ARMAGEDDONIST FACTOIDS" about impending extinction.  However, international agencies actually monitoring the tuna stocks, in collaboration with responsible environmental organizations who actually care about the science, facts, and real environmental protection, were correctly reporting that the commercially fished tuna stocks had not declined in 60 years:

> Tuna and billfish . . . are fished at levels that will provide maximum sustainable yield and are at the abundance that will produce maximum sustainable yield. The U.S. Fisheries are doing extremely well.

60.     Undeterred, Greenpeace also issued sensational alerts about the massive amounts of "by-catch" of non-tuna in tuna nets.  Again, however, this "emotionalizing" issue ignored the science and facts, which showed that by-catch had been reduced to less than 5% in the industry.

1   Nevertheless, Greenpeace has adopted the preposterous claim that the world's tuna demand

2   should be caught only with rod and reel to avoid any by-catch at all.  This is nothing more than

3   an assertion that people should no longer eat tuna.  More important, even if such methods could

4   satisfy the world's tuna demand, doing so would be entirely inconsistent with Greenpeace's

5   claims and fundraising on climate change because doing so would exponentially increase the

6   carbon footprint of the tuna fishing fleet, which would need to be far bigger and operate far

7   longer if forced to apply such inefficient means.  It would also require the massive catch of bait

8   fish vastly in excess of the amounts of non-tuna by-catch Greenpeace was purporting to protect

9   in the first place.  A less coherent position could not be conceived.  But coherence, science, and

10  truth are not important to Greenpeace leadership; inducing donations by whatever means

11  necessary is.

12          61.     Indeed, were Greenpeace interested in science, facts, and real results, it would not

13  have refused for over five years to participate in the International Seafood Sustainability

14  Foundation's ("ISSF") highly successful work improving sustainable commercial tuna fishing.

15  Reflecting a legitimate environmental campaign, this organization is comprised of the tuna

16  industry, leading marine biologists and scientists, and a Who's Who of responsible

17  environmental groups, including the World Wildlife Fund ("WWF"), FishWise, New England

18  Aquarium, Conservation International, SeaFoodWatch, Bird Life International, NOAA, Union of

19  Concerned Scientists, Shark Advocates International, Hawaii Pacific University, and Sustainable

20  Fisheries.  These environmental groups, serious about sustaining the tuna stocks, along with the

21  scientific community and the industry members, who also want to preserve the species upon

22  which their livelihood depends, have worked diligently to dramatically improve the sustainability

23  of the species and reduce the fishing fleet's environmental impact.

24          62.     Were Greenpeace serious about sustainable tuna fishing it would participate in

25  these efforts.  It does not because doing so offers minimal fundraising potential.  Instead, it

26  motors around the ocean in a 240-foot former-Soviet naval vessel, powered by two 3,000 hp gas-

27  powered engines, pumping out sensational but environmentally irrelevant or detrimental

28  fundraising photos and videos, including, ironically, of it using speedboats, helicopters, drones,

and submarines to destroy greenhouse gas reducing Fish Aggregating Platforms that ISSF members have developed and deployed to minimize the fishing fleet's carbon footprint.

63.    Likewise, in December 2014, a major international climate change conference was held in Peru.  Rather than focus its efforts on participating in that conference, Greenpeace again elected instead to pursue an environmentally devastating publicity stunt at a Peruvian UNESCO Heritage Site miles way.  That site, called the Nazca Lines, is a precious moon-like landscape that, because of the environment, has preserved large, extremely fragile geoglyphic figures ancient peoples formed over 2,500 years ago by removing rocks forming a thin patina cover over white sands.  Walking in the Nazca Lines is illegal because doing so necessarily and permanently alters the landscape and, thus, the geoglyphics.  Unconcerned, a gaggle of blundering Greenpeace activists trolloped to, on, and around the site to unfurl a large banner.  When they left, they had permanently defaced this several thousand-year-old UNESCO Heritage Site.  Although Greenpeace purported to apologize for this damage, it refused to identify the members responsible for the illegal destruction and to this day is harboring and protecting those eco-terrorists from justice.

64.    A year later, Greenpeace's dishonesty and malice would again be revealed when, in December 2015, it targeted distinguished Physicist William Happer the day before he was to testify to Congress on $CO_2$.  Attempting to intimidate and discredit Dr. Happer, Greenpeace engaged in a pre-textual email contact in which it impersonated a representative of a Middle Eastern fossil fuel company and offered to hire Dr. Happer to write a paper to support their $CO_2$ position.  Dr. Happer first sent them prior papers he had already published to make clear what his position was, and then also warned them that he did believe fossil fuels caused environmental problems even though he believed certain exaggerated concerns about $CO_2$ were not scientific.  Dr. Happer asked for no remuneration, and when Greenpeace kept pressing to provide some, he made clear that (unlike Greenpeace) he was not motivated by money but would write what he believed as "a labor of love" for science and a subject he cared deeply about:  "My activities to push back against climate extremism are a labor of love, to defend the cherished ideals of science . . . ."  Instead, "if" the company wanted to reimburse him, he explained he would rather they

donate "whatever" amount to a charitable scientific organization that educated on this issue but paid him nothing: "If your client was considering reimbursing me for writing something, I would ask for whatever fee would come to me would go directly to $CO_2$ coalition . . . [which] occasionally covers travel expenses but pays me no fees or salary."

65.     Ignoring this impeccable exchange, the evening before he was to testify, Greenpeace attempted to intimidate Dr. Happer by threatening to publish a story about him and "how fossil fuel companies are able to pay academics to produce research which is of benefit to them." Of course, his exchange showed no such thing and, in fact, reflected the opposite. When he testified anyway, Greenpeace carried out its threat by publishing a report about him called "Academic-For-Hire" falsely claiming that he had agreed to be "secretly pa[id]" to "write research sowing doubts about climate change and promote the company's commercial interests." The story was pure libelous smear as Dr. Happer (a) made clear he did not want to get paid but would write out of "a labor of love;" (b) was not going to get paid anything; (c) made clear he would only write about research and conclusions he had already published; and (d) merely deflected Greenpeace's repeated efforts to get him to accept payment by stating that "if" Greenpeace wanted to "consider[ ] reimbursing" him it could instead donate "whatever" amount to a charity from which he received no remuneration. Greenpeace then publicly confronted Dr. Happer in Congress as he sat for testimony by loudly repeating these slanderous charges before being forcibly removed from the chamber.

66.     This pattern of fraud, deceit, extortive threats, and other illegal activities by Greenpeace has been going on for decades. As a Greenpeace founder, Dr. Patrick Moore, has explained, once Greenpeace attained a significant public profile, others in the organization saw it as a means not to pursue legitimate environmental work, but instead corrupted the organization into a means of enriching themselves through perpetual fraudulent fundraising. As a result, among other things, Canadian authorities long ago revoked Greenpeace's charitable status because its sensational claims "served no public purpose," and authorities in India are also attempting to revoke its charitable status and business registration and investigating it for fraudulent accounting and tax evasion. Just months ago, founder Moore labelled Greenpeace a

"monster" engaged in "extremism," "RICO," "wire-fraud," "witness tampering" and "obstruction of justice."  Resolute is only the latest target of this fraudulent and illegal operation.

### 2.    The Illegal Campaign Against Resolute

67.    Since no later than the end of 2012, the Greenpeace Defendants and other organizations and persons constituting the Enterprise alleged herein have prosecuted an unrelenting and increasingly hostile campaign against the Plaintiffs.  This Enterprise collectively agreed no later than the second half of 2012 to specifically target Resolute with a campaign, the explicitly stated objective of which was to ruin Resolute's brand and business and that of any customer who did business with it.

68.    As part of the campaign plan, the Enterprise members agreed to widely disseminate and publicize an intentionally and materially false, misleading, and defamatory narrative depicting Resolute as, according to the Enterprise members, "the most regressive forest products company" in the world and an "outlier" in the Canadian Boreal forest.  Conversely, the campaign would promote competitors as responsible companies with whom Resolute customers should do business with instead, even though those companies and Resolute were, at a minimum, identically situated.  The intentionally misrepresented narrative would form the basis for interference with Resolute's customers and certification partners and to raise money for the Enterprise members.

69.    In agreeing on the campaign against Resolute, the Enterprise members elected to abandon the Canadian Boreal Forest Agreement ("CBFA" or "Agreement") that they and other ENGOs had only two years earlier hailed as an "historic agreement" that "protected virtually all of the critical habitat of the threatened woodland caribou."  Under the CBFA, Resolute and other forest companies operating in the Boreal had joined with leading ENGOs, including Enterprise members Greenpeace Canada, ForestEthics, and Canopy, to form what the ENGOs called the "largest forest conservation agreement of its kind in history" under which:

> companies involved are proposing to voluntarily relinquish their rights to [harvest] areas equivalent to about 70 million acres – an area as large as Montana . . . We have never, in our experience, seen the forest industry willing to make these kinds of adjustments to their logging plans . . . if the agreement ultimately becomes

1

permanent it will completely change the face of logging in the Boreal forest.

2

70.     Under that Agreement, the environmental groups, including Greenpeace Canada and ForestEthics, agreed not to campaign against signatory forest companies in exchange for commitments from those forestry companies to only harvest in agreed upon areas while the parties developed joint conservation plans based on a detailed, rigorous, and specifically delineated scientific process.  The agreement and that scientific process had a fundamental overarching principle:  the Agreement's collaboration and rigorous scientific process would ensure that market demand for wood was met through environmentally responsible and sustainable means.

71.     On May 6, 2011, on the one-year anniversary of the CBFA, the Enterprise, in a statement issued by Greenpeace Canada, praised the "historic agreement's" impact and "significant" progress, especially the fact that it had already provided what the Enterprise, through Greenpeace Canada, described as a "moratorium . . . protect[ing] "virtually all of the habitat of the threatened woodland caribou":

> A year after the signing and announcement of the Canadian Boreal Forest Agreement (CBFA), there has been significant progress on implementation.  Greenpeace negotiated and signed the CBFA because of tremendous potential for conservation that it presents. The forest industry has finally accepted there is an urgent need to create large protected areas in the commercial Boreal forest in order to preserve biodiversity and habitat-of-species at risk, such as the woodland caribou . . .. To maintain the 'solutions-minded' space to allow this to occur, the logging companies have agreed to a moratorium on logging in nearly 29 million hectares of the 72 million hectares of Canadian Boreal Forest covered by the CBFA. The moratorium area protected virtually all of the habitat of the threatened woodland caribou. (emphasis added).

72.     At all times prior to and after the launching of the campaign, Resolute operated outside of "virtually all of the habitat of the threatened woodland caribou" identified by Greenpeace Canada as the "moratorium area."   In addition, Resolute committed thousands of hours to analyzing and proposing additional protected lands to protect woodland caribou, including proposals to increase such areas by 1.7 million hectares in Quebec and 2 million hectares in Ontario; matched funds raised by ENGOs to conduct research on species management; proposed bringing indigenous communities and governments into the CBFA

- 25 -

1    process so that its goals could be more quickly implemented; and prepared detailed management

2    plans in collaboration with ENGOs, indigenous communities, and governments.

3         73.    Indeed, among the notable accomplishments, Greenpeace Canada publicly touted

4    at the CBFA's one-year anniversary was a joint caribou management plan Greenpeace Canada,

5    Resolute, and others submitted to the Ontario government.   The joint plan covered a "critical

6    caribou range" for a herd that was identified as non-self-sustaining and whose population was

7    declining.  Nevertheless, consistent with the Agreement's core principles, after completing the

8    delineated scientific assessment, the joint plan allocated 2.2 million hectares of that caribou

9    range for harvesting pursuant to certain guidelines that would minimize the impact on, and

10   stabilize, the herd; and 800,000 hectares where there would be no harvesting.  Additional caribou

11   and conservation plans were underway for the other regions of Quebec and Ontario that likewise

12   contemplated a combination of both harvesting and protection in each forest tenure and caribou

13   range.  In the meantime, Resolute continued to honor the "moratorium" that "protect[ed]

14   virtually all of the critical habitat of the threatened woodland caribou."

15        74.    Nevertheless, by the second half of 2012, the Greenpeace Defendants secretly

16   decided to scuttle the agreement, and Enterprise members ForestEthics and Canopy joined in that

17   effort.  The Agreement's requisite collaboration and rigorous scientific analysis took substantial

18   time and effort that the Greenpeace Defendants decided would be better spent on a sensational

19   public campaign against Resolute that would generate substantial publicity and donations for the

20   Greenpeace network, and perhaps force timber companies to make concessions faster than could

21   be done under the scientific CBFA process.  Rather than simply publicly disclosing the real

22   reasons for its decision, Greenpeace Canada, in concert with the other Greenpeace Defendants,

23   ForestEthics, and Canopy, concocted a scheme to falsely accuse Resolute of breaching the

24   CBFA as a pretext for the withdrawal and the aggressive campaign to be prosecuted against

25   Resolute thereafter.

26                      a.    **The Campaign Plan**

27        75.    The agreed upon campaign plan was to intentionally misrepresent Resolute as a

28   rogue bad actor operating with a reckless environmental disregard that risked caribou extinction,

boreal deforestation, adverse climate change, and violated First Nation rights.  The Enterprise members knew these claims were not true, and did not believe them to be true, as evidenced by, among other things, the fact that Resolute's behavior was and has continued to be squarely within the bounds of what was acceptable to them under the CBFA which the Enterprise members touted as "historic" and protective of "virtually all of the critical habitat of the threatened woodland caribou."

76.     The Enterprise's campaign plan against Resolute was the subject of months of discussion in and among the Enterprise members since no later than late-2012 and early 2013, and was ultimately reduced to writing in an operational memorandum.  That memo outlined the extortive threat the Enterprise would make against Resolute, and the actions it would take to destroy Resolute if it did not capitulate to those extortive threats.

77.     Among other things, the planning memorandum stated that unless Resolute agreed to unspecified terms dictated by the Enterprise, the Enterprise would aggressively disseminate the intentional misrepresentations that Resolute violated the CBFA and stood alone, as rogue environmental bad actor, among competitors and other CBFA members:

> ENGOs announce that Resolute has failed to live up to its commitment under the CBFA, that they will no longer negotiate with Resolute or attend any meetings attended by Resolute – likely contrasted by an announced intention to carry on work implementing the CBFA with the remaining FPAC members, referencing the positive work taking place there.

These claims were materially false and misleading and known to be so by each Enterprise member because each knew that Resolute not only had abided by its commitments under the CBFA, it had exceeded those commitments and those undertaken by its competitors.  Moreover, there was no reasonable factual basis for singling out Resolute's performance under the CBFA as deficient or materially below that of other similarly situated CBFA members, and certainly not to extoll and promote one CBFA member while disparaging Resolute for the same conduct.

78.     The planning memorandum also made clear that Resolute alone would be targeted ("ENGOs commence very targeted market campaign directed at Resolute") based on the intentionally misrepresented claim that "Resolute [was] threatening the most significant global conservation agreement (i.e., the CBFA)."  As part of the campaign, the memorandum further

explained that "[a]ll ENGOs [would be] involved in that campaign . . .[with] GP US and GPI becom[ing] actively involved, with the intent of creating a threat to the brands of any customers who buy from Resolute (i.e., they will ask customers 'do you want to associate your reputation/brand with Resolute, the company that destroyed the most globally significant forest conservation agreement?'"

79.      The memorandum further dictated that the "[o]bjective will simply be to make Resolute and its products highly controversial" with "all ENGOs focussing their energy resources on positioning Resolute as the most regressive forest products company."  As part of that effort, " [o]ngoing very negative press and communications directed at customers in Canada, the US and Europe" with all the ENGO's "working on the same team" and "saying don't buy from Resolute unless they meet our demands . . . buy from these other companies (and reference the positive work of the other CBFA companies)."   As it related to Resolute, the campaign was not intended, and did not attempt, to communicate science and facts (although it would claim to do so) but, instead generated and disseminated claims based on how badly those claims could damage Resolute business and brand, and that of its customers.

80.      For example, the Enterprise knew that Resolute had not violated the CBFA, nor was Resolute responsible for any "failure" of the CBFA.   Indeed, in the months leading up to the campaign's launched, Greenpeace Canada and USA and other ENGO signatories acknowledged publicly and privately that neither Resolute nor any other CBFA signatory was responsible for any purported delay in the CBFA implementation.  The "failure" the CBFA was about to experience was the sole product of the Enterprise the ENGO's fundamental commitments under the CBFA by launching a campaign against Resolute with the false claim that it was violating the CBFA and prosecuting with the specific intent to harm Resolute's brand and business and that of its customers based on intentional and defamatory misrepresentations.

81.      Moreover, there was absolutely no reasonable factual basis for singling out Resolute for any adverse conduct under the CBFA or otherwise, or to hold out any and all of its competitors as acceptable business partners while labelling Resolute alone unacceptable. Indeed, Resolute matched or exceeded the performance of its competitors under the CBFA, and

1   to the extent the ENGOs had objections or unmet demands in the CBFA negotiation process,

2   Resolute was either as identically positioned on those issues as its competitors or closer to the

3   ENGOs' position.

4          82.   The planning memorandum also indicated that the Enterprise would directly

5   interfere with Resolute's operations by, among other things, commencing "[l]awsuits directed at

6   all Resolute tenures based on endangered species legislation (*e.g.* ESA, SARA, compliance with

7   Crown Forest Sustainability Act)" and otherwise "increase[e] [the] amount of senior executive

8   time will need to be dedicated to managing the impacts of the campaign, responding to customer

9   concerns, and diverted away from managing the core business."

10         83.   However, more threatening than the planned vexations litigations, the campaign

11  plan also provided that "Resolute FSC certs come under coordinated attack by all ENGOs."  By

12  interfering with Resolute's ability to secure FSC certificates, the Enterprise intended to not only

13  directly impair Resolute's ability to sell its products, but also trump-up a basis upon which to

14  publicly attack Resolute further.  This was a critical element of the campaign plan. Enterprise

15  members had long championed FSC certifications as the "gold standard" of the environmental

16  movement and, consistent with its pledge to the environmental community, Resolute had become

17  the largest FSC certified company in the world.  That status would have made it difficult for the

18  enterprise to credibly depict Resolute as a rogue bad actor or "the most regressive forest products

19  company."   Accordingly, a "coordinated attack by all ENGOs" including ForestEthics,

20  Greenpeace Canada, Greenpeace USA, Greenpeace International, and Canopy was planned.

21         84.   Of course, the memorandum also noted that if Resolute allows the Enterprise to

22  dictate its forest operations and endorsed and extolled the Enterprise, the Enterprise would

23  ensure that Resolute had the "reputation as being Canada's most progressive forest company,"

24  instead of its most "regressive."

25         85.   The planning memorandum noted that the campaign had the "full support from at

26  least some of the funders," which included enterprise members Greenpeace Fund and

27  Greenpeace International, as well as several of the outside foundations involved in the CBFA,

28  upon whom the Enterprise members also relied on for funding

86.     At the time the Enterprise agreed to this campaign plan against Resolute, and to this day, the Enterprise members did not genuinely believe, or have a reasonable factual basis to believe, the core factual predicates for the campaign's essential claims.  Resolute had not violated the CBFA or failed to live up to its commitments under the CBFA.  To the contrary, Resolute had abided by all the terms of the CBFA, and met or exceeded its commitments under the CBFA.  There was no basis for singling it out as the cause for the CBFA's failure, which would be exclusively caused by Greenpeace Canada's pretextual withdrawal and the campaign launched thereafter in violation of the CBFA's terms.

87.     Nor was there a basis for singling Resolute out as a rogue bad actor or the "most regressive forest products company" in the Canadian boreal forest.   Resolute was the most highly FSC certified company in the boreal forest -- the gold standard for progressive operations according to the very enterprise members attempting to depict Resolute as the "most regressive" forest operator.  Moreover, there was absolutely no basis for depicting Resolute as "regressive" and other companies who were identically situated, or in most cases, less favorably situated being promoted as "progressive" good actors, with whom Resolute customers should do business instead.

88.     Consistent with the Enterprise's written campaign plan, for over the next four years and continuing to this day, ForestEthics, Greenpeace USA, Greenpeace Canada, Greenpeace Internatinal, and the other Enterprise members aggressively prosecuted the campaign, which they title the "Resolute: Forest Destroyer" campaign.  Consistent with the campaign's stated agenda, it most aggressively targeted (a) Resolute, against which it relentlessly disseminated materially false and misleading statements and omissions designed explicitly to intentionally misrepresent it as the "most regressive forest products company" and to inflict substantial and potentially terminal damage to its business and brand; (b) Resolute's customers, against which the campaign made fraudulent  demands and extortive threats; (c) the public, particularly potential customers for Resolute sourced products and donors who were both intentionally mislead to provide leverage and funds for the campaign; and (d) the FSC and other certification bodies and auditors whom the Enterprise misled with disinformation and pressured

to support the campaign by applying materially different standards to Resolute than were applied to other identically situated companies.  For a complete recitation of the parties to whom these false allegations were disseminated see below, §§  B(2)(f)(i), (ii),(iii).

### b.  The Campaign Is Launched

#### i.     The Misrepresented Pretext For Withdrawing from the CBFA

89.     The Enterprise launched its campaign with a highly sensational, publicized, and knowingly false report released by Greenpeace Canada on December 6, 2012 titled "Exposed: Resolute Forest Products Breaks Historic Environmental Agreement" (the "Exposed Report"). The Exposed Report intentionally misrepresented that Resolute was harvesting in various regions of the boreal forest in violation of the CBFA, and purported to corroborate those claims with photographs and videos showing purported road building and other operations in areas in which Resolute had agreed not to operate under the CBFA.  The photographs and videos included unidentified Greenpeace network members displaying GPS devices purporting to prove the accuracy of the locations alleged.

90.     In each photograph the GPS device displayed the satellite coordinates along with a caption which read as follows:

- Pin #1: New road built 20 km beyond the limits agreed to under the CBFA in Resolute Forest Products' managed area (FMU 25-51);

- Pin #2: Recently built road 10 km beyond the limits agreed to under the CBFA in Resolute managed area (FMU 25-51);

- Pin #3: Active road building in Resolute managed area in the extreme north of FMU;

- Pin #4: Freshly bulldozed forest inside the Agreement's off-limit areas in FMU 24-41; and

- Pin #5: Active road building in off-limits intact forest in FMU 24-51.

These accusations that Resolute was operating in violation of the CBFA were knowingly false and the photos and videos were intentionally misrepresented and described without any basis to believe they actually depicted what the Enterprise claimed but intentionally misrepresented this

fact to further the campaign plan of harming Resolute.  This identical malicious intent would permeate the Enterprise's campaign.

91.     Specifically, the images and coordinates misrepresented in pins 1 and 2 as Resolute road building were, in fact, roads permitted under the CBFA.  The Enterprise - through Greenpeace Canada, Greenpeace USA, ForestEthics, and Paglia - knew the claims associated with pins 1 and 2 were misrepresented because they each possessed the maps and information showing that to be the case, otherwise had ready access to such information,  and because they were actively involved in the negotiation and implementation of the CBFA's terms.  They also had no reasonable basis for concluding the road was built by Resolute, and did not actually believe that to be true but intentionally misrepresented this fact to further the campaign plan of harming Resolute.

92.     The roads corresponding to pins 3 and 4 were built by the Quebec Ministry of Natural Resource as part of efforts to reforest areas that had been damaged by fire.  The Enterprise - through Greenpeace Canada, Greenpeace USA, ForestEthics, and Paglia - knew these roads were built by the Quebec Ministry because these enterprise members possessed the information showing that to be the case and otherwise had ready access to that information. They also had no information or basis for concluding the road was built by Resolute, and did not actually believe the road was built by Resolute but intentionally misrepresented this fact to further the campaign plan of harming Resolute.

93.     The roads corresponding to pin 5 was actually built by another company that was not a signatory to the CBFA.  The Enterprise - through Greenpeace Canada, Greenpeace USA, ForestEthics, and Paglia - was aware that this company and not Resolute was operating in this area and built the road because these Enterprise members each had ready access to information sufficient to determine that the area affected by this road building is in the area under the jurisdiction of QMNR in anticipation of the 2013-2014 harvesting season.   They also had no information or basis for concluding the road was built by Resolute, and did not actually believe the road was built by Resolute but intentionally misrepresented this fact to further the campaign plan of harming Resolute.

94.     In addition to intentionally misrepresenting photographs and what they depicted, the Exposed Report was accompanied by a video entitled "Scandal in the Boreal Forest" that intentionally misrepresented forest areas that were purportedly "ravaged" by Resolute in violation of the CBFA.  Once again purporting to rely on GPS coordinates, the Enterprise -- through Greenpeace Canada -- intentionally misrepresented in this video that Resolute was operating "20 kilometres beyond the limits set by the [CBFA]" "in off-limit caribou habitat," in clear violation of its commitments under the CBFA.

95.     In fact, however, Greenpeace's video intentionally misrepresented its images, which were, in fact, not images of Resolute operating in "off-limit" CBFA areas or otherwise in violation of the CBFA.  One image intentionally misrepresented in the video depicted an area that had been harvested approximately ten years earlier, before the CBFA even existed.  Moreover, the GPS coordinates associated with this image did not even correspond to the area depicted in the image, but instead corresponded to an area within the moratorium area that had experienced disruption from fire, not harvesting.

96.     The Enterprise -- through Greenpeace Canada, Greenpeace USA, ForestEthics, and Paglia -- knew this image was twice misrepresented because the information associated with the image itself identified it as harvesting from a decade earlier, and these Enterprise members had no basis to believe it had been harvested by Resolute after the CBFA became effective and did not believe it to have been.  In addition, there was no basis to associate this image with GPS coordinates within the CBFA moratorium region, let alone an area that had been disrupted by fire.  To the contrary, the disruption displayed in the image was actually caused by fire, and the attempt to pass it off as depicting harvesting in an area protected under the CBFA, evidences an elaborate and specific intent to misrepresent.

97.     A second image in the video was intentionally misrepresented as evidence of Resolute harvesting in a protected CBFA area when, in fact, the activity and equipment depicted (scarifier) involves the regeneration of an area that had been harvested before the CBFA became effective.  The Enterprise -- through Greenpeace Canada, Greenpeace USA, ForestEthics, and Paglia -- knew this image was misrepresented because these members each were aware from the

information they possessed and knowledge they secured in negotiating and participating in the CBFA that this area had been harvested before the CBFA became effective and was scheduled for mandatory regeneration.  In addition, these Enterprise members would have known from their expertise and familiarity with forestry that the activities and equipment depicted related to regeneration and not harvesting.  Finally, these Enterprise members had no reasonable factual basis for believing the image actually depicted harvesting by Resolute and did not actually believe that is what the image portrayed but intentionally misrepresented it as such to advance the campaign plan.

98.     A third image in the video intentionally misrepresented a protected forest area disrupted by fire as an area disrupted by Resolute harvesting.  The Enterprise – through Greenpeace USA, Greenpeace Canada, ForestEthics, and Paglia - knew this image was misrepresented based on each of their expertise by which they would have been able to recognize the telltale differences between fire and harvest disruption.  Moreover, they had no reasonable factual basis for believing the image actually depicted disruption caused by Resolute harvesting in violation of the CBFA, and did not actually believe that is what the image portrayed but intentionally misrepresented it as such to advance the campaign plan.

99.     A fourth image in the video intentionally misrepresented areas destroyed by fire in 2007, long before the CBFA existed, as prohibited harvesting by Resolute after the CBFA became effective.  The Enterprise – through Greenpeace Canada, Greenpeace USA, ForestEthics, and Paglia - knew this image was misrepresented from the information that accompanied the image and from the telltale differences between disruptions caused by fire and those caused by harvesting, which these Enterprise members each would have known from their experience and expertise.  Moreover, they had no reasonable factual basis for believing that the image actually depicted disruption caused by Resolute harvesting in violation of the CBFA, and did not actually believe that is what the image portrayed but intentionally misrepresented it as such to advance the campaign plan.

100.     A fifth image in the video intentionally misrepresented satellite images of areas harvested in 2003 as areas Resolute harvested after the CBFA had become effective.   The

Enterprise – through Greenpeace Canada, Greenpeace USA, ForestEthics, and Paglia -- would have known this image was misrepresented from the information accompanying the satellite image, and because they each possessed information necessary to know that the depicted area had been harvested before the CBFA became effective.  Moreover, they had no reasonable factual basis for believing the image actually depicted Resolute harvesting in violation of the CBFA and did not actually believe that is what the image portrayed but intentionally misrepresented it as such to advance the campaign plan..

101.     Accordingly, despite knowing Resolute's alleged CBFA violations were factually without basis and intentionally misrepresented, the Enterprise -- through Greenpeace Canada and Greenpeace USA -- used those trumped up misrepresentations as a pretext to withdraw from the CBFA, declare a campaign against Resolute based on those misrepresented claims, and solicit donations to support the campaign against Resolute:

> When the biggest logging company in the Boreal forest goes back on its word to stay out of critical habitat, it signals the Agreement has broken down . . . Greenpeace needs your help.  Help stop Resolute from logging in Canada's endangered forest.  Share this video and tell your friends about the Resolute scandal in the Boreal.

102.     The same day the Exposed Report was released, the Enterprise through Holly Postlewaithe of Greenpeace Canada, issued a "Backgrounder" titled "Resolute Forest Products violates Canadian Boreal Forest Agreement with logging activity in off-limit areas" that falsely stated:

> On August 25th 2012, a Greenpeace team went to Resolute Forest Products' managed areas in the northern portion of the Lac St-Jean region in Quebec, known as the Montagnes Blanches. . . . Greenpeace investigators traveled over 1000 kilometres of forest roads in Resolute Forest Products' Forest Management Units (FMUs) 24-51, 25-51 and 27-51.  Equipped with a GPS, the team documented roads and road building activity in off-limit areas in violation of the CBFA.  In FMU 25-51 (pin 1 & 2 on the map in the photo evidence package), they documented more than 20 kilometers of new roads built in off-limit areas in the heart of pristine caribou habitat.  In FMU (pins 3; 4 & 5), three sites were documented in off-limit areas where logging for road building recently took place.

The Backgrounder linked to the same intentionally misrepresented photographic and video depictions of Resolute breaching the "off-limit" areas in violation of the CBFA that were included in the "Exposed" report and accompanying video.

103. The Enterprise immediately publicized these intentionally false and misleading allegations via social media and in direct communications with Resolute's customers and critical market constituents. For example, immediately after the Exposed Report was published, Nicholas Mainville of Greenpeace Canada tweeted a link to the report on Twitter. And the next day, defendant Rolf Skar of Greenpeace USA sent long-time Resolute customer, Hearst, the photographs of Resolute purportedly harvesting in off-limits areas which Skar described as "evidence we had collected" demonstrating that Resolute had violated the CBFA. As further evidence that Skar and Greenpeace USA were working in concert with Greenpeace Canada in manufacturing these false claims and putative "evidence," Skar references "our" letter to CBFA steering committee informing them of these intentionally misrepresented claims and Greenpeace Canada's withdrawal from the CBFA.

104. Days later, on December 11, 2012, the Enterprise issued another statement based on these intentional misrepresentations titled, "It's Over Resolute Forest Products," through Bruce Cox the Director of Greenpeace Canada, announcing that the Enterprise was leaving the CBFA because "[a] Greenpeace field investigation revealed newly built roads in off-limits areas in Quebec's endangered Montagnes Blanches forest, a forest managed by our CBFA partner Resolute Forest Products."

### ii. The Enterprise's Refusal to Correct Or Retract Its Intentional Misrepresentations

105. In addition to the knowledge and information it possessed indicating that its claims, images, and videos misrepresented that Resolute had violated the CBFA, and its lack of any investigation or reasonable factual basis for believing such misrepresentations were true, the Enterprise's malice and scienter are evidenced by its refusal to correct these misrepresentations immediately when informed they were demonstrably untrue by Resolute.

106. For example, in an immediate response to the Enterprise's intentional misrepresentations, on December 12, 2012, Resolute sent a letter to all CBFA signatories,

including Greenpeace Canada, containing irrefutable evidence that the Enterprise's allegations

and putative proof were materially false, misleading, and intended to deceive.  First, Resolute's

letter demonstrated in detail that none of the five photographs included in the Expose Report

depicted harvesting in violation of the Agreement:

- Resolute demonstrated that the photographs associated with pins 1 and 2 that were intentionally misrepresented as proof of harvesting in violation of the CBFA in were instead images of harvesting in areas clearly delineated as approved CBFA harvesting areas.

- Resolute demonstrated that the photographs associated with pins 3 and 4 that were intentionally misrepresented as proof of unauthorized road building by Resolute in violating of the CBFA depicted instead roads by the Quebec Ministry of Natural Resources ("QMNR") that did not violate the CBFA and were built to facilitated necessary regeneration of areas disrupted by fire in 2007.

- Resolute demonstrated that the photographs associated with pin 5 that were intentionally misrepresented as Resolute harvesting in violating of the CBFA actually depicted harvesting by another company that was not a signatory to the CBFA.

107.    Moreover, in the December 12, 2012 letter Resolute demonstrated that the video

images were likewise phony and misleading:

- Resolute demonstrated that the aerial image misrepresented as a forest "ravaged" by Resolute harvesting in violation of the CBFA was, in fact, an area harvested early in the 2000s before the CBFA (or even Resolute) even existed.  Resolute further demonstrated that the GPS coordinates purportedly corresponding to this image were actually associated with a different area that had been disrupted by fire.

- Resolute demonstrated that another image on the video purporting to show "destruction" from forestry machines engaged in harvesting was actually a scarifier, machinery engaged in reforestation (scarification) of an area burnt by fire.

- Resolute demonstrated that multiple other images on the video purporting to show areas harvested by Resolute were actually areas disrupted by fire.

- Resolute demonstrated the video intentionally misrepresented a 2003 satellite image as an area Resolute harvested in violation of the CBFA, when, in fact, the CBFA did not even exist in 2003 and the area was outside Resolute's forest management areas in any event.

108.    Despite being informed immediately that its accusations and proof were false, the

Enterprise not only declined to retract the claims or purported evidence, it instead immediately

redoubled its efforts to disseminate them.  For example, in a December 14, 2012 letter from

Stephanie Goodwin of Greenpeace Canada to CBFA signatories the Enterprise purported to

1    "provide further clarity on Resolute Forest Product's logging activity in off-limits areas of the

2    Canadian Boreal Forest Agreement," and continued to falsely accuse Resolute of "allow[ing]

3    road building in original CBFA Areas of Suspended Harvest despite active efforts by

4    Greenpeace and other environmental organizations."  This letter and its intentionally false

5    message was repeated and rebroadcasted at the time by the other members of the Enterprise,

6    including Greenpeace USA, ForestEthics, and Paglia.

7        109.    On December 17, 2012, Resolute sent another letter to Bruce Cox and Stephanie

8    Goodwin of Greenpeace Canada again informing her and the Enterprise that these claims were

9    false, factually unfounded, and contrary to the available evidence and demanded that Greenpeace

10   immediately cease and desist from making these allegations and remove all references to these

11   statements from Greenpeace's website.

12       110.    Again evidencing its malice, despite knowing its claims and evidence were false,

13   and being told its claims and evidence were false and asked to stop disseminating those

14   misrepresentations, the very next day after receiving Resolute's second letter, the Enterprise,

15   through Greenpeace Canada, launched a petition on a third-party website "The Petition Site" that

16   repeated these intentional misrepresentations, including that Resolute was "violating the

17   Canadian Boreal Forest Agreement (CBFA) **by approving logging roads in offlimit forest**

18   **areas**."  (emphasis in original)  The petition further alleged that "Resolute's actions break the

19   foundation of the Agreement between forest companies and environmental organizations and

20   threaten the vitality of these endangered forests and the precious wildlife that call it home."  The

21   solicitation referenced back to and provided links to the other materially false and misleading

22   publications Greenpeace had previously published intentionally misrepresenting that Resolute

23   was violating the CBFA.  Within weeks, over 15,000 individuals signed the petition and a

24   significant number of them donated money.

25       111.    Despite knowing that its claims were false and being told that they were false and

26   should be retracted, the Enterprise -- through Greenpeace Canada, Greenpeace USA, Forest

27   Ethics, and Paglia -- continued to disseminate, republish, and solicit donations based on these

28   lies through January 2013.  First, on January 16, 2013, Greenpeace Canada published the "Boreal

Alram Report" which declared that  "Greenpeace calls for a halt on logging in five key areas in the Boreal Forest (the "Boreal Alarm Report")" and contained the false and misleading statement that "Greenpeace left the failed Canadian Boreal Forest Agreement after an investigation revealed Resolute forest products was responsible for logging in the Agreement's off-limit areas . . ." The report contained a hyperlink to the Exposed Report and video which Resolute had rebutted weeks earlier.

112.    On January 17, 2013, Greenpeace Canada published a blog post titled "Resolute Forests Products fails to deliver on sustainability," which likewise falsely claimed that Greenpeace's "investigation" revealed that Resolute "has authorized logging and the construction of roads in this-off limits forest."  Like prior publications, the January 17, 2013 blog post linked to the Exposed Report and the accompanying intentionally misrepresented photographs and video.

113.    Greenpeace USA likewise disseminated these intentionally misrepresented allegations.  On January 22, 2013, Greenpeace USA published a blog post titled "Greenpeace calls for a halt on logging in five key areas in the Boreal Forest," which contained links to Greenpeace Canada's Exposed Report and putative supporting "evidence."  In addition in late January, defendant Daniel Brindis of Greenpeace USA sent long-time Resolute customer, Hearst, the Boreal Alarm report.   Demonstrating that Greenpeace USA worked in collaboration with Greenpeace Canada in preparing the malicious and misleading report, Brindis referred to the report as "our" report.   More significantly, Brindis's email to Hearst referenced his review of Resolute's December 12 rebuttal demonstrating that Brindis and Greenpeace USA continued to make these false charges notwithstanding their knowledge of irrefutable evidence to the contrary.

114.    The Enterprise, through its websites and through Greenpeace Canada, Greenpeace USA, ForestEthics, and Paglia would continue to publish these intentional misrepresentations for months until threatened with impending legal action by Resolute.  Only then did the Enterprise retract the intentional misrepresentations in the hope that its members would not be sued.  The refusal to correct demonstrably false claims except to escape suit is further evidence of the

1    Enterprise's malice.  That malice was further evidenced by the additional misrepresentations it

2    made to cover-up those intentional misrepresentations.

3           115.    On March 19, 2013, more than three months after Resolute first rebutted the

4    falsity of the Enterprise's allegations that Resolute was logging in violation of the CBFA, the

5    Enterprise, through Greenpeace Canada, purported to issue a "Notice of Correction Regarding

6    Resolute Forest Products' Operations," acknowledging that it "incorrectly stated that Resolute

7    had breached the Canadian Boreal Forest Agreement by . . . secretly engag[ing] in logging

8    contrary to the terms of the [CBFA]."  But Greenpeace misrepresented that these false

9    accusations were caused by "incomplete maps," and that it "did not intend to hurt the company

10   but intended to promote a vision of the Boreal that includes Resolute."  These claims were

11   themselves intentional misrepresentations designed to conceal the Enterprise's malice and

12   preserve its credibility so as not to impair its ability to continue executing the campaign.  The

13   cover-up was demonstrably untrue and intentionally so.

14          116.    First, the intentional misrepresentation of multiple photos depicting fire disruption

15   as harvesting by Resolute cannot be blamed on an "incomplete map."  Second, the use of images

16   that are from periods before the CBFA (and Resolute) even existed cannot be blamed on an

17   "incomplete map."  Third, attributing to Resolute harvesting that the Enterprise knew was

18   conducted by another company based on, among other things, communications with the

19   company and the Quebec government cannot be blamed on an "incomplete map."  Fourth, an

20   "incomplete map" would not explain misrepresenting images depicting regeneration activities as

21   harvesting activities.  And fifth, an "incomplete map" cannot be blamed for intentionally

22   misrepresenting that Resolute harvested in an unauthorized area when in fact it was in an

23   authorized area as either the "incomplete map" covered the relevant area or it did not, in which

24   case the Enterprise either knew from the map the claim was not true or recklessly disregarded the

25   truth by not examining a map actually covering that area before making the claim.

26          117.    Moreover, the denial of any intention to harm Resolute by these intentional

27   misrepresentations itself misrepresented the specific intent to hurt Resolute's brand and business

28   that was the objective of the campaign, as evidenced by the misrepresented claims that it knew or

1   could have easily determined were false, the refusal to correct those claims when they were

2   shown to be untrue, the aggressive dissemination of those false claims despite knowing and

3   being told they were not true, and the refusal to rejoin the CBFA after acknowledging that its

4   entire stated basis for leaving had been wrong.

5          118.    Indeed, the intentional falsity of the Enterprise's claim that it did not intend harm

6   to Resolute is demonstrated by what it intentionally did not disclose when it made that claim:

7   the aggressive dissemination of these lies was part of a larger campaign to attack Resolute and

8   ruin its brand and business that the Enterprise, including Greenpeace Canada, Greenpeace USA,

9   Forest Ethics, Paglia and other ENGO's, had agreed upon in or around the end of 2012 in

10  violation of the CBFA.

11                  c.   **The Enterprise's Continued Campaign**

12         119.    By not returning to the "historic" CBFA after being forced reluctantly to admit its

13  highly publicized reasons for leaving were false, the Enterprise, through Greenpeace Canada,

14  demonstrated that it had and was misrepresenting its ongoing desire to pursue agreed upon

15  conservation solutions.   Instead, as the secret campaign plan indicated, what the Enterprise had

16  agreed to do instead was prosecute a public campaign targeting Resolute, ruining its brand and

17  business and that of its customers, and generating publicity and donations in the process.   Since

18  the stated objective of this campaign was harming Resolute and its customers, the statements and

19  messaging were generated to best accomplish that purpose and not to convey scientific based

20  facts and positions although the Enterprise would intentionally misrepresent in all campaign

21  messaging that its intent was to convey science based facts and it would conceal its real stated

22  objective of inflicting harm on Resolute.

23         120.    Accordingly, within days of purportedly retracting its CBFA claims, the

24  Enterprise, through defendant Brindis of Greenpeace USA and Catherine Grant of Greenpeace

25  Canada, launched its "Resolute: Forest Destroyer" campaign theme, intentionally

26  misrepresenting that Resolute was "one of the destructive logging companies in Canada . . .

27  responsible for destroying critical caribou habitat in endangered forest areas" and violating a

28  previously agreed upon moratorium with the Cree Nation in the Broadback Forest.

121.    These newly minted claims were materially and intentionally false and misleading.  The Enterprise knew and had previously widely proclaimed that the CBFA's protected areas -- in which Resolute was still not operating -- "protect[ed] virtually all of the habitat of the threatened woodland caribou," and as part of "protect[ing] virtually all of [that] habitat," the Enterprise – through Greenpeace Canada, Greenpeace USA, Forest Ethics and Paglia - had agreed that Resolute (and other forest companies) could harvest in the very areas that the Enterprise now claimed were "endangered forests" and "critical caribou habitat."   The publication did not disclose that the Enterprise members had previously excluded these areas from the protected "critical caribou habitat" and expressly agreed to let Resolute harvesting there, or offer any explanation for this irreconcilable flip-flop.  Moreover, while the Enterprise singled out Resolute as the "forest destroyer" because of such harvesting, it ignored and did not disclose all the other forest company's harvesting in precisely the same agreed upon areas even though they accounted for a far greater percentage of such harvesting and the associated impact than Resolute.

122.    This publication was intentionally and specifically crafted to mislead the public, donors, and customers that Resolute was the "most regressive forest products company" and thereby further the Enterprise's stated objective of ruining Resolute' reputation, brand, and ability to do business.   Resolute was harvesting in precise compliance with CBFA standards that the Enterprise had publicly touted as "historic" and "unprecedented" achievements for conservation in the boreal and as "protecting virtually all of the critical habitat of the threatened woodland caribou."   Indeed, as evidenced by the CBFA terms themselves and the management plan that Greenpeace Canada, ForestEthics, and Resolute jointly proposed to the Ontario government concerning this same "critical caribou habitat,"  the Enterprise members always acknowledged and understood that harvesting in these areas would be permitted.

123.    The facts and science on this issue did not change.  What changed was the intent and objective of the Enterprise from "protect[ing] virtually all of the habitat of the threatened woodland caribou" and otherwise ensuring that the market's wood demand was met in an environmentally responsible manner, to the very different purpose of inflicting as much harm on

1   Resolute as possible so as to falsely portray it as "the most regressive forest products company,"

2   and thereby pressure it to comply outside the CBFA's robust scientific process.

3       124.    The Enterprise's accusations –through Greenpeace Canada -- that Resolute had

4   violated a previously agreed upon moratorium with the Cree was also false.  Resolute and other

5   logging companies had voluntarily agreed to not harvest in certain areas in which the Quebec

6   government had directed them to harvest in order to give certain Cree nation members an

7   opportunity to raise issues of concern they had with the Quebec government, which holds title to

8   and directs the harvesting of the boreal forest in Canada.   Resolute honored and continued to

9   honor this moratorium until it expired later in 2013.

10      125.    After launching the "Forest Destroyer" campaign, on March 27, 2013, defendant

11  Brindis of Greenpeace USA and Catherine Grant of Greenpeace Canada jointly disseminated a

12  letter to Resolute's critical customers, including Verso, intentionally misrepresenting that

13  Resolute was "[o]ne of the primary forest products companies responsible for destructive logging

14  and roadbuilding in [] Endangered Forest areas," including the Montagne Blanches and Trout

15  Lake.  The letter directed the reader to the January 2013 Boreal Alarm Report that had included

16  the now purportedly retracted misrepresentation that Resolute "recently began building roads in

17  off-limits forest areas. . . ."  The letter did not disclose that those claims had been retracted.

18      126.    The March 27, 2013 letter did not disclose that those claims had been retracted

19  because its misleading intent was to conflate those false claims that Resolute had harvested in

20  protected areas that it and the ENGOs had agreed would not be harvested, with the Enterprise's

21  newly minted claims that Resolute was improperly logging in five regions in the Canadian

22  Boreal forest that Greenpeace had unilaterally declared "endangered forests" and "critical

23  caribou habitat" even though it had not only excluded those areas from the CBFA's protected

24  areas but explicitly agreed Resolute and others could harvest where they were harvesting.  This

25  intentionally misleading "bait and switch" was intended to perpetuate the materially false and

26  misleading claims (first perpetuated in the now retracted claims from earlier that year) that

27  Resolute was operating in violation of the CBFA's terms and beyond what the industry and

28  environmental organizations understood to be responsible sustainable practices

- 43 -

127.    In addition, the Enterprise knew these new accusations against Resolute were false because its members, Greenpeace Canada, Greenpeace USA, Greenpeace International, and ForestEthics, knew that to the extent that these so-called "endangered forests" were being disturbed, it was other logging companies, and not Resolute, who were responsible for that disturbance entirely or, in a few instances, almost entirely.  For example, the Enterprise -- through Greenpeace Canada, Greenpeace USA, ForestEthics, and Paglia -- was in possession and aware of information demonstrating that Resolute was not operating at all in the Trout Lake Forest.  Despite this knowledge, the March 27, 2013 letter intentionally misrepresented that Resolute was harvesting in the Trout Lake Forest.  Likewise, the Enterprise -- through the same members -- was also in possession of, had access to, and the ability to understand, other information showing that Resolute accounted for only a nominal amount of the activity in other so-called endangered forests but it ignored this information, and continued to knowingly attribute to Resolute the activities and impacts of other companies in these areas because doing so furthered its stated objective of misrepresenting Resolute as "the most regressive forest products company" and ruining its brand and business and that of its customers.

128.    The March 27, 2013 letter also purported to identify mills sourcing from these same Greenpeace designated "Endangered Forest Areas," and demanded that Resolute's customers examine their supply chain and confirm whether they were sourcing from Resolute in Quebec and Ontario.  Greenpeace Canada and Greenpeace USA then offered in the letter their "expertise" in identifying and eliminating Resolute from the customer's supply, thereby using their misrepresentations to gain access to customers' proprietary supply-chain data.  The intent was to then redirect customers from Resolute to other suppliers the Enterprise misrepresented as not being engaged in exactly the same behavior.

129.    As a sign of the Enterprise's pure malice toward Resolute, the letter did not identify any of the other companies that were actually operating in, for example, Trout Lake Forest, or any of the other identified "Endangered Forests," or call on customers to determine whether they were sourcing wood from any of these other companies operating in these designated areas.  There was no reasonable factual basis for excluding harvesting by other

companies harvesting in these same purportedly "endangered forests" if, in fact, such harvesting posed the concerns Greenpeace raised.

130.    Indeed, the letter instead discussed only Resolute, and actually encouraged companies to source from other companies that were likely actually harvesting from these endangered forests such as Trout Lake, where Resolute was not. The letter did not do so because it was not motivated by genuine environmental concerns or objectives, or crafted to serve such objectives, but was intended solely to further the campaign's objective of intentionally mispresenting Resolute to be the "most regressive forest products company," harming its brand and business and that of its customers, and generating publicity and donations.

### d. **ForestEthics Delivers the Enterprise's Extortive Threats**

131.    Shortly after these opening salvos of the campaign against Resolute, the Enterprise communicated various extortive threats to Resolute through communications in April and May from Enterprise members ForestEthics and Todd Paglia.  For example, on April 25, 2013, Paglia, on behalf of the Enterprise, wrote to Resolute threatening "very active campaigning" unless it agreed to not only honor the previously agreed upon protected areas that "protect[ed] virtually all the habitat of t threatened woodland caribou" and the substantial additional areas Resolute had proposed to not harvest, but also an unspecified amount of vast additional areas that Resolute could not possibly alone agree to meet and remain in business.

132.    Mr. Paglia issued a second extortive communication in a May 7, 2013 meeting held at Resolute's office, during which he threatened the Vice President Corporate Communications Sustainability and Government Affairs of Resolute that if Resolute failed to forego extensive harvesting rights, ForestEthics and the other ENGOs in the Enterprise would destroy Resolute's brand among its critical market constituents.  Paglia cited successful campaigns by these groups against Fortune 500 companies, including Staples, Office Depot, Williams-Sonoma, Dell, and Victoria's Secret.  In the context of the latter campaign, Paglia said: "We are going to provide all these companies with the option of doing it the easy way. If they want to do it the hard way, we can see a tremendous amount of negative press and damage to their brand."

133.     Conversely, Mr. Paglia offered that if Resolute acquiesced to the Enterprise's demands, and endorsed and promoted them as had the other campaign targets he described, the Enterprise would extol Resolute in the marketplace and promote it vis-à-vis its competitors.  In that conversation, Mr. Paglia made clear that he and the other ENGOs in the Enterprise were not going to limit their campaign against Resolute to attacks based on science and fact but would do whatever was necessary to impose the most harm as possible on Resolute's brand and that of its customers.  Following the meeting, Mr. Paglia sent Resolute information concerning Forest Ethics' previous "collaborations" with Staples and Victoria's Secret.

134.     Between May 10, 2013 and May 14, 2013, Mr. Paglia made additional extortive threats to Resolute, in direct communications with Resolute's CEO Richard Garneau, and through an intermediary, that largely tracked the written campaign plan the Enterprise had created, including the intent to damage Resolute's brand, interfere with its customer relationships, and conduct a "coordinated campaign" to interfere with its FSC certificates.

### e.     The Ongoing "Forest Destroyer" Campaign.

135.     When Resolute refused to acquiesce to the Enterprise's extreme, unfeasible, and extortive demands, the Enterprise began disseminating increasingly broad, sensational, and ubiquitous misrepresentations about Resolute, which is characterized as a rogue "Forest Destroyer."  In context, the Enterprise's narrative was materially false and intentionally misleading because it was based on material false statements and omissions it intended to, and did, communicate that Resolute was: (a) deforesting the boreal and, thereby causing permanent forest loss, the loss of "the last intact forest landscapes" in the boreal forest, and materially impairing the Canadian boreal forest's ability to mitigate climate change; (b) risking the "extinction," "extirpation" and a "death spiral" for woodland caribou; (c) abandoning sustainability efforts and FSC certifications; and (d) violating First Nation rights and economic interests.   These ubiquitous claims were based on numerous intentional misrepresentations and omissions of fact that individually, and in the aggregate, materially overstated Resolute's activities in, and impact on, the boreal forest, and understated its compliance with precisely the

type of sustainable practices the Enterprise members had agreed under the CBFA would be sufficient to protect against these identified risks.

### i. The Enterprise Members Intentionally Misrepresented Their Objective.

136.    As a threshold matter, the campaign's narrative intentionally misrepresented its objective as ensuring that boreal timber harvesting was conducted in a sustainable environmental manner.  In truth, as set forth in the written campaign plan, the objective was to harm Resolute, and Resolute alone, irrespective of the facts that (a) its operations were indistinguishable from those companies that the enterprise praised and directed customers to patronize over Resolute; (b) it was complying with the terms the Enterprise members had requested under the CBFA; and (c) it was harvesting in areas in which the enterprise members had explicitly agreed it could harvest prior to launching their campaign.

137.    In addition, the campaign intentionally misrepresented that its claims about Resolute were based on objective, good faith applications of the scientific evidence and available facts.  However, this was demonstrably untrue because the Enterprise did not make the same claims against any other companies harvesting in the same forests areas based on that same purported science.   These intentional misrepresentations were intended, and did, legitimize the Enterprise's campaign, and concealed that the anti-Resolute campaign's specific and immediate objective and intent was to inflict maximum harm on Resolute and its customers and generate publicity and donations for the Enterprise members.

138.    The Enterprise also intentionally manufactured a false sense of urgency, importance, and magnitude by grossly misrepresenting and exaggerating the conditions in the boreal forest and Resolute's involvement and impact there, and drew associations to hot-button issues such as global warming, endangered species, and the treatment of indigenous peoples for which there was no reasonable factual bases.

139.    To make such claims credible, the Enterprise misrepresented that they had "developed an expertise in matters related to the protection and conservation of Canada's boreal forests . . . .," that their campaign was developed in collaboration with "experts, scientists and researchers across the globe to build a deep understanding of the problem," and their claims of

catastrophic consequences were based on the "best science" and "supported by the most recent scientific data."

140.    These claims were made to bolster the credibility of the Enterprise's intentional misrepresentations and were themselves false.  The fact is that the intentional misrepresentation that comprised the "Forest Destroyer" campaign were not based on expertise or science directed at the conservation of the boreal forest, were not developed in collaboration with "experts, scientists, and researchers from across the globe"; and were not "supported by the most recent scientific data."   To the contrary, the claims made against Resolute in the Forest Destroyer campaign were motivated not by science or conservation but exclusively by the intent to hurt the brands of Resolute and its customers, and generate publicity and donations.

141.    In truth, not only were the campaign's claims not supported by scientific data, they were contradicted by the Enterprise members' own internal analyses and by those in which they participated in the CBFA.  Indeed, this is obvious from the campaign's misrepresentation that Resolute was "destroying" so-called "endangered forests" and "critical caribou habitat" by harvesting areas the CBFA Enterprise members (Greenpeace Canada, ForestEthics, and Canopy) had explicitly agreed should be harvested and were outside the moratorium area that that those same members said "protected virtually all of the critical habitat of the threatened woodland caribou."  That the campaign's core claims were intentionally misrepresented as based on science and facts as claimed, is also demonstrated by the Enterprise members' characterization of those same claims as mere "hyperbole," "heated rhetoric," and "figurative speech" that were not intended to be read with "strict literalism or scientific precision."  But, as set forth below in detail, that is exactly how these claims were intended and understood in the carefully crafted context in which they were communicated.

ii.      The Enterprise Misrepresented that Resolute was Deforesting The Canadian Boreal Forest And Impairing Its Ability To Mitigate Climate Change.

142.    Merriam-Webster defines "destroy" as "to cause (something) to end or no longer exist: to cause the destruction of (something): to damage (something) so badly that it cannot be repaired."  And this was precisely the meaning the campaign's literature was

carefully and intentionally crafted to portray by ubiquitously describing Resolute's purportedly objectionable conduct in the context of global deforestation, forest loss, and climate change.

143.    To convey that the terms "destroy," "destruction," and "destroyer" were intended to be understood according to their defined meaning, the "Resolute: Forest Destroyer" campaign consistently employed those terms in the context of just such types of forest loss.  The campaign consistently associated Resolute's alleged offensive conduct with significant land use changes worldwide that resulted in literal deforestation and tree loss from mass conversion (and permanent loss of)  forests lands to agricultural and population centers and other natural and human non-forestry related conversions.  These massive deforestation events are occurring overwhelmingly in Africa, Asia, and South America, but notably NOT IN THE BOREAL, and have absolutely no comparable relationship to harvesting in a managed forest, in the Canadian boreal managed forest, or, certainly, Resolute's relatively de minimus level of harvesting in that context.

144.    Nevertheless, the language used to specifically describe Resolute's conduct was plainly intended to, and did, equate it in kind and scale with the major deforestation events being referenced.  For example, the campaign accused Resolute of "[d]estroying Canada's Boreal Forest," "destroying vast swathes of the Canadian Boreal forest," being  responsible for the "destruction of vast acres of Canada's magnificent Boreal forest," and "threatening the future of the Boreal forest and the wildlife that rely on it to thrive."   This carefully developed context was plainly intended to, and did, misrepresent that Resolute's purportedly offensive conduct was of like kind, and posed a similar risk, or, at least, was a material contributor to the same deforestation problem.

145.    And the campaign reinforced this literal definition even more strongly by likewise associating Resolute's conduct with a magnitude of climate change risk that could only equate to deforestation on a scale not remotely comparable to Resolute's harvesting and regeneration.   Thus, almost every substantive communication about Resolute notes that the global boreal forest was "the largest forest carbon storehouse" in the world holding "more carbon than all the rainforests combined."  And having done so, the campaign would claim that

1   Resolute's forestry posed a material risk that was of such a magnitude that it would "jeopardize[]

2   one of the Earth's largest carbon sinks and put[] our global climate at risk."   Similarly, the

3   campaign asserted that "the health of forests around the world - and with them the health of

4   billions of people - is in jeopardy.  The Canadian boreal forest, for example, is one of the largest

5   reservoirs of carbon in the world . . . [b]ut it is under threat from unsustainable logging [by]

6   [o]ne company in particular, Resolute Forest Products."[1]  The obvious intent and only reasonable

7   interpretation of this information is that Resolute's activities constitute a material risk to the

8   boreal forest's ability to store carbon.  But this intended message is a gross misrepresentation.

9   Whatever impacts Resolute's harvesting has on climate change, they are de minimus in the

10  context of the global boreal forest.

11

12  _____
   [1] Resolute's depiction as a climate change risk is ubiquitously published and republished by the Enterprise, including by way of example in the following reports and blog posts:

13  • December 22, 2014 blog post authored by Joanna Kerr or Greenpeace Canada, "Who's
      Been Naughty And Who's Been Nice To The Planet This Year," which described
14    Resolute as "[on] [t]op of the naughty list," and falsely alleged that "[w]ithout action to
      curb unsustainable practices like Resolute's, Canada is on the road to worsening climate
15    change and betraying the amazing biodiversity we hold in trust for this world."

16  • July 21, 2015 blog post authored by Amy Moas of Greenpeace USA and published on
      Greenpeace Canada's website, "US Pharmacy Giant Rite Aid Is Destroying Canada's
17    Boreal Forest" which falsely accuses Resolute of "jeopardizing one of the Earth's largest
      carbon sinks and putting our global climate at risk."
18
   • July 21, 2015 blog post authored by Amy Moas of Greenpeace USA, "Rite Aid: Still
19    Making the Wrong Choice for Forests" which falsely alleges that Resolute is "bad news
      for the climate."
20
   • July 27, 2015 blog post authored by Amy Moas of Greenpeace USA, "Why Forests Are
21    Critical For Public Health" which misrepresents that "the health of forests around the
      world - and with them the health of billions of people - is in jeopardy.  The Canadian
22    Boreal forest, for example, is one of the largest reservoirs of carbon in the world . . . [b]ut
      it is under threat from unsustainable logging [by] [o]ne company in particular, Resolute
23    Forest Products."

24  • July 29, 2015 blog post authored by Amy Moas of Greenpeace USA and published on
      Greenpeace Canada's webpage, "US Pharmacy Giant Making Wrong Choice for the
25    Boreal Forest" which falsely states that "the Boreal is the world's largest carbon
      absorbing ecosystem, purifying the air you breath and keeping the climate stable . . . [b]ut
26    in Canada, one force is cutting out the heart of the forest: destructive logging . . . [and a]
      major player in this forest destruction is Resolute Forest Products."
27

28  Additional examples of false publications concerning the impact of Resolute's operations on
   climate change are set forth in Appendix A.

146.    The Enterprise members, including Greenpeace Canada, Greenpeace USA, ForestEthics, Paglia, Moas, Brindis, Skar and Daggett, knew based on their expertise and knowledge that this association and depiction was materially false and misleading because Resolute accounts for no forest loss or deforestation nor does any other forestry company in the Canadian boreal.  In total, less than .5% (.005) of Canada's vast Boreal forest is harvested annually, and Resolute is responsible for only a minority of that miniscule percentage.  In contrast, five times more trees in the Boreal are impacted annually by natural causes such as fires, insects, disease, and wind blowdowns.  Where Resolute does harvest (and where any other companies harvest), each area is promptly and successfully regenerated either naturally (75% of the time) or by Resolute or the government seeding and planting.  Between 2010-2012, Resolute planted an average of over 60 million trees per year, and by 2012 it had **planted its billionth tree in Ontario alone** and has continued to plant trees there since.  That is **a billion** more trees than the Enterprise has ever planted in the Boreal and, of course, the direct opposite of "destruction."   Indeed, there is virtually no permanent loss of Boreal forest acreage annually, and the nominal .02% (.0002) that is lost, is in large part attributable not to forestry but to industrial and urban development, transportation, recreation, and hydroelectricity.

147.    Moreover, in making this "destruction comparison" false claim, the campaign misrepresents and omits the science that actually finds that the Boreal is "still vast and relatively undisturbed in northernmost Canada and Alaska . . . [and] among the least threatened in the world" (emphasis added).   Moreover, according to the Frontier Forest Index, which measures the state of worldwide frontiers, Canada has a score of 8/99 (where 99 is the worst possible score), receiving the fourth lowest (best) mark globally, demonstrating that, as detailed above, the country's frontier has experienced little to no loss and is by no reasonable standard "endangered."  Additionally, according to the United Nations Food & Agricultural Organization's Global Forest Resources Assessment, the Canadian Boreal is not in any way an "endangered forest."

148.    The Enterprise Members know these facts from their knowledge, experience, and expertise and therefore intentionally misrepresented, among other things, that "logging is the

primary driver of forest loss across Canada and that one company [Resolute] is leading the charge," and that Resolute was "destroying the boreal forest," "responsible for the destruction of vast acres of Canada's magnificent boreal forest," and that the boreal is in any way "endangered."

149.    Indeed, when forced to defend this statement in this action, the defendants conceded that "*RFP did not literally destroy an entire forest,*" and claimed they were only using "hyperbole," "heated rhetoric," and "non-verifiable statements of subjective opinion" that should not be taken "literally" or seriously.  Greenpeace's own experts likewise concede that Resolute was not responsible for deforestation, but that "destruction" could also mean the possibility that harvesting might impact the forest composition of insects, fungi, fauna, and tree age because "a forest is made up of more than trees."

150.    However, the defendants statements about Resolute were talking explicitly about tree and "forest loss," not tree age or fungi; "forest loss" of a type comparable to other parts of the world where entire forests were deforested and literally destroyed; and of a magnitude that the defendants said would "jeopardize[] one of the Earth's largest carbon sinks and put[] our global climate at risk."[2]  It is impossible to reconcile these statements and the context in which

---

[2]    The Greenpeace Enterprise's allegations equating Resolute's activities in kind and scale with the major deforestation events are ubiquitously published and republished by the Enterprise, including by way of example in the following:

- January 2013 report authored by Catherine Grant, Nicholas Mainville, Freya Putt, Richard Brooks, Shane Moffatt, and Stephanie Goodwin of Greenpeace Canada, along with Greenpeace USA, "Boreal Alarm: A wake up call for action in Canada's Endangered Forests," which associates Resolute's activities in the Boreal Forest with the deforestation of "rainforests of the Amazon, Indonesia, Congo Basin and Canada's Great Bear Rainforest . . . [which] are increasingly rare and are disappearing at an alarming rate mainly because of logging, the expansion of road networks and other industrial development."

- April 29, 2014 post authored by Amy Moas of Greenpeace USA, "Exposed: 3M Sourcing From Forest Destruction," which associates Resolute's activities with the "rampant deforestation" occurring in Indonesia, Brazil, and Uruguay, among other highly destructive rainforest and other forestry.

- May 2017 report authored by Amy Moas of Greenpeace USA, "Clearcutting Free Speech: How Resolute Forest Products Is Going to Extremes to Silence Critics of its Controversial Logging Practices," which states that Resolute is "destroying key areas" of

they were placed with anything other than that they intended the word "destroy" to be understood by its actual meaning.  It is equally impossible to reconcile the comparison to massive deforestation in Asia, Africa, and South America and the threat of major climate impact with defendants' defense that the word could have simply meant an adjustment to the balance of bugs, fauna, fungi and tree age.  It could have, but not in the context of which it was currently presented.  And defendants' inability to defend the accuracy and reasonableness of this meaning for these claims is further evidence of their malice.

151.    The same is true of their claims about climate change risk.  The defendants knew from their information, experience, and expertise that not only did Resolute's harvesting not create a climate change risk comparable to the deforestation in Asian, Africa, and South America, even all of the harvesting in the Canadian boreal would not have created such a comparable climate change risk.

152.    To the contrary, the United Nations' most recent reporting declares that the amount of greenhouse gases stored in North American forests has increased by millions of metric tons per year, and deforestation caused less than 2% of the total greenhouse gas emissions in Canada in 2012, representing a miniscule portion of global greenhouse gas emissions, about 0.06%.  All of these facts were known and understood by each of the Enterprise members based on their experience, knowledge and available information but they nevertheless intentionally, repeatedly made these materially, misleading claims because the specific intent was to hurt Resolute to advance the campaign plan.

153.    In addition, the "scientific evidence" the Enterprise relies on to support their false claims about climate change risk is inapposite and misrepresented.   While the Enterprise cites a 1998 study based on computer modeling of hypothetical forest landscapes with limited focus on the regions in question, a more recent (2013) and comprehensive paper led by the same scientist, which relied on observed data, rather than a computer simulation to evaluate the climate impacts

---

"Canada's boreal forest, [with] some of the last large expanses of undisturbed natural forest," associating such loss with deforestation in Russia.

of Canada's managed Boreal forest, concluded that managed Boreal forest is having a slight *cooling* effect on global climate, helping rather than further warming the planet.  As organizations that hold themselves out as "experts," and claims to base its campaigns on the "best available science," a strong inference must be drawn that Greenpeace either intentionally failed to disclose or recklessly disregarded the 2013 study which flatly contradicts its false allegations about Resolute's impact on climate change.

154.    Moreover, the Greenpeace Defendants further evidence their malice with their additional defense in this case that their climate change claim was reasonable because "[f]orest degradation unlocks the carbon stored in the soil in a variety of ways that scientists are still exploring . . [w]hen boreal forest vegetation or soils are disturbed, carbon is released, accelerating climate change."  (ECF No. 60.)  Even if it these claims were true, it would not be a reasonable justification for its sensational claims that such activity "jeopardize[d] one of the Earth's largest carbon sinks and put[] our global climate at risk."  And it certainly would not justify attributing that risk solely to Resolute as opposed to the entire forest industry.  Plainly, this *post hoc* excuse is not what was intended or communicated, and the defendants cannot defend what was communicated, which is still further evidence of malice.

### iii.    The Enterprise Intentionally Misrepresented Resolute's Operations In The So-Called "Intact" And "Endangered" Forests.

155.    Because its members had been or still were part of the CBFA and its moratorium that protected "virtually all of the critical habitat of the threatened woodland caribou" and also had agreed to the areas in which Resolute (and the other companies were harvesting), the campaign renamed various areas and minted new claims that Resolute should not be harvesting there, even though it was only harvesting in areas the same Enterprise members had previously agreed it was appropriate to harvest.  These five new areas the enterprise claimed were undisturbed, "intact forests" that it designated "endangered" forests.  From the beginning, the campaign intentionally misrepresented material facts about Resolute and these so-called "endangered forests" in furtherance of its objective to harm Resolute's brand and business and that of its customers and to generate publicity and donations.

156.    First, the enterprise made materially false and misleading statements misrepresenting the uniqueness of these so-called "endangered forests" and the pressure they were under.  For example, the February 2016 Endangered Forests In The Balance Report issued by Greenpeace Canada and featured on the websites of Greenpeace Canada, Greenpeace USA and Greenpeace International  intentionally misrepresents that "*Canada leads the world in loss of intact forests, with 21% of intact forest loss worldwide between 2000 and 2013 occurring in Canada* . . . [b]etween 2000 and 2013 . . . nearly 50% of the Intact Forest Landscapes in the Montagne Blanches Endangered Forest have been lost or degraded."

157.    In fact, the very study Greenpeace Canada cited reveals that rather than leading the world in intact forest loss, North America combined lost the least amount of intact forests on Earth.  Even more important, far from Resolute controlling the fate of any of these intact forests, the same study revealed that the majority of intact forest loss in North America was from fire and other natural disturbances.

158.    Likewise, the Enterprise repeatedly misrepresented that "Resolute is actively logging in and/or sourcing from some of the last large intact areas of [Canada's] managed forest" and in "Quebec's Last Large Intact Forests."[3]  But, in fact, the Enterprise intentionally omits

---

[3]    The Enterprise's false allegations associating Resolute with the destruction or loss of the last intact forest forests are ubiquitously published and republished by the Greenpeace Enterprise, including by way of example in the following reports and blog posts:

- January 2013 report authored by Catherine Grant, Nicholas Mainville, Freya Putt, Richard Brooks, Shane Moffatt, and Stephanie Goodwin of Greenpeace Canada, along with Greenpeace USA, "Boreal Alarm: A wake up call for action in Canada's Endangered Forests," which falsely associates Resolute's harvesting with the world's "rare and [ ] disappearing" "[l]arge undisturbed and intact landscapes" of which Canada "has nearly a quarter," and asserting that "[i]f threats to the Boreal Forest are not immediately addressed and this degradation continues, Canada will soon cease to be home to one of the most magnificent forest ranges in the world";

- May 2013 report authored by Richard Brooks, Shane Moffatt, Stephanie Goodwin, and Nicolas Mainville, falsely stating that Resolute was harvesting from the "last remaining intact areas in the Montagnes Blanches" which "overlap[] with some of the most valuable caribou habitat and carbon-dense forest left in the province";

- November 21, 2013 letter from Oliver Salge of Greenpeace Germany to all members of the European Newspaper Publishers Association falsely stating that Resolute "has a

from these claims that in Quebec and Ontario, approximately 85% of so-called intact forest landscapes are above the Area of Undertaking (Ontario) and the Northern Limit of Allocation (Quebec) where the law prohibits harvesting, and 90% of intact forest landscapes in Quebec are either beyond the Northern Limit or in otherwise protected areas.  Resolute only harvests on a fraction of the remaining intact forest landscape below the Northern Boundary in Quebec and Ontario.  Moreover, areas in which Resolute does harvest are predominately not intact forest landscapes, and any Resolute contribution is entirely immaterial, temporary, and important to the forest's cycle of regeneration and regrowth.

159.    The enterprise also ubiquitously states only that Resolute is "destroying" these intact forests without disclosing that numerous forest companies are also harvesting in these so-called "intact forests" or, more importantly, disclosing that under the CBFA these same enterprise defendants had approved of the very harvesting that they are now say constitutes "destruction" of these "endangered forests."

### iv.    The Enterprise Intentionally Misrepresented The Sustainability Of Threatened Caribou.

160.    The Enterprise's fraudulent campaign also intentionally misrepresents that Resolute, again alone, is "destroying" critical caribou habitat and creating the risk of "extirpation", "extinction," and a "caribou death spiral."  There is no good faith basis for these claims, and the Enterprise members making them have the experience and expertise to know that and do know that.  These claims are made solely to damage Resolute's brand and business and that of its customers pursuant to the campaign plan.

---

record of unsustainable and irresponsible operations in Canada's Boreal Forest, one [of] the last remaining intact forest ecosystems on the planet";

- April 15, 2015 blog post authored by Daniel Brindis of Greenpeace USA, "Rite-Aid Making the Wrong Choice For Ancient Forests," which falsely accuses Resolute of "logging in the last undisturbed ancient forests in Quebec and Ontario";

- May 2017 report authored by Amy Moas of Greenpeace USA, "Clearcutting Free Speech: How Resolute Forest Products Is Going to Extremes to Silence Critics of its Controversial Logging Practices," published on Greenpeace USA, Greenpeace Canada, and Greenpeace, which falsely associates Resolute's harvesting with the loss of "Canada's remaining large intact areas of undisturbed forest."

161.    As a threshold matter, the Enterprise only describes Resolute as a destroyer of these habitats but none of the many other forest companies who are regularly harvesting in the same habitat.  That is because the harvesting in these habitats is not destructive.  Indeed, while the CBFA enterprise members were still part of that Agreement, they agreed that harvesting could and would be done in these areas.  Indeed, they agreed that Resolute could harvest in most or all of the areas it is now being accused of improperly harvesting.

162.    More important, the Enterprise misrepresents the relevant science and study findings in associating Resolute's activities with the "dramatic decline" of woodland caribou in Canada "due to industrial pressure" that the Enterprise claims has caused the loss of "50% of caribou habitat in the last 100 years," and asserting that the "caribou herds whose range overlaps with Resolute's Montagne Blanches operations are unlikely to survive beyond 50 years due to continuing habitat destruction."[4]   Indeed, these are gross misrepresentations of the facts and science.

---

[4] Greenpeace disseminates these claims ubiquitously in website, blog, Twitter, and other internet publications as well as in direct email and other communications, including, by way of example, in the following Greenpeace reports and blog posts:

- May 21, 2013 report authored by Richard Brooks and Shane Moffatt of Greenpeace Canada in collaboration with Stephanie Goodwin, Nicolas Mainville and Holly Postlethwaite of Greenpeace Canada, "Resolute's False Promises: The [Un]Sustainability Report," which falsely asserted that "Resolute talks up the 'vital role' protecting habitat plays in its operations while in fact the company is actively logging the remaining habitat of caribou herds that have been deemed to be not self-sustaining . . . ."

- June 1, 2015 blog post authored by Richard Brooks of Greenpeace Canada and published on Greenpeace USA's webpages, "What Did 10,000 Tweets Say To Resolute Forest Products," which falsely attributed the threat of woodland caribou extinction to Resolute's operations.

- July 29, 2015 blog post authored by Amy Moas of Greenpeace USA and published on Greenpeace Canada's webpage, "US Pharmacy Giant Making Wrong Choice For The Boreal Forest," which falsely represented: "For years, Resolute has been needlessly destroying critical habitat of the endangered woodland caribou . . .."

- August 14, 2015 blog post authored by Joanna Kerr of Greenpeace Canada, "Collaboration Is The Key To Sustainability In Canada's Boreal Forest," which falsely alleged that the "woodland caribou herd overlapping Resolute-managed Caribou Forest is experiencing excessive disturbance of its habitat," and further represented without any basis, that this purported "shortcoming" contributed to FSC's decision to terminate Resolute's forestry certificates.  Greenpeace USA republished the post on the same day on is website.

163.    First, in 2010 and 2011, in talking about the CBFA that it negotiated, Greenpeace heralded that the agreement provided, in Greenpeace's own words, a "moratorium area that protected virtually all of the habitat of the threatened woodland caribou." Yet, to this day, Resolute's harvesting remains absent from "virtually all of [that] habitat," and, therefore, the woodland caribou could not possibly have gone from "protected" to "endangered" due to Resolute's activities.

164.    Second, to the extent that Resolute has since the end of that suspended period under the CBFA harvested in some nominal portion of the area that Greenpeace previously admitted "protected virtually all of the habitat of the threatened woodland caribou," such incursions were at miniscule levels of approximately .41% (.0041) of "virtually all of th[at] habitat" and some of that was to salvage wood from areas leveled by fire or other natural disturbances. Put most simply, it cannot possibly be credibly stated that the reduction of .0041 from a 29 million hectare "area that protects virtually all of the caribou habitat" caused woodland caribou to go from "protected" to "endangered" by Resolute's harvesting. Indeed, the Enterprise's flip-flop from triumphantly declaring the caribou protected to alarmingly declaring the caribou endangered by Resolute, based on virtually identical circumstances, demonstrates its bad faith. And this bad faith is further evidenced by the fact that these miniscule incursions were always contemplated by the CBFA, and, in most cases, explicitly agreed to by the Enterprise Members, including Greenpeace Canada, ForestEthics and Canopy, under the CBFA.

165.    Third, the Enterprise attributes entirely the purported disruption of all the other forest companies operating in these same intact forest landscapes where the Enterprise maintains Resolute harvesting is "destruction" but these other companies are not. For example, in the Trout Lake-Caribou Endangered Forest that is one of the five intact forest landscapes the

- October 12, 2015 blog post authored by Amy Moas of Greenpeace USA, "Maker of Post-It Notes Lives Up To Promise, Begins to Eliminate Destructive Logger from Supply Chain," which falsely accused Resolute of "degrading" the "habitat of endangered wildlife, like the Woodland caribou." A similar blog post by Shane Moffatt of Greenpeace Canada was published on Greenpeace Canada's website the same day.

Additional examples of Greenpeace's false publications concerning Resolute's putative impact on the woodland caribou are set forth in Appendix B.

1   Eenterprise claims should be protected because it is intact and overlaps with a caribou range,

2   Resolute accounted for only .04% of the harvest from that area last year.  Moreover, Resolute is

3   responsible for just over 10% of the fibre harvested in the Caribou Zone in Ontario.   Thus, if the

4   enterprise's allegation is true that harvesting by Resolute would "jeopardizing woodland

5   caribou" in Ontario and its priceless "intact endangered forest," than 99.96% of that harvesting

6   was done by some other company and should be the subject of the enterprise's focus.   But it is

7   not true, so there is no such focus.

8          166.      Likewise, the Enterprise's claims that "caribou herds whose range overlaps with

9   Resolute's Montagne Blanches operations are unlikely to survive beyond 50 years due to

10  continuing habitat destruction" and that the Quebec chief forester determined "that 92% of the

11  habitat in Quebec is too degraded for caribou to prosper" grossly misrepresents the studies on

12  which they are relying.  The truth is that the overwhelming amount of the caribou range in

13  Quebec is not disturbed and that,  according to the very studies the enterprise misrepresents, 94%

14  of the caribou herds that overlap with what the enterprise calls the Montagnes Blanches enjoy

15  undisrupted habitats and are identified as self-sustaining.  Another almost 4% are stable.  Of the

16  remaining 2%, in two herds of 150 caribou each, Resolute has harvested out of a nominal part of

17  their habitat.

18         167.      Fifth, there is no legitimate basis to associate Resolute with the  "dramatic

19  decline" of woodland caribou in Canada "due to industrial pressure" and what the Enterprise

20  claims has caused the loss of "50% of caribou habitat in the last 100 years,"  To the contrary, the

21  science Greenpeace cites unequivocally demonstrates that the dramatic habitat and population

22  losses have emanates not from Ontario or Quebec where Resolute operates, but from western

23  Canada, especially Alberta and British Columbia, far from Resolute's operations.  Thus, the

24  2014 report on Canadian woodland caribou by Global Forest Watch, which the Greenpeace

25  Enterprise cites frequently in this and other contexts, (a) concluded that "[o]ur analysis clearly

26  indicates that the threat to boreal caribou is highest in Alberta" (where Resolute does not

27  operate); (b) identified all fifteen of the designated caribou habitats in Alberta and British

28  Columbia (where Resolute does not operate) as having the highest habitat disturbance levels and

at highest population risks; and (c) did not, in contrast, identify any of the designated habitats the Greenpeace Enterprise associates with Resolute's Quebec operations as being similarly at risk.

168.    Moreover, the Canadian government's Environment Canada study "Recovery Strategy for the Woodland Caribou (Rangifer tarandus caribou), Boreal population, in Canada," that the Greenpeace Enterprise cites for its false claims that Resolute's logging in the last remaining Intact Forests is threatening endangered woodland caribou, points squarely to these same far off regions and other actors as the source of risk to caribou and their habitats.  The study designates all twelve of the identified herds in Alberta as being non-self-sustaining with habitat disturbance levels well over 60%, and all five herds in British Columbia as being non-self-sustaining with habitat disturbance levels between 57-80%.

169.    Sixth, the Enterprise's attempt to create the false impression that Resolute is logging in the last intact forests in Quebec and Ontario, thereby creating disturbances that lead to the population decline of woodland caribou in those regions, is likewise misleading.  As set forth in the Environment Canada report, many of the regions in Ontario and Quebec – including those in which Resolute does not hold harvesting rights -- have already been disturbed, including by impacts other than harvesting, such as fire.

170.    Seventh,  the Greenpeace Enterprise purports to identify eight herd ranges that overlap with Resolute's operations in Quebec and Ontario which have less than the government identified minimum of undisturbed habitat, including Pipmuacan, Manouane, Manicouagan, Charlevoix, Val D'Or, Temiscamie, Quebec, Brightsand, Churchill and Nipigon.  However, Val D'Or is not near any Resolute operations and was obviously included because it is the one herd in Quebec and Ontario identified as least likely to survive. Moreover, Greenpeace fails to disclose that the Environment Canada report actually states that Churchill and Nipigon each have undisturbed habitats above the 65% government recommended minimum.  Thus, to artificially increase the number of herds Greenpeace alleges Resolute is negatively impacting, Greenpeace does a "bait and switch" and cites a different study to support its allegations of disturbance in those regions.

171.    Eighth, the Enterprise likewise fails to disclose that in both Quebec and Ontario, Resolute's harvesting is conducted according to management plans issued by the provincial governments, which have responsibility for caribou management, that include, among other things, long-term plans to restore and maintain caribou habitats, establish protected areas, and implement effective management practices.  Indeed, the land on which Resolute harvests in Quebec is owned by the Province of Quebec and if Resolute was not logging there, some other forestry company would be.

172.    These are all facts known to Greenpeace USA, Greenpeace Canada, ForestEthics and Paglia because they possess the information and have the experience and expertise to understand it.  It is misrepresented because they wanted to misrepresent it in order to harm Resolute's brand and business and that of its customers.

173.    Notwithstanding the fact that Resolute's initial complaint rebutted these false allegations and Greenpeace's putative evidence, Greenpeace continues to disseminate these lies, including in its recent report "Clearcutting Free Speech" report.  Tellingly, the Clearcutting report, while riddled with hundreds of footnotes, obfuscates the name of the study which Greenpeace purports to rely on to support its allegations about the impact of Resolute's operations on woodland caribou, referring to the study as "Environment Canada (2012)."  The reason for this is simple: Greenpeace wants to simultaneously create the appearance of scientific support while at the same time making it hard for the reader to reference the putative support since it flatly contradicts Greenpeace's false and malicious lies.

### v.    The Enterprise Misrepresents Resolute's Relationship with First Nations Communities.

174.    Perhaps the most insidious lie the Enterprise peddles to defraud donors is that they will be protecting indigenous communities, called in Canada "First Nations," who live in the Boreal forest and who the Enterprise misrepresents Resolute has exploited, "abandoned," and "impoverished."[5]

---

[5] The Enterprise has ubiquitously published and republished these claims on its website, blogs, internet forums, Twitter and in direct communications via email and personal communications including, by way of example, the following:

175.     The fact, however, is just the opposite.  While Resolute obviously has issues with its First Nations partners from time to time like any commercial enterprise, it unquestionably provides substantial economic benefits to the people and communities in the Boreal through employment, vendor contracts, the purchase of wood harvested by these communities, and through various forms of joint ventures and partnerships through which they share in the economics of Boreal forestry.  It is this shared interest in the sustainable use of the Boreal that accounts for the overwhelming support Resolute enjoys among the people and communities in the Boreal, completely contrary to the Enterprise's claims.

176.     Resolute has numerous successful partnerships with various First Nations, including the Fort Williams First Nation, Couchiching First Nation, Mitaanjigamiing First Nation, Nigigoonsiminikaaning First Nation, Seine River First Nation, Lac La Croix First Nation, Lac des Mille Lacs First Nation, Wabigoon Lake Ojibway Nation, Atikamekw Council

---

- June 1, 2015 blog post authored by Richard Brooks of Greenpeace Canada and published on Greenpeace USA's website: "What did 10,000 Tweets Say to Resolute Forest Products" which falsely declares that Resolute has widespread conflicts with First Nations communities by stating that "[w]e came to lend our voice to Indigenous First Nations community leaders who are demanding that Resolute respect their rights and desires for protection for their traditional territories."

- July 21, 2015 blog post authored by Amy Moas of Greenpeace USA, "Rite Aid: Still Making the Wrong Choice for Forests" which falsely accuses Resolute of "ignor[ing] the rights of First Nations communities that have inhabited the Boreal for countless generations and who are decision-makers in their territories."  This allegation was also repeated in another July 21, 2015 blog post, "US Pharmacy Giant Is Destroying Canada's Boreal Forest" and a July 28, 2015 blog post, "US pharmacy giant making wrong choice for the Boreal Forest."

- February 2016 publication by Greenpeace Canada, "Endangered Forests in the Balance: The impact of logging reaches new heights in the Montagnes Blanches Endangered Forest" which falsely declares that Resolute is responsible for disputes with First Nations communities by stating that "[t]o eliminate controversy and regain the trust of the marketplace, customers should expect [Resolute] to . . . Ensure Free, Prior and Informed Consent of Indigenous Peoples and respect of Indigenous Rights and Title for any activities on First Nations territories overlapping the Montagnes Blanches Endangered Forest."

Additional examples of false publications concerning Resolute's putative disputes with First Nations published on Greenpeace's website are set forth in Appendix C.

of Obedjiwan, Kitigan Zibi Anishinabeg and the Gull Bay First Nation, among others.  Among

these are the following examples:

- Fort William First Nation: On May 14, 2013, Resolute celebrated the 10th anniversary of its Thunder Bay sawmill partnership between Resolute and the Fort William First Nation, which only the year before had become the first facility in Canada to operate under regulations created by the First Nations Commercial and Industrial Development Act facilitating industrial development with First Nations on their land. The project's ongoing success is the result of Resolute's even broader collaboration with the Fort William First Nation, many members of which are employed at and provide contracting and supplies to the mill.

- Wabigoon Lake Ojibway Nation: Resolute assisted the Wabigoon Lake Ojibway Nation in establishing a tree nursery in their community in the late 1990s and has purchased between 1-1.5 million trees annually from the nursery to support regeneration activities.  Resolute also employs members of the Nation at its Ignace sawmill.

- Atikamekw Council of Obedjiwan: The Opitciwan Sawmill is a unique joint venture operation that has operated successfully since 1988. The Atikamekw Council of Obedjiwan owns 55%, while Resolute owns 45%. The sawmill is located on reserve land and employs numerous community members. As part of the joint venture, Resolute has contributed to the maintenance of road access to the community, supported infrastructure, assisted in the implementation of the sawmill forestry service and entered into wood purchase agreements with the community. In September 2013, the sawmill was awarded the prestigious Aboriginal Business Leadership Award by the Forest Products Association of Canada and the Canadian Council for Aboriginal Business, in recognition of its exemplary history in the community, its commitment to sustainability, the high quality of its production, and a number of other criteria.

- Kiashke Zaaging Anishinaabek, or KZA: The KZA First Nation harvests wood from the Black Spruce sustainable forest license area and delivers round wood, wood chips and biomass fuel to Resolute's Thunder Bay operations.

- Lac des Mille Lacs First Nation:  Resolute has entered into a partnership agreement with the Lac des Mille Lacs First Nation to identify and pursue new economic opportunities related to the harvesting and management of the Black Spruce and Dog River-Matawin forests for its facilities in Northwestern Ontario.

- Conseil des Innus de Pessamit: Resolute has a collaboration agreement with the Conseil des Innus de Pessamit, providing for the recruitment, training, and hiring of Innu labor in Quebec's Côte-Nord region and investment in Innu businesses in the forest, biofuel and wildlife industries.

- Pekuakamiulnuatsh Takuhikan (Mashteuiatsh): In 2015, Resolute raised significant funds for organizations in the Innu community of Pekuakamiulnuatsh Takuhikan (Mashteuiatsh) in the region of Saguenay–Lac-Saint-Jean (Quebec) and Resolute's President and Chief Executive Officer, Richard Garneau, served as honorary chairman of the Mashteuiatsh summer festival promoting and preserving the community's rich history.

- Nigigoonsiminikaaning First Nation, Lac des Milles Lacs First Nation, Seine River First Nation, Couchiching First Nation, Mitaanjigamiing First Nation, and Lac La Croix First Nation:  Resolute signed a Memorandum of Agreement

("MOA") that sets out the framework for several contracts that have resulted in C$100 million in new business for six First Nations MOA partners over the next five years.

177.    Resolute also works with local and provincial governments to support continued economic development. Some recent examples include (all values in C$):

- The Quebec Economic Investment, administered by the provincial government, to which Resolute has contributed $2 million per year over five years for a total of $10 million to be spent on industry diversification and economic development.

- Similar funds have been created in the MRC Domaine-du-Roy and the MRC Maria Chapdelaine in Quebec, to each of which Resolute has contributed $200,000 per year over five years for a total of $1 million in each of the two funds to be spent on community and economic development.

- A separate fund exists in Ontario, administered by the Minister of the Environment, to which Resolute has contributed $1 million per year over five years for a total of $5 million to be spent on environmental projects and activities in the Province.

- During the mill closure process, Resolute engages with local stakeholders to support the continued prosperity of their communities through the maintenance, repurposing and sale of idled assets to other investors.  This includes heating facilities through the winter, creating partnerships to safely demolish old facilities and most often selling the mills for the symbolic sum of $1 to local governments while retaining all environmental remediation responsibility.

178.    In depicting itself as the protector of these Boreal people and communities, the Enterprise not only lies to those it is attempting to defraud, but lies about the people and communities it falsely claims to protect.  Far from protecting these people and communities, the Enterprise's disinformation campaign, extortion, and other illegal conduct has inflicted enormous economic hardship on the Boreal people and communities -- contributing to the closing of their businesses and joint ventures, putting them out of work, and depriving them of buyers for their products.

179.    Likewise, the Enterprise's mantra that it is protecting the interests of the First Nations grossly misrepresents the truth that but for a very small number of First Nation communities, the vast majority of First Nations have constructive and economically beneficial relationships with Resolute that the Enterprise's efforts would only serve to destroy.

180.    The fact is that the sustainable utilization of the Boreal is in the shared interests of all interested parties, including Resolute, the Boreal people and communities, and the Canadian federal and provincial governments, who ultimately decide how best to address all the competing

1   considerations.  The harvesting that occurs is the product of a robust and rigorous political and

2   economic process in which all relevant considerations are carefully weighed.

3         181.    The only party who is genuinely not interested in these considerations is the

4   Enterprise, which is a stranger to the Boreal with no skin in the game other than using the Boreal

5   to raise money, none of which is spent on any real conservation efforts in the Boreal.  Highly

6   misleading and hypocritical is the Enterprise's request for donations to address Resolute's

7   purported "abandoning" of the local communities by closing facilities and "laying off thousands

8   of workers" that fails to explain that these closures and layoffs are a result of economic and

9   market realities, and in some cases, at least partly because of the "Resolute: Forest Destroyer"

10   campaign.  Even then, far from abandoning these communities, where Resolute has been forced

11   to discontinue operations, it has provided substantial notice of such actions and worked diligently

12   with affected employees, all levels of government, and other local authorities on programs to

13   lessen the impact of permanent closures.

14         182.    Ignoring Resolute's real relationship with the Boreal community, the Enterprise

15   grossly distorts and overemphasizes singular issues and events to smear Resolute.  For example,

16   grasping at ways to smear Resolute, the Enterprise misrepresents that Resolute did not intend to

17   honor its pension obligations, but instead would tell its workers "give us decades of work and

18   we'll pay you back with decreased pension benefits."  In fact, Resolute has always committed to

19   honor 100% of the pension benefits under registered plans for its over 20,000 Canadian and

20   American pensioners even when it had the opportunity to reduce those obligations, while many

21   other companies in this industry had, in fact, cut pension benefits by as much as 40%.

22         183.    Likewise, the Enterprise accuses Resolute of attempting to "impoverish" the

23   residents of Thunder Bay through tax breaks.  What the Enterprise misrepresents as a "tax break"

24   was a routine property tax assessment appeal Resolute filed because declining property values

25   had resulted in it being overtaxed under the existing tax regime.  It was not seeking a "break"

26   from that existing regime; it was seeking the proper application of that regime.  Similar cases

27   filed by other forestry companies have found taxes were overvalued by 60% and 73%.  Even if

28

1  its appeal succeeds, Resolute will remain one of the largest industrial employers in Thunder Bay

2  and one of the largest taxpayers.

3  184.   Indeed, in response to these false allegations, on April 17, 2014 the Seine River

4  First Nation wrote to Greenpeace Canada to "set the record straight" regarding Greenpeace's

5  false accusations that (1) Resolute's practices show "disregard for Indigenous rights and

6  disrespect for workers and the communities in which they operate," and (2) Resolute's "policies

7  and practices don't recognize [First Nations'] rights and the company continues to generate

8  conflict through unsustainable operations on culturally valuable forests."  Chief Klyne

9  admonished Greenpeace Canada for making this false charge notwithstanding that Greenpeace

10 never consulted with the Seine River First Nation before purporting to speak on behalf of the

11 First Nations:

12          To my knowledge, Greenpeace has never asked us for a presentation on
            Manitou Aki Inikonigaawin [Great Earth Law].  Greenpeace has never
13          asked us for our vision for our lands, forest, and water.  Nor has
            Greenpeace asked us about our vision of resource development or non-
14          development within these resource sectors.  This is concerning given the
            Board of Greenpeace has a policy on Indigenous Rights. . . . Quite
15          frankly, the Greenpeace assertion that it speaks for First Nations
            impacted by practices on our homelands is not only false, but insulting
16          and misleading . . . .

17 185.   To the contrary, as Chief Klyne explained, the First Nations of the Sapawe Forest

18 area have engaged in discussions and negotiations with Resolute and Ontario since 2010 and, in

19 agreeing to become the forest management unit for the Sapawe forest, gave free, prior and

20 informed consent, which "lead to partnerships with Resolute on other fronts that allows the First

21 Nations to develop economic certainty for the future."   Demonstrating that the true objective of

22 the Enterprise was to designate Resolute as a false actor without consideration for the land,

23 species or First Nations it falsely purports to represent, Chief Klyne advised Greenpeace that

24 rather than protect the First Nations, the Enterprise's disinformation campaign "has sabotaged

25 our efforts to get out of the Welfare state and become economical self-dependent by contacting

26 our destination market to not buy products from us."

27

28

vi.        The Enterprise Misrepresents
Resolute's FSC Certification Status.

186.    The Enterprise repeatedly misrepresents that Resolute had four FSC certificates

revoked because FSC auditors determined Resolute was engaged in the same serious misconduct

the Greenpeace's Enterprise "Resolute: Forest Destroyer" campaign alleged, including its

misrepresentations that Resolute was engaged in "unsustainable forest operations," "reckless

clear cutting," "logging in Endangered Forests without consent of First Nations," "destroying

critical habitat for the endangered woodland caribou" and, thereby, causing a "high risk of

extirpation of caribou herds and many other species," and being "unwilling to take steps needed

to create real solutions to protect these forests that scientists say must be protected" or "work

collaboratively with stakeholders and achieve consent . . . from First Nations Communities."[6]

187.    As an initial matter two of Resolute's FSC certificates expired at the end of their

five year terms, not because of "serious shortcomings," as the Enterprise misrepresents.  This

was made clear in press releases issued by Rainforest Alliance and FSC Canada.  First, in a

December 31, 2014 press release, Rain Forest Alliance stated that the Mistissini-Peribonka FSC

certificate in Quebec "reached the five-year expiration date of the certification agreement on

December 3, 2014 and therefore the certificate status changed from suspended to terminated in

the FSC system."  Likewise, a January 13, 2015 press release announcing the termination of

Resolute's Caribou Forest FSC certificate in Ontario clearly disclosed:  "[A]ll FSC certificates

have a term of 5 years prior to renewal or expiration.  In the absence of any renewal or transfer

process, the Caribou Forest certificate has expired and thus terminated."  Thus, the Enterprise's

attempts to characterize the certificates as terminated due to Resolute's "serious shortcomings" is

a lie.

---

[6] Greenpeace has ubiquitously published and republished these claims on its website, blogs, internet forums, Twitter and in direct communications via email and personal communications including, by way of example, the following: December 16, 2013 blog post authored by Daniel Brindis of Greenpeace USA, "'Its [sic] Not Our Fault That We Lost Our Green Label' says logging giant Resolute"; March 18, 2014 blog post authored by Greenpeace Canada, "Mount Royal Cross Transformed Into Scales Of Justice: Greenpeace Protests The Reckless Destruction Of Canada's Boreal Forest";  August 14, 2015 blog post by Joanna Kerr of Greenpeace Canada, "Collaboration Is The Key To Sustainability In Canada's Boreal Forest" and republished on Greenpeace USA's website; January 2016 report authored by Amy Moas of Greenpeace USA "Resolute Forest Products: Key Risks And Concerns For Investors"; and February 2016 report authored by Greenpeace Canada, "Montagnes Blanches Endangered Forest."

188.     Moreover, the audits that led to temporary suspensions of two FSC certificates were not based on any such wide-ranging or substantial findings.  Instead, the suspensions were based on narrow and idiosyncratic issues, most of which were out of Resolute's control, and an unprecedented treatment of those issues by those handling audits.

189.     First, one audit cited a specific, complex territorial dispute between the Quebec Government and two First Nations concerning a portion of the audited area that was unresolved at the time of the audit, even though Resolute was not a direct party to the dispute and lacked any ability to control or resolve it.

190.     Second, both audits challenged the adequacy of the provincial government's caribou conservation plans, which was also not an issue Resolute controlled.  Moreover, other FSC holders relying on the same caribou habitat conservation plan did not have their FSC certification suspended.

191.     Third, contrary to the Enterprise's claims otherwise, these temporary suspensions had nothing to do with Resolute's on-the-ground practices or compliance with any laws or regulations.

192.     Fourth, most important, the Enterprise's claims about Resolute's FSC compliance do not disclose the Enterprise's direct and indirect role in the suspensions Resolute suffered, or that Resolute was treated dramatically differently than other FSC certificate holders operating in the same areas.  Greenpeace's "Resolute: Forest Destroyer" campaign targeted Resolute's relationship with FSC and its FSC auditors from the very start, with a parallel campaign attacking FSC for not being stringent enough.

193.     That campaign soon evolved into direct claims by the Enterprise that FSC and its auditors were not tough enough on Resolute the "Forest Destroyer."  Thus, as it would do with Resolute customers, the Enterprise threatened to tarnish the FSC brand by accusing it of certifying Resolute despite the Enterprise's highly publicized claims that Resolute was destroying the Boreal forest, its woodland caribou, and its indigenous people.  Once the threat was set, the Enterprise began filing formal complaints with the FSC and Resolute's auditors, and engaging in a campaign of informal communications, to pressure and precipitate the suspension

of Resolute's certification, which the Enterprise would then use to further attack Resolute and raise funds.  Demonstrating how deeply the Enterprise had infiltrated Resolute's Canadian FSC certification and dispute resolution process, a preliminary and non-public report on a Cree complaint filed against Resolute appeared on the Greenpeace Defendant's website even though it was not a party to that complaint or investigation.

194.    The Enterprise's success in contaminating Resolute's Boreal FSC certifications is evidenced by, among other things, the dramatically disparate treatment to which Resolute's FSC certifications were subjected, including, among other things, the following:

(a)    **First Nations** – In Quebec, FSC auditors issued major non-compliances to Resolute for disputes with First Nations, which ultimately contributed to its two suspensions, even though other certificate holders had similar or larger disputes with no non-compliances even declared let alone suspensions issued, and harvested in the very same First Nation's territory using the very same means, which was mandated by the government's forestry officials. Moreover, Resolute was suspended for implementing a government mandated harvesting approach because the Cree purportedly preferred an alternative method -- mosaic cutting -- that is detrimental to caribou and prohibited by the government, but no other certificate holders who likewise followed the law in the same territory over the same Cree objections suffered similar consequences.

(b)    **Caribou Plans** – FSC auditors deemed compliance with the government's regional caribou plan to be insufficient for Resolute while it was deemed sufficient for two certificate holders on adjoining management units and a third certificate holder on another adjacent management who was not even complying with the regional plan and who also was harvesting in prohibited mosaic cut-blocks that are highly-detrimental to woodland caribou. Similarly, FSC auditors deemed insufficient Resolute's compliance with the government's established 35% habitat disturbance rate, the disturbance level was barely even examined in audit reports for other certificate holders, even those operating in the same caribou habitats as Resolute and with greater disturbance levels than Resolute.  Indeed, while overall compliance with the Federal Recovery Strategy was a key requirement imposed by Resolute's auditors, it was and

1   continues to be ignored in most other certificate audits even when audited by the same person.

2   Indeed, Resolute was required to conduct long-term modelling and monitoring of disturbance

3   levels, best available habitats, road network densities, and old forest impacts to demonstrate

4   compliance with federal law even though certificate holders in adjacent areas were not even

5   required to explain their efforts to comply with that law.  Ultimately, Resolute was issued one

6   major non-compliance for planning operations in unfragmented, intact forests, but adjacent

7   certificate holders were not, despite exceeding maximum disturbance thresholds in the same

8   forests.

9          (c)    **Allowable Cut Calculation** – In Quebec, the allowable cut calculation is the

10   responsibility of the government's chief forester.  For other certificate holders, this chief

11   forester's calculation was sufficient to sustain certification, but Resolute was required to prepare

12   a separate calculation that incorporated various FSC standards that were not even mentioned in

13   the audit reports of other certificate holders.  Resolute was issued a major non-compliance

14   finding for failing to do this to the auditor's subjective satisfaction.

15          (d)    **Old Forests** – Resolute was the only certificate holder for whom the

16   governments' approach for old forests was deemed inadequate.  It alone was subjected to a

17   subjective auditor determination of what should be required.

18          (e)    **Gap Analysis** – FSC requires that "gap analyses" be conducted to ascertain the

19   need for additional protected areas in forest tenures.  Resolute used the widely utilized MNR

20   GapTool to conduct this analysis, as did most other certificate holders, because, among other

21   reasons, Ontario legally mandates its use.  The auditors informed Resolute that it was not

22   permitted to use MNR GapTool for FSC purposes, nor could it use other commonly accepted

23   methods used by other certificate holders.

24          (f)    **Maximum Contributions** – Where the gap analysis so indicates, "maximum

25   contributions" of acreage must be made to add to protected areas.  Although Resolute tenures in

26   Ontario currently have the highest level of regulated parks and protected areas in Ontario by

27   substantial margins, it submitted 199,000 hectares of additional candidate sites, which would

28   have resulted in 1 million hectares of parks and protected areas associated with Resolute's

tenures.  Ontario's Ministry of Natural Resources concluded, "the areas identified for protection would maximize contributions needed to enhance representation through filling remaining gaps within the extent of your tenure."  Nevertheless, Resolute's FSC auditors declared it insufficient, despite approving another certificate holder's proposed contribution of merely 5,000 hectares.

195.    The Enterprise not only mischaracterizes the reasons for Resolute's suspensions, it also misrepresents and omits the true facts about Resolute's overall record of FSC and other certification compliance.  Resolute is one of the largest holders of FSC sustainable forest management certificates in all of North America and in January 2015 successfully renewed its FSC certificates in the Mauricie, Abitibi (jointly with Tembec) and North Shore regions of Quebec.  The North Shore certificate was renewed based on the caribou habitat conservation plan prepared and implemented by the government of Quebec.

196.    Moreover, the Enterprise has misrepresented that Resolute no longer supports FSC certification and is actively seeking to undermine the FSC brand.  In fact, Resolute has always remained a supporter of FSC certification standards, both in terms of sustainable forest management certification and chain of custody certification, and is one of the largest holders of FSC certificates in North America.  Although the company has received notice of temporary suspensions under the FSC National Boreal Standard in a process contaminated by Greenpeace, all of the areas in question nevertheless remain certified under the SFI standard.  Indeed, in 2012, the World Wildlife Fund (WWF) announced Resolute as the largest manager of FSC certified forests in the world, and at one time Resolute achieved FSC certification of 76% of the company's managed forests.  Moreover, 100% of the woodlands Resolute manages are audited and certified by independent third parties, and Resolute has publicly committed to maintaining 100% certification in its operations.

       **vii.**      **The Enterprise Falsely Accuses Resolute of Harvesting in the Protected Areas of the Broadback Valley, Trout Lake, and Montagne Blanches.**

197.    Although the Enterprise purported to retract its 2012 claims that Resolute was harvesting in the areas prohibited under the CBFA, it quickly revived this fraud in a different form.  Rather than use doctored photos and explicit claims, it now unilaterally redrew maps and

1    rewrote long-standing geographical delineations to again make the materially false and
2    misleading accusation that Resolute was improperly harvesting in protected areas that it should
3    not and in which it had agreed not to operate, including particularly what Greenpeace's newly
4    minted delineations for the Broadback Valley, Trout Lake, and Montagnes Blanches.

**(1)    Broadback Valley**

6        198.    The Enterprise's "Resolute: Forest Destroyer" campaign falsely accuses Resolute
7    of building roads and infrastructure in the Broadback Valley -- which it characterizes as one of
8    the last remaining intact forests in Northwest Quebec -- in violation of a moratorium Resolute
9    entered into with Greenpeace Canada, Canopy, and CPAWS in March 2010.  This is false.

10       199.    In an April 30, 2009 press release jointly issued by the Cree Nation and SNAP,
11   the Cree-SNAP proposed a 16,000 km² moratorium in the Broadback Valley, comprised of
12   12 000 km² of deferred harvest land in the working forest, and 4,000 km² above the northern
13   limit, totaling 16,000 km². ("Cree-SNAP moratorium").  In March 2010, Resolute and other
14   forestry companies had voluntarily agreed to not harvest in certain areas in which the Quebec
15   government had directed them to harvest in order to give the Quebec government, which holds
16   title to and directs the harvesting of the boreal forest in Canada, an opportunity to address the
17   Cree-SNAP proposal.   Resolute honored and continued to honor this moratorium until it expired
18   later in 2013.  At the time the side agreement was executed, it was expressly understood that the
19   commitment was for the short term, and that harvesting would need to continue outside the area
20   covered by the Cree-SNAP moratorium, including in caribou habitat.

21       200.    Despite the fact that its commitment was for the "short term," to this date, i.e.
22   seven years later, Resolute has honored the moratorium it entered into with these three ENGOs.

23       201.    Nevertheless, as part of the "Resolute: Forest Destroyer" campaign to single out
24   Resolute as an outlier, primary responsible for destruction of the last remaining intact forest
25   landscapes in Quebec, the Enterprise falsely accused Resolute of harvesting in the "Broadback,"
26   in violation of the moratorium by simply expanding the Cree-SNAP moratorium area 180% to
27   include areas that are plainly outside the agreed-upon moratorium, and which the parties
28   expressly understood that Resolute would continue logging.  This false allegation was featured

- 72 -

prominently in the Enterprise's May 2013 Unsustainability Report, in which the Enterprise

through Richard Brooks and Shane Moffatt of Greenpeace Canada, falsely accused Resolute of

logging in the Broadback against the wishes of the Cree.  The report included a map entitled

"Broadback Valley Forest," which depicted a region that Greenpeace unilaterally expanded

beyond the Cree-SNAP moratorium implemented by Resolute in 2010.  Along with the map, the

Unsustainability Report stated:  "Resolute operates in three of Canada's 'Endangered Forest'

areas to source its 'sustainable' products. . . . In the heart of Cree traditional territory lies one of

the last remaining intact forests of northwest Quebec – the Broadback Valley 'Endangered

Forest.'" Consistent with the Enterprise's model to sensationalize its claims, the Unsustainability

Report also included a photo of a road captioned "Logging road deep within the Broadback

Valley 'Endangered Forest'" and a photo of a caribou running across a road with the caption: "A

woodland caribou runs across a road in the Broadback Valley 'Endangered Forest.' The iconic

species is facing an uphill battle for survival in Resolute tenures."  In the weeks that followed,

members of the Enterprise, including defendant Brindis of Greenpeace USA, disseminated these

false statements to Resolute's customers and critical market constituents.

202.    The Enterprise's false allegations that Resolute was logging in the Broadback

Valley were also featured prominently on Greenpeace Canada's "Resolute Forest Destroyer"

campaign page:

> Resolute manages large areas of Boreal Forest, operating in the
> Montagne Blanches and Broadback Valley endangered forests in
> Quebec . . . has been clearcutting, authorizing and building roads
> into previously intact wilderness for years . . . . The Cree in the
> Broadback Valley have demanded that companies such as
> Resolute, respect a moratorium on development after years of
> facing the negative impacts of logging on their traplines and
> forests.

203.    Moreover, the Enterprise once again resorted to intentionally misrepresenting

Resolute's putative harvesting in the "Broadback," with video images

that is actually footage of insect devastation on the North Shore of Quebec several hundred

kilometers away.  Once again, the Enterprise knew this evidence was false because the

information necessary to do so accompanied the images and anyone with basic scientific

1  understanding of forestry would have been able to identify the source of the disturbance as

2  insects and not logging.

3      204.    After Resolute commenced legal action against Greenpeace Canada in May 2013

4  arising from, among other claims, the false allegation that Resolute is harvesting in the

5  Broadback in violation of the agreement with the Cree-SNAP moratorium, Greenpeace Canada

6  tacitly conceded the falsity of the allegation and updated the "Resolute Forest Destroyer"

7  campaign page to read:  "Meanwhile, while Resolute has to date respected a moratorium [ ] of

8  the larger Broadback Valley 'Endangered Forest' area, to the south members of the Algonquins

9  of Barriere Lake continue to protest logging on their traditional territory by the company."

10  Although the Enterprise conceded that Resolute was not violating the Cree-SNAP morato a

11  moratorium which it had not violated, the Enterprise shifted the borders of the so-called

12  Broadback Valley to include the 13,000 km² proposed deferral by the Grand Council of the Cree

13  in 2013, notwithstanding that the Enterprise knew that Resolute did not agree to defer harvesting

14  in this region in connection with the 2010 side-agreement, but rather that the parties to the side

15  agreement explicitly understood that harvesting would continue in that region.

16      205.    Notwithstanding Greenpeace's May 2013 concession that Resolute is not logging

17  in the 2010 moratorium area, Greenpeace has failed to retract their false and misleading

18  statements in the Unsustainability Report accusing Resolute of logging in Broadback Valley.

19  Rather, the Unsustainability Report continues to be featured on the websites of Greenpeace

20  Canada, Greenpeace USA, and Greenpeace International, and each of these Enterprise members

21  continue to solicit donations based on the false and misleading allegations set forth in the

22  rebutted report.

23      206.    As further evidence of Greenpeace USA's and Greenpeace International's

24  knowledge of the unilateral expansion of the region historically understood to be the "Broadback

25  Valley," counsel for Greenpeace has recently conceded that Greenpeace has unilaterally

26  expanded the boundaries of the Broadback beyond the borders delineated by the 2010

27  moratorium, stating:  "[W]e defined a region, the Broadback region, in a way that was consistent

28  with conservation values . . . ."  But the Broadback Valley has a meaning understood to mean the

1    area submitted by the Cree in 2009, and indeed a meaning even once shared by Greenpeace until

2    it decided to blow up the CBFA and redraw the map.

3                              **(2)      Trout Lake Forest**

4          207.    The Enterprise's misinformation campaign misrepresents that Resolute regularly

5    builds roads and harvests in the Trout Lake Forest caribou habitat.  This allegation is featured

6    prominently in the Unsustainability Report and on the homepage for the Enterprise's "Resolute:

7    Forest Destroyer" campaign which alleges that "[i]n Northwestern Ontario, Resolute manages

8    vast lands in the Trout Lake-Caribou Endangered Forest."

9          208.    Resolute does not harvest in protected areas; does not hold harvest rights in the

10   Trout Lake Forest; and does not harvest in the Trout Lake Forest.  In fact, a different logging

11   company, Domtar, has responsibility for the Forest Management Unit ("FMU") in which the

12   Trout Lake Forest is located, and this FMU is over 100 kilometers away from the nearest

13   Resolute forest tenure.  To nevertheless allege that Resolute harvested in this area and thus

14   impacts certain of its caribou populations, the Enterprise conflates this FMU with an adjoining

15   but separate management unit in which Resolute operates called the Caribou Forest.  This is the

16   equivalent of accusing a Georgia timber company of harvesting in Florida by just combining

17   those two distinct states solely for the purpose of making that claim.

18         209.    Importantly, Greenpeace Canada knew that it was conflating Trout Lake, an area

19   in which Resolute does not operate, with Caribou Forest, where Resolute does operate, as

20   evidenced by its concession of this fact in its 2010 Boreal Alarm report, which states: "Trout

21   Lake Forest is licensed to Domtar . . . . Connected by a thin band of intact forest along the

22   northern limits of the allocated forest, the Trout Lake Forest is connected to the Caribou

23   Forest. . . . Resolute Forest Products is the major operator in the Caribou and English Forest."

24   Nonetheless, the map delineated in this report connects the two regions.  In the Enterprise's

25   subsequent publications and in communications with customers, the Enterprise did not disclose

26   the conflation, instead misleading the public into believing that Resolute has operated in the

27   Trout Lake-Caribou.  For example, in its May 2013 Unsustainability report, Greenpeace Canada

28   accused Resolute of operating in the "carbon-rich Trout Lake-Caribou 'Endangered Forest," [ ]

1   prized for its intact caribou habitat . . . ."  Throughout May 2013, the Enterprise through, among

2   others, defendant Brindis, disseminated these false statements to Resolute's customers.

3          210.    The falsity of this statement is made even more stark by the fact that

4   notwithstanding its continued allegations that Resolute is logging in Endangered Forests, the

5   Enterprise has abandoned its allegation that Resolute is logging in Trout Lake.  For instance, the

6   Clearcutting Report references only Caribou Forest.

7          211.    Nevertheless, the Enterprise has failed to retract its false and misleading reports

8   which feature this misrepresentation and the Unsustainability Report continues to be featured on

9   the websites of Greenpeace Canada, Greenpeace USA and Greenpeace International, and the

10  Enterprise continues to solicit donations based on the false and misleading allegations set forth in

11  those rebutted reports.

12                            **(3)    Montagnes Blanches**

13         212.    The Enterprise falsely accuses Resolute of building roads and harvesting in the

14  Montagnes Blanches, which are overwhelmingly located above the Northern Limit and out of

15  bounds for all forestry.  Once again, to accuse Resolute of illegal activity, the Enterprise simply

16  redraws the existing maps beyond any colorable relationship to the historical and long

17  understood delineations of the Montagnes Blanches.  Beginning in 2010, with the publication of

18  Greenpeace Canada's 2010 report "Boreal Refuge: Saving Quebec's Last Large Intact Forests,"

19  the Enterprise unilaterally -- and without disclosure -- designated large swathes of land

20  "Montagnes Blanches," even though these regions fell outside the area historically designated as

21  protected.  Remarkably, Greenpeace's revisions include only a portion of the actual Montagnes

22  Blanches mountains, but do include large swathes of forest managed by Resolute, including

23  Forest Management Units (FMUs) 24-51, 25-51, and 27-51, which are overwhelmingly located

24  within the areas that was universally understood to be outside the Montagnes Blanches (and

25  remain so to everyone but the Enterprise and those they are misleading).

26         213.    After unilaterally expanding the region of the Montagnes Blanches, in December

27  2012, the Enterprise through Greenpeace Canada falsely and misleadingly alleged that Resolute

28  was logging in the Montagnes Blanches as a pretext for Greenpeace Canada's withdrawal from

- 76 -
PLAINTIFFS' AMENDED COMPLAINT CASE NO. 3:17-CV-02824-JST

the CBFA and the launch of a fundraising campaign against Resolute, even though there was no question that Resolute was not logging in the "real" Montagnes Blanches as delineated by the Quebec Government.  Remarkably, by 2013, the Enterprise further expanded the borders of the "Montagnes Blanches" beyond its 2010 delineation.  Greenpeace's 2013 definition of the "Montagnes Blanches" was featured prominently in the Enterprise's Boreal Alarm Report authored by Catherine Grant, Nicholas Mainville and Freya Putt of Greenpeace Canada, which falsely and sensationally alleged:  "Encircled by clearcuts and encroached upon every year by roads and logging operations, the Montagnes Blanches Endangered Forest is at high risk.  Companies like Resolute Forest Products . . . . have plans to go deep into this wild area within the next year.  Resolute has obtained FSC certification in this area in recent years. . . ."  Moreover, the Boreal Alarm Report falsely identified Resolute's harvesting operations to supply the Dolbeau-Mistassini, Girardville, and Saint-Felicien mills as operating in the Montagnes Blanches, when, in fact, none of the areas identified were located in the real Montagnes Blanches.  Importantly, nowhere in the report did Greenpeace disclose the true boundaries of the Montagnes Blanches or the fact that Greenpeace had unilaterally enlarged the area.   Through the first quarter of 2013, the Enterprise, including Daniel Brindis of Greenpeace USA and Catherine Grant and Andisheh Beiki of Greenpeace Canada, disseminated Greenpeace's false and defamatory report to numerous Resolute customers.

214.    In subsequent reports, the Enterprise reprinted this expanded map, each time without disclosing the boundaries of the true Montagnes Blanches or the fact that Greenpeace had unilaterally enlarged the maps.  For instance, in May 2013, Greenpeace Canada published "Resolute's False Promises: The [Un]sustainability Report 2013," which featured images of Resolute's putative "logging in the Montagnes Blanches" and stating that Resolute's Alma paper mill "is known to source from this pristine area."  Throughout May, the Enterprise, including defendant Brindis and enterprise members Catherine Grant and Stephanie Goodwin, disseminated this false report to Resolute's customers.  Moreover, the Unsustainability Report was featured  on Greenpeace USA's website.

215.    Likewise, in May 2014, Greenpeace International authored and published "FSC at Risk: Resolute Forest Management: FSC Must Do More to Protect Intact Forests, Species at Risk and Indigenous Rights in Canada," which included the falsified map and falsely alleged that Resolute's "FMUs 24-51, 25-51, and 27-51 overlap with this Endangered Forest," and that Resolute's "logging operations are central to the fate of the Montagnes Blanches Endangered Forest." This report was disseminated to Resolute's customers.

216.    In February 2016, Greenpeace Canada again published the Enterprise's expanded boundaries in its report "Endangered Forests in the Balance: The impact of logging reaches new heights in the Montagnes Blanches Endangered Forest." The report falsely claimed that between 2000 and 2013, "nearly 50% of the Intact Forest Landscapes in the Montagne Blanches Endangered Forest have been lost or degraded." The report identified Resolute as "central to the fate of the Montagnes Blanches Endangered Forests," and again falsely identified Resolute's FMUs 24-51, 25-51, and 27-51 as overlapping with the Montagnes Blanches. Throughout March and April 2016, Amy Moas of Greenpeace USA, along with Greenpeace Canada, disseminated the false and misleading report to Resolute's critical customers.

217.    In direct response to these false and misleading publications, on May 31, 2016, Laurent Lessard, Quebec's Minister of Forests, Wildlife, and Parks issued a statement to "rectify the facts" concerning Greenpeace's misrepresentations regarding the Montagnes Blanches. Referencing the maps published in Greenpeace Canada's false and defamatory "Endangered Forests in the Balance" report, the Minister stated: "According to experts at Quebec's [Ministry of Forests, Wildlife, and Parks], the *map has major deficiencies that misrepresent the geographical reality and are likely to mislead readers. The map extends well beyond the Montagnes Blanches sector officially recognized by the Quebec government for the protection of woodland caribou. . . .*" (emphasis added.) Along with the statement, the Government of Quebec linked to an official map of the Montagnes Blanches.

218.    Notwithstanding this corrective disclosure from the Quebec Government, Greenpeace has failed to retract their false and misleading reports and statements accusing Resolute of logging in the Montagnes Blanches. To the contrary, the Enterprise continues to

accuse Resolute of logging in the Montagnes Blanches, including in the December 2016 letter to Resolute's book publishers (*infra* §B(2)(f)(viii)) and the Clearcutting report (*infra* §B(2)(f)(viii).) Moreover, Greenpeace's prior reports which include this misrepresentation continue to be featured on Greenpeace USA's, Greenpeace Canada's, and Greenpeace International's websites, and the Enterprise continues to solicit donations based on the false and misleading allegations set forth in those rebutted reports.

viii.  <b><u>The Enterprise Misrepresents That Resolute Has Abandoned Its Commitment To Sustainability</u></b>

219. Finally, in furtherance of their campaign to designate Resolute as the "most regressive forestry company," the Enterprise repeatedly misrepresents that Resolute has abandoned its commitment to FSC certification and sustainability.  Most recently, in Greenpeace USA's May 2017 report "Clearcutting Free Speech:  How Resolute Forest Products Is Going to Extremes to Silence Critics of Its Controversial Logging Practices," authored by Amy Moas, the Enterprise falsely claimed that Resolute is "abandoning sustainability" and its commitment to FSC, citing to terminations of limited FSC certificates and the fact that some of Resolute's forests are certified by independent third parties other than FSC.  This report was published on the websites of Greenpeace USA, Greenpeace Canada, and Greenpeace International.

220. However, this false charges fails to disclose that in addition to remaining one of the largest holders of FSC certificates in North America, Resolute is as an industry leader in sustainable forestry, environmental protection, and safety.  In the past few years, Resolute has received over twenty regional, North American and global awards and distinctions for its sustainability, environmental and safety practices, including:

- In September 2014, Resolute's President and CEO was named to Canada's prestigious Clean50, which recognizes leaders in sustainability in 16 different business categories.

- In December 2014, *The New Economy* magazine's Clean Tech global award for best forestry and paper solutions was awarded to Resolute for its innovation, research, long-term vision and leadership in sustainable forestry.

- In August 2015, Resolute was the silver Best in Biz award recipient in the North American most socially and environmentally responsible company of the year category, and a bronze recipient in the international division based on its commitment to 100% woodlands certifications, transparent sustainability reporting, innovative partnerships

with First Nations, and substantial efforts to minimize resource consumption, waste generation, air emissions, water discharge and environmental incidents.

- In October 2015, Resolute received The International Business Awards (IBAs) gold Stevie award in the environment, health and safety category for both Canada and the United States.

- In November 2015, Resolute received the American Forest & Paper Association (AF&PA) Leadership in Sustainability Award for safety.

- In June 2016, *The New Economy* magazine's Clean Tech global award for best forestry and paper solutions was again presented to Resolute. The award recognizes companies whose ideas, achievements, projects and solutions reflect innovation, long-term vision and leadership. Highlighted achievements included: a 70% reduction in greenhouse gas emissions since 2000; investing in cleaner energy with 72% of total energy needs sourced from renewable sources and 78% of fuel energy from biomass; 100% responsible and sustainable forest management certification and 100% chain of custody certification; partnerships with Canada's First Nations and Aboriginal communities; and world-class safety performance.

- In August 2016, Resolute was recognized by the International Business Awards (IBAs) with a bronze Stevie award in the category of corporate social responsibility program of the year in the United States and Canada. Highlighted achievements included:  a world-class OSHA safety incident rate of 0.66; reducing mill environmental incidents by 55%; plummeting absolute scope 1 and 2 greenhouse gas emissions by 71% since 2000; and signing a C$100 million agreement with six of the 39 First Nations communities with whom the company engages. IBA Stevies are the world's premier business awards and honor accomplishments in all aspects of work life.

- In September 2016, a team of four Resolute employees were also recognized by Clean50 for their leadership in reducing greenhouse gases and environmental incidents, among other achievements.

- In March 2017, Resolute won two 2016/2017 Peer Awards for Excellence for demonstrating leadership in carbon reduction and reporting. Its success in reducing absolute scope 1 and 2 greenhouse gas emissions by 73% over 2000 levels in 2016 – and the comprehensiveness and transparency of its carbon reporting – won Resolute a Corporate Responsibility Award in the sustainability category, as well as an Industry Sector Award in the manufacturing category. Resolute's carbon leadership was also acknowledged in the Global Region Awards in the international category. The Peer Awards for Excellence celebrate tangible accomplishments and innovative ideas in global business. Finalists present their initiatives for review by fellow finalists – a unique process that allows judging by an audience of peers in the areas of corporate responsibility, customer engagement, and people and performance.

- In April 2017, Resolute received the Mercure award for sustainable development at the 2017 Mercuriades Gala. The company earned praise from the jury for its involvement in the Toundra Greenhouse project in Saint-Félicien (Quebec), an innovative joint venture in which Resolute is one of the main partners. The Mercuriades, created by the Fédération des chambres de commerce du Québec, is the province's most prestigious business competition, celebrating the ambition, innovation and performance of Quebec businesses.

- In June 2017, Resolute received an Environmental Leader of the Year Award for jointly developing Toundra Greenhouse. The Environmental Leader Product and Project Awards recognize excellence in products/services and projects that provide companies with environmental, sustainability and energy management benefits. *Environmental Leader* is a leading daily trade publication keeping corporate executives informed about energy, environmental and sustainability news.

- In July 2017, Resolute received the silver Best in Biz global award for being the most environmentally responsible company of the year. The award recognized the company's industry-leading performance, including:  a 73% reduction in absolute GHG emissions; maintaining 100% forest management and chain of custody certifications to international standards; top marks for its CDP Forests Disclosures, actions to manage deforestation risk and implement excellent monitoring and measurement programs; cutting-edge innovations, including installation of leading enzyme-enabled carbon capture technology helping to eliminate GHG emissions; and beneficial business partnerships, including its inaugural Canadian membership in the Carbon Pricing Leadership Coalition, which is working to address climate change by putting a price on carbon.

- In August 2017, Resolute again received the International Business Awards gold Stevie in the health, safety and environmental program of the year category for both Canada and the United States. The award highlighted Resolute's commitment to social, environmental and economic sustainability.

- In September 2017, Resolute's sustainability strategy received an honorable mention from the DuPont Safety and Sustainability Awards, which recognize outstanding initiatives aimed at enhancing workplace safety, sustainability and operational effectiveness. The international DuPont Awards celebrate the achievements of companies that have found effective, innovative ways of becoming greener, cleaner and leaner.

- In September 2017, Resolute was named to Canada's Clean50 Top Projects Awards list for 2018 for its participation in Toundra Greenhouse, in which Resolute holds a 49% equity interest. Canada's Clean50 Top20 Projects category recognizes outstanding sustainability or "clean capitalism" projects from across Canada that innovate, inform and inspire Canadians to do more.

- In October 2017, Seth Kursman, Resolute's vice president, Corporate Communications, Sustainability and Government Affairs, received a 2017 Sustainability Award by the Business Intelligence Group (BIG) for his leadership. BIG honors those who have made sustainability an integral part of their business practice. The award acknowledged Kursman's leadership of sustainability for Resolute – and the company's success in driving performance improvements on a host of key safety, stakeholder and overall sustainability priorities.

- In November 2017, Resolute received an AF&PA Sustainability Award for its GHG reduction program. The company has adopted a series of ambitious sustainability commitments, including a goal to reduce scope 1 and 2 greenhouse gas emissions from its facilities by 65% between 2000 and 2015. By improving the energy efficiency of its operations and increasing the use of lower carbon fuels, at the end of 2016, Resolute had lowered GHG emissions by 73% compared to 2000 levels.

221.    Moreover, in making these false charges, the Enterprise intentionally omits that in its 2016 Annual Report, Resolute Forest Products reported that its Forests Disclosures to CDP earned an "A-" (leadership) score. Resolute's forest management practices were again rated "A-" by CDP in October 2017. These scores are among the highest given by CDP. The ranking recognized Resolute's actions to manage deforestation risk as well as the implementation of excellent monitoring and measurement programs. CDP is a not-for-profit charity that runs the global disclosure system for investors, companies, cities, states and regions to manage their environmental impacts. It has built the most comprehensive collection of self-reported environmental data in the world, creating a system that has resulted in unparalleled engagement on environmental issues worldwide.

f.    **The Enterprise's Dissemination Of Disinformation, Extortion And Other Tortious and Illegal Conduct.**

222.    The Greenpeace Defendants and the other Enterprise members disseminated the Enterprise's disinformation ubiquitously, via websites, blog post, Twitter, emails, public displays, brochures, letters, and innumerable direct in-person and telephonic conversations, to Resolute's most important constituencies, including customers, industry partners and participants, third-party auditors, and government regulators.

i.    **The Enterprise Scuttles The CBFA.**

223.    Central to the launching and success of the "Resolute: Forest Destroyer" campaign was the need to scuttle the "historic" CBFA executed on May 10, 2010. Beginning no later than September 2012, the Enterprise, through Greenpeace Canada, ForestEthics and Canopy, began misrepresenting to other CBFA signatories and participants, including the FPAC industry signatories and their customers participating in the CBFA's Boreal Business Forum ("BBF"), that Resolute was violating the CBFA by harvesting and logging in the protected areas agreed upon in the CBFA. These communications were intended to undermine Resolute's participation in the CBFA, justify Greenpeace Canada's departure from the CBFA, and harm Resolute's business relationships with the CBFA signatories and participants, customers, Boreal communities, and national, regional, and local governments.

224.    For example, on September 17, 2012, Stephanie Goodwin (Greenpeace Canada), Todd Paglia (ForestEthics), and Amanda Carr (Canopy), jointly wrote to member companies of the FPAC falsely accusing Resolute of engaging in "active logging and road building . . . in areas originally designated off limits within the CBFA, including . . . in the Quebec region under priority [thereby] fast-tracking the erosion of the legitimacy of [CBFA]."  The Enterprise, through Stephanie Goodwin of Greenpeace Canada, made the same accusations against Resolute to virtually all of the CBFA members in direct oral and written communications throughout the second half of 2012.

225.    After Greenpeace Canada announced in December 2012 its very public CBFA withdrawal based on these same phony pretexts and their accompanying fabricated photographic "evidence," on December 14, 2012, Stephanie Goodwin wrote to the FPAC and ENGO CBFA signatories outlining "the escalation that led to Greenpeace's departure from the CBFA." Among other things, Ms. Goodwin repeated the false accusations that Resolute had engaged in "road building in original CBFA Areas of Suspended Harvest despite active efforts by Greenpeace and other environmental organizations," which was categorically false.  She also falsely misrepresented that Resolute had "caused a fundamental breakdown in the Agreement and created a 'talk and log' process."  This too was categorically false because it was Greenpeace Canada that essentially broke off and obstructed CBFA participation mid-way through 2012 as it focused instead on manufacturing evidence that it could use as a pretext for withdrawal from and the scuttling of the CBFA.

226.    The Enterprise knew that these accusations were false when made, as were its claim that it was abandoning the CBFA based on these knowingly false claims.  Indeed, after the Enterprise was later forced to retract their claims that Resolute violated the CBFA, it nevertheless refused to resume CBFA participation.  Instead, it continued its newly launched "Resolute: Forest Destroyer" campaign.

227.    To make sure, however, that the CBFA remained no threat to these efforts, the Enterprise continued to pepper CBFA signatories and participants with lies, including, for example, disseminating "Resolute's False Promises: The [un]sustainability report of 2013" (the

"Unsustainability Report"). Likewise, in a May 2013 interview with the Globe and Mail concerning the CBFA negotiations, defendant Paglia of ForestEthics stated: "Getting environmentalists and logging companies to come to an agreement is not easy. We feel like Resolute is the bad apple, and that the rest of the bushel is in very good shape." Other misrepresentations the Enterprise disseminated to CBFA signatories and participants are set forth more fully in Appendices A-D.

ii.       **The Enterprise Threatens and Contaminates Customer <u>and Industry Relationships.</u>**

228.     The Enterprise aggressively targeted Resolute's customers and industry relationships with disinformation, extortive threats, and illegal misconduct. In order to secure proprietary information about Resolute's customers and those companies that sourced from Resolute's customers, the Enterprise directly and through agents used aliases and other false pretenses, including misrepresenting themselves as students and employees of Resolute's customers, through which they misappropriated such proprietary information and exploited it for their own illegal purposes.

229.     Throughout the period relevant to this complaint, there were multiple attempts to solicit Resolute's confidential customer information through fraudulent phone calls. By way of example, only, throughout January 2017, a man identifying himself as an employee with the publishing company Harper Collins made multiple attempts to solicit confidential information about the Harper Collins account. On January 13, 2017, the caller spoke with a customer service manager at Resolute, and inquired about Harper Collins' product and purchasing history under the false pretense of an unpaid invoice. When Resolute's customer service manager posed specific questions about the purchase order reference number, the caller placed the call on hold, only to return to the phone to inform the customer service manager that he had just learned that the invoice had been paid. Under similar false pretenses, members of the Enterprise and those working in concert with them, solicited confidential and proprietary information which was in turn used to interfere with Resolute's current and prospective customer relationships.

230.     The Enterprise likewise targeted Resolute and its customers with cyber-attacks in an effort to secure confidential customer, supply-chain, and other proprietary information,

- 84 -

including through attacks on Resolute's and BestBuy's websites in November 2014 and January 2017.

231.    One key business relationship that the Enterprise targeted early was Resolute's customer Kimberly-Clark, which was a member of the CBFA Boreal Business Forum, a joint panel comprised of leading corporations, representing marketplace regions sourcing from the Boreal, designated to monitor progress towards implementation of the Agreement, provide market recognition and guidance to the process, and act as advocates for joint solutions. Beginning in the summer of 2012, under the false pretenses of compliance with the CBFA, the Enterprise regularly directed disinformation about Resolute to Kimberly Clark's Vice President of Global Sustainability and Manager of Sustainable Forest Management.  For example, on July 27, 2012, Richard Books of Greenpeace Canada wrote to the Kimberly-Clark sustainability officer charging Resolute with alleged non-compliance with FSC standards and threatened to file a complaint with FSC Canada but under the pretense of collaboration agreed to hold off until Kimberly-Clark had an opportunity to review the allegations and respond.  Kimberly-Clark immediately forwarded the communication to Resolute and demanded that Resolute rebut the allegations, which Resolute did.  Nevertheless, demonstrating its bad faith, Greenpeace proceeded to file its complaint with FSC Canada before providing Kimberly-Clark with an opportunity to respond.  Likewise, in December 2012, Greenpeace Canada sent Kimberly Clark its false and malicious Exposed Report accusing Resolute of logging in off-limits areas in violation of the CBFA.  Once again, Kimberly-Clark demanded a response from Resolute and requested a meeting to discuss the allegations.  The Enterprise continued to bombard Kimberly-Clark with false claims about Resolute's forestry practices, including the impact of its logging on the woodland caribou, during meetings in December 2012 and May 2013, and countless other emails, letters, and telephonic discussions throughout 2013, 2014 and 2015.  Ultimately, the pressure exerted on Kimberly-Clark by the Enterprise had its intended effect.  On September 16, 2015, Kimberly-Clark informed Resolute that "[d]ue to Resolute's continued dispute with Greenpeace and the recent upsets in the CBFA we are not going to be able to pursue a contractual relationship."

232.    The Enterprise, through Greenpeace Canada, likewise disseminated its fabricated allegation that Resolute was involved in "active logging and road building . . . in areas originally designated off limits within the CBFA, including . . . in the Quebec region under priority [thereby] fast-tracking the erosion of the legitimacy of [CBFA]," to other members of the Boreal Business Forum and FPAC, including Resolute customers, Pearson, Axel Springer, Hearst, Proctor & Gamble ("P&G"), and Rona.

233.    The Enterprise continued to disseminate these false claims to Hearst in the months that followed.  On December 7, 2012, defendant Skar of Greenpeace USA wrote to the Vice President and General Manager of the Paper Purchasing Unit of Hearst, falsely accusing Resolute of "violat[ing] the [CBFA] with newly built logging roads in an area off limits to logging under the CBFA in Quebec's endangered Montagnes Blanches Forest."  Skar attached the Enterprise's putative corroborating photographic "evidence we collected" which Skar intentionally misrepresented depicted "Resolute Forest Product's violation of the Agreement," and requested a meeting with Hearst to discuss "the implications of Resolute's logging activity and the Agreement's failure to produce comprehensive conservation plans."  Enterprise member Canopy echoed these lies, advising Hearst it was suspending engagement with Resolute because it breached the CBFA.  The Enterprise continued to pepper Hearst with false charges about Resolute throughout January 2013.  On January 21, 2013, defendant Daniel Brindis of Greenpeace USA had a call with Hearst during which he reiterated, among other false claims, that Resolute violated the CBFA and was destroying the last remaining intact forests in Canada. That same day, defendant Brindis of Greenpeace USA along with Catherine Grant of Greenpeace Canada forwarded Hearst the Enterprise's Boreal Alarm Report which purported to corroborate Brindis's false charges that Resolute was "building roads in off-limits forest areas."

234.    From mid-2012 through the first quarter of 2013, the Enterprise, through defendant Brindis of Greenpeace USA and Catherine Grant and Andisheh Beiki of Greenpeace Canada, disseminated its false claims that Resolute was violating the CBFA, including, in the Boreal Alarm Report and other written materials to, among others, the following Resolute customers: Harlequin Enterprises, Ltd., Unisource Worldwide, TC Transcontinental Printing,

Case 3:17-cv-02824-JST   Document 185   Filed 11/08/17   Page 88 of 190

Verso, Sappi and Lowe's.  Specifically, the Enterprise, through Brindis, Beiki, and Grant, falsely alleged that Resolute has "recently began building roads in off-limits forest areas" in violation of the CBFA.  Moreover, the Boreal Alarm Report falsely associates Resolute's harvesting with causing the "disappear[ance]" of "all the remaining large intact areas" in Quebec's managed forests, including in the Montagnes Blanches and Broadback Valley regions, thereby threatening woodland caribou.  In direct response to these allegations, on February 12, 2013, the Director of Sourcing at Verso Paper in Memphis Tennessee advised Resolute that one of its customers inquired whether wood for St. Felicien Pulp is sourced from any of the areas identified in the Boreal Alarm report as endangered, including Montagnes Blanches, Broadback Valley, and Trout Lake.  Sappi inquired the same.  Likewise, Lowe's Director of Corporate Sustainability requested information from Resolute for an upcoming call with Greenpeace to address its demand that Lowe's "immediately eliminate supply from the Broadback Valley forest, which is an area where Resolute operates today" or face "special scrutiny."

235.   Moreover, the Enterprise explicitly and implicitly issued extortive threats to these targets that if they continued to source materials from Resolute they would face a "reputational risk" of being exposed by the Enterprise for their association with Resolute and its putative but falsely asserted bad acts, but, if they terminated their relationships with Resolute and, in some instances, endorsed the Enterprise's stance, they would be protected from such exposure.

236.   Notwithstanding the Enterprise's March 19, 2013 retraction of its false claim that Resolute was logging in off-limits areas in violation of the CBFA, within days, the Enterprise launched a new campaign, the "Resolute Forest Destroyer" campaign which falsely designated Resolute as the "most regressive forest products company," an industry "outlier" which posed an existential threat to Canadian forests due to its purportedly "unsustainable" practices.  For example, on March 28, 2013, defendant Brindis of Greenpeace USA and Catherine Grant of Greenpeace Canada jointly wrote to critical Resolute customers, including TC Transcontinental Printing and Verso Corporation falsely singling out Resolute as "one of the primary forest companies responsible for destructive logging and roadbuilding in three Endangered Forests," that are "facing imminent risk and will be severely impacted if they are not conserved

- 87 -
PLAINTIFFS' AMENDED COMPLAINT CASE NO. 3:17-CV-02824-JST

immediately."  Moreover, the letter falsely charged Resolute with "threatening the survival of woodland caribou herds, a species at risk that is supposed to be protected under Canadian federal and provincial laws."  Greenpeace Canada and Greenpeace USA concluded by demanding that TC Transcontinental Printing and Verso Corporation examine their supply chains to determine whether they were sourcing materials from Resolute, and, if so, terminate that relationship lest they too be targeted.

237.    The Enterprise employed similar tactics against Penguin Random House.  On January 23, 2014, Catherine Grant of Greenpeace Canada forwarded a paper procurement officer at Penguin Random House of North America a document prepared by Greenpeace titled "Resolute's FSC suspensions in Ontario and Quebec, and assessment failure in Ontario – January 2014 update," which misrepresented that limited terminations and suspension of Resolute's FSC certificates corroborated Greenpeace's false allegations of unsustainable and destructive practices, and requested a meeting with Penguin to discuss the ramifications of the suspensions, including how it may impact Penguin's supply chain.  Specifically, Greenpeace Canada's communications with Penguin Random House clearly misinformed Penguin that the issues at play were in Resolute's ability to resolve, even after Quebec's Minister of Forests, Fauna and Parks, as well as the Premier of the Province repeatedly stated that the issues were the responsibility of the provincial government, not Resolute.  Greenpeace Canada likewise failed to disclose that notwithstanding the limited terminations and suspension, Resolute continued to be one of the largest holders of FSC certificates in North America, and was harvesting in full compliance with the rules and regulations of the Quebec and Ontario provincial governments.  This disingenuous and misleading campaigning by Greenpeace necessitated multiple phone calls, document exchanges, in-person meetings and other points of contact with Resolute sales representatives, Resolute's Vice President of Sustainability, members of the Company's Executive Team, and even Richard Garneau, Resolute's President and CEO.

238.    Greenpeace Canada and Greenpeace Germany disseminated similar falsehoods to UPM, a leading supplier of paper to European printers, and to UPM's customers.  Beginning in early 2013, Greenpeace sent UPM the Boreal Alarm Report which falsely alleged that Resolute

has "recently began building roads in off-limits forest areas" in violation of the CBFA, and falsely associated Resolute's harvesting with causing the "disappear[ance]" of "all the remaining large intact areas" in Quebec's managed forests, including in the Montagnes Blanches and Broadback Valley, thereby threatening endangered woodland caribou.  UPM immediately demanded that Resolute respond to these allegations, which Resolute did during a January 2013 conference call.  The Enterprise continued to disseminate disinformation about Resolute to UPM, including its May 2013 Unsustainability Report, which likewise falsely associated Resolute with harvesting from the "last remaining intact areas in the Montagnes Blanches" which "overlap[]" with some of the most valuable caribou habitat and carbon-dense forest left in the province," even though as putative experts on matters related to the Canadian boreal forest, members of the Enterprise knew, or could have easily determined, that 90% of the intact forest landscapes in Quebec are above the Northern Border, and off-limits to all forestry companies, including Resolute.  Moreover, in December 2013, the Enterprise purported to corroborate its false claims, by misrepresenting that the suspension of three of Resolute's FSC certificates "prov[es] forests mismanage[ment]."  In response, UPM frequently communicated to Resolute its concerns about the impact that the "Resolute: Forest Destroyer" campaign would have on UPM's business and reputation should it continue to source pulp from Resolute, and repeatedly requested that Resolute rebut false allegations of purported unsustainable logging practices and suspended FSC certificates.  Moreover, to safeguard itself against customer concerns with Resolute sourced-pulp, the European supplier demanded that Resolute provide only FSC certified pulp.  Resolute acquiesced to UPM's demands, and throughout 2013, Resolute expended significant time and resources responding to the Enterprise's allegations during calls, in-person meetings, and in written correspondence with UPM.  Notwithstanding Resolute's demonstration of the falsity of the Enterprise allegations, on April 2, 2014, UPM informed Resolute of its decision to suspend purchases of Resolute's NBSK in their Blandin and Madison mills because of the Enterprise's "black mailing."  During direct communications between UPM's Vice President of Raw Material Sourcing and executives at Resolute, UPM assured Resolute that it continued to believe in Resolute's sustainability approach, but it was acting under tremendous pressure from Greenpeace

Defendants who threatened that if UPM continued to source pulp from Resolute, they would target its German printers, including Axel Springer, directly, thereby harming UPM's business and reputation among its key constituents.  Yet, UPM's interest in Resolute continued.  In September 2015 -- one and a half years after it communicated its decision to suspend purchases of NBSK from Resolute -- UPM reached out to Resolute for an update on the "Greenpeace" conflict.  Upon learning that the campaign to target Resolute was ongoing, UPM reiterated that its management was taking "a conservative and safe approach as far as the Greenpeace situation," and would not likely resume business with Resolute while the Enterprise's campaign was ongoing.

239.     At the same time that the Enterprise, through Greenpeace Canada and Greenpeace Germany, was threatening Resolute's business relationships with suppliers in Europe, it was simultaneously disseminating the "Resolute: Forest Destroyer" lies directly to Axel Springer, a member of the Boreal Business Forum and one of Resolute's largest German customers, including the Enterprise's false claim that the limited terminations and suspension of Resolute's FSC certificates demonstrated unsustainable practices and forest mismanagement.  From 2013 through 2015, Axel Springer was a frequent target of the Enterprise's campaign.  As a result, in August 2015, Axel Springer informed Resolute that it had decided to cancel its most recent orders due to the Enterprise's campaign.  The Enterprise immediately leaked the news of Axel Springer's decision to multiple media outlets, and celebrated the news on Twitter, noting that the controversy generated by the "Resolute: Forest Destroyer" campaign alone was enough to interfere with Resolute's customer relationships:  "Publisher @axelspringer_EN ditches unsustainable @resolute paper. Wants Canadian paper but less enviro controversy."

240.     The campaign had a similar impact on Resolute's business relationship with P&G, one of the world's largest manufacturers of tissue products.  Historically, P&G procured pulp supplies from Resolute's mills in Thunder Bay, Catawba, and St. Felicien.  Accordingly, in or around December 2012, Greenpeace Canada began targeting P&G, sending them false and misleading information concerning Resolute's purported violation of the CBFA along with the fabricated photographic and video "evidence" which Greenpeace misrepresented corroborated

these lies.  At the time, P&G informed Resolute that it feared becoming the target of

Greenpeace's campaign.  Then, on May 15, 2013, Greenpeace Canada sent P&G its

"Unsustainability Report," which accused Resolute of "[u]nsustainable forestry, regulatory

infractions, failure to protect endangered species, 'green' products that don't live up to the name,

certification that comes up short, disregard for Indigenous rights and communities struggling for

their fair share."  P&G immediately forwarded the report to Resolute and demanded

explanations.  And Richard Brooks and other Enterprise members continued to disseminate the

false "Resolute: Forest Destroyer" lies to P&G throughout 2013.  Defendant ForestEthics did the

same, including in or late 2013 and continuing through the first quarter of 2014.  As a direct

result, during the negotiations for the renewal of P&G's contracts for 2014, P&G demanded that

Resolute include exit clauses which would allow P&G to suspend the contracts in the event that:

(a) Greenpeace threatened to campaign against P&G publicly because of its relationship with

Resolute; (b) Resolute lost its FSC certifications; or (c) Resolute's mill production was impacted

by the campaign launched against them.  To secure the contract renewal for this critical account,

Resolute agreed to P&G's demands.  The Enterprise, through Richard Brooks of Greenpeace

Canada, responded by escalating its efforts to interfere with the P&G relationship, and in March

of 2014, P&G informed Resolute that it was increasingly concerned Greenpeace's campaign

would have a detrimental impact on its customers and its brand, and, ultimately, these concerns

would lead P&G to source pulp from other suppliers.

      241.    The Enterprise continued to disseminate the "Resolute:  Forest Destroyer" lies to

Resolute's customers and trade associations throughout 2013, including, but not limited, to the

following:

- In May 2013, defendant Brindis of Greenpeace USA and Catharine Grant and
  Stephanie Goodwin of Greenpeace Canada disseminated copies of the
  Unsustainability Report and communicated the campaign's lies to, among others,
  Wausau Paper, Lowe's, Pro Build, and the European Newspaper Publishers
  Association ("ENPA").  The Unsustainability Report misrepresented, among
  other things, that Resolute was harvesting from the "last remaining intact areas in
  the Montagnes Blanches" which "overlap[] with some of the most valuable
  caribou habitat and carbon-dense forest left in the province."  The
  Unsustainability Report likewise charged Resolute with "[u]nsustainable forestry,
  regulatory infractions, failure to protect endangered species, 'green' products that
  don't live up to the name, certification that comes up short, disregard for
  Indigenous rights and communities struggling for their fair share."

- During a May 28, 2013 conference call hosted by Greenpeace with the major North American directory publishers, including Resolute customers Local Search Association ("LSA"), YP, and Dex Media, Enterprise member Richard Brooks, with the aid of a PowerPoint presentation he provided to the publishers, made false and misleading statements about Resolute's operations in the boreal Forest. Brooks' presentation falsely singled out Resolute as a rogue bad actor logging in Endangered Forest areas in Quebec and logging in habitat of threatened caribou herds that are not self-sustaining, without disclosing that other companies who were identically situated, or in most cases, less favorably situated were being promoted as "progressive" good actor with whom Resolute customers should do business with instead.  Brooks also warned about the risk of reputational damages that would arise from being associated with Resolute.  As a result, when Resolute was bidding for DexMedia's business in August 2013, DexMedia informed Resolute that one of the biggest obstacles for Resolute was the "Greenpeace attack."

- In August 27, 2013 letters to The F.P. Horak Company and Perfection Press, Inc., defendant Brindis of Greenpeace USA and Shane Moffat of Greenpeace Canada misrepresented that "Resolute has a long track record of unsustainable logging activities in Canada's Boreal Forest[,] and "its operating practices threaten iconic wildlife species."  The letter warned The F.P. Horak Company and Perfection Press that they were purchasing Resolute products that were sourced "from the Montagnes Blanches and other Endangered Forest Areas . . . in the last remaining intact forest areas of Quebec," threatening "some of the most valuable caribou habitat and carbon-dense forest left."  Furthermore, the letter included links to the Enterprise's false and misleading Unsustainability Report and Boreal Alarm Report, and demanded that the companies "cease purchasing from Resolute Forest Products . . ."

- In a September 12, 2013 letter from defendant Brindis of Greenpeace USA to a Senior Director and General Manager at Canon U.S.A., Brindis falsely claimed that Resolute "has a long track record of unsustainable logging activities in Canada's Boreal forest," "threaten[s] iconic wildlife species such as woodland caribou," and "source[s] from destructive logging operations in the Montagnes Blanches Endangered Forest . . . in the last remaining intact forest areas of Quebec."  Furthermore, the letter included links to the Enterprise's false and misleading Unsustainability Report and Boreal Alarm Report.  The letter concluded by urging Canon to end its relationship with Resolute, warning that "sourcing from Resolute poses reputational risk to paper customers."

- By letter dated October 10, 2013 to Ushodaya Enterprises, Tribune Trust and Times Of India, the Enterprise, through Greenpeace India, repeated its false allegation that Resolute produces "controversial newsprint" and has a "long track record of unsustainable and irresponsible logging activities in Canada's Boreal Forest," which "threaten wildlife species at risk such as woodland caribou," is logging without the consent of indigenous First Nations, and is harvesting in endangered forests.  The letter also provided links to the false and defamatory Boreal Alarm Report and Unsustainability Report.  Greenpeace warned Ushodaya that "until these issues are resolved, we believe that sourcing from Resolute poses significant reputational risks.

- During October 2013, the Enterprise targeted Union Bank -- the fourth largest bank in California -- who was featured on Resolute's AlignPaper.com site as a testimonial in connection with its use of Resolute's Ecopaque Laser Paper.  As a result, Union Bank demanded to be removed from Resolute's website and

informed its supplier, Clifford Paper, that it wished to discontinue the use of
Resolute's product.

- In a November 21, 2013 email, Oliver Salge of Greenpeace Germany
disseminated false information to all members of the European Newspaper
Publishers Association ("ENPA"), many of which are customers of Resolute. The
letter falsely asserted that Resolute "has a record of unsustainable and
irresponsible operations in Canada's Boreal Forest, one [of] the last remaining
intact forest ecosystems on the planet" and "operate[s] and source[s] timber . . .
[from] the Montagnes Blanches Ancient Forest in the province of Quebec and the
Trout Lake-Caribou Forest in the province of Ontario." The email warns that
sourcing from Resolute may present "certain reputational issues" to each of these
customers. The email linked to Greenpeace Canada's false and defamatory
Unsustainability Report. In response, in December 2013, DMG Media U.K., a
Resolute customer and member of ENPA, demanded a response and maps of the
region, which Resolute provided. Richard George of Greenpeace UK reiterated
these same falsehoods to the ENPA in May 2015. After diligently reviewing the
facts, in June 2015, ENPA and DMG Media jointly wrote to Salge rebutting his
misrepresentations and explaining that Resolute maintains certification across
100% of lands they manage and that Resolute does not harvest in Montagnes
Blanches as it is located above the northern limit of allocation and out of bounds
for the forest products industry.

- In a series of emails dated December 12, 2013, Shane Moffat and Richard Brooks
of Greenpeace Canada disseminated the defamatory press release, "Canada's
Largest Logging Company Resolute Loses Three Sustainability Certificates
Proving Forests Mismanaged," to, among others, Harlequin Enterprises Ltd.,
Lowe's and Unisource Worldwide. The press release further alleged that
Resolute needs to "rethink their approach and avoid risking the economic viability
of communities and the health of the forest." The press release misrepresented
that issues at play were in Resolute's ability to resolve, even though the issues
that led to these limited suspensions were the responsibility of the provincial
government, not Resolute. Greenpeace Canada likewise failed to disclose that
notwithstanding the limited suspensions, Resolute continued to be one of the
largest holders of FSC certificates in North America and was harvesting in full
compliance with the rules and regulations of the Quebec Government.

242.    In 2014, the Enterprise prevented Resolute from securing a large contract with

one of the world's leading manufacturers of tissue paper, Georgia Pacific. Fearing that dealings

with Resolute might put them in the Enterprise's sights, Georgia Pacific abandoned negotiations

for a large contract with Resolute.

243.    This pattern continued throughout 2014, 2015 and to present. During this period,

the Enterprise ubiquitously disseminated the "Resolute: Forest Destroyer" lies to, among others,

the following Resolute customers: Seaman Paper, Penguin Random House, Flambeau River

Paper, Twin Rivers Paper Company, Wausau Papers, Wegner Media, Kruger Products, McGraw

Hill, Newsmedia UK, Workman Publishing, and Midland Paper. In addition, these lies were

accompanied by demands that these customers stop doing business with Resolute and explicit

1    and implicit threats to target them with such lies if they did not do so.   By way of example, in

2    January 2014, Joanna Kerr and Stephanie Goodwin of Greenpeace Canada separately wrote to

3    Flambeau River Paper and Seaman Paper, respectively, falsely associating Resolute with "forest

4    degradation and destructive practices."  Moreover, the Enterprise falsely claimed that Resolute

5    "has a record of unsustainable operations" which it misleadingly suggests is corroborated by the

6    suspension of three FSC certificates.  The letter further singles out Resolute for "threaten[ing]

7    wildlife at risk such as the woodland caribou," and operating in "Endangered Forests of

8    extraordinary high ecological value."

9        244.   On May 20, 2014, the Enterprise, through Amy Moas of Greenpeace USA, wrote

10    to Midland Paper, accusing Midland of links to Resolute, which Moas described as one of the

11    "most destructive paper producers in the world" and purported to support these claims with links

12    to the "Resolute: Forest Destroyer" campaign page.   Moas warned that Midland "is carrying a

13    heavy reputational risk by sourcing from . . . Resolute Forest Products," and closed by "strongly

14    urg[ing]" that Midland allow Moas and "one of [her] Canadian colleagues" to speak with

15    Midland.  In direct response to Moas's letter, Midland demanded a response from Resolute,

16    which provided point-by-point rebuttals of Greenpeace's allegations.  Throughout 2014 and

17    2015, Moas, in collaboration with Shane Moffatt of Greenpeace Canada, frequently

18    communicated misrepresentations to Midland, including in a February 26, 2015 email that

19    falsely associated the termination and suspension of three of Resolute's FSC certificates with

20    unsustainable practices and forest mismanagement.

21        245.   The Enterprise, through Pat Venditti of Greenpeace U.K., sent similar

22    correspondence to Northern & Shell, Trinity Mirror Plc, DMG Media, and News U.K. by

23    separate letters dated February 2, 2015, each misrepresenting that "Resolute is involved in forest

24    destruction and degradation in some of the most ecologically and culturally important areas of

25    Canada's Boreal Forest," engages in "unsustainable forestry practices which threaten endangered

26    species such as woodland caribou," and are "unwilling to do the 'minimum amount' required by

27    science to conserve this species."  Consistent with its playbook, the Enterprise misrepresented

28    that their allegations of unsustainable practices and forest mismanagement are corroborated by

the suspension of three FSC certificates, when in fact, the Enterprise was well aware that the two terminations and one suspension related to issues that the Quebec's Minister of Forests, Fauna and Parks, as well as the Premier of the Province repeatedly stated that the issues were the responsibility of the provincial government, not Resolute.  On the basis of these misrepresentations, the Enterprise warned that Resolute was "a controversial, high risk source of forest products, including newsprint," and made explicit that this "high risk" could be avoided if these companies instead did business with "alternative, environmentally and socially responsible suppliers."  To illustrate the "high risk" to these Resolute customers, the letter attached Moas's and Moffat's "Better Buying in the Boreal" report targeting and purporting to "expose" Best Buy for sourcing from Resolute, and noted that as a result of the report, Best Buy "meaningfully shifted" business away from Resolute.  The letters did not disclose that Resolute was as "environmentally and socially responsible supplier" as any other in the boreal or elsewhere, and, in fact, by any objective measure was one of the most environmentally and socially responsible, as evidenced by the fact that it remains one of the largest holders of FSC certificates in North America and has won dozens of awards for its sustainable practices.

### iii. The Enterprise Publicly Attacks Resolute's Customers and Industry Relationships.

246.    At the same time that the "Resolute: Forest Destroyer" campaign privately targeted certain Resolute customers, the Enterprise simultaneously targeted other large Resolute customers through high profile, highly inflammatory reports, blog posts, and other internet publications.  The objective of this campaign was to exploit the false public narrative of the "Resolute: Forest Destroyer" campaign and leverage it to publicly intimidate, pressure, and shame these significant customers into terminating their business relationships with Resolute.  Targets of this campaign included 3M, Best Buy, Quad Graphics, and Rite Aid.

### 1) 3M

247.    The Enterprise's first public target was 3M.  Enterprise member ForestEthics initiated the attack in 2009 by issuing a series of reports which falsely accused 3M of sourcing materials from the last remaining endangered forests, including Canada's boreal forest.  Beginning in the spring of 2014, Greenpeace joined ForestEthics with an April 29, 2014

1    sensational and false post by defendant Amy Moas titled "Exposed: 3M Sourcing From Forest

2    Destruction" which reported that Greenpeace was "proud to stand with . . . our ally,

3    ForestEthics" and joined their "demand that 3M immediately stops sourcing [products] from

4    forest destroyers" like Resolute and instead source only from "responsible sources."  Associating

5    Resolute and the Canadian Boreal forestry with allegedly highly destructive rainforest and other

6    forestry and industrial development in South America, Asia, and Russia, the report falsely asserts

7    that "logging is the single greatest threat to caribou survival" and "is pushing woodland caribou

8    to the brink of extinction."

9        248.    The attack and continuing extortive threat on 3M succeeded when, on March 6,

10   2015, 3M announced a new paper sourcing policy, which the Enterprise, through defendant Skar

11   of Greenpeace USA, immediately announced in a report, singling out Resolute, "3M has notified

12   controversial logging giant Resolute Forest Products that it will need to comply with its new

13   sourcing standards or lose business," and days later, on March 18, 2015, 3M informed Resolute

14   after "work[ing] with ForestEthics and Greenpeace . . . we are not pursuing new business with

15   Resolute."  The report was featured on defendant Greenpeace International's website.  By the

16   fall, the Enterprise successfully pressured 3M to terminate all previously existing business with

17   Resolute which Resolute learned on October 12, 2015, when 3M informed Resolute it was

18   eliminating it from its supply chain due to the "continued controversy" with Greenpeace.

19                    **2)    Best Buy**

20       249.    During the same period, the Enterprise targeted Resolute's business relationship

21   with Best Buy.  On November 26, 2014, Shane Moffatt of Greenpeace Canada, in collaboration

22   with defendant Moas of Greenpeace USA, published "Better Buying In The Boreal Forest."

23   That same day, defendant Moas also published "Best Buy is Wasting Ancient Forests, One Flyer

24   At A Time."  Both reports specifically targeted Best Buy's supply relationship with Resolute

25   based on the "Resolute: Forest Destroyer" campaign's central lies.

26       250.    In "Better Buying in the Boreal Forest," Moffatt and Moas misrepresented that

27   Resolute was a "controversial logging company" that "is an outlier in the Canadian forest sector"

28   because of its "significant degradation of the boreal, destruction of endangered species habitat

1    and disputes with indigenous communities."  They further misrepresented that Resolute "will not

2    do the minimum that science says is necessary to protect our forests" and was "not meeting

3    commitments to ensure caribou survive" and had instead "imperiled woodland caribou" and sued

4    one of its FSC auditors "to silence critics."  None of these claims were true, and the Enterprise

5    members knew they were not true.

6          251.    Nevertheless, the Enterprise explicitly threatened Best Buy with likewise being

7    saddled with the false claim that "[b]y purchasing from Resolute . . ., BestBuy risks using

8    priceless caribou habitat or fibre sourced without First Nation consent."  To avoid such "risks,"

9    Moas and Moffatt made explicit that Best Buy must stop sourcing from Resolute and instead use

10   Boreal "forest product companies in Canada successfully pursuing sustainable, equitable, and

11   economically viable forestry."  Greenpeace, of course, identified none, because the entire

12   predicate of this point was false.  Resolute was not an "outlier" in Boreal forestry, except in so

13   far as it was a leader in sustainable Boreal forestry, or at a bare minimum, practiced forestry that

14   was as "sustainable" as any other company, as protective (and, in fact, demonstrably more

15   protective) to the woodland caribou, and as respectful and collaborative with the indigenous

16   populations.  Resolute's operations in the Boreal, met or exceeded those that were legally

17   required, those required for all available certifications, including FSC certification, and those

18   utilized by other companies operating in the Boreal.

19         252.    Similarly, in her "Best Buy is Wasting Ancient forest, One Flyer at a Time" blog

20   post, the Enterprise, through defendant Amy Moas of Greenpeace USA, endorsed and promoted

21   the "Better Buying" report and further falsely claimed Resolute was not "a sustainable source" of

22   Boreal products because it was "responsible for destruction of vast swathes of Canada['']s Boreal

23   Forest, degrading critical caribou herds, and logging without consent of impacted First Nations."

24   She further confirmed the "risk" predicted in the Greenpeace report by accusing BestBuy of

25   "fueling destruction in Canada's Boreal Forest" by sourcing from Resolute.

26         253.    In connection with the Enterprise's attack on Best Buy, the Enterprise leveraged

27   its ongoing relationships with cyber-hacktivists -- including by presenting at conferences

28   attended by these cyber-hacktivists and sharing information with them directly about their latest

1   campaigns and targets -- to induce these cyber-hacktivists to launch massive attacks against the

2   Enterprise's latest targets and its customers, thereby exerting further pressure on these targets to

3   acquiesce to the Enterprise's demands and endorse their positions.

4      254. Evincing the Enterprise's close collaboration with these groups, the same day the

5   Enterprise launched its BestBuy attack, a Twitter feed associated with the cyber-hacktivist group

6   Anonymous -- which had enterprise member Richard Brooks as one of the few Twitter feeds it

7   "follows" -- retweeted a Brooks tweet announcing the BestBuy attack at or about the same time

8   it announced it had attacked and taken down the website of Resolute, describing it as a

9   "MASSIVE TREE KILLER."  The next day, Thanksgiving, it continued to report that it had

10  taken down Resolute's website, and also reported having attacked and taken done the website for

11  CBFA signatory, FPAC, while simultaneously retweeting tweets by Brooks about the

12  Enterprise's Best Buy attack.

13     255. On the day before Thanksgiving, the same day that Greenpeace launched its Best

14  Buy attack and Anonymous attacked the Resolute website, Best Buy's website began

15  experiencing difficulties that prevented customers from accessing the website.  These difficulties

16  continued on Thanksgiving Day as the Resolute website remained disabled from attack, and the

17  FPAC site was also disabled.  The next day, Black Friday, Best Buy's biggest shopping day of

18  the year, the Best Buy site crashed repeatedly and was taken down.  It remained disabled or

19  degraded for much of the day and into the weekend.

20     256. The initial crash on Black Friday was between approximately 10-10:30 a.m., and

21  it was not reported in the media for several hours later.  With incredibly coincidental or

22  incredibly revealing timing, however, at 9:54 a.m., Enterprise member Brooks, who was being

23  retweeted by the Anonymous group who took down the Resolute and FPAC website, announced

24  on Twitter that the Best Buy website had "crashed" ("Might be the weight of 100 million pounds

25  of wasteful flyers from forests that crashed the site") and again at 10:33 am that it was "down"

26  ("BestBuy down, servers couldn't handle the volume? Or the weight of 100 million lbs of flyers

27  from forest?").  He did not indicate how he happened to be monitoring the website at virtually

28

1    the very moment it began to experience difficulties that morning, or how he quickly concluded it

2    had "crashed."

3         257.    Within days of the denial of service attacks, the Enterprise escalated its campaign

4    against Best Buy.  On December 1, 2014, Greenpeace Canada Program Coordinator, Aspa

5    Tzaras, encouraged activists and volunteers to submit false product reviews on Best Buy's

6    website.  Tzaras wrote:

7              By sourcing vast amounts of paper from the Boreal and Resolute, Best
              Buy risks trashing ancient forests for throw-away flyers.  This is bad news
8              for our climate, bad news for creatures that live in the Boreal like the
              woodland caribou, and bad news for the health and diversity of Canada's
9              ancient forests. . . .  **Write a false product review** on Best Buy's website.
              Be creative and make sure to weave in the campaign issues
10

11   (emphasis added).  In the days that followed, Best Buy received over 52,000 emails and negative

12   product reviews from Greenpeace supporters.

13        258.    The Enterprise's 2014 blitzkrieg attack on Best Buy produced immediate victory.

14   On December 8, 2014, Best Buy publicly announced that it would shift business away from

15   Resolute toward companies that support "sustainable forestry practices," which were the

16   Enterprise words plainly placed in its mouth as a condition of peace.  Enterprise member

17   ForestEthics promised that other companies would soon follow suit, stating "Best Buy is just the

18   beginning."  ForestEthics echoed this doomsday predication in a Twitter post, dated January 13,

19   2015: "In 2015 is some of the biggest brands in the world are going to get as far away frm

20   #Resolute as they can." [sic.]

21        259.    In February 2015, a delegation of representatives of the Canadian government and

22   the governments of Quebec and Ontario visited 3M and Best Buy in Minneapolis, Minnesota to

23   discuss Canada's leading sustainable forestry practices.  Notwithstanding their recognition of

24   Canada's sustainable forestry practices, 3M and Best Buy both declined to resume business with

25   Resolute out of fear of further brand damaging publicity from Greenpeace.

26                        **3)      Quad Graphics and Rite Aid**

27        260.    As promised, Greenpeace USA, Greenpeace International, Greenpeace Canada,

28   ForestEthics, and other Enterprise members continued to press their campaign using the Best

                                    - 99 -

Buy attack as a model.  Beginning in March 2015, defendant Brindis of Greenpeace USA began targeting Quad Graphics, a supplier of Resolute products to Rite Aid and CVS, among others. On March 30, 2015, Brindis sent an email to the CEO of Quad Graphics falsely accusing Resolute of "forest destruction and degradation in some of the most ecologically and culturally important areas of Canada's Boreal Forest" and "unsustainable operations," which Brindis claimed was corroborated by the recent suspension/termination of Resolute's FSC certificates. Brindis concluded by admonishing Quad:  "It is worth noting that Quad's current environmental commitments that do not seek to avoid the use of endangered forests . . .  and treat FSC and SFI equally, represent a risk to your company and your customers."  Quad immediately forwarded the email to Resolute and demanded a response.

261.     Importantly, Brindis knew the statements were false when made.  The terminations were not due to "serious shortcomings," but resulted from natural expirations of a five year term.  As an "issue expert" in the Canadian Boreal Forest who holds out his "portfolio" as including the FSC certification scheme, Brindis knew or recklessly disregarded the fact that FSC certifications have five year terms, and that the "terminations" resulted from natural expiration of the five year term.  Moreover, if there was any doubt, a press release issued by Rainforest Alliance months earlier on December 31, 2014 stated that the Mistissini-Peribonka FSC certificate in Quebec "reached the five-year expiration date of the certification agreement on December 3, 2014 and therefore the certificate status changed from suspended to terminated in the FSC system."  Likewise, the January 13, 2015 press release announcing the termination of Resolute's Caribou Forest FSC certificate in Ontario clearly stated:  "[A]ll FSC certificates have a term of 5 years prior to renewal or expiration.  In the absence of any renewal or transfer process, the Caribou Forest certificate has expired and thus terminated."  Moreover, Brindis likewise knew that Lac St. Jean suspension was due to narrow issues that were the responsibility of the Quebec Government, not Resolute, as the Quebec Government has repeatedly and publicly stated.  Finally, with respect to the suspended Black Spruce FSC certificate, Brindis knew and recklessly disregarded a February 4, 2014 Rainforest Alliance press release announcing a new

audit pursuant to a settlement agreement with Rainforest Alliance, but failed to disclose this, notwithstanding that his email referenced the lawsuit with Rainforest Alliance generally.

262.    Within weeks, the Enterprise followed through on its threat to Quad Graphics and began targeting Quad Graphic's customers directly.  In early April 2015, Rite Aid was informed that Greenpeace was preparing to launch a campaign against Rite Aid and was in the process of distributing a presentation targeting Rite Aid's links to Resolute to canvassers who would make public appeals for donations to combat deforestation.  Days later, Greenpeace sent a power-point presentation directly to Rite Aid corporate falsely accusing Resolute of destroying the last remaining intact forests in the Boreal and harming woodland caribou.  Rite Aid was concerned about negative publicity in light of an upcoming board meeting.

263.    Greenpeace immediately exploited Rite Aid's concerns.  On April 15, 2015, defendant Brindis published a blog post on Greenpeace USA's website titled "Rite-Aid Making the Wrong Choice For Ancient Forests."  The report targeted RiteAid's sourcing of paper from Resolute through Quad Graphics stating, "Quad Graphics, the printer that uses millions of pounds of paper a month to create Rite-Aid's throw-away flyers and junk mail, is one of the largest customers of Resolute Forest Products, a company with a controversial environmental record."  In addition, the report falsely accused Resolute of "logging in the last undisturbed ancient forests in Quebec and Ontario, some of which is threatened Woodland Caribou habitat" and criticized Resolute for "ongoing conflicts with Indigenous First Nations."

264.    More significantly, the April 15, 2015 post attached mock-ups of Rite Aid circulars which falsely implied that Resolute was committing the following destructive practices: (i) "Caribou Herd Death Spiral – Destroy One Destroy Another One Free!"; (ii) Logging on Indigenous Peoples Land Without Consent"; (iii) "Destroying Endangered Forests – Destroy One Destroy Another One Free!"; and (iv) "Buzzcutting Bird Breeding Grounds."  Defendant Brindis reiterated these same falsehoods in another post, "How Rite Aid and Other Customers of Boreal Forest Products Can Support Real Solutions," published two days later, which implored Rite Aid to make "better buying decisions," because "[d]espite the appealing Buy one get one free offer, throwing away endangered forests is always a bad deal."

265.     Two days later, defendant Brindis issued a follow-up post "How Rite-Aid And Other Customers of Boreal Forest Products Can Support Real Solutions," which asserted -- without any support or basis -- that FSC is the only "credible certification" and falsely accused Resolute of abandoning FSC certification, citing Resolute's 2014 Form 10-K filed in March 2015 as putative support.

266.     Resolute immediately rebutted these false allegations.  By letter dated May 21, 2015 (the "May 2015 Letter") sent to the Board of directors of Greenpeace USA and defendant Brindis, Resolute outlined the numerous falsehoods in Brindis's blog posts and direct communications with Resolute's customers.

267.     First, Resolute refuted Greenpeace's allegations that the FSC had terminated four FSC certificates as a result of "serious shortcomings."  To the contrary, Resolute explained that two of the FSC certificates in question had a five-year term and thus the certificates naturally "terminated" when those terms expired.  With respect to the "suspended" certificates, one was subject to a new audit.  The other certificate was suspended because of two issues that are the responsibility of the Quebec Government, and completely outside the control of Resolute: (i) a territorial dispute between two First Nations and the Quebec Government; and (ii) an auditor deemed a caribou recovery plan developed by the Quebec Government inadequate.  Neither putative basis for the suspension called into question Resolute's conduct, and three of the four certificates Brindis referenced did not involve any shortcomings whatsoever.   Moreover, with respect to the adequacy of the caribou recovery plan, the Quebec Government had publicly acknowledged its responsibility to address these questions.

268.     Resolute likewise refuted Greenpeace USA's and Brindis's claim that Resolute is "destroying endangered forests" and "involved in forest destruction and degradation in some of the most ecologically and culturally important areas of Canada's Boreal Forest," explaining that less than 1% of the Canadian boreal forest where Resolute operates is harvested each year – and Canada's forestry laws and regulations are among the most stringent in the world.  In addition, 100% of the forests Resolute manages are independently certified by internationally recognized sustainable forest management standards.

269.     Moreover, Resolute demonstrated the falsity of Greenpeace's and Brindis's claim that Resolute is causing a "Caribou Herd Death Spiral," pointing out that approximately three-quarters of the woodland caribou's habitat in Quebec and Ontario is above the "northern limit of allocation" and therefore wholly inaccessible to Resolute and other participants in the forest products industry.  Rather, far from contributing to the "death spiral" of caribou herds, Resolute has been a leader in implementing Provincial Caribou Conservation Plans.  In furtherance of this objective, Resolute's forest management plans provide for the identification and protection of critical areas such as calving grounds, the development of road management strategies, and natural and planted forest regeneration.

270.     Finally, Resolute demonstrated that to convey the false impression that Resolute has abandoned its commitment to FSC certification, Greenpeace doctored the quote from Resolute's 2014 Form 10-K filed, citing only the portion of the 10-K which stated: "[Resolute's] prior FSC commitment is no longer realistic or appropriate."  Importantly, Greenpeace failed to disclose that Resolute remains one of the largest holders of FSC certificates in Northern America which was explicitly stated in Resolute's 2014 10-K.  In fact, read in context, the complete passage from Resolute's 10-K stated:

> [W]e continue to be one of the largest holders of FSC SFM [Sustainable Forest Management] certificates in North America and have successfully renewed our FSC certificates in several areas, including the Mauricie, Abitibi and North Shore regions of Quebec.  However, a previously stated goal to certify 80% of our management forests to the FSC standard is no longer realistic or appropriate considering recent developments and interpretations … We remain fully committed to 100% certifications to one or more of the three internationally-recognized SFM standards in use in Canada.

271.     Nevertheless, Greenpeace USA continued to disseminate these lies in new blog posts.  Between July 21, 2015 and July 28, 2015, defendant Moas of Greenpeace USA published three separate blog posts which accused Rite Aid of "Still Making the Wrong Choice For Forests" and "Destroying Canada's Boreal Forest."  The posts criticized Rite Aid for "ignor[ing] what the best science tells us: the Canadian Boreal forest is at risk and Rite Aid's supplier, Resolute, is making a bad situation worse," by "cutting out the heart of the forest," "needlessly destroying critical habitat of the endangered woodland caribou and at times logging in the

Indigenous Peoples' territories without their consent."  On the basis of these falsehoods, defendant Moas implored Rite Aid to "make the Rite Choice," and stop "turning a blind eye to the forest destruction behind its throwaway flyers."  The Enterprise reiterated these same falsehoods on Facebook and Twitter using the hashtag #RiteAidWrongChoice.

272.    The Enterprise threatened to employ similar public shaming tactics against one of Resolute's largest and most important customers, The Home Depot, Inc. ("Home Depot").  In or around August 2014, Enterprise member Richard Brooks approached Home Depot and threatened to resort to market campaigns and in-store demonstrations just as it had done to Best Buy if Home Depot continued to source paper from Resolute.  In response, Home Depot publicly agreed to engage in discussions with Greenpeace to "ensur[e] their paper and solid wood suppliers are practicing responsible and sustainable forestry."

273.    Greenpeace and the other Enterprise members have also communicated the same materially false, misleading, and defamatory claims to numerous other actual and potential customers not yet known specifically by Resolute because of the surreptitious nature of the communications.

### iv.    The Enterprise Continues To Misrepresent The Impact Of Resolute's Harvesting Activities

274.    In February 2016, Greenpeace Canada and Greenpeace USA published "Endangered Forests in the Balance: The Impact Of Logging Reaches New Heights In The Montagnes Blanches Endangered Forest" and "Certification Update: Montagnes Blanches Endangered Forests" and "Certification Update: Montagnes Blanches Endangered Forest" (the "Montagnes Blanches Reports"), respectively.  Consistent with the Enterprise's prior publications, the Montagnes Blanches Reports associates Resolute's harvesting with the destruction of the last remaining intact forest landscapes in Quebec.

275.    The Endangered Forests In The Balance Report opens with the false and misleading claim that "Canada leads the world in loss of intact forests, with 21% of intact forest loss worldwide between 2000 and 2013 occurring in Canada."  However, the non-peer reviewed web link Greenpeace purports to cite in support of this alarmist charge indicates only the cumulative impact of intact forest loss for Russia, Alaska, and Canada.  Moreover, Greenpeace's

- 104 -

source clearly states Intact Forest loss in the Amazon is 25%, which is larger than the 21% Greenpeace attributes (without any basis) to Canada which Greenpeace falsely labels the "lead in world loss." Tellingly, when the data Greenpeace cited finally became part of scientific literature (Potapov et al., "The last frontiers of wilderness: Tracking loss of forest landscapes from 2000 to 2013," Sci. Adv. (Jan. 13, 2017)), the data indicates that all of North American temperate and boreal forest (i.e. all US **and** Canada) represented 19% of global loss of intact forests. The publication further indicates that of the 19% cumulative loss, 11.5% was due to loss other than from wildfire. The same study shows that only 1.88% of IFL loss in North America is attributable to harvesting. More significantly, the same report shows that in contrast to leading the world in intact forest loss, the Northern American northern boreal forest lost a lower fraction of its intact forest landscapes than any of the seven largest intact forest landscape regions on Earth.

276. The Endangered Forest In The Balance Report continues by falsely charging that "[b]etween 2000 and 2013 . . . nearly 50% of the Intact Forest Landscapes in the Montagne Blanches Endangered Forest have been lost or degraded," and that Resolute's "logging operations are central to the fate of the Montagnes Blanches Endangered Forests." The Enterprise fails to disclose that to support these false charges it unilaterally expanded the borders of the Montagnes Blanches beyond the historically-delineated boundaries to include large portions of Resolute's forest management units. In fact, Resolute does not harvest in the historically delineated Montagnes Blanches. However, even accepting Greenpeace's expanded borders, 90% of the intact forest landscapes in Quebec are above the Northern Border and are off-limits to forestry companies including Resolute, and thus Resolute's harvesting is in no way tied to the fate of Quebec's last remaining intact forest landscapes.

277. Finally, the Enterprise continues to associate the suspensions and terminations of limited FSC certificates with forest mismanagement. Notwithstanding Resolute's detailed explanation, given months earlier, concerning the circumstances surrounding the limited suspension of two FSC certificates, the report failed to disclose that Resolute continues to be one of the largest holders of FSC certificates in North America, and that the limited suspensions were

due to issues outside of Resolute's control which the Quebec Government had publicly accepted

responsibility to address, and indicated no shortcomings on the part of Resolute.

278.    Greenpeace USA's February 2016 report "Certification Update: Montagnes

Blanches Endangered Forest," is replete with these same knowing falsehoods, likewise

associating the suspension and termination of FSC certificates with forest mismanagement and

destruction of the last remaining intact forest landscapes, notwithstanding detailed explanations

by Resolute and the Quebec Government stating that that the issues which led to the suspension

of one FSC certificate was the responsibility of the provincial government, not Resolute.

279.    Throughout March and April 2016, Greenpeace USA and Greenpeace Canada

disseminated the false and misleading Montagnes Blanches Reports directly to several of

Resolute's critical accounts, including Workman Publishing, Penguin Random House, McGraw

Hill, Midland Paper, and News Corp, among others.  For example, in a March 23, 2016 letter to

McGraw Hill, defendant Moas of Greenpeace USA falsely describes Resolute as "a logging

company at the heart of the controversy related to forest destruction in the Endangered Forests of

Quebec and Ontario," and associates Resolute with ongoing "loss of intact forests and decline of

the endangered woodland caribou in Montagnes Blanches Endangered Forest."  Ms. Moas

further alleged that between 2000 and 2013 "7% of the intact forests in the areas [managed by

Resolute in Ontario] have been lost."  Based on these claims, Moas implored McGraw Hill "to

identify alternative suppliers, including in the Canadian Boreal, who can meet your expectations

and safeguard the future of the forests" again without revealing that Resolute was at a minimum

equal to any alternative suppliers in the Boreal.

280.    Likewise, on April 19, 2015, defendant Moas of Greenpeace USA, together with

Richard Brooks of Greenpeace Canada, followed up on previous communications with Midland

Paper, reiterating "we very much remain concerned about your association with Resolute Forest

Products."  The email attached the Montagnes Blanches Reports and falsely stated: "The

Montagnes Blanches is a key battleground for the health of the Boreal forest because of the

operations of one company in particular, Resolute Forest Products."

281.    As intended, customers immediately expressed concerns about sourcing products from Resolute mills in the region misrepresented as "Montagnes Blanche Endangered Forest." Specifically, on April 21, 2016, News Corp emailed Resolute, "How much of the paper that we purchase from you . . . comes from the areas that Greenpeace is complaining about?" and inquired "[c]an we eliminate [Resolute's Alma mill] all together from our supply mix?"  In response, a Resolute executive assured News Corp: "I don't believe that eliminating mills is the answer, we would just be playing into their hands and giving into their tactics."  Nevertheless, News Corp replied, that they were "more concerned with [Greenpeace] them leaving [Harper] alone."  News Corp's fears would soon become a reality.  In early May 2016, the Enterprise informed News Corp that it would be contacting the authors for Harper Collins directly to pressure them to cut all ties with Resolute.

### v.    The Enterprise Targeted Resolute's FSC Certifications

282.    The Enterprise targeted Resolute's FSC certifications by appealing to FSC directly and by seeking to improperly influence FSC's purportedly independent third-party auditors.

283.    The FSC is an international non-profit association, of which Greenpeace is a founding member.  FSC's membership includes other environmental organizations, indigenous peoples and several forest products producers and retailers.  The FSC promulgates standards for responsible forest management, and maintains a global forest certification system for forests and forest products.  As a result of lobbying and promotion by ENGOs, FSC certification has become an accepted mechanism for companies that rely on forest products to manufacture consumer goods to signal to their supply chain and end purchasers that they are committed to recognized sustainability practices.

284.    In or about 2008, Resolute committed publicly to obtain 100% certification of its managed forest from predominant North American certification standards, including FSC, that certify forest management practices.  By September of 2008, Resolute obtained its first FSC certification for three of its forest units.  Less than four years later, Resolute had become the world's largest holder of FSC certificates.  On June 20, 2012, Resolute announced that an

1  additional 7.9 million acres of forest lands in the Lac-Saint-Jean region of Quebec met the FSC

2  Boreal Standard, raising the total area of Resolute-managed FSC-certified forests in North

3  America to 25.6 million acres, an area almost twice the size of Nova Scotia and larger than

4  Portugal, Hungary or South Korea.

5        285.    Resolute's commitment and successful implementation of the FSC pledge it made

6  to Greenpeace entities and the other ENGOs was a surprise and, to these Greenpeace entities, a

7  problem because it impaired their ability to threaten Resolute customers with being tarred by

8  false accusations about Resolute when many of Resolute's Boreal products were certified by the

9  specific certification standard the Enterprise and the other ENGOs promoted as the gold standard

10 (FSC Forest Management standard and FSC Controlled Wood Standard).  It was essential for the

11 Enterprise to manufacture a crack in Resolute's FSC armor.  To do this, it schemed to procure

12 the loss or suspension of at least some of Resolute's FSC certifications.  And it crafted many

13 elements of the "Resolute: Forest Destroyer" campaign to accomplish this goal.

14       286.    This campaign which was explicitly outlined in the Enterprise's operational

15 memorandum, began in July 2012, within weeks of the announcement that Resolute was the

16 largest holder of FSC certifications in the world.  In response to that news, the Enterprise

17 immediately filed a false and misleading complaint with the FSC, alleging, among other things,

18 that Resolute was not in compliance with the FSC standards as they relate to the Caribou Forest

19 tenure in Ontario.  Specifically, the FSC complaint, echoing what would become the mantras of

20 the "Resolute: Forest Destroyer" campaign, falsely alleged that Resolute had not:  (a) properly

21 identified and protected High Conservation Values; (b) adhered to the Precautionary Principles

22 in relation to the woodland caribou management; (c) adequately protected area plans; or (d)

23 appropriately consulted with interested parties.

24       287.    Rainforest Alliance was retained to conduct an independent audit of the disputed

25 areas.  However, the Enterprise contaminated the independence of the audit through, among

26 other means, the "emotionalizing pressure" its "Forest Destroyer" campaign was designed to

27 generate and through other forms of direct and indirect communication and influence.  The result

28 was a disparate and unprecedented audit and result.

288.    The Enterprise's campaign had its intended effect.  On December 17, 2013, the Rainforest Alliance announced that it would be suspending two Resolute FSC certificates. ForestEthics immediately spread the news of the Enterprise's success via Twitter, "Canada's largest forest company, Resolute Forest Products, loses several ecocertifications [sic] #FSC," and subsequently tweeted "Grand Council of the Crees wins suspension of Resolute Forest Products' #FSC Certification."  The Enterprise, including defendant Amy Moas, also spread the news through false tweets that misrepresented that the suspensions were due to "the violation of strict #sustainability standards" and commended the FSC for "stop[ping] the destruction."

289.    As set forth more fully above, the Enterprise would continue to pressure and influence the FSC and its auditors and cause highly disparate and more demanding standards to be applied to Resolute than any other holders of FSC certificates.

### vi.    The Enterprise Targeted Government Regulators.

290.    The Enterprise sought to exert similar pressure on government regulators to implement additional regulatory requirements governing forestry practices.  Accordingly, on June 27, 2009, the Enterprise staged a protest at the Ministry of Natural Resources in Quebec City.  While the demonstration targeted the Government of Quebec, the Enterprise specifically and intentionally sought to draw the regulators' attention to Resolute's predecessor's logging and forestry practices by utilizing Resolute wood products taken from the company's Chateau-Richer sawmill during their protest activities.

291.    Moreover, on June 10, 2015, the Enterprise emailed Peter Politis, Mayor of the Town of Cochrane, reiterating its concerns "about the sustainability of [Resolute's] forestry operations and their impact on the ecological health of our public forests."  Significantly, the Enterprise falsely represented to Politis that its "concerns have been validated by the Forest Stewardship Council and their independent auditors" suspension and/or termination of four FSC certifications.  Yet, as set forth above, the suspension and termination of Resolute's FSC certifications was a direct result of the Enterprise's disinformation campaign.  Accordingly, the Enterprise's attempt to cite the FSC's actions -- which they themselves had influenced -- as

independent verification of the lies they had been, and continued to disseminate, was intentionally false and misleading and designed to harm Resolute.

292.    The June 10, 2015 email to Politis further stated, without any basis, that Resolute "seem[s] unwilling to do anything about [sic] other than rile up communities and threaten organizations with lawsuits."  The email concluded by falsely alleging that Resolute "has troubling relationships with some (not all) First Nation communities" and wrongly accused Resolute of "laying off thousands of workers, while other companies, like Domtar and Canfor, are increasing their workforces."

**vii.      The Enterprise's Other "Bad Acts"**

293.    The Enterprise engaged in additional overt acts in furtherance of its efforts to broadly disseminate falsehoods about Resolute, cause harm to Resolute's business and reputation, and generally promote its agenda with respect to forest management.

294.    On March 18, 2014, ten Greenpeace activists and a group of volunteers embarked on a publicity stunt to shun "Resolute's destructive logging practices."  The Enterprise members transformed the iconic Mount Royal Cross overlooking Montreal into an "immense scales of justice."  Two giant scales were suspended from the arms of the cross.  The heavy side was depicted with the Resolute logo.  By contrast, the lighter side of the scale represented the forest and the communities and wildlife that depended on it.  Running vertically along the cross was a twelve meter banner which posed the question: "Justice?"

295.    Similarly, around this time, the Enterprise launched a public campaign "The Stand For Forests" pledge.  The campaign -- which amounted to nothing more than another publicity stunt to disseminate the Enterprise's false lies about Resolute -- falsely accused Resolute of "put[ting] the health of the Boreal Forest at risk with its destructive logging practices" and purported to "call for people to come together . . . even if it means facing a $7 million lawsuit" and sign a pledge "as a symbol of shared resolve to protect Canada's Boreal Forest from Resolute's clear-cutting."  The product of the Stand for Forests Campaign was a "guardian tree," which was ultimately presented to Resolute at its corporate headquarters in Montreal on May 22,

1    2014.  As evidence of the widespread impact of the Enterprise's misinformation campaign, the

2    guardian tree was signed by 61,000 activists and supporters.

3           296.    The Enterprise has also employed on-the-ground tactics aimed at harming

4    Resolute's relationships with key constituents.  On May 29, 2015, Greenpeace activists,

5    including enterprise member Richard Brooks and defendants Matt Daggett and Rolf Skar,

6    travelled to Augusta, Georgia to communicate falsehoods about Resolute to Resolute's Board of

7    Directors, shareholders, customers, members of the media and financial sectors, and the public

8    alike.  Greenpeace advertised their plans in advance in order to recruit Greenpeace supporters to

9    participate in Greenpeace's "Thunderclap" campaign, thereby facilitating the transmission and

10   display of thousands of messages to Resolute's "most important event of the year."  On May 22,

11   2015, defendant Daniel Brindis wrote:

12              On the 29th of May, the company is holding its Annual General
                Meeting in Augusta, Georgia – the most important event of the
13              year where company leaders and shareholders will meet to review
                their annual plans.  This is also our opportunity to ask Resolute to
14              make protecting the Boreal Forest a key priority for the upcoming
                year. . . We need you to take part in our global Thunderclap
15              Twitter action to shout as loud as we can . . . Sign up using your
                Facebook or your Twitter Account adding your voice to our global
16              tweet and on the day of the AGM, your message and your name
                will automatically go live to the event.
17

18   Greenpeace later touted the success of their demonstration at the Resolute Annual Meeting:

19              Five Greenpeace activists trekked to Augusta, Georgia, USA from
                several corners of North America to deliver some simple messages
20              to the senior management and board of Resolute Forest Products
                . . . We were accompanied, digitally, by people across five
21              continents and from countries as diverse as Brazil, India, New
                Zealand, Spain, Thailand, Turkey, the United States, and Canada.
22              Their messages were projected on site to the company's
                shareholders and directors. . . . We delivered our messages loud
23              and clear.  Resolute senior managers and board heard us.

24          297.    In August 2015, ForestEthics again tried to undermine Resolute's participation in

25   the CBFA and its relationship with its critical stakeholders which were its partners in that

26   agreement.  In an open warning letter addressed to Resolute's CEO, Richard Garneau,

27   ForestEthics publicly accused Resolute of "refusing to co-operate" in the CBFA and purported to

28   unilaterally dismiss Resolute from the CBFA.  In response, Garneau rebutted ForestEthics'

- 111 -

1    allegations of noncompliance, and exposed the underlying purpose of ForestEthic's

2    correspondence, stating "this is just your business model: find the largest company in the

3    industry and threaten, malign, isolate and attack them until they back down.  Then use that

4    success to drive others in the industry to do the same."

5            **viii.**        **The Enterprise's Continued Misconduct.**

6         298.    On May 31, 2016 Resolute commenced this lawsuit and exposed the Enterprise's

7    years-long illegal and malicious campaign against Resolute, its customers, and critical market

8    constituents.  The complaint and expert declarations of renowned scientists Peter Reich Ph.D and

9    Frederick Cubbage Ph.D filed in November 2016, demonstrated the falsity of the Enterprise's

10   false and misleading allegations, with extensive citations to scientific studies and evidence.

11        299.    For instance, Professor Reich, a recipient of the Nobel Prize equivalent in forest

12   ecology (BBVA Foundation Frontiers of Knowledge Award in Ecology and Conservation

13   Biology) demonstrated that the Enterprise misrepresented Resolute's activities as deforestation

14   with a concomitant adverse impact on climate changes by exhibiting a "fundamental disregard"

15   for the distinction between timber harvest (which removes trees but results in new, replacement

16   trees; forest remains forest) which actually slows climate change, and deforestation (where trees

17   are removed or burned, and no or very few trees are remaining), which may contribute to climate

18   change.  As putative experts who claim to have "developed an expertise in matters related to the

19   protection and conservation of Canada's Boreal forest," Greenpeace clearly knew, or could have

20   easily determined, that deforestation and the accompanying climate effects are currently

21   occurring almost entirely in the tropics, and are not occurring in the Boreal.  By contrast,

22   Canada's managed Boreal forests are harvested and remain forested, and thus actually slow

23   climate change rather than aggravating it.

24        300.    In addition, Professor Reich concluded that the "scientific evidence" Greenpeace

25   purports to rely on to support their false claims about climate change are "weakly related" and

26   "largely irrelevant to the issues at hand."  While Greenpeace cites a 1998 study based on

27   computer modeling of hypothetical forest landscapes with limited focus on the regions in

28   question, a more recent (2013) and comprehensive paper led by the same scientist, which relied

on observed data, rather than a computer simulation to evaluate the climate impacts of Canada's managed Boreal forest, concluded that managed Boreal forest is having a slight *cooling* effect on global climate, helping rather than further warming the planet.  As organizations that hold themselves out as "experts," and claims to base its campaigns on the "best available science," a strong inference must be drawn that Greenpeace either intentionally failed to disclose or recklessly disregarded the 2013 study which flatly contradicts its false allegations about Resolute's impact on climate change.

301.    Professor Reich concluded that the putative "scientific evidence" Greenpeace purports to rely on to support its claims that "[f]orest degradation unlocks the carbon stored in the soil in a variety of ways that scientists are still exploring," and that "[w]hen boreal forest vegetation or soils are disturbed, carbon is released, accelerating climate change," is likewise irrelevant to whether disturbance of *Boreal* forests releases carbon.  Rather, the studies Greenpeace cites involve the tropics, not the Boreal.

302.    Finally, Professor Reich concluded that the Enterprise's claims that Resolute is causing the "extinction" or "death spiral" of caribou herds were "gross exaggerations" of any possible impact Resolute may have had on woodland caribou given the low fraction of these regions actually harvested by Resolute (1.53% harvested between 2008 and 2015).  Professor Reich further concluded that it is impossible to disentangle impacts on caribou of Resolute from other forestry companies' operations, wildfires, climate change, road network, expansion, and hunting.  Thus, Greenpeace's allegations were "highly speculative," and "uncertain."

303.    Similarly, the Declaration of Professor Cubbage demonstrates the falsity of the Enterprise's claim that the FSC's suspension of three of Resolute's certificates in Quebec and Ontario indicate unsustainable practices with substantial adverse global impacts especially in light of the facts that: (i) 100% of Resolute's forests are independently certified by third parties, either the FSC or SFI; (ii) the regions where Resolute harvests in Quebec and Ontario are already under extensive federal and provincial regulations mandating sustainable forest management; and (iii) the reasons for the three suspensions were highly technical and in no way related to Resolute's sustainable forest management but relate to issues for which the Quebec government

1   has responsibility.  Thus, Professor Cubbage concluded:  "None of the issues identified by the

2   FSC indicate anything – negative or positive – about the sustainability of Resolute's forest

3   management practices," nor can one "reasonably draw any general inferences regarding

4   Resolute's operations (or caribou, or First Nations, or community support) from these three

5   specific forests."

6       304.    Notwithstanding these corrective disclosures, in December 2016, the Enterprise

7   launched a renewed campaign based on the same knowingly false allegations.  By letter dated

8   December 16, 2016, defendant Amy Moas of Greenpeace USA and Shane Moffatt of

9   Greenpeace Canada jointly wrote to numerous Resolute customers, including Macmillan

10  Publishers, Holtzbrinck Publishing Group, Penguin Random House, Hachette Book Group, and

11  Scholastic, reiterating the knowingly false and rebutted allegations that Resolute is operating in

12  the Montagnes Blanches, is the "driving force" "threaten[ing]" and "jeopardizing" the survival of

13  woodland caribou in Quebec and Ontario, "degrad[ing]" and "threaten[ing] Intact Forest

14  Landscapes," and associated the suspension and termination of limited FSC certificates with

15  Resolute's unsustainable forestry practices and forest mismanagement, when in fact, the

16  Enterprise had actual and constructive knowledge that the issues leading to these suspensions

17  were the responsibility of the provincial government, not Resolute.

18      305.    The December 2016 letter attempted to legitimize the Enterprise's campaign and

19  false claims and mislead Resolute's customers into believing that others agreed with the

20  Enterprise's false allegations by manufacturing a petition against Resolute in which only a few of

21  organizations listed have mandates that have anything to do with forestry, and some of the

22  organizations have signed multiple times under different names to create the false impression of

23  support.

24      306.    Resolute responded to these false allegations by letter dated January 12, 2017,

25  demanding that Greenpeace USA and those working in concert with them, including Shane

26  Moffatt and Greenpeace Canada,  immediately cease and desist their false and malicious

27  campaign (the "Cease and Desist Letter").  Resolute reiterated that the malice behind this

28  renewed dissemination of these materially false and misleading claims is particularly clear

because it came after Resolute had demonstrated the falsity of these claims to the Enterprise, including in the May 2015 letter, the detailed allegations of the complaint, and most recently in the unrebutted declarations of renowned independent scientists.

307.    Nevertheless, the Enterprise continued to disseminate these same falsehoods, including in February 2017 correspondences from defendant Moas and Enterprise member Shane Moffatt to executives at Harper Collins U.K. and News Corp.  That same month, Greenpeace UK's Forest Campaign emailed another customer, Wooden Books Ltd., to declare that "Resolute is destroying some of Canada's most vibrant, ancient forests."  In response to these allegations, Wooden Books Ltd. forwarded Greenpeace's email to Resolute, asking for "some more details about this, so we can make an informed decision regarding our paper sourcing going forward."

308.    Then, on May 17, 2017, the Enterprise launched a self-proclaimed "worldwide campaign" against several of Resolute's book publisher customers, including Penguin Random House, HarperCollins, Simon & Schuster, and Hachette, with the publication of the false and alarmist report, "Clearcutting Free Speech: How Resolute Forest Products Is Going To Extremes To Silence Critics Of Its Controversial Logging Practices (the "Clearcutting Report").  Although loaded with footnotes, the Clearcutting Report, like the Enterprise's past publications, miscites the studies it purports to rely on, omits material facts from those studies, and otherwise fails to disclose other relevant facts concerning Resolute's harvesting, including, most significantly, that the Enterprise has misrepresented Resolute as a solo, rogue bad actor that has materially and adversely departed from the positions of its competitors and government, when in fact, other companies are identically situated, or in most cases, less favorably situated, but are nevertheless being promoted as "progressive" good actors with whom Resolute customers should do business with instead.

309.    By way of example only the Clearcutting Report, consistent with the plan outlined in the Enterprise's operational memorandum, misrepresents Resolute as the most regressive forestry company, falsely alleging among other things that:

- Resolute is destroying the last large intact areas of Canada's managed forest.  In associating Resolute with the loss of the last remaining intact forests, the Enterprise fails to disclose that 85% of intact forest landscapes are above the Area of Undertaking (Ontario) and the Northern Limit of Allocation (Quebec) where the law prohibits

harvesting; (b) over 90% of intact forest landscapes in Quebec are either beyond the Northern Limit or in otherwise protected areas.  Of the remaining 15% intact forest landscapes in the managed forest, Resolute is responsible for only a fraction of the harvesting in this region and thus cannot be leading the charge in destroying these regions.

- Resolute's harvesting is negatively impacting climate change.  This false allegation is inextricably intertwined with Greenpeace's false charge that Resolute's harvesting has caused deforestation or permanent forest loss which studies have shown may impact climate.  However, the Enterprise had actual or constructive knowledge of the falsity of these allegations at the time they were made because Resolute informed them that deforestation and the accompanying climate effects are currently occurring almost entirely in the tropics, and are not occurring in the Boreal.  By contrast, Canada's managed Boreal forests are harvested and remain forested, and thus actually slow climate change rather than aggravating it.

- The termination of three FSC certificates corroborate Greenpeace's allegations of Resolute's forest mismanagement. However, in making these allegations, the Enterprise omits the following relevant facts which were previously disclosed in the May 2015 letter, the Complaint, the Reich Declaration and the Cease and Desist Letter:  (i) the two FSC certificates which were terminated were due to natural expirations, not a finding of nonconformance; and (ii) the other certificate was suspended because of two issues that are the responsibility of the Quebec government (a territorial dispute with the Cree nation and inadequacy of the caribou recovery plan developed by the Quebec government), and completely outside the control of Resolute.  Thus, as the Enterprise understood, neither putative basis for the suspension called into question Resolute's conduct, and two of the three certificates the Clearcutting report referenced did not involve any shortcomings whatsoever.

- Resolute obtained three blocks of land from within Montagnes Blanches in an auction scale and harvested them.  However, the Report fails to disclose that this allegation is based on Greenpeace's unilateral expansion of the Montagnes Blanches region beyond the historically delineated borders and the delineation defined by the Government of Quebec in May 2016.  Notwithstanding that the Minister of Quebec had explicitly admonished Greenpeace's expansion of the Montagnes Blanches as "misleading," Greenpeace continues to include Resolute's forest management units in its delineation of the Montagnes Blanches to support its false narrative that Resolute is the most regressive forestry company leading the charge in the destruction of intact forest landscapes.

310.    Defendant Paglia of ForestEthics echoed Greenpeace's admonishment of Resolute's book publisher customers.  In a blog post published on May 18, 2017, defendant Paglia publicly shamed Penguin, Random House, Harper Collins, and Simon & Schuster for "still doing business with Resolute despite the company's destructive logging," and threatened that "other big brands will be increasingly faced with choosing between being loyal to a company like Resolute or living up to their values."

311.    The campaign against the book publishers was presciently timed to coincide with the 2017 Book Exposition at the Jacob Javits Center in New York.  Between May 31 and June 2, 2017, Greenpeace held court at the Book Expo, renting a booth at the Javits Center.  Among

others, defendants Moas, Skar, and Brindis were each observed distributing the false, malicious and misleading Clearcutting Report and misrepresenting Resolute as a rogue, bad actor responsible for destruction in the Canadian Boreal forest: "Forests are crucial for the planet and our voices are vital to protect them.  Right now, both free speech and forests are under threat from Resolute Forest Products, one of the world's largest suppliers of book paper.  Together, we can stop Resolute from silencing us."

312.    Following the Expo, Greenpeace USA continued to use the threat of bad press and boycotts against the publishers to extort endorsements and meetings.  For example, in early June 2017, defendant Moas wrote to the CEO of Simon & Schuster informing her that Moas would be at their headquarters the following Wednesday and expected the CEO to meet with her at a specified time.  Moas warned Simon & Schuster that if it did not confirm the appointment, Moas would still show up at headquarters, but with a photographer in tow, thus putting Simon & Schuster's reputation and customer relations on the line.  Moas further informed Simon & Schuster that it was the only publisher to have declined a meeting with Greenpeace and that prior meetings with other publishers had resulted in substantive agreements.  Fearful of Greenpeace's threats, Simon & Schuster acquiesced to Greenpeace's demands.

313.    Greenpeace USA employed similar tactics against Penguin and Macmillan.  In response to Moas's demand for a meeting, Greenpeace secured a meeting with Penguin executives in Penguin's New York offices in June 2017.  The pressure on Penguin and the threat of negative publicity had its intended effect.  Following its meeting with Greenpeace, Penguin demanded that Resolute commit to moving as much product and production from Alma to Calhoun, but where not possible, Penguin requested FSC certification.  Penguin informed Resolute that if it is not able to commit, Penguin would move to another vendor.  Likewise, Greenpeace met with Macmillan's CEO, John Sargent, on May 31, 2017.  Prior to the meeting, Macmillan requested and participated in a tour of Resolute's Alma paper mill, La Doré sawmill and Boreal operations, so that Macmillan was prepared to respond to Greenpeace's allegations.

314.    One long-time Resolute customer who acquiesced to the Enterprise's extortive tactics was Hachette Livre.  In June 2017, after months-long pressure from Greenpeace USA and

ForestEthics, the CEO of Hachette Livre issued a public statement endorsing the Enterprise's campaign and the "importance of operating in line with the Forest Stewardship Council's sustainability standards," and admonished the "vigor of [Resolute's] legal response to Greenpeace" "as excessive."  Lauding Hachette's capitulation, defendant Moas proclaimed in a Greenpeace press release:  "we look forward to seeing how Resolute resolves this issue," while warning the other major publishers that they "need to move more quickly on this issue to regain the confidence of the half of a million people around the world who have asked publishers to live up the [sic] their promises and ensure forests . . . are not attacked on their watch."  The press release linked to the false Clearcutting Report.

315.   The Enterprise amplified its campaign against the book publishers throughout the summer of 2017.   Beginning in June 2017, Kat Clark of Greenpeace USA reached out directly to authors, seeking their endorsement of Greenpeace's campaign and requesting that the authors pressure their publishers to eliminate Resolute from their supply chain.  The purported basis for this request was the false and misleading allegations that Resolute "has harmed ancient forests, jeopardized the habitat of endangered species, and violated Indigenous People's rights in the Canadian Boreal forest."

316.   Moreover, on June 20, 2017, Amy Moas published on Greenpeace International's website a blog post titled "What happened when we demanded that publishers hear the voices of 500,000 of you."  Consistent with the Enterprise's prior disinformation, Moas falsely associated Resolute with destroying the last remaining intact forests in Canada and threatening endangered woodland caribou, and publicly admonished Resolute's book publisher customers for their lack of response to the Enterprise's demands to eliminate Resolute from their supply chain.

317.   In response, Macmillan demanded that Greenpeace provide the scientific support for its allegations against Resolute.  The response -- after more than five weeks -- set forth in an email titled "The carbon and climate importance of Intact Forest Landscapes" --mixes vague statements that are largely true about forests and their ecology ("Canada's boreal forest, it has some of the last large expanses of undisturbed natural forest, is home to threatened species and is one of the world's largest terrestrial stores of carbon") with innuendo about the putative impact

of Resolute's harvesting ("Resolute Forest Products, one of the largest logging companies in North America, is destroying key areas of this magnificent forest and has abandoned sustainable forestry efforts").  In accordance with its scheme to falsely portray Resolute as the most regressive forestry company, the email did not set forth any facts or scientific evidence to support its lies about Resolute's putative impact on intact forest landscapes and woodland caribou, but instead simply rattled off these continental scale factoids before singling out Resolute as the sole company responsible for the impacts, to the exclusion of other forestry companies that were engaged in identical practices.  To the contrary, as Resolute informed the Enterprise on numerous occasions, and which as putative experts in matters related to the Canadian boreal Forest, Greenpeace would have surely known or could have easily determined, in Quebec and Ontario where Resolute harvests, 85% of intact forest landscapes are above the Northern Border (Quebec) or the Area of Undertaking (Ontario) which are off-limits to all forestry companies, including Resolute.  And in the remaining 15% intact forest landscapes in the managed forests, Resolute's operations constitute a fraction of the cumulative harvesting by forestry companies, and is conducted in compliance with the rules and regulations of the provincial governments that have decided that a certain amount of harvesting furthers society's needs.

318.   Most recently, in an August 3, 2017 blog post titled "11 People With Extraordinary Power Over the Future of One Threatened Species," Greenpeace USA again publicly admonished executives at Penguin Random House, HarperCollins, Simon & Schuster, and MacMillan for being "actively associated with Resolute Forest Products' destructive operations by buying substantial quantities of paper from the controversial loggers."  In conclusion, defendant Moas warned: "These publishers have a choice – keep their heads in the sand or roll up their sleeves and work with both Resolute and government officials to ensure everyone is doing everything possible to safeguard Woodland Caribou.  Ultimately it comes down to whether or not publishers will keep their promises to their readers that their books are sustainable and not harming magnificent forests and threatened species."

C.    **Summary Of Allegations Of Actual Malice**

319.    The facts as set forth above, taken together, demonstrate that Greenpeace International, Greenpeace USA, Greenpeace Canada, Amy Moas, Rolf Skar, Daniel Brindis, Matthew Daggett, Richard Brooks, and Shane Moffatt, among others, had actual or constructive knowledge of the falsity of the allegations that they disseminated in reports, blog posts, and social media.

320.    Each defendant's and Enterprise' member's actual and constructive knowledge summarized below is imputed to all other members of the Enterprise because as set forth above, the Greenpeace USA and the Greenpeace Canada Canadian Boreal Forest teams collaborated with and shared knowledge and information with one another for the purpose of carrying out the "Resolute: Forest Destroyer" campaign, by among other things, in many instances jointly writing and publishing reports, disseminating letters and emails to Resolute's customers and market constituents, holding joint conference calls with Resolute's customers, and participating in joint meetings with Resolute's customers.  Likewise, Greenpeace International collaborated closely with Greenpeace Canada and Greenpeace USA in the Resolute Forest Destroyer Campaign including by, among other things, authorizing and developing the campaign, providing the right to use the Greenpeace name to Enterprise members GP-Inc., GP-Fund, and Greenpeace Canada, funding these entities, underwriting this disinformation campaign, and providing an internet platform and website to support, facilitate, and authoring, reviewing and publishing false and defamatory publications and communications for the campaign.

321.    The actual and constructive knowledge of Greenpeace Canada is imputed to all members of Greenpeace Canada's Canadian Boreal Forest team, including Richard Brooks, Nicolas Mainville, Stephanie Goodwin, Shane Moffatt, Holly Postlethwaite, Freya Putt, and Catherine Grant, among others, all of whom worked closely together in preparing publications concerning Resolute, and the actual and constructive knowledge of all of these members is imputed back to Greenpeace Canada.  Likewise, the actual and constructive knowledge of Greenpeace USA is imputed to all members of Greenpeace USA's Canadian Boreal team, including Defendants Daniel Brindis, Amy Moas, and Rolf Skar, all of whom worked closely

PLAINTIFFS' AMENDED COMPLAINT CASE NO. 3:17-CV-02824-JST

1    together in preparing publications concerning Resolute, and the actual and constructive

2    knowledge of all of these members is imputed back to Greenpeace USA.

3        322.    Moreover, the actual and constructive knowledge of Greenpeace USA,

4    Greenpeace Canada, and Greenpeace International is imputed to defendants ForestEthics and

5    Todd Paglia.  As memorialized in ForestEthics's operational memorandum and shared with, and

6    approved, by the other members of the Enterprise, including Greenpeace Canada, Greenpeace

7    USA, Greenpeace International, and Greenpeace Fund, beginning no later than 2012, these

8    ENGOs  agreed to engage in a "coordinated" "very targeted market campaign" to falsely

9    designate Resolute as a rogue actor in the Canadian Boreal forest with the self-described

10   "objective" of "mak[ing] Resolute and its products highly controversial. and "positioning

11   Resolute as the most regressive forest products company."   Given the shared objective and

12   agreed upon plan between ForestEthics, Greenpeace International, Greenpeace USA, and

13   Greenpeace Canada, there is a strong inference that ForestEthics and Paglia had a responsible

14   part in the preparation and publication of the Greenpeace entities' false and defamatory

15   publications.

16       **1.     The Enterprise Launches A Campaign To Falsely Single Out**

17       **Resolute As The Most Regressive Forest Products Company**

18       323.    As the Enterprise's operational memo explicitly detailed, the "objective" of the

19   Enterprise's campaign was to falsely "position[ ] Resolute as the most regressive forest products

20   company."  The Enterprise would do so by first inventing a pretext to scuttle the CBFA before

21   launching a highly publicized disinformation campaign attacking Resolute's brand and

22   customers based on the misrepresentation that Resolute was a rogue bad actor operating with a

23   reckless environmental disregard that risked caribou extinction, Boreal deforestation, adverse

24   climate change, and violating First Nation rights.

25       324.    The Enterprise's scienter and malice is most plainly exhibited in the campaign's

26   intentional misrepresentation of Resolute as a bad actor while endorsing and promoting other

27   companies holding the identical positions, engaged in the same alleged objectionable conduct, or

28   even more of that conduct or worse conduct, and not otherwise materially distinguishable from

     Resolute but similarly situated.   In disseminating the campaign's false statements, the Enterprise

     - 121 -

did not disclose to the public that its purpose was to falsely villainize Resolute, and that it had absolutely no basis for depicting Resolute as "regressive" and promoting other companies who were identically situated, or in most cases, less favorably situated as "progressive" good actors with whom Resolute customers should do business with instead.  This selective manipulation of the facts and disparate treatment of Resolute's competitors was intended to serve the objective of not just damaging Resolute's brand but also enhancing its competitors' brands and driving customers to pursue alternatives to doing business with Resolute, which would not otherwise be possible if Greenpeace treated all similarly situated logging companies the same.

325.    Thus, each of the tactics and misrepresentations set forth below were done with actual malice by virtue of the fact that they were carried out in furtherance of an explicit plan to misrepresent Resolute as a villain, an outlier among other CBFA members and its competitors, even though there was no reasonable factual basis for singling-out Resolute's performance in the Canadian boreal Forest as deficient or that its performance stood in a materially adverse position vis-à-vis the other similarly situated competitors whom the Enterprise extolled in order to misrepresent Resolute as the rogue, bad actor.

### 2.    The Enterprise Disseminated False And Misleading Allegations With Actual Knowledge Of, Or Reckless Disregard For, Their Falsity.

#### a.    The Enterprise's Claims Were Based On Fabricated Evidence

326.    As set forth in §2(b), central to the launching and success of the "Resolute: Forest Destroyer" campaign was the need for a pretext to scuttle the "historic" CBFA.  On December 6, 2012, Enterprise member Greenpeace Canada issued the Exposed Report, which falsely and maliciously accused Resolute of logging in "off-limits areas" in violation of the CBFA.  Between December 2012 and March 2013, among others, defendants Greenpeace USA, Skar, and Brindis, and Enterprise members Greenpeace Canada, Mainville, and Goodwin, disseminated this false charge in a series of reports and direct communications to Resolute's customers and other critical market constituents.

327.    While the Exposed Report alleged that Greenpeace uncovered these putative violations during "[a] Greenpeace field investigation," the facts demonstrate that Greenpeace fabricated the evidence it purported to rely on including photographs and video footage

putatively corroborated by GPS coordinates depicting Resolute building roads in areas protected

under the Agreement.

328.    First, none of the five photographs Greenpeace Canada putatively documented

during its "investigation," depict Resolute harvesting in violation of the CBFA.  Rather, the

roadbuilding depicted in these five photographs where either: (a) authorized by the CBFA (pins 1

& 2); (b) built by the Quebec Ministry of Natural Resources (pins 3 & 4); or (c) built by another

forestry company (pin 5).  It is inconceivable that Greenpeace overlooked these numerous

geographical inconsistencies which explicitly demonstrate that Resolute was not logging in

violation of the agreement:

- **Photographs of Pins 1 & 2**: Greenpeace Canada was intimately involved in the negotiation of the CBFA moratorium, including the selection of the authorized harvesting areas, and was in possession of or had direct access to maps clearly identifying that road construction in those areas were authorized under the Agreement.  Additionally, as a core member of the CBFA working group that was negotiating a protected area within this region, Greenpeace Canada had intimate knowledge of the region.  Finally, Greenpeace Canada made no effort to corroborate or verify the accuracy of its claims, even though it could easily verify the claims as a CBFA signatory.

- **Photographs of pins 3 and 4**: public documentation known to or available to Greenpeace Canada through QMNR regional offices reflected that the roads depicted in these photographs were built by the QMNR, not Resolute, and for the sole purpose of providing access to large areas of forest burned in the summer of 2007 after it was determined that natural regeneration was insufficient to ensure the return of adequate forests.  Resolute was not involved in the implementation of this special QMNR reforestation plan and therefore in no way breached the Agreement.  Greenpeace Canada not only misrepresented that Resolute was responsible for building these roads, but also misrepresented that the roads were related to harvesting when, in fact, they were related to regeneration in areas that would not otherwise regenerate.

- **Photographs of pin 5:** public documentation known available to Greenpeace Canada through QMNR regional offices reflected that this area was harvested by a non-signatory forestry company that was not bound by the terms of the CBFA.  The area affected by this road building is in the area under the jurisdiction of QMNR in anticipation of the 2013-2014 harvesting season.  As a signatory to the CBFA and a putative expert on issues concerning the Canadian Boreal forest, Greenpeace should have known that Resolute was not involved in that roadbuilding.

329.    Second, the video footage embedded in the Expose Report purporting to show

Resolute logging in violation of the CBFA was likewise doctored and misleading.

- The blurred aerial image, described as evidence of "ravaged" forest, is in reality an area harvested early in the 2000s in accordance with rules applicable at that time, long before the CBFA existed.  Greenpeace Canada did not possess any

information from which it could reasonably conclude the image represented Resolute logging in 2012, let alone logging in violation of the CBFA, and in fact the image reflected the opposite, as recognizable to the trained eye from configuration of worksites and residual tree buffers. Abundant regeneration can also be seen in the harvested area. To add supposed credibility to its message, Greenpeace deliberately manipulated the GPS coordinates for the image. Upon verification of the coordinates, they in fact refer to a location in an area that experienced fires in 2007, not logging, and an "expert" such as Greenpeace would unequivocally recognize that those two areas could not correspond to each other or areas impacted during the existence of the CBFA.

• Another image on the video purporting to show forestry machinery knocking over several stems and suggesting "destruction" of the forest is, in fact, footage of preparation for reforestation (scarification), which was a fact evident to anyone with knowledge of forestry and certainly a group which purported to possess and communicate information based on science. During such an operation, residual stems at times need to be dealt with in order to protect foresters, eliminating the risk of injury while working in planting furrows. Such a safety measure is especially important in the case of a burned forest, as appears to be the case in this picture.

• Several times the video shows images of Resolute's harvesting causing "destruction," however, the images depicted are areas impacted by fires, not harvesting, as anyone with a trained eye and certainly Greenpeace would have known. Notwithstanding this knowledge, Greenpeace misrepresented them because burnt areas look particularly devastated as fires, unlike logging, do not proceed according to a harvesting plan or include, for example, wooded buffers adjacent to lakes and waterways.

• The video shows a satellite image of an area that was harvested in 2003 according to rules in effect at the time, and long before the existence of the CBFA, as apparent to a trained or informed observer from the image itself, and certainly a group such as Greenpeace. While the video once again alleges that Resolute does not respect its commitments under the CBFA, verification of the GPS coordinates reflect that that the area in question is primarily outside of Resolute's forest management unit. Greenpeace Canada was aware of this from the nature of the image itself, and would have been known based on a simple comparison of maps to GPS coordinate information Greenpeace had in its possession.

330. Greenpeace Canada's knowledge and malice in disseminating this fabricated evidence is further evidenced by the fact that even after Resolute rebutted the falsity of Greenpeace's allegations by letter dated December 12, 2012 and demonstrated that neither the photographs nor the videos depict Resolute harvesting in violation of the CBFA, Greenpeace Canada and those working in concert with it failed to conduct any investigation to determine the validity of the evidence it purported to rely on, but instead continued to disseminate these fake photographs and videos in new reports, blog posts and email correspondence.

331. It was only after Resolute threatened Greenpeace with legal action that Greenpeace finally retracted its false claims, using the excuse of "incomplete maps," which was

a further misrepresentation designed to conceal the real motivation for claiming Resolute had violated the CBFA.  Greenpeace Canada and Greenpeace USA made this claim not because it was true, preserve its credibility so it could continue to effectively disseminate misrepresentations about Resolute now that it had successfully justified its withdrawal from the CBFA based on a series of materially and intentionally false pretexts.  In any event, the wholly inadequate "incomplete map" excuse did not explain any of the misrepresentations, particularly not how Greenpeace misrepresented that its purported photographs and videos of Resolute logging in off-limits areas corresponded with CBFA restricted areas when, in fact, they did not; areas were associated with Resolute activity when, in fact, they were not; videos and images showed Resolute harvesting in violation of the CBFA, when, in fact, they showed neither Resolute activity nor harvesting in CBFA restricted areas; and GPS coordinates that did not even match the video image they purported to support.

332.    Moreover, the denial of any intention to harm Resolute by these demonstrable lies is utterly irreconcilable with Greenpeace's refusal to rejoin the CBFA after acknowledging its entire stated basis for leaving had been wrong.  Indeed, the intentional falsity of the Enterprise's claim that it did not intend harm to Resolute is demonstrated by what it intentionally did not disclose when it made that claim:  that the Enterprise, including Greenpeace Canada, Greenpeace USA, Forest Ethics, Paglia and other ENGO's had agreed upon the aggressive dissemination of these lies as part of a larger campaign to attack Resolute and ruin its brand and business.

### b.    Defendants Omit Material Information

333.    As further evidence that the Enterprise's false allegations about Resolute featured in the Enterprise's reports, publications, and oral and written communications were made with actual malice, numerous particularized facts demonstrate that the Enterprise intentionally and maliciously omitted material information in order to falsely portray Resolute as the most regressive forestry company with unsustainable operations and an outlier in the forest industry.  Most fundamentally, the Enterprise omitted that the explicit purpose of the disinformation campaign was to "make Resolute and its products highly controversial" and falsely "position[]

Resolute as the most regressive forest products company."  In order to falsely villainize Resolute, the Enterprise omitted the following material information:

334.  **Resolute Is Only Responsible For A Fraction Of Logging In Quebec and Ontario:**  To set the misleading foundation that Resolute is a rogue actor logging in the last of the Canadian boreal Forest's intact forest landscapes, the Enterprise intentionally omits that in Quebec and Ontario, approximately 85% of so-called intact forest landscapes are above the Area of Undertaking (Ontario) and the Northern Limit of Allocation (Quebec) where the law prohibits harvesting, and 90% of intact forest landscapes in Quebec are either beyond the Northern Limit or in otherwise protected areas.  The Enterprise also omits that Resolute only harvests on a fraction of the remaining 10% of intact forest landscape below the Northern Boundary in Quebec and Ontario, along with numerous other forestry companies, which are at a minimum similarly situated to Resolute.  Moreover, areas in which Resolute does harvest are predominately not intact forest landscapes, and any Resolute contribution is entirely immaterial, temporary, and necessary for the forest's cycle of regeneration and regrowth.  In fact, numerous other forestry companies operate in Quebec and Ontario in the very same management units and under the same rules, and Resolute's operations only account for just over 10% percent of total harvesting in the caribou range of Ontario.  Yet, Defendants tellingly do not even mention other forestry companies in Ontario who are responsible for over *90% of harvesting* in the caribou range.

335.  **Resolute's record of sustainability**:  Likewise, to portray Resolute as an "outlier" with "unsustainable operations," the Enterprise intentionally omits that Resolute is regularly recognized as an industry leader in sustainable forestry, environmental protection, and safety.  In the past few years alone, Resolute has received more than twenty regional, North American, and global awards and distinctions for its sustainability, environmental, and safety practices.  These awards include recognitions for Resolute's "100% woodland certifications, transparent sustainability reporting, innovative partnerships with First Nations, and substantial efforts to minimize resource consumption, waste generation, air emissions, water discharge, and environmental incidents."  The Enterprise also omits that when Resolute harvests in the Canadian Boreal Forest, each area is promptly and successfully regenerated either naturally

1  (75% of the time) or by Resolute or the government seeding and planting.  Between 2010-2012,

2  Resolute planted an average of over 60 million trees per year, and by 2012 it had **planted its**

3  **billionth tree in Ontario alone,** and has continued to plant trees there since.

4       336.  **FSC Certificates:**  The Enterprise's claims about Resolute's FSC compliance and

5  the conclusions that can be drawn from the limited terminations and suspension do not disclose

6  the Enterprise's direct and indirect role in the suspensions Resolute suffered, or that Resolute

7  was treated dramatically differently than other FSC certificate holders operating in the same

8  areas.  As the Enterprise explicitly threatened Resolute in May 2013, the Enterprise's "Resolute:

9  Forest Destroyer" campaign targeted Resolute's relationship with FSC and its FSC auditors from

10  the very start, with a parallel campaign attacking FSC for not being stringent enough.  Thus, as it

11  would do with Resolute customers, the Enterprise threatened to tarnish the FSC brand by

12  accusing it of certifying Resolute despite the Enterprise's highly publicized claims that Resolute

13  was destroying the Boreal forest, its woodland caribou, and logging without the consent of the

14  indigenous people.  Once the threat was made, the Enterprise began a coordinated attack on

15  Resolute's FSC certificates by filing formal complaints with Resolute's auditors and the FSC,

16  and engaging in a campaign of informal communications, to pressure and precipitate the

17  suspension of Resolute's certification.  Moreover, the Enterprise repeatedly omitted that

18  notwithstanding the limited losses and suspensions, which the Enterprise itself contributed to,

19  Resolute remains one of the largest holders of FSC certificates in North America, and 100% of

20  the woodlands Resolute manages are audited and certified by independent third parties.

21       337.  **Resolute Harvests Pursuant To Strict Regulations in the Canadian Boreal**

22  **Forest**:  To portray Resolute as a destructive company with unsustainable practices, defendants

23  likewise omit that Canada has among the strictest forest regulation frameworks in the world.

24  Moreover, in addition to Canadian regulation, the Enterprise fails to disclose that Resolute

25  harvests under the strict guidelines and regulations of the Quebec and Ontario provincial

26  governments, which hold title to these public lands for their people, strictly regulate, monitor,

27  and enforce the manner in which they are harvested and mandate sustainable forest management.

28  In fact, comprehensive scientific studies have found Canada's forest management among the best

1    in the world.  Provincial forest regulations mandate land-use planning, require indigenous

2    consent, administer wildlife habitat protection, monitor timber harvesting, and establish

3    reforestation practices.

4        338.  **Woodland Caribou:**  The Enterprise omits that most of the caribou population

5    decline is occurring in Alberta and Newfoundland and Labrador, far away from Resolute's

6    operations.  The Enterprise also omits that in Ontario and Quebec where Resolute harvests, 77%

7    and 76% of the woodland caribou ranges, respectively, are located above the Area of

8    Undertaking (Ontario) and the Northern Limit of Allocation (Quebec) and are not even available

9    for harvesting.

10       339.  **Relationship with First Nations:**  To portray Resolute as violating Indigenous

11   Rights, the Enterprise intentionally omits that Resolute has numerous successful partnerships

12   with various First Nations, including the Fort Williams First Nation, Couchiching First Nation,

13   Mitaanjigamiing First Nation, Nigigoonsiminikaaning First Nation, Seine River First Nation, Lac

14   La Croix First Nation, Lac des Mille Lacs First Nation, Wabigoon Lake Ojibway Nation,

15   Atikamekw Council of Obedjiwan, Kitigan Zibi Anishinabeg and the Gull Bay First Nation,

16   among others.  As Chief Earl Klyne of Seine River First Nation stated in his letter to

17   Greenpeace, Greenpeace does *not* speak for all First Nations, and its claims that Resolute's

18   practices show "disregard for Indigenous rights" misrepresents the Resolute's relationship with

19   First Nations, particularly the Seine River First Nation and its five First Nation community

20   partners, who gave free prior informed consent in the Sapawe Forest, and had "partnerships with

21   Resolute on other fronts that allows the First Nations to develop economic certainty for the

22   future," which the Defendants have "sabotaged" with its disinformation campaign.  Defendants'

23   mantra that it is protecting the interests of the First Nations grossly misrepresents the truth that

24   the vast majority of First Nations have constructive and economically beneficial relationships

25   with Resolute that the Enterprise's campaign has only served to destroy.  Moreover, Defendants

26   intentionally omit that FSC non-conformances relating to Indigenous Rights are, as repeatedly

27   stated by the Quebec government, issues between the Quebec government and the First Nations,

28   and not the responsibility of Resolute.

1

2

                        **c.**      **Defendants' Putative Scientific Evidence Contradicts Or Otherwise Fails To Support Their False And Misleading Allegations**

3        340.    Moreover, numerous particularized facts demonstrate that members of the

4  Enterprise including Greenpeace International, Greenpeace USA, Brindis, Moas, Skar, Daggett,

5  and Greenpeace Canada distort, miscite, and cherry-pick from the sources they purport to rely

6  on, creating a strong inference that its allegations about Resolute were made with actual

7  knowledge of their falsity or reckless disregard for their truth.

8        341.    **Climate Change:** As set forth in §2(e)(ii), members of the Enterprise including

9  Greenpeace International, Greenpeace USA, Brindis, Moas, Skar, Daggett, and Greenpeace

10  Canada alleged that Resolute's operations were negatively impacting climate change.  However,

11  none of the putative "scientific evidence" these Enterprise members reference support their

12  allegations, giving rise to a strong inference that these defendants published these statements

13  with actual or constructive knowledge of their falsity.

14        342.    First, Greenpeace International, Greenpeace USA, Brindis, Moas, Skar, and

15  Daggett cite in their motions to strike a 1998 study by Werner A. Kurz to support their allegation

16  that "[s]cientific studies" have "concluded that natural forests store more carbon than forests

17  managed for timber production due to their older average age."  However, this 1998 study is

18  based on computer modeling of hypothetical forest landscapes with limited focus on the regions

19  in question.  By contrast, a more recent (2013) and comprehensive paper led by the *same*

20  *scientist*, which relied on actual observed data, rather than a computer simulation to evaluate the

21  climate impacts of Canada's managed boreal forest, concluded that the managed boreal forest is

22  having a slight *cooling* effect on global climate, helping rather than further warming the planet.

23        343.    Likewise, the studies Greenpeace International, Greenpeace USA, Brindis, Moas,

24  Skar, and Daggett purport to rely on in their motion to strike to support their claims that "[f]orest

25  degradation unlocks the carbon stored in the soil in a variety of ways that scientists are still

26  exploring . . [w]hen boreal forest vegetation or soils are disturbed, carbon is released,

27  accelerating climate change," is irrelevant to whether disturbance of *boreal* forests releases

28

1    carbon.  Rather, the studies these Enterprise members cite focus on forest degradation in *tropical*

2    forests, not the Boreal forest where Resolute operates.

3         344.    In addition, Greenpeace International, Greenpeace USA, Brindis, Moas, Skar,

4    Daggett's allegation that "natural forests store more carbon than forests managed for timber

5    production," are directly contradicted by the UN's Intergovernmental Panel on Climate Change

6    which has publicly declared that sustainable forest harvesting and management is one of the most

7    important mechanisms for removing and sequestering greenhouse gases from the atmosphere.

8    As putative experts in matters relating to the Canadian Boreal forest, a strong inference may be

9    drawn that Greenpeace Canada, Greenpeace USA, Daniel Brindis, Amy Moas, Rolf Skar, and

10   Greenpeace International had actual or constructive knowledge of this publicly available industry

11   information.  This inference is further strengthened by the fact that these Greenpeace entities,

12   including Greenpeace International, Greenpeace USA, and Greenpeace Canada, often cited

13   findings by the Intergovernmental Panel on Climate Change in the context of other campaigns.

14        345.    **Caribou**: As set forth in § B2(e)(iv), members of the Enterprise including

15   Greenpeace International, Greenpeace USA, Daniel Brindis, Amy Moas, Rolf Skar, and

16   Greenpeace Canada alleged that Resolute's operations were threatening or jeopardizing the

17   survival of woodland caribou.  However, none of the putative "scientific evidence" Greenpeace

18   references supports these false charges, giving rise to a strong inference that these defendants

19   published these statements with actual or constructive knowledge of their falsity.

20        346.    Defendants and Enterprise members Greenpeace Canada, Greenpeace USA,

21   Greenpeace International, Moas, and Brindis, among others, cite to a 2014 report by Global

22   Forest Watch and a 2012 report by Environment Canada to support their allegations that

23   Resolute's harvesting is jeopardizing woodland caribou, including in the following false and

24   misleading reports and communications: (i) May 2013 Unsustainability Report; (ii) May 2013

25   emails from Daniel Brindis of Greenpeace USA and Catherine Grant and Stephanie Goodwin of

26   Greenpeace Canada disseminating the Unsustainability Report to Resolute's customers; (iii)

27   August 2013 FSC at Risk Controlled Wood Report by Greenpeace International; (iv) May 2014

28   FSC at Risk FSC Must Do More Report by Greenpeace International; (v) February 2016

1  Endangered Forests in the Balance Report by Greenpeace Canada; (vi) March 2016 emails from

2  Amy Moas to Resolute's customers transmitting the Endangered Forest in the Balance Report;

3  (vii) April 2016 email from Amy Moas of Greenpeace USA and Richard Brooks of Greenpeace

4  Canada transmitting the Endangered Forest in the Balance Report; (viii) December 16, 2016

5  Letter from Amy Moas to Resolute's customers; (ix) May 2017 Clearcutting Free Speech Report,

6  by Amy Moas of Greenpeace USA; and (x) June 2017 June Book Expo, Amy Moas, Rolf Skar,

7  Daniel Brindis of Greenpeace USA.

8         347.    However, far from supporting these defendants' and Enterprise members'

9  allegations, the Global Forest Watch report concluded that: (a) "[o]ur analysis clearly indicates

10  that the threat to boreal caribou is highest in Alberta" (where Resolute does not operate); (b)

11  identified all fifteen of the designated caribou habitats in Alberta and British Columbia (where

12  Resolute does not operate) as having the highest habitat disturbance levels and at highest

13  population risks; and (c) did not, in contrast, identify any of the designated habitats the

14  Enterprise associates with Resolute's Quebec operations as being similarly at risk.

15         348.    Likewise, the Canadian government's 2012 Environment Canada report likewise

16  points to Alberta and British Columbia herds as the source of risk to caribou and their habitats.

17  The study designates all twelve of the identified herds in Alberta as being non-self-sustaining

18  with habitat disturbance levels well over 60%, and all five herds in British Columbia as being

19  non-self-sustaining with habitat disturbance levels between 57-80%.

20         349.    **Destruction Of Intact Forest Landscapes**: As set forth in § 2B2(e)(iii) members

21  of the Enterprise accused Resolute of causing forest loss in the last remaining intact forests in

22  Canada.  These allegations were made in, among other reports,  the February 2016 Endangered

23  Forests In The Balance Report, issued by Greenpeace Canada and featured on the websites of

24  Greenpeace Canada, Greenpeace USA and Greenpeace International, which falsely asserted that

25  "*Canada leads the world in loss of intact forests, with 21% of intact forest loss worldwide*

26  *between 2000 and 2013 occurring in Canada* . . . [b]etween 2000 and 2013 . . . nearly 50% of the

27  Intact Forest Landscapes in the Montagne Blanches Endangered Forest have been lost or

28  degraded."  The report further alleged that Resolute's "logging operations are central to the fate

1    of the Montagnes Blanches Endangered Forests."  In February and March 2016, defendant Moas

2    disseminated this false report to numerous Resolute customers.

3         350.    However, the non-peer reviewed web link Greenpeace Canada, Greenpeace USA,

4    Greenpeace International and Moas purport to cite does not support the alarmist and sensational

5    charges concerning intact forest loss in Canada.  Rather, the study only addresses the *cumulative*

6    impact of intact forest loss for Russia, Alaska, and Canada.  Moreover, the source clearly states

7    that Intact Forest loss in the Amazon is 25%, which is larger than the 21% Greenpeace attributes

8    (without any basis) to Canada yet which Greenpeace falsely labels the "lead in world loss."

9    Tellingly, when the data Greenpeace cited finally became part of scientific literature (Potapov et

10   al. Sci. Adv. 2017:3), the data indicates that all of North American temperate and boreal forest

11   (*i.e.* all US **and** Canada) represented 19% of global loss of intact forests.  The publication further

12   indicates that of the 19% cumulative loss in North America, 11.5% was due to loss other than

13   from wildfire. The same study shows that only 1.88% of IFL loss in North America is

14   attributable to harvesting.  More significantly, the same report shows that in contrast to leading

15   the world in intact forest loss, the Northern American northern boreal forest lost a *lower* fraction

16   of its IFL than any of the 7 largest IFL regions on Earth.

17            **d.    The Enterprise Continued To Disseminate Their  False Claims
                     Notwithstanding Prior Admissions And Material <u>Events That</u>
18                   <u>Confirm Their Falsity</u>**

19         351.    Not only did the Enterprise fabricate evidence to support its false claims, it also

20   continued to make and disseminate these false claims even after Resolute informed the

21   Enterprise of the falsity of its statements and other industry and market participants issued public

22   statements rebutting its lies.

23         352.    **<u>CBFA</u>**: In addition to the knowledge and information it possessed indicating that

24   its claims, images, and videos misrepresented that Resolute had violated the CBFA, and its lack

25   of any investigation or reasonable factual basis for believing such misrepresentations were true,

26   the Enterprise's malice and scienter are evidenced by its refusal to correct these

27   misrepresentations immediately when informed they were demonstrably untrue by Resolute.

28

- 132 -

353.    As set forth in § B2(b) , following the December 6, 2012 publication of the Exposed Report, Backgrounder, and accompanying photographs and videos, Resolute irrefutably rebutted the false allegations that it was logging in "off-limits areas" in violation of the CBFA and demonstrated point-by-point the falsity of the putative corroborating "evidence," by letters dated December 12, 2012 sent to all CBFA signatories, including Greenpeace Canada, and letter dated December 17, 2012 sent to Greenpeace Canada, Bruce Cox (Director of Greenpeace Canada), and Stephanie Goodwin.

354.    Moreover, Greenpeace USA's knowledge of Resolute's December 12, 2012 letter is explicitly evidenced by Daniel Brindis's reference to "our review of Resolute's counterclaims" in a January 22, 2013 email to Hearst.

355.    Notwithstanding knowledge of the falsity of their statements regarding the CBFA, Greenpeace Canada and Greenpeace USA continued to falsely allege that Resolute was logging in off-limits areas in violation of the CBFA, with actual knowledge of the statement's falsity, including in the following publications and communications:

- December 14, 2012 letter from Stephanie Goodwin to CBFA signatories: which falsely accused Resolute of "allow[ing] road building in original CBFA Areas of Suspended Harvest despite active efforts by Greenpeace and other environmental organizations";

- December 18, 2012 Petition launched by Greenpeace Canada:  which falsely alleged Resolute was "violating the Canadian Boreal Forest Agreement (CBFA) **by approving logging roads in off limit forest areas**."  (emphasis in original);

- January 16, 2013 article written jointly by Greenpeace Canada: which falsely alleged that "Greenpeace left the failed Canadian Boreal Forest Agreement after an investigation revealed Resolute forest products was responsible for logging in the Agreement's off-limit areas . . ." The report contained a hyperlink to the Exposed Report and video, which Resolute had rebutted weeks earlier;

- January 16, 2013 Boreal Alarm report written jointly by Greenpeace Canada and Greenpeace USA: which falsely alleged that Resolute "recently began building roads in off-limits areas";

- January 17, 2013 article "Resolute Forest Products fails to deliver on sustainability," authored by Mainville and published by Greenpeace Canada: which falsely claimed that Greenpeace's "investigation" revealed that Resolute "has authorized logging and the construction of roads in this-off limits forest." The blog post linked to the Exposed Report and the accompanying phony photographs and video;

- January 2013 emails from Grant to numerous Resolute customers repeating false allegations and attaching the false and defamatory Boreal Alarm report;

- 133 -

- Undated Greenpeace Canada Boreal Forest main page;

- January 22, 2013 conference call between Daniel Brindis of Greenpeace USA, Grant of Greenpeace Canada, and Hearst;

- January 22, 2013, Greenpeace USA published a blog post titled "Greenpeace calls for a halt on logging in five key areas in the Boreal Forest": which contained links to Greenpeace Canada's Exposed Report and putative supporting "evidence."

- January 22, 2013 email from Daniel Brindis of Greenpeace USA, copying Catherine Grant of Greenpeace Canada, to Hearst purporting to have reviewed Resolute's counterclaims and attaching the false and defamatory Boreal Alarm Report.

356.    The refusal to correct and retract or even investigate demonstrably false claims except to escape suit is further evidence of the Enterprise's malice. That malice was further evidenced by the additional misrepresentations it made to cover-up those intentional misrepresentations.

357.    **Harvesting in the Montagnes Blanches:** As set forth in §B2(e)(vii)(3) , Resolute and the Government of Quebec rebutted the Enterprise's false allegation that Resolute was harvesting in Montagnes Blanches, including in the Complaint filed on May 31, 2016 and a press release issued by the Government of Quebec that same day, which identified "*major deficiencies*" in the map of the Montagnes Blanches set forth in Greenpeace Canada's February 2016 Endangered Forests In The Balance Report.  Among other things, the Government of Quebec admonished Greenpeace for including maps that "misrepresent the geographical reality" and "extends well beyond the Montagnes Blanches sector officially recognized by the Quebec government for the protection of the woodland caribou."

358.    As named defendants and Enterprise members in the Complaint, Greenpeace USA, Moas, Brindis, Skar, Greenpeace International and Greenpeace Canada had actual knowledge or constructive knowledge of the falsity of their statements regarding the Montagnes Blanches as outlined in the complaint.

359.    Likewise, Greenpeace Canada had actual or constructive knowledge of the press release by the Government of Quebec, which expressly referenced the Greenpeace Canada report and admonished the inclusion of maps which were "likely to mislead the reader."

1      360.    Notwithstanding knowledge of the Quebec Forestry Minister's public statement

2  and the complaint filed in this action, Greenpeace Canada, Greenpeace USA, and Greenpeace

3  International continued to disseminate the false statement that Resolute was harvesting in the

4  Montagnes Blanches, with actual knowledge of the statements' falsity, including in the following

5  publications and communications:

- December 2016 letters to Resolute's book publishing customers, jointly authored by defendant Amy Moas of Greenpeace USA and Shane Moffat of Greenpeace Canada which falsely asserted "[I]n the Montagnes Blanches Forest in Quebec, there are three caribou herds . . . where habitat disturbance, including some from Resolute's operations, is jeopardizing their survival";

- February 2017 letter to Harper Collins U.K. and News Corp., jointly authored by defendant Moas and Enterprise member Shane Moffat;

- May 2017 Clearcutting Report, authored by defendant Moas of Greenpeace USA and featured prominently on the websites of Greenpeace USA, Greenpeace International, and Greenpeace Canada which falsely accuses Resolute of obtaining three blocks of land from within Montagnes Blanches in an auction sale and harvesting there; and

- At the June 2017 Book Expo Convention, where defendants Moas, Skar, and Brindis were each observed distributing the false, malicious and misleading Clearcutting Report.

16     361.    **FSC Certification**: As set forth in § 2B2(e)(vi), Resolute and industry and market

17  participants issued the following public statements that established the falsity of the Enterprise's

18  statements that the suspension or termination of four of Resolute's FSC certificates reflects or

19  proves Resolute's "unsustainable" forestry practices or "forest mismanagement"::

- On October 3, 2014, Quebec Forestry Minister Laurent Lessard issued a statement to the press to "set[ ] the record straight" regarding "facts that had been distorted," particularly that the non-compliances identified in Resolute's Lac St-Jean and Mistissini-Peribonka certificates "are the government's business – protecting woodland caribou and agreements with First Nations," and to reiterate that Quebec has "the most stringent criteria in the world," "safeguard[s] the 'principal,'" and that only the 'interest' is harvested";

- On December 31, 2014, Rainforest Alliance announced in a press release that the Mistissini-Peribonka FSC certificate in Quebec "reached the five-year expiration date of the certification agreement on December 3, 2014 and therefore the certificate status changed from suspended to terminated in the FSC system."

- On January 13, 2015, the FSC announced in a press release that Resolute's Caribou Forest FSC certificate in Ontario expired, clearly stating:  "[A]ll FSC certificates have a term of 5 years prior to renewal or expiration.  In the absence of any renewal or transfer process, the Caribou Forest certificate has expired and thus terminated."

- 135 -

- On February 4, 2015, Rainforest Alliance announced in a press release that Resolute's Black Spruce FSC certificate was subject to a new audit.

362.    As a putative expert on matters concerning the Canadian Boreal Forest, including specifically expertise "in the FSC certification scheme," Greenpeace Canada, along with Greenpeace USA, Daniel Brindis (whose "portfolio" includes FSC certifications), Amy Moas, and Rolf Skar all knew or recklessly disregarded this publicly available industry information.

363.    Additionally, Resolute informed the Enterprise of the falsity of their statements regarding the status of its certificates in the following:

- May 2015 letter from Resolute's outside counsel to the Board of Directors at Greenpeace USA and Defendant Brindis;

- May 31, 2016 Complaint;

- November 22, 2016 Declaration of Frederick Cubbage;

- January 12, 2017 Cease and Desist Letter from Resolute's outside counsel to Greenpeace USA and those working in concert with them, including Shane Moffatt and Greenpeace Canada.

364.    As named defendants and Enterprise members in the Complaint, Greenpeace USA, Moas, Brindis, Skar, Greenpeace International and Greenpeace Canada had actual knowledge or constructive knowledge of the falsity of their allegations regarding Resolute's FSC certificates as outlined in the complaint and the Declaration of Frederick Cubbage,

365.    Notwithstanding knowledge of the public statements issued by industry and market participants and Resolute's May 2015 letter, the complaint, Cubbage Declaration and Cease and Desist Letter, defendants Greenpeace USA, Skar, Brindis, Moas and Enterprise member Greenpeace Canada, with actual knowledge of the statement's falsity, continued to misrepresent the suspension or termination of limited FSC certificates as proof of Resolute's unsustainable forestry practices and forest mismanagement , including in the following publications:

- March 30, 2015 email from Daniel Brindis to Quad Graphics: which falsely misrepresented that the suspension and termination of limited FSC certificates was proof of Resolute's unsustainable forestry practices;

- January 2016 Report "Resolute Forest Products: Key Risks And Concerns For Investors," authored by Amy Moas of Greenpeace USA: which falsely represented the suspension and termination of limited FSC certificates as evidence

- 136 -

that Resolute was not practicing "responsible social and environmental forest management practices";

- February 2016 Endangered Forest in the Balance report, authored by Greenpeace Canada;

- February 2016 Montagnes Blanches Endangered Forest report, authored by Greenpeace Canada: ;

- April 2016 email from Amy Moas of Greenpeace USA and Shane Moffatt of Greenpeace Canada to Midland Paper;

- December 16, 2016 letter to Resolute's customers, jointly written by Amy Moas of Greenpeace USA and Shane Moffatt of Greenpeace Canada.

366. In addition, Greenpeace International continued to disseminate these false and malicious representations, including by featuring the following reports on its website:

- December 12, 2013 blog post "FSC suspends three of Resolute's certificates," by Grant Rosoman, Greenpeace International Global Forest Solutions Project Coordinator, falsely representing that the suspension and termination of limited FSC certificates showed that Resolute had bad operations or otherwise unsustainable forestry practices;

- April 6, 2014 blog post titled "Forest Solutions," featuring May 2014 report "Forest Solutions: An insider's look at Greenpeace collaborations in forest regions around the world," authored by Stephanie Goodwin, in collaboration with Richard Brooks, Catherine Grant, Shane Moffat, Eduardo Sousa, and Nicholas Mainville;

- May 30, 2017 "Clearcutting Free Speech" Report.

367. **Jeopardizing endangered woodland caribou**: As set forth in § 2B2(e)(iv), Resolute demonstrated the falsity of the Enterprise's allegations that Resolute is jeopardizing or threatening the survival of the woodland caribou including in the following:

- May 2015 letter from Resolute's outside counsel to the Board of Directors at Greenpeace USA and Defendant Brindis;

- May 31, 2016 Complaint;

- November 22, 2016 Declaration of Peter Reich; and

- January 12, 2017 Cease and Desist Letter from Resolute's outside counsel to Greenpeace USA and those working in concert with them, including Shane Moffatt and Greenpeace Canada.

368. As named defendants and Enterprise members in the Complaint, Greenpeace USA, Moas, Brindis, Skar, Greenpeace International and Greenpeace Canada had actual

knowledge or constructive knowledge of the falsity of their statements regarding woodland caribou as established in the complaint and the Declaration of Peter Reich.

369.   Notwithstanding knowledge of the falsity of their statements, defendants Greenpeace USA, Skar, Brindis, Moas and Enterprise member Greenpeace Canada continued to disseminate the false and misleading allegation that Resolute is jeopardizing caribou survival and destroying forests, with actual knowledge of falsity, including in the following publications:

- July 21, 2015 blog post, "Rite Aid: Still Making the Wrong Choice For Forests," by Amy Moas: which falsely accuses Resolute of "logging in some of the last ancient forests in Canada still undisturbed by industrial development . . . threaten[ing] wildlife like the woodland caribou . . . .";

- July 28, 2015 blog post "US Pharmacy Giant Making Wrong Choice For The Boreal Forest," authored by Moas and published on Greenpeace Canada and Greenpeace International's webpages: which falsely represented that "For years, Resolute has been needlessly destroying critical habitat of the endangered woodland caribou . . .."

- August 14, 2015 blog post "Collaboration Is The Key To Sustainability In Canada's Boreal Forest," authored by Joanna Kerr of Greenpeace Canada: which falsely represented that a "woodland caribou herd overlapping Resolute-managed Caribou Forest is experiencing excessive disturbance of its habitat";

- October 12, 2015 blog post "Maker of Post-It Notes Lives Up To Promise, Begins to Eliminate Destructive Logger from Supply Chain," authored by Amy Moas of Greenpeace USA: which falsely accused Resolute of "degrading" the "habitat of endangered wildlife, like the Woodland caribou."

- January 2016 Report "Resolute Forest Products: Key Risks And Concerns For Investors," authored by Amy Moas of Greenpeace USA: falsely accusing Resolute of providing "inadequate protection for woodland caribou habitat" and that Resolute "will not do the minimum that the science says is required to protect our forests and the threatened caribou . . . .";

- February 2016 Endangered Forest in the Balance report, authored by Greenpeace Canada: falsely accusing Resolute of "shortcomings in regards to woodland caribou habitat protection," and stating Resolute is unwilling to do "the minimum that science says is required to protect our forests and the threatened caribou that call them home";

- February 2016 Montagnes Blanches Endangered Forest report, authored by Greenpeace Canada and published on Greenpeace USA's website: falsely accusing Resolute of "failure to conserve the threatened woodland caribou";

- March 2016 letter from Amy Moas of Greenpeace USA to McGraw Hill: falsely accusing Resolute of "logging unsustainably," "actively contributing to the loss of intacts forests and woodland caribou habitat."

- April 2016 email from Amy Moas of Greenpeace USA and Shane Moffatt of Greenpeace Canada to Midland Paper: falsely attributing to Resolute the "decline of the endangered woodland caribou" in the Montagnes Blanches;

- <u>December 16, 2016 letter to Resolute's customers, jointly written by Amy Moas of Greenpeace USA and Shane Moffatt of Greenpeace Canada</u>: falsely accusing Resolute of "jeopardizing" woodland caribou "survival" in the Montagnes Blanches and Caribou Forest;

- <u>The May 2017 Clear Cutting Report, which was authored by defendant Moas and featured prominently on the websites of Greenpeace USA, Greenpeace International, and Greenpeace Canada</u>: falsely stating that "eight of the caribou herd ranges that overlap with Resolute's operations in Ontario and Quebec have less than the government identified minimum of undisturbed habitat," and that Resolute is "jeopardizing the species' chances of survival."

- <u>At the June 2017 Book Expo Convention, where defendants Moas, Skar, and Brindis were each observed distributing the false, malicious and misleading Clearcutting Report.</u>

- <u>August 3, 2017 blog post "11 people with extraordinary power over the future of one threatened species" authored by Amy Moas of Greenpeace USA and published on Greenpeace Canada's website</u>:  "Garneau has overseen the destruction of thousands of hectares of Intact Forest Landscapes within the forests [Resolute] manage in Ontario alone.  And Eight of the 10 herds of caribou present within Resolute's operations have experienced more disturbance to their habitat than government scientists consider viable for the caribou's survival."

370.   **Climate Change**: As set forth in § 2B2(e)(ii), Resolute demonstrated the falsity of the Enterprise's allegations that Resolute's harvesting is threatening or aggravating climate change, including in the following:

- May 31, 2016 Complaint;

- November 22, 2016 Declaration of Peter Reich; and

- January 12, 2017 Cease and Desist Letter from Resolute's outside counsel to Greenpeace USA and those working in concert with them, including Shane Moffatt and Greenpeace Canada.

371.   As named defendants and Enterprise members in the Complaint, Greenpeace USA, Moas, Brindis, Skar, Greenpeace International and Greenpeace Canada had actual knowledge or constructive knowledge of the falsity of their allegations as outlined in the Complaint and the Declaration of Peter Reich.

372.   Notwithstanding knowledge of the Complaint, the Reich Declaration and the Cease and Desist Letter, defendants Greenpeace USA, Skar, Brindis, Moas and Enterprise member Greenpeace Canada continued to disseminate the false allegation that Resolute is threatening or aggravating climate change, with knowledge of its falsity, including in the following publications:

- The May 2017 Clearcutting Report, which was authored by defendant Moas of Greenpeace USA; and

- At the June 2017 Book Expo Convention, where defendants Moas, Skar, and Brindis were each observed distributing the false, malicious and misleading Clearcutting Report.

373.    The Clearcutting Report was featured – and continues to be featured -- prominently on the websites of Greenpeace USA, Greenpeace Canada and Greenpeace International.

374.    **Relationships with First Nations**: As set forth in§ 2B2(e)(v), Resolute and industry and market participants issued the following public statements correcting the Enterprise's false statements regarding Resolute's relationship with First Nations, including the following:

- April 17, 2014 Letter from Seine River First Nation to Greenpeace Canada refuting the allegations in the Unsustainability Report accusing Resolute of "Infringing Indigenous Rights" and recognizes Resolute's CEO, Richard Garneau, for "having a vision of the future that recognizes Indigenous Rights and the important role they will play in the future on all resources extraction or non-extraction."

- On October 3, 2014, Quebec Forestry Minister Laurent Lessard issued a statement to the press to "set[ ] the record straight" that conflict with First Nations arose from a complex territorial dispute between the Quebec Government and two First Nations, that Resolute was not a direct party to the dispute and lacked any ability to control or resolve it; and

- May 31, 2016 Complaint.

375.    As a putative expert on matters concerning the Canadian Boreal Forest, Greenpeace Canada, along with Greenpeace USA, Daniel Brindis, Amy Moas, Rolf Skar, Greenpeace International and Matthew Daggett, all had actual or constructive knowledge of this publicly available industry information.

376.    Moreover, as named defendants and Enterprise members in the Complaint, Greenpeace USA, Moas, Brindis, Skar, Greenpeace International, Daggett, and Greenpeace Canada had actual knowledge or constructive knowledge of the falsity of their allegations as outlined in the Complaint and the Declaration of Peter Reich.

377.    Notwithstanding knowledge of the falsity of their statements, defendants Greenpeace USA, Amy Moas, Daniel Brindis, Rolf Skar, Greenpeace International, and

Enterprise member Greenpeace Canada continued to make false statements regarding Resolute's relationship with First Nations, with knowledge of the statements' falsity, including in the following publications:

- The May 2017 Clearcutting Report, authored by defendant Moas of Greenpeace USA.

- At the June 2017 Book Expo Convention, where defendants Moas, Skar, and Brindis were each observed distributing the false, malicious and misleading Clearcutting Report.

378.    The Clearcutting report was featured prominently on the websites of Greenpeace USA, Greenpeace International and Greenpeace Canada.

### 3.    Defendants Have Conceded The Falsity Of Their Claims

379.    Evidencing the Greenpeace Defendants' actual knowledge of the falsity of their allegations, when forced to defend their statements, the Enterprise has admitted that their allegations concerning Resolute "do not hew to strict literalism or scientific precision," and are instead only "hyperbole" and "heated rhetoric" that cannot be taken "literally."  Indeed, Greenpeace USA, Brindis, Moas, and Skar have conceded that "*RFP did not literally destroy an entire forest,*" alleging instead that their statements are "hyperbole," "heated rhetoric," "non-verifiable statements of subjective opinion" that should not be taken "literally" or seriously. Indeed, Greenpeace's own expert has conceded that "in [only] rare cases, boreal logging results in the outright loss of forest."  Likewise, ForestEthics and Paglia have conceded that their statements are "describing figurative, rather than literal, destruction," and amount to "mere hyperbole" or "figurative rhetoric."

### i.    Defendants Have Failed To Retract Knowingly False Allegations.

380.    Notwithstanding Defendants' knowledge of the falsity of their statements and plaintiffs' and other market constituents' repeated corrective disclosures as set forth above, defendants have failed to retract their false and misleading allegations, and these misrepresentations continue to be featured on the websites of Greenpeace Canada, Greenpeace USA and Greenpeace International, and the Enterprise continues to solicit donations based on the false and misleading allegations set forth in those rebutted reports.

4.      **Additional Inferences Of Actual Malice**

1.   **Defendants Hold Themselves Out As Experts**

381.    Enterprise members, including Greenpeace USA, Greenpeace International, Greenpeace Canada, and ForestEthics, as well as those individuals working on their behalf, such as defendants and Enterprise members Skar, Brindis, Moas, Paglia, Mainville and Brooks, held themselves out as experts "who had developed an expertise on matters related to the protection and conservation of Canada's boreal forests." Moreover, these defendants and the Enterprise repeatedly claimed that their campaigns, including their "Resolute Forest Destroyer" campaign were based on the "best available science."

382.    Defendant Greenpeace USA (comprised of Greenpeace Inc. and Greenpeace Fund) purports to "work with experts, scientists and researchers across the globe to build a deep understanding" of environmental issues. Defendant Greenpeace USA further alleges that its Canadian Boreal Forest campaign is based in the "best available science" and "best available data."

383.    Moreover, defendant Greenpeace USA holds out defendants Rolf Skar, Daniel Brindis and Amy Moas, Ph.D, as "issue experts" for the Canadian Boreal Forest. Specifically, Greenpeace USA represents that Skar is as an "expert" who has since 2007 "contributed to international Greenpeace campaigns to stop deforestations, including in the Boreal." Likewise, Greenpeace USA represents that defendant Brindis is an "expert" whose "portfolio" includes "the Canadian Boreal, and environmental certification schemes like the Forest Stewardship Council." Finally, Greenpeace USA describes defendant Moas as an "expert" in "deforestation and forest degradation" in the Canadian Boreal using "science-based" campaigns and boasting an academic career dedicated to environmental science and policy. Likewise, defendant Greenpeace Fund touts its "more than 40 year history of campaigning." Greenpeace Fund claims it "plays a leading role in the international environmental movement combining a passion for transformational change with scientific expertise and decades of experience." Defendant Greenpeace International similarly touts a "40-year history of campaigns" as putative evidence of its vast knowledge of, and impact on, the environmental movement.

384.     Enterprise member Greenpeace Canada likewise touts its "40 year history of campaigns based in the best available science and research."  More significantly, Greenpeace Canada claims that it has "developed an expertise in matters related to the protection and conservation of Canada's boreal forests" and represents that its Canadian Boreal Forest campaign "is science-based, and supported by the most recent scientific data."  In addition, Greenpeace Canada boasts the credentials of its Boreal Forest Campaign team, including enterprise member Nicolas Mainville who Greenpeace Canada represents is "a biologist with a master's degree in Environmental Sciences," and Enterprise member Richard Brooks who Greenpeace Canada alleges received a "a master's degree in Forest Conservation."  Other core members of this purported expert Boreal Forest team include Stephanie Goodwin, Shane Moffatt, Holly Postlethwaite, Freya Putt, and Catherine Grant.

385.     These representations create a strong inference that these defendants either intentionally misrepresented their expertise and reliance on the "best" and "most recent scientific data," or otherwise had actual knowledge of, or recklessly disregarded, the falsity of their allegations about Resolute's putative impact on the environment based on their knowledge and review of this scientific evidence.

**2.   The Enterprise's Business Model Is Predicated On Disseminating Sensationalist and Alarmist Propoganda**

386.     As set forth in §B(1), the Enterprise's business model is based on sensational misinformation untethered to facts or science, but crafted instead to induce strong emotions.  Greenpeace has demonstrated time and time again that it is willing to fabricate evidence in the form of doctored images and video footage in order to further its campaigns.  Indeed, Greenpeace's most senior leaders have been forced to admit that their goal is not to present accurate facts, but to "emotionalize" issues and thereby "pressure" (i.e. manipulate) their audiences.  Thus, Greenpeace uses what it calls internally "ALARMIST ARMAGEDDONIST FACTOIDS" to evoke these emotions and induce support it would not otherwise receive.  Indeed, the Enterprise here has admitted that their allegations "do not hew to strict literalism or scientific precision," and are instead only "hyperbole" and "heated rhetoric" that cannot be taken "literally."  Given Greenpeace's own admissions that it seeks to

"emotionalize" issues with "ALARMIST ARMAGADDONIST FACTOIDS," there is a strong inference that Greenpeace knew and recklessly disregarded the facts and science in order to sensationalize and emotionalize their campaign.

### D.    Damages

387.    The Enterprise's campaign has and continues to inflict substantial harm on Resolute in various respects.

388.    Indeed, in January 2016, Greenpeace published a putative briefing for investors admitting, indeed trumpeting, that the issues it had manufactured during the "Resolute: Forest Destroyer" campaign "are contributing to a loss of market share, loss of social license to operate in the Boreal Forest, reputational damage, and increased costs" to Resolute.  Greenpeace's admission is accurate.

389.    First, the unrelenting campaign of disinformation has materially harmed Resolute's brand, reputation, and goodwill in the marketplace, as well as the business, community, and government relationships on which its business depends.

390.    Second, the unrelenting campaign of disinformation has directly targeted and either impaired or terminated multiple contractual and other customer relationships including, but not limited to, those set forth herein such as 3M, Axel Springer, Best Buy, Georgia Pacific, Kimberly Clark, P&G, Union Bank, Burrows Paper Corporation, and UPM.  Greenpeace's January 2016 release admitted that the loss of Kimberly Clark, 3M, and Axel Springer alone was at least C$100 million:

> "The exact financial impact of these reductions and cancellations is not in the public domain but given the estimated contracts of identified customer cancellations and reductions, it is estimated at over C$100 million."

391.    Third, beyond specific contracts and customer relationships that have been lost or impaired as a result of the unrelenting campaign of disinformation, the amount of market share Greenpeace acknowledges Resolute is losing constitutes even greater harm, and it is not harm that is limited merely to products related directly to the Boreal forest.  Ascertaining the full scope of these losses will require discovery.

392.   Fourth, as Greenpeace notes, Resolute has incurred costs and expenses attempting to address the issues and difficulties the campaign against it has caused, as well as internal resources.  These include time and expenses incurred responding to and rebutting the campaign's disinformation directly with customers, auditors, regulators, and other stakeholders, publicly responding to and rebutting Greenpeace's public disinformation, and pursuing legal remedies for Greenpeace's illegal behavior.

393.   Firth, Resolute has suffered direct monetary damages as a result of the Enterprise's illegal cyber-attacks, including the costs of defending against, and mitigating the effects of, attempted denials of service, among other damages to be determined at trial.

394.   The total amount of these damages can only be calculated once the full scope and activities of the Enterprise are revealed.

# CAUSES OF ACTION

## COUNT I

### RACKETEERING IN VIOLATION OF RICO, 18 U.S.C. §§ 1962(c) (AGAINST ALL DEFENDANTS)

395.   Plaintiffs restate paragraphs 1 through 394 above as if fully set forth herein

396.   At all relevant times, each Defendant is a person within the meaning of 18 U.S.C. § 1961(3).

397.   Beginning in at least 2012 and continuing through the present (the "Scheme Period"), Defendants and Enterprise members were associated in fact and comprised an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) willfully and with actual knowledge of the illegality of their actions and those of the enterprise.  The Enterprise is engaged in, and its activities affect, interstate and foreign commerce.

398.   The Enterprise has an existence beyond that which is merely necessary to commit predicate acts and, among other things, oversaw and coordinated the commission of numerous predicate acts on an on-going basis in furtherance of the scheme, each of which caused direct harm to Plaintiffs.

399.     During the Scheme Period, each of the Defendants agreed to and did conduct and participate in the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962(c).  It was the purpose of the Enterprise to create and disseminate false and misleading reports and information concerning Resolute, under the guise of protecting the environment, but in truth, for the unlawful purpose of interfering with Resolute's business and soliciting fraudulent donations from the public at-large.  This widespread dissemination scheme was intended to, and did in fact, result in substantial profits for the members of the Enterprise, and caused direct harm to Resolute.

400.     The Enterprise's racketeering conduct and acts in furtherance of the fraudulent scheme included, but were not limited to the predicate RICO acts of: (a) use of mails and wires in a scheme to defraud Resolute of its confidential business information and business and in violation of 18 U.S.C. §§ 1341 and 1343, as set forth in 18 U.S.C. §§ 1961(1)(B); (b) use of mails and wires in a scheme to defraud donors by targeting and harming Resolute in violation of 18 U.S.C. §§ 1341 and 1343; (c) extortion of Resolute and its customers in violation of 18 U.S.C. §§ 875-77, 880, and 18 U.S.C. § 1951; (e) computer fraud directed at Resolute's computers and website in violation of 18 U.S.C. § 1030(a)(5) resulting in damage as defined in § 1030(c)(4)(A)(i)(II) through (VI); (f) money laundering of illicit proceeds in violation of 18 U.S.C. § 1957; and (g) theft of trade secrets in violation of 18 U.S.C. § 1832, which constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

### a)  Use of mails and wires in furtherance of a scheme to defraud Resolute of its critical business and market relationships

401.     As set forth in herein, beginning no later than August 2012, defendants and Enterprise Members developed a scheme to fraudulently and intentionally target Resolute with a "brand damaging" campaign and destroy its reputation among its critical market constituents including customers, stakeholders, auditors, certification agencies, trade associations and government regulators.  As outlined by defendant Paglia of ForestEthics on behalf of the Enterprise, the Enterprise launched this scheme with the false, malicious, and subsequently retracted lie that Resolute was logging in off-limits areas in violation of the CBFA, and threatened that if Resolute did not acquiesce to the Enterprise's demands to defer harvesting in

vast areas in which it held harvesting rights, Enterprise members Greenpeace Canada, Greenpeace USA, Greenpeace International, Canopy, and ForestEthics would all "work[ ] on the same team" with the "objective" of "mak[ing] Resolute and its products highly controversial," by among other things, portraying Resolute as a rogue actor among otherwise compliant companies thereby "positioning Resolute as the most regressive forest products company."  For the next four years and continuing to the present day, ForestEthics, Greenpeace USA, Greenpeace International, Greenpeace Canada and the other Enterprise members made good on the Enterprise's threats, aggressively pursuing the "Resolute: Forest Destroyer" campaign with ever expanding and increasingly malicious lies disseminated to every important Resolute business constituency.  As the operational memorandum predicted, most aggressively targeted were (a) Resolute's customers to whom the Enterprise made extortive threats to also publicly label them as "forest destroyers" if they continued to do business with Resolute; and (b) the FSC and the certification bodies' auditors whom the Enterprise contaminated with its disinformation in order to make it impossible for Resolute to maintain its status as the industry's leader in FSC certifications.

402.    For the next four years, the Defendants used the mails and wires to execute the scheme to defraud.  Each of the Defendants, in furtherance of and for the purpose of executing and attempting to execute this scheme and artifice to defraud Resolute of its critical business relations and confidential business information, on numerous occasions committed acts, used and caused to be used wire communications in interstate and foreign commerce and U.S. mails, by both making and causing to be made wire communications and mailings.  These wire communications and mails were made, inter alia, for the purpose of: (i) preparing false and misleading reports concerning Resolute and its customers; (ii) broadly disseminating the false and defamatory reports and other statements through Greenpeace USA's, Greenpeace International's, and Greenpeace Canada's website and other internet platforms, such as Twitter and Facebook; (iii) communicating and coordinating with one another to effectuate the dissemination of false and misleading information necessary to perpetrate the scheme to harm Resolute; (iv) disseminating the false and misleading allegations directly to Resolute's

1    stakeholders, customers, trade associations, government regulators, and other critical market

2    constituents through email, U.S. mail, and phone; (v) misappropriating proprietary customer,

3    sourcing, and other trade secret information from Resolute and its customers under the guise of

4    aliases; (vi) harassing Resolute's customers with threats to terminate doing business with

5    Resolute or otherwise become a target of the Enterprise's campaign; and (vii) wiring

6    fraudulently obtained funds to sustain the Enterprise's "campaign" against Resolute.

7         403.    Defendants committed and participated in these acts willfully and with knowledge

8    of their illegality.

9         404.    Each such use of a wire communication and/or mailing in connection with the

10   described scheme constitutes a separate and distinct violation of the RICO statute, by virtue of

11   violating the incorporated federal predicate acts proscribed by 18 U.S.C. §§ 1341 and/or 1343,

12   and each causing direct injury to Resolute's business and property.

13        405.    As set forth herein, throughout the scheme period, the Enterprise disseminated

14   falsehoods about Resolute by phone, through electronic mail, and U.S. mail to Resolute's critical

15   business constituents with the intention of misleading these customers about Resolute's business

16   customers and causing these customers to stop doing business with Resolute.  While Resolute

17   does not have the full knowledge of the extent of the use of the wires and mails by the Enterprise

18   in furtherance of the scheme, the following charts show some, but not all, of those violations.  By

19   way of example only, the Enterprise use the mails and wires to defraud Resolute of the following

20   customers, among others:

21        (a)     **Best Buy**: On November 26, 2014, the Enterprise through Amy Moas of

22   Greenpeace USA and Shane Moffat of Greenpeace Canada published "Better Buying In The

23   Boreal Forest" which admonished Best Buy for sourcing from Resolute, which the report falsely

24   misrepresented was a "controversial logging company" that is "an outlier in the Canadian forest

25   sector" because of its "significant degradation of the boreal, destruction of endangered specific

26   habitat, and disputes with indigenous communities."   The Report also falsely stated that

27   Resolute "will not do the minimum that science says is necessary to protect our forests" and was

28

1    "not meeting commitments to ensure caribou survive" and had instead "imperiled woodland

2    caribou."

3          That same day, the Enterprise, through defendant Moas also published "Best Buy Is

4    Wasting Ancient Forests, One Flyer At A Time," which falsely asserted that "Resolute Forest

5    Products is responsible for the destruction of vast swathes of Canadas Boreal Forest, degrading

6    critical caribou habitat and logging without the consent of impacted First Nations."

7          Between November 26 to November 28, 2014, the Enterprise used the mails and wires to

8    coordinate and execute a cyber-attack on Best Buy's website.

9          Within days of the denial of service attack, on December 1, 2014, the Enterprise, through

10   Aspa Tzaras of Greenpeace Canada, escalated its attack by instructing activists to "write a false

11   product review" on Best Buy's website, resulting in more than 52,000 emails and negative and

12   fake product reviews.

13         (b)     **3M**: On April 29, 2014, the Enterprise, through Amy Moas of Greenpeace USA,

14   issued the sensational and false report "Exposed: 3M Sourcing From Forest Destruction" that

15   solicited donations by stating that Greenpeace was "proud to stand with . . . our ally,

16   ForestEthics" and joined their "demand that 3M immediately stops sourcing [products] from

17   forest destroyers" like Resolute and instead source only from "responsible sources."  Associating

18   Resolute and the Canadian Boreal forestry with allegedly highly destructive rainforest and other

19   forestry and industrial development in South America, Asia, and Russia, the report falsely asserts

20   that "logging is the single greatest threat to caribou survival" and "is pushing the woodland

21   caribou to the brink of extinction."  The report was featured on Greenpeace USA's and

22   Greenpeace Canada's websites.

23         Between April 2014 and October 2015, Enterprise members continued to target 3M with

24   false lies about Resolute and their harvesting operations in direct emails and via phone.

25         (c)     **Hachette**: On December 16, 2016, the Enterprise, through defendant Amy Moas

26   of Greenpeace USA and Shane Moffat of Greenpeace Canada, sent a letter to Hachette Book

27   Group reiterating the knowingly false and rebutted allegations that Resolute is operating in the

28   Montagnes Blanches, is the "driving force" "threaten[ing]" and "jeopardizing" the survival of

PLAINTIFFS' AMENDED COMPLAINT CASE NO. 3:17-CV-02824-JST

woodland caribou in Quebec and Ontario, "degrading" and "threaten[ing] Intact Forest Landscapes," and had FSC certificates either terminated or suspended for "environmental nonconformances" and "Indigenous rights nonconformances."

On May 17, 2017, the Enterprise, through defendant Moas of Greenpeace USA launched a self-proclaimed "worldwide campaign" against several of Resolute's book publisher customers, including Hachette, with the publication of the false and alarmist Clearcutting Report that falsely and maliciously charged Resolute with: (i) harvesting in the Montagne Blanches; (ii) engaging in "unsustainable" practices; (iii) "threaten[ing]" the survival of woodland caribou in Ontario and Quebec; (iv) causing intact forest landscape loss; and (iv) abandoning its commitment to FSC certification.  The report was featured on the websites of Greenpeace USA, Greenpeace Canada and Greenpeace International.

(d)     **Penguin**: In April 2016, the Enterprise through defendant Amy Moas of Greenpeace USA sent the paper procurement officer at Penguin Random House two putative Greenpeace briefings on the Montagnes Blanches Endangered Forest in northern Quebec which falsely alleged that Resolute is harvesting in the Montagnes Blanches, causing destruction of intact forests and decline of the woodland caribou.

Moreover, on December 16, 2016, the Enterprise, through defendant Amy Moas of Greenpeace USA and Shane Moffat of Greenpeace Canada, wrote to Penguin reiterating the knowingly false and rebutted allegations that Resolute is operating in the Montagnes Blanches, is the "driving force" "threaten[ing]" and "jeopardizing" the survival of woodland caribou in Quebec and Ontario, "degrading" and "threaten[ing] Intact Forest Landscapes," and had FSC certificates either terminated or suspended for "environmental nonconformances" and "Indigenous rights nonconformances."

On May 17, 2017, the Enterprise, through defendant Moas of Greenpeace USA launched a self-proclaimed "worldwide campaign" against several of Resolute's book publisher customers, including Hachette, with the publication of the false and alarmist Clearcutting Report that falsely and maliciously charged Resolute with: (i) harvesting in the Montagne Blanches; (ii) engaging in "unsustainable" practices; (iii) "threaten[ing]" the survival of woodland caribou in

Ontario and Quebec; (iv) causing intact forest landscape loss; and (iv) abandoning its commitment to FSC certification.  The report was featured on the websites of Greenpeace USA, Greenpeace Canada and Greenpeace International.

In the months that followed, Greenpeace has continued to target and pressure Penguin, both in direct publications and online blog posts, including in an August 3, 2017 blog post warning that "[t]hese publishers have a choice – keep their heads in the sand or roll up their sleeves and work with both Resolute and government officials to ensure everyone is doing everything possible to safeguard Woodland Caribou.  Ultimately it comes down to whether or not publishers will keep their promises to their readers that their books are sustainable and not harming magnificent forests and threatened species."

Each of the foregoing reports, website publications, emails, phone calls, and other use of the mails and wires in furtherance of the scheme to defraud constitutes a separate violation of mail and/or wire fraud.

406.    In addition to the above enumerated examples, the Enterprise also disseminated falsehoods about Resolute by phone, through electronic mail, U.S. mail, and posts on social media platforms such as Twitter and Facebook which resulted in direct injury to Plaintiffs.  The total number of phone calls, e-mails, and mailings, and the identities of all enterprise members is not yet known, but members of the Enterprise engaged in the following phone calls, e-mails, and U.S. mailings as set forth in Table A, each constituting a separate mail or wire communication in furtherance of the fraudulent scheme:

**TABLE A**

| ADDITIONAL MAIL AND WIRE COMMUNICATIONS | | | | |
|---|---|---|---|---|
| SENDER/CALLER | RECIPIENT | DATE | SUBJECT | METHOD |
| Greenpeace Canada | Kimberly-Clark | 8/21/2012 | Accusing Resolute of non-compliance with FSC standards | E-mail |
| Greenpeace | P&G | 9/2012 | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest | U.S. Mail or E-Mail |
| Stephanie Goodwin (Greenpeace Canada), Todd | Axel Springer | 9/18/2012 | Accusing Resolute of violating the CBFA | E-mail |

| Paglia (ForestEthics), Amanda Carr (Canopy) | | | | |
|---|---|---|---|---|
| Greenpeace Canada | Pearson | 9/26/2012 | Accusing Resolute of violating the CBFA | Phone |
| Greenpeace | Rona | 10/2012 | Accusing Resolute of violating the CBFA | E-mail |
| Greenpeace | Sears | 10/23/2012 | Accusing Resolute of logging in the Montagnes Blanches and Broadback Valley | U.S. Mail or E-mail |
| Greenpeace | P&G | 11/2012 | Accusing Resolute of non-compliance with FSC standards | U.S Mail or E-mail |
| Canopy | Hearst | 11/29/2012 | Accusing Resolute of logging in off limit areas in violation of the CBFA | U.S. Mail or E-mail or Phone |
| Greenpeace Canada | Pearson | 12/3/2012 | Accusing Resolute of violating in off limits areas in violation of the CBFA | U.S. Mail or E-mail |
| Greenpeace Canada | Sears | 12/6/2012 | Accusing Resolute of violating in off limits areas in violation of the CBFA | U.S. Mail or E-mail |
| Rolf Skar (Greenpeace USA) | Hearst | 12/7/2012 | Accusing Resolute of logging in off limit areas in violation of the CBFA | E-mail |
| Greenpeace Canada | Kimberly-Clark | 12/7/2012 | Accusing Resolute of logging in off limit areas in violation of the CBFA and transmitting "evidence we collected" | U.S. Mail or E-mail |
| Andisheh Beiki and Catherine Grant (Greenpeace Canada) | Lowes Companies, Inc. | 1/2013 | Accusing Resolute of logging in off limit areas in violation of the CBFA and transmitting the "Boreal Alarm" Report accusing Resolute of harvesting in the Montagnes Blanches | Phone |
| Andisheh Beiki and Catherine Grant (Greenpeace Canada) | Harlequin Enterprise | 1/17/2013 | Accusing Resolute of logging in off limit areas in violation of the CBFA and transmitting the "Boreal Alarm" Report accusing | E-mail |

PLAINTIFFS' AMENDED COMPLAINT CASE NO. 3:17-CV-02824-JST

| | | | Resolute of harvesting in the Montagnes Blanches | |
|---|---|---|---|---|
| Greenpeace | Sappi | 1/21/2013 | Transmitting "Boreal Alarm" report accusing Resolute of harvesting in the Montagnes Blanches and logging in off-limits areas in violation of the CBFA | E-mail |
| Daniel Brindis (Greenpeace USA) and Catherine Grant (Greenpeace Canada) | Hearst | 1/22/2013 | Accusing Resolute of logging in off limit areas in violation of the CBFA | Phone |
| Daniel Brindis (Greenpeace USA) and Catherine Grant (Greenpeace Canada) | Hearst | 1/22/2013 | Accusing Resolute of logging in off limit areas in violation of the CBFA and transmitting "Boreal Alarm" Report accusing Resolute of harvesting in the Montagnes Blanches | E-mail |
| Andisheh Beiki and Catherine Grant (Greenpeace Canada) | Lowes Companies, Inc. | 1/22/2013 | Accusing Resolute of logging in off limit areas in violation of the CBFA and transmitting "Boreal Alarm" Report accusing Resolute of harvesting in the Montagnes Blanches | E-mail |
| Andisheh Beiki and Catherine Grant (Greenpeace Canada) | Unisource | 1/22/2013 | Accusing Resolute of logging in off limit areas in violation of the CBFA and transmitting "Boreal Alarm" Report accusing Resolute of harvesting in the Montagnes Blanches | E-mail |
| Greenpeace | Scholastic | 1/24/2013 | Accusing Resolute of logging in off limit areas in violation of the CBFA and transmitting "Boreal Alarm" Report accusing Resolute of harvesting in the Montagnes Blanches | U.S. Mail or E-mail |
| Greenpeace | Axel Springer | 1/28/2013 | Accusing Resolute of logging in off limit areas in violation of the CBFA | U.S. Mail or E-mail |

PLAINTIFFS' AMENDED COMPLAINT CASE NO. 3:17-CV-02824-JST

| Greenpeace | WAZ | 1/28/2013 | Transmitting video accusing Resolute of logging in off limit areas in violation of the CBFA | E-mail |
|---|---|---|---|---|
| Greenpeace | Verso | 2/13/2013 | Accusing Resolute of harvesting in the Montagnes Blanches and Broadback Valley | E-mail |
| Greenpeace | Bauer Publishing | 2/15/2013 | Accusing Resolute of harvesting in the Montagnes Blanches and Broadback Valley | U.S. Mail or E-mail |
| Daniel Brindis (Greenpeace USA) and Catharine Grant (Greenpeace Canada) | TC Transcontinental | 3/28/2013 | Accusing Resolute of harvesting in the Montagnes Blanches, Broadback Valley, and Trout Lake-Caribou and threatening the survival of woodland caribou | U.S. Mail or E-mail |
| Daniel Brindis (Greenpeace USA) and Catharine Grant (Greenpeace Canada) | Verso | 3/28/2013 | Accusing Resolute of harvesting in the Montagnes Blanches, Broadback Valley, and Trout Lake-Caribou and threatening the survival of woodland caribou | U.S. Mail or E-mail |
| Daniel Brindis (Greenpeace USA) and Catharine Grant (Greenpeace Canada) | Monadnock | 3/28/2013 | Accusing Resolute of harvesting in the Montagnes Blanches, Broadback Valley, and Trout Lake-Caribou and threatening the survival of woodland caribou | U.S. Mail or E-mail |
| Shane Moffatt (Greenpeace Canada) | Unisource | 4/23/2013 | Accusing Resolute of harvesting in the Montagnes Blanches, Broadback Valley, and Trout Lake-Caribou and threatening the survival of woodland caribou | U.S. Mail or E-mail |
| Catharine Grant (Greenpeace Canada) | Wausau Paper | 5/15/2013 | Transmitting "Resolute False Promises - the [Un]sustainability Report" accusing Resolute of logging in the Montagnes Blanches, Broadback Valley, and Trout Lake- | E-mail |

| | | | Caribou and endangering the woodland caribou | |
|---|---|---|---|---|
| Catharine Grant (Greenpeace Canada) | Lowes Companies, Inc. | 5/15/2013 | Transmitting "Resolute False Promises - the [Un]sustainability Report" accusing Resolute of logging in the Montagnes Blanches, Broadback Valley, and Trout Lake-Caribou and endangering the woodland caribou | E-mail |
| Daniel Brindis (Greenpeace USA) | Pro Build | 5/16/2013 | Transmitting "Resolute False Promises - the [Un]sustainability Report" accusing Resolute of logging in the Montagnes Blanches, Broadback Valley, and Trout Lake-Caribou and endangering the woodland caribou | E-mail |
| Greenpeace | Unisource Worldwide | 5/31/2013 | Transmitting "Resolute False Promises - the [Un]sustainability Report" accusing Resolute of logging in the Montagnes Blanches, Broadback Valley, and Trout Lake-Caribou and endangering the woodland caribou | U.S. Mail or E-mail |
| Greenpeace | Local Search Association, Dex Media | 6/2013 | Accusing Resolute of forest destruction and degradation in Canada's Boreal Forest, logging in the Montagnes Blanches, Broadback Valley, and Trout Lake-Caribou, endangering woodland caribou, and logging without the consent of First Nations | Phone |
| Greenpeace | Office Depot | 6/2013 | Accusing Resolute of harvesting from the Montagnes Blanches, Broadback Valley, and Trout Lake-Caribou | U.S. Mail or E-mail |

PLAINTIFFS' AMENDED COMPLAINT CASE NO. 3:17-CV-02824-JST

| Richard Brooks (Greenpeace Canada) | Hearst | 6/14/2013 | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest, , endangering woodland caribou, harvesting from Montagnes Blanches, and logging without consent from First Nations | E-mail |
|---|---|---|---|---|
| Greenpeace | Twin Rivers Paper | 7/2013 | Transmitting "Resolute False Promises - the [Un]sustainability Report" accusing Resolute of logging in the Montagnes Blanches, Broadback Valley, and Trout Lake-Caribou and endangering the woodland caribou | U.S. Mail or E-mail |
| Daniel Brindis (Greenpeace USA) and Shane Moffatt (Greenpeace Canada) | Perfection Press, Inc. | 8/27/2013 | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest, disputes with Indigenous communities, aggravating climate change, and harvesting from the Montagnes Blanches, and linking to the "Boreal Alarm" and "Unsustainability" Reports | U.S. Mail or E-mail |
| Daniel Brindis (Greenpeace USA) | F.P. Horak | 8/27/2013 | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest, disputes with Indigenous communities, aggravating climate change, and harvesting from the Montagnes Blanches, and linking to the "Boreal Alarm" and "Unsustainability" Reports | U.S. Mail or E-mail |
| Greenpeace | Pearson | 9/3/2013 | Accusing Resolute of Violating the CBFA | U.S. Mail or E-mail |

| Greenpeace | Pearson | 9/4/2013 | Transmitting Boreal Alarm report accusing Resolute of harvesting in the Montagnes Blanches | U.S. Mail or E-mail |
|---|---|---|---|---|
| Daniel Brindis (Greenpeace USA) | Canon USA | 9/12/2013 | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest, disputes with Indigenous communities, aggravating climate change, and harvesting from the Montagnes Blanches, and linking to the "Boreal Alarm" and "Unsustainability" Reports | U.S. Mail or E-mail |
| Greenpeace Canada | Pearson | 9/26/2013 | Accusing Resolute of Violating the CBFA | Phone |
| Oliver Salge (Greenpeace Germany) | European Newspaper Publisher's Association | 11/21/2013 | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest, disputes with Indigenous communities, and harvesting from the Montagnes Blanches and Trout Lake-Caribou, and linking to the "Unsustainability" Report | E-mail |
| Greenpeace | UPM | 12/3/2013 | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest | Phone |
| Richard Brooks (Greenpeace Canada) | Lowes Companies, Inc. | 12/12/2013 | False allegations re FSC suspensions | E-mail |
| Shane Moffatt (Greenpeace Canada) | Unisource | 12/12/2013 | False allegations re FSC suspensions | E-mail |
| Marcus Ginder (Canopy) | Quad Graphics | 12/12/2013 | False allegations re FSC suspensions | E-mail |
| Greenpeace | Office Depot | 12/12/2013 | False allegations re FSC suspensions | U.S. Mail or E-mail |
| Joanna Kerr (Greenpeace Canada) | Seaman Paper | 1/9/2014 | Accusing Resolute of unsustainable operations in the Canadian Boreal forest, disputes with | U.S. Mail or E-mail |

| | | | Indigenous First Nations communities, operating in Montagnes Blanches and Trout Lake-Caribou, and threatening woodland caribou | |
|---|---|---|---|---|
| Joanna Kerr (Greenpeace Canada) | Clearwater Paper | 1/9/2014 | Accusing Resolute of unsustainable operations in the Canadian Boreal forest, disputes with Indigenous First Nations communities, operating in Montagnes Blanches and Trout Lake-Caribou, and threatening woodland caribou | U.S. Mail or E-mail |
| Joanna Kerr (Greenpeace Canada) | TC Transcontinental customer | 1/9/2014 | Accusing Resolute of unsustainable operations in the Canadian Boreal forest, disputes with Indigenous First Nations communities, operating in Montagnes Blanches and Trout Lake-Caribou, and threatening woodland caribou | U.S. Mail or Email |
| Greenpeace | Boise Cascade | 1/23/2014 | Accusing Resolute of unsustainable operations in the Canadian Boreal forest | Phone |
| Catherine Grant (Greenpeace Canada) | Penguin Random House | 1/23/2014 | False allegations re FSC certificates | E-mail |
| Greenpeace | John Wiley & Sons | 1/27/2014 | False allegations re FSC certificates | U.S. Mail or E-mail |
| Stephanie Goodwin (Greenpeace Canada) | Flambeau River Papers | 1/27/2014 | Accusing Resolute of unsustainable operations in the Canadian Boreal forest, threatening woodland caribou, disputes with Indigenous First Nations, and operating in Broadback Valley | U.S. Mail or E-mail |

| Greenpeace | Best Buy | 2/2014 | Accusing Resolute of unsustainable operations in the Canadian Boreal forest | U.S. Mail or E-mail |
|---|---|---|---|---|
| Greenpeace | Tribune Company | 2/2014 | Accusing Resolute of unsustainable operations in the Canadian Boreal forest | U.S. Mail or E-mail |
| Richard Brooks (Greenpeace Canada) | P&G | 2/2014 | Accusing Resolute of unsustainable operations in the Canadian Boreal forest | U.S. Mail or E-mail |
| Joanna Kerr (Greenpeace Canada) | Twin River Papers | 2/8/2014 | Accusing Resolute of destructive logging operations in Canadian Boreal Forest, threatening woodland caribou, disputes with Indigenous communities, logging in Montagnes Blanches and Trout Lake-Caribou | U.S. Mail or E-mail |
| Stephanie Goodwin (Greenpeace Canada) | Pro Build | 3/2014 | Accusing Resolute of logging in Montagnes Blanches, Broadback Valley, and Trout Lake-Caribou | Phone |
| Greenpeace | UPM | 3/2014 | Accusing Resolute of unsustainable operations in the Canadian Boreal forest | U.S. Mail or E-mail or Phone |
| Catherine Grant (Greenpeace Canada) | Wausau Paper | 3/19/2014 | Accusing Resolute of logging in First Nations' territory without consent, destroying critical caribou habitat, logging in the Montagnes Blanches | E-mail |
| Hilde Stroot (Greenpeace Nederland) and Oliver Salge (Greenpeace Germany) | Wegener Media | 4/3/2014 | Accusing Resolute of unsustainable operations in the Canadian Boreal forest, threatening woodland caribou, disputes with Indigenous First Nations, and operating in Montagnes Blanches and Trout Lake-Caribou, and FSC failings | U.S. Mail or E-mail |

| Stephanie Goodwin (Greenpeace Canada) | Flambeau River Paper | 4/4/2014 | Transmitting "Forest Solutions - Collaborations with Greenpeace from around the world" accusing Resolute of logging in the Montagnes Blanches and Trout Lake-Caribou, destroying woodland caribou habitat, logging without the consent of First Nations, and FSC failings | U.S. Mail or E-mail |
|---|---|---|---|---|
| Richard Brooks (Greenpeace Canada) | Krueger | 4/14/2014 | Transmitting link to "Forest Solutions - Collaborations with Greenpeace from around the world" accusing Resolute of logging in the Montagnes Blanches and Trout Lake-Caribou, destroying woodland caribou habitat, logging without the consent of First Nations, and FSC failings | E-mail |
| Greenpeace | Loblaw | 4/24/2014 | False allegations re FSC suspensions | U.S. Mail or E-mail |
| Greenpeace | SCA Hygiene Products | 5/13/2014 | Transmitting "FSC at Risk: Resolute Forest Management" report accusing Resolute of threatening woodland caribou, disputes with First Nations, logging in the Montagnes Blanches, and FSC failings | U.S Mail or E-mail |
| Greenpeace | Scholastic | 5/20/2014 | Transmitting "FSC at Risk: Resolute Forest Management" report accusing Resolute of threatening woodland caribou, disputes with First Nations, logging in the Montagnes Blanches, and FSC failings | U.S Mail or E-mail |

| Amy Moas (Greenpeace USA) | Midland Paper | 5/20/2014 | Accusing Resolute of "destructive reign" in the Canadian Boreal Forest | E-mail |
|---|---|---|---|---|
| Stephanie Goodwin (Greenpeace Canada) | Quad Graphics | 5/22/2014 | False allegations re FSC suspensions | E-mail |
| John Sauven (Greenpeace UK) | Guardian | 7/15/2014 | Accusing Resolute of unsustainable operations in the Canadian Boreal forest, threatening woodland caribou, disputes with Indigenous First Nations, and operating in "Endangered Forests," and FSC failings | E-mail |
| Shane Moffatt (Greenpeace Canada) | Flambeau River Papers | 9/23/2014 | Linking to "Boreal Alarm" report accusing Resolute of logging in the Montagnes Blanches, Broadback Valley, Trout Lake Caribou | U.S. Mail or E-mail |
| Greenpeace | Express Newspapers | 2/2015 | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest | U.S. Mail or E-mail |
| Greenpeace | News International | 2/ 2015 | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest | U.S. Mail or E-mail |
| Pat Venditti (Greenpeace UK) | DMG Media | 2/2/2015 | Accusing Resolute of forest destruction and degradation in the Canadian Boreal Forest, FSC failings, threatening woodland caribou, disputes with First Nations; transmitting "Better Buying in the Boreal" report accusing Resolute of being an outlier company degrading the Boreal and imperiling the woodland caribou | U.S. Mail or E-mail |
| Pat Venditti (Greenpeace UK) | News UK | 2/2/2015 | Accusing Resolute of forest destruction and degradation in the Canadian Boreal | U.S. Mail or E-mail |

| | | | Forest, FSC failings, threatening woodland caribou, disputes with First Nations; transmitting "Better Buying in the Boreal" report accusing Resolute of being an outlier company degrading the Boreal and imperiling the woodland caribou | |
|---|---|---|---|---|
| Pat Venditti (Greenpeace UK) | Northern & Shell | 2/2/2015 | Accusing Resolute of forest destruction and degradation in the Canadian Boreal Forest, FSC failings, threatening woodland caribou, disputes with First Nations; transmitting "Better Buying in the Boreal" report accusing Resolute of being an outlier company degrading the Boreal and imperiling the woodland caribou | U.S. Mail or E-mail |
| Pat Venditti (Greenpeace UK) | Trinity Mirror Plc | 2/2/2015 | Accusing Resolute of forest destruction and degradation in the Canadian Boreal Forest, FSC failings, threatening woodland caribou, disputes with First Nations; transmitting "Better Buying in the Boreal" report accusing Resolute of being an outlier company degrading the Boreal and imperiling the woodland caribou | U.S. Mail or E-mail |
| Greenpeace | Bed Bath & Beyond | 2/2/2015 | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest | U.S. Mail or E-mail |
| Amy Moas (Greenpeace USA) and Shane Moffatt (Greenpeace Canada) | Midland Paper | 2/26/2015 | False allegations re FSC suspensions and transmitting link to "Better Buying in the Boreal" report accusing | E-mail |

| | | | Resolute of being an outlier company degrading the Boreal and imperiling the woodland caribou | |
|---|---|---|---|---|
| Amy Moas (Greenpeace USA) and Shane Moffatt (Greenpeace Canada) | HarperCollins | 2/26/2015 | False allegations re FSC suspensions and transmitting link to "Better Buying in the Boreal" report accusing Resolute of being an outlier company degrading the Boreal and imperiling the woodland caribou | E-mail |
| Daniel Brindis (Greenpeace USA) | Quad Graphics | 3/30/2015 | Accusing Resolute of forest destruction and degradation in the Canadian Boreal Forest and FSC failings | E-mail |
| Greenpeace USA | Rite Aid | 4/11/2015 | Accusing Resolute of destroying the Boreal and endangering woodland caribou | E-mail |
| Daniel Brindis (Greenpeace USA) | Resolute customer | 4/14/2016 | Transmitting "Better Buying in the Boreal" report accusing Resolute of being an outlier company degrading the Boreal and imperiling the woodland caribou | E-mail |
| Richard George (Greenpeace UK) | European Newspaper Publishers Association | 5/13/2015 | False allegations re FSC suspensions | U.S. Mail or E-mail |
| Christiane Mazetti (Greenpeace Brazil) | Folha | 8/2015 | Accusing Resolute of forest destruction and degradation in Canada's Boreal forest, FSC failings, jeopardizing woodland caribou, disputes with Indigenous First Nations, and transmitting "Better Buying in the Boreal" report accusing Resolute of being an outlier company degrading the Boreal and imperiling the woodland caribou | E-mail |

| Amy Moas (Greenpeace USA) | McGraw Hill | 3/23/2016 | Transmitting Montagnes Blanches Reports accusing Resolute of logging in Montagnes Blanches, endangering woodland caribou, and FSC failings | U.S. Mail or Email |
|---|---|---|---|---|
| Amy Moas (Greenpeace USA) and Shane Moffatt (Greenpeace Canada) | Penguin Random House | 4/2016 | Transmitting Montagnes Blanches Reports accusing Resolute of logging in Montagnes Blanches, endangering woodland caribou, and FSC failings | E-mail |
| Amy Moas (Greenpeace USA) and Shane Moffatt (Greenpeace Canada) | HarperCollins | 4/2016 | Transmitting Montagnes Blanches Reports accusing Resolute of logging in Montagnes Blanches, endangering woodland caribou, and FSC failings | E-mail |
| Amy Moas (Greenpeace USA) and Shane Moffatt (Greenpeace Canada) | Midland Paper | 4/19/2016 | Transmitting Montagnes Blanches Reports accusing Resolute of logging in Montagnes Blanches, endangering woodland caribou, and FSC failings | E-mail |
| Amy Moas (Greenpeace USA) and Shane Moffatt (Greenpeace Canada) | Macmillan; Holtzbrinck Publishing Group | 12/16/2016 | Accusing Resolute of harvesting in the Montagnes Blanches, degrading and threatening intact forest landscapes, and threatening and jeopardizing the survival of woodland caribou | U.S. Mail or E-mail |
| Amy Moas (Greenpeace USA) and Shane Moffatt (Greenpeace Canada) | Penguin Random House | 12/16/2016 | Accusing Resolute of harvesting in the Montagnes Blanches, degrading and threatening intact forest landscapes, and threatening and jeopardizing the survival of woodland caribou | U.S. Mail or E-mail |

| Amy Moas (Greenpeace USA) and Shane Moffatt (Greenpeace Canada) | Hachette Book Group | 12/16/2016 | Accusing Resolute of harvesting in the Montagnes Blanches, degrading and threatening intact forest landscapes, and threatening and jeopardizing the survival of woodland caribou | U.S. Mail or E-mail |
|---|---|---|---|---|
| Amy Moas (Greenpeace USA) and Shane Moffatt (Greenpeace Canada) | Scholastic | 12/16/2016 | Accusing Resolute of harvesting in the Montagnes Blanches, degrading and threatening intact forest landscapes, and threatening and jeopardizing the survival of woodland caribou | U.S. Mail or E-mail |
| Amy Moas (Greenpeace USA) and Shane Moffatt (Greenpeace Canada) | Harper Collins UK | 2/2017 | Accusing Resolute of harvesting in the Montagnes Blanches, degrading and threatening intact forest landscapes, and threatening and jeopardizing the survival of woodland caribou | U.S. Mail or E-mail |
| Amy Moas (Greenpeace USA) | Simon & Schuster | 6/8/2017 | Accusing Resolute of unsustainable operations in the Canadian Boreal Forest | U.S. Mail or E-Mail |

407.   Moreover, Greenpeace authored and published numerous reports and other Resolute-related updates and blog posts as set forth in Table B on their website, which misled Resolute's customers and resulted in lost business and other interferences with Resolute's business relationships and contractual relationships.  Moreover, communications with Resolute's customers frequently linked or attached these false and misleading publications.   Each publication constitutes a separate fraudulent wire communication:

**TABLE B**

| GREENPEACE PUBLICATIONS | | | |
|---|---|---|---|
| TITLE | AUTHOR | DATE | WEBSITE |

| | | | |
|---|---|---|---|
| Consuming The Boreal Forest: The Chain Of Destruction From Logging Companies To Consumers | Greenpeace Canada | 8//2007 | Greenpeace Canada Greenpeace USA |
| Crisis In Our Forests: A Case Study Of AbitibiBowater's Irresponsible Forestry In The English River Forest | Kim Fry, Richard Brooks, Dave Pearce, Melissa Filion (Greenpeace Canada) | 11/2009 | Greenpeace Canada |
| Stop Logging in endangered forest areas | Greenpeace Canada | 11/26/2012 | Greenpeace Canada |
| Exposed: Resolute Forest Products Breaks Historic Environmental Agreement | Greenpeace Canada | 12/6/2012 | Greenpeace Canada |
| Scandal in the Boreal Forest | Greenpeace Canada | 12/6/2012 | Greenpeace Canada |
| Backgrounder: Resolute Forest Products Violate Canadian Boreal Forest Agreement With Logging Activity In Off-Limit Areas | Greenpeace Canada | 12/6/2012 | Greenpeace Canada |
| It's over Resolute Forest Products | Bruce Cox (Greenpeace Canada) | 12/11/2012 | Greenpeace Canada |
| Boreal Alarm: A Wakeup Call For Action In Canada's Endangered Forests | Catharine Grant, Nicolas Mainville, Freya Putt, Richard Brooks, Shane Moffatt, Holly Postlethwaite, Stephanie Goodwin (Greenpeace Canada) along with Greenpeace USA | 1/16/2013 | Greenpeace USA Greenpeace Canada |
| Greenpeace calls for halt on logging in five key areas in the Boreal Forest | Greenpeace Canada | 1/16/2016 | Greenpeace Canada |
| Resolute Forest Products fails to deliver on sustainability | Greenpeace Canada | 1/17/2013 | Greenpeace Canada |
| Quebec's Boreal Forest: Unions, Government and Greenpeace Talk Solutions | Nicolas Mainville (Greenpeace Canada) | 1/17/2013 | Greenpeace Canada |
| Greenpeace Calls For A Halt On Logging In Five Key Areas In The Boreal Forest | Cassady Craighill (Greenpeace USA) | 1/22/2013 | Greenpeace USA |
| Formal Complaints: Resolute's Forest Stewardship Council (FSC) certificates in Ontario and Quebec | Greenpeace Canada | 3/25/2013 | Greenpeace Canada |
| Ridiculous Tax Break Sought By Resolute In The Boreal Forest | Richard Brooks (Greenpeace Canada) | 4/10/2013 | Greenpeace Canada |
| Resolute's False Promises: The [Un]sustainability Report 2013 | Richard Brooks, Shane Moffatt | 5/15/2013 | http://www.greenpeace.org/canada/resolutefalsepromises/ |
| Buyer Beware, Resolute Forest Products' Sustainability Falls Flat, Report Reveals | Greenpeace Canada | 5/15/2013 | Greenpeace Canada |
| Resolute's Green Marketing Won't Cut It | Shane Moffatt (Greenpeace Canada) | 5/16/2013 | Greenpeace Canada |

| | | | |
|---|---|---|---|
| Resolute Forest Products' Deceit Leads To Collapse Of Boreal Agreement | Greenpeace Canada | 5/21/2013 | Greenpeace Canada |
| Resolute's lawsuit for $7 million aims to silence criticism | Greenpeace Canada | 6/20/2013 | Greenpeace Canada |
| FSC AT RISK: Canada's Resolute Forest Products: Opening FSC To Controversial 'Controlled Wood' Sources | Greenpeace International | 8/29/2013 | Greenpeace International |
| Resolute's Flawed 'Controlled Wood' Threatens FSC's Credibility | Catharine Grant (Greenpeace Canada) | 8/29/2013 | Greenpeace Canada Greenpeace USA |
| Woodland Caribou Aren't The Only Ones In Trouble! | Catharine Grant (Greenpeace Canada) | 10/3/2013 | Greenpeace Canda |
| ForestEthics Defends An Endangered Forest In Ontario | Catharine Grant (Greenpeace Canada) | 10/10/2013 | Greenpeace Canada |
| Sustainability Requires Action, Not Words | Shane Moffatt (Greenpeace Canada) | 10/10/2013 | Greenpeace Canada |
| FSC Suspends Three Certificates Operated By Logging Giant Resolute | Grant Rosoman (Greenpeace International) | 12/12/2013 | Greenpeace International Greenpeace USA |
| Canada's Largest Logging Company Resolute Loses Three Sustainability Certificates, Proving Forest Mismanaged | Richard Brooks (Greenpeace Canada) | 12/12/2013 | Greenpeace Canada |
| It's Not Our Fault That We Lost Our Green Label' Says Resolute | Richard Brooks (Greenpeace Canada) | 12/15/2013 | Greenpeace Canada |
| It's Not Our Fault That We Lost Our Green Label' Says Logging Giant Resolute | Daniel Brindis (Greenpeace USA) | 12/16/2013 | Greenpeace USA |
| The Guardian Tree: Where art and the forest come together | Richard Brooks (Greenpeace Canada) | 2/12/2014 | Greenpeace Canada |
| Forest Solutions: An Insider's Look At Greenpeace Collaborations In Forest Regions Around The World | Stephanie Goodwin (Greenpeace Canada) | 3/1/2014 | Greenpeace Canada Greenpeace International |
| Message To Resolute: You Can Collaborate With Us.  Others Have | Richard Brooks (Greenpeace Canada) | 3/17/2014 | Greenpeace Canada |
| Mount Royal Cross Transformed Into Scales Of Justice: Greenpeace Protests The Reckless Destruction Of Canada's Boreal Forest | Greenpeace Canada | 3/18/2014 | Greenpeace Canada |
| What Environmentalists Do | Stephanie Goodwin | 4/3/2014 | Greenpeace Canada |
| FSC AT RISK: Resolute Forest Management: FSC Must Do More To Protect Intact Forests, Species At Risk And Indigenous Rights In Canada | Greenpeace International | 5/2014 | Greenpeace International |
| Mr. Garneau, Will You Be Part Of The Solution?  60,000 Citizens Stand For Forests | Greenpeace Canada | 5/22/2014 | Greenpeace Canada |
| Ignoring Boreal Forests Could Speed Up Global Warming | Shane Moffatt (Greenpeace Canada) | 6/5/2014 | Greenpeace Canada |
| Greenpeace At Resolute's AGM: Will Richard Garneau Be Part Of The Solution | Nicolas Mainville (Greenpeace Canada) | 5/23/2014 | Greenpeace Canada |

| | | | |
|---|---|---|---|
| Resolute's Transparency Crisis Over Its Operations In Canada's Forests | Nicolas Mainville (Greenpeace Canada) | 6/12/2014 | Greenpeace Canada |
| Ontario Nature Shines A Spotlight On Caribou Forest | Shane Moffatt (Greenpeace Canada) | 9/15/2014 | Greenpeace Canada |
| Field Visit To Atikamekw: The Devastation Of The Logging Industry Has Lasted Too Long | Nicolas Mainville (Greenpeace Canada) | 9/26/2014 | Greenpeace Canada |
| Better Buying In The Boreal Forest | Shane Moffatt (Greenpeace Canada), along with Amy Moas (Greenpeace USA) | 11/2014 | Greenpeace Canada |
| Best Buy Is Wasting Ancient Forests, One Flyer At A Time | Amy Moas | 11/26/2014 | Greenpeace USA |
| Electronics Giant Best Buy Wasting Boreal Forest One Flyer At A Time: Greenpeace Report | Greenpeace Canada | 11/26/2014 | Greenpeace Canada |
| Help Best Buy Get Out Of Ancient Forests | Shane Moffatt (Greenpeace Canada) | 11/26/2014 | Greenpeace Canada |
| Best Buy Does Better For Canada's Forests, Commits To Sustainable Paper | Greenpeace Canada | 12/9/2014 | Greenpeace Canada |
| For Workers And For Our Public Forests, Resolute Must Work To Regain Its FSC Certificates | Richard Brooks (Greenpeace Canada) | 12/18/2014 | Greenpeace Canada |
| Who's Been Naughty And Who's Been Nice To The Planet This Year | Joanna Kerr (Greenpeace Canada) | 12/22/2014 | Greenpeace Canada |
| Will You Stand For The Boreal Forest? | Cristiana De Lia (Greenpeace Canada) | 2/17/2015 | Greenpeace International |
| Posted: Good News for Forests! | Rolf Skar (Greenpeace USA) | 3/6/2015 | Greenpeace International |
| FSC International Calls Out Resolute Forest Products' Leadership, Asks For An Immediate Change In Approach | Nicolas Mainville (Greenpeace Canada) | 3/16/2015 | Greenpeace Canada |
| Rite Aid Making The Wrong Choice For Ancient Forests | Daniel Brindis (Greenpeace USA) | 4/15/2015 | Greenpeace USA |
| How Rite Aid And Other Customers Of Boreal Forest Products Can Support Real Solutions | Daniel Brindis (Greenpeace USA) | 4/17/2015 | Greenpeace USA |
| Join Our Thunderclap: Say It Loud For Real Solutions In The Boreal Forest | Daniel Brindis (Greenpeace USA) | 5/22/2015 | Greenpeace USA |
| Chief Forester Of Quebec Issues Alarming Report On Future Of Caribou | Nicolas Mainville (Greenpeace Canada) | 5/29/2015 | Greenpeace Canada |
| What Did 10,000 Tweets Say To Resolute Forest Products? | Richard Brooks (Greenpeace Canada) | 6/1/2015 | Greenpeace USA |
| Ban On Logging: Cree First Nation More Committed Than Ever To Protect Their Last Intact Forests | Nicolas Mainville (Greenpeace Canada) | 7/14/2015 | Greenpeace Canada |
| Rite Aid: Still Making The Wrong Choice For Forests | Amy Moas (Greenpeace USA) | 7/21/2015 | Greenpeace USA |
| US Pharmacy Giant Rite Aid Is Destroying Canada's Boreal Forest | Amy Moas (Greenpeace USA) | 7/21/2015 | Greenpeace Canada |
| Why Forests Are Critical For Public Health | Amy Moas (Greenpeace USA) | 7/25/2015 | Greenpeace USA |
| US pharmacy Giant Making Wrong Choice For The Boreal Forest | Amy Moas (Greenpeace USA) | 7/29/2015 | Greenpeace International |

PLAINTIFFS' AMENDED COMPLAINT CASE NO. 3:17-CV-02824-JST

| | | | |
|---|---|---|---|
| Collaboration Is The Key To Sustainability In Canada's Boreal Forest | Joanna Kerr (Greenpeace Canada) | 8/28/2015 | Greenpeace USA |
| Maker of Post-It Notes Lives Up To Promise, Begins To Eliminate Destructive Logger from Supply Chain | Amy Moas (Greenpeace USA) | 10/12/2015 | Greenpeace USA |
| Protecting Intact Forests & FSC's Motion 65: Getting The Facts Straight | Greenpeace Canada | 12/15/2015 | Greenpeace Canada |
| Resolute Forest Products: Key Risks And Concerns For Investors | Amy Moas (Greenpeace USA) | 1/2016 | n/a |
| Axing The Broadback? Strong Opposition To The Logging Industry At The COMEX Public Hearings | Nicolas Mainville (Greenpeace Canada) | 1/21/2016 | Greenpeace Canada |
| Certification Update February 2016 - Montagnes Blanches Endangered Forest | Greenpeace Canada | 2/2016 | Greenpeace USA |
| Endangered Forests in the Balance - The impact of logging reaches new heights in the Montagnes Blanches Endangered Forest - Updated February 2016: | Greenpeace Canada | 2/2016 | Greenpeace Canada |
| A Good Reputation Takes Work Not Forest Destruction | Richard Brooks (Greenpeace Canada) | 3/24/2016 | Greenpeace Canada |
| Boreal Forest: The Facts | Greenpeace Canada | 3/27/2016 | Greenpeace Canada |
| Clearcutting Free Speech: How Resolute Forest Products Is Going To Extremes To Silence Critics of Its Controversial Logging Practices | Amy Moas (Greenpeace USA) | 5/2017 | Greenpeace International Greenpeace USA Greenpeace Canada |
| What happened when we demanded that publishers hear the voices of 500,000 of you | Amy Moas (Greenpeace USA) | 6/19/2017 | Greenpeace International |
| 11 People With Extraordinary Power Over the Future of One Threatened Species | Amy Moas (Greenpeace USA) | 8/4/2017 | Greenpeace Canada Greenpeace USA |
| HarperCollins, Forest Destruction, and Free Speeach | Amy Moas (Greenpeace USA) | 9/1/2014 | Greenpeace USA |
| Resolute: Forest Destroyer | Greenpeace Canada | Undated | Greenpeace Canada |
| Boreal Forests | Greenpeace USA | Undated | Greenpeace USA |
| #STAND FOR FORESTS | Greenpeace | Undated | Greenpeace |
| Resolute Forest Products Can Save Forests and Jobs and Respect Indigenous Rights | Greenpeace Canada | Undated | Greenpeace Canada |

408.    Each of the predicate acts referred to in the preceding paragraphs was for the purpose of executing the Enterprise's fraudulent scheme, and Defendants and enterprise

1    members engaged in such acts with the specific intent of furthering that scheme, willfully and

2    with knowledge of its falsity.  Each of the Defendants performed or participated in the

3    performance of at least two of the predicate acts.

4          409.     The Enterprise's scheme to defraud Resolute of its customers was the but-for,

5    proximate, and direct cause of injury to Resolute's business, property, and industry reputation.

6    As outlined by the Enterprise through defendant Paglia of ForestEthics, Resolute was the direct

7    target and intended victim of the Enterprise's scheme to defraud.  The Defendants'

8    misstatements were intended to and did in fact mislead Resolute's customers that Resolute is a

9    rogue actor or "the most regressive forest products company" among otherwise compliant

10   companies, resulting in actual loss of business.   By way of example only, the following

11   companies terminated their business relationships with Resolute as a direct result of the

12   Enterprise's scheme to defraud:

13         (a)     **BestBuy**: Immediately following the Enterprise's November 2014 attack on Best

14   Buy including by publicly admonishing Best Buy in false and misleading blog posts for sourcing

15   from Resolute, coordinating and executing a cyber-attack against Best Buy on its busiest

16   shopping day of the year, and falsely and maliciously orchestrating 52,000 negative product

17   reviews, on December 8, 2014 Best Buy announced it would shift business away from Resolute

18   toward companies that support "sustainable forestry practices."

19         (b)     **3M**:  As a result of Greenpeace's and ForestEthic's dissemination of false and

20   misleading information to 3M in reports, blog posts, via social media, electronic mail and by

21   phone, on March 18, 2015, 3M informed Resolute after "work[ing] with ForestEthics and

22   Greenpeace . . . we are not pursuing new business with Resolute."

23         (c)     **Hachette**:  In June 2014, after months of being targeted with the Enterprise's

24   disinformation about Resolute, including in the December 16, 2016 letter and May 2017

25   Clearcutting Report, Hachette terminated its business relationship with Resolute and publicly

26   endorsed the Enterprise's campaign.

27         (d)     **Kimberly-Clark**: As a result of the Enterprise's dissemination of false and

28   misleading information to 3M in reports, blog posts, via social media, electronic mail and by

phone, on September 2015, Kimberly Clark informed Resolute that "[d]ue to Resolute's continued dispute with Greenpeace" it would not pursue a contractual relationship.

410.    In addition to lost business, numerous other customers demanded accommodations from Resolute such as alternative sourcing from Resolute's other non-Canadian mills in direct response to the Defendants' misrepresentations regarding Resolute's operations in Canada, FSC certifications, or exit clauses.  These customers include, by way of example only, CVS, Victoria's Secret, Procter and Gamble, and Penguin, among others.

411.    Moreover, countless other customers demanded information from Resolute in direct response to the Defendant's false allegations, referencing specific false statements by Defendants.  As a result, Resolute was forced to divert enormous time, effort, resources, and funds to rebutting these false allegations, which is precisely what Defendant Paglia predicted in his May 2013 script detailing actions the Enterprise would take against Resolute: "As a result of all the foregoing [targeting of Resolute's business], . . . an increasing amount of senior executive time will need to be dedicated to managing the impacts of the campaign, responding to customer concerns, and diverted away from managing the core business."

### b) Use of mails and wires in furtherance of a scheme targeting Resolute with the specific intent of defrauding donors

412.    As set forth herein, beginning no later than August 2012, defendants and Enterprise members developed a scheme to launch a fundraising campaign based on the false pretext that Resolute is a rogue actor engaged in unsustainable forestry practices that is destroying intact, endangered forests and threatened woodland caribou.   As the Enterprise threatened, through defendant Paglia, the campaign was intended to falsely "position[ ] Resolute as the most regressive forest products company."

413.    Per its outline, the Enterprise then used the mails and wires to direct false and misleading "ALARMIST ARMAGEDDONIST FACTOIDS" casting Resolute as villain of the Canadian Boreal Forest in order to "emotionalize" and manipulate prospective donors. Accompanying each false and sensational "ALARMIST AND ARMAGEDDONIST" statement, report, web, and blog post with a heavy-handed plea in various forms for the reader to

"DONATE NOW."  The donated funds were then used to perpetuate the campaign villainizing Resolute.

414.    Over the past four years, the Defendants used the mails and wires to execute this scheme to defraud donors.  Each of the Defendants, in furtherance of and for the purpose of executing and attempting to execute this scheme and artifice to defraud donors, on numerous occasions committed acts, used and caused to be used wire communications in interstate and foreign commerce and U.S. mails, by both making and causing to be made wire communications and mailings.  These wire communications and mails were made, inter alia, for the purpose of: (i) preparing false and misleading reports concerning Resolute and its customers for the purpose of misleading donors and prospective donors; (ii) broadly disseminating the false and defamatory reports and other statements through Greenpeace's website and other internet platforms, such as Twitter and Facebook; (iii) communicating and coordinating with one another to effectuate the dissemination of false and misleading information necessary to perpetrate the scheme to harm Resolute; (iv) misappropriating proprietary customer, sourcing, and other trade secret information from Resolute and its customers; (v) disseminating the false and misleading allegations directly to donors; (vi) wiring fraudulently obtained funds to sustain the Enterprise's "campaign" against Resolute; and (vii) filing fraudulent tax returns.  Defendants committed and participated in these acts willfully and with knowledge of their illegality.

415.    Each such use of a wire communication and/or mailing in connection with the described scheme constitutes a separate and distinct violation of the RICO statute, by virtue of violating the incorporated federal predicate acts proscribed by 18 U.S.C. §§ 1341 and/or 1343, and each causing direct injury to Resolute's business and reputation.  While Resolute does not have the full knowledge of the extent of the use of the wires and mails by the Enterprise in furtherance of the scheme, known examples of use of mails and wires in furtherance of the Enterprise's scheme to defraud are set forth in Tables A and B.

416.    In addition, upon information and belief, the Enterprise disseminated falsehoods about Resolute by phone, through electronic mail, and U.S. mail to these donors and prospective

donors.  The total number of phone calls, e-mails, and mailings, and the identities of all Enterprise members is not yet known.

417.    In addition, Greenpeace International, GP-Fund, GP-Inc., and Greenpeace Canada have processed millions of dollars in fraudulently induced donations over the wires in thousands of individual transactions.  Each such transaction constitutes a predicate act.

418.    Defendant's scheme to defraud donors was the but-for, direct, and proximate cause of injury to Resolute's business, property, and reputation.  These predicate acts were intended to and did mislead donors about the Plaintiffs and the putative impact of their harvesting on the environment in order to fraudulently induce donors to donate to Greenpeace's campaign against Resolute.

419.    As a direct result of the misinformation campaign, Resolute was injured in its business, property, and reputation including in the form of lost business and other interference with its contractual and prospective business relationships, including accommodations from Resolute such as alternative sourcing from Resolute's other non-Canadian mills, FSC certifications, or exit clauses.  Moreover, countless other customers demanded information from Resolute in direct response to the Defendant's false allegations, referencing specific false statements by Defendants.  As a result, Resolute was forced to divert enormous time, effort, resources, and funds to rebutting these false allegations,

c) **Extortion And Attempted Of Resolute's And Resolute's Customer's Property In Violation Of Hobbs Act And State And Federal Statutes Criminalizing Same**

420.    As set herein, beginning no later than August 2012, defendants and enterprise members attempted to extort property and other things of value from Resolute and Resolute's customers, without consent, through the wrongful use of fear and threats.

421.    Beginning in April 2013, the Enterprise, through defendant Paglia of ForestEthics used fear and threats of a "coordinated" "brand damaging campaign" and "lawsuits directed at all of Resolute tenures based on endangered species legislation" to attempt to coerce Resolute to forego harvesting rights in large tracts of land and endorse the Enterprise's position and efforts,

which provided a substantial benefit to the Enterprise in the form of enhanced fundraising potential.

422.    As alleged herein, the Enterprise also took direct action against Resolute's customers whereby the Enterprise issued extortive threats demanding that such customers terminate their relationships with Resolute and endorse the Enterprise's position and efforts, which provided a substantial benefit to the Enterprise in the form of enhanced fundraising potential.

423.    As set forth herein, Defendants' extortion of Resolute and its customers was the but-for, direct, and proximate cause of injury to Resolute's business, property, and reputation. These predicate acts were intended to extort property and other things of value from Plaintiffs and their customers and resulted in actual harm to Resolute's business and reputation.

### d)  Computer Crimes Directed At Resolute

424.    As set forth herein, the Enterprise coordinated and carried out cyber-attacks on Resolute's website.  In November 2014, the Enterprise, through the Twitter handle Reaper Tango Down, directed denial of service ("DDOS") attacks against Resolute's website.  Calling Resolute a "Massive Tree Killer," the Enterprise announced that it had attacked and taken down Resolute's website.

425.    All of Resolute's computers that supported or assisted in supporting its website were protected computers in that they were used in and/or affected interstate and foreign commerce.  The Enterprise intentionally accessed these computers without authorization.

426.    The Enterprise knowingly caused the transmission of a program, information, code, or command in the form of a DDOS attack interfering with Resolute's website by redirecting traffic to the company's servers and repeating requests to the servers every time a visitor came to the website, which overwhelmed its capacity and caused it to go down.

427.    The Enterprise's DDOS attack impacted ten or more of Resolute's protected computers.  The DDOS attack impaired the integrity of and data, program, system, or information on Resolute's computers by slowing down, overloading, and overwhelming

Resolute's computers serving Resolute's website, and by making Resolute's website inaccessible.

428.    As a result of the Enterprise's cyber-attack, Resolute sustained damages in the form of resources and time to conduct an investigation into the cause and source of these down-time incidents, determining and conducting an assessment of the damage caused by the invasion of Resolute's servers, restoring and remedying the damages, increasing cyber-security systems and returning the computers into service.

### e)   Money Laundering

429.    In furtherance of the campaign, the Enterprise knowingly engaged in monetary transactions involving illicit proceeds derived from the illegal campaign against Resolute. The Enterprise deposited, withdrew, transferred, or exchanged funds in or affecting interstate or foreign commerce to a financial institution.  These funds were derived from the Enterprise's racketeering activity, including mail and wire fraud, extortion, illegal interference with commerce, and violations of the Computer Fraud and Abuse Act.

### f)   Misappropriation Of Confidential Information

430.    As set forth herein, the Enterprise knowingly attempted to and did steal Plaintiffs' confidential and propriety customer and other information by fraud, artifice, or deception, including through the use of aliases, cyber-attacks and other illegal means, to the economic benefit of an entity other than Plaintiffs.  Such information is related to products and services used in interstate or foreign commerce.  Plaintiffs have taken reasonable measures to keep such information secret, and the information derives economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

431.    Each of the predicate acts referred to in the preceding paragraphs was for the purpose of executing the Enterprise's fraudulent scheme, and set forth herein, Defendants and enterprise members engaged in such acts with the specific intent of furthering that scheme, willfully and with knowledge of its falsity.  Each of the Defendants performed or participated in the performance of at least two of the predicate acts.

432.    The conduct and actions set forth herein were related to each other by virtue of: (a) common participants; (b) a common victim; and (c) the common purpose and common result of a concerted attack on Plaintiffs' business practices to fraudulently solicit and maximize donations and cause harm to Resolute's business, property, and reputation.

433.    The Defendants' activities were interrelated, not isolated, and involved a calculated series of repeated violations of the law in order to conceal and promote fraudulent activity.  The Enterprise has existed with the current members and others as yet unknown since at least 2012, and the conduct and activities have continued as of the date of this Complaint.

434.    The Defendants' direct and indirect participation in the Enterprise's affairs through the pattern of racketeering and activity described herein constitutes a violation of 18 U.S.C. § 1962(c).

435.    As a direct and proximate cause of the Defendants' violations of 18 U.S.C. §1962(c), Plaintiffs have sustained damage to their business, property, and reputation, including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above that was not only foreseeable but intended and an objective of the predicate activity. Plaintiffs' damages include, but are not limited to: (i) lost revenue, profits and enterprise value, including lost business opportunities, lost customers, lost market share and decreased production; (ii) increased fees and expenses, as well as the expenditure of significant human resources, incurred and devoted to uncovering the nature and scope of, and attempting to remedy, Defendants' illegal enterprise and the harm directly resulting therefrom; (iii) misappropriated proprietary information; and (iii) damaged reputation in the global marketplace, business and environmental communities.

436.    As a result of the violations of 18 U.S.C. § 1962(c), Plaintiffs have suffered damages in an amount to be proven at trial, but which Greenpeace itself estimates to be not less than C$100 million.  Plaintiffs are entitled to recover from the Defendants the amount in which they have been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest, costs, and attorneys' fees incurred by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), and disgorgement of Defendants' illicit proceeds.

## COUNT II

### RACKETEERING IN VIOLATION OF RICO, 18 U.S.C. §§ 1962(a)
### (AGAINST ALL DEFENDANTS)

437.    Plaintiffs restate paragraphs 1 through 436 as if fully set forth herein.

438.    The Enterprise is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a), which was engaged in, or the activities of which affected, interstate and/or foreign commerce.

439.    In furtherance of the Enterprise, Defendants committed the predicate racketeering acts as pleaded herein.  It was the purpose of the Enterprise to create and disseminate false and misleading reports and information concerning Resolute, under the guise of protecting the environment, but in truth, for the unlawful purpose of interfering with Resolute's business relationships and soliciting fraudulent donations from the public at-large.  This widespread dissemination scheme was intended to, and did, result in substantial profits for the members of the Enterprise, and caused enormous harm to Resolute in so far as it funded the enterprise racketeering activity against Plaintiffs which intentionally damaged its business and property.

440.    The Enterprise's conduct and acts in furtherance of the fraudulent scheme included, but were not limited to the predicate RICO acts of: (a) use of mails and wires in a scheme to defraud Resolute of its confidential business information and business and in violation of 18 U.S.C. §§ 1341 and 1343, as set forth in 18 U.S.C. §§ 1961(1)(B); (b) use of mails and wires in a scheme to defraud donors by targeting and harming Resolute in violation of 18 U.S.C. §§ 1341 and 1343; (c) extortion of Resolute and its customers in violation of 18 U.S.C. §§ 875-77, 880, and 18 U.S.C. § 1951; (e) computer fraud directed at Resolute's computers and website in violation of 18 U.S.C. § 1030(a)(5) resulting in damage as defined in § 1030(c)(4)(A)(i)(II) through (VI); (f) money laundering of illicit proceeds in violation of 18 U.S.C. § 1957; and (g) theft of trade secrets in violation of 18 U.S.C. § 1832, which constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

441.    In conducting the affairs of the Enterprise, Defendants used and invested income that was derived from the pattern of racketeering activity, directly or indirectly, in the operations

of the Greenpeace Defendants and the Enterprise, which are entities and an enterprise engaged in, and the activities of which affect, interstate and foreign commerce, in violation of 18 U.S.C. § 1962(a). Specifically, the Defendants used funds they fraudulently procured through the alleged pattern of predicate acts to: (a) fund the Enterprise; (b) fund the dissemination of materially false and fraudulent information used to induce donors to make contributions to the Enterprise and individual Enterprise Members; and (c) fund the expanded attack on Resolute and its relationships with customers, partners and other critical business constituents as alleged in this complaint, including but not limited to the use of illicit funds from fraudulently induced donations to fund the direct actions against Resolute customers that caused the loss of those customers and market share in an amount the Enterprise has estimated to be not less than C$100 million, (d) to fund direct and indirect actions directed at Resolute's relationship with FSC and the auditors responsible for evaluating compliance with FSC certification standards, and € to fund the fraudulent misappropriation of proprietary customer, sourcing and other trade secret information from Resolute and its customers, which it then used to target these customers.

442. Accordingly, the racketeering activity consisted of multiple, related acts perpetrated during the Scheme Period that are indictable under 18 U.S.C. § 1343 (relating to wire fraud) and 18 U.S.C. § 1341 (relating to mail fraud) as well as the other predicate acts alleged herein that are within the scope of 18 U.S.C. § 1961(1)(B) and (5).

443. As a direct and proximate cause of the Defendants' violations of 18 U.S.C. §1962(a), Plaintiffs have sustained damage to their business, property and reputation, including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above, as well as, the use and investment of the illicit funds derived through those predicate acts to target and harm Resolute's business, property and reputation. Plaintiffs' damages include, but are not limited to: (i) lost revenue, profits and enterprise value, including lost business opportunities, lost customers, lost market share and decreased production; (ii) misappropriated proprietary information; (iii) increased fees and expenses, as well as the expenditure of significant human resources, incurred and devoted to uncovering the nature and scope of, and

attempting to remedy, Defendants' illegal enterprise and the harm directly resulting therefrom; and (iv) damaged reputation in the global marketplace, business and environmental communities.

444.     As a result of the violations of 18 U.S.C. § 1962(a), Plaintiffs have suffered substantial damages in an amount to be proven at trial, but which the Enterprise has estimated as not less than C$100 million.  Plaintiffs are entitled to recover from the Defendants the amount in which they have been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest, costs, and attorneys' fees incurred by reason of the Enterprise's violations of 18 U.S.C. § 1962(a), and disgorgement of Defendants' illicit proceeds.

## COUNT III

### CONSPIRACY IN VIOLATION OF RICO, 18 U.S.C. § 1962(d)
### (AGAINST ALL DEFENDANTS)

445.     Plaintiffs restate paragraphs 1 through 444 above as if fully set forth herein.

446.     As set forth herein, during the Scheme Period, each of the Defendants willfully, knowingly and unlawfully conspired to, and did further the efforts of the Enterprise to perpetrate the scheme against Plaintiffs through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(c) and 1962(a).

447.     In furtherance of the conspiracy, and to effectuate its objectives, each of the Defendants and Enterprise members agreed that the following predicate acts, among others, would be committed by one or more the members of the conspiracy: (a) use of mails and wires in a scheme to defraud Resolute of its confidential business information and business and in violation of 18 U.S.C. §§ 1341 and 1343, as set forth in 18 U.S.C. §§ 1961(1)(B); (b) use of mails and wires in a scheme to defraud donors by targeting and harming Resolute in violation of 18 U.S.C. §§ 1341 and 1343; (c) extortion of Resolute and its customers in violation of 18 U.S.C. §§ 875-77, 880, and 18 U.S.C. § 1951; (e) computer fraud directed at Resolute's computers and website in violation of 18 U.S.C. § 1030(a)(5) resulting in damage as defined in § 1030(c)(4)(A)(i)(II) through (VI); (f) money laundering of illicit proceeds in violation of 18 U.S.C. § 1957; and (g) theft of trade secrets in violation of 18 U.S.C. § 1832, which constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

448.     Specifically, the following predicate acts were performed at the direction of, and/or were foreseeable to, the Defendants, for the purpose of executing the scheme to solicit fraudulent donations and harm Resolute's business: (i) the preparation of false and misleading reports concerning Resolute and its customers; (ii) the broad dissemination of false and defamatory reports and other statements through Greenpeace's website and other internet platforms, such as Twitter and Facebook; (iii) communication and coordination with one another to effectuate the dissemination of false and misleading information necessary to perpetrate the scheme to harm Resolute; (iv) the dissemination of false and misleading allegations directly to Resolute's stakeholders, customers, trade associations, government regulators, and other critical market constituents through email and phone; (v) the misappropriation of proprietary customer, sourcing and other trade secret information from Resolute and its customer; (vi) extortionate threats directed at Resolute and its customers ; (vii) the solicitation of fraudulent charitable donations from the public by means of false pretenses, representations, or promises; (viii) the wiring of fraudulently obtained funds to sustain the Enterprise's "campaign" against Resolute; and (ix) submitting materially false and misleading tax submissions and financial information.

449.     It was specifically intended and foreseen by Defendants that the Enterprise would engage in, and conduct activities which affected interstate commerce.  Each Defendant was aware of the various racketeering schemes, assented to the efforts of the Enterprise to carry out these acts, and acted in furtherance of the conspiracy.

450.     The pattern of racketeering consisted of multiple acts of racketeering by each of the Defendants.  The activities of these Defendants were interrelated, not isolated, and were perpetrated for the same or similar purposes by the same persons.  These activities extended for several years, and continued up to the commencement of this action.  The Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(c) and 1962(a), in violation of 18 U.S.C. § 1962(d).

451.     Plaintiffs have been injured in their business and property as a direct and proximate cause of the Defendants' conspiracy to violate 18 U.S.C. §§ 1962(c) and 1962(a), and the overt acts taken in furtherance of that conspiracy.

452.     Plaintiffs have been injured in their business and property as a direct and proximate cause of the Defendants' violations of 18 U.S.C. §1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above.  Plaintiffs' damages include, but are not limited to: (i) lost revenue, profits and enterprise value, including lost business opportunities, lost customers, lost market share and decreased production; (ii) misappropriated proprietary information; (iii) increased fees and expenses, as well as the expenditure of significant human resources, incurred and devoted to uncovering the nature and scope of, and attempting to remedy, Defendants' illegal enterprise and the harm directly resulting therefrom; and (iv) damaged reputation in the global marketplace, business and environmental communities.

453.     As a result of the violations of 18 U.S.C. § 1962(d), Plaintiffs have suffered substantial damages in an amount to be proven at trial, but which the Enterprise has estimated as not less than C$100 million.  Plaintiffs are entitled to recover from the Defendants the amount in which they have been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest, costs, and attorneys' fees incurred by reason of the Enterprise's violations of 18 U.S.C. § 1962(d), and disgorgement of Defendants' illicit proceeds.

## COUNT IV

### DEFAMATION
### (AGAINST ALL DEFENDANTS)

454.     Plaintiffs restate paragraphs 1 through 453 above as if fully set forth herein.

455.     As set forth herein, Defendants knowingly and intentionally published false and injurious statements about Resolute, including, among other things, that:

> (a)     Resolute is engaged in destructive and unsustainable logging activities in Canada's Boreal Forest;
>
> (b)     Resolute is engaged in logging activities in the First Nations Communities' territories without their consent;
>
> (c)     Resolute is responsible for the destruction of vast areas of Canada's Boreal Forest and destroyed critical woodland caribou habitat;
>
> (d)     Resolute's logging practices violate Canadian forestry regulations and FSC certification standards;

(e)     Resolute's Forest Stewardship Council certificates have been suspended as a result of serious deficiencies in Plaintiffs' logging operations;

(f)     Resolute violated the CBFA by logging in off-limits areas.

456.    Defendants published these false and misleading statements in numerous publications on the internet, on social media platforms such as Twitter and Facebook, and in direct emails, letters, and telephone communications with Plaintiffs' stakeholders, customers, trade associations, government regulators, and other critical market constituents.

457.    As set forth herein, the false and defamatory statements set forth herein concerning Plaintiffs were made and published with actual malice, as such statements were made by Defendants with knowledge of their falsity or reckless disregard for their truth.

458.    Defendants published these falsehoods to third-parties and understood and intended that these false statements would have the effect of injuring Plaintiffs' reputation, preventing others from doing business with Plaintiffs, and interfering with Plaintiffs' existing business relationships.  Those third-parties include, among others, Plaintiffs' stakeholders, customers, trade associations, shareholders, third-party auditors, government regulators, other critical market constituents, and the general public.

459.    Defendants' false statements directly harmed Plaintiffs' business, property, and reputation in numerous specific ways, including, but not limited to: lost customers; lost profits; increased expenses; legal fees; and costs expended to mitigate the impact of Defendants' malicious campaign.

460.    Defendants' publication of the false and defamatory statements cited herein have proximately caused Plaintiffs to suffer monetary damages in an amount to be determined at trial.

461.    The Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to consequences.

462.    Because Defendants have engaged in conduct of a fraudulent and malicious nature, Plaintiffs are entitled to reputational and punitive damages.

## COUNT V

### TRADE LIBEL

### (AGAINST ALL DEFENDANTS)

463.    Plaintiffs restate paragraphs 1 through 462 above as if fully set forth herein.

464.    As set forth herein, Defendants knowingly and intentionally published false and injurious statements disparaging the quality of Plaintiffs' product, including, among other things, that Resolute's products are not sustainable and should not be purchased because:

(a)    Resolute is engaged in destructive and unsustainable logging activities in Canada's Boreal Forest;

(b)    Resolute is engaged in harvesting activities in the First Nations Communities' territories without their consent;

(c)    Resolute is responsible for the destruction of vast areas of Canada's Boreal Forest and destroyed critical woodland caribou habitat;

(d)    Resolute's harvesting violates Canadian forestry regulations and FSC certification standards; and

(e)    Resolute's Forest Stewardship Council certificates have been suspended as a result of serious deficiencies in Plaintiffs' logging operations.

465.    Defendants published these false, defamatory, and disparaging statements in numerous publications on the internet, on social media platforms such as Twitter and Facebook, and in direct emails, letters, and telephone communications with Plaintiffs' stakeholders, customers, trade associations, government regulators, and other critical market constituents.

466.    As set forth herein the false, defamatory, and disparaging statements set forth herein concerning the quality of Plaintiffs' product were made and published with actual malice, as such statements were made by Defendants with knowledge of their falsity or reckless disregard for their truth.

467.    Defendants published these falsehoods to third-parties and understood and intended that these false statements would have the effect of disparaging the quality of Plaintiff's products, preventing others from doing business with Plaintiffs, and interfering with Plaintiffs' existing business relationships.

468.     Defendants' false statements directly harmed Plaintiffs' business, property, and reputation in numerous specific ways, including, but not limited to: lost customers; lost profits; increased expenses; legal fees; and costs expended to mitigate the impact of Defendants' malicious campaign.

469.     Defendants' publication of the false, defamatory, and disparaging statements cited herein have proximately caused Plaintiffs to suffer monetary damages in an amount to be determined at trial.

## COUNT VI

### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

### (AGAINST ALL DEFENDANTS)

470.     Plaintiffs restate paragraphs 1 through 469 above as if fully set forth herein.

471.     Plaintiffs had prospective business relationships with many third-parties, including, but not limited to: (i) potential customers; (ii) potential investors; (iii) potential distributors; (vii) potential employees; (viii) community leaders; and (iv) government regulators.

472.     Each of the Defendants knew of Plaintiffs' potential business relationships with these third parties.

473.     Defendants intentionally and maliciously interfered with and disrupted Plaintiffs' prospective business relationships with these third-parties by employing wrongful means, including, but not limited to, the dissemination of false, misleading and defamatory statements concerning Plaintiffs' business.  This interference was committed intentionally and without justification or excuse and was carried out by, among other things:

(f)     The publication of false and misleading statements in numerous publications on the internet;

(g)     The publication of false and misleading statements on social media platforms;

(h)     The dissemination of false, misleading, and defamatory allegations to Plaintiffs' stakeholders, customers, trade associations, community leaders, government regulators, and other critical market constituents; and

(i)     Other overt acts to harm Plaintiffs' business and reputation.

474.     Plaintiffs had a reasonable expectation that each of the aforementioned business relationships would result in Plaintiffs obtaining the benefits of these business opportunities. However, Defendants' wrongful actions disrupted and directly caused Plaintiffs to lose the business relationships described herein, thereby causing Plaintiffs to suffer significant economic damages.  Each of the Defendants was aware of, and intended to cause, this disruption of Plaintiffs' prospective business relationships.

475.     As a direct and proximate result of Defendants' intentional interference with Plaintiffs' prospective business relationships with third-parties, Plaintiffs' business relationships were damaged, including but not limited to: (i) prospective relationships with new customers; and (ii) potential new business with existing customers.

476.     The Defendants' wrongful interference with and disruption of Plaintiffs' prospective business relationships caused Plaintiffs to suffer monetary damages, stemming from, among other things, lost revenue, decreased production, increased costs, injury to reputation and attorney's fees in an amount to be determined at trial.

477.     The Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to consequences.

478.     Because Defendants have engaged in conduct of an oppressive, fraudulent, and malicious nature, Plaintiffs are entitled to punitive damages.

## COUNT VII

### TORTIOUS INTERFERENCE WITH
### CONTRACTUAL RELATIONS

479.     Plaintiffs restate paragraphs 1 through 227 above as if fully set forth herein.

480.     Plaintiffs had contractual relationships and agreements with third-parties, including, among others, customers, trade associations, distributors, and shareholders.

481.     Each of the Defendants knew of Plaintiffs' contractual relationships with these third-parties.

482.    Defendants intentionally and maliciously interfered with and disrupted Plaintiffs' contractual relationships with these third-parties.  This interference was committed intentionally and without justification and was carried out by, among other things:

> (j)    The dissemination of false, misleading and defamatory allegations to and about customers in an effort to coerce those customers to cease conducting business with Plaintiffs;
>
> (k)    The publication of false and misleading statements in numerous publications on the internet, on social media platforms, and via email, mail, telephone in-person communications to Plaintiffs' stakeholders, customers, trade associations, shareholders, third-party auditors, government regulators, community leaders and other critical market constituents.
>
> (l)    Threatening to harm Plaintiffs' customers unless they terminated their business relationships with Plaintiffs; and
>
> (m)    Effecting the unjustified suspension of Plaintiffs' FSC certificates in order to damage the marketability of Plaintiffs' products.

483.    Defendants were not parties to these contracts and interfered with and disrupted the contractual relationships without privilege.

484.    As a direct and proximate result of Defendants' intentional interference and disruption of Plaintiffs' contractual relationships with third-parties, Plaintiffs have suffered actual damages in an amount to be determined at trial.

485.    The Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to consequences.

486.    Because Defendants have engaged in conduct of an oppressive, fraudulent, and malicious nature, Plaintiffs are entitled to punitive damages.

## COUNT VIII

### COMMON LAW CIVIL CONSPIRACY
### (AGAINST ALL DEFENDANTS)

487.    Plaintiffs restate paragraphs 1 through 485 above as if fully set forth herein.

488.    As set forth herein, each of the Defendants, together with others, conspired with respect to Counts IV-VII, IX and acted in concert to commit unlawful acts.  Each of the

Defendants shared the same conspiratorial objective, which was to create and disseminate false, misleading and defamatory statements, regarding:

       (n)    Plaintiffs' logging practices and the alleged effect these practices had on the First Nations Communities, the Canadian Boreal Forest, woodland caribou habitat, and the world climate;

       (o)    Plaintiffs' logging practices allegedly violating the Canadian Forestry laws and regulations and FSC certification standards;

       (p)    Plaintiffs' Forest Stewardship Council certifications being suspended as the result of serious deficiencies in Plaintiffs' logging operations; and

       (q)    Plaintiffs' alleged violation of the CBFA by logging in off-limits areas.

489.    Defendants' conspiratorial scheme was carried out by the commission of the wrongful and overt acts set forth above, including, but not limited to:

       (r)    The publication of false and misleading statements in numerous publications on the internet;

       (s) The publication of false and misleading statements on social media platforms;

       (t)    The dissemination of false, misleading, and defamatory allegations to Plaintiffs' stakeholders, customers, trade associations, third-party auditors, government regulators, and other critical market constituents.

490.    At all relevant times, Defendants' conduct was willful and done with legal malice and knowledge that it was wrongful.

491.    As a direct, proximate result of the operation and execution of the conspiracy, Plaintiffs have been injured and suffered damages in an amount to be proven at trial.

## COUNT IX

### UNFAIR BUSINESS PRACTICES IN VIOLATION OF

### CAL. BUS. & PROF. CODE §§ 17200 and 17500

### (AGAINST ALL DEFENDANTS)

492.    Plaintiffs restate paragraphs 1 through 493 above as if fully set forth herein.

493.    As set forth herein, Defendants engaged in unlawful, unfair, and fraudulent business practices by knowingly and intentionally publishing false and misleading statements concerning Plaintiffs, without disclosing Defendants' economic motivation and personal interest

in seeing Resolute harmed, in violation of Business and Professions Code §§ 17200 and 17500. These false and misleading statements include, among other things, that:

> (u)    Resolute is engaged in destructive and unsustainable logging activities in Canada's Boreal Forest;
>
> (v)    Resolute is engaged in logging activities in the First Nations Communities' territories without their consent;
>
> (w)    Resolute is responsible for the destruction of vast areas of Canada's Boreal Forest and destroyed critical woodland caribou habitat;
>
> (x)    Resolute's logging practices violate Canadian forestry regulations and FSC certification standards;
>
> (y)    Resolute's Forest Stewardship Council certificates have been suspended as a result of serious deficiencies in Plaintiffs' logging operations;
>
> (z)    Resolute violated the CBFA by logging in off-limits areas.

494.    Defendants published these false and/or misleading statements concerning Resolute in numerous publications on the internet, on social media platforms such as Twitter and Facebook, and in direct emails, letters, and telephone communications with Plaintiffs' stakeholders, customers, trade associations, government regulators, other critical market constituents, and the general public.

495.    The false, defamatory, and disparaging statements set forth herein concerning Plaintiffs were made and published with actual malice, as such statements were made by Defendants with knowledge of their falsity or reckless disregard for their truth.

496.    Defendants published these falsehoods to third-parties and understood and intended that these false statements would have the effect of injuring Plaintiff's reputation, preventing others from doing business with Plaintiffs, and interfering with Plaintiffs' existing business relationships.  Those third-parties include, among others, Plaintiffs' stakeholders, customers, trade associations, shareholders, third-party auditors, government regulators, other critical market constituents, and the general public.

497.    Defendants' false statements have injured Plaintiffs' business, property, and reputation in numerous specific ways, including, by diminution of the value of Plaintiffs' assets and amounts lost in the decline of Plaintiffs' market capitalization and other vested interests of Plaintiffs resulting from the Defendants' conduct.

498.    Plaintiffs are entitled to preliminary and permanent injunctive relief restraining the Defendants from committing further unfair trade practices and mandating the full disclosure of Defendants' personal and financial interests in seeing Plaintiffs' harmed and full disclosure of the false and misleading nature of Defendants' statements regarding Plaintiffs.

## DEMAND FOR JURY TRIAL

Demand is hereby made for a trial by jury for all issues so triable.

WHEREFORE, Plaintiffs demand judgment:

(a)    Awarding Plaintiffs compensatory damages in amounts to be determined at trial, together with interest, attorneys' fees, costs and disbursements;

(b)    Awarding Plaintiffs punitive and exemplary damages in amounts to be determined at trial;

(c)    Awarding Plaintiffs treble damages, costs of suit, attorney's fees and costs of litigation under 18 U.S.C. § 1964(c), in amounts to be determined at trial;

(d)    Awarding Plaintiffs injunctive relief preventing Defendants from engaging in continued wrongful activity and disgorgement, as set forth herein, in the form that the Court may determine is just and proper, and requires them to disgorge all monies they have improperly secured;

(e)    Prejudgment and post-judgment interest; and

(f)    Such other and further relief as is just and proper.


Dated: November 6, 2017

KASOWITZ BENSON TORRES LLP

By: /s/ Lyn R. Agre
        Lyn R. Agre
        Michael J. Bowe
        Lauren Tabaksblat

*Attorneys for Plaintiffs*