UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RESOLUTE FOREST PRODUCTS, INC., et al., | Case No. 17-cv-02824-JST |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS AND STRIKE** |
| GREENPEACE INTERNATIONAL, et al., | |
| Defendants. | Re: ECF Nos. 197, 198, 199 |

## I.    INTRODUCTION

Plaintiffs Resolute Forest Products, Inc., Resolute FP US, Inc., Resolute FP Augusta, LLC, Fibrek General Partnership, Fibrek U.S., Inc., Fibrek International, Inc., and Resolute FP Canada, Inc. (collectively, "Resolute" or "Plaintiffs"), filed this case alleging claims for violation of the federal RICO laws[1] as well as state law claims including defamation and tortious interference with prospective and contractual business relations. ECF No. 1. Defendants are the environmental groups Greenpeace and Stand, as well as several of their employees and officers. *Id.* The Court granted Defendants' previous motions to dismiss Resolute's initial complaint. ECF No. 173. Resolute filed an amended complaint. ECF No. 185 ("FAC"). Defendants now bring three renewed motions to dismiss and strike. ECF Nos. 197, 198, 199.

In one motion, Defendants Stand, formerly known as ForestEthics, and Todd Paglia, the organization's Executive Director, move to dismiss Resolute's amended complaint under Rule 12(b)(6) with prejudice and to strike it under California's "anti-SLAPP" statute, which provides grounds to dismiss actions deemed Strategic Lawsuits Against Public Participation, Cal. Civ. Proc. Code § 425.16. ECF No. 197. In a second motion, Defendant Greenpeace Fund, Inc.

---

[1] The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962 *et seq.*

("Greenpeace Fund") moves to dismiss under Rule 12(b)(6) and to strike. ECF No. 198. Finally, Defendants Greenpeace International, Greenpeace, Inc., Greenpeace, Inc. employees Daniel Brindis, Amy Moas, and Rolf Skar, and Greenpeace International employee Matthew Daggett (collectively, the "Greenpeace Defendants") move to dismiss. ECF No. 199. The Court grants the motions in part and denies them in part.

## II.    REQUESTS FOR JUDICIAL NOTICE

The parties make three requests for judicial notice. ECF Nos. 202, 209, 216. First, the Greenpeace Defendants ask the Court to take judicial notice of: (1) a complaint filed against them in the District of North Dakota, (2) two news articles, (3) a public statement by Arnaud Nourry, the CEO of Hachette Livre referenced in Resolute's complaint, (4) two documents filed in Ontario Superior Court, and (5) nine emails, reports, letters, and other documents written by the Greenpeace Defendants referenced in Resolute's complaint. ECF No. 202 at 3-4.

Under the incorporation by reference doctrine, a court may "take into account documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'" *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)). Additionally, a court "may take notice of proceedings in other courts . . . if those proceedings have a direct relation to matters at issue." *Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007) (internal quotation marks and citation omitted). Finally, under Federal Rule of Evidence 201, courts may take into account matters of public record, as long as they are not subject to reasonable dispute. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001). However, a document is not judicially noticeable "simply because it appears on a publicly available website, regardless of who maintains the website or the purpose of the document." *Rollins v. Dignity Health*, 338 F. Supp. 3d 1025, 1032 (N.D. Cal. 2018). Accordingly, the Court takes judicial notice of the Greenpeace Defendants' documents, although it does so as to the news articles solely because the request is unopposed.

Resolute asks the Court to take judicial notice of (1) one document filed in Ontario Superior Court, (2) one news article, and (3) a transcript from this Court's October 10, 2017 oral

1   argument. ECF No. 209 at 2. These requests are likewise unopposed, and the Court takes judicial

2   notice of these documents as well.

3          Finally, the Greenpeace Defendants request judicial notice of (1) a news article, (2) a letter

4   regarding a release discussed in the briefing but not the complaint, (3) a document referenced in

5   Resolute's complaint, (4) a document that Defendants characterize as publicly filed in Canadian

6   litigation but which is actually an email between counsel regarding that litigation, (5) a document

7   publicly filed in Ontario Superior Court, (6) publicly available records and statements from the

8   Forest Stewardship Council and Rainforest Forest Products, and (7) a public statement by

9   Resolute. ECF No. 216 at 3-5. The Court does not take judicial notice of the second of these

10  documents, the letter regarding the release, as the release is not referenced in the complaint, and

11  the parties debate the letter's authenticity and the veracity of its contents. *See* ECF No. 210 at 27

12  n.2. Likewise, the Court does not take judicial notice of the letter regarding the Canadian

13  litigation because to "the Court's knowledge, this . . . has not been publicly filed in this action or

14  in any other action." *Mata v. Manpower Inc.*, No. 14-CV-03787-LHK, 2016 WL 1039037, at *7

15  (N.D. Cal. Mar. 15, 2016) (declining to take judicial notice of deposition testimony in other

16  litigation). The Court takes judicial notice of the remaining documents.

## III.    BACKGROUND

18         Plaintiffs consist of several corporate entities in the forest products industry, which

19  together harvest trees and mill wood to manufacture and sell paper products. FAC ¶¶ 24-30.

20  Defendants Greenpeace International, a worldwide organization based in the Netherlands;

21  Greenpeace, Inc., a U.S. based affiliate; Greenpeace Fund, a U.S. based fundraising organization;[2]

22  and Stand, are all non-profit environmental advocacy organizations. *Id.* ¶¶ 31-34. Individual

23  defendants Paglia, Moas, Skar, and Brindis work for Defendants. *Id.* ¶¶ 35-39. Resolute alleges

24  that the Defendants worked together with other environmental organizations, including non-party

25  Greenpeace Canada, to carry out a campaign called "Resolute: Forest Destroyer" to target the

26

27  [2] Although Resolute alleges that "GP-Fund and GF-Inc. . . . are separate and distinct legal
    entities," throughout its complaint and briefing, Resolute refers to the parties together as
28  Greenpeace USA. FAC ¶ 41.

logging company with misrepresentations regarding its sustainability practices in Canada, and to drive its customers to leave the company. *Id.* ¶¶ 5-7. The most relevant alleged misrepresentations include the following.[3]

The first statement concerns the Canadian Boreal Forest Agreement ("CBFA"). Under the CBFA, Resolute and other forest companies operating in the Boreal joined with leading environmental groups, including non-party Greenpeace Canada and Defendant ForestEthics. *Id.* ¶ 69. The groups agreed not to publicly campaign against signatory forest companies in exchange for commitments from those forestry companies to harvest only in agreed-upon areas while the parties developed joint conservation plans. *Id.* ¶ 70. In a September 17, 2012 letter to the Forest Products Association of Canada, Paglia and several non-parties accused Resolute of logging in areas protected by the CBFA. *Id.* ¶ 224. Shortly thereafter, on December 6, 2012, non-party Greenpeace Canada issued a report about Resolute's failure to comply with the CBFA, which featured photographs and videos purporting to show unlawful harvesting. *Id.* ¶ 89. Skar sent an email to Resolute customer Hearst on December 7, 2012, attaching photographs allegedly indicating that Resolute had violated the CBFA. *Id.* ¶ 103.

Resolute alleges that these photographs did not depict unlawful logging. The roads depicted in the photographs either were permitted by the CBFA or constructed by the government of Quebec. And the deforestation depicted in the photographs resulted from harvesting that occurred a decade before the CBFA. *Id.* ¶¶ 92, 95. Accordingly, in a December 12, 2012, letter to Stand and other CBFA members, Resolute wrote that it had not violated the CBFA, and explained why the photographs were misleading. *Id.* ¶¶ 106-07. In late January 2013, Brindis emailed the Greenpeace Canada report to Hearst, notwithstanding Brindis's acknowledgement that he had reviewed Resolute's rebuttal. *Id.* ¶ 113. On March 19, 2013, Greenpeace Canada issued a notice of correction acknowledging that it erred due to using incomplete maps when it stated that Resolute violated the CBFA. *Id.* ¶¶ 115-16. Resolute does not allege that Defendants made any

---

[3] The Court provides only a summary given that the amended complaint spans 224 pages including exhibits. The Court's previous order dismissing and striking Resolute's complaint covers the factual background of the dispute in more detail. ECF No. 173.

specific misrepresentations regarding Resolute's compliance with the CBFA after this retraction.[4]

Resolute also alleges that "since no later than late-2012 and early 2013," the Defendants and other non-party environmental advocacy organizations discussed plans to target Resolute, and the plan was memorialized in an "operational memorandum." FAC ¶ 76. Resolute alleges that the memorandum described a plan to falsely depict Resolute as violating the CBFA, and as a particularly bad actor among forestry companies. *Id.* ¶¶ 77-88. The memorandum also outlined plans to commence lawsuits against Resolute, and to attack the Forest Stewardship Council certifications that Resolute held at the time for its environmental commitments. *Id.* The memorandum is not attached to the complaint, and Resolute does not identify the memorandum's author(s) or the date(s) on which it was written or disseminated.

Resolute alleges that a 2010 Greenpeace Canada report misleadingly stated that Resolute was logging in the Montagnes Blanches, when it was not, that in May 2013, Brindis sent the 2010 Greenpeace Canada report to Resolute's customers, and that Greenpeace USA featured the report on its website. *Id.* ¶¶ 212-24. On May 31, 2016, Laurent Lessard, Quebec's Minister of Forests, Wildlife, and Parks issued a statement explaining that the map that Greenpeace featured in this report to show that Resolute logged in the Montagnes Blanches was misleading. *Id.* ¶ 217. His statement included a link to an official map of the Montagnes Blanches. *Id.*

Notwithstanding the Minister's corrective disclosure, Greenpeace USA and Greenpeace International continue to feature the report on their websites. *Id.* ¶ 218. Likewise, in a December 16, 2016 letter, Moas wrote to numerous Resolute customers that Resolute was operating in the Montagnes Blanches. *Id.* ¶ 304. On January 12, 2017, Resolute wrote a cease and desist letter to Defendants asserting that "Resolute has never harvested in the actual Montagnes Blanches." ECF

---

[4] In a May 2013 interview concerning the CBFA negotiations, Paglia stated "Getting environmentalists and logging companies to come to an agreement is not easy. We feel like Resolute is the bad apple, and that the rest of the bushel is in very good shape." FAC ¶ 227. However, the interview's context makes clear that Paglia referred to renewed CBFA negotiations in 2013, not Resolute's earlier alleged violation of the agreement in 2012. *See* Brent Jang, *Boreal Forest Talks Break Down*, THE GLOBE & MAIL (May 21, 2013), *available at* https://www.theglobeandmail.com/report-on-business/industry-news/energy-and-resources/boreal-forest-conservation-talks-collapse/article12034252/; *Knievel*, 393 F.3d at 1076 (providing for judicial notice of documents referenced in complaint).

Then on May 17, 2017, Greenpeace, Inc. published a report by Moas about Resolute's efforts to silence Greenpeace, which argued that Resolute harvested in the Montagnes Blanches. FAC ¶¶ 308-09. Moas, Skar, and Brindis each distributed the report during a book expo between May 31 and June 2, 2017. *Id.* ¶ 311.

Finally, Resolute alleges that Greenpeace misrepresented that the company lost four Forest Stewardship Council ("FSC") certifications.[5] *Id.* ¶ 186. On March 30, 2015, Brindis wrote in an email to Quad Graphics that "two of Resolute's FSC certificates have been terminated and an additional two . . . suspended due to serious shortcomings." ECF No. 185-2 at 3-4.[6] Resolute does not allege that Greenpeace's claim that the certifications ended was false. Instead, Resolute alleges these statements were misleading because two of its certifications, the Mistissini-Peribonka and Caribou Forest certifications, expired automatically at the end of their natural five-year terms. *Id.* ¶ 187. With regard to the remaining two certificates, Resolute alleges that "the audits that led to temporary suspensions of two FSC certificates were not based on . . . wide-ranging or substantial findings. Instead, the suspensions were based on narrow and idiosyncratic issues, most of which were out of Resolute's control, and an unprecedented treatment of those issues by those handling audits." *Id.* ¶ 188.

Resolute alleges a number of additional misstatements, threats, and bad acts by Defendants. For example, Resolute alleges that Paglia met with Resolute executives and threatened to target the company with negative press unless they agreed to forego extensive harvesting rights. *Id.* ¶¶ 132-33. Likewise, Moas published several blog posts claiming such things as that Resolute was "bad news for the climate" and that "[t]he Canadian Boreal forest, . . . one of the largest reservoirs of carbon in the world [was] under threat from unsustainable logging

---

[5] The Forest Stewardship Council is a global not-for-profit organization that sets standards for responsibly-managed forests. FSC members include environmental groups, social organizations, businesses, forest owners and managers, processing companies, and campaigners. FSC certification consists of verification that an organization meets those standards.

[6] Relatedly, Resolute alleges that the Defendants interfered with Resolute's FSC certifications, by publicly and privately lobbying FSC against Resolute, FAC ¶¶ 193-94, and by filing a misleading complaint with FSC based on Resolute's failure to protect particular areas, *id.* ¶ 286. FSC hired an independent auditor that concluded that two of Resolute's certificates should be suspended in December 2013. *Id.* ¶ 288. Resolute also alleges that FSC subjected it to more scrutiny than other companies for similar behavior. *Id.* ¶ 194.

[by] [o]ne company in particular, Resolute Forest Products." *Id.* ¶ 145 n.1. Resolute also alleges that Defendants misleadingly stated that that Resolute's practices had a large effect on climate change, when they in fact had a *de minimis* impact, and that Defendants targeted Resolute as a particularly bad actor, when other companies had similar or worse practices. *Id.* ¶¶ 144, 280.

Resolute initially filed its case in the Southern District of Georgia. Following transfer to this Court, the Court granted Defendants' motions to dismiss and strike Resolute's complaint in its entirety. ECF No. 173. Resolute then filed an amended complaint, ECF No. 185, which brings nine causes of action, each against all Defendants:

 (1) Racketeering in violation of 18 U.S.C. § 1962(c), on the basis of predicate acts including mail fraud, wire fraud, computer crimes, money laundering, and misappropriation of confidential information;

 (2) Racketeering in violation of 18 U.S.C. § 1962(a) by investing income from racketeering;

 (3) Conspiracy in violation of 18 U.S.C. § 1962(d);

 (4) Defamation;

 (5) Trade libel;

 (6) Tortious interference with prospective business relations;

 (7) Tortious interference with contractual relations;

 (8) Common law civil conspiracy; and

 (9) Unfair business practices and false advertising in violation of Cal. Bus. & Prof. Code §§ 17200, 17500 ("Unfair Competition Law" or "UCL").

FAC ¶¶ 395-498. Resolute seeks compensatory damages, treble damages, punitive damages, interest, injunctive relief, and attorneys' fees and costs. *Id.* at 190.

## IV. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Dismissal under Rule 12(b)(6) is appropriate . . . where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v.*

7

*Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). "While a complaint . . . does not need detailed factual allegations, [it] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In other words, a pleading must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

Claims sounding in fraud are subject to the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure. *See Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004). Under Rule 9(b), plaintiffs must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Stating with particularity entails "stat[ing] the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Glaser v. Nationstar Mortg., LLC*, No. 16-CV-07245-LB, 2017 WL 1861850, at *10 (N.D. Cal. May 9, 2017) (citation omitted).

## V. ANALYSIS

### A. Defamation and Related State Law Claims

#### 1. Elements of defamation

"The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage." *Wong v. Jing*, 189 Cal. App. 4th 1354, 1369 (2010) (citing *Taus v. Loftus*, 40 Cal. 4th 683, 720 (2007)). "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Cal. Civ. Code § 45.

To adequately allege a defamatory statement, a plaintiff must first allege that a statement was materially false. "A statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 247 (2014) (citations omitted).

Likewise, a defamatory statement must be a provably false statement of fact as opposed to a statement of opinion. "Generally, statements of opinion are not actionable as defamation,

whereas statements of fact are actionable." *Piping Rock Partners v. David Lerner Assocs.*, 946 F. Supp. 2d 957, 970 (N.D. Cal. 2013), *aff'd*, 609 F. App'x 497 (9th Cir. 2015). "Whether a statement is a fact or opinion is a question of law for the court to decide." *Id.* When determining whether a statement can reasonably be interpreted as a factual assertion, the Court must examine the totality of the circumstances in which it was made. *Knievel*, 393 F.3d at 1074-75. In making this determination, courts look to the following factors:

> First, we look at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work. Next we turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation. Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false.

*Id.* at 1075 (quoting *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995).

Resolute argues that each of the Defendants' statements "were intended to be viewed as objective statements of fact" and should be evaluated as such. ECF No. 210 at 49. It points to Defendants' representations that their publications were "based on 'objective,' 'accurate' facts, 'research,' 'data' and 'expertise.'" *Id.* (citing FAC ¶¶ 137-40). It states that Greenpeace USA "purports to 'work with experts, scientists and researchers across the globe to build a deep understanding' of environmental issues and further represents that the Canadian Boreal Forest campaign is based in the 'best available science' and 'best available data.'" *Id.* (citing FAC ¶¶ 139, 382). Greenpeace responds that "the challenged statements are all based on credible science, cited in the publications in suit, and all resound as advocacy on environmental public policy." ECF No. 214 at 16. It contends that "[i]n almost every instance, Greenpeace's statements criticizing Resolute either incorporated, or were accompanied by, substantive reports documented with references to (typically previously published) scientific analyses, audits and official terminations of Resolute's Forest Stewardship Council certifications as non-compliant with applicable standards. In other words, the statements clearly set forth the basis for the opinions expressed therein, and case law in this Circuit confirms that such statements are nonactionable." *Id.* at 217 (citing *Standing Comm. on Discipline of U.S. Dist. Court for Cent. Dist. of Cal. v.*

*Yagman*, 55 F.3d 1430, 1439 (9th Cir. 1995)).

Accordingly, these motions require the application of two related principles of defamation law. First, "[a] statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning." *Yagman*, 55 F.3d at 1439. "The rationale behind this rule is straightforward: When the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts." *Id.* Second, a statement is more likely to be viewed as one of fact, as opposed to opinion, when the speaker might reasonably be perceived as an expert or authority on the topic of the statement. *See Wilbanks v. Wolk*, 121 Cal. App. 4th 883, 904 (2004) (concluding a defendant's "position as a crusader and watchdog to the industry also works against any argument that she was merely stating the facts and drawing her own opinion from them"); *see also Slaughter v. Friedman*, 32 Cal. 3d 149, 154 (1982) ("Although accusations of 'excessive' fees or 'unnecessary' work when made by laymen might indeed constitute mere opinion, similar accusations by professional dental plan administrators carry a ring of authenticity and reasonably might be understood as being based on fact.").

### 2. Timeliness

The statute of limitations for Resolute's defamation claim is one year. Cal. Civ. Proc. Code § 340(c). The statutes of limitations for Resolute's related claims for trade libel, interference with prospective business and contractual relations, and common law conspiracy are two years. *Guess, Inc. v. Superior Court*, 176 Cal. App. 3d 473, 475 (1986) (trade libel is two years); Cal. Civ. Proc. Code § 339 (interference is two years); *Wyatt v. Union Mortg. Co.*, 24 Cal. 3d 773, 792 (1979) (statute of limitations for common law conspiracy follows underlying tort).[7] Resolute filed its complaint on May 31, 2016, so all defamation claims must be based on statements made on or after May 31, 2015, and all other state law claims must be based on conduct on or after May 31,

---

[7] While Resolute's UCL claims are subject to a four-year statute of limitations, Cal. Bus. & Prof. Code § 17208, Resolute fails to state a claim for unfair competition, other than the instances of adequately pleaded defamation in 2016 and 2017, for the reasons discussed below.

2014.

Defendants argue that the vast majority of the alleged defamatory statements were made outside of the statute of limitations for defamation. *See* ECF Nos. 197 at 19; 199 at 18. Resolute does not address this argument. *See* ECF No. 210 at 47 n.3 (noting only that some of the state claim statutes of limitations are two years, not one, and that Defendants are responsible for timely statements made by others).

### 3. Actual Malice

Defendants each contend that Resolute fails to state a claim for state law defamation and the related state causes of action because Resolute fails to allege any actionable statement made with actual malice. *See, e.g.*, ECF No. 199 at 16. When a plaintiff is a public figure, he must also allege actual malice as to each defamatory statement. *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 265 (9th Cir. 2013). For the same reasons it concluded in its prior order, and because Resolute does not argue otherwise, the Court concludes that Resolute is a limited public figure and must allege actual malice as to each alleged defamatory statement. *See* ECF Nos. 173 at 10-12; 210.

Actual malice requires that the defendant acted either "with knowledge that the statement was false or with reckless disregard as to whether or not it was true." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988)). "And although the concept of 'reckless disregard' 'cannot be fully encompassed in one infallible definition,'" the Supreme Court has made clear that the defendant must either have made the false publication with a high degree of awareness of its probable falsity or have entertained serious doubts as to the truth of the publication. *Id.* (quoting *St. Amant v. Thompson,* 390 U.S. 727, 730 (1968)) (additional citations omitted); *see also United States v. Alvarez*, 567 U.S. 709, 719 (2012) ("Even when considering some instances of defamation and fraud, moreover, the Court has been careful to instruct that falsity alone may not suffice to bring the speech outside the First Amendment. The statement must be a knowing or reckless falsehood.").

Another court in this district recently described the actual malice standard as a "demanding

11

burden" because "general allegations that a defendant should have known or should have investigated the truth of his or her statements do not adequately plead actual malice." *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1239 (N.D. Cal. 2014); *see also Palin v. N.Y. Times Co.*, 264 F. Supp. 3d 527, 540 (S.D.N.Y. 2017) (requiring a "high degree of particularized proof . . . before plaintiff can be said to have adequately alleged clear and convincing evidence of actual malice").

At the outset, Resolute argues it is improper to rule on actual malice at the Rule 12(b)(6) stage without the opportunity for discovery. ECF No. 210 at 59-60. However, as in its prior order, the Court concludes that it is proper to dismiss a complaint when the Court concludes the plaintiff fails to plead actual malice as a matter of law. *See Wynn*, 75 F. Supp. 3d at 1240 (concluding court could dismiss complaint where "there is no reasonable expectation that discovery will prove any evidence that demonstrates subjective malice"); *see also Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018) (concluding that when anti-SLAPP motion is denied for legal insufficiency it is treated as a motion under Rule 12(b)(6), but when it is denied for lack of evidence, discovery is required); *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) (concluding district court improperly concluded that "[e]very expert we asked said Metabolife is not safe" was false as a matter of fact, rather than as alleged, without allowing discovery); *Wynn v. Chanos*, No. 14-CV-04329-WHO, 2015 WL 971360, at *2 (N.D. Cal. Mar. 3, 2015) (rejecting plaintiffs' similar arguments that *Metabolife* entitles them to discovery), *aff'd*, 685 F. App'x 578 (9th Cir. 2017).[8]

### a.   Actual Malice as to Each Defendant

Defendants argue that Resolute fails to adequately allege actual malice as to each defendant. *See, e.g.*, ECF No. 199 at 17. Apart from the doctrine of *respondeat superior*, "Plaintiff cannot recover in this action without proving each defendant acted with actual malice as to each purported defamation." *Murray v. Bailey*, 613 F. Supp. 1276, 1281 (N.D. Cal. 1985)

---

[8] *But see Flowers v. Carville*, 310 F.3d 1118, 1131 (9th Cir. 2002) ("Actual malice is a subjective standard that turns on the defendant's state of mind; it is typically proven by evidence beyond the defamatory publication itself. For that reason, 'the issue of actual malice . . . cannot be properly disposed of by a motion to dismiss,' where the plaintiff has had no opportunity to present evidence in support of his allegations." (quoting *Metabolife*, 264 F.3d at 848)).

(citing *Hoffman v. Washington Post Co.*, 433 F. Supp. 600, 605 (D.D.C. 1977), *aff'd,* 578 F.2d 442 (D.C. Cir. 1978)). "When there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice." *Palin*, 264 F. Supp. 3d at 536.

Resolute accordingly must allege that each defendant had actual malice when it published, or had responsibility for the publication of, a defamatory statement. In its opposition to these motions, Resolute contends that the amended complaint pleads actual malice as to several defendants:

(1) Daniel Brindis had actual knowledge of falsity, or recklessly disregarded the truth, in his January 2013 allegations that Resolute violated the CBFA because he referenced reviewing Resolute's rebuttal. FAC ¶ 113.

(2) Amy Moas had actual knowledge of falsity, or recklessly disregarded the truth, when she stated that Resolute was harvesting in in the Montagnes Blanches, despite a public statement in May 2016 by the Quebec Forestry Minister that the maps showing such harvesting were misrepresentative. FAC ¶¶ 317, 360.

(3) Rolf Skar had actual malice based on his December 7, 2012 statement that Resolute was building in violation of the CBFA. FAC ¶ 233.[9]

(4) Greenpeace USA had actual malice based on the doctrine of *respondeat superior* with regard to Brindis, Moas, and Skar's publications.

(5) Greenpeace International had actual malice because it published Greenpeace, Inc.'s report noting that Resolute acquired "harvest blocks through auction sales inside the Montagnes Blanches," after the Quebecois Minister's May 2016 statement. FAC ¶ 271; ECF No. 185-4 at 1.

ECF No. 210 at 68-70. Resolute does not explain how the FAC alleges actual malice as to

---

[9] The statements in question were published before Resolute issued its rebuttal on December 12, 2012, and the cited paragraphs do not explain how Skar knew, or recklessly disregarded the possibility, that the statements were false.

specific statements by Daggett, Paglia, or Stand, and the Court concludes that Resolute fails to allege defamation as to those Defendants. *Id.*[10]

Resolute likewise does not allege that Greenpeace Fund published a defamatory statement. *Id.* Resolute alleges that Greenpeace Fund published "disinformation" on its website but identifies no specific statement. FAC ¶ 45. Instead, Resolute argues that Greenpeace Fund is responsible for statements by Moas, Brindis, and Skar, who work for Greenpeace, Inc., *id.* ¶¶ 36-39, because Greenpeace Fund and Greenpeace, Inc. together constitute an entity called Greenpeace USA. ECF No. 210 at 57-58. "Greenpeace USA" is purely a creature of Resolute's nomenclature. Resolute does not allege that Greenpeace USA is a legal entity, or that it has employees. FAC ¶ 41. To the contrary, Resolute alleges that Greenpeace Fund and Greenpeace, Inc. are "separate and distinct legal entities with no corporate relationship to each other." *Id.* Resolute does not allege that Greenpeace Fund has any editorial oversight over statements by Moas, Brindis, or Skar, or any other Greenpeace-associated person or entity, only that Greenpeace Fund "collects . . . donations throughout the United States, and distributes those monies to Greenpeace International" and Greenpeace, Inc. *Id.*[11] Moas, Brindis, and Skar refer to themselves as Greenpeace USA employees, and publish their work on the Greenpeace USA website. ECF No. 210 at 57. While these allegations might suggest that Greenpeace USA, if it is a legal entity, is responsible for Moas, Brindis, and Skar's statements, they do not support the notion that Greenpeace Fund has any control over or involvement with Greenpeace USA or responsibility for the statements of Greenpeace USA's agents.[12] Resolute fails to allege that Greenpeace Fund had any responsibility

---

[10] Resolute alleges that in a May 18, 2017 blog post, Paglia stated that brands are "increasingly faced with choosing between being loyal to a company like Resolute or living up to their values." FAC ¶ 310. As discussed below, this is not provable as false. Resolute's remaining allegations regarding Paglia are untimely.

[11] The Court notes that in *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281 (9th Cir. 2013), the Ninth Circuit addressed whether Greenpeace, Inc., which it referred to as Greenpeace USA, was responsible for actions by other Greenpeace organizations affiliated with Greenpeace International. The concurrence concluded that Greenpeace International did not control Greenpeace, Inc., "an operationally independent member of . . . the Amsterdam-based 'parent' entity that licenses the Greenpeace name to groups like Greenpeace [Inc.]" *Id.* at 1294 (M. Smith, J., concurring in part, dissenting in part).

[12] Resolute argues that two recent cases in this district show that Greenpeace Fund is liable for Greenpeace, Inc.'s acts because the two "lump[ themselves] together" as Greenpeace USA. ECF No. 210 at 57. The cases are inapposite. Both concluded that the plaintiff adequately alleged

over these individuals' statements. *See Cantrell v. Forest City Publ'g Co.*, 419 U.S. 245, 254 (1974) (holding employer vicariously liable for actual malice of employee); *Osmond v. EWAP, Inc.*, 153 Cal. App. 3d 842, 852 (1984) (requiring some meaningful allegation of responsibility for statement); *see also Matson v. Dvorak*, 40 Cal. App. 4th 539, 549 (1995) (disagreeing that "mere contribution of money to [a non-profit advocacy organization] is sufficient to establish that [one] played a 'responsible part'" in alleged libel (quoting *Osmond*, 153 Cal. App. 3d at 852)). Accordingly, Resolute fails to allege that Greenpeace Fund is responsible for any defamatory statement made with actual malice. Greenpeace Fund is dismissed as a defendant.

For similar reasons, the FAC fails to plausibly allege that any Defendant is responsible for statements by non-party Greenpeace Canada. Resolute hinges its arguments regarding that topic on statements by Brindis and Skar in December 2012 and January 2013, forwarding Greenpeace Canada materials and referring to them as "our" evidence. ECF No. 210 at 58; FAC ¶¶ 103, 113. These allegations concern statements made more than three years before the filing of the complaint and fail to show that any defendant is liable for an *actionable timely* statement by Greenpeace Canada. *See Osmond*, 153 Cal. App. 3d at 854 ("[A]t the very least, plaintiff must prove the distributors either knew of the libelous content of the article or that facts were known which imposed a duty to investigate." (citations omitted)).[13]

Resolute does allege that Greenpeace International published actionable reports on its website. *See* ECF Nos. 185-2 at 6 (alleging Greenpeace International published on its website in May 2014 that caribou herds "whose ranges overlap with Resolute's Montagnes Blanches operations" are unlikely to survive); 185-4 at 1 (similar on May 17, 2017). The Court assesses these potentially actionable publications below, but otherwise concludes that Resolute fails to allege that Greenpeace International is responsible for statements by any other Defendant or non-

---

collective liability where a particular corporation, Bosch, subdivided into various sectors, but certain Bosch employees worked for multiple sectors. *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 977 (N.D. Cal. 2018); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2017 WL 4890594, at *11 (N.D. Cal. Oct. 30, 2017). Resolute does not allege that Moas, Brindis, and Skar work for any entity but Greenpeace, Inc.
[13] Below, the Court separately discusses Resolute's argument that Defendants are liable for Greenpeace Canada's statements as a result of a civil conspiracy.

party. *See Delk v. Ocwen Fin. Corp.*, No. 3:17-CV-02769-WHO, 2017 WL 3605219, at *5 (N.D. Cal. Aug. 21, 2017) (holding that generally "a parent corporation . . . is not liable for the acts of its subsidiaries. . . . But, the corporate veil can be pierced if the court finds that the parent company was somehow involved in the wrong doing." (citation omitted)).

Resolute plausibly alleges that Greenpeace, Inc. is responsible for statements by Moas, Brindis, and Skar, as well as other statements on its website, because it is their employer, and it was involved in the campaign in which their statements were published. FAC ¶¶ 37-39; *see Cantrell*, 419 U.S. at 254. Greenpeace, Inc. does not argue otherwise. *See* ECF No. 199.

### b. The Operational Memorandum

The Greenpeace Defendants argue that the Court should not consider the "operational memorandum" probative of any defendant's subjective intent. ECF No. 199 at 19-20. Resolute provides few details regarding this operational memorandum, including who wrote it, when it was written, or when and how it was disseminated. FAC ¶¶ 76-87.[14] Resolute alleges that the memorandum states that Greenpeace USA and Greenpeace International would "be actively involved" in a plan to target Resolute, but offers no indication as to whether the Defendants agreed to be so involved, as Resolute does not allege that the Defendants wrote the memorandum, or were aware of its contents before it was written. *Id.* ¶¶ 76, 78, 85 (alleging only that the memorandum "reduced to writing" plans of the "Enterprise members"). Moreover, as discussed below, if the memorandum was written before Resolute's December 12, 2012 letter rebutting the evidence of Resolute's violation of the CBFA, or before its author learned of that letter, its author may well have believed its statement that "Resolute has failed to live up to its commitment under the CBFA" was true when it was written. *Id.* ¶ 77. As it must, the Court construes the allegations concerning the operational memorandum in the light most favorable to Resolute, but finds that these allegations add nothing to the Court's actual malice analysis.

### c. The CBFA Statements

---

[14] Resolute's opposition claims Paglia authored the memorandum, ECF No. 210 at 21, but arguments are not allegations. *See Twombly*, 550 U.S. at 586.

The Greenpeace Defendants argue first that non-party Greenpeace Canada published the CBFA statements outside of the statute of limitations in 2012 and 2013. ECF No. 199 at 18 n.5. Moreover, they argue, Greenpeace Canada's public correction demonstrates good faith rather than actual malice. *Id.* at 14-15. The Court agrees that Resolute fails to allege any actionable statement regarding the CBFA because each alleged statement was made outside of the statute of limitations (and many were made by non-parties). *See, e.g.*, ECF No. 185-4 at 9-10 (alleging a statement on December 7, 2012 by Skar that Resolute was logging in violation of the CBFA, and a similar September 2012 statement by Paglia).

#### d.     The Montagnes Blanches Statements

Resolute argues that it adequately pleads actual malice as to the Montagnes Blanches statements because Defendants continued to state that Resolute logged in the Montagnes Blanches well after Quebec's Minister of Forests publicly stated on May 31, 2016 that Greenpeace's map showing such logging inaccurately depicted what constituted the Montagnes Blanches. FAC ¶ 217. Resolute is correct as to two of the alleged statements.

First, Resolute identifies a December 16, 2016 letter to customers in which Amy Moas wrote that "in the Montagnes Blanches Forest in Quebec, there are three caribou herds, and in the Caribou Forest in Ontario there is an additional herd where habitat disturbance, including some from Resolute's operations, is jeopardizing their survival." ECF No. 185-2 at 1-2. Also, in a report entitled "Clearcutting Free Speech" published on May 17, 2017 on Greenpeace International and Greenpeace, Inc.'s websites, and distributed by Moas, Skar, and Brindis at a book expo in June 2017, Moas wrote that "Resolute has acquired three harvest blocks through auction sales inside the Montagnes Blanches. . . . All three sites have been logged." ECF No. 185-4 at 1. The Clearcutting Free Speech report relies on the map of the Montagnes Blanches that the Minister of Forests publicly called inaccurate. ECF No. 214 at 20. Resolute alleges that Moas's statements after the Minister of Forests' May 2016 statement were made with actual malice because "[n]otwithstanding this corrective disclosure from the Quebec Government, Greenpeace has failed to retract their false and misleading reports and statements accusing Resolute of logging in the Montagnes Blanches." FAC ¶ 218. Resolute does not allege that Moas

knew about the Quebecois statement. *Id.* Resolute does, however, allege that Moas "had actual knowledge" or recklessly disregarded the truth based on the complaint filed on May 31, 2016 in this case, which stated that Greenpeace's maps of the Montagnes Blanches, and statements that Resolute operated in the Montagnes Blanches, were false. *Id.* ¶¶ 357-58; *see also* ECF No. 1 ¶ 141 (alleging that Defendants' maps inaccurately depicted the Montagnes Blanches).

The Greenpeace Defendants respond that "Montagnes Blanches" is a vague term like "the Rockies" and that their statements that Resolute's logging activities in that general region affected caribou were not false. ECF No. 214 at 20 ("The Montagnes Blanches, or 'white mountains,' is a descriptive word used to refer to a vast forested region containing spectacular 'white mountains' – somewhat akin to the 'Rockies' in the United States as a nomenclature."). The Greenpeace Defendants also argue that their statements regarding Resolute's harvesting in the Montagnes Blanches are not actionable because whether they are true or not does not affect the gist of the statements, which go to Resolute's effect on caribou herds. *Id.* at 20 n.11. Courts which have rejected claims for defamation on this basis have done so where the statements were inaccurate in only a minor way. *See Reed v. Gallagher*, 248 Cal. App. 4th 841, 863 (2016) (describing inactionable statements as ones that were only "technically inaccurate," and finding no defamation under "gist" argument where defendant stated that plaintiff was ordered to do something, when in fact the parties settled to avoid such an order). While "[m]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified," the gist of Moas's statement is that Resolute harvested inside the Montagnes Blanches, and Moas was on notice that this was not true when she wrote the report. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (citation omitted). The inaccuracy was not minor.

The Court concludes that Resolute adequately pleads actual malice as to the Clearcutting Free Speech report. First, the statement is materially false in alleging that Resolute was logging in the Montagnes Blanches when it was not. *See Hoeper*, 571 U.S. at 247. Second, the statement is provably false and likely to be taken by readers as a statement of fact, especially given its categorization as a report by an expert body and its lack of cautionary terms. *See Piping Rock Partners*, 946 F. Supp. 2d at 971; *Knievel*, 393 F.3d at 1074-75. Finally, the FAC plausibly

alleges that Moas was at least reckless given the Quebec Minister of Forests' public statement that Greenpeace's maps were inaccurate and the filing of the complaint in this case stating the same. *See Harte-Hanks Commc'ns,* 491 U.S. at 667. The Court reaches this conclusion even though the Clearcutting Free Speech report identified the sources on which it relied, because those sources were incorrect as to the Montagnes Blanches map. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990) ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.").

Resolute adequately alleges falsity and actual malice as to Moas, and also as to Greenpeace, Inc., under a theory of *respondeat superior*. *See Cantrell*, 419 U.S. at 254. Resolute also adequately alleges that Brindis and Skar knew about the defamatory nature of the statement when they distributed it in June 2017, and that Greenpeace International knew when it published the statement on its website in May 2017, as each received the complaint in this case, and likely read about the Quebecois minister's statement. ECF No. 185-4 at 1; *see Matson*, 40 Cal. App. 4th at 549 ("[T]he distributor of allegedly libelous materials cannot be held liable unless it is shown that he either knew of its libelous content or knew of facts which imposed a duty to investigate."); *see also Carafano v. Metrosplash.com, Inc.*, 207 F. Supp. 2d 1055, 1073 (C.D. Cal. 2002), *aff'd on other grounds*, 339 F.3d 1119 (9th Cir. 2003), *and holding modified by Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157 (9th Cir. 2008) ("The rationale is that one who merely plays a secondary role in disseminating information published by another may avoid liability by showing there was no reason to believe it to be a libel.").

### e. The FSC Certification Statements

Finally, as to the suspension of Resolute's FSC certifications, the Greenpeace Defendants argue that the FAC alleges no specific statements on that topic. ECF No. 214 at 23. In an appendix to the complaint, Resolute does offer specifics as to Brindis's March 2015 email to Quad Graphics, which stated "two of Resolute's FSC certificates have been terminated and an additional two certificates have been suspended due to serious shortcomings related to Indigenous Peoples' rights[.]" ECF No. 185-3 at 2. Resolute alleges these statements were misleading because two of

19

its certifications terminated at the end of their natural five-year terms. FAC ¶ 187. Likewise Resolute alleges that two of its certificates were suspended "based on narrow and idiosyncratic issues." *Id.* ¶ 188. However, Resolute also alleges that it was issued at least one "major non-compliance" by FSC auditors. *Id.* ¶ 194.

The Court concludes that Brindis's statement was neither materially false nor provably false. Resolute does not dispute that two of its FSC certificates were terminated and two were suspended. Resolute disputes only that its certificates were suspended based on "narrow" issues, rather than "serious shortcomings." The difference between these phrases is one of opinion and not fact.

### f. The Remaining Misrepresentations

The Court has reviewed each of the 296 alleged defamatory statements. *See* ECF No. 210 at 47. In the preceding sections of this order, the Court analyzed in detail the statements that Resolute comes closest to alleging are defamatory. As to the remaining statements, the Court concludes that Resolute fails to allege defamation either because it fails to allege actual malice or because the statements are ones of opinion. Many of Resolute's remaining allegations consist of critiques that Defendants failed to adequately highlight Resolute's positive environmental contributions, or disagreements about whether Defendants should have relied on one report instead of another. *See, e.g.*, FAC ¶ 335 (alleging that Defendants failed to highlight Resolute's many awards for environmental sustainability); *id.* ¶ 343 (criticizing Defendants' reliance on a report about forest degradation generally, rather than boreal forests). These statements are shielded by the First Amendment as not provably false, or statements that "cannot reasonably be interpreted as stating actual facts." *Milkovich*, 497 U.S. at 19-20 (citation and internal quotation marks omitted). Finally, the Court remains unpersuaded by Resolute's argument that Defendants are liable for defamation based on statements that Resolute "destroyed" the forest. ECF No. 210 at 52. The Court again concludes that the use of the word "destroy" is hyperbolic opinion describing a loss of forest trees, which did occur. *See* ECF No. 173 at 16 (noting that "[t]he word 'destroy' is a perennial instrument of hyperbole" and giving examples).

### 4.   Trade Libel

The Court applies the same falsity and actual malice standards to each of Resolute's remaining state law claims under trade libel, intentional interference with business relationships, civil conspiracy, and the UCL. *See Gardner v. Martino*, 563 F.3d 981, 992 (9th Cir. 2009) (clarifying that the actual malice standard applies to intentional interference with economic relations and contractual relations); *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1183 (9th Cir. 2001) (applying the actual malice standard to the UCL); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1057-58 (9th Cir. 1990) (applying the actual malice standard to claims for trade libel and tortious interference with business relationships). Accordingly, the Court limits its analysis to the Defendants' statements concerning the Montagnes Blanches that were made with actual malice.

To state a claim for trade libel, Resolute must allege "(1) a statement that (2) was false, (3) disparaging, (4) published to others in writing, (5) induced others not to deal with it, and (6) caused special damages." *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1113 (C.D. Cal. 2004). Resolute fails to state a claim for trade libel because it fails to adequately plead special damages. Resolute alleges in a general sense that *all* of the damages it suffered from the nine distinct causes of action amount to over $300 million Canadian dollars, but it fails to allege the amount of damages attributable specifically to trade libel. FAC ¶ 17 ("[D]amages are far in excess of the C$100 million Greenpeace estimates."); *id.* ¶ 436 (estimating Plaintiffs suffered damages not less than C$100 million "to be trebeled" under RICO); *id.* at 190 (providing no estimate of damages). General damages allegations like these across all the claims of a complaint are insufficient when they fail to allege "what amount of that total is attributable to the libelous statements." *Homeland Housewares, LLC v. Euro-Pro Operating LLC*, No. CV 14-03954 DDP (MANX), 2014 WL 6892141, at *4 (C.D. Cal. Nov. 5, 2014); *see id.* ("Plaintiffs' general statements of economic loss and bare statement for relief of $3 million dollars in damages do not sufficiently identify special damages."); *see also G.U.E. Tech, LLC v. Panasonic Avionics Corp.*, No. SACV 15-00789-CJC(DFMX), 2015 WL 12696203, at *5 (C.D. Cal. Sept. 15, 2015) (requiring "reasonably specific estimates of the damages allegedly stemming from the trade libel"); *First Advantage Background Servs. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d 929, 938 (N.D. Cal. 2008)

21

(dismissing claim where plaintiff failed to allege the amount of business before and after the asserted libelous statement). Resolute fails to state a claim for trade libel because it fails to allege special damages.

### 5. Intentional Interference with Prospective and Contractual Economic Relationships

Because the actual malice standard applies to Resolute's claims for intentional interference with prospective and contractual economic relationships, *see Unelko*, 912 F.2d at 1057-58, the Court assesses only whether Resolute states a claim for these causes of action based on the previously-identified Montagnes Blanches statements. *See Worrell-Payne v. Gannett Co., Inc.*, 134 F. Supp. 2d 1167, 1180-81 (D. Idaho 2000), *aff'd*, 49 F. App'x 105 (9th Cir. 2002) ("Since none of the *Statesman*'s articles contain actionable statements of fact, [plaintiff's] claims for intentional interference with contract and intentional interference with a prospective economic advantage must be dismissed."); *see also Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 30 F. Supp. 2d 1182, 1192-93 (D. Ariz. 1998), *aff'd*, 306 F.3d 806 (9th Cir. 2002) ("Thus, in order for Plaintiffs to prevail on their intentional interference with business relationships claim, they must meet the First Amendment's requirements for defamation actions.").

To plead interference with prospective business relations, Resolute must plausibly assert "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's acts." *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1152 n.6 (2004). The prospective economic relationship must be reasonably probable and not speculative. *See Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 852 (9th Cir. 2004). Resolute also must allege that the Defendants "engaged in an independently wrongful act in disrupting the relationship," in addition to the interference itself. *Reeves*, 33 Cal. 4th at 1152; *id.* (describing an act as "independently wrongful . . . if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard'" (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003)).

Resolute adequately alleges an independently wrongful act in the form of the alleged defamatory Montagnes Blanches statements. Moreover, Resolute alleges that between May 31 and June 2, 2017 Moas, Skar, and Brindis distributed the Clearcutting report, which included the Montagnes Blanches statement, at a book expo. FAC ¶ 311. Resolute fails to allege, however, that this conduct interfered with a *reasonably probable* business relationship, as Resolute fails to allege that any specific business relationship was interrupted as a result of these statements. *Pardi*, 389 F.3d at 852 (concluding relationship was too speculative because it "was not reasonably probable that [plaintiff] would have attained [the contract] but for" the alleged interference); *see also Donoho v. Cty. of Sonoma*, No. 15-CV-01392-WHO, 2015 WL 3866228, at *8 (N.D. Cal. June 22, 2015) (dismissing claim for failing to allege interference was but-for cause of plaintiff's failure to receive promotion); FAC ¶ 311.

To plead intentional interference with contractual relations, Resolute must allege "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990). Where a plaintiff only alleges interference with an at-will contract, particularly in the case of competitor interference claims, courts are instructed to treat such claims as intentional interference with prospective business relations claims. *See Reeves*, 33 Cal. 4th at 1148-49.

As for interference with current customers, Resolute alleges that on May 17, 2017 Defendants launched a campaign targeting its current customers "including Penguin Random House, HarperCollins, Simon & Schuster, and Hachette," with the publication of the Clearcutting report, which included the defamatory Montagnes Blanches statement. FAC ¶ 308. As part of this campaign, Paglia published a blog post on May 18, 2017 "sham[ing] Penguin Random House, Harper Collins, and Simon & Schuster" for doing business with Resolute. *Id.* ¶ 310. Resolute alleges that following the blog post, Greenpeace representatives met with Penguin executives, following which Penguin demanded that Resolute move its source of supply out of the Montagnes Blanches or obtain FSC certification. *Id.* ¶ 313. Resolute does not allege, however, that its

23

business relationship with Penguin suffered any negative impact as a result of Penguin's demand. Likewise, Resolute alleges that prior to May 31, 2017, Macmillan requested a tour of Resolute's mills "so that Macmillan was prepared to respond to Greenpeace's allegations." *Id.* Again, however, Resolute does not allege that its business relationship with Macmillan suffered. Finally, Resolute alleges that Hachette Livre issued a public statement endorsing Greenpeace and the FSC standards, and taking issue with Resolute's conduct in suing Greenpeace, but Resolute does not plausibly allege that Hachette terminated, breached, or disrupted a contract as a result. *Id.* ¶ 314.[15] While these allegations show intentional efforts to interfere with Resolute's existing client relationships, they do not show the "actual breach or disruption of the contractual relationship" required to support intentional interference with contract.[16] *See Pac. Gas & Elec. Co.*, 50 Cal. 3d

---

[15] The FAC does make this allegation *implausibly*, however. It states, "In June 2014, after months of being targeted with the Enterprise's disinformation about Resolute, including in the December 16, 2016 letter and May 2017 Clearcutting Report, Hachette terminated its business relationship with Resolute and publicly endorsed the Enterprise's campaign." FAC ¶ 409(c). There are at least two problems with this allegation. First, June 2014 occurs *before* December 2016 and May 2017 and so the statements could not have caused the alleged termination. Second, as referenced in the complaint, on June 8, 2017, the CEO of Hachette wrote a letter to Resolute's CEO that begins, "Hachette Livre, which I am head of, *has been a client of [Resolute] for several years now*." ECF No. 200-4 at 2 (emphasis added); *see also* FAC ¶ 314 (describing letter). So in June 2017, Hachette was still a customer, and while the letter criticizes Resolute's practices it neither terminates nor threatens to terminate Hachette's client relationship with Resolute.

The most likely explanation of these discrepancies is that Paragraph 409 of the complaint correctly identifies the June 2017 letter but incorrectly states the fact of termination. Whatever the explanation, the allegation that Resolute's business relationship with Hachette ended is not plausible.

[16] Resolute's remaining allegations fare no better. Resolute alleges that in June 2017, a non-party Greenpeace USA employee wrote to customers requesting they eliminate Resolute from their supply chain because Resolute "has harmed ancient forests, jeopardized the habitat of endangered species, and violated Indigenous People's rights in the Canadian Boreal forest." *Id.* ¶ 315. On June 20, 2017, Moas published a blog post admonishing Resolute's book customers for their lack of response to Greenpeace's demands to eliminate Resolute from their supply chain. *Id.* ¶ 316. Finally, in an August 3, 2017 blog post Greenpeace USA admonished Penguin Random House, HarperCollins, Simon & Schuster, and Macmillan for being "actively associated with Resolute Forest Products' destructive operations by buying substantial quantities of paper from the controversial loggers." *Id.* ¶ 318. No actual disruption of Resolute's business relationships is alleged to have taken place as a result of these statements.

United States District Court
Northern District of California

at 1126 (requiring actual breach or disruption of contract, and resulting damage). Accordingly, these claims are dismissed.

### 6. Civil Conspiracy

Civil conspiracy "is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510 (1994) (citing *Wyatt*, 24 Cal. 3d at 784). "Civil conspiracy consists of three elements: '(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct.'" *PQ Labs, Inc. v. Yang Qi*, No. C 12-0450 CW, 2012 WL 2061527, at *8 (N.D. Cal. June 7, 2012) (quoting *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1581 (1995)). "Standing alone, a conspiracy does no harm and engenders no tort liability. It must be activated by the commission of an actual tort." *Applied Equip.*, 7 Cal. 4th at 511. "The conspiring defendants must . . . have actual knowledge that a tort is planned and concur in the tortious scheme with knowledge of its unlawful purpose." *Kidron*, 40 Cal. App. 4th at 1582 (citing *Wyatt,* 24 Cal. 3d at 784-86). This knowledge must be combined with an intent to aid in achieving the objective of the conspiracy. *Kidron,* 40 Cal. App. 4th at 1582. A claim of unlawful conspiracy must contain "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly,* 550 U.S. at 556. A bare allegation that a conspiracy existed does not suffice. *Id.*

Here, Resolute fails to allege that Defendants and other non-parties agreed to an *unlawful* plan. Resolute's allegations of a common unlawful plan depend on the "operational memorandum," which stated "that unless Resolute agreed to unspecified terms dictated by the Enterprise, the Enterprise would aggressively disseminate the intentional misrepresentations that Resolute violated the CBFA and stood alone, as rogue environmental bad actor, among competitors and other CBFA members." FAC ¶ 77. However, the memorandum is undated, and the FAC does not indicate who wrote or joined it. *Id.* It is not clear from the FAC whether the memorandum's stated goal of a group plan was the memorialization of an existing agreement or

merely the aspiration of the memorandum's author. Finally, Resolute alleges that in early September and December 2012, Stand and other environmental organizations carried out the memorandum's plan by publishing reports and statements that Resolute violated the CBFA. *Id.* ¶¶ 223-25. However, after the organizations learned that Resolute had not actually violated the CBFA in December 2012, and issued a correction in March 2013, the organizations' actions diverged from those laid out in the memorandum. *Id.* ¶¶ 107, 113, 115. The organizations never again stated that Resolute violated the CBFA, and instead launched the "Resolute: Forest Destroyer" campaign, which criticized Resolute's environmental record in ways not described by the memorandum. *Id.* ¶ 120.[17] In short, as described by the FAC, the operational memorandum fails to allege a conspiracy because it does not allege that any of the Defendants agreed to conduct that they knew to be unlawful at the time, i.e., Resolute fails to allege the commission of an underlying tort. *See Kidron*, 40 Cal. App. 4th at 1582 ("The conspiring defendants must also have actual knowledge that a tort is planned and concur in the tortious scheme *with knowledge of its unlawful purpose.*" (emphasis added)). The Court dismisses Resolute's civil conspiracy claim.

### 7. UCL

Resolute also brings a claim under the UCL. Cal. Bus. & Prof. Code § 17200. Section 17200 prohibits unfair competition, including "any unlawful, unfair or fraudulent business act or practice." *Id.* Unfair competition includes "anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (quoting *Rubin v. Green*, 4 Cal. 4th 1187, 1200 (1993)). An action based on Section 17200 "borrows" violations of other laws and treats them as unlawful practices. *Chabner v. United Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000). Because the Court has concluded that Resolute states a claim for defamation with respect to the Montagnes Blanches statements, Resolute's defamation claim may serve as the basis for its Section 17200 claim. *See Luxpro Corp. v. Apple Inc.*, No. C 10-03058 JSW, 2011 WL 1086027, at *15 (N.D.

---

[17] The operational memorandum also described several plans which did not come to pass, for example, to file lawsuits against Resolute for their failure to comply with endangered species regulations, and one plan which did come to pass, to target Resolute's FSC certifications. FAC ¶¶ 82, 83, 186.

Cal. Mar. 24, 2011).

## B. RICO claims

To state a successful claim under RICO, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's 'business or property.'" *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (citations omitted); *see also Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007). To have standing under RICO, a plaintiff must further allege that the RICO violation proximately caused injury to its business or property. *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 463-64 (2007). The RICO statute of limitations is four years. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 183 (1997). Because Resolute fails to plead proximate cause, its RICO claims must be dismissed.[18]

A plaintiff has standing to bring suit under RICO only if the alleged RICO violation was the proximate cause of the plaintiff's injury. *Holmes*, 503 U.S. at 268. The Ninth Circuit has identified three factors that are relevant in evaluating whether the defendant proximately caused the alleged injury: "(1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1055 (9th Cir. 2008). Where plaintiff's RICO claim is based on fraud, the plaintiff is not required to show that *it* relied on defendant's misrepresentations, but it must show that *someone* relied on them to plaintiff's detriment. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649, 657-58 (2008). For example, another court in this district concluded that a plaintiff adequately alleged RICO proximate cause where the defendant impersonated the plaintiff restaurant's website and induced customers to order delivery through the defendant, thus directly depriving the plaintiff of its

---

[18] Because the Court concludes that Resolute's RICO allegations fail for lack of proximate cause, it does not reach the parties' remaining arguments concerning those claims.

ordinary delivery fee. *C&M Cafe v. Kinetic Farm, Inc.*, No. 16-CV-04342-WHO, 2016 WL 6822071, at *7 (N.D. Cal. Nov. 18, 2016) (referring to the plaintiff as the "direct victim").

Resolute alleges two theories of proximate cause: (1) that the Defendants defrauded their own donors, and (2) that the Defendants defrauded Resolute's customers, which negatively affected those customers' relationships with Resolute. As it did in a prior order, the Court again concludes that Resolute fails to allege standing as to the fraud allegedly perpetrated against Greenpeace's own donors. ECF No. 173 at 20. The donors are clearly the more direct victims of any such statements, as it they who parted with any fraudulently induced donations. *See Bridge*, 553 U.S. at 657-58. Only the donors have standing to bring those claims.

The alleged fraud perpetrated against Resolute's customers is more closely connected to Resolute's alleged harm. An example from *Bridge* shows why. In explaining that a plaintiff need not plead first-party reliance to show proximate cause, the Supreme Court explained,

> [S]uppose an enterprise that wants to get rid of rival businesses mails misrepresentations about them to their customers and suppliers, but not to the rivals themselves. If the rival businesses lose money as a result of the misrepresentations, it would certainly seem that they were injured in their business 'by reason of' a pattern of mail fraud, even though they never received, and therefore never relied on, the fraudulent mailings.

*Bridge*, 553 U.S at 649-50. So here, if Resolute's customers relied on Defendants' statements in a way that caused Resolute to lose money, the Court could conclude that Resolute was "injured in its business" for purposes of RICO. But Resolute does not make such a showing. Specifically, it fails to show that any customer relied on the Defendants' allegedly fraudulent misstatements to Resolute's detriment.[19]

For example, Resolute alleges that Brindis sent a report that alleged harvesting in the Montagnes Blanches to Resolute customers including Sappi and Lowes, and those customers in turn asked Resolute to provide information regarding its lumber sourcing. FAC ¶ 234. Resolute does not, however, allege that Resolute even responded to this request. Resolute alleges that Defendants disseminated misleading reports about the Montagnes Blanches to book publisher

---

[19] *See also* note 15, *supra* (explaining why allegations that Hachette terminated its business relationship with Resolute are not plausible).

Penguin, including that Resolute's Alma paper mill used lumber from the Montagnes Blanches, and Penguin then demanded that Resolute either move its production away from Alma or obtain FSC certification. *Id.* ¶ 313. And "Penguin informed Resolute that if it [was] not able to commit, Penguin would move to another vendor." *Id.* Nonetheless, the business relationship must have remained intact, given that the FAC identifies Penguin as still being a Resolute customer one month after this demand. *Id.* ¶ 318. Similarly, Resolute alleges that after hearing Defendants' erroneous Montagnes Blanches statements, book publisher Macmillan requested and received a tour of a Resolute mill. *Id.* ¶¶ 304, 313. At this point, Resolute's story stops. What effect, if any, the tour had on Resolute's relationship with Macmillan – or on its bottom line – Resolute does not say.

These are just examples, but the complaint's remaining allegations fare no better. Those allegations either are incomplete, *see, e.g.*, FAC ¶ 213 (alleging Brindis disseminated a report to customers without identifying the customers or the action taken by those customers), do not involve fraud, *id.* ¶ 240 (alleging ForestEthics carried out the "Resolute: Forest Destroyer" campaign), involve customer responses that are not alleged to have caused any loss to Resolute, *id.* ¶ 314 (alleging that Hachette sent a letter to Resolute criticizing aspects of its operations and its conduct in this lawsuit, but taking no financial action), or involve nonparties, *id.* ¶ 238 (alleging that Greenpeace Canada and Greenpeace Germany disseminated materials).

Accordingly, the Court finds that Resolute fails to allege reliance, and accordingly proximate cause.

## C. RICO Conspiracy

Plaintiffs also bring a RICO conspiracy claim against each Defendant. To establish a RICO conspiracy, Plaintiffs must allege either (1) "an agreement that is a substantive violation of RICO," or (2) "that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) (citing 18 U.S.C. § 1962(d)). Because Resolute fails to allege an underlying RICO offense, it fails to allege a RICO conspiracy.

### D.    Motions to Strike

Defendants have also filed a motion to strike pursuant to California's "anti-SLAPP" law. That law provides for the pre-trial dismissal of actions it deems Strategic Lawsuits Against Public Participation (or "SLAPPs") that "'masquerade as ordinary lawsuits' but are brought to deter common citizens from exercising their political or legal rights or to punish them for doing so." *Batzel v. Smith*, 333 F.3d 1018, 1024 (9th Cir. 2003) (quoting *Wilcox v. Superior Court*, 27 Cal. App. 4th 809, 816 (1994)). The California legislature enacted the anti-SLAPP statute "to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." *Metabolife*, 264 F.3d at 839.

"California anti-SLAPP motions to strike and entitlement to fees and costs are available to litigants proceeding in federal court." *Thomas v. Fry's Electronics, Inc.*, 400 F.3d 1206, 1206 (9th Cir. 2005). However, because anti-SLAPP motions are a creature of state law, they apply only to a plaintiff's state law causes of action. *Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 955 n.3 (9th Cir. 2013) ("[T]he anti-SLAPP statute does not apply to federal law causes of action." (quotation omitted)); *see also Hudson Martin Ferrante St. Witten & Demaria, PC v. Forsythe*, No. 16-CV-06551-BLF, 2017 WL 1315576, at *2 (N.D. Cal. Apr. 7, 2017) ("The anti-SLAPP statute does not apply to claims asserted under federal law.").

The Ninth Circuit evaluates anti-SLAPP motions in two steps: "First, the defendant must 'make a prima facie showing that the plaintiff's suit arises from an act by the defendant made in connection with a public issue in furtherance of the defendant's right to free speech under the United States or California Constitution.'" *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1272-73 (9th Cir. 2013) (quoting *Batzel*, 333 F.3d at 1024). The California legislature has instructed that public issues should be "construed broadly." Cal. Civ. Proc. Code § 425.16(a). Then, the plaintiff "must demonstrate that the complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Metabolife*, 264 F.3d at 840 (citation and internal quotation marks omitted). The Ninth Circuit recently clarified that "when an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal

Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated." *Planned Parenthood Fed'n of Am.*, 890 F.3d at 834.

The Court concludes, as in its prior order, that the lawsuit "arises from an act by the defendant made in connection with a public issue in furtherance of the defendant's right to free speech." *In re NCAA*, 724 F.3d at 1272-73. Resolute's claims are based on Defendants' speech activities regarding the important public matter of environmental sustainability. ECF No. 210 at 94-95. As to the second step, Resolute has demonstrated that its complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment as to the claims concerning the Montagnes Blanches discussed earlier in this order, but not as to its remaining state law claims. Defendants' anti-SLAPP motions to strike are granted as to the claims dismissed under Rule 12(b)(6), and denied as to those which survive the Court's Rule 12(b)(6) analysis.[20]

### E. Personal Jurisdiction Over Greenpeace International

The Greenpeace Defendants argue the Court lacks personal jurisdiction over Greenpeace International because the Netherlands-based organization lacks sufficient minimum contacts with the State of California. ECF No. 199 at 49.

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). "California authorizes its courts to exercise jurisdiction 'to the full extent that such exercise comports with due process.'" *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1067 (9th Cir. 2017) (quoting *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1020 (9th Cir. 2017). "Accordingly, the jurisdictional analyses under [California] state law and federal due process are the same." *Id.* (quotation omitted). To satisfy due process, a nonresident defendant must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting

---

[20] At this juncture, the Defendants are "entitled to recover attorney fees and costs incurred in moving to strike the claims on which [they] prevailed, but not fees and costs incurred in moving to strike the remaining claims." *Choyce v. SF Bay Area Indep. Media Ctr.*, No. 13-CV-01842-JST, 2013 WL 6234628, at *10 (N.D. Cal. Dec. 2, 2013) (quoting *ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1020 (2001)).

*Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

"The strength of contacts required depends on which of the two categories of personal jurisdiction a litigant invokes: specific jurisdiction or general jurisdiction." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015). "A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017) (emphasis in original). General jurisdiction over a corporation is appropriate only when the corporation's contacts with the forum state "are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler AG*, 571 U.S. at 127 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Resolute does not argue that the Court has general jurisdiction over Greenpeace International.

"Specific jurisdiction is very different." *Bristol-Myers*, 137 S. Ct. at 1780. In order for the court to exercise specific jurisdiction, the *suit* must arise out of or relate to the defendant's contacts with the *forum. Id.* "In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Id.* (quoting *Goodyear,* 564 U.S. at 919). Accordingly, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear,* 564 U.S. at 919.

The Ninth Circuit has established a three-part test for analyzing a claim of specific personal jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (quoting *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987).

Under the first prong of the test for specific personal jurisdiction, Plaintiffs must show that Defendants purposefully directed their activities toward California, or purposefully availed themselves of the privilege of conducting activities here. *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1142 (9th Cir. 2017). For tortious conduct of the kind alleged here, the Court applies the "purposeful direction" test. *Id.* Purposeful direction "requires that the defendant . . . have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 803 (quoting *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)).

To support its claim of specific jurisdiction, Resolute states that "GPI [Greenpeace International] directed its activities to the State through its ongoing licensing agreement with California-based GP-Inc. and GP-Fund whose activities GPI directs and funds, including with respect to the 'Resolute: Forest Destroyer.'" ECF No. 210 at 93. These allegations are insufficient to support the exercise of specific jurisdiction because they are not addressed to the "very controversy" that establishes jurisdiction. Rather, all of the contacts between the Greenpeace entities are longstanding organizational ties, such as licensing agreements, that have nothing to do with the facts of this case. *See, e.g.*, *Linthicum v. Shenkman*, No. 13CV1099 WQH (DHB), 2013 WL 4875024, at *6 (S.D. Cal. Sept. 10, 2013) (holding that "allegations and evidence that [the defendant] conducted business in California with individuals and businesses unrelated to the purported contract at issue [were] not sufficient to confer specific personal jurisdiction").

Resolute also argues that under Federal Rule of Civil Procedure 4(k)(2), the Court has jurisdiction over Greenpeace International as a foreign defendant which lacks substantial contacts with any single state, but has sufficient contacts with the United States as a whole. ECF No. 210 at 93-94. Resolute's RICO claims arise under federal law, and Greenpeace International has not identified any other state which has general personal jurisdiction over it. *See In re Volkswagen "Clean Diesel" Mktg.*, 2017 WL 4890594, at *17 (concluding the "first two elements" of the Rule 4(k) test were not in dispute where claims arose under federal law, and Defendant failed to identify another state which had general jurisdiction over it). "The due process analysis under

33

Rule 4(k)(2) is nearly identical to traditional personal jurisdiction analysis with one significant difference: rather than considering contacts between the [defendant] and the forum state, [the Court considers] contacts with the nation as a whole." *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 462 (9th Cir. 2007). Resolute alleges that Daggett, a Greenpeace International employee, traveled to Resolute's offices in Georgia to "to communicate falsehoods about Resolute to Resolute's Board of Directors." FAC ¶ 296. The Court concludes that it has personal jurisdiction over Greenpeace International for the remaining defamation and UCL claims under Rule 4(k) on the basis of this contact.

## CONCLUSION

Defendants' motions to dismiss are granted in part and denied in part. The Court dismisses all claims except for Resolute's claim for defamation based on the Montagnes Blanches statements, and the corresponding UCL claim, against defendants Greenpeace, Inc., Greenpeace International, Brindis, Moas, and Skar. It concludes that the Court has specific jurisdiction over Greenpeace International with respect to those claims. The remaining claims are dismissed with prejudice. The remaining defendants are dismissed.

**IT IS SO ORDERED.**

Dated: January 22, 2019

_____
JON S. TIGAR
United States District Judge