UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RESOLUTE FOREST PRODUCTS, INC., et al.,

                  Plaintiffs,

      v.

GREENPEACE INTERNATIONAL, et al.,

                  Defendants.

Case No.  17-cv-02824-JST   (KAW)

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SANCTIONS; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SANCTIONS**

Re: Dkt. Nos. 459, 461

Plaintiffs Resolute Forest Products, Inc., Resolute FP US, Inc., Resolute FP Augusta, LLC, Fibrek General Partnership, Fibrek U.S., Inc., Fibrek International, Inc., and Resolute FB Canada, Inc. (collectively, "Resolute") filed the instant action against Defendants Greenpeace International, Greenpeace, Inc., Greenpeace Fund, Inc., Daniel Brindis, Amy Moas, Matthew Daggett, and Rolf Skar (collectively, "Greenpeace").  (First Am. Compl. ("FAC") at 1, Dkt. No. 185.)  Resolute brings defamation claims based on Defendants' December 2016 and May 2017 statements that Resolute was operating in the Montagnes Blanches ("Challenged Statements").  Pending before the Court are: (1) Resolute's motion for sanctions, and (2) Greenpeace's motion for sanctions.  (Resolute Mot. for Sanctions, Dkt. No. 461; Greenpeace Mot. for Sanctions, Dkt. No. 459.)

Having considered the parties' filings, the relevant legal authority, and the arguments made at the October 20, 2022 hearing, the Court GRANTS IN PART AND DENIES Resolute's motion for sanctions, and GRANTS IN PART AND DENIES IN PART Greenpeace's motion for sanctions.

# I.   BACKGROUND

Resolute is comprised of corporate entities in the forest products industry, which harvest wood for the manufacture and sale of paper products.  (FAC ¶¶ 24-30.)  Greenpeace is comprised of non-profit environmental advocacy and several of their employees.  (FAC ¶¶ 31-33, 36-39.)  Resolute alleges that in December 2012, non-party Greenpeace Canada released a false report about Resolute's purported failure to comply with the Canadian Boreal Forest Agreement ("CBFA").  (FAC ¶¶ 89, 225.)  Resolute alleges that this was part of a Greenpeace campaign to target Resolute with misrepresentations regarding their sustainability practices in Canada.  (*See* FAC ¶¶ 5-7.)  Plaintiffs subsequently filed suit against Greenpeace Canada ("Greenpeace Canada Action").  (Tabaksblat Decl., Exh. 11 ("Resolute Litig. Hold"), Dkt. No. 459-1.)

On May 21, 2015, Resolute sent Greenpeace USA[1] a cease and desist letter, complaining of statements made by Defendant Brindis that Resolute was destroying Canada's boreal forest and negatively affecting caribou, and that Resolute's Forest Stewardship Council ("FSC") certificate had been suspended.  (Tabaksblat Decl., Exh. 5.)  On May 31, 2016, Resolute filed the instant action.  (Dkt. No. 1.)  That same day, Quebec's Minister of Forests, Wildlife, and Parks issued a statement that a map used by Greenpeace Canada to demonstrate that Resolute was operating in the Montagnes Blanches was misleading.  (FAC ¶¶ 212, 217.)  Greenpeace subsequently issued the Challenged Statements; specifically, in December 2016, Defendant Moas wrote a letter to Resolute's customers, claiming that Resolute was operating in the Montagnes Blanches.  (FAC ¶ 304.)  In May 2017, Defendant Greenpeace, Inc. published a report titled "Clearcutting Free Speech," which again stated that Resolute was logging in the Montagnes Blanches.  (FAC ¶¶ 308-09.)

A highly contentious discovery process followed, culminating in the instant competing motions for sanctions.  Both parties assert significant discovery failures warranting a multitude of sanctions, as described below.

---

[1] Resolute has alleged that non-party Greenpeace Fund and Defendant Greenpeace, Inc. constitute an entity called "Greenpeace USA."  (*See* Dismissal Order at 14, Dkt. No. 246.)  The presiding judge has found that "'Greenpeace USA' is purely a creature of Resolute's nomenclature."  (*Id.*)

United States District Court
Northern District of California

### A.    Resolute's Motion for Sanctions

On March 15, 2022,[2] Resolute filed its motion for sanctions, asserting that Greenpeace had destroyed Skype messages, including those between May 31, 2016 (the date of the Quebec minister's statement regarding the Montagnes Blanches map) and December 16, 2016 (the date of Defendant Moas's letter).  (Resolute Mot. for Sanctions at 3.)

On June 9, 2015, after receipt of the cease and desist letter, Greenpeace's counsel circulated a litigation hold to Defendants Skar, Brindis, and Daggett; the litigation hold was also forwarded to Defendant Moas.  (Dkt. No. 461-7 at 3.)  On June 8, 2016, after the filing of the instant action, Greenpeace's counsel sent a litigation hold, requiring staff to preserve any data that may relate to the lawsuit, including all "electronic records."  (*Id.* at 2-3.)  On January 22, 2019, the presiding judge dismissed all claims except for Resolute's defamation claim based on the Challenged Statements, specifically noting that Resolute had adequately alleged that Defendants knew of the Quebec Minister's public statement at the time they made or distributed the Challenged Statements.  (Dismissal Order at 19.)

Greenpeace witnesses have stated that they communicated extensively through Skype.  (*E.g.*, Brindis Depo. at 331:10-12, Dkt. No. 461-16.)  Most Greenpeace witnesses also testified that they made sure not to delete any of their Skype chats.  (*E.g.*, Moas Depo. at 314:3-19, Dkt. No. 460-9; Daggett Depo. at 16:10-15, Dkt. No. 460-11.)  Defendant Brindis, however, testified that he realized "at a certain moment" after the lawsuit was filed that he had an auto-delete setting on his personal Skype account, resulting in messages being saved for only a few days or weeks.  (Brindis Depo. at 330:16-331:5, Dkt. No. 460-12.)  Once he realized it, he changed the setting to make sure they were being maintained.  (*Id.* at 330:18-20.)  At the hearing, Greenpeace stated that it was not sure when this occurred, but assumes it was around December 2017 based on Defendant Brindis's available Skype data.

On September 18, 2020, Greenpeace produced Skype messages for four custodians:

---

[2] Resolute's motion for sanctions was originally filed on March 15, 2022, and Greenpeace's motion for sanctions was originally filed on May 20, 2022.  (Dkt. Nos. 435, 455.)  On May 24, 2022, the Court ordered the parties to file revised motions and briefs, noting the excessive exhibits and lack of pincites.  (Dkt. No. 457.)

3

1   Defendants Moas, Skar, Brindis, and Daggett.  (Tabaksblat Decl. ¶ 8.)  This production consisted

2   of over 9,600 Skype messages during the period between December 20, 2016 and December 21,

3   2017.  (Tabaksblat Decl. ¶ 8.)  For these custodians, Skype data from the Cloud was only available

4   from April 20, 2017 on.  (*See* Greenpeace Opp'n at 4-5.)  It appears that in 2016 and 2017,

5   Microsoft migrated Skype from a peer-to-peer system to a centralized system, impacting where

6   data was stored.  (Williams Decl. ¶ 36(c), Dkt. No. 460-1.)  Skype has a published statement on its

7   website that messages will not be available if they are "dated back to April 2017."  (Williams

8   Decl. ¶ 37.)  It is not apparent that Microsoft warned of the loss or provided notice of the loss prior

9   to August 2020.  (Williams Decl. ¶¶ 37, 42.)  Older messages were retrieved from laptops and

10  phones.  (*See* Greenpeace Opp'n at 4-5.)

11      Following the September 18, 2020 production, the parties subsequently agreed to an

12  attorney-supervised call between the parties' forensic technology experts to discuss the issue of

13  the lost Skype data.  (Tabaksblat Decl. ¶ 9.)  Greenpeace's counsel also responded to a list of

14  written questions on February 4, 2021.  (Tabaksblat Decl. ¶ 9, Exh. 6.)  Thereafter, Greenpeace's

15  counsel did not respond to follow-up questions and stated they would not participate in the call

16  between the experts.  (Tabaksblat Decl. ¶ 10.)  Greenpeace's counsel instead stated that if

17  Resolute wanted additional information, they would need to pursue it through formal discovery.

18  (Tabaksblat Decl. ¶ 10.)

19      Resolute subsequently subpoenaed Microsoft for the Skype data.  (Tabaksblat Decl. ¶ 13.)

20  Greenpeace worked with nine custodians to execute consent forms to allow Microsoft to disclose

21  the custodians' Skype data.  (Koonce Decl. ¶ 19, Dkt. No. 460-7.)  On March 1, 2021, Microsoft

22  stated that the consent forms had been altered, and would need to be resubmitted "without any

23  changes to them other than filling them out and signing."  (Tabaksblat Decl., Exh. 11.)  Microsoft

24  also stated that no data had been preserved as to: (1) matt.daggett, (2) gaia21 st2005, (3) GP

25  Amplification Skype group, (4) Boreal Forest Skype Group, (5) CORE TEAM Skype group, (6)

26  NRO Skype group, (7) https://join.skype/com/HFJifxA6nz6P, (8)

27  https://join.skype.com/mBIWvm7sjP8b, and (9) live.jhpape.  (*Id.*)  Resolute made no further

28  attempts to subpoena the data from Microsoft.  (Koonce Decl. ¶ 20.)

United States District Court
Northern District of California

In summary, the following Skype production has been made (or not made) for Defendants Brindis, Moas, Skar, and Daggett as custodians:

| Custodian | Production Period | Missing Messages Period |
|---|---|---|
| Daniel Brindis | 1/3/2017 – 11/6/2020 | 5/31/2016 – 1/3/2017 |
| Matthew Daggett | 4/20/2017 – 1/31/2020 | 5/31/2016 – 4/20/2017 |
| Amy Moas | 12/19/2016 – 3/5/2021 | 5/31/2016 – 12/19/2016 |
| Rolf Skar | 9/23/2016 – 3/4/2021 | 5/31/2016 – 9/23/2016 |

(Resolute Reply at 6, Dkt. No. 462; Greenpeace Opp'n at 4-5.)  In addition to the above Skype production, Greenpeace has produced from other custodians 61 Skype conversations (approximately 2,852 pages) from between May 31, 2016 and December 2016, as well as 74 Skype chats from December 2016.  (Koonce Decl. ¶¶ 10-11.)  This production included chats with Defendants Brindis, Moas, Skar, and Daggett.  (Koonce Decl. ¶ 11.)

## B.  Greenpeace's Motion for Sanctions

Greenpeace, in turn, has filed a motion for sanctions, asserting that Resolute violated the Court's January 20, 2021 order requiring Resolute to respond to Greenpeace's damages interrogatories.  (Greenpeace Mot. for Sanctions at 3-4.)  Greenpeace also asserts that Resolute has failed to adequately preserve and search for evidence, causing spoliation and the tardy production of over 14,000 documents (out of 25,000).  (*Id.* at 13-14.)

### i.  Damages Interrogatories

On September 5, 2019, Greenpeace served Resolute with interrogatories seeking the bases for Resolute's damages claims.  (Second Koonce Decl. ¶ 2, Dkt. No. 459-1.)  On December 2, 2020, the parties filed a joint discovery letter to compel Resolute's response to certain interrogatories.  Specifically, Interrogatory No. 7 required that Resolute state: (1) all facts showing that its reputation had been damaged, (2) a full description of each item or element of damage, (3) the amount of each element of damage, (4) how each element of damage was calculated, and (5) a description of the source of each calculation of each element of damage.  (*See* Discovery Order at 1, Dkt. No. 381.)  Interrogatory No. 13 required Resolute to identify how its market share compared to the market share of their competitors from January 2015 to the present.  (*Id.* at 3-4.)  Finally, Interrogatory No. 14 required Resolute to identify every asset whose value had diminished

1    due to Greenpeace's conduct.  (*Id.* at 4.)  In each instance, Resolute asserted that the

2    interrogatories sought premature expert discovery.  (*Id.* at 1, 4.)

3         On January 20, 2021, the Court found that Resolute's responses were not adequate.  As to

4    Interrogatory No. 7, the Court found that Resolute had failed to explain why it could not, for

5    example, describe each item of damage or explain how the actionable statements damaged it.

6    (Discovery Order at 2.)  While the Court acknowledged that damages could be difficult to

7    calculate, this did not mean Resolute could avoid identifying and explaining the information it did

8    possess.  (*Id.*)  Accordingly, the Court ordered Resolute "to respond to Interrogatory No. 7 in full,

9    except that Plaintiffs need only identify material facts, rather than *all* facts.  While specific

10   calculations of damages may require expert reports, Plaintiffs must still identify and provide the

11   underlying information."  (*Id.* at 3.)  The Court also ordered Resolute to provide all information

12   needed to substantiate its claim that it lost market share because of the Challenged Statements

13   (Interrogatory No. 13), and to identify each asset that diminished in value due to Greenpeace's

14   conduct (Interrogatory No. 14).  (*Id.* at 4.)

15        In compliance with the Court's order, on February 20, 2021, Resolute served its

16   supplemental responses to Interrogatory Nos. 7, 13, and 14.  (Second Koonce Decl., Exh. 1 ("Feb.

17   20, 2021 Interrogatory Resp."), Dkt. No. 459-2.)  In February 2022, Greenpeace sent letters

18   seeking clarification regarding damages; for example, Greenpeace noted that Resolute had

19   identified lost volumes of sale from UPM, Burrows, Fibermark, Finch Paper, P&G, Clearwater,

20   Kimberly Clark, and West Linn, but that no documents had been produced showing that these

21   companies received the Challenged Statements or otherwise altered their purchases from Resolute

22   as a result.  (Second Koonce Decl., Exh. 3.)  Greenpeace thus asked Resolute to confirm if they

23   did not intend to base their damages claims on their relationships with these customers, and to

24   confirm that they did not intend to base their damages claims on relationships with any other

25   customers other than those identified in the interrogatory responses.  (*Id.*)  On March 1 and 9,

26   2022, Greenpeace followed up on this issue, but received no response.  (Second Koonce Decl.,

27   Exhs. 4, 5.)

28        On April 19, 2022, less than three weeks before the fact discovery cut-off, Resolute served

a new response to Interrogatory Nos. 7, 13, and 14.  (Second Koonce Decl., Exh. 8 ("Apr. 19, 2022 Interrogatory Resp."); *see also* Dkt. Nos. 447, 450.)  The April 19, 2022 responses included the following new information:

| February 20, 2021 Response | Additional Information in April 19, 2022 Response |
|---|---|
| Interrogatory No. 7 (Facts re Damages) | |
| **Lost profits** of approximately $40 million between April 2014 and December 2017, including increased costs and/or lost profitability in customer relationships resulting from the modification or purchasing habits and/or requirements.  Lost sales from UPM, Burrows, Fibermark, Finch Paper, P&G, Clearwater, Kimberly Clark, and West Linn. | **Lost profits** from book publishers and end users declining to do business with Resolute or declining to purchase from the area defined by Greenpeace as the Montagnes Blanches, resulting  in higher cost wood fiber and bleaching costs.  Other book publishers declined to expand business or print more prominent authors on Resolute's paper.  Some pulp customers terminated their relationship with Resolute or declined to do business. |
| **Mitigation costs** from addressing customer inquiries regarding the Challenged Statements, fees and costs from the retention of public relations and marketing firms, and legal fees and costs associated with evaluating claims arising from the Challenged Statements. | No additional information |
| **Diversion of employee resources** to respond to customer inquiries and prepare responses to the Challenged Statements.  The resources could otherwise have been spent on pursuing new customers and business, focusing on strategic business opportunities, and maintaining and servicing other existing customers. | No additional information |
| | **Lost opportunities** from decrease in paper demand, requiring Resolute to offline paper machines in Calhoun and continue to idle paper machines in Alma.  Other paper competitors did not have any substantial papermill closures during this time.  Additionally, Resolute did not pursue certain strategic acquisitions due to an inability to obtain financing or shareholder buy-in or because of concern that the acquisitions would subject Resolute to additional exposure to Greenpeace's claims about Resolute's activities in the Canadian Boreal Forest. |
| | **Impaired investments** in the Alma, |

| | |
|---|---|
| | Kenogami, Dolbeau, and St. Felicien mills; in 2015, the projected EBITDA was $800 million, but Resolute's EBITDA during the relevant period did not exceed $500 million. |
| | **Restrictions on debt capacity and sales of shares**, resulting in the Resolute Board cautioning management not to take on additional debt to finance capital projects or other investments in 2016/2017.  Resolute encountered issues obtaining financing due to concerns about the Challenged Statements. |
| Interrogatory No. 13 (Market Share) | |
| Identified documents reflecting indicators of Resolute's market share. | Resolute required to offline paper machines in Alma and close machines in Calhoun, while competitors did not close paper mills for substantial periods of time during this period. |
| Interrogatory No. 14 (Diminished Assets) | |
| Human capital, goodwill, accounts receivable, customer contracts and business relationships, FSC certifications and credits, supply guarantees, wood processing plants and mills, raw materials for wood and paper products, inventory of wood and paper products. | Loss of market shares, declined enterprise value, depressed share price and shareholder equity, foregone profits, and the offlining of paper machines. |

(Feb. 20, 2021 Interrogatory Resp.; Apr. 19, 2022 Interrogatory Resp.[3])

Resolute asserts that this response merely "expounded on the information provided in prior responses based on new information learned through the course of ongoing discovery and Plaintiffs' extensive work with experts during the intervening year."  (Second Tabaksblat Decl. ¶ 25, Dkt. No. 469-1.)  Resolute also states it made a corresponding document production in March 2022.  (Second Tabaksblat Decl. ¶ 25.)  Greenpeace, in turn, asserts that Resolute made a document production of several dozen additional documents that appeared related to the new damages claims a few days after sending the April 2022 interrogatory responses.  (Second Koonce Decl. ¶ 18.)

On April 28, 2022, Resolute's Rule 30(b)(6) representative on damages, Richard Garneau, was deposed.  (Second Koonce Decl. ¶ 20.)  When asked what book publisher customer-related

---

[3] It appears other new information regarding damages were added in response to interrogatories not at issue in the Court's January 20, 2021 discovery order.  (*See* Apr. 19, 2022 Interrogatory Resp. at 17-22.)

United States District Court
Northern District of California

damages Resolute had suffered because of the Challenged Statements, Mr. Garneau repeatedly stated that these facts would be addressed by the damages expert, and that: "my understanding is that the discovery is still going on and that we're going to, at some point, have all the facts . . . ." (Garneau Depo. at 148:3-149:25, Dkt. No. 459-11.)

Additionally, on September 12, 2022, Resolute moved to extend various deadlines because its damages expert had "requested and reviewed several hundred documents that were not . . . produced to Defendants." (Dkt. No. 475 at 2-3.) Greenpeace opposed on the ground that Resolute was essentially asking for additional time "to collect and produce more documents that already should have been produced in fact discovery." (Dkt. No. 476 at 2-3.) On September 16, 2022, the presiding judge denied Resolute's motion in a text-only entry. (Dkt. No. 477.) On September 21, 2022, in a written order expanding on the prior denial, the presiding judge observed that Resolute's damages "expert has now uncovered hundreds of new documents 'concerning damages theories that were previously disclosed to defendants and explored during fact discovery,' a description that suggests these documents should have been produced during fact discovery." (Dkt. No. 478 at 2.)

### ii. Document Production

#### a. Litigation Hold

Greenpeace asserts that Resolute failed to institute a litigation hold in this case, resulting in the failure to preserve evidence. Specifically, in April 2014, Plaintiffs issued a "Litigation Hold and Document Preservation Notice" ("Resolute Litigation Hold"), requiring that recipients preserve all actions related to the Greenpeace Canada Action. (Second Koonce Decl., Exh. 11 ("Resolute Litigation Hold").) The Resolute Litigation Hold stated that the Greenpeace Canada Action alleged that "the Defendants made false and defamatory statements about Resolute and that the Defendants are threatening and intimidating Resolute's customers." (*Id.*) The Resolute Litigation Hold required the retention of records, which "were likely prepared or generated in the period between 2009 to present and may relate to" allegations regarding Resolute harvesting in the Broadback Valley Forest, Resolute's pensions, Resolute's Align family of paper products, Resolute's use of recycled content in its products, Greenpeace Canada's December 2012

United States District Court
Northern District of California

1   publications, and Greenpeace's communications with Resolute's customers, stakeholders, and

2   investors.  (*Id.* at 2.)  The Resolute Litigation Hold was ultimately circulated among 56 Resolute

3   employees.  (Vachon Decl. ¶ 13, Dkt. No. 469-25.)  Resolute's legal department also circulated

4   quarterly litigation hold update e-mails to employees subject to the litigation hold, and received

5   audit committee reports.  (Vachon Decl. ¶ 14.)  Questionnaires were also distributed to employees;

6   the questionnaire listed categories of documents that should be preserved, including "[d]ocuments

7   regarding the Montagne Blanches region and Greenpeace's false allegation that Resolute built

8   logging roads in violation of the Canadian Boreal Forest Agreement (CBFA)."  (Vachon Decl. ¶ 7,

9   Exh. 1.)

10      Although it appears no litigation hold was issued specific to the instant action, custodians

11   in this action testified that they understood the Resolute Litigation Hold extended to records

12   concerning all of Greenpeace's statements, not just those in the Greenpeace Canada Action.  (*See*

13   Romeo Depo. at 105:1-2, Dkt. No. 469-13 (explaining that he preserved all documents that

14   referred to Greenpeace), Goulding Depo. at 329:22-24, Dkt. No. 469-20 (explaining that if it

15   mentioned Greenpeace, he would not delete it).)  Additionally, Resolute backed up all e-mail

16   account data at the end of the year.  (Papps Decl. ¶ 13, Dkt. No. 46-29.)  Individuals were also

17   given more e-mail storage or overflow e-mail folders (the "Archives") to store e-mail

18   communications that needed to be preserved.  (Papps Decl. ¶ 6.)  Several custodians, including

19   Seth Kursman, Kevin Goulding, and Carolyn Pinto, had documents stored on the Archives.

20   (Papps Decl. ¶ 12.)

21          b.   Document Production

22      Greenpeace also asserts that Resolute failed to adequately identify, collect, search, and

23   produce documents, resulting in spoliation. Greenpeace served their initial discovery requests in

24   September 2019.  (Second Tabaksblat Decl. ¶ 2.)  Resolute then requested Greenpeace's input on

25   e-discovery metrics such as search terms and proposed custodians, but Greenpeace did not

26   respond.  (Second Tabaksblat Decl. ¶¶ 2, 5.)  Accordingly, Resolute identified five custodians,

27   including Richard Garneau (CEO), Yves Laflamme (successor President and CEO), Seth Kursman

28   (Vice President, Communications, Sustainability & Government Affairs with responsibility for

United States District Court
Northern District of California

10

United States District Court
Northern District of California

customer communications), John Lafave (Senior Vice President, Pulp and Paper Sales and Marketing), Marc Bedard (Vice President, Forestry), and Francois Dumoulin (predecessor Vice President, Forestry).  (Second Tabaksblat Decl. ¶ 8.)  Resolute asserts it advised collecting documents from the supervisor of each relevant department because it was Resolute's business practice to copy or forward all substantive communications to the department supervisor. (Resolute Opp'n at 6.)  Between January 31, 2020 and December 31, 2020, Resolute "substantially completed" the production of these custodians' responsive documents, as well as all documents produced by Resolute in the Greenpeace Canada Action.  (Second Tabaksblat Decl. ¶¶ 10-11.)  This amounted to approximately 10,564 documents.  (Second Koonce Decl. ¶ 60.)  Of these, approximately 1,000 documents lack custodian metadata, 700 lack date metadata, and half lack hash value metadata.  (Second Koonce Decl. ¶ 60.) Greenpeace states that Resolute represented that they completed their document production in December 2020.  (Second Koonce Decl. ¶ 64.)

In August 2021, Greenpeace asserts it first became aware of "holes" in Resolute's discovery during the deposition of Mr. Goulding, during which Mr. Goulding identified several categories of documents that had not been produced.  (Second Koonce Decl. ¶ 27.)  On September 9 and 13, 2021, Greenpeace's counsel inquired about documents that appeared missing, including documents related to damages and mill closures.  (Second Koonce Decl., Exhs. 12, 13.)  On October 7, 2021, Resolute produced 1,200 documents.  (Second Koonce Decl. ¶ 30.)  On October 8, 2021, Greenpeace for the first time inquired about the search metrics Resolute used to collect and produce documents.  (Second Koonce Decl. ¶ 31; Second Tabaksblat Decl. ¶ 15.)  Resolute, in response, informed Greenpeace that it had searched the documents of the six custodians, out of sixteen witnesses originally identified by Resolute as having relevant knowledge.  (Second Koonce Decl. ¶ 32.)

Between October 2021 and January 2022, Resolute collected and produced documents for the additional custodians requested by Greenpeace.  (Second Tabaksblat Decl. ¶ 19.)  Greenpeace asserts that "these productions often came mere days before depositions."  (Second Koonce Decl. ¶ 32.)  The parties would adjourn the depositions to give Greenpeace additional time to review the

production.  (Second Tabaksblat Decl. ¶ 22.)  On February 10, 2022, Resolute also disclosed that it had not searched the Archives, which totaled nearly 4,000 documents.  (Second Koonce Decl. ¶ 43.)  Resolute asserts that the Archives were compromised almost entirely of duplicates of previously produced documents but from different custodian inboxes.  (Second Tabaksblat Decl. ¶ 21.)  In total, approximately 14,362 additional documents were produced between October 2021 and February 2022.  (Second Koonce Decl. ¶ 62; *see also* Second Tabaksblat Decl. ¶ 22.)

Greenpeace also asserts that during depositions, individuals testified as to the existence of documents that were not produced or, in some instances, not searched.  For example, Mr. Goulding, the direct supervisor of the salespeople who interacted with publishing customers that allegedly received the Challenged Statements, testified that he used texts for "[t]ypically short messages that have some urgency for you to issue the text," but that he was never asked to produce any text messages related to Greenpeace.  (Second Koonce Decl. ¶ 44; Goulding Depo. at 326:23-327:7, 331:2-7, Dkt. No. 459-18.)  Mr. Romeo testified that he texted with other employees and customers, but that he had no ability to go back and look at his texts.  (Romeo Depo. at 107:12-18, 109:13-110:2, Dkt. No. 459-19.)  Mr. Romeo also testified that he would take handwritten notes from meetings with customers, but that he was never asked to produce them.  (Romeo Depo. at 99:23-100:8.)  Mr. Kursman, Vice President, Communications, Sustainability & Government Affairs, testified that he sent "tens of thousands" of e-mails, while Resolute states that Mr. Kursman was the custodian or duplicate custodian of more than 3,700 documents.  (Kursman Depo. at 147:15-16, Dkt. No. 459-22; Blair Decl. ¶ 20, Dkt. No. 469-30.)

## II.    LEGAL STANDARD

### A.    Rule 37(e)

Federal Rule of Civil Procedure 37(e) concerns the failure to preserve electronically stored information ("ESI").  "Rule 37(e) sets forth three criteria to determine whether spoliation of ESI has occurred: (1) the ESI 'should have been preserved in the anticipation or conduct of litigation'; (2) the ESI 'is lost because a party failed to take reasonable steps to preserve it'; and (3) '[the ESI] cannot be restored or replaced through additional discovery.'"  *Porter v. City & Cty. of S.F.*, No. 16-cv-03771-CW (DMR), 2018 U.S. Dist. LEXIS 151349, at *6-7 (N.D. Cal. Sep. 5, 2018)

1   (quoting Fed. R. Civ. P. 37(e)).  If these criteria are satisfied and there is "prejudice to another

2   party from loss of the information," the court "may order measures no greater than necessary to

3   cure the prejudice."  Fed. R. Civ. P. 37(e)(1).

4           If, however, the court finds that "the party acted with the intent to deprive another party of

5   the information's use in the litigation," the court may impose more severe sanctions, including an

6   adverse inference jury instruction or terminating sanctions.  Fed. R. Civ. P. 37(e)(2).  "Unlike Rule

7   37(e)(1), there is no requirement that the court find prejudice to the non-spoliating party under

8   Rule 37(e)(2)."  *Porter*, 2018 U.S. Dist. LEXIS 151349, at *7.  Intent, in turn, requires more than

9   "[n]egligent or even grossly negligent behavior."  Fed. R. Civ. P. 37 advisory committee's note

10   (2015).  Rather, "courts have found that a party's conduct satisfies Rule 37(e)(2)'s intent

11   requirement when the evidence shows or it is reasonable to infer, that a party purposefully

12   destroyed evidence to avoid its litigation obligations."  *Porter*, 2018 U.S. Dist. LEXIS 151349, at

13   *8.

14       **B.      Rule 37(b)**

15           Rule 37(b)(2)(A) concerns the impositions for sanctions for failure to comply with "an

16   order to provide or permit discovery."  Sanctions may include evidentiary sanctions, adverse jury

17   instructions, or terminating sanctions.  A district court "has great latitude in imposing sanctions for

18   discovery abuse."  *Dahl v. City of Huntington Beach*, 84 F.3d 363, 367 (9th Cir. 1996).  Any such

19   sanction, however, must be "just" in light of the particular circumstances of the case.  *Ins. Corp. of

20   Ireland v. Compagnie des Bauxites*, 456 U.S. 694, 707 (1982).  When choosing among possible

21   sanctions, the court should consider a sanction designed to: (1) penalize those whose conduct may

22   be deemed to warrant such a sanction; (2) deter parties from engaging in the sanctioned conduct;

23   (3) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (4)

24   restore a prejudiced party to the same position he or she would have been in absent the

25   wrongdoing.  *See Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976);

26   *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983).

27           Rule 37 also mandates the imposition of monetary sanctions on a party that fails to obey a

28   discovery order, requiring that the offending party "pay the reasonable expenses, including

United States District Court
Northern District of California

13

attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C).  "Willfulness, fault, or bad faith is not required for the imposition of monetary sanctions under Rule 37(b)(2)."  *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C 09-1967 CW, 2012 U.S. Dist. LEXIS 155511, at *22 (N.D. Cal. Oct. 30, 2012)

### III.    DISCUSSION

### A.    Resolute Motion for Sanctions – Skype Production

#### i.    Reasonable Steps to Preserve Skype Messages

With respect to the three criteria for finding spoliation, the parties do not dispute that the Skype messages should have been preserved.  Thus, the Court first considers whether the Skype messages were "lost because a party failed to take reasonable steps to preserve it."  Fed. R. Civ. P. 37(e).

Here, Greenpeace contends that it took reasonable steps to preserve the Skype messages by issuing a litigation hold, ensuring that custodians understood not to delete ESI, and utilizing cloud-based systems to retain data.  (Greenpeace Opp'n at 14.)  Moreover, Greenpeace contends that the data loss was outside of its control, as the loss of Skype messages on the cloud was due to the system-wide Microsoft change in April 2017.  (*Id.*)  Resolute, in turn, points to Defendant Brindis's admission that he failed to turn off the auto-delete setting on his personal Skype account.  (*See* Resolute Reply at 10.)  Resolute further argues that Greenpeace should have taken further actions to preserve the Skype messages, such as backing up their existing messages onto a central laptop.  (*Id.* at 10-11.)

In support, Resolute cites *Colonies Partners, L.P. v. County of San Bernardino*, No. 518CV00420JGBSHK, 2020 WL 1496444 (C.D. Cal. Feb. 27, 2020), *report and recommendation adopted,* No. 518CV00420JGBSHK, 2020 WL 1491339 (C.D. Cal. Mar. 27, 2020).  (Resolute Reply at 10.)  There, the custodian deleted e-mails by closing his e-mail account, such that the account was no longer accessible.  *Colonies Partners, L.P.*, 2020 WL 1496444, at *3-4.  The custodian also lost text messages when he obtained a new cell phone, and regularly deleted text messages when he received and read them.  *Id.* at *4, 5.  The district court further found that the

1   defendants failed to take reasonable steps to preserve the evidence because it appeared no one had

2   informed the custodian "of his obligation to retain such information, which suggests there was no

3   formal litigation hold in place[.]"  *Id.* at *8.

4          The Court finds that Resolute has not demonstrated that Greenpeace failed to take

5   reasonable steps to preserve the Skype messages.  Unlike *Colonies Partners, L.P.*, Greenpeace did

6   issue a litigation hold.  More importantly, with the exception of Defendant Brindis's failure to turn

7   off the auto-delete setting on his personal Skype account, there is no showing that individual

8   Defendants actively deleted or caused Skype messages to be lost.  Rather, it appears that the

9   individual Defendants assumed that the Skype messages would be saved as long as they did not

10  delete them.  Instead, in April 2017, Microsoft migrated Skype to a new system, affecting the

11  storage of data.  (Williams Decl. ¶ 36.)  As the Advisory Committee has noted, Rule 37(e) "is

12  inapplicable when the loss of information occurs despite the party's reasonable steps to preserve.

13  For example . . . information the party has preserved may be destroyed by events outside the

14  party's control--the computer room may be flooded, a 'cloud' service may fail, a malign software

15  attack may disrupt a storage system, and so on."  Fed. R. Civ. P. 37(e) advisory committee's notes

16  (2015).  In such circumstances, the courts "need to assess the extent to which a party knew of and

17  protected against such risks."  *Id.*  Yet here, Resolute provides no information to suggest this data

18  migration did not occur, that messages saved on the Cloud prior to April 2017 were actually

19  saved, or that users were warned of this potential loss.

20         While Resolute argues that Greenpeace should have backed up the messages on a

21  computer, it does not adequately explain why Greenpeace's reliance on the messages being

22  retained is not reasonable, particularly in the absence of any evidence in the record that such

23  reliance was not warranted.  In its papers and at the hearing, Resolute pointed to Greenpeace's

24  failure to back up the messages, issue a notice to Microsoft to preserve the messages, or use a paid

25  plan to preserve the messages, but Resolute cites no authority in support.

26         Resolute speculates that Greenpeace intentionally deleted the Skype messages, the Court

27  finds no such showing.  (Resolute Mot. for Sanctions at 14.)  Resolute points to the timing,

28  arguing that the fact that the Skype messages were preserved three days after the December 16,

15

United States District Court
Northern District of California

1   2016 letter "smacks of bad faith." (*Id.*)  Yet Resolute acknowledges in its reply that Defendant

2   Skar did provide messages from September 23, 2016 on.  (*See* Resolute Reply at 6.)  Additionally,

3   there is no evidence that the individual Defendants deleted or were even capable of deleting the

4   Skype messages from a certain period.  Indeed, Greenpeace's expert notes that when analyzing the

5   Skype interface, he "found no settings that would permit a user to execute automated deletes

6   and/or remove all messages prior to a specified date."[4]  (Williams Decl. ¶ 29.)  Thus, it does not

7   appear possible for the individual Defendants to have intentionally deleted Skype messages prior

8   to a certain date.  Moreover, if Greenpeace truly intended to delete Skype messages, it is unclear

9   why they did not delete Skype messages from all custodians.  Indeed, other custodians and

10  Greenpeace Canada provided messages from the relevant period, including messages with the

11  individual Defendants.  (*See* Greenpeace Opp'n at 4.)  Resolute's reliance on the loss of Skype

12  messages is insufficient; "[t]he bare fact that evidence has been altered or destroyed does not

13  necessarily mean that the party has engaged in sanctions-worthy spoliation." *Reinsdorf v.*

14  *Skechers U.S.A., Inc.*, 296 F.R.D. 604, 626 (C.D. Cal. 2013); *see also Solutions v. Falck N. Cal.*

15  *Corp.*, No. 19-cv-06104-SBA (JCS), 2021 U.S. Dist. LEXIS 202622, at *22 (N.D. Cal. Sep. 10,

16  2021) ("Falck's insistence that any inconsistency or missing documentation is proof of misconduct

17  is similarly speculative.").

18          Accordingly, on this record, the Court finds that with the exception of Defendant Brindis's

19  admitted failure to turn off the auto-delete setting on his personal Skype account, Resolute has

20  failed to demonstrate that Greenpeace failed to take reasonable steps to preserve the evidence.

21  Thus, the Court next considers the third criteria for spoliation as to the Skype messages lost as a

22

23  [4] In a footnote, Resolute asserts a right to depose Mr. Williams in connection with his declaration,
    but does not otherwise dispute Mr. Williams's declaration, provide a declaration from its own

24  expert, or provide **any** basis to doubt Mr. Williams's findings and conclusions. (Resolute Reply at
    13 n.7.)  As the party seeking sanctions under Rule 37(e)(2), Resolute has "the burden of

25  establishing spoliation by demonstrating that [the non-moving party] destroyed documents and
    had some notice that the documents were potentially relevant to the litigation before they were

26  destroyed." *Ryan v. Editions Ltd. West, Inc.*, 786 F.3d 754, 766 (9th Cir. 2015); *see also Hinitz v.*
    *Intero Real Estate Servs.*, No. 18-cv-05623-BLF, 2020 U.S. Dist. LEXIS 247947, at *12 (N.D.

27  Cal. May 13, 2020) (finding that the moving party had not satisfied its burden of demonstrating
    that the destruction of Facebook videos and posts was intentional, particularly where the non-

28  moving party had put forth evidence that it only intended to remove the videos and posts from its
    public page and did not know that the posts would not be preserved when it did so).

United States District Court
Northern District of California

1    result of Defendant Brindis's failure.

2              ii.    **Restoration or Replacement Through Additional Discovery**

3              As an initial matter, Greenpeace disputes whether there are any Skype messages lost.  On

4    the record, it is unclear when Defendant Brindis had the auto-delete setting on, although

5    Greenpeace indicated at the hearing that it was likely until December 2017.  Moreover,

6    Greenpeace points to the fact that other custodians and Greenpeace Canada did provide Skype

7    messages for the period between May and December 2016, including conversations with

8    Defendant Brindis.  (*See* Koonce Decl. ¶ 10, Exh. A.)  Thus, Greenpeace argues that while

9    Defendants Moas, Skar, Brindis, and Daggett may have lost Skype messages, any conversations

10   between them and other custodians or Greenpeace Canada would have been produced.

11   (Greenpeace Opp'n at 17-18.)  As Resolute points out, however, this would not cover

12   conversations between the individual Defendants or other employees and third-parties for whom

13   Skype data was not produced or restored.  (Resolute Reply at 7.)  Thus, the Court finds it likely

14   that Skype messages have, in fact, been lost.

15             Next, Greenpeace contends that Resolute cannot demonstrate that Defendant Brindis's

16   Skype messages could not be restored or replaced through additional discovery, namely subpoenas

17   to Microsoft.  (Greenpeace Opp'n at 18.)  The parties worked together to execute consent forms to

18   allow Microsoft to disclose Skype data, but the parties dispute whether Resolute made further

19   attempts to subpoena the data from Microsoft after the original consent forms were rejected.

20   (Koonce Decl. ¶ 20.)  Notably, at the hearing, Greenpeace itself seemed rather doubtful that

21   Microsoft would have the messages.  Indeed, given that Microsoft deleted data prior to April

22   2017, the Court is skeptical that the data Resolute is most concerned about would have been

23   available.  Accordingly, the Court disagrees that the missing Skype messages could have been

24   restored by seeking discovery through Microsoft.

25             Based on the record, the Court cannot find that there was no prejudice to Resolute.  "For a

26   finding of prejudice under Rule 37(e)(1), the Court has discretion to determine whether the loss of

27   the information is prejudicial; neither party carries a burden of proving or disproving prejudice."

28   *Chinitz*, 2020 U.S. Dist. LEXIS 247947, at *7 (internal quotation omitted).  Here, the lost

messages would have included those between Defendant Brindis and the other named Defendants, non-custodian employees, and third-parties during a critical period, namely between the date of the Quebec minister's statement regarding the Montagnes Blanches map and the first Challenged Statement. While Greenpeace may argue that no "smoking gun" messages existed at this time, Resolute had a right to review the Skype messages from this period and to understand Greenpeace's rationale and thought process in issuing the Challenged Statements. (*See* Greenpeace Opp'n at 20.) Thus, Resolute was prejudiced by this loss.

That said, the Court does not find that terminating sanctions or an adverse jury instruction are warranted, particularly given the limited scope of the Court's finding of spoliation -- namely, any messages lost by Defendant Brindis's failure to turn off the auto-delete function that were not otherwise turned over through the production of other custodians or Greenpeace Canada. Moreover, there is no evidence Defendant Brindis intentionally spoliated these Skype messages. Accordingly, the Court RECOMMENDS a jury instruction of a short factual statement regarding the spoliation of this evidence. The statement should inform the jury that Defendant Brindis had a duty to preserve all Skype messages, but that despite this duty, certain Skype messages were lost during the period that Defendant Brindis failed to turn off the auto-delete function on his Skype account. *Compare with Porter*, 2018 U.S. Dist. LEXIS 151349, at *12-13 (denying the request for an adverse jury instruction where the defendant failed to preserve a piece of central evidence but there was no showing of intentional malfeasance, and instead ordering that "the jury may hear a short factual statement at trial regarding the spoliation of this evidence"). The Court also ORDERS Greenpeace to pay Plaintiff's attorney's fees for the time spent meeting and conferring on Defendant Brindis's failure to turn off the auto-delete function, as well as 10% of the time spent on the instant motion for sanctions.

**B.    Greenpeace Motion for Sanctions**

**i.    Damages Interrogatories**

First, Greenpeace seeks sanctions under Rule 37(b) for failure to comply with the Court's January 20, 2021 order. (Greenpeace Mot. for Sanctions at 15.) The Court finds that Resolute failed to comply, and that sanctions are warranted.

Here, the Court ordered Resolute to identify all material facts supporting its damages, substantiate its claims that it lost market share, and to identify each asset that diminished in value due to Greenpeace's conduct.  (Discovery Order at 3-4.)  In its February 2021 responses, Resolute identified three categories of damages (lost profits, mitigation costs, and diversion of employee resources) in response to Interrogatory No. 7, identified documents reflecting Resolute's market share in regard to Interrogatory No. 13, and various categories of diminished assets.  (Feb. 20, 2021 Interrogatory Resp.)  In April 2022, however, Resolute added significant new information that should have been disclosed before.  For example, with respect to Interrogatory No. 7, Resolute identified additional categories of damages such as lost opportunities from decreases in paper demand, the offlining of paper machines, and the decision not to pursue strategic acquisitions; impaired investments in certain mills; and restrictions on debt capacity and sales of shares, resulting in the decision not to take on additional debt to finance capital projects or other investments.  (Apr. 19, 2022 Interrogatory Resp.)

Resolute argues that "the majority of information that was set forth in the April 2022 responses were previously disclosed, and the limited new information is merely additional examples of the categories of damages (lost profits, lost opportunities, and loss of market share) that were previously identified."  (Resolute Opp'n at 22.)  Contrary to Resolute's assertions, however, these were not "merely" additional examples.  These are new categories of damages that were not disclosed in the February 10, 2021 responses; the need to offline paper machines, the impairment of investments in certain mills, and the inability to obtain financing or sell stock are simply not examples of lost profits from changes in customer relationships, mitigation costs from addressing customer inquiries or hiring public relations and law firms, or diversion of employee resources to respond to customer inquiries about the Challenged Statements.[5]  A reasonable person

---

[5] To the extent Resolute also points to its August 12, 2020 response to Interrogatory No. 10, the Court also finds that this response would not have put a reasonable person on notice of Resolute's newly claimed damages.  (Resolute Opp'n at 22.)  Interrogatory No. 10 requires Resolute to identify all facts and communications relating to its claim that business transactions Resolute had an interest in were harmed.  (Second Tabaksblat Decl., Exh. 23 (Aug. 12, 2020 Interrogatory Resp.) at 12.)  In its response, Resolute identifies costs to rebut the Challenged Statements, specifically supplying Hachette with FSC credits, written correspondence to and a helicopter tour for Macmilliam, and responses to and a tour for Penguin Random House.  (*Id.* at 13.)  Again, none

United States District Court
Northern District of California

1   would not view an inability to obtain financing as an "example" of lost profits, mitigation costs, or

2   diversion of employee resources.  The Court ordered Resolute to disclose **all** material facts

3   supporting its damages in January 2021, yet Resolute did not identify these significant categories

4   of damages -- including allegedly **$300 million** in impaired investments -- until April 2022, a few

5   weeks before the fact discovery cut off.  This is not only a violation of the Court's discovery

6   order, but an abuse of the discovery process.

7        In the alternative, Resolute contends that it was simply supplementing its discovery

8   responses.  (Resolute Opp'n at 23.)  It is certainly true that Rule 26(e) requires that a party

9   supplement or correct its responses, but Rule 26(e) also requires that the supplementation occur

10  "in a **timely** manner." Fed. R. Civ. P. 26(e) (emphasis added).  It certainly does not "create a

11  loophole through which a party who . . . .wishes to revise her disclosures in light of her opponent's

12  challenges to the analysis and conclusions therein, can add to them to her advantage after the

13  court's deadline for doing so has passed.  Rather, 'supplementation under the Rules means

14  correcting inaccuracies, or filling the interstices of an incomplete report based on information that

15  was not available at the time of the initial disclosure.'"  *Luke v. Family Care & Urgent Med.*

16  *Clinics*, 323 Fed. Appx. 496, 500 (9th Cir. 2009) (quoting *Keener v. United States*, 181 F.R.D.

17  639, 640 (D. Mont. 1998)).  While Resolute argues that it provided its revised interrogatory

18  responses after document production and depositions, Resolute fails to explain why document

19  production or the depositions were necessary when the damages concern information in Resolute's

20  own possession.  None of this was new information; rather, the offlining of the Calhoun paper

21  machines occurred in the fall of 2017, the projected EBITDA for the Alma, Kenogami, Dolbeau,

22  and St. Felicien mills was for 2015, and the inability to obtain financing included a 2017 incident

23  with Bank of America.  Moreover, this failure to provide damages-related information appears to

24  be an ongoing pattern; indeed, in September 2022, Resolute again attempted to extend deadlines in

25  order to produce "several hundred documents" related to damages.  (Dkt. No. 475 at 2-3.)  In

26  denying Resolute's motion, the presiding judge noted that Resolute's description of the documents

27  _____

28  of this is related to the need to offline machines, the impairment of investments, or the inability to
    obtain financing.

United States District Court
Northern District of California

1    "suggests these documents should have been produced during fact discovery." (Dkt. No. 478 at

2    2.)

3           Finally, at the hearing, Resolute argued that there was no prejudice because the documents

4    had been provided to Greenpeace, such as documents regarding the mills.  This, however, would

5    require Greenpeace to review tens of thousands of documents and speculate as to what Resolute's

6    damages theories are.  This is not the law.  Resolute was required to disclose its damages theories

7    in response to Greenpeace's interrogatories, per the Court's January 2021 order.  It cannot simply

8    rely on unspecified documents productions to satisfy this obligation.  Thus, the Court concludes

9    that Resolute's actions were not substantially justified.

10          While Greenpeace requests terminating sanctions, the Court finds that evidentiary

11   sanctions are adequate to penalize Resolute for its misconduct.  Accordingly, the Court

12   RECOMMENDS evidentiary sanctions; any damages theories first disclosed in the April 2022

13   interrogatory responses, as well as any supporting evidence, should be excluded.  Additionally,

14   having found that Resolute violated the Court's discovery order, the Court ORDERS Resolute to

15   pay Greenpeace's attorney's fees caused by the failure.  As discussed above, Resolute failed to

16   timely update its interrogatory responses without a reasonable explanation.  Resolute's behavior is

17   not in good faith.  Accordingly, Resolute shall be required to pay attorney's fees required to

18   contact Resolute to clarify the bases for their alleged damages.  The Court will also award certain

19   attorney's fees incurred in bringing the instant motion for sanctions, as discussed in the

20   conclusion.

21          **ii.    Spoliation**

22          Next, Greenpeace seeks sanctions under Rule 37(e) for spoliation.  (Greenpeace Mot. for

23   Sanctions at 20.)  Greenpeace asserts that Resolute committed spoliation in a number of ways; the

24   Court will discuss each alleged act and whether it demonstrates spoliation that warrants sanctions.

25                  a.  Litigation Hold

26          First, Greenpeace argues that Resolute failed to implement a litigation hold in this case,

27   instead relying on the Resolute Litigation Hold issued in 2014 pertaining to the Greenpeace

28   Canada Action.  (Greenpeace Mot. for Sanctions at 21.)

The Court finds that Greenpeace has not demonstrated that the failure to implement a litigation hold specific to this case resulted in the failure to preserve ESI. While Resolute did not issue a litigation hold specific to this case, it appears that custodians in this case understood the Resolute Litigation Hold to extend to records making any reference to Greenpeace, not simply to records related to the Greenpeace Canada Action. (*See* Romeo Depo. at 105:1-2, Goulding Depo. at 329:22-24.) Resolute also circulated questionnaires that referred to the Montagnes Blanches allegations, backed up its e-mail account data, and gave additional storage to certain custodians to ensure preservation. (Papps Decl. ¶¶ 6, 12, 13.) Thus, while the Court finds below that Resolute failed to preserve or produce certain categories of documents, it is not apparent to the Court that ESI was lost as a result of the litigation hold, or that Resolute failed to take reasonable steps to preserve ESI.

b. Texts

The Court finds that Greenpeace has demonstrated that Resolute failed to search and permitted the destruction of text messages. Mr. Goulding testified that he used texts for work, and would use it to send "short messages that have some urgency for you to issue the text," but that he only understood the Resolute Litigation Hold to pertain to e-mails. Mr. Goulding also stated that he never checked to ensure that texts were being preserved, and was never asked to provide any text messages. (Goulding Depo. at 326:11-327:7, 327:18-21, 330:7-331:7.) Mr. Romeo testified that he texted with other employees and customers, but that the texts were not preserved and he had no way of going back to look at his texts. (Romeo Depo. at 107:16-108:11; 109:13-8.) Additionally, Resolute produced no texts, and apparently conducted no search of any text accounts.

Resolute argues that the text messages did not include relevant information, pointing to Mr. Romeo's testimony that he did not believe he texted anything relevant to the litigation to other employees, and that he would use texts to set up meetings with customers or let them know he was on his way. (Resolute Opp'n at 18; Romeo Depo. at 108:12-19, 109:1-6, 109:14-22.) Mr. Goulding, however, testified that he used texts to send short messages with "some urgency," which does not suggest they were all non-substantive. Greenpeace also points to deposition

1    testimony in which Mr. Romeo acknowledged an e-mail in which Mr. Goulding noted that he had

2    texted with Mr. Romeo on the day they attended the 2017 Book Expo.  (Greenpeace Reply at 12,

3    Dkt. No. 471.)  Resolute has alleged that Defendants Moas, Skar, and Brindis were distributing the

4    challenged "Clearcutting Free Speech" report at that 2017 Book Expo.  (FAC ¶ 311.)  Moreover, it

5    is unclear how Resolute could unilaterally determine that the text messages contained no relevant

6    information when they never searched them.  Resolute's failure to take any reasonable steps to

7    produce or preserve the texts has deprived Greenpeace of communications between employees and

8    with customers, with no ability to determine if they were, in fact, non-substantive.  Moreover,

9    unlike above where Greenpeace noted that Resolute could search for the missing Skype messages

10   by subpoenaing Microsoft, Resolute does not suggest that there are any alternative means to

11   search for the text messages, including those that have been destroyed.

12                        c.   Personal E-Mail Accounts

13        The Court finds that Greenpeace has not demonstrated that ESI from personal e-mail

14   accounts was lost, such that Greenpeace suffered any prejudice.  Carolyn Pinto testified that when

15   she had technical issues or wanted to work on something on her own time or after work, it was

16   possible she would send things between her personal and work e-mail addresses.  (Pinto Depo. at

17   88:23-89:3, Dkt. No. 459-17.)  She also testified, however, that any e-mail in her personal e-mail

18   account that related to Greenpeace would have originated from her work e-mail.  (Pinto Depo. at

19   140:17-23.)  Greenpeace argues that Resolute should have been required to search Ms. Pinto's

20   personal e-mail, but there is nothing in the record to suggest that any e-mails sent to or from Ms.

21   Pinto's personal e-mail would have been produced as part of the search of her work e-mail.

22   (Greenpeace Reply at 13.)  Resolute further states that it has produced e-mails that included Ms.

23   Pinto's personal e-mail address.  (Tabaksblat Decl., Exh. 7.)

24        Greenpeace also points to testimony by Francois Dumoulin, in which he acknowledged an

25   e-mail that had been sent between his work and personal e-mail address.  (Dumoulin Depo. at

26   175:2-6, 193:6-10 Dkt. No. 459-24.)  Mr. Dumoulin also testified that he very rarely used his

27   personal e-mail address at all, and would send things from his work e-mail address "most of the

28   time."  (Dumoulin Depo. at 175:4-12.)  Again, however, it is not apparent that e-mails sent to or

1    from Mr. Dumoulin's personal e-mail would not  already have been included in the production

2    from his work e-mails.  Thus, Greenpeace has failed to demonstrate that ESI was lost or

3    unavailable from an alternate source.

4           d.  Local Documents on Personal Devices

5       The Court finds that Greenpeace has not demonstrated that ESI in the form of local

6    documents on personal devices was lost.  While Ms. Pinto testified that she would edit documents

7    on her personal computer, she further stated that if she made changes to a document on her

8    personal computer, she would have sent it back to her work e-mail so that she would have

9    everything in the same place.  (Pinto Depo. at 141:20-143:19.)  Any such documents would

10   therefore have been produced through Ms. Pinto's e-mails or documents saved on her work

11   computer.  Likewise, Greenpeace relies on Ms. Pinto's testimony that she used her personal

12   computer after becoming a consultant, but Ms. Pinto made clear that she logged in using a VPN to

13   a remote or virtual desktop.  (Pinto Depo. at 246:21-25.)  Thus, as Resolute points out, any

14   materials saved on that remote desktop would be on Resolute's servers, not on Ms. Pinto's

15   personal computer.  (Tabaksblat Decl., Exh. 7 at 2.)

16      Greenpeace further points to Mr. Goulding's testimony that no one searched his personal

17   computer, but does not identify any testimony that he actually used his personal computer for

18   work purposes.  (Goulding Depo. at 405:21-406:5.)  It is therefore unclear any evidence existed on

19   Mr. Goulding's personal devices.

20          e.  Hard Copies of Documents

21      As an initial matter, the Court notes that hard copies of documents would not warrant

22   sanctions under Rule 37(e) because it is not ESI.  The Court, however, does observe that it appears

23   Resolute failed to search and permitted the destruction of hard copies.  Indeed, Mr. Romeo

24   testified that he took handwritten notes after client meetings, but was never asked to produce them.

25   (Romeo Depo. at 99:23-100:8.)  He also stated that he did not know if he would have been able to

26   produce them anyway because he did not hold onto them for long.  (Romeo Depo. at 100:10-11.)

27          f.  Seth Kursman E-mails and Custodial Documents

28      The Court finds that Greenpeace has demonstrated that Resolute lost or failed to produce

United States District Court
Northern District of California

documents from Mr. Kursman.  Mr. Kursman, who is the Vice President of Communications, Sustainability & Government Affairs, testified that he sent "tens of thousands" of e-mails, or been in the loop on them.  (Kursman Depo. at 147:15-16.)  Mr. Kursman further testified that there is "hardly a day that goes by" where he is not sending e-mails or working on documents.  (Kursman Depo. at 230:24-231:2.)  Yet Greenpeace contends that Resolute initially produced only 1,050 documents from Mr. Kursman, despite Mr. Kursman being one of the original custodians searched by Resolute, and produced no documents during the relevant time periods surrounding the Challenged Statements.  (Second Koonce Decl. ¶ 44.)  A later production from the "Archive" included 776 documents from 2015-2017, which was half the size of Ms. Pinto's production despite Ms. Pinto being one of Mr. Kursman's reportees and being on parental leave for twelve months during that period.  (Second Koonce Decl., Exh. 22.)  Indeed, when Greenpeace asked Mr. Kursman about this production, he himself stated that it did not make sense and hoped Greenpeace would address it with Resolute.  (Kursman Depo. at 230:16-231:2.)

Resolute contends that of its document production, Mr. Kursman was the custodian of more than 3,700 documents.  (Blair Decl. ¶ 20.)  This amount seems concerningly small given Mr. Kursman's own testimony that he sent "tens of thousands" of e-mails and either sent or worked on documents daily.  Moreover, Mr. Kursman was one of the original custodians searched by Resolute and chosen because, as the supervisor of the department, he would have received a copy of all substantive communications.  (Resolute Opp'n at 6.)  Thus, based on Resolute's own assertions, it would seem reasonable that Mr. Kursman would have significantly more documents, as he would have possessed his own e-mails as well as a copy of all substantive communications from his department.  Given this significant disparity, the Court finds that spoliation occurred, and that there is no explanation for the loss or failure to produce.  Moreover, given Mr. Kursman's importance in this case and the sheer volume of documents at issue, the Court finds that this loss is prejudicial.

g.  Kevin Goulding Documents

The Court finds that Greenpeace has not demonstrated that Resolute lost or failed to produce documents from Mr. Goulding.  While Greenpeace points to what it asserts is the

25

United States District Court
Northern District of California

1   relatively low number of documents produced by Mr. Goulding despite being the direct supervisor

2   of the salespeople who interacted with the book publishing customers, it is unclear from the record

3   how large his production should have been.  (Second Koonce Decl., Exh. 22.)  It appears Resolute

4   found that Mr. Goulding was the custodian or duplicate custodian of more than 1,600 documents,

5   and the custodian or sender/recipient of 216 documents between December 2016 and May 2017.

6   (Blair Decl. ¶ 19.)  Without more information, however, the Court cannot determine if this is

7   inexplicably low or not.

8                        h.   E-mail Blasts

9            The Court finds that Greenpeace has demonstrated that Resolute lost or failed to produce e-

10  mail blasts.  These e-mail blasts were e-mails sent to a mailing group, usually to send positive

11  news or anything that was noteworthy and worth sharing.  (Pinto Depo. at 187:10-23.)

12  Greenpeace states that it received only a few blasts from Resolute, although it received such blasts

13  from third-parties.  (Second Koonce Decl., Exh. 22.)  As an example, Greenpeace produces a blast

14  ostensibly sent from Mr. Kursman to HarperCollins Publishers, which specifically discusses a

15  podcast that Mr. Kursman participated in to discuss Resolute's "decision to hold Greenpeace

16  accountable for their actions."  (Second Koonce Decl., Exh. 24.)  Additionally, almost no drafts or

17  e-mails were produced despite Ms. Pinto testifying that she drafted the blasts and had them

18  reviewed by as many people as who were responsible, as well as Nathalie Guilbault and Mr.

19  Kursman.  (Pinto Depo. at 188:5-14.)

20           In response, Resolute merely states that the blasts are not missing, but that "they were

21  simply sent from e-mail accounts that were not custodians in this action."  (Tabaksblat Decl., Exh.

22  7.)  At the hearing, Resolute further clarified that the e-mail blasts were sent by a third-party.

23  While this does not explain why drafts of the e-mail blasts were not produced, it also appears that

24  the parties did not meet and confer on this matter.  Thus, the Court is not inclined to find

25  spoliation on a matter raised for the first time in a motion for sanctions.

26                        i.   Specific Documents Found in Third-Party Productions

27           The Court finds that Greenpeace has not demonstrated that Resolute lost or failed to

28  produce documents from third-parties.  While Greenpeace identifies eleven documents that were

United States District Court
Northern District of California

produced by third-parties and not Resolute, it does not argue that these documents were lost by Resolute.  Rather, it argues that this "underscore[s] how limited and haphazard Plaintiffs' apparent search was."  (Greenpeace Reply at 15.)  Resolute, in turn, argues that the exemplar documents were either not responsive or were inadvertently not produced.  (Resolute Opp'n at 20.)  It is not clear from the record that the failure to produce these eleven documents demonstrates the spoliation of ESI, even if it may demonstrate a "haphazard" search.

j.   Disaggregated Document Drafts

The Court finds that Greenpeace has not demonstrated that Resolute lost or failed to produce e-mails including document drafts.  Greenpeace argues that there are drafts of documents that were clearly passed among employees, but no e-mails showing the exchange of the drafts.  (Second Koonce Decl., Exh. 22 at 3.)  Resolute, in turn, states that those drafts were likely stored in a shared drive and then produced in the format in which it was held.  (Tabaksblat Decl., Exh. 7.)  Thus, it is not apparent that e-mails including these drafts existed.

k.   Missing Metadata

Finally, the Court finds that Greenpeace has not demonstrated that Resolute lost or failed to produce metadata.  While Resolute admits that 700 documents were produced without metadata, Resolute only states that this is "because the documents were hard copy documents or such metadata does not exist."  While this fails to explain why documents that were not hard copies lacked metadata to begin with, it does not demonstrate Resolute destroyed the metadata.  Rather, as Greenpeace complains, it is possible those documents lacking metadata "were simply copied from Plaintiffs' production in the Canadian litigation."  (Greenpeace Reply at 14.)  This neither demonstrates destruction of metadata, nor does Greenpeace explain why the lack of metadata is prejudicial.

l.   Conclusion

As discussed above, the Court finds that Resolute has committed spoliation of ESI as to: (1) text messages and (2) Mr. Kursman's e-mails and custodial documents.  Accordingly, the Court RECOMMENDS a jury instruction of a short factual statement regarding the spoliation of this evidence.  The statement should inform the jury that Resolute had a duty to preserve and

1    produce this evidence, but that despite this duty, Resolute failed to do so.  The Court also

2    ORDERS Resolute to pay all attorney's fees Greenpeace incurred to address the production (or

3    failure to produce) these two categories of documents, *e.g.*, meeting and conferring, as well as

4    other efforts taken to search for these documents.  The Court will also award certain attorney's

5    fees incurred in bringing the instant motion for sanctions, as discussed in the conclusion.

6              **iii.    Abuse of Discovery Process**

7              Finally, Greenpeace seeks monetary sanctions based on Resolute's "belated and *ad hoc*"

8    production, including the production of more than over 14,000 documents between October 2021

9    and February 2022, nearly a year after Resolute "substantially completed" its production.  (*See*

10   Greenpeace Mot. for Sanctions at 24; Second Koonce Decl. ¶ 64.)  Specifically, Greenpeace

11   requests that the Court exercise its inherent powers to impose "monetary sanctions in the form of

12   attorney's fees against a party or counsel who acts 'in bad faith, vexatiously, wantonly, or for

13   oppressive reasons.'"  (Greenpeace Mot. for Sanctions at 24; *Toppan Photomasks, Inc. v. Park*,

14   No. 13-cv-03323-MMC (JCS), 2014 U.S. Dist. LEXIS 74063, at *35 (N.D. Cal. May 29, 2014)

15   (quoting *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006)).  "Before awarding such

16   sanctions, the court must make an express finding that the sanctioned party's behavior constituted

17   or was tantamount to bad faith.  A party demonstrates bad faith by delaying or disrupting the

18   litigation . . . ."  *Leon*, 464 F.3d at 961 (internal quotation omitted).  "[T]he amount of monetary

19   sanctions must be reasonable."  *Id.* (internal quotation omitted).

20             The Court finds that Resolute's discovery misconduct was in bad faith.  In opposition,

21   Resolute argues that the delayed production was due to Greenpeace's failure to respond to

22   Resolute's inquiries as to search metrics.  (Resolute Opp'n at 16.)  Resolute, however, cites no

23   authority that Greenpeace was required to assist in crafting Resolute's search metrics, such that the

24   failure to do so abrogated Resolute's obligation to provide all responsive documents.  *See U.S.*

25   *Legal Support, Inc. v. Hofioni*, No. 2:13-cv-01770-MCE-AC, 2015 U.S. Dist. LEXIS 137984, at

26   *14 (E.D. Cal. Oct. 7, 2015) ("Plaintiff has an obligation to produce all responsive documents in

27   its possession, custody, or control within thirty (30) days of the request for production.").

28   Resolute also contends that it was a mere "oversight" that resulted in its failure to search the

Archives, namely due to a new document management team when Lotus Notes was transitioned to Outlook.  (Resolute Opp'n at 20; Papps Decl. ¶ 11.)  Resolute, however, also states that these Archives were backed up annually.  (Resolute Opp'n at 5; Papps Decl. ¶ 17.)  Thus, it would appear Resolute was fully aware of the Archives given its great pains to maintain them; the suggestion that Resolute then overlooked them rings hollow.

Resolute also argues that many of the documents from its Archives were duplicates of previously produced documents, but that does not mean that the entire later production was from the Archives or duplicates.  (Resolute Opp'n at 20-21.)  The duplicates from the Archives also does not explain the sheer number of  documents that were produced nearly a year after Resolute "substantially completed" its production; indeed, it appears Resolute disclosed to Greenpeace that the Archives included 4,000 documents.  (Second Tabaksblat Decl. ¶ 21; Second Koonce Decl. ¶ 43.)  Yet the production between October 2021 and February 2022 consisted of over *14,000* documents, in comparison to its prior production of 10,564 documents.  At the hearing, Resolute admitted that not all of these documents were duplicates.  Thus, Greenpeace was still required to go through these later productions to find the documents that were not duplicates.  While a party may supplement its responses, the supplementation is "not . . . improper as long as [the] initial search was done diligently and in good faith."  *Id.* at *16; *see also id.* ("While the court is aware that discovery can, at times, prove a burdensome and lengthy enterprise, that fact does not justify what would effectively be a period of endless discovery.").  Here, Resolute's attempts to shift blame to Greenpeace for failing to provide feedback as to search metrics or custodians, or to suggest its late production due to an oversight with the Archives, does not justify the late production.  Furthermore, as noted above, these late productions appear to be a pattern, the most recent example being Resolute's September 2022 request to extend deadlines in order to produce "several hundred documents" related to damages for the first time.

Moreover, this delayed production was not without consequence.  Greenpeace states that Resolute would routinely "produce large tranches of a deponent's custodial documents on the eve of depositions, which required Defendants to last-minute reschedule the depositions or scramble to review new documents, sometimes hours before a deposition."  (Second Koonce Decl. ¶ 63.)

1    Significantly, Resolute does not dispute this behavior.  Rather, Resolute argues that there was no

2    prejudice because it agreed to adjourn the depositions and continue the existing discovery

3    deadlines.  (Resolute Opp'n at 17; Second Tabaksblat Decl. ¶ 22.)  Yet such adjournments and

4    continuances of discovery deadlines would not have been required if Resolute had not delayed in

5    producing the custodial documents of the deponent.  Indeed, the fact that this behavior happened

6    repeatedly before a custodian's deposition further demonstrates bad faith and improper

7    gamesmanship.

8           Accordingly, the Court finds that the imposition of sanctions is warranted.  Here, the

9    primary prejudice identified by Greenpeace is the rescheduling of depositions and review of late-

10   produced documents.  Therefore, the Court ORDERS Resolute to pay attorney's fees required to

11   reschedule depositions and review of newly produced documents in preparation for the

12   rescheduled depositions.  The Court will also award certain attorney's fees incurred in bringing the

13   instant motion for sanctions, as discussed below.

14                              **IV.    CONCLUSION**

15          For the reasons stated above, the Court GRANTS IN PART AND DENIES IN PART

16   Resolute's motion for sanctions, and RECOMMENDS a jury instruction of a short factual

17   statement regarding the spoliation of Skype messages lost by Defendant Brindis's failure to turn

18   off the auto-delete function.  The Court also awards Resolute attorney's fees, namely the

19   attorney's fees incurred from meeting and conferring on Defendant Brindis's failure to turn off the

20   auto-delete function, as well as 10% of the time spent on Resolute's motion for sanctions.

21          The Court GRANTS IN PART AND DENIES IN PART Greenpeace's motion for

22   sanctions.  The Court RECOMMENDS evidentiary sanctions, specifically the exclusion of any

23   damages theories first disclosed in the April 2022 interrogatory responses and any supporting

24   evidence.  The Court also RECOMMENDS a jury instruction of a short factual statement

25   regarding Resolute's failure to preserve and produce text message and Mr. Kursman's e-mails and

26   custodial documents.

27          As to attorney's fees, the Court awards Greenpeace attorney's fees, specifically the

28   attorney's fees incurred from: (1) contacting Resolute to clarify the bases for their alleged

United States District Court
Northern District of California

30

damages, (2) addressing the two categories of spoliated documents, *e.g.*, meeting and conferring with Resolute and efforts undertaken to locate the documents, and (3) rescheduling depositions and reviewing newly produced documents in preparation for the rescheduled depositions. Additionally, taking into account Greenpeace's limited success on the spoliation issue, the Court awards 80% of the time spent on Greenpeace's motion for sanctions.

The parties shall meet and confer as to the attorney's fees amounts. If the parties are unable to come to an agreement on the amount, the parties shall file their motions for attorney's fees by **December 1, 2022**, absent a stipulation to extend the deadlines.

IT IS SO ORDERED.

Dated: November 2, 2022

KANDIS A. WESTMORE
United States Magistrate Judge

31