THOMAS R. BURKE (CA State Bar No. 141930)
DAVIS WRIGHT TREMAINE LLP
50 California Street, 23rd Floor
San Francisco, CA  94111
Telephone:(415) 276-6500
Facsimile: (415) 276-6599
Email:      thomasburke@dwt.com

LAURA HANDMAN (appearing *pro hac vice*)
CHELSEA T. KELLY (appearing *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
Telephone:(202) 973-4200
Facsimile: (202) 973-4499
Email:      laurahandman@dwt.com
            chelseakelly@dwt.com

LACY H. KOONCE, III (appearing *pro hac vice*)
KLARIS LAW
29 Little West 12th Street
New York, NY 10014
Telephone:   (917) 612-5861
Email:       lance.koonce@klarislaw.com

Attorneys for Defendants
GREENPEACE INTERNATIONAL (aka "GREENPEACE STICHTING COUNCIL"), GREENPEACE, INC., DANIEL BRINDIS, AMY MOAS, and ROLF SKAR

DAVIS WRIGHT TREMAINE LLP

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA:  OAKLAND DIVISION

| | |
|---|---|
| RESOLUTE FOREST PRODUCTS, INC., RESOLUTE FP US, INC., RESOLUTE FP AUGUSTA, LLC, FIBREK GENERAL PARTNERSHIP, FIBREK U.S., INC., FIBREK INTERNATIONAL INC., and RESOLUTE FP CANADA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> GREENPEACE INTERNATIONAL (aka "GREENPEACE STICHTING COUNCIL"), GREENPEACE, INC., GREENPEACE FUND, INC., FORESTETHICS, DANIEL BRINDIS, AMY MOAS, MATTHEW DAGGETT, ROLF SKAR, TODD PAGLIA, and JOHN AND JANE DOES 1 through 20, inclusive, <br><br> Defendants. | Case No. 4:17-cv-02824-JST <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** <br><br> Complaint Filed:  May 31, 2016 <br> Amended Complaint Filed:  November 8, 2017 <br><br> Hearing Date: April 20, 2023 at 2:00 pm |

1

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2

      **PLEASE TAKE NOTICE THAT ON** April 20, 2023 at 2:00 p.m. in Courtroom 6 of the

3

U.S. District Court for the Northern District of California located at 1301 Clay Street, Oakland,

4

California, 94612, Greenpeace International, Greenpeace, Inc., Daniel Brindis, Amy Moas, and Rolf

5

Skar (collectively, the "Greenpeace Defendants" or "Defendants") will and do hereby bring this

6

motion under Federal Rule of Civil Procedure 56 for summary judgment.

7

      Through this motion, the Greenpeace Defendants seek summary judgment on and dismissal

8

of the remaining claims brought by Resolute Forest Products, Inc., Resolute FP US, Inc., Resolute

9

FP Augusta, LLC, Fibrek General Partnership, Fibrek U.S., Inc., Fibrek International Inc., and

10

Resolute FP Canada, Inc. (collectively, "Resolute" or "Plaintiffs").  This motion will be based on

11

this Notice of Motion and Motion, the following Memorandum of Point and Authorities, the

12

Declaration of Lacy H. Koonce, III, and all exhibits thereto, all pleadings and papers on file herein,

13

the Reply the Greenpeace Defendants anticipate filing, and any oral and/or documentary evidence

14

as may be presented at the hearing in this matter.

15

16

Dated:  December 19, 2022

17

                         Respectfully submitted,

18

19

                      /s/ *Laura Handman*
                      Laura Handman (admitted *pro hac vice*)

20

                      DAVIS WRIGHT TREMAINE LLP
                      1301 K Street NW, Suite 500 East

21

                      Washington, DC 20005

22

                      Telephone:    (202) 973-4200
                      Facsimile:     (202) 973-4499

23

                      Email: laurahandman@dwt.com

24

                      *Counsel for Defendants Greenpeace*
                      *International, Greenpeace, Inc., Daniel*

25

                      *Brindis, Amy Moas, and Rolf Skar*

26

27

28

DAVIS WRIGHT TREMAINE LLP

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION .................................................................................................... 1

II.    STATEMENT OF FACTS ....................................................................................... 3

       A.     History of the Montagnes Blanches Region and Various Uses of the Name "Montagnes Blanches" .................................................................. 3

       B.     Resolute Coordinates with the Québec Minister of Forestry Laurent Lessard to Criticize Greenpeace Canada's Conservation Campaign on the Montagnes Blanches. ...................................................... 8

       C.     The Same Day the Ministry Publishes the Lessard Statement, Resolute Files this Lawsuit in the Southern District of Georgia, Asserting Defamation and RICO Claims. ................................................. 11

       D.     Greenpeace Canada and Other Canadian Environmental Groups Respond to the Lessard Statement.  The Greenpeace Defendants Agreed the EFB Report Remained Accurate. ............................................ 11

       E.     Greenpeace Canada and the Greenpeace Defendants Continued to Campaign to Protect the Montagnes Blanches and Also Campaigned Against Resolute's Filing of Multiple Lawsuits Designed to Chill Their Speech. ....................................................................................... 14

       F.     This Court Dismisses Almost All Claims, Rules It Is a SLAPP-Case, Awards Fees. ................................................................................ 16

       G.     Discovery Revealed that Resolute Incurred No Damages Specifically from the Challenged Statements. ......................................... 17

III.   LEGAL STANDARD ............................................................................................ 19

IV.    ARGUMENT ........................................................................................................ 20

       A.     The Challenged Statements Are Not Defamatory. ................................... 20

       B.     The Challenged Statements Are Substantially True and/or Protected Opinion. .................................................................................... 25

              1.     The Term "Montagnes Blanches" Constitutes Protected Opinion. ............. 26

              2.     The Challenged Statement from the Clearcutting Report Is True. ............... 28

              3.     The Challenged Statement from the December Letter Is True. ................... 28

       C.     Defendants Did Not Act with Actual Malice in Making the Challenged Statements. ............................................................................. 31

              1.     There Can Be No Actual Malice for a Statement of Opinion. ..................... 32

              2.     There Is No Evidence, Let Alone "Clear and Convincing Evidence," that the Greenpeace Defendants Knew Their Use of the Montagnes Blanches Term Was False or Acted with Reckless Disregard to Its Truth. ...................................................... 33

       D.     Plaintiffs Have Not Incurred Any Special Damage from the Challenged Statements. ............................................................................. 36

       E.     Resolute's UCL Claim Must Be Dismissed as Well. ............................... 40

V.     CONCLUSION ...................................................................................................... 40

DAVIS WRIGHT TREMAINE LLP

ii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Hearst Publ'g Co.*,
  120 F. Supp. 850 (S.D. Cal. 1954) ........................................................................ 37

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................................... 19

*Balzaga v. Fox News Network, LLC*,
  173 Cal. App. 4th 1325 (2009) ............................................................................. 20

*Bartholomew v. YouTube, LLC*,
  17 Cal. App. 5th 1217 (Cal. Ct. App. 2017) ........................................................ 37

*Beilenson v. Superior Ct.*,
  44 Cal. App. 4th 944 (1996) ................................................................................. 24

*Brown v. Wireless Networks, Inc.*,
  No. C 07-4301 EDL, 2008 WL 4937827 (N.D. Cal. Nov. 17, 2008) ................... 25

*CACI Premier Tech., Inc. v. Rhodes*,
  536 F.3d 280 (4th Cir. 2008) ................................................................................ 33

*Caraccioli v. Facebook, Inc.*,
  167 F. Supp. 3d 1056 (N.D. Cal. 2016), *aff'd*, 700 F. App'x 588 (9th Cir. 2017) ................. 40

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................................... 19

*Cerrito v. Time, Inc.*,
  302 F. Supp. 1071 (N.D. Cal. 1969), *aff'd*, 449 F.2d 306 (9th Cir. 1971) .................. 3, 32, 36

*Clark v. Hidden Valley Lake Ass'n*,
  No. 16-CV-02009-SI, 2017 WL 4922375 (N.D. Cal. Oct. 31, 2017) ................... 20

*Clary v. Total Facility Sols., Inc.*,
  Civ. No. 20-768 JAP/LF, 2021 WL 1754196, at *10 (D.N.M. May 4, 2021) ....................... 30

*Dodds v. ABC, Inc.*,
  145 F.3d 1053 (9th Cir. 1998) .............................................................................. 20

*Doe v. Fitzgerald*,
  Case No. CV 20-10713-MWF, 2022 WL 2784805 (C.D. Cal. May 13, 2022) ..................... 37

*Edward/Ellis v. New United Motors Mfg., Inc.*,
  No. C 07-05452 WHA, 2008 WL 5384323 (N.D. Cal. Dec. 22, 2008) ................. 25

DAVIS WRIGHT TREMAINE LLP

iii

DAVIS WRIGHT TREMAINE LLP

*Erlich v. Etner*,
    224 Cal. App. 2d 69 (1964) ................................................................ 37, 38, 39

*Experian Info. Sols., Inc. v. Carfax, Inc.*,
    No. 11 CV 08927, 2012 WL 2597915 (N.D. Ill. July 5, 2012) ............................................. 26

*First Advantage Background Servs. Corp. v. Private Eyes, Inc.*,
    569 F. Supp. 2d 929 (N.D. Cal. 2008) .................................................... 29, 34, 38

*Franklin v. Dynamic Details, Inc.*,
    116 Cal. App. 4th 375 (2004) ................................................................ 20

*Gang v. Hughes*,
    111 F. Supp. 27 (S.D. Cal. 1953) .......................................................... 37

*Gardner v. Martino*,
    563 F.3d 981 (9th Cir. 2009) ................................................................ 25

*Golden N. Airways v. Tanana Publ'g Co.*,
    218 F.2d 612 (9th Cir. 1954) ................................................................ 24

*Gomes v. Fried*,
    136 Cal. App. 3d 924 (1982) ................................................................ 37

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ........................................................................ 31, 32

*Holomaxx Techs. v. Microsoft Corp.*,
    783 F. Supp. 2d 1097 (N.D. Cal. 2011) ................................................... 40

*Homeland Housewares, LLC v. Euro-Pro Operating LLC*,
    CV 14-03954 DDP, 2014 WL 6892141 (C.D. Cal. Nov. 5, 2014) ......................... 38

*Inc. v. Google, Inc.*,
    108 F. Supp. 3d 876 (N.D. Cal. 2015) .................................................... 36

*Ingersoll v. Tuesley*,
    No. 276828, 2008 WL 4228353 (Mich. Ct. App. Sept. 16, 2008) ......................... 27

*Koch v. Goldway*,
    817 F.2d 507 (9th Cir. 1987) ................................................................ 27

*Leidholdt v. L.F.P. Inc.*,
    860 F.2d 890 (9th Cir. 1988) ................................................................ 32

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ........................................................................ 19

*New.Net, Inc. v. Lavasoft*,
    356 F. Supp. 2d 1090 (C.D. Cal. 2004) ................................................... 40

iv

DAVIS WRIGHT TREMAINE LLP

*Norse v. Henry Holt & Co.*,
  991 F.2d 563 (9th Cir. 1993) .......................................................................................... 20

*Nunes v. CNN*,
  520 F. Supp. 3d 549 (S.D.N.Y. 2021) ........................................................................... 40

*Open Source Security, Inc. v. Perenes*,
  Case No 17-cv-04002-LB, 2017 WL 6539874 (N.D. Cal. Dec. 21, 2017)...................... 20, 25

*Peabody v. Barham*,
  52 Cal.App.2d 581 (1952) .............................................................................................. 37

*Planet Aid, Inc. v. Ctr. for Investigative Reporting*,
  No. 17-CV-03695-MMC, 2021 WL 1110252 (N.D. Cal. Mar. 23, 2021), *aff'd sub nom.*
  *Planet Aid, Inc. v. Reveal*, 44 F.4th 918 (9th Cir. 2022) .................................................. 23, 33

*Pridonoff v. Balokovich*,
  36 Cal. 2d 788 (1951) ..................................................................................................... 37

*Ringler Assocs., Inc. v. Maryland Cas. Co.*,
  80 Cal. App. 4th 1165 (2000) ........................................................................................ 25

*Rivera v. Nat'l R.R. Passenger Corp.*,
  No. C 99-04003 SI, 2004 WL 603587 (N.D. Cal. Mar. 22, 2004)................................... 19

*Rosen v. Am. Israel Pub. Affs. Comm., Inc.*,
  41 A.3d 1250 (D.C. 2012) .............................................................................................. 25

*Skidmore v. Gilbert*,
  No. 20-CV-06415-BLF, 2022 WL 464177 (N.D. Cal. Feb. 15, 2022) ............................ 25, 27

*Smith v. Maldonado*,
  72 Cal. App. 4th 637 (1999)..................................................................................... 21, 24, 36

*St. Amant v. Thompson*,
  390 U.S. 727 (1968) ....................................................................................................... 32

*Subhani v. JPMorgan Chase Bank, Nat. Ass'n*,
  No. C 12-01857 WHA, 2012 WL 1980416 (N.D. Cal. June 1, 2012).................................. 36

*Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*,
  594 F.2d 730 (9th Cir. 1979).......................................................................................... 19

*Time, Inc. v. Pape*,
  401 U.S. 279 (1971) ....................................................................................................... 33

*Toledo Heart Surgeons, Inc. v. Toledo Hosp.*,
  154 Ohio App. 3d 694 (2003) ........................................................................................ 30

*United States v. Alvarez*,
  567 U.S. 709 (2012) ....................................................................................................... 32

v

DAVIS WRIGHT TREMAINE LLP

*Whitney v. California*,
    274 U.S. 357 (1927) (Brandeis, J., concurring), *overruled on other grounds by
    Brandenburg v. Ohio*, 395 U.S. 444 (1969) ............................................................. 24

*Woods v. Prot. One Alarm Monitoring, Inc.*,
    628 F. Supp. 2d 1173 (E.D. Cal. 2007) .................................................................. 21

*Wynn v. Chanos*,
    75 F. Supp. 3d 1228 (N.D. Cal. 2014) ............................................................. 27, 32

**Statutes**

California Civil Code
    § 45 ................................................................................................................ 20, 37
    § 48a(d)(2) ..................................................................................................... 37, 38

**Rules**

Federal Rule of Civil Procedure
    9(g) ...................................................................................................................... 37
    56(a) ..................................................................................................................... 19
    56(c)(4) ................................................................................................................ 19

**Constitutional Provisions**

United States Constitution
    First Amendment ............................................................................................. *passim*

# I.    INTRODUCTION

After nearly seven years of litigation, this case remains the same as the day it was filed—an extraordinarily cynical attempt by the largest logging company in Canada to cut down legitimate, First Amendment-protected speech by non-profit environmental groups daring to criticize that company's activities. This Court has recognized the significant constitutional values at risk here, concluding years ago that this lawsuit arose from Defendants' exercise of their free speech on "the important public matter of environmental sustainability," and awarding Defendants over $600,000 as a result. ECF No. 246 ("MTD Order") at 31; ECF No. 314 at 8.  Heedless of that Order, Resolute has continued to act as a traditional SLAPP-plaintiff, filing countless discovery motions while simultaneously—as the Court has found—"abus[ing] . . . the discovery process," failing to "take any reasonable steps to produce or preserve" certain documents, violating the Court's discovery order, and demonstrating "bad faith and improper gamesmanship."  ECF No. 486 at 20-23.

In one respect only, Resolute has been successful: It has forced the Greenpeace Defendants to spend a mountain of legal fees defending themselves against the sole remaining two statements in this case.  But that should end upon the Court's adjudication of this motion because, despite three years of a "highly contentious discovery process," *id.* at 2, there is no genuine dispute as to any material fact, entitling Defendants to summary judgment as a matter of law.  **Put simply, Resolute's legal claims are, in the end, unsustainable.**

As this Court has reminded Plaintiffs: "This case is very limited: it is based only on Defendants' December 2016 and May 2017 statements that Plaintiffs were operating in the Montagnes Blanches."  ECF No. 339 at 1.  Discovery has undisputedly proven that Resolute cannot establish any, let alone all, of the elements of defamation based on these two statements (collectively, the "Challenged Statements").  Specifically, there is no genuine dispute as to any material fact that the Challenged Statements are: (1) not defamatory; (2) substantially true and/or protected opinion incapable of being proven true or false; (3) not made with actual malice; and (4) that Resolute has not suffered any special damage as a result of the Challenged Statements.

As explored further below, discovery has shown that the Greenpeace Defendants have used the term "Montagnes Blanches" consistently for years to refer to a specific mapped area they have

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 4:17-cv-02824-JST

DAVIS WRIGHT TREMAINE LLP

campaigned to protect, rendering the two Challenged Statements true. Even were this not the case, discovery has also shown that the name "Montagnes Blanches" has been used in myriad ways by multiple groups. First, the term is colloquially understood by Québec citizens to refer to a general eco-region in the north of the Saguenay-Lac-St-Jean administrative region—and Canadian environmental groups, timber companies, and the Québec government have adopted the name to refer to a variety of different boundaries within that region since 2006. For example, the Québec Forest Ministry alone has used the Montagnes Blanches name over the past decades to refer to at least *three* different geographic entities, and environmental NGOs have consistently used the name to refer to a number of areas they believe should be protected from logging due to their high-conservation value and importance to woodland caribou. Even Resolute has used the "Montagnes Blanches" name inconsistently over time to refer to different areas when making its own proposals for areas to be protected from harvesting or responding to Defendants' advocacy.

The fact that the name is capable of a variety of interpretations that have been deployed as part of a fierce public debate over protection for woodland caribou, highlights that the Challenged Statements were quintessentially statements made in the context of environmental advocacy, protected by the First Amendment. Although Defendants always made clear which interpretation of the Montagnes Blanches *they* were referring to, the Challenged Statements' references to Resolute operating "in the Montagnes Blanches" at a minimum constitute a matter of protected opinion, incapable of being proven true or false. These references also are not defamatory, as the Challenged Statements made very clear that Defendants were not accusing Resolute of illegally operating in areas off-limits to logging—but rather in an area that was not protected but which Defendants believed worthy of protection due to its conservation value. And they are true because Resolute does not dispute that it was, in fact, operating in the area to which Defendants referred.

Further, there is no evidence, let alone clear and convincing evidence, that Defendants acted with actual malice in making the Challenged Statements. The Court allowed the Challenged Statements to proceed to discovery because Defendants made these statements after the Québec Forest Minister, Laurent Lessard, published a press release in May 2016, which criticized Greenpeace Canada's map of the Montagnes Blanches. However, discovery has made clear that

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 4:17-cv-02824-JST

DAVIS WRIGHT TREMAINE LLP

1   Minister Lessard published this press release *at the direction of and in direct coordination with*

2   *Resolute*—which filed this lawsuit the same day as the press release.  The press release bizarrely

3   defined the Montagnes Blanches as an area that the Québec government *had never before referred*

4   *to* and which was inconsistent with the Ministry's use of the Montagnes Blanches name from only

5   a month prior.  In fact, the Ministry often aided Resolute's efforts against Greenpeace Canada, even

6   sending the Deputy Minister abroad to meet with Resolute customers to discuss Greenpeace Canada

7   reports.  Defendants accurately perceived Minister Lessard's press release as politically motivated

8   and factually inaccurate. More importantly, they believed that it did not undermine the well-

9   established data and science that Greenpeace Canada relied on in creating its map of the Montagnes

10  Blanches (and which they had been campaigning on for at least six years), and that the Minister's

11  press release talked past the issues Defendants sought to address, *i.e.*, the need for additional

12  protection of the eco-region.  Accordingly, there is no evidence Defendants knew their interpretation

13  of the Montagnes Blanches was *false* and continued to use it—as required to find actual malice.

14          Finally, Resolute's claim also fails because there is no evidence that the Challenged

15  Statements caused them to incur any damages—let alone special damages, which must be

16  particularly pleaded and proven. "Summary judgment is an integral part of the constitutional

17  protection afforded to defendants in [defamation] actions such as this," which—as this Court has

18  found—arose from Defendants' First Amendment right to free speech. *Cerrito v. Time, Inc.*, 302 F.

19  Supp. 1071, 1075–76 (N.D. Cal. 1969), *aff'd*, 449 F.2d 306 (9th Cir. 1971).  Because Resolute

20  cannot establish a genuine dispute of material fact with respect to any element of defamation,

21  Defendants respectfully request that the Court grant this motion for summary judgment.

22              **II.     STATEMENT OF FACTS**

23  **A.  History of the Montagnes Blanches Region and Various Uses of the Name "Montagnes**

24       **Blanches"**

            Since the early 2000s, many environmental groups in Canada have campaigned to protect a

25  forest area called the "Montagnes Blanches" in Québec, due to the ecological value of the area and

26  its importance to woodland caribou. *See* Ex. 1, Suppl. Expert Report of Pier-Olivier Boudreault

27  ("Boudreault Report") at 3-6.  Over the years, both these groups and the Québec government have

28

DAVIS WRIGHT TREMAINE LLP

3

defined and utilized a number of different boundaries to refer to this region for a variety of purposes. *See id.* at 3-4.[1]  Most of these boundaries overlap; all are generally located in the same forest region in the north of the administrative region of Saguenay-Lac-St-Jean; and all use the term "Montagnes Blanches."  *See id.* at 5.  The name "Montagnes Blanches" or "White Mountains" itself comes from a mountain range, river, and valley located around this same forest area; neither the Québec government nor the environmental groups have ever based their boundary definitions specifically around the peaks of the mountains.  *See* Ex. 2, Dep. of Francis Forcier, representative of the Québec Ministry of Forests ("Forcier") at 73:16-74:2; 287:15-22 (testifying the Montagnes Blanches mountain range extends far beyond the boundaries of the government's 2008 Montagnes Blanches proposed biodiversity preserve and the April 2016 Montagnes Blanches proposed caribou reserve, even though all three areas use the same name); Ex. 3, Dep. of Greenpeace Canada employee Shane Moffatt ("Moffatt") at 41:21-42:6 (noting that Québec citizens refer to the broad forest eco-region as the "Montagnes Blanches" to "reflect that the area is in part home to a white mountain range").

The first mentions in the public sphere of the "Montagnes Blanches" as an area for ecological protection date back to a February 2006 campaign initiated by "Aux Arbres Citoyens," a collective of Canadian environmental groups. Ex. 1 at 5. The Canadian Parks and Wilderness Society (CPAWS Québec), Nature Québec, the World Wildlife Fund, and the Québec Network of Ecological Groups launched this historic campaign, gathering over 180,000 signatures from Canadian citizens to protect a sector they called the "Montagnes Blanches Valley" sector. Ex. 1 at Ex. 1 to Boudreault Report. The collective defined and mapped the Montagnes Blanches Valley sector, describing its ecological value based on the presence of woodland caribou and intact forests.  *Id.*; *see also* Ex. 1 at Annex A-1.

In May 2008, the Québec Government established an area named the "Montagnes Blanches Proposed Biodiversity Reserve," a proposed protected area within the Montagnes Blanches sector defined two years earlier by Aux Arbres Citoyens, but significantly smaller than that sector.  Ex. 1 at 6-7; *see also id.*, Annex A-2. This reserve never achieved permanent status and was later absorbed into a larger protected area in 2021.  *Id.* at 7.

---

[1] Exhibits to this motion are attached to the accompanying Declaration of Lacy H. Koonce, III.

4

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

In 2010, non-party Greenpeace Canada commissioned Global Forest Watch Canada ("GFWC")—a "scientific organization [with] lead experts in mapping [who] use remote satellite data" and "have a specialization in . . . priority assessment for conservation areas," Ex. 4, Dep. of Pier-Olivier Boudreault ("Boudreault") at 108:3-109:6—to perform a mapping analysis of the ecological values of Québec's last intact forests, in order to identify which areas were most important to conserve. *See* Ex. 5 at 29. GFWC analyzed the following twelve ecological values: presence of old forests, presence of wetlands, area of intact forests, variety of bird species, variety of tree species, net carbon flow, critical habitat of woodland caribou, proximity to protected areas, mammal diversity, reptile and amphibian diversity, carbon concentration in the soil, and presence of lakes and rivers. *See id.* Based on this analysis, GFWC identified and mapped several "priority areas," which Greenpeace Canada published in a 2010 report called "Boreal Refuge: Report on the Last Large Intact Forests of the Québec Forest Territory" (Ex. 5, "Boreal Refuge Report"). One of these priority areas, which overlapped substantially with the Montagnes Blanches Valley Sector previously mapped by Aux Arbres Citoyens, was named the "Montagnes Blanches Priority Area." *Id.* at 31-33; *see also* Ex. 1 at 5. In the Boreal Refuge Report, Greenpeace Canada refers separately to the "Montagnes Blanches proposed biodiversity reserve" and the "Montagnes Blanches range," making clear these entities are distinct from the "Montagnes Blanches Priority Area." Ex. 5 at 31.

Also in 2010, 21 forest companies including Resolute, led by the Forest Products Association of Canada ("FPAC"), and nine environmental organizations including Greenpeace Canada, entered into the Canadian Boreal Forest Agreement ("CBFA"). Ex. 6 at 1. Under the agreement, the forest companies agreed to temporarily defer logging in certain portions of the caribou ranges in the boreal forest. *See id.* at 28-29. However, in December 2012, Greenpeace Canada withdrew from the CBFA, citing lack of progress towards certain goals and pointing out apparent violations by Resolute where it appeared to be logging in areas where it had agreed to defer logging.[2] Ex. 7 (Skar) at 53:13-54:16, 62:7-14.

In 2012, GFWC and Greenpeace Canada published a further refinement of the analysis of

---

[2] Non-party Greenpeace Canada later retracted its statements about Resolute logging in these areas, after concluding it had inadvertently relied on inaccurate data. Ex. 7, Dep. of Rolf Skar ("Skar") at 82:1-83:24. It did not return to the CBFA, however, given its other reasons for withdrawal.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 4:17-cv-02824-JST

the priority areas identified in the Boreal Refuge Report and examined the areas "again for ecological significance and threats from encroaching development and logging in particular."  Ex. 8 at 11; Ex. 3 (Moffatt) at 41:4-9 (noting this adjustment was made to "encapsulate the information provided to Greenpeace Canada by Global Forest Watch in terms of the areas of highest conservation value").[3]  This refinement resulted in the identification of five endangered forest areas in Canada, which were of high conservation value and in need of government protection from unsustainable forestry operations.  Ex. 8 at 11.

In December 2012, Greenpeace Canada published a report called "Boreal Alarm: A Wake-Up Call for Action in Canada's Endangered Forests" (Ex. 8, "Boreal Alarm Report"), which presented these five forest areas, described their ecological value, and explained that they were endangered in part because they were largely unprotected by Canadian law and thus available for logging by forestry companies.[4]  *See generally id.*  One of the five forests was called the "Montagnes Blanches Endangered Forest" ("MBEF"). The MBEF largely overlapped with the 2010 boundaries of the Montagnes Blanches Priority Area, but extended further westward based on GFWC and Greenpeace Canada's aforementioned additional analysis of the data. *Id.* at 11; Ex. 1 at 5. Like the 2010 Boreal Refuge Report, the 2012 Boreal Alarm Report refers separately to the Montagnes Blanches mountain range—making clear that this entity was distinct from the MBEF.  Ex. 8 at 13.[5]

---

[3] The Greenpeace Defendants were not involved in the mapping of these priority areas or in the initial selection and use of the "Montagnes Blanches" name.  Ex. 9, Jan. 18, 2022 Dep. of Amy Moas ("Moas 30(b)(6)") at 48:3-11; Ex. 10, Dep. of Matthew Daggett ("Daggett") at 58:2-59:25; Ex. 11, Nov. 17, 2021 Dep. of Amy Moas ("Moas") at 137:17-19.

[4] While there is no official definition of "endangered forest" by the Canadian or Québec governments, the Wye Group was established in April 2001 as a forum among a broad group of environmental NGOs and industry participants "to define and identify the characteristics of Endangered Forests, and propose purchaser actions in relation to these forests." Ex. 12 at 3; *see also* Ex. 7 (Skar) at 65:5-67:17. Mr. Daggett, former employee of Greenpeace International, testified that his understanding was that GFWC relied, at least in part, on the Wye Group's articulation of "endangered forests" in its work for Greenpeace-Canada. Ex. 10 (Daggett) at 57:22-59:25. Likewise, Ms. Moas testified she understood Greenpeace Canada used the term "endangered forest . . . to talk about [an] area that was really important for conservation reasons"—as well as that the area was "under threat" and in danger "of disappearing if additional protections were not secured." Ex. 9 (Moas 30(b)(6)) at 30:1-31:16; 38:15-39:13.

[5] Significantly, Greenpeace Canada's extension of the MBEF preceded Resolute's purchase, at government auction, of the logging sites discussed later in the Clearcutting Free Speech Report (*infra* at 15-16).  *See* Ex. 13, Dep. of Francois Dumoulin ("Dumoulin") at 189:1-190:5.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 4:17-cv-02824-JST

DAVIS WRIGHT TREMAINE LLP

After 2012, the remaining CBFA parties, including Resolute, raised different proposals for the permanent protection of areas in Québec from timber harvesting. Resolute in particular routinely used the term "Montagnes Blanches" to identify the areas being discussed.  *See* Ex. 14 at RFP-0001264 ("Resolute and ENGOs also support the creation of large protected areas in . . . [t]he Montagnes Blanches area"); Ex. 15 at RFP-0000802 (referring to "Montagnes Blanches package"); Ex. 16 at RFP-0000174 ("industry presented a proposal that consisted of . . . [p]rotection of the Montagnes Blanches"). Resolute also recognized there was no clear definition of the "Montagnes Blanches." Ex. 17 (in response to pulp customer asking Resolute to ensure no deliveries of pulp sourced from "disputed sectors" such as the Montagnes Blanches, Resolute Forestry Director Francois Dumoulin noted the "question is problematic in the sense that the Montagnes Blanches territory is not a clearly defined territory . . . . Greenpeace is presenting its own definition, but other environmental groups have proposed different divisions.")[6]; Ex. 18 at RFP-0025013 ("I want to clarify that there is no area 'generally accepted' as the Montagnes Blanches.").

In 2015, CPAWS Québec and three other environmental organizations proffered some new proposals for the creation of two large protected areas in the Montagnes Blanches and Broadback River Valley sectors.  Ex. 1 at 10-12.  CPAWS Québec concentrated on the Montagnes Blanches region due to the ecological importance of this sector demonstrated in the Aux Arbres Citoyens campaign as well as the presence of several high-priority caribou conservation sectors in this area as defined by the Québec Woodland Caribou Re-establishment Team.  *Id.* at 11. Six of these caribou conservation sectors fell within the boundaries of Greenpeace Canada's MBEF map. *See id*. at 12; *see also* Ex. 4 (Boudreault) at 128:6-129:2.

In February 2016, Greenpeace-Canada published a report titled "Endangered Forests in the Balance: The Impact of Logging Reaches New Heights in the Montagnes Blanches Endangered Forest" (hereinafter, the "EFB Report"), which included a map using the same Montagnes Blanches boundaries as depicted in the Boreal Alarm Report. Ex. 19 at 4. The EFB Report described the high ecological value of the MBEF, stated that it was largely unprotected from logging by the

---

[6] *See also* Ex. 13 (Dumoulin) at 143:6-144:9.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 4:17-cv-02824-JST

government, and explained that its unique features were threatened by industrial logging.[7]  *Id.* at 2. The EFB Report also described Resolute's sourcing of wood from this area, stating, for example, that from "2013 to 2014, Resolute successfully bid on approximately 175,000 [cubic meters] of wood from 2,200 hectares located directly within the Montagnes Blanches Endangered Forest." *Id.* at 3. At his deposition, Mr. Forcier testified that this statement was correct; and that it was also clear that the EFB Report was not accusing Resolute of logging in the 2008 proposed Montagnes Blanches Biodiversity Reserve—which was off-limits to logging.  Ex. 2 (Forcier) at 199:4-201:9.

In April 2016, the Québec Ministry proposed another caribou protection area within what it called the "Montagnes Blanches sector." Ex. 1 at 13-14; *see also id.*, Annex A-5. This proposed area extended beyond the 2008 Montagnes Blanches Biodiversity Reserve and aimed to protect approximately 10,000 kilometers for the caribou. *See id.* Notably, Resolute's CEO Richard Garneau criticized the Ministry's April 2016 action plan, stating to the Canadian media: "There are major principles that have been announced, there is talk of increasing the protection of the White Mountains . . . .  We know that the White Mountains are the territory that will ensure the sustainability of forest harvesting over the next 20 years, which will allow us to maintain jobs, which will allow us to maintain the harvest. There is absolutely nothing quantified." Ex. 20. When reviewing this statement from Mr. Garneau at his deposition, Mr. Forcier from the Québec Ministry stated: "It is clear here that when the Government of Québec talks about the White Mountains and when Mr. Richard Garneau talks about the White Mountains they're not referring to the same thing . . . .  It would seem that Mr. Garneau is referring to the whole north of the Saguenay-Lac-St-Jean region."  Ex. 2 (Forcier) at 142:19-144:24.

**B.    Resolute Coordinates with the Québec Minister of Forestry Laurent Lessard to Criticize Greenpeace Canada's Conservation Campaign on the Montagnes Blanches.**

Resolute took offense to Greenpeace Canada's EFB Report, though it never produced

---

[7] The report also noted that: "Not all Endangered Forests are necessarily facing imminent extinction or complete degradation: however, due to the threats posed by one or more stressors (climate change, industrial use, urbanization, etc.), they are in danger of losing their ability to function as complete and intact, natural ecosystems, and thereby to continue supporting numerous species and essential ecological processes. . . . Greenpeace and other conservation organizations developed a set of common criteria to define Endangered Forests."  Ex. 19 at 2.

evidence any of the claims therein were false.  Still, Mr. Garneau emailed Québec Forest Minister Laurent Lessard on March 28, 2016, attaching a copy of the EFB Report and calling it a "[n]ew Greenpeace intimidation campaign still targeting Resolute customers."  Exs. 21 & 22. Mr. Garneau complained to Minister Lessard that the EFB Report "[s]pecifically targets the White Mountains (2.3 million hectares – between .7 and 1 cubic meter per hectare per year)," includes a "[l]ist of sawmills sourcing from this sector now and in the future," and "[s]eems to make it clear that the disturbance is the cause of [caribou] population decline." Ex. 21. Mr. Garneau then twice emailed Minister Lessard on April 2, 2016 with more complaints.  Ex. 23 at RFP-0037903 (stating "And this is the rest of the letter Greenpeace sent to clients last week with the request for the White Mountains to be protected. . . . Both organizations [including NRDC] are increasing the level of blackmail with clients"); *see also* Ex. 24 at RFP-0037905 (criticizing NRDC, CPAWS, and SNAP as "activists who destroy communities," claiming they want to "turn a partial victory into a full victory . . . After the victory achieved on the mid-coast rainforest . . . come Broadback and the White Mountains").[8]

After receiving these messages from Mr. Garneau, the Ministry started working on a public response to the EFB Report and even asked Mr. Garneau for "a few ideas" they could use for the press release.  *See* Ex. 27 at RFP-0038642 (May 25, 2016 email exchange in which Mr. Garneau sends a news article about the EFB Report to a Ministry employee, who responds: "Ok re the minister. . . .  We will also prepare a press release that Catherine will send to all the media.  So, if you have a few ideas . . . .")[9]; *see also* Ex. 2 (Forcier) at 265:3-266:20 (noting the Ministry collaborated with forestry companies like Resolute to obtain a list of their clients who could have received the EFB Report); Ex. 29 at 5 (same).[10]  In crafting its response, the Ministry decided to

---

[8] Mr. Garneau appears to have had a close relationship with Minister Lessard, sometimes even emailing him via the Minister's personal email address.  *See* Exs. 25 & 26.

[9] This was not the first time that the Ministry coordinated with Resolute before sending out a press release.  *See* Ex. 28 at RFP-0001312 (November 2015 email from Resolute employee stating she is "sending a press release to be issued shortly by Minister Laurent Lessard").

[10] The Ministry regularly aided Resolute in its business efforts—even sending Deputy Minister Richard Savard, abroad to North America and Europe to meet with Resolute customers and assure them of Resolute's allegedly sustainable practices. *See* Ex. 30 (June 2014 document discussing ████████████████████████████████████████████████████); Ex. 31 at RFP-0034722 (July 2015 draft letter to Lowes from Resolute stating: "███████████████████████████████████████████████████████████████

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 4:17-cv-02824-JST

DAVIS WRIGHT TREMAINE LLP

publish—*for the first time*—a new map in which it defined the "Montagnes Blanches Sector" as limited to a certain area known as the "Massif de Manouanis."  *See* Ex. 2 (Forcier) at 286:5-16 (testifying that prior to Minister Lessard's May 2016 statement, the Québec Government had never "publically [sic] equated the Massif de Manouanis with the Montagnes Blanches"); *see also* Ex. 32 at 2 (May 26, 2016 email from the Québec Wood Marketing Office to the Québec Forest Ministry responding to request related to the drafting of this public response, stating: "[W]e do not have a sector outline for the White mountains. However, the regional office will take care of making a map and show that the forest planning . . . respects protected areas"). The Massif de Manouanis is not all off-limits from logging; rather, only part of the region falls within the administrative protective zones. *See* Ex. 2 (Forcier) at 286:17-287:6; *see also* ECF No. 254-2 at 4. Additionally, the Minister's map overlaps with part of the Greenpeace Canada MBEF map.  *See* Ex. 1 at 14.

The Ministry published this new map along with the rest of its public response to the EFB Report on May 31, 2016. *See* Ex. 33 (the "Lessard Statement"). In the Lessard Statement, the Ministry claimed that the map published by Greenpeace Canada in the EFB Report "extends well beyond the Montagnes Blanches sector officially recognized by the Québec government for the protection of woodland caribou. The central part of the Manouanis natural region, where the Montagnes Blanches sector is located, contains old forests that may be up to two hundred years old and have been spared by fire.  On the other hand, the surrounding sectors have largely been shaped by fire." *Id.* at RFP-0038883.  The Lessard Statement concludes by referencing the aforementioned April 2016 action plan for caribou protection in the Montagnes Blanches sector. Strangely, however, the map in the Lessard Statement *contradicted* the definition of the Montagnes Blanches sector that the Ministry used just one month prior in the April 2016 action plan.  *See* Ex. 20; *see also* Ex. 1 at 13-14 & Annex A-5. Indeed, Mr. Forcier from the Québec Ministry conceded that the Montagnes Blanches sector "that was described in the April . . . 2016 . . . caribou rehabilitation plan" covered

").

DAVIS WRIGHT TREMAINE LLP

10,000 kilometers, while the Montagnes Blanches area identified in the Lessard Statement covered only 8,000. Ex. 2 (Forcier) at 224:19-225:22 (admitting that in April 2016, the Ministry "was comfortable calling a much larger region the White Mountain sector" than in May 2016).  After publishing the Lessard Statement, the Minister's Chief of Staff personally requested her deputy send copies directly to Mr. Dumoulin at Resolute. *See* Ex. 34. Mr. Dumoulin then remarked to his colleague Marc Bedard that Minister Lessard "took it upon himself to ensure he had an English version" of the Lessard Statement.  *See* Ex. 35.

**C.    The Same Day the Ministry Publishes the Lessard Statement, Resolute Files this Lawsuit in the Southern District of Georgia, Asserting Defamation and RICO Claims.**

The same day the Ministry published the Lessard Statement, Resolute filed this lawsuit in the U.S. District Court for the Southern District of Georgia, asserting alleged violations of the Racketeer Influenced and Corrupt Organizations Act and various state laws, including defamation. *Compare* Ex. 33, *with* ECF No. 1 ("Compl.").  On this day, Resolute employee Seth Kursman also sent a copy of a press release titled "Resolute Files Racketeering Suit Against Greenpeace" to Martin Pelletier, Director of Coordination and Strategic Orientations at the Québec Ministry. Ex. 36.

Resolute's Complaint retread much of the same ground as an earlier lawsuit it filed against Greenpeace Canada in 2013 ("Canadian Action").  *See* ECF No. 62 at 6-8.  It identified all of the alleged defamatory statements set forth in that case—including statements by Greenpeace Canada regarding the CBFA and Resolute's Forest Stewardship Council ("FSC") certificates—seeking to hold the Greenpeace Defendants liable for many of the same facts it was asserting in Canada.  *See id.* at 7. Among its numerous allegedly defamatory statements by Greenpeace Canada, the Complaint included the Boreal Alarm Report and the EFB Report.  *See* Compl. at 96-97.

**D.    Greenpeace Canada and Other Canadian Environmental Groups Respond to the Lessard Statement.  The Greenpeace Defendants Agreed the EFB Report Remained Accurate.**

In response to the Lessard Statement's claims regarding the Montagnes Blanches, CPAWS Québec published a press release on June 6, 2016 titled: "Are the Montagnes Blanches protected?" Ex. 1 at 14.  Therein, CPAWS Québec criticized several aspects of the Lessard Statement—noting the Ministry's plan "[u]nder no circumstances" provided "long-term protection of the territory" for

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 4:17-cv-02824-JST

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

caribou; and also disputing the Lessard Statement's characterization of the Northern Limit[11] as protecting "almost 90% of intact forest landscapes . . . ."  *Id.*, Ex. 14 to Boudreault Report.[12]

Greenpeace Canada also assessed how to respond to the Lessard Statement, and considered drafting an op-ed to set "the record straight on the [EFB] report as well as clarify[] our goals of the campaign . . . ."  Ex. 40 at GPDEFS00028780.  The Greenpeace Defendants were not substantively involved in handling this response, as the EFB Report was a Greenpeace Canada report.  *See* Ex. 9 (Moas 30(b)(6)) at 121:7-125:23 (recalling she discussed the Lessard Statement on a call with the "Greenpeace Canada team," and they agreed that Mr. Lessard's criticisms of the Greenpeace Canada map were unwarranted and did not change the accuracy of the map; and that someone might draft a rebuttal to the Lessard Statement, but she was not part of that team); Ex. 3 (Moffatt) at 149:4-19 (stating he did not recall discussing the Lessard Statement with Greenpeace U.S. colleagues, but did recall discussing it with colleagues in Québec).[13]

Nonetheless, those of the Greenpeace Defendants who did read the Lessard Statement at the time (or were asked to analyze it in their depositions) felt strongly it was comparing "apples to oranges," in comparing the EFB Report's map—which Greenpeace Canada defined as an area of high-conservation value worthy of protection, and which they had been campaigning on for at least six years—agaist a never-before-seen government map that was not discussing the same topic as Greenpeace Canada's map, the need for additional protection. *See* Ex. 11 (Moas) at 121:9-122:19;

---

[11]  The "northern limit" is a boundary "defined by the Canadian government . . . which separates unmanaged forests in the north . . . from productive forests in the south," available for logging.  Ex. 37, Dep. of Maik Marahrens ("Marahrens") at 99:15-22.

[12]  In December 2017, CPAWS Québec published an interactive map of the Montagnes Blanches sector, showing the approximate boundaries of the region and demonstrating that an area of critical importance for caribou had been excluded from the government's announced protected region**.**  Ex. 1 at 16-17; *see also*               Ex.              38,               *available               at* https://www.arcgis.com/apps/Cascade/index.html?appid=532fb77e7a1f48369d5110794685633c. CPAWS Québec also created a web page dedicated to the Montagnes Blanches sector, which is still online now.  Ex. 39, *available at* https://snapQuebec.org/les-montagnes-blanches/.  These resources do not use the definition of the Montagnes Blanches boundaries from the Lessard Statement, rather, they refer to the "Montagnes Blanches" mostly "for communication reasons, in order to make this important sector better known to the general public and to stakeholders."  Ex. 1 at 17-18.

[13]  Other employees of Greenpeace U.S. and Greenpeace International did not recall seeing and/or hearing about the Lessard Statement during this time.  *See* Ex. 41, Dep. of Daniel Brindis ("Brindis") at 236:3-12; Ex. 10 (Daggett) at 197:13-14; Ex. 42, Dep. of Eugenie Mathieu ("Mathieu") at 138:7-139:15.

*see also* Ex. 7 (Skar) at 215:8-219:7 (the Lessard Statement "was talking past the issues that . . . we were trying to address," and "seemed to be talking about something else, like mentioning areas that were not allocated for logging, . . . In the reports, . . . we are clear that we're pushing for new conservation measures to be taken.  So we're not talking about the area that has been set aside. We're talking about the need to expand the conservation"); Ex. 41 (Brindis) at 238:24-239:8 (the Lessard Statement "made a lot of straw man arguments or mischaracterized what we were saying . . . [H]is statements were actually talking over us . . . ."); Ex. 37 (Marahrens) at 111:4-112:4 (stating, when we "talked about the Montagnes Blanches Endangered Forest area, . . . we had a clear definition for it and a clear explanation for it, . . . the government had its take, other people had their take, we had ours and we explained ours").  Amy Moas testified it seemed clear that Minister Lessard did not understand the EFB Report; and his statements in no way undermined the "well-established data and information" that Greenpeace Canada relied on to make its claims and create its map.  Ex. 9 (Moas 30(b)(6)) at 203:6-13.

This "apples to oranges" view is consistent with the fact that the name "Montagnes Blanches" is colloquially understood by Québec citizens, if at all, to refer to a general region mainly to the north in the administrative region of Saguenay-Lac-St-Jean—not to the specific five mountain peaks themselves and certainly not to a map that the Québec Ministry published for the first time in May 2016.  *See* Ex. 3 (Moffatt) at 42:7-43:11 (noting that based on "spending a good bit of time in Quebec; speaking with my colleagues who are from Quebec, live in Quebec; speaking with other environmentalists in Quebec about this forest . . .  looking at media articles which discuss the Montagnes Blanches, [and] reading about journalists' coverage on the Montagnes Blanches" it was clear that the Montagnes Blanches term "was and continues to be common in Quebec to refer to this broad eco-region of high conservation value forests"); *see also* Ex. 1 at 18 (noting that, as a result of "several campaigns by environmental and citizens' groups" in Québec since the 2000s, the Montagnes Blanches name "has been mentioned regularly in the public sphere and [its] existence has progressively been materialized in the collective imagination of Quebeckers. They are not limited to a specific government or ministerial designation (Minister Lessard) or protected area, but rather to a much larger area with many conservation values that are important to protect for the

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 4:17-cv-02824-JST

DAVIS WRIGHT TREMAINE LLP

conservation of boreal biodiversity."); Ex. 11 (Moas) at 63:2-25 (based on "work with supporters and the public in Canada" the "Montagnes Blanches is a region . . . [,which] to the average person is undefined, just like lots of other examples of regions . . . like the Rockies," and stating that "[w]e used the term so that the average person in Canada would know generally where we are talking about").  Even Mr. Forcier from the Québec Ministry agreed that the "official name Montagnes-Blanches or White Mountains doesn't seem to be official, it's more popular, more common."  Ex. 2 (Forcier) at 91:2-7.

The Greenpeace Defendants also testified it was not unusual for provincial governments like the Québec Ministry to make statements in support of the forestry industry—at the expense of environmental protection—as such governments often share incentives parallel to those of industry. *See* Ex. 7 (Skar) at 223:11-15 ("It's not unusual for a government official, who is in charge of something like forestry, to . . . use that sort of language, to say . . . 'There's nothing wrong.  There's no room for improvement here.  And these NGOs . . . I strongly disagree with them.'"); *see also* Ex. 41 (Brindis) at 238:1-13 ("I think that the . . . Ministry of Forestry . . . has had messaging . . . that are in support of Resolute.  They've even invested public moneys [sic] into . . . marketing Quebec forestry and forest products from Quebec for the international market.  So I think that they . . . have a lot of shared interest with Resolute").  Ms. Moas further testified that Minister Lessard was "highly politicized" and "not an unbiased figure" whose "job was to make sure that the logging industry in Canada continued." Ex. 11 (Moas) at 123:19-25 (noting Lessard had "a vested interest in the forestry industry, . . . [and his statement] was basically the equivalent of Resolute saying these things to us").

**E.   Greenpeace Canada and the Greenpeace Defendants Continued to Campaign to Protect the Montagnes Blanches and Also Campaigned Against Resolute's Filing of Multiple Lawsuits Designed to Chill Their Speech.**

Throughout 2016 and 2017, Greenpeace Canada and the Greenpeace Defendants continued to perform their duties as environmental advocates by publishing statements regarding their continued concern over the lack of protection for high-priority conservation areas in the Canadian Boreal Forest, such as the Montagnes Blanches.  On December 16, 2016, Ms. Moas sent a letter—signed by herself and Shane Moffatt of Greenpeace Canada—to several publishing companies that purchased paper from Resolute (Ex. 43, the "December Letter"). The letter called on the publishing

DAVIS WRIGHT TREMAINE LLP

companies to assess whether their purchases from Resolute were in compliance with the companies'

sustainability policies and to "communicate your sustainability expectations to [Resolute] directly."

*See id.* at GPDEFS00029547 & 50. The December Letter included several examples of Resolute's

unsustainable practices as well as its campaign to silence free speech by filing multiple lawsuits

against Greenpeace entities. *See generally id.*

Regarding the Montagnes Blanches, the December Letter stated: "In particular, in the

Montagnes Blanches Forest in Quebec, there are three caribou herds, and in the Caribou Forest in

Ontario there is an additional herd where habitat disturbance, including some from Resolute's

operations, is jeopardizing their survival." *Id.* at GPDEFS00029548. This sentence included a

footnote to a government publication by Environment Canada called "2012 Recovery Strategy for

the Woodland Caribou" as well as a report by caribou scientist, Tyler Rudolph. *Id.* at n.5. The

December Letter also included a link to the EFB Report, which showed Greenpeace Canada's

MBEF map. *Id.* at GPDEFS00029549 n.11. During his deposition, Mr. Dumoulin conceded: "some

of the habitat disturbance [mentioned in the December Letter wa]s from Resolute's operations,"

stating "it is true that some of the . . . harvesting has been done by Resolute . . . ." Ex. 13 (Dumoulin)

at 264:3-6.

Ms. Moas explained that the Greenpeace Defendants used the term "Montagnes Blanches

Forest" in the December Letter instead of "Montagnes Blanches Endangered Forest" because, by

that time, Greenpeace Canada had "moved away from the term endangered forest . . . because of

First Nation concerns . . . ." Ex. 11 (Moas) at 175:2-15; *see also id.* at 101:9-103:1 (explaining that

at the time environmental advocacy groups had originally defined the criteria for endangered forests,

the First Nation indigenous communities in Canada were not consulted, and so because the term

carried some baggage for these communities, the Greenpeace entities ultimately ceased using it).

On May 17, 2017, Ms. Moas and her colleagues published a report called "Clearcutting Free

Speech:  How Resolute Forest Products is going to extremes to silence critics of its controversial

logging practices" (Ex. 44, the "Clearcutting Report"). This report was largely aimed at criticizing

Resolute for suing the Greenpeace entities for millions of dollars instead of working collaboratively

to find lasting solutions for the Canadian forests.  *See id.* at 2.  The Clearcutting Report also itemized

DAVIS WRIGHT TREMAINE LLP

several critiques of Resolute's forestry practices.

Most relevant here, the report criticized Resolute's operations in the Montagnes Blanches, showing the same map of the Montagnes Blanches boundaries that Greenpeace Canada had been using since the 2012 Boreal Alarm Report. *See id.* at 28. The Report described the process by which a forestry company like Resolute acquires wood allocation rights under the Québec government's system and then identified three such areas that Resolute had acquired within the Montagnes Blanches Forest under this process.  Specifically, the Clearcutting Report stated that:

> In Northern Québec, Resolute logs in and sources from a large geographic area managed directly by the Québec provincial government.  Resolute is given timber volume allocations alongside other forestry companies operating in the region. The exact harvesting areas for each company are not made public by the provincial government.  However, a parallel auction system allocating additional harvesting rights allows for the identification of at least a few company-specific areas of operation.  Through this process, since 2013, Resolute has acquired three harvest blocks through auction sales inside the Montagnes Blanches, an area of forest with high conservation values that local organizations have for years sought to protect.  The Devau, Bonnard and Tremblay sites total 3,719 hectares and included intact forest and caribou habitat.  All three sites have been logged; the Tremblay site being most recent, with logging completed in winter 2016/2017.

*Id.* (footnotes omitted).  The Report also included satellite images of these three harvest blocks, showing that all three had been logged since 2013. *See id.* at 27.  Resolute has never contested that it purchased or logged these three sites or that, by definition, such sites were legal for logging.  In fact, multiple Resolute employees conceded that Resolute did operate within the area identified in the Clearcutting Report.  *See* Ex. 45, Jan. 19, 2022 Dep. of Marc Bedard ("Bedard") at 148:22-25 ("[W]e were logging in what Greenpeace called the . . . Montagnes Blanches . . . .  We knew that").

**F.   This Court Dismisses Almost All Claims, Rules It Is a SLAPP-Case, Awards Fees.**

On November 8, 2017, Resolute amended its Complaint to include several new statements it alleged were defamatory, including the December Letter and the Clearcutting Report.  ECF No. 185 ("Am. Compl.") ¶¶ 173, 218.  On January 22, 2019, the Court dismissed almost all of Resolute's claims with prejudice—including the RICO claims and defamation/UCL claims based on 294 out of 296 statements.  *See generally* MTD Order.  Regarding these 294 statements, the Court found: (1) statements regarding the CBFA were published outside of the statute of limitations by non-parties; (2) statements about Resolute's FSC certificates were "neither materially false nor provably

DAVIS WRIGHT TREMAINE LLP

false"; and (3) the remaining statements either failed "to allege actual malice or . . . [were] statements . . . of opinion." *Id.* at 16-17, 19-20. The Court also noted that Resolute failed "to plausibly allege that any Defendant is responsible for statements by non-party Greenpeace Canada." *Id.* at 15. Additionally, in its Order, the Court concluded that Resolute's lawsuit constituted a SLAPP action because it arose "from an act by the defendant made in connection with a public issue in furtherance of the defendant's right to free speech[,] . . . the important public matter of environmental sustainability." *Id.* at 31. Accordingly, the Court awarded the Greenpeace Defendants attorneys' fees and costs arising from the claims that were dismissed from the case, in the amount of $545,572.36 in fees and $20,687.18 in costs.  ECF No. 314 at 8.

The only two allegedly defamatory statements that the Court did not dismiss from the case were the Montagnes Blanches statements from the December Letter and the Clearcutting Report. MTD Order at 17 (identifying the Challenged Statements as "in the Montagnes Blanches Forest in Quebec, there are three caribou herds, and in the Caribou Forest in Ontario there is an additional herd where habitat disturbance, including some from Resolute's operations, is jeopardizing their survival"; and "Resolute has acquired three harvest blocks through auction sales inside the Montagnes Blanches. . . . All three sites have been logged.").  The Court found that Resolute adequately pleaded actual malice as to these two statements because both asserted that Resolute was operating in the Montagnes Blanches based on boundaries the Lessard Statement had claimed were misleading. *Id.* at 17-19. The Court dismissed with prejudice statements about the Montagnes Blanches that were made before the Lessard Statement, such as the Boreal Alarm Report and EFB Report. *See generally id.*  The Court also did not identify any other statements from the December Letter or Clearcutting Report other than the Challenged Statements that survived dismissal. *See id.*

Throughout the parties' extensive discovery period (over three years), the Court consistently rejected Plaintiffs' attempts to expand the scope of the case, reminding Plaintiffs that the case is limited to the Challenged Statements, and cautioning that sanctions might be warranted for future such attempts.  ECF No. 339 at 1; *see also* ECF No. 341 at 2; ECF No. 269 at 8.

**G.  Discovery Revealed that Resolute Incurred No Damages Specifically from the Challenged Statements.**

DAVIS WRIGHT TREMAINE LLP

Though the focus of Resolute's lawsuit initially appeared to be claims that the Greenpeace Defendants harmed Resolute's relationship with publishing customers, in fact, neither of the Challenged Statements caused any publishing companies to change their purchasing patterns.  Ex. 46 at RFP-0103181-82.  Accordingly, in last-minute interrogatory responses and the damages report filed by its expert, Resolute has shifted its theory of damages. ECF No. 459-9; Ex. 47, Corrected Expert Report of Marti P. Murray ("Murray Report").  Resolute now alleges four categories of damages: lost profits, out-of-pocket costs, management diversion damages, and reputational harm. *See generally* Ex. 47.  In total, Resolute seeks, at the very least, $53.4 million, along with additional damages Ms. Murray says will be quantified at trial.  *Id.* ¶ 53.

Resolute's lost profits claims are based entirely on seven pulp customers who changed their purchasing patterns with Resolute ***before*** the Challenged Statements were published,[14] but whom Resolute alleges would have returned but-for the Challenged Statements.  *Id.*  ¶¶ 77-112.  There is no documentary evidence that six of those seven customers even received either of the Challenged Statements; and no evidence that any of them changed their purchasing practices as a result. Resolute's claimed out-of-pocket costs relate first to two operating expense categories Resolute used to track expenses associated with responding to environmental criticism and funding its litigation against Defendants, non-party Greenpeace Canada, and possibly others, called respectively, Project GATE and Project RICO.  Ex. 47 ¶ 336; Ex. 48, Dep. of Marti Murray ("Murray") at 247:10-248:4; 249:14-18;  251:15-252:2;  254:4-255:5.  For both categories, Resolute has not provided any underlying documents breaking down the expenses it claims amount to $24.6 million.  Ex. 48 (Murray) at 257:8-259:23.  The other claimed out-of-pocket costs are approximately $17 million related to closing and/or re-opening certain paper machines at Resolute's mills.  Ex. 47 ¶¶ 347-354. Resolute also seeks amounts that it will disclose for the first time at trial related to strategic M&A transactions it alleges it was not able to complete due to the Challenged Statements and increased productions costs related to customers' demand for FSC-certified products.  *Id.* ¶¶ 376-387.  The

---

[14] Defendants have filed a motion in *limine* to preclude Resolute from relying on damages evidence based on statements this Court previously either dismissed from the case or ruled were beyond the scope of discovery—such as statements made prior to December 2016.  ECF No. 480.

18

DAVIS WRIGHT TREMAINE LLP

Court has precluded Resolute from relying on the theories related to the paper machines and M&A transactions, as a sanction for the company's failure to timely disclose them.  ECF No. 486 at 19.[15] Like the Project GATE and Project RICO costs, the management diversion damages Resolute claims also do not distinguish between employee time spent responding to the Challenged Statements from time spent responding to any of the other 294 statements the Court has already struck, and rely on estimates from Resolute's employees about how much time they spent.  Ex. 48 (Murray) at 217:5-219:5; Ex. 47 ¶¶ 364-373.

### III.   LEGAL STANDARD

Summary judgment is proper if the pleadings and discovery show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial."  *Rivera v. Nat'l R.R. Passenger Corp.*, No. C 99-04003 SI, 2004 WL 603587, at *3 (N.D. Cal. Mar. 22, 2004).  The moving party need only point out to the Court that there is an absence of evidence to support the non-moving party's case.  *See id.*  The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'"  *See Celotex Corp.,* 477 U.S. at 324.

To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Additionally, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  The evidence the parties present must be admissible.  Fed. R. Civ. P. 56(c)(4).

DAVIS WRIGHT TREMAINE LLP

---

[15] Resolute filed objections to this sanctions order, which are currently pending.  ECF No. 492.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 4:17-cv-02824-JST

DAVIS WRIGHT TREMAINE LLP

## IV.    ARGUMENT

"The elements of a claim for libel and defamation under California law are (1) an intentional publication, (2) that is false, (3) defamatory, and (4) unprivileged, and (5) that has a natural tendency to injure or that causes special damage." *Open Source Security, Inc. v. Perenes*, Case No 17-cv-04002-LB, 2017 WL 6539874, at *7 (N.D. Cal. Dec. 21, 2017).  Additionally, where the plaintiff is a public figure, the plaintiff must establish by clear and convincing evidence that the defendant made the allegedly defamatory statements with actual malice—*i.e.*, "with knowledge of their falsity or with reckless disregard of their truth or falsity." *Clark v. Hidden Valley Lake Ass'n*, No. 16-CV-02009-SI, 2017 WL 4922375, at *5 (N.D. Cal. Oct. 31, 2017).

Here, the Court should grant summary judgment for Defendants because the Challenged Statements are: (1) not defamatory; (2) substantially true and/or protected opinion incapable of being proven true or false; (3) not made with actual malice; and (4) Plaintiffs have not suffered any special damage as a result of the Statements.  Because *all* of the aforementioned elements are required for a finding of defamation, if the plaintiff is unable to establish a material dispute of fact regarding even one element, summary judgment is warranted.  The Court should similarly grant summary judgment on Resolute's tag-along claim for alleged violation of the California Unfair Competition Law ("UCL"), as this claim is predicated upon the same facts as the defamation claim, which fails.

### A.    The Challenged Statements Are Not Defamatory.

Under California law, a statement is defamatory if it "exposes any person to hatred, contempt, ridicule, or obloquy, or . . . causes him to be shunned or avoided, or . . . has a tendency to injure him in his occupation." Cal. Civ. Code § 45.  Whether or not a challenged statement is fairly susceptible of a defamatory meaning is a question of law, *see Dodds v. ABC, Inc.*, 145 F.3d 1053, 1065 (9th Cir. 1998), and the determination should be made "from the standpoint of the average reader, judging the statement not in isolation, but within the context in which it is made." *Norse v. Henry Holt & Co.,* 991 F.2d 563, 567 (9th Cir. 1993); *see also Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 389 (2004) ("courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed"); *Balzaga v. Fox News Network, LLC*, 173 Cal. App. 4th 1325, 1338–39 (2009)

20

1   (affirming trial court's granting of defendant's anti-SLAPP motion, holding no reasonable viewer

2   could have understood news program's caption to have a defamatory meaning, noting the court must

3   consider full context of the broadcast—or if the alleged statement is contained in a headline, "the

4   headline must be read in conjunction with the entire article").

5          "Where the words or other matters that are the subject of a defamation action are of

6   ambiguous meaning, or are innocent on their face and defamatory only in the light of extrinsic

7   circumstances, the plaintiff must plead and prove that as used, the words had a particular meaning,

8   or 'innuendo,' that makes them defamatory." *Woods v. Prot. One Alarm Monitoring, Inc.*, 628 F.

9   Supp. 2d 1173, 1187 (E.D. Cal. 2007) (citing *Smith v. Maldonado*, 72 Cal. App. 4th 637, 645-46

10  (1999)).  "This includes the requirement that in an instance of ambiguous language, *i.e.*, where the

11  language is susceptible of either a defamatory or innocent interpretation, the plaintiff must also

12  allege the extrinsic circumstances which show that the third person reasonably understood it in its

13  derogatory sense (the 'inducement')."  *Id.*

14          Here, the Challenged Statements are incapable of defamatory meaning because they in no

15  way imply that Resolute was operating illegally or in an area that was off-limits to logging. To the

16  contrary, the Clearcutting Report made clear that Resolute lawfully acquired the rights to source

17  wood from the Montagnes Blanches through a government-run auction process.  Specifically, the

18  relevant paragraph of the Clearcutting Report begins by stating that, in Northern Québec, "Resolute

19  logs in and sources from a large geographic area ***managed directly by the Québec provincial***

20  ***government***."  Ex. 44 at 28 (emphasis added).  It then states that through the auction system,

21  Resolute "acquired three harvest blocks . . . inside the Montagnes Blanches, an area of forest with

22  high conservation values that local organizations have for years ***sought to protect***."  *Id.* (emphasis

23  added).  Nowhere does the Report state that this area is already protected.  Additionally, that

24  sentence footnotes to auction data directly from the Government of Québec, Le Bureau de mise en

25  marché des bois ("The Timber Marketing Bureau")—making even clearer that this auction system

26  is managed by the Québec government. *See id.* at n.131.  Further, the Clearcutting Report includes

27  a map directly above this paragraph, showing exactly where these three harvest blocks are located.

28  *See id.* at 28.  This map uses the same boundaries that Greenpeace Canada had been campaigning

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 4:17-cv-02824-JST

on for years, and published in the Boreal Alarm Report and EFB Report—both of which made clear that this was an area that was largely available to logging, but that Greenpeace Canada thought **should** be protected because of its high ecological value. *Compare* Ex. 44 at 28, *with* Ex. 8 at 11-13 & Ex. 19 at 3-4. Mr. Forcier agreed that the EFB Report was not accusing Resolute of logging in the 2008 proposed Montagnes Blanches Biodiversity Reserve—which was off-limits to logging. Ex. 2 (Forcier) at 199:4-201:9.

Likewise, the December Letter in no way accuses Resolute of illegal logging.  The Challenged Statement in the December Letter simply states that "in the Montagnes Blanches Forest in Quebec, there are three caribou herds . . . where habitat disturbance, including some from Resolute's operations, is jeopardizing their survival."  Ex. 43 at GPDEFS00029548. Nowhere does the December Letter state or imply that the Montagnes Blanches Forest is off-limits to logging, or that anything about Resolute's conduct was illegal. Additionally, the December Letter includes a footnote to the EFB Report, which as noted *supra*, includes a map identifying the area being discussed—and which Mr. Forcier testified was "clear" that it was not accusing Resolute of logging in a protected caribou reserve.  *See* Ex. 2 (Forcier) at 199:4-201:9.

Even Resolute employees agreed that the Greenpeace Defendants did not say "Resolute was harvesting illegally . . . ." Ex. 49, Dep. of Carolyn Pinto ("Pinto") at 116:22-117:3; *see also id.* at 119:4-11 ("I don't believe they accused Resolute of doing something illegal, to my recollection"). And there is no documentary evidence that publishing companies or any other Resolute customers thought either of the Challenged Statements accused Resolute of illegal logging. Resolute did not get any email inquiries from customers confused about whether they were engaging in illegal operations. During their depositions, none of the corporate representatives of the publishing companies testified that they interpreted the Challenged Statements to accuse Resolute of illegal logging in the Montagnes Blanches caribou preserve or above the northern limit. Indeed, even if Resolute customers misunderstood the area that the Greenpeace Defendants were discussing in the Challenged Statements to refer to the area identified in the Lessard Statement (there is no evidence that any such misunderstanding occurred), there would still be no defamatory meaning. As Mr. Forcier testified, the Lessard Statement, for the first time, publicly defined the "Montagnes

Blanches" sector as co-extensive with the "Massif de Manouanis;" and part of the Massif de Manouanis is below the northern limit and available for logging operations. Ex. 2 (Forcier) at 286:5-287:6; *see also* Ex. 45 (Bedard) at 150:8-14. Accordingly, ***even under the Ministry's definition as of May 2016***, stating that a company was logging in the "Montagnes Blanches" did not accuse them of illegal logging. This is significant because, to be actionable, an allegedly defamatory statement "must be 'material,' meaning, it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Planet Aid, Inc. v. Ctr. for Investigative Reporting*, No. 17-CV-03695-MMC, 2021 WL 1110252, at \*15 (N.D. Cal. Mar. 23, 2021), *aff'd sub nom. Planet Aid, Inc. v. Reveal*, 44 F.4th 918 (9th Cir. 2022).

Likewise, there is certainly no evidence that any Resolute customers or other members of the public misunderstood the Challenged Statements to be referring to logging around the peaks of the Montagnes Blanches mountains, as Resolute now appears to claim.[16] Such an interpretation would make no sense, as neither the Lessard Statement nor environmental groups ever defined the Montagnes Blanches forest or sector as limited to only the peaks themselves.[17] Ex. 1 at 5. The *only* entity that appears to refer to just the five peaks when referring to the Montagnes Blanches is Resolute.[18] Further, the Challenged Statements either use the phrase "Montagnes Blanches Forest" or state "Montagnes Blanches, an area of forest . . . ," making clear they are not discussing the peaks alone. And because logging was not permitted at the top of these mountain peaks, the Québec government would not have auctioned off harvest blocks there—as discussed in the Clearcutting Report—making it impossible for a reasonable reader to make such a misinterpretation. Accordingly, because, as established *supra*, the term "Montagnes Blanches" is capable of multiple

---

[16] At deposition, Resolute's witnesses provided various, inconsistent answers as to precisely how they ***believed*** customers or the public interpreted the term "Montagnes Blanches;" most indicated that they believed customers did not know what the Montagnes Blanches were until they asked Resolute. Ex. 13 (Dumoulin) at 166:15-25; 219:6-220:10; Ex. 50, Apr. 28, 2022 Dep. of Richard Garneau ("Garneau") at 97:25-98:23; Ex. 51, Dep. of Charles Del Vecchio at 151:5-152:2.

[17] The Resolute customers who received the earlier Greenpeace Canada reports (Boreal Refuge, Boreal Alarm, and EFB Report) would already have been familiar with the boundaries and underlying criteria that Greenpeace Canada used to define the Montagnes Blanches.

[18] Indeed, Resolute invented the terms "real" and "actual" Montagnes Blanches specifically as counterpoint to Greenpeace Canada's mapping of the MBEF. Ex. 52, Jan. 21, 2022 Dep. of Marc Bedard ("Bedard 30(b)(6)") at 54:10-21; 60:3-15.

23

DAVIS WRIGHT TREMAINE LLP

meanings, and no statements by Defendants implied any illegal conduct by Resolute, Plaintiffs' claim cannot survive because they have not and cannot "allege the extrinsic circumstances which show [a] third person reasonably understood [the statement] . . . in its derogatory sense . . . ." *Smith*, 72 Cal. App. 4th at 645-46.

Because the Challenged Statements did not state or imply that Resolute was engaging in illegal logging, there is no basis for finding these statements defamatory.  Simply stating that a company is logging in an area where they *are allowed to log*—but where environmentalists would prefer they do not log because of the conservation value of the land—is not defamatory.  Indeed, courts have rejected defamation claims based on statements associating plaintiffs with activities that—while legal—may be considered objectionable by some. *See Golden N. Airways v. Tanana Publ'g Co.*, 218 F.2d 612, 623-25 (9th Cir. 1954) (article stating company was "unable to comply with the requirements of financial responsibility, preventive maintenance . . . and the innumerable requirements necessary to operate safely, efficiently and economically" was not defamatory as it "charges nothing illegal, nothing fraudulent," noting: "It is an established principle in the law of libel that it is never libelous to accuse one of doing a legal act although strong epithets are used in describing the act"); *see also Beilenson v. Superior Ct.*, 44 Cal. App. 4th 944, 951-52 (1996) (holding campaign mailer accusing a political candidate of maintaining a private law practice while employed by the state not defamatory as there "was nothing illegal" about doing so—the mailer simply implied that a state official's time "ought to be devoted to his public post"—and to "charge a breach of ethics is not to charge a breach of the law").

As this Court has previously found, where, as here, Defendants' statements "rely on scientific research or fact," the "academy, and not the courthouse, is the appropriate place to resolve scientific disagreements of this kind."  ECF No. 173 at 17-18. As Defendants' environmental advocacy criticizing Resolute's forestry practices lies within the core of First Amendment protection, and in light of Resolute's extensive, continuing efforts to respond to Defendants' speech in the market, the Court should reject Resolute's defamation claims here and honor the principle espoused by Justice Brandeis that "the remedy to be applied is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring), *overruled on other*

24

DAVIS WRIGHT TREMAINE LLP

1   *grounds by Brandenburg v. Ohio*, 395 U.S. 444 (1969).

2   **B.   The Challenged Statements Are Substantially True and/or Protected Opinion.**

3       "In all cases of alleged defamation, whether libel or slander, the truth of the offensive

4   statements or communication is a complete defense against civil liability, regardless of bad faith or

5   malicious purpose." *Ringler Assocs., Inc. v. Maryland Cas. Co.*, 80 Cal. App. 4th 1165, 1180-81

6   (2000).  "It is sufficient if the substance of the charge is proven true, irrespective of slight inaccuracy

7   in the details, 'so long as the imputation is substantially true so as to justify the 'gist or sting' of the

8   remark.'"  *Id.*  A defamation claim "cannot survive defendant's summary judgment motion . . .

9   [where] the statements were substantially true, and plaintiff does not present any evidence that raises

10  a genuine issue of fact as to their truthfulness."  *Edward/Ellis v. New United Motors Mfg., Inc.*, No.

11  C 07-05452 WHA, 2008 WL 5384323, at *5 (N.D. Cal. Dec. 22, 2008).

12      Additionally, it "is an essential element of defamation that the publication be of a false

13  statement of fact rather than opinion." *Brown v. Wireless Networks, Inc.*, No. C 07-4301 EDL, 2008

14  WL 4937827, at *1 (N.D. Cal. Nov. 17, 2008); *see also Open Source Security, Inc.*, 2017 WL

15  6539874 at *8 ("California defamation law requires that the offending statement 'expressly or

16  impliedly assert a fact that is susceptible to being proved false,' and must be able reasonably to be

17  'interpreted as stating actual facts.'").  Ultimately, unless "a reasonable factfinder could conclude

18  that the contested statement implies an assertion of objective fact, . . . the claim is foreclosed by the

19  First Amendment."  *Gardner v. Martino*, 563 F.3d 981, 987 (9th Cir. 2009).

20      Courts have found that where a term is capable of multiple meanings, it is a matter of

21  opinion, incapable of being proven true or false.  For example, in *Skidmore v. Gilbert*, No. 20-CV-

22  06415-BLF, 2022 WL 464177, at *9 (N.D. Cal. Feb. 15, 2022), the Court found that the defendants'

23  "use of the terms 'racist,' 'xenophobic,' 'hateful,' and the like would be protected opinions[, as they]

24  . . . are not capable of 'precise meaning' and are 'susceptible to varying viewpoints and

25  interpretations.'"  Even words that are "exceptionally negative, insulting, and highly charged . . .

26  [are] not actionable under defamation-type claims . . . [if] it is 'a word that lacks precise meaning'

27  and 'can imply many different kinds of fact.'"  *Id.*; *see also Rosen v. Am. Israel Pub. Affs. Comm.*,

28  *Inc.*, 41 A.3d 1250, 1256-58 (D.C. 2012) (holding a statement that the plaintiff's conduct "did not

25

comport with the standards that [defendant] expects of its employees" was not provably false because "standards" is "a general term capable of multiple meanings" and "communicates no specific message about a discernible fact to an uniformed hearer"); *Experian Info. Sols., Inc. v. Carfax, Inc.*, No. 11 CV 08927, 2012 WL 2597915, at *5 (N.D. Ill. July 5, 2012) (dismissing statements as opinion where they were "neither precise nor verifiable, and . . . [were] capable of having multiple meanings . . . because the precise meaning of such general terms . . . could easily differ from one person to another").

### 1. *The Term "Montagnes Blanches" Constitutes Protected Opinion.*

Here, it is clear the term "Montagnes Blanches" has had numerous meanings throughout the past few decades in Québec.  Since 2006, Aux Arbres Citoyens, CPAWS Québec, Greenpeace Canada, and other Canadian ENGOs or collectives have used the Montagnes Blanches name to describe a region of high conservation value that environmentalists believed should be protected from logging.  The Québec Forest Ministry has used the Montagnes Blanches term over the past 15 years to refer to at least ***three*** different geographic entities: a proposed biodiversity caribou reserve in 2008, a vast land sector in April 2016, and a somewhat smaller land sector in May 2016 (part of which was and still is available for commercial logging).  Even Resolute's CEO himself has used the Montagnes Blanches name inconsistently over time to refer to different areas.  *Compare* Ex. 2 (Forcier) at 142:19-144:24 ("[W]hen the Government of Quebec talks about the White Mountains and when Mr. Richard Garneau talks about the White Mountains they're not referring to the same thing . . . .  Mr. Garneau is referring to the whole north of the Saguenay-Lac-St-Jean region"), *with* Ex. 50 (Garneau) at 30:18-20 (testifying that Resolute now considers the definition of the Montagnes Blanches to be "the five peaks that are all located above the northern limit").

The evidence adduced here does not support a conclusion that the definition of the Montagnes Blanches in the Lessard Statement is the only accurate definition of the term—especially considering that neither Resolute nor Canadian ENGOs use the Lessard Statement's definition. *See* Exs. 38 & 39 (CPAWS Québec's webpage and map of Montagnes Blanches sector, neither of which use or mention the Lessard Statement's borders). This is particularly true because discovery has made clear the Lessard Statement was a politically-motivated response to the EFB Report

DAVIS WRIGHT TREMAINE LLP

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 4:17-cv-02824-JST

undertaken at the direction and under the influence of Resolute; and it defined the Montagnes Blanches as an area the Ministry had never before referred to and which was inconsistent with the Ministry's use of the Montagnes Blanches name from only a month prior.  *See* Exs. 21 & 22; Ex. 23 at RFP-0037903; Ex. 27 at RFP-0038642; Ex. 2 (Forcier) at 286:5-16; 224:19-225:22.

Accordingly, because the term "Montagnes Blanches" is capable of multiple meanings and "susceptible to varying viewpoints and interpretations," one cannot prove true or false whether an entity was logging there—rendering such a statement protected opinion.[19]  *Skidmore*, 2022 WL 464177, at *9.  This is especially true where, as here, the Greenpeace Defendants disclosed the basis for their opinion—or in this case, for their interpretation of the Montagnes Blanches boundaries— for example, in the Clearcutting Report, defining the Montagnes Blanches as "an area of forest with high conservation values that local organizations have for years sought to protect" and including a map of the area.  Ex. 44 at 28; *see also* Ex. 43 at 3 (including at footnote 11, a link to the EFB Report, whose title refers to the Montagnes Blanches, and which included a map and detailed description of the area); *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1233-34 (N.D. Cal. 2014) ("[O]pinions that are based on expressly stated or disclosed facts are actionable 'only if the stated facts are themselves false and demeaning' . . . because '[w]hen the facts . . . are disclosed, readers will understand they are getting the author's interpretation of the facts presented . . . .'"); *Koch v. Goldway*, 817 F.2d 507, 509 (9th Cir. 1987) ("Context can be determinative that a statement is opinion and not fact, for the context of a statement may control whether words were understood in a defamatory sense.").

The Court's MTD Order indicates that the ***only*** allegedly defamatory assertion at issue from the Challenged Statements is that Resolute was operating in the Montagnes Blanches. MTD Order at 17-19.  Accordingly, the Court should end its analysis here, upon determining that this assertion is incapable of defamatory meaning and constitutes protected opinion.  However, in an abundance

---

[19] Courts have also refused to find defamation liability based on the popular use of a term even if "the popular sense of a term may not be technically accurate," although here, there is no singular accurate sense of the term.  *Ingersoll v. Tuesley*, No. 276828, 2008 WL 4228353, at *5 (Mich. Ct. App. Sept. 16, 2008); *see also* Ex. 2 (Forcier) at 91:2-7 (the "official name Montagnes-Blanches or White Mountains doesn't seem to be official, it's more popular, more common").

27

DAVIS WRIGHT TREMAINE LLP

of caution, the Greenpeace Defendants also include an explanation of why the other words in the Challenged Statements are also true:

### 2.    *The Challenged Statement from the Clearcutting Report Is True.*

The Challenged Statement from the Clearcutting Report states that:  "Resolute has acquired three harvest blocks through auction sales inside the Montagnes Blanches. . . . All three sites have been logged."  MTD Order at 17.  After addressing the use of the "Montagnes Blanches" term *supra*, the only remaining assertions are that: (1) Resolute acquired these three harvest blocks through auction sales; and (2) all three of these sites were logged.  Both are indisputably true.

In the Clearcutting Report, the Greenpeace Defendants cited auction data from the Québec Timber Marketing Bureau proving Resolute had acquired these three harvest blocks: Devau, Tremblay, and Bonnard—and stating the dates of acquisition for each.  *See* Ex. 44 at 28 nn.131, 134-136.  And they included satellite images of the three blocks from 2013-2016 (and Tremblay in 2017) in the Report, showing they had been logged since 2013. *See id.* at 27. During their depositions, Resolute employees did not dispute that Resolute had acquired or logged these three harvest blocks.  *See* Ex. 49 (Pinto) 122:16-123:3 (noting, "I don't have reason to doubt [the] claim" that Resolute had logged these three sites).  Resolute employees also admitted that Resolute was not only logging in the area identified as the Montagnes Blanches in the Clearcutting Report, it was responsible for the **majority** of logging there.  *See* Ex. 45 (Bedard) at 209:10-210:5 (agreeing that "between year 2008 and 2015," Resolute was "responsible for 64 percent of harvest in that area"); *see also id.* at 148:22-25 ("[W]e were logging in what Greenpeace called the . . . Montagnes Blanches . . . .  We knew that"); Ex. 13 (Dumoulin) at 259:20-260:8 (admitting, "where Greenpeace was talking about whether there were harvest blocks acquired through auction sales inside the Montagnes Blanches, . . . it referenced directly the map it  . . . was discussing" and the blocks "seemed to have been located within the delineation that Greenpeace was using").

Accordingly, this statement is not actionable because it is entirely true.

### 3.    *The Challenged Statement from the December Letter Is True.*

The Challenged Statement from the December Letter states that "in the Montagnes Blanches

28

Forest in Quebec, there are three caribou herds, and in the Caribou Forest in Ontario[20] there is an additional herd where habitat disturbance, including some from Resolute's operations, is jeopardizing their survival." MTD Order at 17. After addressing the use of the "Montagnes Blanches" term, the only remaining assertions include: (1) there are three caribou herds in this area; (2) these three herds were experiencing habitat disturbance that was jeopardizing their survival; and (3) Resolute's operations caused some of that habitat disturbance. All three of these assertions are true; and this Statement is also non-actionable because the term "jeopardizing their survival" is protected opinion incapable of being proven true or false.

*First*, Resolute employees did not dispute there were at least three caribou herds in the Montagnes Blanches, as that term was used by the Greenpeace Defendants. *See* Ex. 13 (Dumoulin) at 262:21-263:12 (testifying he believed there were four herds in this area). The Greenpeace Defendants also cited a federal caribou report from the Canadian government, which included maps and data on where certain herds were located, *see* Ex. 53 ("2012 Environment Canada Report"), as well as a 2012 report by caribou scientist Tyler Rudolph for the Québec Ministry of Natural Resources and Wildlife (Ex. 54, "Rudolph Report"), which included such maps and data for other herds. Based on these two publications, the Greenpeace Defendants were able to determine that the Montagnes Blanches overlapped with the following four caribou herds: the Pipmuacan, Manouane, Temiscamie, and Manicouagan. *See* Ex. 19 at 6 & n.28.

*Second*, it is true that three of these four herds were experiencing habitat disturbance that was jeopardizing their survival. The 2012 Environment Canada Report states that the ***minimum*** percentage of undisturbed habitat for a caribou herd to have a "measurable probability (60%) . . . to be self-sustaining" is 65% of the area. Ex. 53 at vii. In other words, if a caribou herd is encountering habitat disturbance greater than 35%, it is more likely than not that it cannot sustain itself, and thus ultimately will not survive. *See id.* at 23. The Report notes that even at 65% of undisturbed habitat, "there remains a ***significant risk (40%)*** that local [caribou] populations will not be self-sustaining." *Id.* at vii (emphasis added). The Report then identifies the percentage of undisturbed habitat for the herds it was assessing—finding that: (1) the Pipmuacan herd had 59% disturbed habitat; and (2) the

---

[20] As this case does not concern the Caribou Forest in Ontario, Defendants do not address that clause.

29

Manouane herd had 39% disturbed habitat.  *Id.* at 69. The Rudolph Report, which analyzed the Temiscamie herd among others, found that the Temiscamie herd had 46% disturbed habitat.  Ex. 54 at 39; Ex. 19 at 6.  Accordingly, by the time the December Letter was published, all three herds were already encountering levels of habitat disturbance beyond 35%—*i.e.*, too great to allow them even a measurable probability of sustaining themselves.

The Court should also find this statement non-actionable because the word "jeopardize" is inherently subjective, and thus a matter of protected opinion.  *See Toledo Heart Surgeons, Inc. v. Toledo Hosp.*, 154 Ohio App. 3d 694, 702 (2003) (stating the defendant-hospital "jeopardized its non-profit status" constituted non-actionable opinion); *see also Clary v. Total Facility Sols., Inc.*, Civ. No. 20-768 JAP/LF, 2021 WL 1754196, at *10 (D.N.M. May 4, 2021) (stating "Plaintiff was creating a hostile and threatening environment" was "pure opinion"). Resolute's own caribou expert conceded that "jeopardized" is not a scientific term, and "[p]eople could interpret it however they want." Ex. 56, Dep. of Peter Reich ("Reich") at 168:7-18. Relatedly, this Court previously dismissed as non-actionable opinion statements that Resolute "destroyed" the forest—concluding this word constituted "opinion describing a loss of forest trees, which did occur."  MTD Order at 20.  Because the Greenpeace Defendants disclosed the true facts upon which they based their statement that the caribou's survival was jeopardized (namely, the 2012 Environment Canada Report and Rudolph Report), this statement is also non-actionable opinion.

*Third*, it is true that Resolute caused some of the habitat disturbance these three caribou herds were facing.[21]  Mr. Dumoulin confirmed as much, admitting that "some of the habitat disturbance [mentioned in the December Letter wa]s from Resolute's operations," and stating, "it is true that some of the . . . harvesting has been done by Resolute . . . ."  Ex. 13 (Dumoulin) at 264:3-6. Mr. Dumoulin also conceded the three harvest blocks that Resolute acquired within the Montagnes Blanches area identified in the Clearcutting Report (Devau, Tremblay, and Bonnard) were "in caribou habitat."  *Id.* at 257:21-258:2.  Even if Mr. Dumoulin had not admitted that at least some of the caribou habitat disturbance in the Montagnes Blanches was caused by Resolute (he did), one can

---

[21] It bears noting that the Challenged Statement does not claim that all or even most of the caribou habitat disturbance was caused by Resolute, only some.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 4:17-cv-02824-JST

DAVIS WRIGHT TREMAINE LLP

draw this same conclusion because: (1) Resolute does not contest harvesting in this area; and (2) scientific consensus agrees that forest harvesting negatively impacts woodland caribou.

In his expert report, Daniel Kneeshaw, a biology professor at Université du Québec à Montréal who specializes in forest conservation, noted that, there "is no debate in government documents about the negative impact of forest harvesting on woodland caribou populations;" indeed, the Québec Forest Ministry has acknowledged that "forest harvesting is the primary factor listed as being of high risk" to caribou. Ex. 55 at 3-4. Accordingly, because Resolute admits harvesting in the area identified as the Montagnes Blanches in the Challenged Statements and harvesting undoubtedly harms caribou populations by disturbing their habitat, it is entirely (or at the very least, substantially) true that Resolute has caused some of the habitat disturbance experienced by caribou in the Montagnes Blanches.[22]

Because the Challenged Statements are all either entirely or, at least, substantially true and/or constitute statements of protected opinion, the Court should dismiss them as non-actionable.

## C. Defendants Did Not Act with Actual Malice in Making the Challenged Statements.

As this Court has previously found, Resolute is a limited public figure, and thus must establish that the Greenpeace Defendants acted with actual malice in making the Challenged Statements. *See* MTD Order at 11. Actual malice requires that the defendant acted either "with knowledge that the statement was false or with reckless disregard as to whether or not it was true." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989). "Reckless disregard" is generally defined as requiring that the defendant "made the false publication with a 'high degree of

---

[22] Dr. Kneeshaw also rebuts Resolute's expert witness Peter Reich, who argued Resolute's operations did not have a meaningful percentage impact on the caribou herds in Québec, but misleadingly limited his analysis to only the disturbance incurred during 2015-2018. Ex. 55 at 7-9. Dr. Kneeshaw explains that such a limited view fails to appreciate the impact of disturbance over time—for example, forests take about 40 years to grow back after being harvested; thus, the impact of a tree cut in 2015 (and the resulting destruction of caribou food and shelter) will last much longer than Dr. Reich acknowledges. *See id.* Dr. Reich also admitted during his deposition that the chart he included in his expert report allegedly calculating Resolute's percentage impact on caribou habitat was simply provided to him by Resolute; he just "assum[ed] it's accurate." Ex. 56 (Reich) at 250:3-21. And if this chart refers only to Resolute's "cut-block size," it does not adequately measure Resolute's effects on caribou habitat, as road networks and "forests left between harvest blocks" (which are suboptimal habitat) must also be considered, as they greatly impact caribou. Ex. 55 at 9.

31

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

1  awareness of . . . probable falsity,' . . . or . . . 'entertained serious doubts as to the truth of the

2  publication.'" *Id.*; *see also St. Amant v. Thompson,* 390 U.S. 727, 731 (1968) (noting this standard

3  is "not measured by whether a reasonably prudent man would have published, or would have

4  investigated before publishing," it requires sufficient evidence of actual serious doubts); *United*

5  *States v. Alvarez,* 567 U.S. 709, 719 (2012) ("[F]alsity alone may not suffice to bring the speech

6  outside the First Amendment. The statement must be a knowing or reckless falsehood.").

7      Whether "the evidence in the record in a defamation case is sufficient to support a finding

8  of actual malice is a question of law," *Wynn*, 75 F. Supp. 3d at 1234; and to survive summary

9  judgment, a plaintiff must put forth "clear and convincing evidence" of actual malice, *Reveal*, 44

10  F.4th at 928.  Given the actual malice standard arises from a defendant's First Amendment right to

11  free speech, "[s]ummary judgment is an integral part of the constitutional protection afforded

12  defendants in [defamation] actions such as this." *Cerrito*, 302 F. Supp. at 1075–76.  Indeed, absent

13  "an affirmative showing of facts from which defendant's probable knowledge of falsity may be

14  constitutionally sustained . . . ; the mere hope of questioning the credibility of the defendant's

15  witnesses is not sufficient to resist summary judgment." *Id.*  Thus, where a plaintiff cannot meet

16  "the heavy burden of proving actual malice," "the First Amendment makes it incumbent upon the

17  Court to grant defendant's motion for summary judgment." *Id.*  This is critical in a case like this,

18  which the Court has already concluded arose from Defendants' exercise of their free speech on "the

19  important public matter of environmental sustainability." MTD Order at 31. Even assuming the

20  Court does not dismiss Resolute's claims because the Challenged Statements are true or non-

21  defamatory, Resolute cannot meet its heavy burden of showing actual malice for two main reasons:

22      **1.    *There Can Be No Actual Malice for a Statement of Opinion.***

23      A predicate to finding actual malice is that a false statement of fact, as opposed to opinion,

24  was made.  *See Leidholdt v. L.F.P. Inc.*, 860 F.2d 890, 893 (9th Cir. 1988) (holding that "[o]nly if

25  the article is not an expression of opinion must we decide whether any of the allegedly false

26  statements are . . . actionable," including whether they "were made with 'actual malice'").  The

27  Supreme Court has held that in situations where the allegedly defamatory statement is "one of a

28  number of possible rational interpretations" of an ambiguous situation, such interpretation is "not

32

enough to create a jury issue of malice . . . ." *Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971); *see also Planet Aid, Inc.*, 2021 WL 1110252, at *18 (holding defendants' reliance on certain key documents—which plaintiffs alleged demonstrated knowledge of falsity—could not support actual malice where the documents were "complex and often ambiguous" and "defendants' interpretation thereof was 'one of a number of possible rational interpretations'"). Thus, where a statement is open to multiple interpretations, a defendant cannot be liable if she believed her interpretation to be true. *See CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 296 (4th Cir. 2008) (no actual malice where defendant adopted one of at least two "rational interpretations" of underlying facts).

Here, to find actual malice, there must be clear and convincing evidence that the Greenpeace Defendants knew that their interpretation of the Montagnes Blanches was *false* (or thought it highly likely that it was false). This is impossible because, for the reasons stated *supra* in section B(1), there is no single true definition of the term "Montagnes Blanches"—rather, the term has had numerous meanings throughout the past few decades, as used by various environmental groups, forest industry, and by the Québec Forest Ministry. Even Resolute has used different definitions of the term over the years; and its CEO admitted the company does not use the same definition as the Lessard Statement. Accordingly, because the Greenpeace Defendants' use of the Montagnes Blanches term in the Challenged Statements would thus be "one of a number of possible rational interpretations" of the term, there can be no actual malice. *Pape*, 401 U.S. at 290.

### 2. There Is No Evidence, Let Alone "Clear and Convincing Evidence," that the Greenpeace Defendants Knew Their Use of the Montagnes Blanches Term Was False or Acted with Reckless Disregard to Its Truth.

Even assuming the Challenged Statements contain any false statements of fact (they do not), there still can be no liability because there is no evidence that the Greenpeace Defendants knew the statements were false or acted with reckless disregard as to their truth. To the contrary, discovery indisputably established the Greenpeace Defendants: (1) believed their map of the Montagnes Blanches was an accurate and scientifically credible depiction of an area of high ecological value in need of government protection from logging; and (2) did not believe the Lessard Statement rendered their map inaccurate or misleading, as Minister Lessard was talking about entirely different issues, comparing apples to oranges, and was also politically biased in favor of Resolute.

33

*First*, Greenpeace Canada's initial reports on the Montagnes Blanches Endangered Forest make clear the area was originally mapped in 2010 with the assistance of GFWC (mapping experts who specialize in assessing priority areas for conservation, *see* Ex. 4 (Boudreault) at 108:3-109:6), based on the levels of twelve ecological values, and was later refined in 2012 to incorporate further data on ecological significance and threats from encroaching development. *See* Ex. 5 at 29; *see also* Ex. 8 at 11; Ex. 19 at 5 n.i. The Greenpeace Defendants testified that—while they were not personally involved in the underlying mapping work—they believed that Greenpeace Canada and GFWC's mapping was scientific and credible in defining an area of high conservation value in need of protection from logging.  *See* Ex. 11 (Moas) at 66:17-67:10; 74:14-75:4 (noting "there were 12 different conservation values that were looked at . . . and . . . partnering with global forest watch, . . . an external mapping agency, were able to map these conservation values throughout Canada," and further stating that for "each one of the 12 conservation values, there's an entire body of scientific literature"); Ex. 7 (Skar) at 235:7-11 ("I had confidence in the values . . . that were being captured in . . . the [Montagnes Blanches] mapping . . . the intact forest landscapes, the caribou habitat, things that went into the proposal"); Ex. 37 (Marahrens) 79:8-80:10 (noting that the Montagnes Blanches area identified in the Greenpeace Canada reports were based on "science . . . [including] the high conservation value concept . . . laid out in the first report").

*Second*, the Greenpeace Defendants did not believe the Lessard Statement rendered their Montagnes Blanches map inaccurate or misleading. They testified the Lessard Statement was comparing "apples to oranges," in comparing their map—which Greenpeace Canada clearly defined as an area of high-conservation value worthy of protection, and which they had been campaigning on for at least six years—against a never-before-seen government map that was not even discussing the same topic as Greenpeace Canada's map, *i.e.*, the need for additional protection. Ex. 7 (Skar) at 215:8-219:7 (noting the Lessard Statement "was talking past the issues that . . . we were trying to address," and "seemed to be talking about something else, like mentioning areas that were not allocated for logging"); Ex. 11 (Moas) at 121:9-122:19, 261:3-6 ("We believed strongly at the time that we did not mislead readers and that [Minister Lessard] did not understand our map or what we were doing with it . . . . [T]he high conservation values that were mapped and that originated the

DAVIS WRIGHT TREMAINE LLP

Montagnes Blanches boundaries in the first place still stood"); Ex. 10 (Daggett) at 204:5-23 (noting the Lessard Statement's criticisms were unwarranted especially considering it "announce[d] a map that wasn't previously public and happened after the [EFB] report itself").  The Greenpeace Defendants also did not find the Lessard Statement to be unbiased or entirely credible, as it was not unusual for provincial governments like the Québec Ministry to make statements in support of the forestry industry—at the expense of environmental protection—because such governments often share interests with the industry. Ex. 7 (Skar) at 223:11-15; Ex. 41 (Brindis) at 238:1-13; Ex. 11 (Moas) at 123:19-25 (noting Minister Lessard had "a vested interest in the forestry industry, . . . [and his statement] was basically the equivalent of Resolute saying these things to us").[23]

Discovery has confirmed the Greenpeace Defendants' suspicions the Lessard Statement was politically motivated, heavily influenced by Resolute, and published in direct coordination with Resolute—who filed this lawsuit the same day it was published.  *See* Exs. 21 & 22; Ex. 23 at RFP-0037903; Ex. 27 at RFP-0038642.  Mr. Garneau, who was close enough with Minister Lessard to email him at his personal email account, apparently convinced Lessard to publish a bizarre statement defining the Montagnes Blanches as an area it had ***never before referred to as such***; and which actually ***contradicted*** the Ministry's use of the Montagnes Blanches name from only a month prior, and reduced that area by a fifth. *See* Ex. 2 (Forcier) at 286:5-16; *see also id.* at 224:19-225:22.  And the Ministry not only had "a vested interest in the forest industry," it actively aided Resolute's efforts against Greenpeace Canada —even sending Minister Lessard's Deputy Minister, Richard Savard, abroad to Europe and North America to meet with Resolute customers following some of Greenpeace Canada's reports criticizing Resolute's practices.  *See* Ex. 30; Ex. 31 at RFP-0034722.

All in all, because they did not see the Lessard Statement as setting forth the only possible permissible use of the term "Montagnes Blanches" or in any way undermining the accuracy of and

---

[23] The Greenpeace Defendants further found the Lessard Statement questionable because it contained material inaccuracies.  *See* Ex. 11 (Moas) at 125:21-22 (noting it "ma[de] claims in here that were not at all accurate to our understanding"); Ex. 10 (Daggett) at 204:18-205:7 (testifying that "[s]everal of the bullet points [in the Lessard Statement] are false," including the allegation that the EFB Report "conflates forest fires with forest harvesting"); Ex. 37 (Marahrens) at 95:12-19 (disagreeing with statement that "Quebec is a world leader in responsible forest management," noting that "if it would be responsible, . . . it wouldn't allow the logging of old-growth forests").

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 4:17-cv-02824-JST

DAVIS WRIGHT TREMAINE LLP

science behind their Montagnes Blanches map, the Greenpeace Defendants did not see any need to refrain from using the Montagnes Blanches term in the future.  *See* Ex. 9 (Moas 30(b)(6)) at 203:10-16 ("[W]e felt . . . strongly that we . . . had well-established data and information to make the claims that we did and the map that we did," thus, while "there was conversations about responding and telling [Minister Lessard] that he didn't understand [the EFB Report], . . . that was the extent of it"); Ex. 11 (Moas) at 124:9-12 ("[W]e did not at all believe that it was necessary for us to change any course of our campaigning"); Ex. 7 (Skar) at 232:12-233:7 ("[T]he place that was described in [the Greenpeace Canada reports] . . . was tiered to values and data. . . .  So I didn't think the term 'Montagnes Blanches' . . . couldn't be applied to the endangered forest area" after the Lessard Statement was published); Ex. 37 (Marahrens) at 111:4-112:4.

Accordingly, there is no evidence—let alone clear and convincing evidence—that the Greenpeace Defendants knew their use of the Montagnes Blanches term was false or acted with reckless disregard as to its truth.  To the contrary, they believed their Montagnes Blanches boundaries were a scientifically credible depiction of an area of high ecological value in need of protection from logging; and the politically-biased Lessard Statement—which talked past the issues they were trying to address—did nothing to undermine this accuracy or preclude them from using the term going forward.  Because Resolute thus cannot meet "the heavy burden of proving actual malice," "the First Amendment makes it incumbent upon the Court to grant defendant's motion for summary judgment."  *Cerrito*, 302 F. Supp. at 1075–76.

**D.  Plaintiffs Have Not Incurred Any Special Damage from the Challenged Statements.**

Under California law, even a false and defamatory statement is not actionable unless it "has a natural tendency to injure (libel per se) or causes special damages."  *Subhani v. JPMorgan Chase Bank, Nat. Ass'n*, No. C 12-01857 WHA, 2012 WL 1980416, at *7 (N.D. Cal. June 1, 2012). Resolute did not plead a claim for libel *per se* (*see* Am. Compl.); and even if it had, a statement cannot constitute libel *per se* where, as here, it is "susceptible of an innocent interpretation."  *Smith*, 72 Cal. App. 4th at 646 n.4; *see also Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 888 (N.D. Cal. 2015) (a statement can only be libelous *per se* if the defamatory meaning "appears from the language itself without the necessity of explanation or the pleading of extrinsic facts").  Here, as

DAVIS WRIGHT TREMAINE LLP

established in Section IV.A *supra*, the Challenged Statements are incapable of defamatory meaning because they in no way imply that Resolute was operating illegally; and as demonstrated in Section IV.B, the term "Montagnes Blanches" is also capable of multiple meanings.  Accordingly, these statements cannot constitute defamation *per se*.

Because the Challenged Statements are not defamatory *per se*, Resolute must prove the Statements proximately caused it to incur special damages—*i.e.*, "damages that plaintiff alleges and proves that he or she has suffered in respect to his or her property, business, trade, profession, or occupation, including the amounts of money . . . expended as a result of the alleged libel, and no other." Cal. Civ. Code § 48a(d)(2); *see also* § 45 ("Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damages as a proximate result thereof."). Special damages must be established "precisely," *Gomes v. Fried*, 136 Cal. App. 3d 924, 940 (1982), and "with particularity," *Peabody v. Barham*, 52 Cal.App.2d 581, 585 (1952), *overruled on other grounds. See also* Fed. R. Civ. P. 9(g) (requiring that special damages be "specifically stated."). A "general allegation of the loss of a prospective employment, sale, or profit will not suffice." *Pridonoff v. Balokovich*, 36 Cal. 2d 788, 792 (1951). A plaintiff must also establish "the specific manner in which he lost business as a result of the defamation." *Gang v. Hughes*, 111 F. Supp. 27, 29 (S.D. Cal. 1953).  This requires Resolute to both "identify specific customers and transactions that have failed because of the alleged statements," *Doe v. Fitzgerald*, Case No. CV 20-10713-MWF, 2022 WL 2784805, at *10 (C.D. Cal. May 13, 2022), and identify how its alleged damages resulted from the statements. *Anderson v. Hearst Publ'g Co.*, 120 F. Supp. 850, 852 (S.D. Cal. 1954).  These are "rigorous requirements of proof of damage." *Erlich v. Etner*, 224 Cal. App. 2d 69, 73 (1964).  This standard is not satisfied by a "mere conclusion" or "guess" about purported losses, or by showing a generalized decline in business. *Id.* at 75.  As Resolute has failed to establish damages flowing from either of the Challenged Statements, neither is actionable.  *Bartholomew v. YouTube, LLC*, 17 Cal. App. 5th 1217, 1232 (Cal. Ct. App. 2017) (libel claim that "cannot reasonably be understood as imputing any particular wrongdoing to" plaintiff absent extrinsic facts fails for lack of special damages).

DAVIS WRIGHT TREMAINE LLP

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 4:17-cv-02824-JST

*First*, Resolute cannot prove any of the categories of damages identified by its expert because it cannot show that any of those purported damages were caused by the Defendants in this case rather than other entities, or that the damages were caused by the Challenged Statements rather than any of the other 294 statements Resolute previously alleged were defamatory, or as a result of other factors. *Cf. Erlich*, 224 Cal. App. 2d at 75 (plaintiff must establish damages "attributable to the publications for which [defendant] was responsible"); *First Advantage Background Servs. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d 929, 938 (N.D. Cal. 2008) (requiring plaintiff to establish those damages it claims to have suffered "***just*** as a result of the libelous statements") (emphasis added). Resolute's damages expert attributes damages generally to what she calls the "Greenpeace Campaign," which she defines to include both Defendants and Greenpeace Canada, along with various statements made by Defendants between 2012 and 2017 that the Court has already struck. Ex. 47 ¶¶ 20; 142-230; 144 (describing Greenpeace Canada's exit from the CBFA as the "start of the Greenpeace Campaign against RFP that commenced in 2012"). Resolute's expert readily admits she made no effort to separate the impact of Greenpeace Canada's conduct from Defendants' conduct in calculating damages. Ex. 48 (Murray) at 247:10-248:4; 249:14-18; 251:15-252:2. She also acknowledges her analysis does not calculate damages resulting from the Challenged Statements alone. *Id.* at 254:4-255:5; 113:1-114:5; Ex. 57, Expert Report of Michael J. Wallace ("Wallace Report") ¶ 13. Nor did she even attempt to account for other factors, such as Resolute's loss of FSC certifications. Ex. 48 (Murray) at 129:14-130:9; Ex. 57 ¶¶ 54-59. Resolute thus has not shown "what amount of that total is attributable to the libelous statements" and consequently cannot prove special damages. *Homeland Housewares, LLC v. Euro-Pro Operating LLC*, CV 14-03954 DDP, 2014 WL 6892141, at *4 (C.D. Cal. Nov. 5, 2014) (such a showing does not satisfy special damages requirements). *See also* Cal. Civ. Code § 48a(d)(2) (party must show the damages it has "suffered… as a result of the alleged libel, and no other").

*Second*, Resolute cannot prove that any of the lost profits it claims related to seven pulp customers were proximately caused by the Challenged Statements. For each of the customers, Resolute either does not seek damages from any time after the first Challenged Statement was published or has conceded the customer made the decision to stop or reduce its purchasing from

38

DAVIS WRIGHT TREMAINE LLP

Resolute *before* the Challenged Statements were published.[24]   Ms. Murray opined that post-December 2016 damages should nonetheless be compensable because "Resolute would have been in a much better position to recover their lost contracts in the absence of the Challenged Statements." Ex. 48 (Murray) at 112:7-114:5.  In support of this novel theory, however, Resolute has offered no evidence whatsoever that any customers ever told anyone at Resolute as much, and it is required to prove causation "by something more than [its] own guess as to what had gone on in his former customers' minds, where that mental operation was entirely uncommunicated to him . . . ." *Erlich*, 224 Cal. App. 2d at 75.  Compounding this failure, Resolute also has offered no documentary evidence that six of the seven pulp customers *ever* received either of the Challenged Statements, or that any of the seven ever told Resolute they did, let alone that they changed their purchasing patterns as a result.  Further, Resolute's expert failed to consider alternative causes for any changes in customers' purchasing patterns.  For example, ████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████.  Ex. 57 ¶¶ 96-99.  This is precisely the kind of "mere conclusion" or "guess" about purported losses that does not satisfy special damages. *Erlich*, 224 Cal. App. 2d at 75.

*Third*, Resolute cannot prove any out-of-pocket costs associated with Project GATE or Project RICO, or any management diversion costs, were proximately caused by the Challenged Statements.  Resolute has failed for each category to even *attempt* to calculate the amount of damages flowing from the Challenged Statements alone, and instead simply offers the total costs that "wouldn't have been incurred but-for the Greenpeace Campaign," lumping in costs associated with responding to statements made by non-Defendants and statements other than the Challenged Statements.[25]   Ex. 48 (Murray) at 247:10-248:4; 249:14-18; 251:15-252:2; 254:4-255:5.   And

---

[24] Ex. 47 ¶ 263 ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████.

[25] Ms. Murray conceded these categories of costs included costs Resolute paid to litigate the Canadian Action, costs spent litigating the struck RICO claims in this case, and costs spent

39

Resolute has not offered any information specifying exactly what went into the Project GATE/Project RICO calculations, because its expert instead simply relied on numbers Resolute provided her, but failed to produce in fact discovery, making it impossible to test the costs. *Id.* at 257:8-259:23. Similarly, for the management diversion costs, Resolute's expert simply assigned each of 14 Resolute employees a percentage of purportedly diverted time (which remains the same year over year) and then multiplied that percentage by each employee's salary. Ex. 47 ¶¶ 364-373. This is not sufficient for special damages. *Nunes v. CNN,* 520 F. Supp. 3d 549, 561 (S.D.N.Y. 2021) (applying California law and explaining that a "general 'monetary demand stated in round numbers is generally not considered to reflect the specific damages required of special damages'" which instead require the plaintiff "explain what the damages comprise or how they are calculated").[26]

**E.   Resolute's UCL Claim Must Be Dismissed as Well.**

In the MTD Order, the Court made clear that Resolute failed "to state a claim for unfair competition, other than the instances of adequately pleaded defamation in 2016 and 2017," *i.e.*, the Challenged Statements. MTD Order at 10 n.7; *see also id.* at 26. Accordingly, because now, at the summary judgment stage, Resolute's defamation claim fails, the UCL claim based on the defamation claim too must fail. *See Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1064 (N.D. Cal. 2016) ("Plaintiff's UCL claim is tethered to the allegations stated for his other claims. . . . As those claims fail, so does the one for violation of the UCL"), *aff'd*, 700 F. App'x 588 (9th Cir. 2017); *see also Holomaxx Techs. v. Microsoft Corp.*, 783 F. Supp. 2d 1097, 1108 (N.D. Cal. 2011).

## V.   CONCLUSION

For the foregoing reasons, Defendants request that this Court grant their motion for summary judgment and dismiss the case.

Dated: December 19, 2022

---

counteracting statements by other ENGOs. Ex. 48 (Murray) at 247:10-248:4; 249:14-18; 251:15-252:2; 254:4-255:5.

[26] The rest of Resolute's theories are doomed because it has not quantified any purported damages associated with them, and instead claims it may produce testimony at trial supporting each, Ex. 47 ¶¶ 347-352, 387, which is insufficient for special damages. *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1113 (C.D. Cal. 2004) ("simply refer[ring] to an amount to be ascertained at trial" is not sufficient for special damages).

DAVIS WRIGHT TREMAINE LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DAVIS WRIGHT TREMAINE LLP

Respectfully submitted,

/s/ *Laura Handman*
Laura Handman (admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
Telephone:    (202) 973-4200
Facsimile:    (202) 973-4499
Email: laurahandman@dwt.com

*Attorneys for Defendants Greenpeace*
*International, Greenpeace, Inc., Daniel*
*Brindis, Amy Moas, and Rolf Skar*

41